UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

JEFFREY S. VAUGHN, individually and on :    Case No. 04 Civ. 8391 (DLC)
behalf of those Class Members similarly situated, :

              Plaintiff, :    **AFFIRMATION OF**
                  :    **BLAINE H. BORTNICK**

      -against- :

LEEDS, MORELLI & BROWN, P.C., LEEDS, :
MORELLI & BROWN, L.L.P., LEEDS & :
MORELLI, LEEDS, MORELLI & BROWN, :
PRUDENTIAL SECURITIES, INC., :
PRUDENTIAL FINANCIAL, INC., :
WACHOVIA CORPORATION, WACHOVIA :
SECURITIES, LLC, LENARD LEEDS, STEVEN :
A. MORELLI, JEFFREY K. BROWN, JAMES :
VAGNINI, FREDERIC DAVID OSTROVE, :
ROBERT JOHN VALLI, JR., :
DISCRIMINATION ON WALL STREET, INC. :
DISCRIMINATION ON WALL STREET, :
MANHATTAN, INC., JOHN DOES, 1-10 AND :
JANE DOES, 1-10 a fictitious designation for :
presently unknown licensed attorneys, :
professionals and/or unknown persons or entities,, :

             Defendants. :

------------------------------------------------------------- x

      Blaine H. Bortnick, an attorney duly admitted to practice in the courts of the

State of New York and the Southern District of New York, states under penalty of perjury:

      1.      I am a partner of Liddle & Robinson, L.L.P., attorneys for Plaintiff Jeffrey

S. Vaughn. This Affirmation is respectfully submitted in support of Plaintiff's Motion to

Lift the Stay and to Vacate an arbitration award rendered by a panel of the National

Association of Securities Dealers, Inc. ("NASD") in the arbitration proceeding entitled, *Jeffrey S. Vaughn v. Leeds, Morelli & Brown, P.C., Leeds, Morelli & Brown, L.L.P., Prudential Securities, Inc., et al.*, NASD Dispute Resolution Arbitration Number 06-00534.

      2.      Attached hereto as Exhibit A is a true and correct copy of the Award, dated May 10, 2007, and delivered to Petitioner on May 11, 2007.

      3.      Attached hereto as Exhibit B is a true and correct copy of a transcript of the arbitration hearing held on April 23, 2007.

      4.      Attached hereto are true and correct copies of all exhibits admitted into evidence by the parties at the arbitration hearing held on April 23, 2007.

          a.  Attached as Exhibit C is a true and correct copy of Claimant's Exhibit 1, the Opinion and Order of this Court, dated August 12, 2005.

          b.  Attached as Exhibit D is a true and correct copy of Claimant's Exhibit 2, the September 5, 2006 Transcript of Proceedings in *Vaughn v. Leeds, Morelli & Brown, P.C., et al.,* S.D.N.Y. Case No. 04 Civ. 08391 (DLC).

          c.  Attached as Exhibit E is a true and correct copy of Claimant's Exhibit 3, the Settlement Agreement and General Release entered into on October 27, 1998.

          d.  Attached as Exhibit F is a true and correct copy of Respondents' Exhibit 1, Mr. Vaughn's retainer agreement with Leeds & Morelli, Esqs., dated January 5, 1998.

e.  Attached as Exhibit G is a true and correct copy of Respondents'

Exhibit 2, a letter from Jeffrey S. Vaughn to Jeffrey K. Brown.

Dated: New York, New York
       August 2, 2006


_____
BLAINE H. BORTNICK

Award
NASD Dispute Resolution

In the Matter of the Arbitration Between:

Jeffrey S. Vaughn (Claimant) vs. Leeds, Morelli & Brown, P.C., Leeds Morelli & Brown, L.L.P., Prudential Securities, Inc., Leeds & Morelli, Leeds Morelli & Brown, Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown, Prudential Financial, Inc., James Vagnini, Frederic Ostrove, John Robert Valli, Jr., Discrimination on Wall Street, Inc., and Discrimination on Wall St. Manhattan, Inc. (Respondents)

Case Number:    06-00534            Hearing Site: New York, New York

Nature of the Dispute:  Associated Person vs. Member, and Non-Members.

## REPRESENTATION OF PARTIES

Claimant Jeffrey S. Vaughn hereinafter referred to as "Claimant":  Blaine H. Bortnick Esq., and Jeffrey S. Liddle, Esq., Liddle & Robinson, L.L.P, New York, NY.

Respondents Leeds, Morelli & Brown, P.C. ("Leeds P.C."), Leeds Morelli & Brown, L.L.P ("Leeds L.L.P"), Leeds & Morelli ("Leeds & Morelli"), Leeds Morelli & Brown ("Leeds Morelli & Brown"), Lenard Leeds ("L. Leeds"), Steven A. Morelli ("S. Morelli"), Jeffrey K. Brown ("Brown"), James Vagnini ("Vagnini"), Frederic David Ostrove ("Ostrove"), and John Robert Valli, Jr. ("Valli"), hereinafter referred to as "Leeds Respondents":  Shari Clare Lewis, Esq., Rivkin Radler LLP, Uniondale, NY.

Respondent Prudential Equity Group, LLC ("PEG"), and Prudential Financial, Inc. ("PFI") hereinafter referred to as "Prudential Respondents" :  Gerard E. Harper, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

Respondent Discrimination on Wall Street, Inc. ("Discrimination Inc.") did not enter an appearance in this matter.
Respondent Discrimination on Wall St. Manhattan, Inc. ("Discrimination Manhattan") did not enter an appearance in this matter.

## CASE INFORMATION

Statement of Claim filed on or about:  February 2, 2006.
Claimant signed the Uniform Submission Agreement:  February 2, 2006.

Joint Statement of Answer filed by Leeds Respondents on or about:  September 15, 2006.
Leeds P.C. signed the Uniform Submission Agreement:  September 15, 2006.
Leeds L.L.P signed the Uniform Submission Agreement:  September 15, 2006.
Leeds & Morelli signed the Uniform Submission Agreement:  September 15, 2006.
Leeds Morelli & Brown signed the Uniform Submission Agreement:  September 15, 2006.
L. Leeds signed the Uniform Submission Agreement:  September 15, 2006.

S. Morelli signed the Uniform Submission Agreement:  September 15, 2006.
Brown signed the Uniform Submission Agreement:  September 15, 2006.
Vagnini signed the Uniform Submission Agreement:  September 15, 2006.
Ostrove signed the Uniform Submission Agreement:  September 15, 2006.
Valli signed the Uniform Submission Agreement:  September 15, 2006.

Joint Statement of Answer submitted by PEG and PFI on or about:  September 15, 2006.
PEG signed the Uniform Submission Agreement:  September 15, 2006.
PFI did not sign the Uniform Submission Agreement.

Discrimination Inc. did not file an Answer or sign the Uniform Submission Agreement.

Discrimination Manhattan did not file an Answer or sign the Uniform Submission Agreement.

## CASE SUMMARY

Claimant asserted the following cause of action:  violations of NASD rules.

Unless specifically admitted in their Answer, Leeds Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in their Answer, Prudential Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimant requested that the Panel issue an order declaring that Claimant may pursue his class action claims against Respondents in court, reimbursement of his filing fees, costs, and attorneys' fees, and that disciplinary action be brought against the Prudential Respondents.

Leeds Respondents requested dismissal of the Statement of Claim in its entirety.

Prudential Respondents requested dismissal of the Statement of Claim in its entirety, attorneys' fees, and costs.

## OTHER ISSUES CONSIDERED AND DECIDED

Respondents Discrimination on Wall Street, Inc., and Discrimination on Wall Street, Manhattan, Inc., did not file with NASD Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the terms of a Settlement Agreement dated October 27, 1988 and, are bound by the determination of the Panel on all issues submitted.

Upon review of the file and the representations made by the Claimant, the undersigned arbitrators (the "Panel") determined that Respondents Discrimination on Wall Street, Inc., and Discrimination on Wall Street, Manhattan, Inc., have been properly served with

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 3 of 5

the Statement of Claim and received due notice of the hearing, and that arbitration of the matter would proceed without said Respondents present, in accordance with the NASD Code of Arbitration Procedure (the "Code").

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims are dismissed in their entirety; the Settlement Agreement, dated October 27, 1998 precludes Claimant from bringing a Class Action in court.

2. Any and all relief not specifically addressed herein is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | Waived |

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, Prudential Equity Group, LLC is a party.

| | |
|---|---|
| Member surcharge | = $1,500.00 |
| Pre-hearing process fee | = $  750.00 |
| Hearing process fee | = $2,200.00 |

### Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted or each decision rendered on either a discovery-related motion on the papers or a contested motion for the issuance of a subpoena. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with Panel @ $1,000.00 | | | = $2,000.00 |
| Pre-hearing conferences: | December 7, 2006 | 1 session | |
| | March 20, 2007 | 1 session | |
| One (1) Hearing session @ $1,000.00 | | | = $1,000.00 |
| Hearing Date: | April 23, 2007 | 1 sessions | |
| Total Forum Fees | | | = $3,000.00 |

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 4 of 5

1. The Panel has assessed $3,000.00 of the forum fees jointly and severally to PEG and Leeds P.C.

## Fee Summary

1. PEG is solely liable for:

| | |
|---|---|
| Member Fees | = $4,450.00 |
| Total Fees | = $4,450.00 |
| Less payments | = $4,450.00 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

2. PEG and Leeds P.C. are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $3,000.00 |
| Total Fees | = $3,000.00 |
| Less payments | = $     0.00 |
| Balance Due NASD Dispute Resolution | = $3,000.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

NASD REGULATION

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lewis S. Kurlantzick | - | Public Arbitrator, Presiding Chairperson |
| Nathan M. Lubow | - | Public Arbitrator |
| Doris Lindbergh, Esq. | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_Lewis S. Kurlantzick_
Lewis S. Kurlantzick
Public Arbitrator, Presiding Chairperson

5/1/07
Signature Date

Nathan M. Lubow
Public Arbitrator

Signature Date

Doris Lindbergh, Esq.
Non-Public Arbitrator

Signature Date

May 10, 2007
Date of Service  (For NASD Dispute Resolution use only)

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

Lewis S. Kurlantzick          -          Public Arbitrator, Presiding Chairperson
Nathan M. Lubow               -          Public Arbitrator
Doris Lindbergh, Esq.         -          Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____
Lewis S. Kurlantzick
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Nathan M. Lubow
Public Arbitrator

5/7/07
_____
Signature Date

_____
Doris Lindbergh, Esq.
Non-Public Arbitrator

_____
Signature Date

May 10, 2007
_____
Date of Service  (For NASD Dispute Resolution use only)

TOTAL P.06

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

Lewis S. Kurlantzick         -         Public Arbitrator, Presiding Chairperson
Nathan M. Lubow              -         Public Arbitrator
Doris Lindbergh, Esq.        -         Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____                                    _____
Lewis S. Kurlantzick                                        Signature Date
Public Arbitrator, Presiding Chairperson



_____                                    _____
Nathan M. Lubow                                             Signature Date
Public Arbitrator


_____                                    May 3 2007
Doris Lindbergh, Esq.                                       Signature Date
Non-Public Arbitrator


__May 10, 2007_____
Date of Service  (For NASD Dispute Resolution use only)

[Page 1]

ARBITRATION PROCEEDINGS

AMERICAN ARBITRATION ASSOCIATION

------------------------------------------X

In the Matter of the

Arbitration between

JEFFREY S. VAUGHN,

        Claimant,

     -and-

LEEDS, MORELLI & BROWN, P.C.,

LEEDS, MORELLI & BROWN, LLP,

PRUDENTIAL SECURITIES INC.,

et al.,

        Respondents.

------------------------------------------X

           One Liberty Plaza

           New York, New York

           Monday, April 23, 2007

B E F O R E:

   LEWIS KURLANTZICK, Chairman

   NATHAN LUBOW, ARBITRATOR

   DORIS LINDBERGH, ARBITRATOR

Reported by:

William Byrne

| | |
|---|---|
| 1 | 1 |
| 2  A P P E A R A N C E S: | 2  P R O C E E D I N G S |
| 3  For the Claimant: | 3  THE CHAIRMAN:  This is the |
| 4  LIDDLE & ROBINSON, ESQS. | 4  hearing of April 23, 2007 NASD case |
| 5  800 Third Avenue | 5  0600534 Jeffrey S. Vaughn versus |
| 6  New York, New York 10022 | 6  Leeds Morelli & Brown et al.  We are |
| 7  BY:  BLAINE H. BORTNICK, ESQ. | 7  going to start with the introduction |
| 8  REBECCA A. SAENGER, ESQ. | 8  of the arbitration panel.  I am the |
| 9 | 9  chairman, Lewis Kurlantzick. |
| 10  For the Respondent: | 10  ARBITRATOR LUBOW:  Nathan |
| 11  PAUL, WEISS, RIFKIND, WHARTON & GARRISON, ESQS. | 11  Lubow, the arbitrator. |
| 12  1285 Avenue of the Americas | 12  ARBITRATOR LINDBERGH:  Doris |
| 13  New York, New York 10018 | 13  Lindbergh, the arbitrator. |
| 14  BY:  GERARD E. HARPER, ESQ. | 14  THE CHAIRMAN:  I have no |
| 15  LIZA M. VELAZQUEZ, ESQ. | 15  additional disclosures to make at |
| 16  SAMUEL M. SHELDON, ESQ. | 16  this point. |
| 17 | 17  ARBITRATOR LINDBERGH:  I have |
| 18  For the Respondent: | 18  no disclosures. |
| 19  Leeds Morelli & Brown | 19  ARBITRATOR LUBOW:  I have no |
| 20  RIVKIN RADLER, ESQ. | 20  disclosures to make. |
| 21  EAB Plaza Uniondale | 21  THE CHAIRMAN:  We will go |
| 22  New York 11556 | 22  around the room and if everybody |
| 23  BY:  SHARI CLAIRE LEWIS, ESQ. | 23  would indicate your name and your |
| 24 | 24  relationship to the parties, please. |
| 25 | 25  MR. VAUGHN:  Jeffrey Vaughn, |
| [Page 2] | [Page 4] |
| 1  ALSO PRESENT: | 1 |
| 2  KENNETH THYNE, ESQ. | 2  the claimant in this arbitration. |
| 3  JULIA HENICK RIGBY, ESQ. | 3  MR. BORTNICK:    Blaine |
| 4 | 4  Bortnick, I am with the law firm of |
| 5 | 5  Liddle & Robbinson.  With me today |
| 6 | 6  is my colleague Robin Saenger.  I |
| 7 | 7  represent the claimant in this |
| 8 | 8  action. |
| 9 | 9  Present in the room today, is |
| 10 | 10  Mr. Kenneth Thyne, who is also |
| 11 | 11  counsel for Mr. Vaughn.  Also Mr. |
| 12 | 12  Vaughn's wife is sitting there in |
| 13 | 13  the back, she is not a participant. |
| 14 | 14  MS. LEWIS:  My name is Shari |
| 15 | 15  Lewis, and I am from the law firm of |
| 16 | 16  Rivkin Radler.  I represent the |
| 17 | 17  respondent Leeds Morelli & Brown in |
| 18 | 18  this action. |
| 19 | 19  MR. HARPER:  My name is |
| 20 | 20  Gerard Harper.  I am from the law |
| 21 | 21  firm of from Paul Weiss Rifkind |
| 22 | 22  Wharton & Garrison.  I represent |
| 23 | 23  Prudential Securities, the |
| 24 | 24  respondent.  And with me are my |
| 25 | 25  colleagues Liza Velazquez and Samuel |
| [Page 3] | [Page 5] |

[2]  (Pages 2 to 5)

1
2    Sheldon as well as a representative
3    of my client Julia Rigby who is the
4    assistant general counsel, and I
5    have a paralegal here as well.
6        THE CHAIRMAN:  Do you have
7    any objection to Ms. Vaughn being
8    present during the proceeding?
9        MR. HARPER:  I don't.
10       THE CHAIRMAN:  We need to at
11   this point to obtain conformation
12   from the parties or the
13   representatives of the their
14   acceptance of the panel's
15   composition.
16       MR. BORTNICK:  Yes, we accept
17   for the claimant.
18       MS. LEWIS:  Yes, we accept.
19       MR. HARPER:  Prudential
20   Securities accepts for the
21   respondent.
22       THE CHAIRMAN:  We have
23   submitted our properly executed
24   oaths of arbitrators to the NASD
25   dispute resolution staff.  This
                              [Page 6]

1
2    controversy has been submitted to
3    the panel for hearing in accordance
4    with the Code of Arbitration
5    Procedure.
6        The panel is authorized to
7    determine each of the matters set
8    forth in the parties' statements and
9    filed with the NASD dispute
10   resolution unless the law directs
11   otherwise.  All the awards rendered
12   pursuant to the code will be final
13   and will not be subject to an
14   appeal.
15       We would appreciate it if no
16   interruptions are made during an
17   individual's testimony.  Parties are
18   entitled to make objections, cross
19   examine and redirect witnesses, and
20   the arbitrators may ask questions as
21   they deem appropriate.
22       The submission of the matter
23   to arbitration will not preclude any
24   right of the NASD that it otherwise
25   would be authorized to adopt,
                              [Page 7]

1
2    administer or enforce.  If any
3    matter comes to the attention of the
4    panel during this panel's
5    participation in this proceeding
6    that this panel has reason to
7    believe may constitute a violation
8    of the association rules or the
9    federal securities laws, the panel
10   may initiate a referral of the
11   matter to the association for
12   disciplinary investigation.
13       If we make any such referral
14   it will only be initiated after this
15   dispute has been either settled or
16   otherwise disposed of or after a
17   final award has been rendered.
18       We have been selected to serve
19   as neutral arbitrators to decide the
20   matter, we are not NASD dispute
21   resolution employees.  Pursuant to
22   Canon 1 of the ABA, AAA Code of
23   Ethics we as neutral arbitrators
24   have the duty of conducting this
25   proceeding with fairness and
                              [Page 8]

1
2    integrity.  That duty extends to all
3    parties and to this process,
4    therefore, on behalf of the panel I
5    respectfully request that all
6    parties and their counsel or
7    representatives refrain from
8    engaging in any conversations or
9    contact with the panel members
10   except within this room and in the
11   presence of all parties' counsel or
12   representatives.
13       We thank you for your
14   anticipated cooperation in that
15   respect.
16       I need to now administer the
17   oath to those who are or are likely
18   to be witnesses.  I don't know who
19   they are.  I assume Mr. Vaughn, and
20   I don't know whether that includes
21   Mr. Morelli but if it does please
22   raise your right hand.
23       (The chairman swore in the
24   proposed witnesses: Mr. Vaughn and
25   Mr. Morelli.)
                              [Page 9]

1
2        THE CHAIRMAN:  The arbitrators
3   have read the pleadings that have
4   been submitted by the parties.
5   These papers along with executed
6   submission agreements will be marked
7   and received into evidence as
8   Arbitrator's Exhibit 1.  We intend
9   to take a break midmorning,
10  midafternoon and for lunch.
11  However, if any of the participants
12  have need to take a break at any
13  other time or for any other reason
14  please let us know, and we will be
15  happy to cooperate with you.
16       Each party may make an opening
17  statement.  It should be limited to
18  what the parties intend to prove and
19  should not be a presentation of the
20  evidence or of the merits of the
21  case with respect to documentary
22  evidence.  That evidence will be
23  marked for identification shown to
24  the opposing parties for review and
25  possible objection to its
                              [Page 10]

1
2   been killed in support of that
3   effort, but it all boils down to one
4   thing what was the intention of the
5   parties to the settlement agreement,
6   when Mr. Vaughn signed a September
7   agreement back in October of 1998
8   where he settled his matter with
9   Prudential Securities.  That's all.
10       The agreement contains an
11  arbitration clause, and the
12  arbitration clause says any dispute
13  arising out of the agreement shall
14  be arbitrated pursuant to the rules
15  of the New York Stock Exchange or
16  the NASD.  Both forms have the exact
17  same rule.  For purposes of the NASD
18  we are talking about the rule that
19  prohibits class actions from being
20  arbitrated and, in fact, furthermore
21  as pointed out in the statement of
22  claim that industry parties such as
23  Prudential are in fact prohibited
24  from enforcing agreements to compel
25  arbitration at the NASD of class
                              [Page 12]

1   admissibility.
2        The panel will rule on any
3   objections asserted and determine
4   whether the document will be
5   received in evidence. The parties
6   and attorneys are responsible for
7   providing copies of all proposed
8   exhibits to the other parties and to
9   the panel.  Parties are encouraged
10  to avoid repetitive arguments and
11  parties and counsel please direct
12  all objections to the panel and not
13  to each other.
14       We are now ready for the
15  parties' opening statements
16  beginning with the claimant.
17       MR. BORTNICK:  Good morning.
18  We are here for what I hope is going
19  to be a very short hearing because
20  we are here to decide just one issue
21  as directed by the federal court.  I
22  know that the panel has seen
23  briefing upon briefing upon
24  briefing, and lots of trees have
25                              [Page 11]

1   action claims.  That's why we have,
2   for example, class actions that are
3   dealing with securities, fraud and
4   so forth.
5        Typically, as I'm sure this
6   panel well knows if somebody has a
7   typical customer case they have to
8   arbitrate it, but class actions are
9   heard in court.  There are the
10  arbitration agreements when a
11  customer signs up with a company
12  like Prudential or Merrill Lynch or
13  anywhere else.
14       The same thing here.  We have
15  an arbitration clause it doesn't
16  include class actions, nevertheless,
17  the federal court has sent to
18  arbitration the question of the
19  meaning of the arbitration clause.
20       Now the court suggested there
21  are three possible interpretations.
22  One of which I think everybody
23  probably agrees in the room, at
24  least from the parties' side it
25                              [Page 13]

[4]  (Pages 10 to 13)

1
2  doesn't apply, which would be that
3  you could have a class arbitration.
4      I'm certain that Mr. Friedman
5  would never allow a class
6  arbitration to go forward with the
7  NASD. The NASD is simply not
8  equipped to handle a class action.
9  So the question is whether Mr.
10 Vaughn intended to waive his rights
11 to bring a class action when he
12 signed the settlement agreement.
13     You will hear Mr. Vaughn
14 testify today, the answer is clearly
15 no. And that will basically be all
16 the evidence you are going to hear.
17 Mr. Vaughn's testimony is going to
18 be short, and I'm interested to see
19 what the defense will be, but we
20 will find out. And that's it.
21     In conclusion of the hearing,
22 which I don't even think should go
23 beyond the morning, I think it will
24 be clear that Mr. Vaughn did not
25 intend to waive class action, his

[Page 14]

1
2  Chairman. Good morning, and thank
3  you for agreeing to serve.
4      I feel something like deja vu
5  all over again because we have made
6  this argument and heard Mr. Bortnick
7  make this argument over and over
8  again.
9      Let me give you a timeline
10 here, just briefly. Mr. Vaughn
11 entered into a retainer agreement
12 with what was then Leeds Morelli in
13 January of 1998 and he agreed in
14 that retainer agreement to pay a
15 legal fee and Leeds Morelli agreed
16 to attempt to negotiate a
17 settlement.
18     Mr. Vaughn went through a
19 process that we will hear about, and
20 he asked for $200,000 from
21 Prudential Securities and an
22 extension of his Cobra rights. And
23 he got $200,000 and an extension of
24 his Cobra rights. And so he got
25 every nickel he asked for in the

[Page 16]

1
2  rights to bring a class action, and
3  as such his class action against
4  Prudential and by extension Leeds
5  Morelli & Brown should go back to
6  court.
7      Leeds Morelli & Brown is here
8  only because even though they are
9  not a party to the agreement the
10 federal court ruled they get the
11 benefit of whatever the arbitration
12 clause is and how it is interpreted
13 as a codefendant with Prudential.
14     They are here even though they
15 are not a party to the settlement
16 agreement, but because they actually
17 are a codefendant in the class
18 action and, therefore, get the
19 benefits, to the extent there are
20 any benefits of an arbitration
21 clause that Prudential Securites
22 gets.
23     Thank you.
24     THE CHAIRMAN:  Proceed.
25     MR. HARPER:  Thank you, Mr.

[Page 15]

1
2  mediation.
3      Almost six years to the day of
4  when he executed that settlement
5  there arrives a class action with
6  Mr. Vaughn's name on the north side
7  of a caption and a bunch of names on
8  the south side of the caption
9  including my client. So we made
10 pursuant to the rules that permit us
11 to make it under the NASD rules,
12 specifically permit us in that
13 circumstance to go into court and
14 compel that he arbitrate pursuant to
15 an arbitration clause that was in
16 the settlement agreement.
17     And in response to that motion
18 to compel my friend, Mr. Bortnick,
19 made exactly the arguments that he
20 is making today. He made exactly
21 the argument that the NASD rules
22 forbid me to do what I did; he made
23 exactly that -- he argued that the
24 rules of the NASD expressly and
25 unambiguously state that a claim

[Page 17]

[5]  (Pages 14 to 17)

1
2  submitted as a class action is not
3  eligible for arbitration.
4      Simply put because they are
5  not eligibile for arbitration this
6  court is the appropriate forum.  It
7  is beyond doubt that the NASD
8  prohibits the submission of claims
9  and so, therefore, under those rules
10 this court cannot compel an
11 arbitration.
12     That is what Mr. Vaughn argued
13 in front of Judge Coate and Judge
14 Coate responded that the arbitration
15 clause in the agreement contains
16 sweeping languag concerning the
17 scope of the questions commited to
18 arbitration, as it commits to
19 arbitration any claim or controversy
20 arising out of or related to the
21 this agreement, meaning the
22 settlement agreement or even the
23 interpretation thereof.
24     And Vaughn claims that the
25 arbitration clause is inconsistent

[Page 18]

1
2  with the rules of the NASD, but this
3  interpretation contradicts the clear
4  statement that the arbitration
5  clause applies to any claim.  Even
6  assuming that Mr. Vaughn was right
7  and the applicable arbitration
8  rulings do apply and indeed forbid
9  class arbitration, that it would be
10 plausible to interpret the
11 arbitration clause required that all
12 the claims be arbitrated and to
13 disallow class action with no
14 further qualifications or caveats.
15     The next thing that happened
16 was that Mr. Vaughn filed a claim
17 identical to the claim he has filed
18 here with the New York State Stock
19 Exchange.  And the New York State
20 Stock Exchange has a rule that it
21 will not exercise jurisdiction.  It
22 is a plain black and white
23 rule certainly known to my friend
24 Mr. Bortnick who spends more time in
25 these halls than I do and in the New

[Page 19]

1
2  York State Stock Exchange than I do,
3  that you can't, it doesn't have
4  jurisdiction over parties other than
5  members.  And Mr. Vaughn had named
6  Leeds Morelli and a bunch of lawyers
7  from that firm and a bunch of John
8  Does and so forth.
9      So the New York Stock Exchange
10 said we have no jurisdiction over
11 this claim.  And so back to court
12 goes Mr. Vaughn and Mr. Bordnick.
13 And once more they make exactly the
14 same arguments that they are making
15 now to this panel, and that they had
16 previously made to Judge Coate.
17     So we went to Judge Coate and
18 said -- they went to the one flora
19 that won't hear claims against
20 nonmembers but the NASD does, so go
21 to the NASD.  And in that Judge
22 Coate again sent Mr. Vaughn off to
23 arbitration in December of '05.  And
24 then in May of '06, five months
25 later or so, Mr. Vaughn files once

[Page 20]

1
2  again an identical piece of paper
3  saying the rules of the NASD forbid
4  class actions, therefore, the
5  promise I made to arbitrate my claim
6  is invalid as to my class action
7  complaint, which is exactly the
8  argument that he had made to Judge
9  Coate the first time and the second
10 time.
11     And so we went into Judge
12 Coate.  We said, Judge Coate, he is
13 asking you ladies and gentlemen to
14 be the Second Circuit and to
15 overrule your ruling.  And one of
16 the interesting things that Judge
17 Coate said was that she had before
18 her three documents.  She had before
19 her the original letter to the NA --
20 rather to the New York State Stock
21 Exchange setting forth the statment
22 of claim and the description
23 following the ruling that she had
24 made.
25     Second she had before her the

[Page 21]

[6] (Pages 18 to 21)

1
2  claim, the statement of claim in
3  this case, which again describes in
4  detail or purports to, the issue
5  before this panel and the ruling and
6  intention of Judge Coate.
7       Finally, she had before her a
8  letter that was from Ms. Saenger on
9  behalf of Mr. Vaughn, that says that
10 because we've gotten the lists with
11 your names on them among others, and
12 that the letter says the skills and
13 knowledge options listed in the
14 terms regarding the arbitration
15 selection process do not match the
16 issue before the NASD in this case.
17      Mr. Vaughn's statement of
18 claim presents a very narrow issue
19 of whether he waived his right to a
20 class action by signing the
21 settlement agreement with Prudential
22 Securities.  Therefore, we request
23 an arbitration possessing knowledge
24 of the law of arbitration.  And to
25 that comment on September when we
                              [Page 22]

1
2       And I think, said Judge Coate,
3  the presentation of the legal issue
4  in those letters is inaccurate and
5  misleading.
6       So we are just -- where does
7  that leave us?  I think what it
8  leaves us with is that -- and I'll
9  make it now in an opening statement
10 rather than later on interrupt the
11 testimony -- I object, if I could do
12 it now, to any testimony from Mr.
13 Vaughn.
14      First, on the grounds there is
15 no parole evidence permissible here
16 because the contract is clear and
17 unambiguous.
18      Second, because the whole
19 thrust of his testimony, as Mr.
20 Bortnick describes it, is that he
21 wants to go back to court to
22 litigate his claim.  And that has
23 already been adjudged something he
24 cannot do by Judge Coate.
25      Third, it is an integrated
                              [Page 24]

1
2  went into court, and asked Judge
3  Coate what is going on here, she
4  said a couple of interesting things.
5       She said, first, claimant
6  clearly agreed to arbitration of his
7  claims and I ruled that the
8  arbitration agreement was valid and
9  enforceable, and that legally was
10 not in dispute.  In other words,
11 under Judge Coate's ruling there is
12 no -- as a matter of law Mr. Vaughn
13 must arbitrate his individual claim.
14      She then said in connection
15 with the order to show cause you
16 have been given a set of documents
17 that include some of the plaintiff's
18 submissions to the stock exchange
19 and to the NASD including a February
20 and October 28th letter to the stock
21 exchange, a February 2nd letter,
22 a statement of claim to the NASD,
23 and the August 15, 2006 letter to
24 the NASD, the one I just read from
25 involving the arbitration.
                              [Page 23]

1
2  agreement as to which parole
3  evidence as to one portion or
4  another portion is prohibited.
5       Fourth, because the standard
6  or the argument that is being -- the
7  evidence that is being offered for,
8  is that Mr. Vaughn did not give a
9  knowing and voluntary waiver of his,
10 quote, right to a class action.
11      Well, the lawyers in the room
12 are familiar with the concept of
13 knowing and voluntary waiver and
14 what it applies to is substantive
15 rights.  If I'm going to waive my
16 right to a privilege against
17 self-incrimination, my waiver of
18 that right must be known and
19 voluntary.  But there are scores of
20 cases, and we cite them that say
21 that a waiver of a right to class
22 action is simply a waiver of a
23 procedural means by which a
24 substantive right is adjudicated,
25 and that the class action itself is
                              [Page 25]

1 
2 not a substantive right.
3     And so, therefore, the
4 standard of knowing involuntary
5 waiver has nothing to do with the
6 enforceability of an arbitration
7 agreement.
8     The argument that the claimant
9 is making here is that he doesn't
10 have to arbitrate his claim, and he
11 is seeking a declaratory judgment
12 from you to that effect. He does
13 not even plead what his claim is.
14 In other words, there is no
15 grievance he brings before you other
16 than that he doesn't want to
17 arbitrate, which is exactly what
18 Judge Coate said he must do.
19     And if you read Judge Coate's
20 September 5th transcript of '06, she
21 warns Mr. Bortnick, she warned Mr.
22 Bortnick that if he failed to file a
23 claim that lacked the underlying
24 grievance here, the grievance
25 alleged in the class action, that
[Page 26]

1 
2 Mr. Vaughn would forever waive and
3 be barred from asserting that claim
4 and --
5     MR. BORTNICK: I'm going to
6 object. That is not flat-out untrue
7 what she said. I have never, I
8 don't think I can remember objecting
9 to an opening statement but that is
10 flat-out untrue, and I know what
11 occurred because she was talking
12 about an ethical issue and she
13 wanted to make sure Mr. Vaughn
14 understood that if he lost in this
15 forum on this issue and he didn't
16 submit an individual claim then it
17 was gone. But it was never about
18 the fact that if he won in this, it
19 was always understood he would have
20 his claim in court and I strongly
21 object to that.
22     MR. HARPER: I've never
23 interrupted an opening statement in
24 my life, and I thought your
25 instruction --
[Page 27]

1 
2     THE CHAIRMAN: Perhaps you
3 were not so offended.
4     MR. HARPER: I don't offend
5 easily, when you have been at this a
6 while.
7     THE CHAIRMAN: Why don't you
8 move on.
9     MR. HARPER: I'm reading from
10 the judge's statement, page 5 now.
11     Now should Mr. Vaughn decide
12 that he doesn't want to submit an
13 individual claim to the arbitration
14 proceeding I expect, and I'm not
15 going to get a ruling on this now
16 but that he can't get a second bite
17 at the apple, and I see plaintiff's
18 counsel nod in agreement, that a
19 forfeiture or waiver rules or res
20 judicata would apply, and that's it.
21     He had an opportunity to
22 arbitrate the claim. Again, we are
23 playing within our hypothetical, he
24 didn't arbitrate it and end of the
25 story. Mr. Bortnick can read into
[Page 28]

1 
2 that whatever he wants. I read it,
3 I think it is pretty clear and so
4 I'll end as I began.
5     This is now the fourth or
6 fifth time I have been in front of
7 decision makers saying that Mr.
8 Vaughn promised to arbitrate, and he
9 is here. And Judge Coate said that
10 that's why he must arbitrate, it is
11 legal and enforceable and he must
12 arbitrate his individual claim.
13     And what Mr. Bortnick and Mr.
14 Vaughn are here to solicit from the
15 panel is a ruling he need not
16 do so. And with the utmost respect
17 to this panel, the panel has no
18 right to do that.
19     THE CHAIRMAN: Thank you, Mr.
20 Harper.
21     MS. LEWIS: Thank you. I
22 would like to thank you all for your
23 time today. I would like to start
24 first directing your attention to
25 what I hope will be an easily
[Page 29]

[8] (Pages 26 to 29)

1
2  disposed of matter, and that's the
3  bad faith inclusion of claims
4  against the individual respondent in
5  this proceeding.
6       Separate and apart from the
7  arbitration ruling in the decision
8  by Judge Coate filed on March 20,
9  2006, which is annexed to our
10  submission as Exhibit G by Judge
11  Coate determined that the individual
12  respondents named in this procedure
13  were dismissed from the case not
14  because of the arbitration clause
15  but because of the lack of
16  jurisdiction. And in response to a
17  cross-motion to extend their time to
18  serve these defendants in that
19  matter, the court indicated that the
20  plaintiff had shown a complete
21  disregard and disinterest in getting
22  them in as parties in this action.
23       So whether or not or whatever
24  this panel concludes as to the
25  arbitrability of this matter, these
                                    [Page 30]

1
2  but those individuals should be
3  given all costs that they incurred
4  in defending what was brought from
5  nothing more than intimidation.
6  That's the first part. And again
7  because there has been no opposition
8  to that application, I presume that
9  that looking at this decision,
10  looking at the submissions by the
11  parties, that can be fairly easily
12  determined.
13       The remainder of the
14  application that applies to this
15  declaratory judgment for permission
16  to go back, which would apply
17  against the law firm or potentially
18  and one of the respondents, I
19  certainly join in the able argument
20  that was put forward by Mr. Harper
21  in terms of what has already been
22  determined by Judge Coate. There is
23  a requirement under the law that if
24  we are going to eviscerate an
25  arbitration provision, it has to be
                                    [Page 32]

1
2  respondents cannot be sent back to
3  federal court. With due deference
4  to this panel there is simply no
5  authority for you to overrule the
6  jurisdictional determination of a
7  federal court that there is no
8  jurisdiction over these individuals.
9       That defense was included in
10  the answer served by the individual
11  respondent. It was fully brieved in
12  the moving papers. It was ignored
13  in the opposition by the claimant
14  and required our reply, when not
15  given multiple opportunities no
16  possible basis has or can be
17  advanced for including these
18  individual defendants and they have
19  been dismissed from the federal
20  action in an application for
21  declaratory judgment saying that
22  they can go back to court against
23  them.
24       And I would submit to you that
25  not only should they be dismissed
                                    [Page 31]

1
2  said with positive assurance that
3  the parties did not intend to the
4  matter to be submitted for
5  arbitration.
6       The only thing that we can say
7  with positive assurance in this case
8  is based upon the facts that there
9  is a settlement clause in the
10  settlement agreement that applies to
11  this dispute that requires any claim
12  or controversy regarding the
13  agreement or its interpretation to
14  be determined by arbitration under
15  the rules of either the NASD or the
16  New York State Stock Exchange.
17       Now, any claim or dispute --
18  excuse me, any claim or controversy
19  is self-evident as to its meaning on
20  its face. And any effort to
21  introduce testimony contrary to the
22  clear meaning of any claim or
23  controversy must be arbitrated is
24  impermissible under the standard
25  contract interpretation laws and
                                    [Page 33]

[9]  (Pages 30 to 33)

| | |
|---|---|
| 1 | 1 |
| 2  against established policy which | 2  the meaning or even address the |
| 3  requires positive assurance that | 3  meaning of a clear phrase in the |
| 4  something is not included, but we | 4  contract would make all contracts |
| 5  have even more positive assurance | 5  unenforceable. Because everybody |
| 6  here based upon Judge Coate's | 6  could come in and say, oh, I changed |
| 7  decision that said no matter what | 7  my mind and what I really intended |
| 8  else, the first decision, her | 8  was this or that. It is just here |
| 9  statement on the record later on, no | 9  the language is so clear based upon |
| 10  matter what else Mr. Vaught's | 10  the agreement, which I suggest is |
| 11  individual claims must be | 11  the piece of evidence in this case. |
| 12  arbitrated. | 12  It would be inappropriate. That's |
| 13      She said there were three | 13  all I have to say right now. |
| 14  other possibilities, as Mr. Bortnick | 14      THE CHAIRMAN: Thank you, Ms. |
| 15  said which all agree that one of | 15  Lewis. |
| 16  them is not likely, that the NSAD | 16      We are ready for the |
| 17  will take a class arbitration. | 17  presentation of evidence starting |
| 18      The other two options that she | 18  with the claimant. |
| 19  recognized as plausible did not | 19      MR. BORTNICK: Thank you, I |
| 20  include Mr. Vaughn going back on his | 20  call Mr. Vaughn. |
| 21  individual claim. | 21      MR. HARPER: I take it for |
| 22      And the next thing that we | 22  the record, Mr. Chair, that you have |
| 23  have positive assurance about and we | 23  overruled my objection. |
| 24  have it because in their submission | 24      THE CHAIRMAN: No, I want to |
| 25  Mr. Vaughn stated that his | 25  to hear what he has to say before |
|      [Page 34] |      [Page 36] |

| | |
|---|---|
| 1 | 1 |
| 2  individual claim was identical to | 2  and I also want to hear from the |
| 3  and part of the class action claim, | 3  other side. It is not no one has |
| 4  that there is nothing that's | 4  responded to your argument. |
| 5  fictionally out there as a class | 5      MR. HARPER: Fine, I beg your |
| 6  action that he can go back for, back | 6  pardon. |
| 7  to court on and still arbitrate as | 7      MR. BORTNICK: At this time I |
| 8  an individual claim because they are | 8  think it it is probably easier if I |
| 9  one and the same. | 9  just introduce the first three |
| 10      So clearly what we have, and I | 10  exhibits before we get going with |
| 11  think part of the issue here, is | 11  Mr. Vaughn. |
| 12  that Mr. Vaughn is asking, framing | 12      THE CHAIRMAN: Fine. |
| 13  the wrong question, it is not | 13      MR. BORTNICK: Exhibit Number |
| 14  whether, as Mr. Harper suggested | 14  1 is going to be the opinion and |
| 15  there is intentional waiver of the | 15  order of Judge Coate dated August |
| 16  class action but whether or not the | 16  12, 2005. |
| 17  parties intended Mr. Vaughn to | 17      Exhibit Number 2 is going to |
| 18  arbitrate his claims. And that has | 18  be the transcript of the hearing in |
| 19  already been determined, and any | 19  front of Judge Coate dated September |
| 20  parole evidence by Mr. Vaughn or my | 20  5, 2006. |
| 21  client Mr. Morelli, would be | 21      And Exhibit 3 is going to be |
| 22  inappropriate. | 22  the settlement agreement between Mr. |
| 23      The phrase is apparent and | 23  Vaughn and Prudential dated October |
| 24  clear on its face, and to allow any | 24  1998. |
| 25  party or their attorney to attack | 25      MR. HARPER: We have one |
|      [Page 35] |      [Page 37] |

[10]  (Pages 34 to 37)

| | |
|---|---|
| 1 | 1    J. Vaughn |
| 2    signed by both parties. | 2         THE CHAIRMAN: I will permit |
| 3         MR. BORTNICK: That's fine, | 3    it, overruled. |
| 4    we would be happy to do that. | 4    Q.    Start with "I did not." |
| 5         MR. HARPER:  Why don't we use | 5    A.    "I did not rule that |
| 6    that one. | 6    everything had to be subject to |
| 7         MR. BORTNICK:  Okay. | 7    arbitration. I contemplated, therefore, |
| 8    J E F F R E Y   S.   V A U G H N, | 8    that the arbitrator in deciding the |
| 9    having been first duly sworn by the | 9    parties intentions might decide that their |
| 10    Chairman was examined andtestified as | 10    agreement to arbitrate does not foreclose |
| 11    follows: | 11    the plaintiffs from coming to court and |
| 12         (Exhibit Number 1, opinion and | 12    litigating a class action." |
| 13    order of Judge Coate dated August | 13    Q.    If you turn over to page 15 -- |
| 14    12, 2005 marked for identification, | 14    A.    Yes. |
| 15    as of this date.) | 15    Q.    -- and just read the next |
| 16         (Exhibit Number 2, transcript | 16    sentence beginning at line 3 with "but" |
| 17    of the hearing in front of Judge | 17    just the one sentence. |
| 18    Coate dated September 5, 2006 marked | 18    A.    "But I think it would be wrong |
| 19    for identification, as of this | 19    for the defendants to characterize it the |
| 20    date.) | 20    way you are today, to suggest that the |
| 21         (Exhibit Number 3, settlement | 21    arbitrators' hands are bound in some way |
| 22    agreement between Mr. Vaughn and | 22    such that they couldn't rule in |
| 23    Prudential Securities, dated October | 23    interpreting the party's intent that the |
| 24    1998 marked for identification, as | 24    plaintiff has the right to come to court |
| 25    of this date.) | 25    and proceed on a class action." |
| [Page 38] | [Page 40] |

| | |
|---|---|
| 1         J. Vaughn | 1         J. Vaughn |
| 2    EXAMINATION BY | 2    Q.    Thank you. Mr. Vaughn, now, |
| 3    MR. BORTNICK: | 3    you had actually filed a class action in |
| 4    Q.    Mr. Vaughn, on Exhibit Number | 4    court? |
| 5    2, the transcript, I would like you to | 5    A.    Yes. |
| 6    turn to page 14. | 6    Q.    If you turn to Arbitrator's |
| 7    A.    Yes. | 7    Exhibit 1, is this the amended complaint |
| 8    Q.    Line 19 of the transcript that | 8    that you filed in front of Judge Coate? |
| 9    begins with "I did not," can you read that | 9    A.    Yes. |
| 10    through the next two sentences? | 10    Q.    And the date of this amended |
| 11    A.    I did not rule -- | 11    complaint is what? |
| 12         MR. HARPER:  I object. You | 12         Is there an affidavit of |
| 13    can read this as well as the witness | 13    service attached to it? |
| 14    is the witness reading what Judge | 14    A.    Yes. |
| 15    Coate said to the panel. | 15    Q.    When was it served? |
| 16         THE CHAIRMAN:  Proceed. | 16         MS. LEWIS:  Objection. There |
| 17         MR. BORTNICK:  We just heard | 17    has been a legal determination as to |
| 18    here two attorneys telling this | 18    the service on various parties. In |
| 19    panel what the judge said. I | 19    fact the legal determination that |
| 20    thought it would be a much better | 20    five of the parties were not served. |
| 21    idea, it is a much better idea, it | 21    I do not believe that this witness |
| 22    is very short let's put it in front | 22    has any personal knowledge of |
| 23    of the panel and read it out loud, | 23    service of any legal document. |
| 24    so everybody can hear it what the | 24         MR. BORTNICK:  The only |
| 25    judge said why we are here. | 25    purpose here is to just, so that it |
| [Page 39] | [Page 41] |

[11]  (Pages 38 to 41)

J. Vaughn

1    is all clear that at the time Judge
2    Coate made these statements on the
3    record, she had in front of her the
4    complaint that Mr. Vaughn had filed
5    a class action complaint and then
6    she thereafter made the statement
7    many times.  That's all.
8         THE CHAIRMAN:   We will note
9    that.
10    **Q.**    Mr. Vaughn, I'm not sure you
11    stated your full name for the record,
12    would you please state your full name.
13    **A.**    Jeffrey Sherwood Vaughn.
14    **Q.**    Just very briefly, what's your
15    educational background?
16    **A.**    Finance at Pace in 1985.
17    **Q.**    You received what degree?
18    **A.**    BA in finance.
19    **Q.**    And there came a time where
20    you became employed by Prudential
21    Securities?
22    **A.**    That's correct.
23    **Q.**    When was that?
24    **A.**    In February of '85.

[Page 42]

J. Vaughn

1    that were done on the floor of the
2    exchange.  Breaks meaning discrepancies
3    between transactions that went on the
4    prior day.  Or like I said up to some
5    point, up until the settlement I was the,
6    one of the key people in making sure the
7    company had no exposure.
8         **Q.**    This was a back office
9    function?
10    **A.**    Yes,  this was a back office
11    function.
12    **Q.**    And how long did you remain in
13    this job?
14    **A.**    For maybe four years I would
15    say.
16    **Q.**    And then what was your next
17    job?
18    **A.**    The next job was trade support
19    specialist, which I actually worked on the
20    block trading desk working with the
21    traders and the back office in P&S, and
22    pretty much a liaison between the traders
23    and the floor of the exchange and our
24    Prudential block office.

[Page 44]

J. Vaughn

1    **Q.**    And what was the firm known as
2    at the time?
3    **A.**    Pru Bache, I believe.
4    **Q.**    Prudential Bache?
5    **A.**    Yes.
6    **Q.**    Were you licensed in the
7    securities industry at any time such as a
8    Series 7 or any other security license?
9    **A.**    No.
10    **Q.**    Have you ever received a
11    security license?
12    **A.**    No.
13    **Q.**    What was your first job with
14    Prudential Securities?
15    **A.**    Operations clerk.
16    **Q.**    And what did those job
17    responsibilities entail?
18    **A.**    Pretty much to take care of
19    all back office issues that were
20    pertaining to trades that were done the
21    prior day or any day before the settlement
22    of trades.
23    **Q.**    Can you give me an example?
24    **A.**    Pretty much whatever breaks

[Page 43]

J. Vaughn

1    **Q.**    The block trading desk is a
2    large number of shares being traded at one
3    time?
4    **A.**    Yes.
5    **Q.**    For example, 20,000 shares of
6    IBM that would be a block trade?
7    **A.**    Yes.
8    **Q.**    A big one?
9    **A.**    No, a small one.
10    **Q.**    And this again was a back
11    office function?
12    **A.**    Yes, it was.
13    **Q.**    And how long did you remain
14    employed with Prudential?
15    **A.**    For a total of about 13 years.
16    **Q.**    When did you leave?
17    **A.**    In '98 I want to I believe it
18    was November of '98.
19    **Q.**    Was it before or after you
20    signed Exhibit 3 the settlement agreement?
21    **A.**    After.
22    **Q.**    And you stayed with Prudential
23    through all of its name changes?
24    **A.**    Yes, I did.

[Page 45]

[12]  (Pages 42 to 45)

J. Vaughn

1
2    Q.    But it was always as a broker
3  dealer?
4    A.    Yes.
5    Q.    The respondent party here
6  today?
7    A.    Meaning.
8    Q.    Prudential Financial?
9    A.    Now it is Prudential
10 Financial, when I left it was Prudential
11 Securities.
12    Q.    Now, did there come a time
13 where you retained the law firm of Leeds
14 Morelli & Brown to represent you?
15    A.    Yes, I did.
16    Q.    You heard the opening
17 statement from Mr. Harper which said it
18 was January of 1998; does that sound about
19 right?
20    A.    That's when I signed the
21 retainer, that's correct.
22    Q.    When did you first start
23 talking with Leeds Morelli & Brown?
24    A.    Probably back in November the
25 prior year.

[Page 46]

J. Vaughn

1
2    THE CHAIRMAN:   When he
3  retained Leeds Morelli & Brown to
4  prosecute the discrimination case.
5    A.    Meaning where?
6    Q.    In court.
7    A.    In court.
8    Q.    Had you had exposure to the
9  New York Stock Exchange, the NASD or any
10 securities industry arbitration up until
11 that point?
12    A.    No.
13    Q.    Other than the proceeding we
14 are in today and events that led up to
15 this particular proceeding, have you ever
16 had any exposure to New York State Stock
17 Exchange or NASD arbitration?
18    A.    Yes.
19    Q.    What was your exposure?
20    A.    Well, number one, there was a
21 mediation hearing about my particular case
22 within the rest of the people who had come
23 forward from Prudential.  And then after
24 that there was a -- I had to testify
25 against Tony Carranate who came in and

[Page 48]

J. Vaughn

1
2    Q.    And just very briefly what was
3  the subject matter that you asked Leeds
4  Morelli & Brown Leeds to represent you in?
5    A.    Briefly it was a hostile work
6  environment, a discrimination issue.
7    Q.    Were you the only person
8  represented by Leeds Morelli & Brown who
9  were employees of Prudential with respect
10 to this matter?
11    A.    No.
12    Q.    How many were there?
13    A.    Initially it probably started
14 out to be about maybe 50 people and as it
15 went on it ended up to be about 400 or a
16 little more maybe.
17    Q.    Over the same issue?
18    A.    Yes.
19    Q.    Was it your intention at that
20 time to file a lawsuit?
21    A.    Yes.
22    Q.    Where were you intending to
23 file a lawsuit at that time?
24    MS. LEWIS:    At what point in
25 time?

[Page 47]

J. Vaughn

1
2  wanted to or I guess he was going after
3  Prudential for whatever reasons and I had
4  to testify against him.
5    Q.    In arbitration? He was part of
6  the management?
7    A.    He was part of the management.
8  Yes.
9    Q.    He was suing Prudential?
10    A.    Yes.
11    Q.    And you were brought in as a
12 witness for Prudential?
13    A.    Yes.
14    Q.    Have you ever had any other
15 exposure to the arbitration process?
16    A.    No.
17    Q.    Now, did there come a time
18 when your case settled?
19    A.    Yes.
20    Q.    And is Exhibit 3 your
21 settlement agreement?
22    A.    Yes, it is.
23    Q.    Do you recall when you saw
24 your settlement agreement for the first
25 time?

[Page 49]

[13]  (Pages 46 to 49)

J. Vaughn

1       J. Vaughn
2    A.  Yes, I do.
3    Q.  When was that?
4    A.  It was at a fundraiser for
5  Carl McCall at Tavern on the Green
6  probably in November of '98.
7    Q.  Was it the day you signed your
8  agreement?
9    A.  Yes, it was.
10   Q.  So I just want to be clear,
11 you saw it for the first time that was the
12 day you signed it?
13   A.  The first time I saw my
14 agreement was in the bathroom of Tavern on
15 the Green that's where I signed it.
16   Q.  You saw it for the first time
17 and signed it in the bathroom at Tavern on
18 the Green?
19   A.  Yes.
20   Q.  Who showed it to you?
21   A.  Jeffrey Brown.
22   Q.  He was one of the partners of
23 Leeds Morelli & Brown?
24   A.  Yes.
25   Q.  What were the circumstances of

[Page 50]

1       J. Vaughn
2  it to some point and just made it clear to
3  me that this is somewhat of a gag order
4  for the most part. Just, you can't say
5  anything, and you can't come back to
6  Prudential and go public which I guess at
7  the time we were trying, we wanted to make
8  this public. And they said that if you
9  sign this you can't go public. That was
10 the gist of the conversation.
11   Q.  Any other or anything else
12 that you discussed?
13   A.  No.
14   Q.  Just that point?
15   A.  Yes.
16   Q.  If you would take a look at
17 paragraph 14 of your of Exhibit 3 the
18 settlement agreement --
19   A.  Yes.
20   Q.  -- where it where it says
21 arbitration.
22   A.  Yes.
23   Q.  Did you discuss that clause at
24 all with Mr. Brown?
25   A.  No.

[Page 52]

1       J. Vaughn
2  your seeing it in the bathroom?
3    A.  We were invited there by Leeds
4  Morelli & Brown to it was a fundraiser for
5  Carl McCall he was running for New York
6  State Comptroller, and we were invited and
7  not only myself but a few other people
8  were introduced to their settlement
9  agreements there for the first time. So I
10 just --
11   Q.  Mr. Vaughn, were you sitting
12 at table and he said here is your
13 agreement? What were the circumstances.
14   A.  No, again, like I said I saw
15 it for the first time in the men's room.
16   Q.  Where did you sign it?
17   A.  In the men's room.
18   Q.  How long did you review it in
19 the men's room?
20   A.  Briefly, maybe about three or
21 four minutes or five minutes tops.
22   Q.  Was Mr. Brown there with you?
23   A.  Yes.
24   Q.  Did he say anything to you?
25   A.  Pretty much, he just went over

[Page 51]

1       J. Vaughn
2    Q.  Did you have any understanding
3  of what the arbitration procedures were
4  under the prevailing constitution of rules
5  of the New York State Stock Exchange Inc
6  or the National Association of Securities
7  Dealers Inc.?
8    A.  No, not in totality.
9    Q.  Did you know whether they had
10 any rules concerning class actions?
11   A.  No, I didn't.
12   Q.  Did you have the intent to
13 waive a class action when you read it?
14   A.  No.
15   Q.  Did you discuss that clause
16 with Mr. Brown?
17   A.  No, not at all.
18   Q.  At the time you signed this
19 agreement, did you believe that you were
20 waiving your rights to bring a class
21 action based upon this agreement?
22   A.  No, and I didn't give it any
23 thought either.
24     MR. BORTNICK: I have nothing
25 further.

[Page 53]

[14]  (Pages 50 to 53)

1          J. Vaughn
2          THE CHAIRMAN:  Thank you,
3      you may proceed.
4          MR. BORTNICK:  Thank you, Mr.
5      Chairman.
6  EXAMINATION BY
7  MR. HARPER:
8      Q.    Good morning, Mr. Vaughn.
9      A.    Good morning.
10     Q.    My name is Gerard Harper, I
11  represent Prudential.
12     A.    Yes.
13     Q.    I take it you have testified
14  before at least once?
15     A.    Yes.
16     Q.    And that was in the
17  arbitration against Mr. Carranate?
18     A.    Yes.
19     Q.    And any other time?
20     A.    No, other than the mediation
21  that we went through with Prudential.
22     Q.    When you say you testified at
23  a mediation were you sworn in?
24     A.    If I remember correctly, yes.
25     Q.    And who was the mediator?

[Page 54]

1          J. Vaughn
2      A.    Yes.
3      Q.    How many mediators?
4      A.    I don't remember.
5      Q.    You don't remember the names?
6      A.    No.
7      Q.    Let me show you what your
8  lawyer marked as Panel Exhibit 1 just a
9  moment ago, and if I could direct your
10  attention to paragraph 14.
11     A.    Yes.
12     Q.    Panel Exhibit 1 --
13         THE CHAIRMAN:  Isn't that the
14  amended complaint?
15         MR. HARPER:  Yes.
16         MR. BORTNICK:  It is part of
17  Arbitrator Exhibit 1, it is not
18  Panel Exhibit 1.
19         MR. HARPER:  I'm sorry.
20     Q.    Could you turn to paragraph 14
21  of part of Arbitrator Exhibit 1 --
22     A.    Yes.
23     Q.    -- and read that paragraph 14,
24  page 4?
25     A.    Yes.

[Page 56]

1          J. Vaughn
2      A.    I can't tell you that, I don't
3  remember.
4      Q.    Where was it held?
5      A.    It was held in, I want to
6  believe it was the NASDAQ building over
7  here by across the street from I don't
8  know the exact address but it's across the
9  street from New York Plaza.
10     Q.    And who was present?
11     A.    I mean who was present, it
12  would have been Leeds, Morelli myself and
13  the panel.
14     Q.    Was Mr. Leeds and Mr. Morelli
15  there?
16     A.    If I remember correctly, yes,
17  they all were there.
18     Q.    When you say all, you mean
19  Leeds?
20     A.    Morelli and Brown was there.
21     Q.    And you were there?
22     A.    Yes.
23     Q.    Was your wife there?
24     A.    No, my wife wasn't there.
25     Q.    And the mediator was there?

[Page 55]

1          J. Vaughn
2      Q.    Can you read that out loud?
3      A.    "Upon information and belief,
4  Leeds Morelli & Brown and the lawyer
5  defendant's without plaintiff's knowledge
6  agreed to cap various claims under their
7  agreement with PSI and refused to press
8  plaintiff's claims until they received
9  payment from PSI which payments were
10  concealed from plaintiff and plaintiff's
11  class."
12     Q.    What is your information and
13  belief to that?
14     A.    I have no idea.
15     Q.    Now, you left Prudential in
16  1998?
17     A.    That's correct.
18     Q.    And why don't you take a look
19  at your settlement agreement which is
20  Exhibit 3?
21     A.    Yes.
22     Q.    And that is your signature on
23  page 4?
24     A.    Yes.
25     Q.    Who wrote the date in there,

[Page 57]

[15]  (Pages 54 to 57)

```
 1              J. Vaughn
 2  is that your handwriting?
 3      A.    I don't know.
 4      Q.    Do you recognize that?
 5      A.    No.
 6      Q.    Do you remember whether that
 7  was the date of the McCall fundraiser?
 8      A.    Possibly because I believe I
 9  left in the early part of November, so
10  that it could possibly be the date.
11      Q.    Well, let's turn to page 1 of
12  Exhibit 3.
13      A.    Yes.
14      Q.    Could you read paragraph 1,
15  the first page?
16      A.    Yes. "Separation from
17  employment, Vaughn's last date of
18  employment at PSI shall be October 23,
19  1998."
20      Q.    Does that refresh your
21  recollection that you signed this
22  agreement after your last day of
23  employment at PSI?
24      A.    No.
25      Q.    Is that statement false?
                            [Page 58]
```

```
 1              J. Vaughn
 2      A.    I don't recall. I don't
 3  recall.
 4      Q.    But you have no reason to
 5  doubt, as you sit here today, that you
 6  executed the document on or about October
 7  27, 1998 and that your laste date of
 8  employment was four days before?
 9      A.    No, I don't necessarily agree
10  with that.
11      Q.    If you don't agree with that,
12  then tell me what is in your mind that
13  makes you doubt the authenticity and
14  accuracy of the document?
15      A.    Because when I left Prudential
16  before I had anything in writing stating
17  what my last day was, I got a call from
18  Leeds Morelli & Brown at the job 4 o'clock
19  in the afternoon -- and I remember this
20  clearly -- they said if you choose to, you
21  do not have to go back to Prudential
22  anymore we have X, Y and Z for you, that's
23  it. You let us know what you want to do.
24          And that's what I remember.
25  It could have been that day, but clearly I
                            [Page 59]
```

```
 1              J. Vaughn
 2  was still an employee of Prudential as far
 3  as I remember as of October 23.
 4      Q.    So you could have been orally
 5  notified that your claim had been resolved
 6  and understood that your last day was to
 7  be October 23, 1998 and then signed the
 8  paperwork four days later?
 9      A.    I can't say, I don't remember.
10      Q.    You have no reason to doubt as
11  you sit here today that the statements in
12  the document itself are accurate?
13      A.    No, I don't have a reason to
14  doubt it.
15      Q.    Thank you.
16          Now, you mentioned that you
17  retained Leeds & Morelli and your best
18  estimate was January of 1998; do you
19  recall that?
20      A.    Yes.
21      Q.    Did you sign an agreement with
22  Leeds & Morelli?
23      A.    Leeds & Morelli and myself we
24  talked in the latter part of the year
25  before I signed that retainer. So did I
                            [Page 60]
```

```
 1              J. Vaughn
 2  sign a retainer when I first was
 3  introduced to them, no, this took about a
 4  month or so before I did.
 5      MR. BORTNICK:    Would you
 6  read back the question, please.
 7      (A portion of the record was
 8  read.)
 9      Q.    Yes?
10      A.    Yes.
11      Q.    Let me show you a document
12  that will be marked as whatever you want
13  to mark it as?
14      MR. BORTNICK:    Respondents'
15  Exhibit 1.
16      MR. HARPER:    That's fine.
17      (Respondents' Exhibit 1,
18  agreement marked for identification,
19  as of this date.)
20      Q.    You weren't fired by
21  Prudential, correct?
22      A.    No.
23      Q.    I'm incorrect?
24      A.    No, I wasn't fired by
25  Prudential.
                            [Page 61]
```

[16]  (Pages 58 to 61)

J. Vaughn

1  
2     Q.    You left voluntarily?  
3     A.    Yes.  
4     Q.    And now, when you initially  
5  retained Leeds Morelli, it was for the  
6  purpose of negotiating a settlement with  
7  PSI; isn't that right?  
8     A.    No, that is not right.  
9     Q.    When you signed the retainer  
10  agreement with Leeds Morelli, you did so  
11  to retain them to negotiate settlement  
12  with PSI, correct?  
13     A.    No.  
14     Q.    Look at the first paragraph of  
15  paragraph 1.  
16     A.    Yes.  
17     Q.    And let me rephrase the  
18  question for you.  
19     A.    Yes.  
20     Q.    You say you met with Leeds  
21  Morelli sometime in November --  
22     A.    Yes.  
23     Q.    -- of what I guess was '97.  
24     A.    Yes.  
25     Q.    Did you call them or did they  

[Page 62]

J. Vaughn

1  
2     Q.    And then you subsequently  
3  executed a retainer agreement with Leeds  
4  Morelli, correct?  
5     A.    That's correct.  
6     Q.    And in that retainer agreement  
7  the first thing that Leeds Morelli  
8  promised to do was to negotiate a  
9  settlement with PSI on your behalf,  
10  correct?  
11     A.    I don't know that.  
12     Q.    Read paragraph 1 of the  
13  retainer agreement.  
14     A.    "The retainer will only  
15  include the contacting of employee to seek  
16  a negotiated settlement."  
17     Q.    Stop for a minute.  Is there  
18  any word in that sentence you don't  
19  understand?  
20     A.    No.  
21     Q.    And so the retainer agreement  
22  in the first instance was only to contact  
23  PSI to seek a negotiated settlement,  
24  correct?  
25     A.    According to the retainer,  

[Page 64]

J. Vaughn

1  
2  call you?  
3     A.    I didn't call them.  I was  
4  referred to them by another colleague who  
5  had already retained them.  
6     Q.    Who?  
7     A.    Connie Hernandez.  
8     Q.    And what did Ms. Hernandez say  
9  to you and what did you say to her?  
10     A.    Connie expressed to me that  
11  she knew I was looking for a lawyer as  
12  well because of the issues that were going  
13  on at Prudential, and I wanted to do  
14  something about it.  
15        So Connie told me she already  
16  had a lawyer that she had signed a  
17  retainer for, she said they were good and  
18  that maybe it would be better that I join  
19  them rather than have an individual,  
20  another lawyer, and not have the esteem it  
21  would be if you had more than one person  
22  being retained by a particular firm.  
23     Q.    And that happened in around  
24  November of?  
25     A.    November, December of '97.  

[Page 63]

J. Vaughn

1  
2  yes.  
3     Q.    And then if you would read the  
4  second sentence, please.  
5     A.    "If legal action is required  
6  then the parties will discuss a different  
7  financial situation."  
8     Q.    So the first task that you  
9  gave Leeds Morelli was to go seek a  
10  settlement of your claims?  
11     A.    In correct.  
12     Q.    Well --  
13     A.    Whatever this says here is one  
14  thing, I'm telling you that is incorrect.  
15     Q.    So this contract means nothing  
16  too?  
17     A.    I didn't say it doesn't mean  
18  anything.  You are asking me, and I'm  
19  being totally honest with you, no, that is  
20  not the case.  
21     Q.    You didn't understand it when  
22  you read it?  
23     A.    You got to -- okay.  
24     Q.    Did you understand?  
25     A.    Yes, I understood.  

[Page 65]

[17] (Pages 62 to 65)

J. Vaughn

| | | |
|---|---|---|
| 1 | | J. Vaughn |
| 2 | **Q.** | Did you read it? |
| 3 | **A.** | Yes. |
| 4 | **Q.** | Did you read it in the men's |

4 **Q.** Did you read it in the men's
5 room or somewhere else?
6 **A.** I don't remember where I read
7 it.
8 **Q.** Did you read it in their
9 office?
10 **A.** I don't remember.
11 **Q.** Have you ever been to their
12 office?
13 **A.** Yes.
14 **Q.** How many times?
15 **A.** I don't recall.
16 **Q.** And you read this before you
17 signed it?
18 **A.** Yes.
19 **Q.** And you understood it?
20 **A.** I understood the agreement
21 that I had with Leeds & Morelli, again.
22 **Q.** Now, let's go back to
23 paragraph 6 --
24 **A.** Yes.
25 **Q.** -- read that out loud.
[Page 66]

J. Vaughn

1 A. "There are no other agreements
2 between the parties other than those
3 contained here in this agreement
4 represents the entire understanding of the
5 parties."
6 **Q.** Is there any word or phrase in
7 that sentence or paragraph that you do not
8 understand?
9 **A.** I understand it clearly.
10 **Q.** You understand it clearly?
11 **A.** Yes.
12 **Q.** So whatever agreement you had
13 with Leeds & Morelli as of January 5, 1998
14 was in these two pages, right?
15 **A.** According to this, yes.
16 **Q.** According to this?
17 **A.** Yes.
18 **Q.** And so there was no other
19 contract between you?
20 **A.** Again, do you want to talk
21 about what is on paper or do you want to
22 talk about what we agreed upon?
23 **Q.** You see I can only talk about
24 what is on paper. Let's read the next
[Page 67]

J. Vaughn

1 sentence.
2 **A.** "All parties have read this,
3 understood each and every term herein, and
4 the signature below constitutes an
5 acknowledgement of such an understanding."
6 **Q.** Now do you understand all the
7 words there?
8 **A.** Clearly.
9 **Q.** Was that true when you signed
10 it, when you promised and acknowledged
11 that all, that you read it understood it;
12 was it true at the time?
13 **A.** No.
14 **Q.** It was false?
15 **A.** Yes.
16 **Q.** So you lied when you signed
17 your name to this contract?
18 **A.** I didn't lie no more than the
19 person who signed above my name.
20 **Q.** Was paragraph 7 true or false
21 when you signed it?
22 **A.** I believe I just answered that
23 question.
24 **Q.** Tell it to me again.
[Page 68]

J. Vaughn

1 A. No. When you asked him to
2 repeat the question, could you repeat the
3 answer --
4 THE CHAIRMAN: Mr. Vaughn,
5 answer the question, please.
6 A. The answer is yes again.
7 **Q.** It is false?
8 **A.** Yes.
9 **Q.** And number 6 is false too?
10 **A.** That is correct.
11 **Q.** And number 1 is false too?
12 **A.** That's correct.
13 **Q.** Is there anything in
14 Respondents' Exhibit 1 that is true?
15 **A.** Yes, I retained them.
16 **Q.** That's it?
17 **A.** That's it.
18 **Q.** And you read an understood the
19 agreement, but it was a false agreement
20 you knew it to be false at the time you
21 signed it?
22 **A.** Again, I understood the
23 agreement. I understood what's in the
24 agreement. Again, Leeds & Morelli as well
[Page 69]

[18] (Pages 66 to 69)

J. Vaughn

1  as myself and everybody else who was
2  involved in this were under different
3  perceptions or different interpretations
4  of what was going to happen with this
5  particular situation.
6        Now, what's on paper is one
7  thing. That is the only thing right now
8  we can sit here and say we know to be true
9  that's what was put on paper. However,
10  there were other things that went on that
11  were discussed and totally a lot of this
12  stuff is maybe past the limitations of
13  even going into any further, but the fact
14  of the matter is I'm telling you as well
15  as everybody else in here that this may be
16  a statement in truth, but it's not a true
17  statement.
18        Q.    All I wanted from you was did
19  you sign the document that you knew was
20  false at the time?
21        A.    I answered that.
22        Q.    And you did that's what you
23  did, right?
24        A.    Yes.

[Page 70]

J. Vaughn

1        Now, and you don't remember
2        Q.    Now, and you don't remember
3  where you were when you signed this
4  document?
5        A.    No.
6        Q.    Do you know who was present?
7        A.    No.
8        Q.    Now, no one from PSI was
9  present when you signed this document?
10        A.    Absolutely not.
11        Q.    And PSI had absolutely nothing
12  to do with your selection of counsel?
13        A.    No, they didn't have anything
14  to do with it.
15        Q.    That was somebody you chose on
16  your own?
17        A.    Yes.
18        Q.    Based on recommendation from
19  Ms. Hernandez?
20        A.    That's correct.
21        Q.    You gave to Leeds & Morelli a
22  calculation of your injuries and damages
23  which you computered to equal $200,000,
24  correct?
25        A.    Actually it was computed to be

[Page 71]

J. Vaughn

1  more, but we don't have that in our
2  paperwork here today but, yes, it was
3  more.
4        Q.    It was more?
5        A.    Yes.
6        Q.    Let me take a look then. Let
7  me mark as Respondents' Exhibit 2, a
8  five-page document.
9        (Respondents' Exhibit 2 a
10  five-page document marked for
11  identification, as of this date.)
12        Q.    Can you identify Respondents'
13  Exhibit 2 for me, Mr. Vaughn?
14        A.    Yes.
15        Q.    What is it?
16        A.    This is a document stating
17  what we were looking for in damages and
18  basically my complaint to Prudential.
19        Q.    And do you see on page 3 where
20  it says back pay damage estimated
21  $200,000?
22        A.    Yes.
23        Q.    Were they your estimated
24  damages at the time?

[Page 72]

J. Vaughn

1        A.    These were estimated based on
2  conversations that I had specifically
3  with -- in the counsel at the time, but
4  your answer is yes.
5        Q.    Did anybody ever tell you that
6  your lawyer stood up in front of Judge
7  Coate and said you had no damages on your
8  underlying claims as opposed to your
9  theory of the class action?
10        A.    No.
11        Q.    Nobody told you that?
12        A.    No.
13        Q.    So the first time you read the
14  transcript of February 5, 2006 when Mr.
15  Bortnick asked you to read it out loud, is
16  the first time you saw that today?
17        A.    Yes.
18        Q.    So he hadn't shown you that
19  before?
20        A.    I have seen it.
21        Q.    Turn to -- you have seen it?
22        A.    Yes.
23        Q.    Have you read it?
24        A.    Yes, I read it. You asked me

[Page 73]

[19] (Pages 70 to 73)

J. Vaughn

1  is this the first time I have seen it, I
2  said, no, I have seen it.
3  
4      **Q.**    When did you see it?
5      **A.**    Whenever they mailed me a copy
6  of everything that we have gone through
7  thus far.
8      **Q.**    Okay.  So turn to page 7 --
9      **A.**    Yes.
10      **Q.**    -- and if you will refer to
11  line 11?
12      **A.**    Yes.
13      **Q.**    Could you read the sentence to
14  the rest of paragraph beginning with "Mr.
15  Vaughn"?
16      **A.**    "Mr. Vaughn, when he settled
17  his original case with Prudential with
18  Leeds & Morelli representing him, a piece
19  of paper that said:  I think these are my
20  damages is a certain amount, and
21  Prudential agreed to pay that certain
22  amount to Mr. Vaughn less, of course, the
23  contingency portion that went to Leeds
24  Morelli & Brown."
25      **Q.**    And if you go to page 9, line

[Page 74]

J. Vaughn

1  mediation.  I do recall showing up at
2  mediation and based on what I had to say
3  they were going to assess what amount
4  would be what they would consider a
5  settlement.
6      **Q.**    And that amount just happened
7  to coincide with your estimate of what
8  your actual damages were?
9      **A.**    Yes.
10      **Q.**    And you got the $200,000,
11  right?
12      **A.**    Yes.
13      **Q.**    And you got the Cobra payments
14  on your behalf for six months, right?
15      **A.**    I don't recall.
16      **Q.**    You don't remember --
17      **A.**    I don't recall.
18      **Q.**    -- whether you got that
19  benefit out of the contract?
20      **A.**    I don't recall.
21      **Q.**    But you got those things
22  without having to go to court, right?
23      **A.**    Yes.
24      **Q.**    So you got what you asked for

[Page 76]

J. Vaughn

1  3, after the words "Mr. Bortnick."  Could
2  you read the first paragraph there?
3      **A.**    "The court" --
4      **Q.**    No, after the words "Mr.
5  Bortnick."
6      **A.**    "Mr. Vaughn did not have any
7  intention to bring a one-on-one
8  arbitration because he has a damages issue
9  here and he understands that."
10      **Q.**    Do you know what Mr. Bortnick
11  was talking about?
12      **A.**    I have to read the rest of
13  this to understand that but, no, to answer
14  the question, just reading that one
15  sentence, no.
16      **Q.**    The fact is you submited a
17  claim in mediation for $200,000; that's
18  the claim you submitted in mediation,
19  right?
20      **A.**    No.
21      **Q.**    You submitted a larger claim
22  in mediation?
23      **A.**    We went to mediation I don't
24  recall ever submitting any numbers to

[Page 75]

J. Vaughn

1  without having to go to court and without
2  having a hearing like this, nobody was
3  cross examining you, were they?
4      **A.**    No.
5      **Q.**    And there were no judges
6  there?
7      **A.**    No.
8      **Q.**    No juries there?
9      **A.**    Not that I recall.
10      **Q.**    And you got 100 percent of
11  what you asked for?
12      **A.**    Yes.
13      **Q.**    And you were asserting an
14  individual claim, a claim unique to you,
15  correct?
16      **A.**    Correct.
17      **Q.**    Not on behalf of a class, if
18  you right?
19      **A.**    That's correct.
20      **Q.**    What is a class action?
21      **A.**    A class action is a group of
22  people coming together for one specific
23  issue for a common cause that would be a
24  class action in my view.

[Page 77]

[20]  (Pages 74 to 77)

J. Vaughn

1      J. Vaughn
2      Q.    Did you know what a class
3  action was back in 1998?
4      A.    Again, that's probably I would
5  have thought the same thing.
6      Q.    Now, are you being paid to be
7  a plaintiff in this action?
8      A.    No, I'm not.
9      Q.    When is the first time the
10  thought occurred to you to file a class
11  action against my client and others?
12      A.    When I realized that from what
13  I believed is that the actual agreement
14  that I signed was when I found out they
15  had a relationship with Prudential for
16  whatever reasons, and that wasn't made
17  known to me under confidentiality I would
18  think of your client, then I thought at
19  that point, hey, Prudential paying you and
20  you are taking money from me. I think
21  that there's something wrong with this,
22  and that's when I decided to pursue it.
23      Q.    I asked you one question and I
24  said "when" not what, "when"?
25      A.    I don't remember.
                                    [Page 78]

1      J. Vaughn
2      A.    Yes.
3      Q.    That is when the thought first
4  occurred to you?
5      A.    Yes.
6      Q.    And yet you filed a class
7  action in October of 2004?
8      A.    Okay. Well, I could be off
9  but it had to be after 2004 or about
10  around 2004.
11      Q.    So it wasn't after 2004 it was
12  in 2004?
13      A.    Okay.
14      Q.    How long before you filed a
15  class action?
16      A.    I don't remember. I don't
17  remember.
18      Q.    Now, whose idea was it to file
19  a class action?
20      A.    Whose idea?
21          MR. BORTNICK:   I will object
22      to the extent that if Mr. Vaughn had
23      an attorney at the time that he
24      should not reveal the substance of
25      the attorney-client communications.
                                    [Page 80]

1      J. Vaughn
2      Q.    Was it --
3          MR. BORTNICK:  I will object
4      in terms of the tone here from Mr.
5      Harper. If he can ask the same
6      question without the tone.
7          THE CHAIRMAN:   It is cross.
8      Q.    All I asked you is when?
9      A.    I don't remember.
10      Q.    You don't remember?
11      A.    No.
12      Q.    Was it in 1999?
13      A.    I don't remember.
14      Q.    So it could have been 1999?
15      A.    No, I don't remember. I don't
16  recall.
17      Q.    You don't recall?
18      A.    No.
19      Q.    Do you recall how long it was
20  before you commenced the class action?
21      A.    It would have had to have been
22  after 2004.
23      Q.    After 2004?
24      A.    Yes.
25      Q.    So 2005?
                                    [Page 79]

1      J. Vaughn
2          THE CHAIRMAN:  Fine.
3          MR. BORTNICK:   I wasn't Mr.
4      Vaughn's counsel at the time. But
5      if he had other counsel.
6      Q.    Whose idea was it?
7      A.    Again, when this was brought
8  to my attention?
9      Q.    By whom?
10      A.    By Connie Hernandez.
11      Q.    Connie Hernandez brought it to
12  your attention?
13      A.    Yes. Then I decided to go
14  forward with it. When that time was I
15  don't recall. It had to be somewhere
16  around 2004, and my reason for saying that
17  is because prior to that I spent from 2000
18  to 2003 working in Atlanta for Citigroup.
19  So when I got back up here is when this
20  all surfaced.
21      A.    Who do you work for now?
22      A.    I work for Bloomberg.
23      Q.    What did Mr. Hernandez say to
24  you and you say to her?
25      A.    I don't remember the exact
                                    [Page 81]

[21]  (Pages 78 to 81)

1          J. Vaughn
2  conversation.
3      Q.    Did she mention a lawyer's
4  name?
5      A.    She mentioned Angela Roper,
6  yes.
7      Q.    And did you call Angela Roper
8  or did she call you?
9      A.    I called her.
10     Q.    And had Ms. Hernandez retained
11 Ms. Roper?
12     A.    I don't know.
13     Q.    And you have no recollection
14 whatsoever what Ms. Hernandez said to you
15 in prompting you to make a call to Ms.
16 Roper?
17     A.    No?
18     Q.    Who is Ms. Roper?
19     A.    My other attorney.
20     Q.    Mr. Thyne's partner?
21     A.    Yes.
22     Q.    Now, let's go to the
23 settlement agreement?
24     A.    Yes.
25     Q.    Between the time Mr. Hernandez
                                [Page 82]

1          J. Vaughn
2  friends you mentioned it to?
3      A.    No.
4      Q.    How about Ms. Hernandez?
5      A.    Ms. Hernandez is a very good
6  friend.
7      Q.    You mentioned to her you were
8  unhappy that you got 100 percent of what
9  you asked for in the PSI settlement?
10     A.    Again, some of the things that
11 we are talking about here are not stated
12 in this because these were things that,
13 number one, were either too old to talk
14 about or they are not on paper.
15          The things that I was unhappy
16 with, if I must go into detail about them,
17 was Leeds & Morelli told me that, hey, you
18 would be getting when you --
19     MR. HARPER:  I have to
20 interrupt the witness, this is
21 cross-examination.
22     MR. BORTNICK:  The question
23 was, what were different --
24     THE CHAIRMAN:  Hold on, one
25 at a time.
                                [Page 84]

1          J. Vaughn
2  spoke to you in about 2004 and the --
3  between the time you signed your
4  settlement agreement in October 1998 and
5  when you spoke to Mr. Hernandez at some
6  point, had you ever expressed unhappiness
7  about your settlement agreement with
8  Prudential?
9      A.    Yeah.
10     Q.    To whom?
11     A.    I mean it was just to family
12 and friends for the most part, nobody
13 legally.
14     Q.    Did you ever complain to Leeds
15 & Morelli?
16     A.    No.
17     Q.    Did you ever complain to PSI?
18     A.    No.
19     Q.    So other than family or
20 friends -- what members of your family?
21     A.    I don't remember it was just
22 family, just friends.
23     Q.    Your wife?
24     A.    It wasn't my wife at the time.
25     Q.    Do you remember any of the
                                [Page 83]

1          J. Vaughn
2      MR. HARPER:  If you read it
3  back the question is what did you
4  say to Ms. Hernandez.
5      THE CHAIRMAN:  Read it back.
6      (A portion of the record was
7  read.)
8      THE CHAIRMAN:  Let me say one
9  thing. Mr. Vaughn, do not make any
10 assumptions that something is too
11 old for us to hear. If counsel has
12 some objection based on time to what
13 you are going to say they will make
14 it, but don't make that assumption
15 yourself. Don't screen yourself
16 from saying something you think is
17 irrelevant. Okay.
18     THE WITNESS:  Fine.
19     Q.    Yes or no?
20     A.    It is not yes or no. I did
21 not mention to her that I was content that
22 I got 100 or upset I got 100 percent. It
23 was not 100 percent. 100 percent would
24 have been the job working for DOW, which
25 was Discrimination on Wall Street, which
                                [Page 85]

[22]  (Pages 82 to 85)

J. Vaughn

1  is a company that Leeds & Morelli as well
2  as the people at Prudential had put
3  together for this purpose.
4      MS. LEWIS:  Objection.
5      A.    On top of that, which I have
6  documentation for and I don't have it with
7  us, but they also said that, hey, Jeff,
8  you are going to get out of this deal you
9  will get $200,000 you will have a job
10 working with DOW and you will get
11 long-term disability.  And I was going to
12 their counselors for the purpose of this
13 disability which never took place -- which
14 never took place as well as they took 1
15 percent of what -- or something along
16 those lines of the what I settled for for
17 purposes of DOW.
18     So in other words I was buying
19 into the company so I would have a job and
20 work for and none of that existed.  Again,
21 this is not on paper, this is something
22 that we agreed upon and these are things
23 that can be shown.
24     MS. LEWIS:  Can I note my

[Page 86]

J. Vaughn

1  objection for the record.  We have
2  been told time and again by every
3  counsel here that we were not going
4  into the merits of these claims, all
5  of which Leeds & Morelli denies.
6  And this testimony regarding DOW or
7  promises by Leeds & Morelli is not
8  only -- there's documents that exist
9  that aren't here.  I mean this has
10 no relevancy.  Even if it could be
11 proved to what is being discussed
12 here regarding the intentions of Mr.
13 Vaughn regarding when he signed the
14 agreement that said he will
15 arbitrate the claim.
16     MR. BORTNICK:  I want to
17 largely agree what we said, but what
18 can be proved, certainly not today,
19 but I certainly agree with what this
20 hearing was about, it was elicited
21 on cross-examination.  So I didn't
22 think it was my place to object, but
23 I do agree this is about what, as
24 she said, I think almost a direct

[Page 87]

J. Vaughn

1  quote what Mr. Vaughn's intentions
2  were at the signing of the
3  settlement agreement, that's the
4  sole issue I agree with her and
5  whether this DOW was right or wrong
6  or whatever is not part of this
7  hearing.
8      MS. LEWIS:  Respectfully,
9  part of the problem here was this
10 door was opened on direct when Mr.
11 Bortnick went well beyond, this is
12 the agreement did you sign it, did
13 you mean to sign it.  So he asked
14 about his qualifications and
15 experience and Mr. Harper
16 understandably is trying to follow
17 up on it, but at some point when we
18 start getting to the full measure of
19 the claims we have to object.
20     MR. HARPER:  I actually would
21 only say that Mr. Vaughn can talk
22 all he wants, but I think it all
23 should be stricken.  I think he is
24 not answering the exact question

[Page 88]

J. Vaughn

1  that I ask and on cross-examination
2  I would ask for instruction that he
3  listen to the question I ask and
4  answer only that question because if
5  you look at the questions I'm asking
6  as opposed to the answers I'm
7  getting, they all go to which
8  issue Mr. Bortnick and Ms. Lewis
9  think are an issue here.
10     THE CHAIRMAN:  Ms. Lewis'
11 objection is overruled.  Mr. Vaughn
12 is to answer the question.  However,
13 there's no reason why Mr. Vaughn has
14 to accept your characterization of
15 something that happened, if he
16 disagrees with it, if there is an
17 assumption built into your question
18 and he does not accept that
19 assumption, he can make that known.
20     MR. HARPER:  Fair point.
21     Q.    By the way, you just talked
22 about all these promises that were made to
23 you that aren't on paper, none of them
24 were made by Prudential, correct?

[Page 89]

[23]  (Pages 86 to 89)

J. Vaughn

1
2    A.    Correct.
3    Q.    Let's go to the settlement
4    agreement.
5    A.    Yes.
6    Q.    And start with paragraph 16
7    because I want to to go over it with you
8    carefully.
9    A.    Yes.
10   Q.    Let's take it one sentence at
11   a time, Mr. Vaughn --
12   A.    Yes.
13   Q.    -- paragraph 16.
14   A.    Yes.
15   Q.    "Voluntary execution," let's
16   read the first sentence out loud.
17   A.    "Vaughn acknowledges that he
18   has carefully read this agreement and
19   understands all of its terms including the
20   full and final release of claims set forth
21   above.
22   Q.    Is there anything in that
23   sentence that you do not understand?
24   A.    No.
25   Q.    Is there anything in that

[Page 90]

J. Vaughn

1
2    sentence that you did not understand at
3    the time?
4    A.    No.
5    Q.    Is there anything in that
6    sentence that was false at the time you
7    signed the agreement?
8    A.    No.
9    Q.    Let's do the second sentence,
10   and this is a little longer one, so maybe
11   we will break it down by semicolons.  But
12   let's read the first part of the sentence
13   up to the first semicolon.
14   A.    "Vaughn further acknowledge
15   that he has voluntarily entered into this
16   agreement."
17   Q.    Is there anything about that
18   phrase you do not understand?
19   A.    No.
20   Q.    And you understood it clearly
21   at the time you signed the agreement,
22   correct?
23   A.    Yes.
24   Q.    And that statement is true
25   when you went into the agreement; is that

[Page 91]

J. Vaughn

1
2    correct?
3    A.    Yes.
4    Q.    The next phrase.
5    A.    "That he has not relied upon
6    any representation or statement written or
7    oral not set forth in this agreement."
8    Q.    Is there anything about that
9    sentence that you do not understand?
10   A.    Pretty much the whole thing.
11   Q.    You don't understand any of
12   it?
13   A.    No.
14   Q.    And what word don't you
15   understand?
16   A.    Anything that I just read in
17   that sentence there I do not understand.
18   Q.    Do you understand what the
19   word "relied" means?
20   A.    Yes.
21   Q.    What does it mean?
22   A.    Depended upon.
23   Q.    Do you understand what the
24   word "representation of statement" means?
25   A.    Yes.

[Page 92]

J. Vaughn

1
2    Q.    What does it mean?
3    A.    Representation of someone who
4    is being represented.
5    Q.    A fact or statement?
6    A.    Yes.
7    Q.    "Written or oral," do you
8    understand those words?
9    A.    Yes.
10   Q.    And "not set forth in this
11   agreement"?
12   A.    That I don't understand.
13   Q.    So let's break it down that
14   you have not depended upon any statement
15   of the fact whether in writing or oral
16   that isn't in the agreement?
17   A.    No.
18   Q.    No, what does it mean?
19   A.    Well, because you said it says
20   here:  Any representation or statement
21   written or oral, what is meant by oral?
22   Q.    You tell me.  Do you
23   understand what the word "oral" means?
24   A.    I know what the word "oral"
25   means as it pertains to this statement.

[Page 93]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

```
 1              J. Vaughn
 2     Q.    What does the word "oral"
 3   mean?
 4     A.    I'm asking you.
 5     Q.    One of the good things and bad
 6   things about being a lawyer is that I get
 7   to ask the questions.  So what does the
 8   word "oral" mean to you in everyday life?
 9     A.    Verbal.
10     Q.    In other words not written
11   down but talked?
12     A.    Yes.
13     Q.    So we understand what the word
14   "oral" means?
15     A.    Exactly.
16     Q.    So now tell me what in this
17   sentence fragment you do not understand?
18     A.    I don't understand again where
19   it says:  That he has not -- that he has
20   not relied upon any representation or
21   statement written or oral not set forth in
22   this agreement.
23          There were things that were
24   said orally that are not in this
25   agreement.
                                    [Page 94]
```

```
 1              J. Vaughn
 2   minutes ago that it was accurate and true,
 3   that you had carefully read and understood
 4   all the terms of the contract and now you
 5   are telling me two fragments later that
 6   you didn't understand what that fragment
 7   meant.
 8     A.    I'm telling you two fragments
 9   later that I did not understand all of the
10   terms.  I understood what the contract
11   represented, I did not all of the terms in
12   the contract is what I'm saying.
13     Q.    Read the next sentence
14   fragment.
15     A.    "That the only consideration
16   for signing this agreement is as set forth
17   herein."
18     Q.    Do you know what that means?
19     A.    No.
20     Q.    Do you know what
21   "consideration" is in a contract?
22     A.    Yes, I know what consideration
23   is.
24     Q.    What is it?
25     A.    (No response.)
                                    [Page 96]
```

```
 1              J. Vaughn
 2     Q.    On which you relied?
 3     A.    Yes.
 4     Q.    But you just told me that the
 5   first sentence was true and that you
 6   understood it to be true at the time,
 7   which is that you understood all of its
 8   terms?
 9     A.    I'm not going to say I
10   understood all of its terms.
11     Q.    You are changing the testimony
12   you gave me five minutes ago?
13     A.    I'm not changing my testimony,
14   I'm telling you I did not understand all
15   of the terms included in this.  I'm not a
16   lawyer.
17     Q.    But you said a few -- I
18   understand you are not a lawyer, but you
19   signed a contract.
20     A.    I understand.
21     Q.    And you are trying against
22   Prudential to get around the contract, and
23   I'm trying to focus on the promises you
24   made to my client when you signed the
25   contract.  And you told me not five
                                    [Page 95]
```

```
 1              J. Vaughn
 2     Q.    Let me help you.  Is it fair
 3   to say that your understanding of the word
 4   "consideration" is the promises that
 5   Vaughn makes to PSI and the promises that
 6   PSI makes to Vaughn in a contract that is
 7   consideration and exchange of
 8   consideration?
 9     A.    I can see that, but that's not
10   what I would interpret it as.
11     Q.    You tell me what you interpret
12   it as.
13     A.    I don't understand this the
14   way it is being represented here.
15     Q.    I thought you just told me you
16   knew what consideration is?
17     A.    Again, you are going to ask me
18   about a word or are you going to ask me
19   about a message fragment.
20     Q.    Consideration in the context
21   of this agreement; do you know what it
22   means?
23     A.    No.
24     Q.    So that's another sentence
25   that you acknowledge that you don't
                                    [Page 97]
```

[25]  (Pages 94 to 97)

J. Vaughn

1        J. Vaughn
2 understand the terms?
3    A.    Right.
4    Q.    Even though you told me you
5 did understand all the terms?
6    A.    Again, I understand what or
7 understood what the contract represented.
8 I did not understand all of the terms in
9 the contract.
10    Q.    What did this contract, this
11 contract, the written contract, what did
12 it represent?
13    A.    What it represented to me was
14 that Prudential -- I have agreed to settle
15 with Prudential on X amount of dollars,
16 and that was it, that's what that means to
17 me.
18    Q.    Did you give anything to
19 Prudential for that $200,000?
20    A.    What do you mean did I give
21 anything to them.
22    Q.    Did you make any promises to
23 Prudential?
24    A.    That the only thing that I
25 promised was that it wouldn't be something

[Page 98]

1        J. Vaughn
2 that would go to the news.
3    Q.    That's it?
4    A.    That was it.
5    Q.    All right. Well, let's go
6 back to the first page of the contract --
7    A.    Yes.
8    Q.    -- of the settlement
9 agreement.
10    A.    Yes.
11    Q.    And in paragraph 4 it reads:
12    "Vaughn hereby releases and
13 discharges PSI, its parents, divisions,
14 subsidiaries and affiliations and their
15 current and former directors, officers,
16 shareholders, agents and employees and
17 each of their predecessors, successors and
18 assigns, hereinafter the company, from any
19 and all claims and causes of action except
20 for the benefits specifically set forth in
21 this agreement arising out of or relating
22 to Vaughn's employment or separation from
23 employment." Do you see that?
24    A.    Yes.
25    Q.    Isn't that a promise that you

[Page 99]

1        J. Vaughn
2 made to PSI in this agreement? You gave
3 PSI a release from all claims and causes
4 of action; do you see that?
5    A.    Yes.
6    Q.    And yet having released all
7 those claims you are bringing a new one?
8    A.    Yes.
9    Q.    And if you go down and it
10 says: "That the release covers any claims
11 that you ever had or may hereafter have,
12 whether known or unknown" -- this is the
13 last line -- "suspected or unsuspected up
14 to and including the date of this
15 agreement." Do you see that?
16    A.    Yes.
17    Q.    Is there anything in there you
18 don't understand?
19    A.    I pretty much understand that.
20    Q.    And then on the top of page 2
21 it says: Vaughn further agrees, promises
22 and covenance, that to the maximum extent
23 permitted by law neither he" that means
24 you "for any person organization or other
25 entity acting on his behalf, has or will

[Page 100]

1        J. Vaughn
2 file, charge, claim, sue or cause to be or
3 permit to be filed, charge or claim any
4 actions for damages or other relief -- "
5 do you see that?
6    A.    Yes.
7    Q.    -- "against the company" --
8    A.    Yes.
9    Q.    -- "involving any matter
10 occurring in the past up to the date of
11 this agreement." Do you see that?
12    A.    Yes.
13    Q.    Is there anything there you
14 don't understand?
15    A.    I understand it.
16    Q.    You understand that was
17 something else you gave to PSI, you
18 promised not to sue PSI, right?
19    A.    Yes.
20    Q.    And you did sue PSI again?
21    MR. BORTNICK:    I will
22 object. The basis of the lawsuit
23 which is on a well-recognized
24 exception to a release is not an
25 issue here. The claim in that being

[Page 101]

[26]  (Pages 98 to 101)

J. Vaughn

1                J. Vaughn
2    there is a collusion between his
3    attorneys and Prudential, that would
4    void a release if --
5         THE CHAIRMAN: If proven true.
6         MR. BORTNICK: That is not
7    here for today, but he is asking him
8    about these issues and trying to
9    make it seem as if he can't even sue
10   them in the first place which is not
11   true.
12       MR. HARPER: I don't
13   understand the objection, so I will
14   continue with my examination.
15       THE CHAIRMAN: Fine.
16    Q.    Then down on paragraph 9 it
17  says: "Non disparagement. Vaughn
18  represents that he has not and agrees that
19  he will not in any way disparage PSI." Do
20  you see that?
21    A.    Yes.
22    Q.    Do you understand it?
23    A.    Yes.
24    Q.    But in fact you have
25  disaparaged PSI, correct?

[Page 102]

J. Vaughn

1                J. Vaughn
2    A.    I don't know, have I?
3    Q.    Well, you sued them, right?
4    A.    No.
5    Q.    You haven't sued us?
6    A.    No.
7    Q.    What are we doing here?
8    A.    Again, we are here to see if
9   this is -- if I can -- if I had any
10  knowledge that I could not bring a class
11  action suit against Prudential and the
12  answer to that is no.
13       However, have I sued
14  Prudential right now, this is we are here
15  to see if that's possible. Do you
16  understand what I'm saying?
17    Q.    I do. I hope you understand
18  that I believe you made lots of promises
19  to PSI that you've broken in this
20  agreement including the one that says that
21  you will not disclose directly or
22  indirectly except to legal advisors if
23  circumstances underlying this agreement
24  which you publicly filed a lawsuit,
25  correct?

[Page 103]

J. Vaughn

1                J. Vaughn
2    A.    Yes.
3    Q.    So you breached that too,
4  right?
5    A.    Yes.
6    Q.    And then you also said or
7  promised that any claim or controversy
8  arising out of or related to this
9  agreement or interpretation thereof will
10  be settled by arbitration. That is in
11  paragraph --
12       MR. BORTNICK: I want to
13  object.
14    A.    I think you need to say it,
15  how it says --
16    Q.    Under the then prevailing
17  constitution rules of the New York State
18  Stock Exchange Inc. or the National
19  Association of Securities Dealers Inc. Do
20  you see that.
21    A.    Yes.
22    Q.    You made that promise too?
23    A.    Correct.
24    Q.    Now, you still have my
25  $200,000?

[Page 104]

J. Vaughn

1                J. Vaughn
2    A.    Are you trying to be funny?
3    Q.    No.
4    A.    What does that have to do with
5  why we are here?
6    Q.    What it has to do with, I gave
7  you $200,000 or that is to say PSI did.
8       THE CHAIRMAN: Ask a question
9  only.
10    Q.    PSI gave you the $200,000, is
11  that correct?
12    A.    Correct.
13    Q.    You still have it?
14    A.    That's not here or there.
15    Q.    Yes or no?
16       THE CHAIRMAN: Answer the
17  question.
18       MR. BORTNICK: I have an
19  objection. We are not talking about
20  this is not about a recission
21  proceeding. He is asking about
22  recission and about whether this
23  agreement should be rescinded. We
24  paid you $200,000, you give it back
25  to us.

[Page 105]

[27] (Pages 102 to 105)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

J. Vaughn

1    Recission has nothing to to
2   what we are here for today.  Of
3   course, Mr. Vaughn cashed the check
4   or part of the check he got.  That
5   is not the issue.
6       THE CHAIRMAN:  Do you want to
7   respond to the objection?
8       MR. HARPER:  I'm asking him a
9   question and it goes to the heart.
10      THE CHAIRMAN:  He objected to
11  it and he's given his reasons for
12  objecting.  I want to know whether
13  you wanted to respond.
14      MR. HARPER:  I'm not talking
15  about recission or anything else.
16  I'm here because this gentleman is
17  saying he didn't understand what he
18  was doing when he signed the
19  agreement.  And you have heard the
20  testimony, and I'm going to leave it
21  for the most part as it is that he
22  understands one minute and doesn't
23  understand it the next.
24      THE CHAIRMAN:  So you are

[Page 106]

J. Vaughn

1   any and all costs incurred in connection
2   with any such recovery including
3   reasonable attorneys' fees.
4       Do you understand the meaning
5   of that phrase?
6       A.   Yes.
7       Q.   In paragraph 14 of the
8   settlement agreement where it says:  "Any
9   claim or controversy arising out or
10  related to the agreement the interpretion
11  thereof," it doesn't say except class
12  actions, right?
13      A.   No, it doesn't.
14      Q.   You knew what a class action
15  was in October of 1998, correct?
16      A.   Yeah.
17      MR. HARPER:  I pass the
18  witness.
19      THE CHAIRMAN:  Off the
20  record.
21      (Discussion off the record.)
22      THE CHAIRMAN:  You may
23  proceed.
24      MS. LEWIS:  Thank you.

[Page 108]

J. Vaughn

1   saying this question is appropriate
2   because --
3       MR. HARPER:  This question is
4   appropriate because if he is going
5   to walk away from the promises he
6   made to me, I want the $200,000
7   back.  I'm wondering why if this
8   agreement is so meaningless to him
9   he hasn't given me the money back.
10      MR. BORTNICK:  That's a
11  statement.  I want my money back is
12  not the question.
13      MR. HARPER:  The question is:
14      Q.   Have you kept the money?
15      A.   Yes.
16      THE CHAIRMAN:  Objection is
17  overruled.
18      A.   Yes.
19      Q.   And finally let me go to
20  paragraph 15, and read:  "Vaughn agrees in
21  the event of finding of a breach of the
22  agreement, he will forfeit to PSI all
23  amounts received pursuant to this
24  agreement, and he shall indemnify PSI for

[Page 107]

J. Vaughn

1   EXAMINATION BY
2   MS. LEWIS:
3       Q.   Mr. Vaughn, when you settled
4   your claim you were aware you were not
5   settling it in any court proceeding; isn't
6   that correct.
7       A.   That's correct.
8       Q.   And you were aware that by
9   settling it, you were agreeing to give up
10  the right to go to court regarding a
11  claim; isn't that correct?
12      A.   Yes.
13      Q.   And in fact when you went
14  through the mediation process before the
15  mediators where you argued in favor of
16  your claim, you knew that was in lieu of
17  going to court; didn't you?
18      A.   Yes.
19      Q.   There was never a point in
20  time when you went to the mediators and
21  you said, well, if I don't like what you
22  say then I can still file in federal
23  court; did you?
24      A.   No, I didn't say that.

[Page 109]

[28] (Pages 106 to 109)

J. Vaughn

1
2   Q.    And you knew that by going to
3   the mediators to present your claim you
4   weren't going to have a jury trial either;
5   is that correct?
6   A.    Yes.
7   Q.    And I would like to direct
8   your attention back to the settlement
9   agreement.
10  A.    Yes.
11  Q.    Did anyone other than you and
12  a representative of the Prudential sign
13  the agreement?
14  A.    No.
15  Q.    There were other people making
16  claims against Prudential; is that
17  correct?
18  A.    Yes.
19  Q.    This only settled your claim?
20  A.    Yes, that's correct.
21  Q.    Did you have to get permission
22  from any of the other claimants to settle
23  your claim?
24  A.    No.
25  Q.    Did they have a vote because

[Page 110]

J. Vaughn

1
2   is that Mr. Vaughn independently
3   went into a private agreement
4   between Mr. Vaughn and Prudential
5   and nobody else participated in it.
6   And this is further evidence of the
7   fact that the class action is an
8   after-the-fact creation that has
9   nothing to do with the private
10  settlement agreement.
11      MR. BORTNICK:   If I had gone
12  out and bought a share of World Com
13  that was my private decision perhaps
14  with my broker to buy a share of
15  World Com.  It is totally irrelevant
16  as to whether I'm going to be either
17  a class member or a class
18  representative of a lawsuit against
19  World Com or a class action against
20  World Com which had been ongoing.
21      I mean there is no relevance.
22  It is like saying the sky is blue so
23  you can't file a class action or you
24  can file a class action.  It is a
25  disconnected idea.

[Page 112]

J. Vaughn

1
2   it was going to affect their claim one way
3   or another as to whether or not you settle
4   your claim?
5       MR. BORTNICK:   I will
6   object.  I don't see any relevancy
7   even to what has been on direct or
8   cross or what has been brought up.
9       MS. LEWIS:   This would be my
10  cross.  So I don't have to follow on
11  his cross, but the claim is that Mr.
12  Vaughn has the right to proceed in a
13  class action and that he can
14  eviscerate his individual process
15  because he wants to go in a group
16  and I think the group participation
17  in his settlement and whether or not
18  this is a one-on-one settlement or
19  something that somebody else
20  participated in because all of these
21  claims about 50 other people in the
22  works is very relevant.
23      THE CHAIRMAN:   And the
24  relevance is?
25      MS. LEWIS:   And the relevance

[Page 111]

J. Vaughn

1
2       THE CHAIRMAN:   The objection
3   is overruled.
4       MS. LEWIS:   Read back
5   question.
6       (A portion of the record was
7   read.)
8   A.    No.
9   Q.    Now in paragraph 14 it says,
10  does it not: "Any claim or controversy
11  arising out of or related to this
12  agreement"?  I want to stop there.
13  A.    Yes.
14  Q.    Do you understand the words
15  "any claim or controversy"?
16  A.    Yes.
17  Q.    "Will be or the interpretation
18  thereof will be settled by an
19  arbitration."
20      Do you understand what that
21  means will be settled by arbitration?
22  A.    Yes.
23  Q.    And then it goes on to say:
24  "Under the prevailing
25  constitution rules of New York State Stock

[Page 113]

[29]  (Pages 110 to 113)

J. Vaughn

1  Exchange or National Association of
2  Security Dealers Inc." you understood
3  those would be the rules you would be
4  proceeding on for an arbitration; is that
5  correct?
6
7     A.   Yes.
8     Q.   Did you ask about what those
9  rules were going to be?
10    A.   No.
11    Q.   Did you ask whether or not you
12 would be entitled to bring a class
13 action?
14    A.   No.
15    Q.   Did it matter to you one way
16 or the other in deciding to accept
17 $200,000 whether or not you would still be
18 entitled to bring a class action?
19    A.   No.
20    Q.   Did you understand that there
21 was any exception to the phrase, "any
22 claim or controversy" that would be
23 brought under the arbitration?
24    A.   No.
25    Q.   Did you ask if there was any

[Page 114]

J. Vaughn

1     A.   It would have to be after
2     Q.   Was it before or after they
3  paid you your Cobra?
4     A.   Again, Cobra is something
5  nobody paid me any Cobra or anything like
6  that. If it was in there it's in there.
7  No one paid me Cobra or anything.
8     Q.   Nobody paid your Cobra?
9     A.   No.
10    Q.   Did you ever seek legal
11 counsel asking someone to enforce the
12 obligation in the settlement agreement
13 regarding a payment of Cobra?
14    A.   No.
15    Q.   Is that something that you
16 didn't pay attention to one way or the
17 other?
18    A.   No.
19    Q.   In paragraph 16 --
20    A.   Yes.
21    Q.   -- towards the end of the
22 paragraph it says: "Vaughn also
23 acknowledges that he has been afforded at
24 least 21 days to consider the release

[Page 116]

J. Vaughn

1  exception that you could still bring
2  something in court?
3     A.   No.
4     Q.   When did you first decide that
5  you wished to bring a class action?
6     A.   When I realized Prudential had
7  a secret agreement with Leeds & Morelli --
8  when I say secret because I knew nothing
9  about it, and that they were being paid by
10 Leeds & Morelli as well as by myself. So
11 I looked at that as a reason.
12    Q.   When you say -- I asked you
13 for when. So why are you telling me what
14 was the basis that you think you have a
15 claim. When did you determine that?
16    MR. BORTNICK:  I object to
17    the question because the question
18    was when, and his answer was when I
19    realized.
20    THE CHAIRMAN:  That's fine.
21    Q.   What was the date?
22    A.   I don't recall.
23    Q.   Was it before or after you
24 received full payment?

[Page 115]

J. Vaughn

1  provision contained herein." Was that
2  true?
3     A.   I don't know, I guess, yeah.
4     Q.   You had 21 days to consider
5  whether to release this claim in exchange
6  for payment of $200,000?
7     A.   Yes.
8     Q.   And you did that?
9     A.   Yes.
10    Q.   And after that 21 days you
11 decided to go forward and release the
12 claim against Prudential?
13    A.   This has been way beyond 21
14 days, we are talking about years now.
15    Q.   It says in the contract --
16    A.   I understand that.
17    Q.   -- that you had 21 days to
18 consider the release before you accepted
19 it, and you took that time and decided you
20 wanted to release this claim?
21    A.   Yes.
22    Q.   And in connection with that
23 you had the terms of the settlement
24 agreement?

[Page 117]

[30]  (Pages 114 to 117)

```
 1              J. Vaughn
 2     A.      Yes.
 3     Q.      And then it also says that you
 4 have seven days after signing this
 5 agreement to revoke it in writing.
 6     A.      Yes.
 7     Q.      Did you understand that at the
 8 time?
 9     A.      Yes.
10     Q.      And during that seven-day time
11 period, you had the settlement agreement
12 in your possession; isn't that correct?
13     A.      Possibly.
14     Q.      Did you ask anybody for it?
15     A.      No.
16     Q.      Did you review its terms in
17 those seven days?
18     A.      Yes.
19     Q.      And after reviewing and during
20 that seven-day period you did not revoke
21 this agreement?
22     A.      No.
23     Q.      Was there any questions that
24 you directed to anybody about the
25 agreement?
                              [Page 118]
```

```
 1              J. Vaughn
 2 elapsed between the time you signed
 3 whatever you signed in the bathroom the
 4 agreement and the release?
 5     A.      It had to be maybe a couple of
 6 weeks, maybe two weeks or something like
 7 that.
 8     Q.      During that two-week period
 9 did you have any conversations with Mr.
10 Morelli?
11     A.      When I went into his office
12 and signed the release for the check, yes.
13     Q.      Other than that, did you have
14 any other conversations with Mr. Morelli
15 at any time regarding a settlement
16 agreement?
17     A.      No.
18     Q.      Did you discuss the terms of
19 the settlement agreement when you took the
20 check?
21     A.      No.
22     Q.      Did you ask him about the
23 arbitration provision?
24     A.      No.
25     Q.      Did you ask him about the
                              [Page 120]
```

```
 1              J. Vaughn
 2     A.      Yeah.
 3     Q.      Who did you speak with?
 4     A.      Steve Morelli.
 5     Q.      When did you speak with Mr.
 6 Morelli regarding the settlement
 7 agreement?
 8     A.      The day I came into his office
 9 and signed a release for the check.
10     Q.      So you met with Mr. Morelli
11 and you signed the agreement in his
12 office?
13     A.      Not the agreement I signed the
14 release for the check.  I had to sign a
15 release for it.  So I signed that in his
16 office, the agreement was signed in the
17 bathroom at Tavern on the Green.
18     Q.      How much time elapsed between
19 the time you were in the bathroom and the
20 time you signed the release?
21     A.      When you say the release, you
22 are talking about the agreement or are you
23 talking about the check?
24     Q.      You just said you signed the
25 release.  I'm asking you how much time
                              [Page 119]
```

```
 1              J. Vaughn
 2 class actions?
 3     A.      No.
 4     Q.      Did you ask him whether or not
 5 I will be able to go to federal court
 6 after this and sue Prudential again?
 7     A.      No, because I figured that he
 8 is my attorney, he would tell me that.
 9     Q.      That you would be entitled --
10     A.      What my rights are at that
11 point.
12     Q.      Did Mr. Morelli tell you you
13 cannot go to federal court?
14     A.      No.
15     Q.      He never told you that?
16     A.      Never.
17     Q.      You read the agreement and it
18 said that you were releasing all claims?
19     A.      Yes.
20     Q.      Did you ask him:  What is this
21 I'm releasing all my claims?
22     A.      No, I had no reason to ask him
23 that
24     Q.      Because you understood that?
25     A.      Yes.
                              [Page 121]
```

[31]  (Pages 118 to 121)

J. Vaughn

1  Q.    You understood that you had to
2  arbitrate any claim or controversy under
3  the agreement?
4  A.    Yes.
5  Q.    When you went to see Mr.
6  Morelli for the release of the check, did
7  you hand him a written revocation saying I
8  don't want to go forward with this
9  agreement?
10 A.    No.
11 Q.    Did you tell Mr. Morelli at
12 that time I never agreed to arbitrate any
13 claim or controversy after this?
14 A.    No.
15      MS. LEWIS:   I have nothing
16 further.
17      THE CHAIRMAN:  Thank you.
18      MR. BORTNICK:   I have some
19 questions.
20 EXAMINATION BY
21 MR. BORTNICK:
22 Q.    Mr. Vaughn, when you say that
23 you signed a release in order to get the
24 check, was that a release in the form of

[Page 122]

J. Vaughn

1  release, it was a statement saying these
2  are the deductions from the $200,000 and
3  here is the Leeds & Morelli Brown check
4  for the net?
5  A.    Correct.
6      MR. BORTNICK:  Nothing
7  further.
8      THE CHAIRMAN:  Any recross.
9      MR. HARPER:  No.
10     MS. LEWIS:  Nothing further.
11     ARBITRATOR LINDBERGH:  I have
12 a question.  It is related to your
13 statement.
14     Mr. Vaughn, I'm looking for
15 the date to be specific so that you
16 can know it.  It is Respondent's 2,
17 Mr. Vaughn's statement.  I wondered
18 if you typed that yourself?
19     THE WITNESS: No, I didn't.
20     ARBITRATOR LINDBERGH:  Do you
21 recall who did type it?
22     THE WITNESS: I submitted a
23 statement which I have a copy of but
24 this I think was done at Leeds &

[Page 124]

J. Vaughn

1  an agreement like I promise not to sue, or
2  was it I give you the check and you are
3  released, I'm acknowledging I'm getting a
4  check?
5  A.    That was a statement with the
6  deductions on it for DOW and for their
7  fees and the amount of the check that was
8  going to be given to me, that's what I
9  signed that release for.
10 Q.    That was a check from Leeds &
11 Morelli?
12 A.    Yes.
13 Q.    It was the $200,000 settlement
14 minus certain deductions?
15 A.    Yes.
16 Q.    And if I understood what you
17 said, the release was just a document
18 saying these are the deductions?
19 A.    Yes.
20     MS. LEWIS:  This is redirect.
21 Why are you leading the witness like
22 this?
23     THE CHAIRMAN:  Overruled.
24 Q.    The release when you call it a

[Page 123]

J. Vaughn

1  Morelli.
2      ARBITRATOR LINDBERGH:  Nothing
3  further.
4      THE CHAIRMAN:  Mr. Vaughn,
5  several times in the course of your
6  testimony, for example, when you
7  were talking about the Leeds Morelli
8  retainer agreement --
9      THE WITNESS:  Yes.
10     THE CHAIRMAN:  -- you
11 indicated that that wasn't really
12 the full picture of what was
13 transpiring between the two of you.
14 Sometimes you called it a false
15 statement or whatever.
16     Could you elaborate on that as
17 to what the full picture was as you
18 saw it in this situation?
19     THE WITNESS:  Certainly.
20 Again, when we signed this retainer
21 or myself when I signed this
22 retainer for Leeds & Morelli, we
23 were or we had a bit of a group at
24 that point.  The group had or was

[Page 125]

[32]  (Pages 122 to 125)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

1  very much looking to take this
2  public, this was not an issue of
3  settling, this was strictly we
4  wanted to go public with it and we
5  wanted it to be -- and go to court.
6      After talking with Leeds &
7  Morelli, you know, they told to us
8  do otherwise and we followed suit
9  with that.  However, as far as the
10 agreement is concerned they, again,
11 when I signed not the retainer --
12 are we talking about specifically
13 the retainer.
14     THE CHAIRMAN:  That is one
15 place.
16     THE WITNESS:  The retainer --
17 again, the retainer was signed
18 somewhere after, and if I remember
19 correctly, somewhere around the time
20 that we had already been or where we
21 had already dealt with Prudential
22 and knowing what they wanted to do
23 with the cases.  And we ended up
24 signing the retainer afterwards.  I

[Page 126]

J. Vaughn

1  know we did not all of us sign it up
2  front, the retainers.
3      As far as the settlement
4  agreement is concerned, again, and I
5  specifically said it over Prudential
6  phones which were recorded at the
7  time:  Look, you guys are telling me
8  that I'm going to be working for
9  DOW, I'm going to get $200,000 that
10 is not taxable and I'm going to get
11 long-term disability.
12     The three people who were on
13 the phone was Jeff Brown, Steve
14 Morelli and Lenny Leeds, and all of
15 them agreed that's what was going to
16 happen.
17     Now when I saw this in the
18 bathroom at Tavern on the Green, I
19 specifically asked Jeff, who was the
20 one who presented it to me:  Jeff,
21 what about the long-term disability
22 what about the job for DOW.  That
23 could not be put into this -- in his
24 words, that could not actually be

[Page 127]

J. Vaughn

1  put into this, but yes these are the
2  things you will get as part of your
3  settlement.
4      So that's why when you asked
5  questions about that I was a little
6  reluctant because I know of a
7  different story.
8      THE CHAIRMAN:  One other
9  question.  A little clarification
10 about the relationship between the
11 21 days that the agreement says that
12 you had to consider the release and
13 the signature in the bathroom; how
14 did those two -- what was the time?
15     THE WITNESS:  For the
16 signature --
17     THE CHAIRMAN:  You said you
18 signed it in the bathroom.
19     THE WITNESS:  It was about two
20 weeks afterwards, Steve called me to
21 come down to his office in Carle
22 Place, Long Island to pick up my
23 check and that was two weeks after I
24 signed this in the bathroom at

[Page 128]

J. Vaughn

1  Tavern on the Green.
2      ARBITRATOR LUBOW:  Thank you.
3      Had you not been afforded at
4  least 21 days prior to signing it?
5  In other words, you weren't given
6  this 21 days before you signed it?
7      THE WITNESS:  No, not at all.
8  I signed it the same day it was
9  presented to me.
10     THE CHAIRMAN:  And had you
11 been presented with the substance of
12 this?
13     THE WITNESS:  Other than what
14 I've just spoke about what the terms
15 were of my settlement nothing per se
16 in writing.
17     THE CHAIRMAN:  And how long
18 before had that been presented to
19 you?
20     THE WITNESS:  It would have to
21 have been like I say maybe a week or
22 so before.  It was whenever that
23 fundraiser for Carl McCall went on,
24 that's when they informed me

[Page 129]

[33]  (Pages 126 to 129)

J. Vaughn

1    basically and the day I left
2    Prudential for the day that was the
3    day they told me if you don't want
4    to come back you don't have to come
5    back, this is what you are getting.
6    Later on I met them at Tavern on the
7    Green, where I first saw this
8    agreement and signed it there at
9    Tavern on the Green. And even then
10   they went on to say, hey, this is
11   what you are getting. This is,
12   there are certain things that aren't
13   in here, that is for whatever
14   obvious reasons but you will get
15   those things. And, again,
16   documentation, I have to prove that
17   they did try to go after those
18   things.
19         THE CHAIRMAN:  And you knew
20   you had seven days to back out of
21   this?
22         THE WITNESS: Yes.
23         THE CHAIRMAN:  You didn't
24   consult -- did you consult another

[Page 130]

J. Vaughn

1    but, he does have seven days to
2    revoke it in writing and the
3    agreement, I think, specifically
4    provides that we don't cut the check
5    until the seven days passes.
6         THE CHAIRMAN:  Fine.
7         MR. HARPER:  I don't think
8    there is a controversy between the
9    parties that those time periods were
10   within the claimants' rights to
11   uphold or disregard.
12         THE CHAIRMAN:  Fine.
13         MR. HARPER:  I have nothing
14   further.
15         MR. BORTNICK:  Mr. Vaughn is
16   our only witness we have nothing
17   more to press, we rest.
18         THE CHAIRMAN:  Do you have
19   any witnesses?
20         MR. HARPER:  Prudential
21   rests?
22         THE CHAIRMAN:  Do you have
23   any witnesses, Ms. Lewis?
24         MS. LEWIS:  We rest.

[Page 132]

J. Vaughn

1    lawyer to review this?
2         THE WITNESS: No.
3         THE CHAIRMAN:  Thank you very
4    much.
5         MR. BORTNICK:  Nothing
6    further.
7         MR. HARPER:  Nothing further
8    order.
9         MR. BORTNICK:  I think Mr.
10   Harper is about to say there is not
11   an issue as to whether the
12   release was valid because he wasn't
13   afforded 21 days. We are not making
14   the claim he was short changed in
15   the time. It means they have to
16   hold the agreement open for 21 days
17   and he can sign it within half a
18   second of receiving it, that's
19   actually a DEA waiver.
20         MR. HARPER:  And it has
21   nothing to do with the time of the
22   execution, as Mr. Bortnick says he
23   can sign it immediately or he can
24   decide to take the full 21 days, and

[Page 131]

J. Vaughn

1         MR. HARPER:  Can I make a
2    suggestion while we have burdened
3    you with a great deal, I would like
4    to read the transcript and submit a
5    very, very short piece of paper.
6         I don't think we need, I would
7    just be repeating whatever I said in
8    terms of the closing, and if I have
9    a transcript I might think it might
10   inspire me but I'm not talking
11   anything voluminous. Ten pages
12   tops.
13         MR. BORTNICK:  I think, Mr.
14   Harper, I appreciate what he is
15   trying to say. I think we have the
16   right for closing statements I
17   believe under the rules.
18         THE CHAIRMAN:  Sure.
19         MR. BORTNICK:  I would like
20   to use my right.
21         THE CHAIRMAN:  You say you
22   want to file a posthearing brief?
23         MR. HARPER:  Yes.
24         MR. BORTNICK:  So we can

[Page 133]

[34]  (Pages 130 to 133)

J. Vaughn

1 argue after the closing about that?
2 THE CHAIRMAN: Yes. One
3 doesn't exclude the other.
4 MR. BORTNICK: I think I may
5 have misunderstood him. I intend to
6 burden you a little.
7 MR. HARPER: I know the rules
8 say it, but I was hoping to forebear
9 from the closing statement.
10 MR. BORTNICK: You need not
11 to.
12 THE CHAIRMAN: Proceed.
13 MR. BORTNICK: Rule 10301-D,
14 subsection 3 of the NASD rules. No
15 member or associated person -- we
16 are talking about Prudential here --
17 shall seek to enforce any agreement
18 to arbitrate against a customer,
19 other member or person associated
20 with the member who has initiated in
21 court a punitive class action --
22 that would be Mr. Vaughn -- or is a
23 member of a punitive or certified
24 class, with respect to any claims
25 [Page 134]

J. Vaughn

1 and she said, no, it is for the
2 arbitrators to decide what was the
3 intention of the parties when the
4 agreement was signed. Specifically,
5 what was the intention with respect
6 to class actions.
7 She came up with three things
8 that she thought might be possible.
9 And one of them no one is arguing.
10 No one is arguing that it was the
11 intent of the parties to have class
12 arbitration, so we are left with
13 two, two possibilities. Okay.
14 So we want to know what the
15 intent of the agreement is. That's
16 easy, we swear, we put under oath
17 and ask the people that signed the
18 agreement, the people that entered
19 into the agreement, Mr. Vaughn and,
20 well, I thought Prudential.
21 Obviously, Leeds & Morelli
22 can't do it. The only thing they
23 possibly could have done, and I
24 thought they might be doing because
25 [Page 136]

J. Vaughn

1 encompassed by the class action
2 unless and until -- and there's a
3 four separate things set out. For
4 example, unless and until the court
5 decides not to certify the class or
6 one of the class members opt out,
7 for example. But the point of the
8 rule is clear, Prudential under rule
9 10301-D3 is not even allowed to be
10 doing what it is doing here, and
11 that's why a statement of claim we
12 have specifically sought the relief
13 of a disciplinary referral against
14 Prudential because it is a direct
15 violation of this rule what they are
16 doing here, that's number one.
17 Number 2, this panel has had
18 way too much paper on why we are
19 here, and that's why I wanted today
20 read into the record what Judge
21 Coate said. She wanted to know --
22 she wanted the arbitrators to
23 decide, not her, because we had
24 initially argued she should decide
25 [Page 135]

J. Vaughn

1 Mr. Brown was on the witness list
2 because maybe he was going to show
3 up and said I advised Mr. Vaughn
4 that so forth and so on, but he
5 didn't say that, he wasn't here to
6 say that.
7 The only testimony you had is
8 Mr. Vaughn's testimony, and he
9 clearly said I didn't intend to
10 waive a class action. I did not
11 intend to make some kind of waiver
12 with conflict with the other part of
13 rule 10301 which has no class
14 actions at the NASD.
15 I was frankly shocked that
16 Prudential, at least at first I was
17 shocked that Prudential did not put
18 any witnesses on their witness list
19 and did not have anybody appear to
20 say what Prudential's intent was,
21 because then you would have a "he
22 said, she said." Mr. Vaughn says
23 one thing and Prudential would say
24 the other, and the panel would have
25 [Page 137]

[35] (Pages 134 to 137)

J. Vaughn

1  to figure it out.
2       We can only speculate, but
3  perhaps the best reason, the one
4  that makes the most sense is that
5  nobody from Prudential showed up is
6  because no one from Prudential was
7  going to come here and say something
8  that wasn't true. But it really
9  doesn't matter the only testimony
10 you have is Mr. Vaughn, that is the
11 only thing that can be relied on as
12 far as what were the intentions of
13 the parties not what is the basis of
14 Mr. Vaughn's class action case, not
15 whether he was happy with his
16 attorneys, not whether he thinks he
17 has to pay $200,000 back to
18 Prudential to continue in court.
19      That is all just more than
20 window dressing. It is the circus
21 around why we are here. And you
22 only heard testimony from one
23 witness about intent and that's why
24 this case was sent here, and so
25                    [Page 138]

J. Vaughn

1  MR. HARPER: Yes.
2       MR. HARPER: Mr. Bortnick,
3  consistently overlooks Rule 10216-F
4  of the NASD rules which says, if a
5  member or a current or former
6  associated person of a member files
7  in court of the claim against a
8  member or current or former
9  associated person of a member that
10 includes matters that are subject to
11 mandatory arbitration, identified by
12 the rules of the association or by
13 private agreement, the defendant
14 party may move to compel arbitration
15 of the claims that are subject to
16 mandatory arbitration.
17      Pursuant to that right and
18 that rule we made a motion to compel
19 that the United States federal
20 district court granted in the face
21 of precisely the argument Mr.
22 Bortnick is making to you this
23 morning.
24      So the idea that we were in
25                    [Page 140]

J. Vaughn

1  really there is nothing left to do.
2  I don't see how there could be any
3  finding that there was an intent to
4  waive class action claims because
5  you heard no competent evidence that
6  would support that.
7       So we are left here in the
8  situation where the panel really, at
9  least in my view, has no choice but
10 to make a finding that the class
11 action can go forward and, frankly,
12 that Prudential should be, at least
13 that the panel doesn't have the
14 ability for a regulatory
15 disciplinary -- not to actually
16 impose the discipline, but it has
17 the panel to make the referral to
18 the appropriate district because it
19 is a clear violation of the rule in
20 trying to enforce a no class action
21 clause that they are not allowed to.
22      MR. BORTNICK: Thank you.
23      THE CHAIRMAN: Anything
24 further?
25                    [Page 139]

J. Vaughn

1  violation of this rule, and I note
2  that the rule on which Mr. Bortnick
3  relies 10301, does not refer to a
4  formerly associated person. They
5  could have put that in the rule,
6  they didn't, but they did put it in
7  the rule on your right to move to
8  compel.
9       Now, I'm at something of a
10 disability here because the lawyers
11 in the room know that in connection
12 with a communication between Mr.
13 Vaughn and his personally chosen
14 lawyer the lawyer Prudential had
15 absolutely nothing to do with
16 selecting for him. Prudential had
17 no right at all to communicate with
18 Mr. Vaughn directly that's an
19 ethical road in the Code of
20 Professional Responsibilities in New
21 York and in every model Rule of
22 Professional Conduct in the 50
23 jurisdictions.
24      So Prudential is uniquely
25                    [Page 141]

[36] (Pages 138 to 141)

J. Vaughn

1  disabled from having any knowledge
2  of what was said between Mr. Vaughn
3  and his lawyers that was subject to
4  a privilege at the time.  And one
5  that would have sent us to ethics
6  jail had we attempted to try and
7  communicate with Mr. Vaughn about
8  the meaning of the agreement that
9  was for his handpicked lawyer to do,
10  and it is deeply unfair for Mr.
11  Vaughn to come in here and say he
12  has a right to sue me because his
13  handpicked lawyer he claims he
14  didn't understand the agreement that
15  between PSI and his lawyer because
16  his lawyer didn't explain it to him.
17  Now, Mr. Bortnick says Prudential
18  has no witness on intent and the
19  reason we have no witness on intent
20  is because Prudential expressed its
21  intent in plain, clear, unambiguous
22  language in the agreement and for
23  Mr. Bortnick to suggest that the
24  only evidence before you is Mr.

[Page 142]

J. Vaughn

1  Vaughn's ever changing ever shifting
2  testimony about what he understood
3  and didn't understand what was true
4  and what wasn't true is the only
5  evidence before you is quite untrue.
6      Of course, you have before you
7  the agreements that he signed that
8  very clear and unambiguous language
9  in them.  Equally clear and
10  unambiguous is the transcript of
11  Judge Coate in response again to
12  exactly the arguments exactly the
13  arguments that Mr. Bortnick is
14  making to you, quote, the plaintiff
15  clearly agreed to the arbitration of
16  his claims.
17      And I ruled that the
18  arbitration agreement was valid and
19  enforceable and that legally was not
20  in dispute, and that what this panel
21  was to decide was what kind of
22  arbitration proceedings we would
23  have, what kind of arbitration
24  proceedings we would have, is what

[Page 143]

J. Vaughn

1  the judge says in her transcript.
2      So I think it is pretty clear
3  when you sign on to a arbitration
4  clause with an individual claim,
5  remember all he had was a individual
6  claim, not a class claim.  He had an
7  individual claim that he was
8  discriminated against.  And he said
9  he wanted to be paid $200,000, and
10  he was by PSI in a mediation
11  process.
12      The system worked.  The law
13  favors these kind of alternative
14  dispute resolution mechanisms.  And
15  in Mr. Vaughn's case, it worked very
16  handsomely for him.  And it would be
17  I think an unmistakeable inference
18  arising from the clear and
19  unambiguous language of the contract
20  that when a person settles an
21  individual claim and agrees to
22  arbitrate any dispute over the
23  settlement agreement.  For example,
24  if he doesn't get his Cobra, which I

[Page 144]

J. Vaughn

1  happen to believe not to be true,
2  but I don't have the document here
3  to demonstrate it as a statutory
4  segue, so it would be quite bizarre
5  for Cobra not to have worked in
6  those circumstances.  It is
7  egregiously unfair for Prudential to
8  have to be confronted again by
9  someone it settled with and be paid
10  in a clear and unambiguous contract,
11  what is now almost nine years ago or
12  eight years ago, at some point it is
13  time to stop.  Thank you.
14      THE CHAIRMAN:  You are next.
15      MS. LEWIS:  Let me start with
16  this, which is where we ended when
17  we were opening.  Which is the
18  propriety of having Mr. Vaughn
19  testify at all.
20      And I think that Mr. Vaughn's
21  testimony was the quintessential
22  example of the wisdom of the law
23  that says when you have an agreement
24  the intent of the parties is the

[Page 145]

[37]  (Pages 142 to 145)

J. Vaughn

1  objective intent, based upon the
2  words in that agreement, and not the
3  ability of the individuals to go
4  back and try to remember what they
5  did or did not intend eight years
6  ago or nine years ago, whatever it
7  is.
8       Mr. Vaughn demonstrated that
9  he understood certain parts and
10 other parts maybe did not understand
11 other parts, he didn't read some.
12 Maybe he didn't read others very
13 conveniently. And let us be honest,
14 Mr. Vaughn, and his counsel will
15 have to go back to federal court in
16 order to seek his money, they have
17 not sought any money here. They
18 have conveniently turned the
19 standard on its head, the court did
20 not refer to this court or to the
21 panel I mean the question of whether
22 or not there was a knowing waiver of
23 class actions. What was referred
24 was a question of the interpretation

[Page 146]

J. Vaughn

1  arbitrated, can be brought back to
2  court, notwithstanding that
3  unambiguous clause because he has
4  chosen to designate himself as the
5  head of a class, when based upon an
6  individually negotiated settlement
7  puts this in a particularly unique
8  position.
9       Now in preparing for this
10 hearing I actually went onto the
11 NASD website, and the NASD website
12 has a section that talks about we
13 are not just looking to help the
14 industry and the customers and the
15 securities, we can offer dispute
16 resolution to the commercial world
17 and delve into individual questions
18 and individual issues.
19      This is not a customer claim,
20 this is not even an employment
21 claim. This is a commercial
22 contract, a settlement agreement.
23 And in that settlement agreement,
24 the parties unambiguously agreed

[Page 148]

J. Vaughn

1  of the arbitration clause. And the
2  testimony to the extent that it was
3  consistent at all, was consistent
4  with Mr. Vaughn knew and understood
5  that any claim or controversy
6  arising in connection with the
7  agreement or its interpretation was
8  to be arbitrated.
9       And whether or not or what the
10 rules were, he didn't inquire, he
11 didn't care, he wanted his $200,000
12 and he received his $200,000. He
13 had opportunities to ask questions,
14 he had opportunities to revoke, he
15 didn't, as he testified, he just
16 didn't care. That subsequently in
17 order to evade and, frankly,
18 fundamentally attack the quality of
19 the alternative dispute resolution
20 process, Mr. Vaughn, and his counsel
21 can put his name in front of a
22 punitive class action and claim that
23 his individual claims that the court
24 has already determined must be

[Page 147]

J. Vaughn

1  they were going to submit any claim
2  or dispute and Mr. Vaughn has
3  testified that he understood that
4  that should be the end of the
5  question that that should be this
6  body in respect for arbitration and
7  the alternative dispute process
8  should have the discretion to say,
9  he understood the clause, he
10 understood everything, and it says
11 on its face any claim or
12 controversy. And we will go no
13 further than that because the rest
14 was just the rules that were going
15 to be applied in that proceeding.
16      In other words, as Mr. Harper
17 aptly quoted what the court said:
18 What the arbitration is going to
19 look like, not whether or not an
20 arbitration was going to be
21 conducted or not.
22      I would ask again that Mr.
23 Vaughn's testimony be stricken
24 because it should not be relevant to

[Page 149]

[38]  (Pages 146 to 149)

J. Vaughn

1  this conversation. And point out in
2  response to Mr. Bortnick's comments
3  that is the reason why we didn't
4  compound the error by putting any
5  witness on at this time.
6      The last thing is I would be
7  remiss if I didn't go back and
8  remind about the individual
9  respondents, you heard no word of
10 testimony or heard no word in
11 argument they do not belong here and
12 in due difference to the panel there
13 has been no referral to
14 jurisdictional issues nor could
15 there be. Thank you.
16     MR. BORTNICK:   I have a very
17 brief rebuttal.
18     THE CHAIRMAN:   Yes.
19     MR. BORTNICK:   Over and over
20 I hear from Prudential as well as
21 the Leeds & Morelli firm the
22 individual that this is clear and
23 unambiguous, the arbitration clause
24 is clear and unambiguous. If it was

[Page 150]

J. Vaughn

1  language and it is clear on its
2  face, but instead to say: We knew
3  what we were doing when we stuck
4  this in the agreement. We drafted
5  the agreement and we put this clause
6  in because we wanted to make sure
7  there would never be a class action.
8  That is easy to do, but they didn't.
9      I think we probably can guess
10 why. The same thing for the Leeds &
11 Morelli defense. You could have put
12 on Mr. Brown when he said: I told
13 Mr. Vaughn that, but they didn't
14 and, of course, we know why it's
15 because that conversation with Mr.
16 Vaughn and Mr. Brown never took
17 place; so, in fact, these parties
18 are uniquely qualified to defend.
19 Thank you.
20     THE CHAIRMAN:   Thank you.
21 First of all, we are complete here.
22 If that was a request that his
23 testimony be stricken, it is denied.
24 And I have a couple of questions for

[Page 152]

J. Vaughn

1  so clear and unambiguous, we never
2  would have been here. The judge
3  would have said: Off to arbitration
4  you go. Instead she said, the
5  arbitrators have to figure out what
6  it means, and I can think of, she
7  says at the top of page 4 of the
8  transcript at least three different
9  things and maybe there are more. It
10 was clearly ambiguous to her at
11 least.
12     And that's why she said, and I
13 quoted earlier, you need to figure
14 out the arbitrator -- she said the
15 arbitrator, but we are talking about
16 a panel here -- what are the party's
17 intentions, that is the word she
18 uses "intentions." We read that
19 earlier.
20     And so Prudential is not
21 uniquely disabled, it is uniquely
22 qualified to put on a defense here.
23 Bring up the Prudential witness who
24 is not going to say I can read the

[Page 151]

J. Vaughn

1  the lawyers which I hope will help
2  us.
3      First of all, Mr. Bortnick, I
4  apologize for mangling your name
5  before. Why isn't it appropriate to
6  read the reference in the provision.
7  The reference to the NASD rules as
8  shorthand for no class actions.
9      MR. BORTNICK:   You mean in
10 this context or generally speaking?
11     THE CHAIRMAN:   I don't think
12 it makes a difference.
13     MR. BORTNICK:   I'm sorry, I
14 just don't understand the question.
15 You mean in this particular case or
16 this context or other.
17     THE CHAIRMAN:   I'm not sure
18 there is any difference.
19     MR. BORTNICK:   There is in
20 the sense there are class actions as
21 the panel is aware that go on every
22 day against the securities industry.
23 I mean there must be hundreds in
24 court right now, you know, that's an

[Page 153]

[39]   (Pages 150 to 153)

1    J. Vaughn
2    everyday occurrence, all the 10B5
3    cases, the tort reform, and so
4    forth. Of course there are class
5    actions that exist. And the rule is
6    there because the NASD for the stock
7    exchange are equipped as forums to
8    handle the administration of a class
9    action. They've decided there are
10   certain kinds of cases they are not
11   going to hear, class actions are one
12   of them.
13          It doesn't mean that I as a
14   buyer, and I never bought World Com
15   at least not to my knowledge I
16   bought a mutual fund, but as a
17   purchaser of World Com doesn't mean
18   I've waived my rights to a class
19   action against you know there were
20   lawsuits against --
21          THE CHAIRMAN: I don't think
22   you understand me. There is a
23   provision here it says: Here is
24   what is going to happen if there is
25   a dispute, we are going to go to
                              [Page 154]

1    J. Vaughn
2    bringing a class action against
3    Merrill Lynch for wrong research or
4    CSFP is a better example because
5    those were the claims that were made
6    by other firms not me. So everybody
7    has the same agreement when you have
8    a customer agreement in a customer
9    case, I agree to -- if I have a
10   dispute with my broker, Merrill
11   Lynch, I agree to arbitrate pursuant
12   to the rules of the NASD but not for
13   class actions, that's why the class
14   actions exist.
15          Moreover, it is a question of
16   what is the intent of the actual
17   people, what is the intent to them
18   at the time they are signing it, the
19   two parties to get down to the
20   micro. And that's why I said
21   Prudential should have had someone
22   saying what they thought it meant.
23          THE CHAIRMAN: Suppose the
24   NASD has more onerous pleading
25   rules -- just hypothetical -- than a
                              [Page 156]

1    J. Vaughn
2    arbitration under the rules of the
3    NASD. And I'm wondering why it is
4    not appropriate to read that phrase
5    as "just as it means whatever the
6    time periods are for pleading in the
7    NASD as no class actions" it is a
8    different way of saying it, in other
9    words.
10          MR. BORTNICK: I understand.
11   First of all, because this is also
12   the rule that firms aren't allowed
13   to oppose a class action claim that
14   I read to the panel. But the
15   fundamental issue here is by
16   agreeing to arbitrate, pursuant to
17   the rules of the NASD -- which is
18   pretty near exactly what the
19   agreement says -- the rules are
20   clear, just like anyone else that is
21   arbitrating, I agree to arbitrate
22   pursuant to the rules of NASD if I
23   buy a share of World Com from my
24   broker at Merrill Lynch. It doesn't
25   mean I have been prohibited from
                              [Page 155]

1    J. Vaughn
2    judicial process, has a shorter
3    statute of limitations than the
4    judicial process; how is that
5    different from the case where the
6    claimant says -- the claimant says I
7    didn't mean to submit to those
8    rules, those rules are tougher than
9    the rules in the judicial process, I
10   didn't mean to submit to those.
11          MR. BORTNICK: Again,
12   perhaps, I'm not understanding the
13   question. He is agreeing to submit
14   to rules that prohibit class actions
15   from being heard in this forum, but
16   permit them to go on in the courts.
17   That's why I use the example of all
18   security industry class action
19   cases. To my knowledge nobody's
20   ever argued to any NASD or New York
21   stock exchange panel when MillBerg
22   Weiss or Burnstein Lidowitz the mega
23   class action firms bring a class
24   action case against the securities
25   industry like Prudential or similar
                              [Page 157]

[40] (Pages 154 to 157)

J. Vaughn

1  firms. No one has ever made the
2  argument, you have a customer
3  agreement that says you only -- that
4  says something different. But with
5  respect to the issue of class
6  actions, this is the first time I
7  ever heard the argument being made.
8  And the reason -- and I don't
9  understand why it is being made
10 because the parties agreed to
11 arbitrate pursuant to rules. And
12 those rules mean class actions are
13 in court. And in fact certain
14 discriminations at the option of the
15 employee under most circumstances
16 are also in the court by the way.
17       The U-4, which I know the
18 panel is familiar with has standard
19 form language that says the employee
20 agrees to bring all actions arising
21 out of that employment to
22 arbitration, but also in the rules
23 but not in the U4 was a change some
24 years ago to the NASD and the New

[Page 158]

J. Vaughn

1  accounts at --
2       THE CHAIRMAN: I assume that
3  is what you are saying?
4       MR. BORTNICK: Yes.
5       MR. HARPER: He actually
6  worked at Solomon Smith Barney.
7       MR. BORTNICK: Yes, I'm
8  sorry.
9       MR. HARPER: And they were
10 arbitrated because my firm
11 represented Solomon Smith Barney in
12 those arbitrations.
13       What I heard Mr. Bortnick say,
14 is that if he buys a share of stock
15 he can't be a member of a 10B5 class
16 action. When I buy a share of stock
17 I don't sign an arbitration
18 agreement. My understanding is that
19 I assume he was referring to a suit
20 against the broker.
21       MR. BORTNICK: The customer
22       MR. HARPER: If it is a claim
23 of say an unauthorized trade or if
24 it is a claim that I was defrauded

[Page 160]

J. Vaughn

1  York State Stock Exchange rules that
2  said: If you have a sex
3  discrimination lawsuit, race
4  discrimination lawsuit, you may
5  choose to bring that in court. So
6  it is the same thing here. Class
7  actions, they can't be heard here.
8       THE CHAIRMAN: The first
9  question to Mr. Harper and Ms.
10 Lewis: Is this like the customer
11 case he is referring to?
12       MR. HARPER: No, because if I
13 buy a share of World Com, and then
14 sue the officers and directors of
15 World Com in a class action, I
16 haven't signed any arbitration.
17       MR. BORTNICK: I'm saying,
18 for example, the World Com suit, as
19 you understand it, that is one
20 example they sued a lot of
21 individuals but they also sued
22 Credit Suisse, First Boston, where I
23 believe Mr. Jack Krupman worked for
24 bad research. You have brokerage

[Page 159]

J. Vaughn

1  by Mr. Grubman's analyst reports
2  into acquiring excessive World Com
3  stock, that's an arbitration.
4       THE CHAIRMAN: And you are
5  suggesting it's a possible class
6  action?
7       MR. BORTNICK: There are class
8  actions and, in fact, now that you
9  are saying it, it is a case I'm not
10 involved in in my office -- there is
11 a class action or was a class action
12 against Solomon Smith Barney over
13 World Com stock because our two
14 firms have an issue as to whether
15 one of our clients opted out of the
16 suit because he wanted to go to
17 arbitration or pursuing it in
18 arbitration, and there is a question
19 of whether he opted out of the
20 lawsuit and is allowed to go to
21 arbitration.
22       And Mr. Harper was very
23 careful, he did not say that a
24 purchaser of a share of World Com

[Page 161]

[41]  (Pages 158 to 161)

J. Vaughn

1 can't be a member of a class because
2 again the broker -- what he said if
3 it was an unauthorized trade or
4 something like that in general, but
5 he knows that there are, I don't
6 know, thousands of people that
7 bought World Com that was part of
8 the lawsuit and the ultimate
9 settlement of the World Com class
10 action in which Solomon Smith Barney
11 was a defendant, those are real
12 class actions in court.
13     THE CHAIRMAN:  And were these
14 suits in which the arbitration
15 clause was raised as you can't sue
16 us?
17     MR. BORTNICK:  I'm sure it
18 was never raised, to tell you the
19 truth.
20     MS. LEWIS:  If I may
21 interject because there are cases
22 that are out there that we
23 have cited to you that we discussed,
24 where that circumstance has been

[Page 162]

J. Vaughn

1 ultimately settled. So we don't know
2 where it went. But the Second
3 Circuit felt that the southern
4 district judge who was hearing it
5 was so in error for not considering
6 the arbitration clauses that were
7 contained in these other private
8 agreements that they were reversed
9 and sent it back for purposes of
10 determining whether what, if
11 anything, had to be arbitrated.
12     Here we are in a different
13 circumstance.  We have not an
14 employment contract, not a
15 discrimination contract, not a
16 securities contract.  We have a
17 commercial contract between two
18 independently represented people
19 which resolved the dispute and it is
20 from that the claim that we are
21 addressing is arising.  And whether
22 or not as we have argued, Mr.
23 Vaughn's claim --
24     THE CHAIRMAN:  What is the

[Page 164]

J. Vaughn

1 raised and there is a class action
2 suit in addition with the securities
3 fraud litigation and related claims
4 were made regarding individuals who
5 would either have a contract for
6 services or professionals.  And the
7 court makes an analysis as to
8 whether or not the claims fall
9 within the arbitration clause and
10 whether or not they are encompassed
11 with the classic action.
12     So what Mr. Bortnick has been
13 dismissing as just so much legal
14 gobbledegook that we've put before
15 the arbitrators is very relevant
16 here.  In fact, Mr. Bortnick cited
17 several cases in regarding the
18 foreign currency tax shelters, but I
19 personally was involved in
20 representing lawyers.  And the
21 Second Circuit reverts to the denial
22 of the motion to compel arbitration
23 in that case, and it was sent back
24 to the district court and the case

[Page 163]

J. Vaughn

1 difference you are referring to?
2     MS. LEWIS:  Because Mr.
3 Vaughn, as Mr. Harper was addressing
4 in cross-examination, made certain
5 promises an received payment for
6 those promises.  And one of the
7 promises made was:  I will arbitrate
8 any claim or dispute and that is a
9 promise between two parties without
10 regard to anybody else and the court
11 has --
12     THE CHAIRMAN:  How is that
13 different from the customer
14 agreement?
15     MS. LEWIS:  Because the
16 customer agreements, first of all,
17 have certain statutory requirements,
18 and they have certain questions as
19 to whether or not there is even true
20 arm's length transaction.  And here
21 is your agreement take it or leave
22 it.  But even those cases I pointed
23 out, and refer the panel to the
24 Canon versus Gun Allen case.  In

[Page 165]

[42] (Pages 162 to 165)

J. Vaughn

1   that case the court said, well, yes
2   it is a securities fraud claim but
3   vis-a-vis the professional it has a
4   contract, we are going to look at
5   what should be arbitrated and we are
6   going to look at that first.
7   Because if we settle an arbitration
8   that is going to formulate what has
9   to be addressed, if anything has to
10  be addressed in class action.
11        Here, the court has determined
12  Mr. Vaughn's individual claim must
13  be arbitrated.  So if we address
14  that or had we addressed that, had
15  it been brought in arbitration it
16  might have formulated whether or not
17  Mr. Vaughn's claim could ever be
18  included in a class action if his
19  individual claim is identical to
20  what he would claim as a class
21  action.
22        THE CHAIRMAN:  Proceed.
23        MR. BORTNICK:  Yes.  The Gun
24  Allen case she refers to, and I'm

[Page 166]

J. Vaughn

1   fundamentally says that there was
2   something, that he called it a
3   secret in his testimony, between
4   Leeds & Morelli and Prudential
5   attorneys that he didn't know about
6   that affected the agreement.  So he
7   brought a class action, and the
8   judge said, well, he could have
9   technically waived his right to
10  bring a class action at all
11  depending on what his intent or what
12  the intention of the parties were to
13  the agreement.
14        And that's why I keep coming
15  back to the intention of Jeffrey
16  Vaughn and the intention of
17  Prudential.  And you only had the
18  testimony on one because that's what
19  if judge said.  In the Gun Allen
20  case the way they characterize it on
21  page 10 of their I guess reply
22  brief, is not a particularly
23  remarkable point.  You only, you
24  can't sweep into court things that

[Page 168]

J. Vaughn

1   not saying I agree with her
2   characterization of it, but the way
3   they characterized it in their
4   motion papers was that there was no
5   arbitration for claims that were
6   encompassed by a pending class
7   action.
8        In other words, claims that
9   are part of the class action go to
10  court and don't get arbitrated,
11  that's what their characterization
12  of the Gun Allen case is.
13        The case that Mr. Vaughn
14  brought, he is the one bringing the
15  class action claim so, of course,
16  the claim that he would otherwise
17  have, the so-called individual claim
18  is the class action claim, there is
19  no difference and it's just to think
20  of it any other way is just not only
21  flat-out wrong, but it is
22  nonsensical.
23        He has brought a claim, a
24  class action claim in court that

[Page 167]

J. Vaughn

1   are not part of the class action,
2   that's unremarkable.
3        MR. HARPER:  I have something
4   else.
5        THE CHAIRMAN:  Yes.
6        MR. HARPER:  I think there
7   are lots of reasons why this panel
8   should hold Mr. Vaughn to his
9   promise, but I think one of the
10  things that, Mr. Chairman, I think
11  you are going to, is what is going
12  on between this and the typical
13  customer and/or the typical employee
14  claim.
15        And I think what Ms. Lewis has
16  been trying to say is because it is
17  neither, it is neither a customer
18  complaining about a trade nor is it
19  an employee complaining about racial
20  or sex discrimination or age
21  discrimination.
22        It is an employee complaining
23  about an arm's length agreement that
24  exchanged consideration, and had a

[Page 169]

[43]  (Pages 166 to 169)

J. Vaughn

dispute resolution clause that happened to refer to the procedures of the NASD, and which is shorthand for no class action, which makes perfect sense because there was no class action to begin with, it was a unique individualized claim that Mr. Vaughn was settling.

And I can't emphasize enough, how I'm standing here eight years later having paid all the consideration having lived up to my part of the bargain in every respect and I'm still arguing with somebody who hasn't worked for me in nine years who settled with me nine years ago or eight years ago, or whatever it is, and I'm still expending resources trying to uphold an agreement that has dust on it.

And I would respectfully suggest that fairness occupies a place or ought to occupy a place at the table.

[Page 170]

J. Vaughn

Mr. Bortnick can cite all the rules he wants about the NASD, but he can't address the simple facts that the rules of the NASD specifically allowed me to go into court to compel arbitration against a former employee. That is what the rule says. The rule does not forbid me to make a motion to compel arbitration against a former employee.

Mr. Vaughn was a former employee when he signed the agreement and when he got the check. And he was a former employee when he brought the class action. And so the notion that we are here to decide about the intention of the parties when the intention of the parties is set out in a contract that Mr. Vaughn promised me he understood and read at the time, that the law presumes he understood and read. The cases in New York and

[Page 171]

J. Vaughn

the cases in New Jersey and the cases all across the country you signed an agreement, you are dispositively presumed, irrefutably presumed to have understood the terms and conditions of that contract.

And you cannot come in eight years later and say: My lawyer didn't tell me this. And to say it to me, when I wasn't his lawyer and when I had no right to communicate with him.

This is not about knowing and voluntary waiver because that concept applies only to substantive rights, and the Supreme Court, every federal circuit, every federal district court has held time and time again that to agree to an alternate dispute resolution process is not to forego a substantive right because the courts have faith in these processes to vindicate those

[Page 172]

J. Vaughn

rights.

MR. BORTNICK:    I want to respond. It has been raised several time here and and I want to address this fairness issue. I'm standing here eight years later having to defend.

The flip answer to the other side of that is the truth here at least the claim in this case is if we don't hold you to account for what you did eight years ago, you get away with doing something really bad, and so that's why you are here.

THE CHAIRMAN:    One at a time. We don't want to rehear the testimony.

MR. BORTNICK:    Mr. Vaughn said it came up in a question several times during cross, what the case is about and what the class action complaint is about.

And so this whole idea of fairness, The fairness is not to let

[Page 173]

| | |
|---|---|
| 1  J. Vaughn | 1  J. Vaughn |
| 2  an injustice be gone unadressed. | 2  30thank you very much. |
| 3  And that's why the class action is | 3      Thank you for your patience |
| 4  here because this is just like any | 4  and good spirit. |
| 5  other class action, the amount -- | 5 |
| 6  that is why it is a class action, | 6      (Whereupon, at 1:30 P.M., the |
| 7  the amount, Mr. Vaughn has been | 7  arbitration was concluded.) |
| 8  damageed either there's a legal | 8 |
| 9  theory it has to do with the amount | 9 |
| 10 of the -- I don't think we have to | 10 |
| 11 go there.  It is not about the | 11 |
| 12 $200,000, but the amount that he is | 12 |
| 13 damaged is so small that it | 13 |
| 14 doesn't -- | 14 |
| 15     THE CHAIRMAN:   We understand | 15 |
| 16 the purpose of class actions. | 16 |
| 17     MR. BORTNICK:  Fine. | 17 |
| 18     THE CHAIRMAN:  Will each of | 18 |
| 19 the parties state affirmatively | 19 |
| 20 whether you had a full and fair | 20 |
| 21 opportunity to be heard. | 21 |
| 22     MR. BORTNICK:  Yes. | 22 |
| 23     MS. LEWIS:  Yes. | 23 |
| 24     MR. HARPER:  Yes, | 24 |
| 25 exhaustively, Mr. Chairman. | 25 |
| [Page 174] | [Page 176] |

| | |
|---|---|
| 1  J. Vaughn | 1      J. Vaughn |
| 2     THE CHAIRMAN:   We will take | 2      I N D E X |
| 3  that for a yes.  The decision will | 3 |
| 4  be forwarded to the parties and/or | WITNESS   EXAMINATION BY      PAGE |
| 5  their counsel in order to expedite | 4 |
| 6  the delivery of the panel's decision | 5  J.VAUGHN  Mr. Bortnick      36, 121 |
| 7  to the parties, the panel may either | 6      Mr. Harper      54 |
| 8  execute a handwritten copy of the | 7      Ms. Lewis      108 |
| 9  award or each arbitrator may execute | 8      E X H I B I T S |
| 10 a counterpart copy of the award. | 9 |
| 11 And ASD is not responsible for the | EXHIBITS   DESCRIPTION PAGE |
| 12 disposal of any documents left here. | 10 |
| 13 So if you want to retain secure | 1 Opinion and order of Judge |
| 14 control of them, you should take | 11 Coate dated August 12, 2005      38 |
| 15 them with you when you leave. | 12 2 Transcript of the hearing in |
| 16     The record will remain open | 13 front of Judge Coate dated |
| 17 until the panel arrives at a | 14 September 5, 2006      38 |
| 18 decision or the panel determines | 15 3 Settlement agreement between |
| 19 that it is closed.  No party will | 16 Mr. Vaughn and Prudential |
| 20 contact any member of the | 17 Securities, dated October 1998      38 |
| 21 arbitration panel directly.  All | 18 RESPONDENTS' |
| 22 communications are to be directed to | 19 1 Agreement      61 |
| 23 the staff person assigned to this | 20 2 Five-Page document      72 |
| 24 case.  We request that the parties | 21 |
| 25 leave the room at the same time. | 22 |
| [Page 175] | 23 |
| | 24 |
| | 25 |
| | [Page 177] |

[45]  (Pages 174 to 177)

```
1        C E R T I F I C A T E
2
3   STATE OF NEW YORK  )
4              )  : ss.
5   COUNTY OF NEW YORK )
6
7          I, WILLIAM BYRNE, a Notary
8   Public within and for the State of New
9   York, do hereby certify that the within is
10  a true and accurate transcript of the
11  proceedings taken on April 23, 2007.
12         I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage and that I am
15  in no way interested in the outcome of this
16  matter.
17         IN WITNESS WHEREOF, I have
18  hereunto set my hand this 5th day of May,
19  2007.
20
21         _____
22         WILLIAM BYRNE
23
24
25
                          [Page 178]
```

[46]  (Page 178)

**A**

AAA 8:22
ABA 8:22
ability
  139:15
  146:4
able 32:19
  121:5
absolutely
  71:10,11
  141:16
accept 6:16
  6:18 89:15
  89:19
  114:16
acceptance
  6:14
accepted
  117:19
accepts 6:20
account
  173:12
accounts
  160:2
accuracy
  59:14
accurate
  60:12 96:2
  178:10
acknowledge
  91:14 97:25
acknowled...
  68:11
acknowled...
  68:6
acknowled...
  90:17
  116:24
acknowled...
  123:4
acquiring
  161:3
acting 100:25
action 5:8,18
  13:2 14:8
  14:11,25
  15:2,3,18

17:5 18:2
19:13 21:6
22:20 25:10
25:22,25
26:25 30:22
31:20 35:3
35:6,16
40:12,25
41:3 42:6
53:13,21
65:5 73:10
77:21,22,25
78:3,7,11
79:20 80:7
80:15,19
99:19 100:4
103:11
108:15
111:13
112:7,19,23
112:24
114:13,18
115:6
134:22
135:2
137:11
138:15
139:5,12,21
147:23
152:8 154:9
154:19
155:13
156:2
157:18,23
157:24
159:16
160:17
161:7,12,12
162:11
163:2,12
166:11,19
166:22
167:8,10,16
167:19,25
168:8,11
169:2 170:5
170:7

171:17
173:23
174:3,5,6
178:14
actions 12:19
13:3,9,17
21:4 53:10
101:4
108:13
121:2 136:7
137:15
146:24
153:9,21
154:5,11
155:7
156:13,14
157:14
158:7,13,21
159:8 161:9
162:13
174:16
actual 76:9
78:13
156:16
addition
163:3
additional
4:15
address 36:2
55:8 166:14
171:4 173:5
addressed
166:10,11
166:15
addressing
164:22
165:4
adjudged
24:23
adjudicated
25:24
administer
8:2 9:16
administra...
154:8
admissibility
11:2

adopt 7:25
advanced
31:17
advised
137:4
advisors
103:22
affect 111:2
affidavit
41:12
affiliations
99:14
affirmatively
174:19
afforded
116:24
129:4
131:14
afternoon
59:19
after-the-fact
112:8
age 169:21
agents 99:16
ago 56:9
95:12 96:2
145:12,13
146:7,7
158:25
170:18,18
173:13
agree 34:15
59:9,11
87:18,20,24
88:5 155:21
156:9,11
167:2
172:21
agreed 16:13
16:15 23:6
57:6 67:23
74:21 86:23
98:14
122:13
127:16
143:16
148:25

158:11
agreeing 16:3
109:10
155:16
157:13
agreement
12:5,7,10
12:13 14:12
15:9,16
16:11,14
17:16 18:15
18:21,22
22:21 23:8
25:2 26:7
28:18 33:10
33:13 36:10
37:22 38:22
40:10 45:21
49:21,24
50:8,14
51:13 52:18
53:19,21
57:7,19
58:22 60:21
61:18 62:10
64:3,6,13
64:21 66:20
67:4,13
69:20,20,24
69:25 78:13
82:23 83:4
83:7 87:15
88:4,13
90:4,18
91:7,16,21
91:25 92:7
93:11,16
94:22,25
96:16 97:21
99:9,21
100:2,15
101:11
103:20,23
104:9
105:23
106:20
107:9,23,25

108:9,11
110:9,13
112:3,10
113:12
115:8
116:13
117:25
118:5,11,21
118:25
119:7,11,13
119:16,22
120:4,16,19
121:17
122:4,10
123:2 125:9
126:11
127:5
128:12
130:9
131:17
132:4
134:18
136:5,16,19
136:20
140:14
142:9,15,23
143:19
144:24
145:24
146:3 147:8
148:23,24
152:5,6
155:19
156:7,8
158:4
160:19
165:15,22
168:7,14
169:24
170:21
171:15
172:4
177:15,19
agreements
10:6 12:24
13:11 51:9
67:2 143:8

[180]

164:9
165:17
agrees 13:24
100:21
102:18
107:21
144:22
158:21
al 1:11 4:6
alleged 26:25
Allen 165:25
166:25
167:13
168:20
allow 14:5
35:24
allowed
135:10
139:22
155:12
161:21
171:6
alternate
172:22
alternative
144:14
147:20
149:8
ambiguous
151:11
amended
41:7,10
56:14
AMERICAN
1:2
Americas
2:12
amount
74:20,22
76:4,7
98:15 123:8
174:5,7,9
174:12
amounts
107:24
analysis
163:8

analyst 161:2
andtestified
38:10
and/or
169:14
175:4
Angela 82:5
82:7
annexed 30:9
answer 14:14
31:10 69:4
69:6,7 73:5
75:14 89:5
89:13
103:12
105:16
115:19
173:9
answered
68:23 70:22
answering
88:25
answers 89:7
anticipated
9:14
anybody 73:6
118:14,24
137:20
165:11
anymore
59:22
apart 30:6
apologize
153:5
apparent
35:23
appeal 7:14
appear
137:20
apple 28:17
applicable
19:7
application
31:20 32:8
32:14
applied
149:16

applies 19:5
25:14 32:14
33:10
172:17
apply 14:2
19:8 28:20
32:16
appreciate
7:15 133:15
appropriate
7:21 18:6
107:2,5
139:19
153:6 155:4
April 1:17
4:4 178:11
aptly 149:18
arbitrability
30:25
arbitrate
13:9 17:14
21:5 23:13
26:10,17
28:22,24
29:8,10,12
35:7,18
40:10 87:16
122:3,13
134:19
144:23
155:16,21
156:11
158:12
165:8
arbitrated
12:14,20
19:12 33:23
34:12 147:9
148:2
160:11
164:12
166:6,14
167:11
arbitrating
155:21
arbitration
1:1,2,4 4:8

5:2 7:4,23
12:11,12,25
13:11,16,19
13:20 14:3
14:6 15:11
15:20 17:15
18:3,5,11
18:14,18,19
18:25 19:4
19:7,9,11
20:23 22:14
22:23,24
23:6,8,25
26:6 28:13
30:7,14
32:25 33:5
33:14 34:17
40:7 48:10
48:17 49:5
49:15 52:21
53:3 54:17
75:9 104:10
113:19,21
114:5,23
120:23
136:13
140:12,15
140:17
143:16,19
143:23,24
144:4 147:2
149:7,19,21
150:24
151:4 155:2
158:23
159:17
160:18
161:4,18,19
161:22
162:15
163:10,23
164:7 166:8
166:16
167:6 171:7
171:11
175:21
176:7

arbitrations
160:13
arbitrator
1:21,22
4:10,11,12
4:13,17,19
40:8 56:17
56:21
124:12,21
125:3 129:3
151:15,16
175:9
arbitrators
6:24 7:20
8:19,23
10:2 40:21
135:23
136:3 151:6
163:16
Arbitrator's
10:8 41:6
argue 134:2
argued 17:23
18:12
109:16
135:25
157:20
164:23
arguing
136:10,11
170:15
argument
16:6,7
17:21 21:8
25:6 26:8
32:19 37:4
140:22
150:12
158:3,8
arguments
11:11 17:19
20:14
143:13,14
arising 12:13
18:20 99:21
104:8
108:10

113:11
144:19
147:7
158:21
164:22
arm's 165:21
169:24
arrives 17:5
175:17
ASD 175:11
asked 16:20
16:25 23:2
47:3 69:2
73:16,25
76:25 77:12
78:23 79:8
84:9 88:14
115:13
127:20
128:5
asking 21:13
35:12 65:18
89:6 94:4
102:7
105:21
106:9
116:12
119:25
asserted 11:4
asserting
27:3 77:14
assess 76:4
assigned
175:23
assigns 99:18
assistant 6:4
associated
134:16,20
140:7,10
141:5
association
1:2 8:8,11
53:6 104:19
114:2
140:13
assume 9:19
160:3,20

assuming 19:6
assumption 85:14 89:18 89:20
assumptions 85:10
assurance 33:2,7 34:3 34:5,23
Atlanta 81:18
attached 41:13
attack 35:25 147:19
attempt 16:16
attempted 142:7
attention 8:3 29:24 56:10 81:8,12 110:8 116:17
attorney 35:25 80:23 82:19 121:8
attorneys 11:7 39:18 102:3 108:4 138:17 168:6
attorney-cl... 80:25
August 23:23 37:15 38:13 177:11
authenticity 59:13
authority 31:5
authorized 7:6,25
Avenue 2:5 2:12
avoid 11:11

award 8:17 175:9,10
awards 7:11
aware 109:5 109:9 153:22

**B**
B 1:19 177:8
BA 42:19
Bache 43:4,5
back 5:13 12:7 15:5 20:11 24:21 31:2,22 32:16 34:20 35:6,6 43:20 44:9 44:11,22 45:11 46:24 52:5 59:21 61:6 66:22 72:21 78:3 81:19 85:3 85:9 99:6 105:24 107:8,10,12 110:8 113:4 130:5,6,21 138:18 146:5,16 148:2 150:8 163:24 164:10 168:16
background 42:16
bad 30:3 94:5 159:25 173:15
bargain 170:14
Barney 160:7 160:12 161:13 162:11
barred 27:3

based 33:8 34:6 36:9 53:21 71:18 73:2 76:3 85:12 146:2 148:6
basically 14:15 72:19 130:2
basis 31:16 101:22 115:15 138:14
bathroom 50:14,17 51:2 119:17 119:19 120:3 127:19 128:14,19 128:25
beg 37:5
began 29:4
beginning 11:17 40:16 74:14
begins 39:9
behalf 9:4 22:9 64:9 76:15 77:18 100:25
belief 57:3,13
believe 8:7 41:21 43:4 45:18 53:19 55:6 58:8 68:23 103:18 133:18 145:2 159:24
believed 78:13
belong 150:12
benefit 15:11 76:20

benefits 15:19,20 99:20
best 60:17 138:4
better 39:20 39:21 63:18 156:4
beyond 14:23 18:7 88:12 117:14
big 45:9
bit 125:24
bite 28:16
bizarre 145:5
black 19:22
Blaine 2:7 5:3
block 44:21 44:25 45:2 45:7
blood 178:14
Bloomberg 81:22
blue 112:22
body 149:7
boils 12:3
Bordnick 20:12
Bortnick 2:7 5:3,4 6:16 11:18 16:6 17:18 19:24 24:20 26:21 26:22 27:5 28:25 29:13 34:14 36:19 37:7,13 38:3,7 39:3 39:17 41:24 53:24 54:4 56:16 61:5 61:14 73:16 75:2,6,11 79:3 80:21 81:3 84:22 87:17 88:12

89:9 101:21 102:6 104:12 105:18 107:11 111:5 112:11 115:17 122:19,22 124:7 131:6 131:10,23 132:16 133:14,20 133:25 134:5,11,14 139:23 140:3,23 141:3 142:18,24 143:14 150:17,20 153:4,10,14 153:20 155:10 157:11 159:18 160:5,8,14 160:22 161:8 162:18 163:13,17 166:24 171:2 173:3 173:19 174:17,22 177:5
Bortnick's 150:3
Boston 159:23
bought 112:12 154:14,16 162:8
bound 40:21
breach 107:22

breached 104:3
break 10:9 10:12 91:11 93:13
breaks 43:25 44:3
brief 133:23 150:18 168:23
briefing 11:24,24,25
briefly 16:10 42:15 47:2 47:5 51:20
brieved 31:11
bring 14:11 15:2 53:20 75:8 103:10 114:12,18 115:2,6 151:24 157:23
bringing 100:7 156:2 167:15
brings 26:15
broken 103:19
broker 46:2 112:14 155:24 156:10 160:21 162:3
brokerage 159:25
brought 32:4 49:11 81:7 81:11 111:8 114:23 148:2 166:16

167:15,24
168:8
171:17
**Brown** 1:8,9
2:19 4:6
5:17 15:5,7
46:14,23
47:4,8 48:3
50:21,23
51:4,22
52:24 53:16
55:20 57:4
59:18 74:24
124:4
127:14
137:2
152:13,17
**building** 55:6
**built** 89:18
**bunch** 17:7
20:6,7
**burden** 134:7
**burdened**
133:3
**Burnstein**
157:22
**buy** 112:14
155:23
159:14
160:17
**buyer** 154:14
**buying** 86:19
**buys** 160:15
**Byrne** 1:24
178:7,22

**C**
**C** 2:2 4:2
178:1,1
**calculation**
71:22
**call** 36:20
59:17 62:25
63:2,3 82:7
82:8,15
123:25
**called** 82:9

125:15
128:21
168:3
**Canon** 8:22
165:25
**cap** 57:6
**caption** 17:7
17:8
**care** 43:19
147:12,17
**careful**
161:24
**carefully**
90:8,18
96:3
**Carl** 50:5
51:5 129:24
**Carle** 128:22
**Carranate**
48:25 54:17
**case** 4:4
10:21 13:8
22:3,16
30:13 33:7
36:11 48:4
48:21 49:18
65:20 74:17
138:15,25
144:16
153:16
156:9 157:5
157:24
159:12
161:10
163:24,25
165:25
166:2,25
167:13,14
168:21
173:11,22
175:24
**cases** 25:20
126:24
154:3,10
157:19
162:22
163:18

165:23
171:25
172:2,3
**cashed** 106:4
**cause** 23:15
77:24 101:2
**causes** 99:19
100:3
**caveats** 19:14
**certain** 14:4
74:20,21
123:15
130:13
146:10
154:10
158:14
165:5,18,19
**certainly**
19:23 32:19
87:19,20
125:20
**certified**
134:24
**certify** 135:6
178:9,12
**Chair** 36:22
**chairman**
1:20 4:3,9
4:14,21 6:6
6:10,22
9:23 10:2
15:24 16:2
28:2,7
29:19 36:14
36:24 37:12
38:10 39:16
40:2 42:9
48:2 54:2,5
56:13 69:5
79:7 81:2
84:24 85:5
85:8 89:11
102:5,15
105:8,16
106:7,11,25
107:17
108:20,23

111:23
113:2
115:21
122:18
123:24
124:9 125:5
125:11
126:15
128:9,18
129:11,18
130:20,24
131:4 132:7
132:13,19
132:23
133:19,22
134:3,13
139:24
145:15
150:19
152:21
153:12,18
154:21
156:23
159:9 160:3
161:5
162:14
164:25
165:13
166:23
169:6,11
173:16
174:15,18
174:25
175:2
**change**
158:24
**changed** 36:6
131:15
**changes**
45:24
**changing**
95:11,13
143:2
**characteriz...**
89:15 167:3
167:12
**characterize**

40:19
168:21
**characteriz...**
167:4
**charge** 101:2
101:3
**check** 106:4,5
119:9,14,23
120:12,20
122:7,25
123:3,5,8
123:11
124:4
128:24
132:5
171:15
**choice** 139:10
**choose** 59:20
159:6
**chose** 71:15
**chosen**
141:14
148:5
**circuit** 21:14
163:22
164:4
172:19
**circumstance**
17:13
162:25
164:14
**circumstan...**
50:25 51:13
103:23
145:7
158:16
**circus** 138:21
**cite** 25:20
171:2
**cited** 162:24
163:17
**Citigroup**
81:18
**claim** 12:22
17:25 18:19
19:5,16,17
20:11 21:5

21:22 22:2
22:2,18
23:13,22
24:22 26:10
26:13,23
27:3,16,20
28:13,22
29:12 33:11
33:17,18,22
34:21 35:2
35:3,8 60:5
75:18,19,22
77:15,15
87:16 101:2
101:3,25
104:7
108:10
109:5,12,17
110:3,19,23
111:2,4,11
113:10,15
114:22
115:16
117:6,13,21
122:3,14
131:15
135:12
140:8 144:5
144:7,7,8
144:22
147:6,23
148:20,22
149:2,12
155:13
160:23,25
164:21,24
165:9 166:3
166:13,18
166:20,21
167:16,17
167:18,19
167:24,25
169:15
170:8
173:11
**claimant** 1:6
2:3 5:2,7

| | | | | | |
|---|---|---|---|---|---|
| 6:17 11:17 | 41:3 42:6 | 173:22 | **client** 6:3 | 112:20 | **compel** 12:24 |
| 23:5 26:8 | 53:10,13,20 | 174:3,5,6 | 17:9 35:21 | 154:14,17 | 17:14,18 |
| 31:13 36:18 | 57:11 73:10 | 174:16 | 78:11,18 | 155:23 | 18:10 |
| 157:6,6 | 77:18,21,22 | **classic** | 95:24 | 159:14,16 | 140:15,19 |
| **claimants** | 77:25 78:2 | 163:12 | **clients** | 159:19 | 141:9 |
| 110:22 | 78:10 79:20 | **clause** 12:11 | 161:16 | 161:3,14,25 | 163:23 |
| 132:11 | 80:6,15,19 | 12:12 13:16 | **closed** 175:19 | 162:8,10 | 171:7,10 |
| **claims** 13:2 | 103:10 | 13:20 15:12 | **closing** 133:9 | **come** 36:6 | **competent** |
| 18:8,24 | 108:12,15 | 15:21 17:15 | 133:17 | 40:24 46:12 | 139:6 |
| 19:12 20:19 | 111:13 | 18:15,25 | 134:2,10 | 48:22 49:17 | **complain** |
| 23:7 30:3 | 112:7,17,17 | 19:5,11 | **Coate** 18:13 | 52:5 128:22 | 83:14,17 |
| 34:11 35:18 | 112:19,23 | 30:14 33:9 | 18:14 20:16 | 130:5,5 | **complaining** |
| 57:6,8 | 112:24 | 52:23 53:15 | 20:17,22 | 138:8 | 169:19,20 |
| 65:10 73:9 | 114:12,18 | 139:22 | 21:9,12,12 | 142:12 | 169:23 |
| 87:5 88:20 | 115:6 121:2 | 144:5 147:2 | 21:17 22:6 | 172:9 | **complaint** |
| 90:20 99:19 | 134:22,25 | 148:4 | 23:3 24:2 | **comes** 8:3 | 21:7 41:7 |
| 100:3,7,10 | 135:2,6,7 | 149:10 | 24:24 26:18 | **coming** 40:11 | 41:11 42:5 |
| 110:16 | 136:7,12 | 150:24 | 29:9 30:8 | 77:23 | 42:6 56:14 |
| 111:21 | 137:11,14 | 152:6 | 30:11 32:22 | 168:15 | 72:19 |
| 121:18,21 | 138:15 | 162:16 | 37:15,19 | **commenced** | 173:23 |
| 134:25 | 139:5,11,21 | 163:10 | 38:13,18 | 79:20 | **complete** |
| 139:5 | 144:7 | 170:2 | 39:15 41:8 | **comment** | 30:20 |
| 140:16 | 146:24 | **clauses** 164:7 | 42:3 73:8 | 22:25 | 152:22 |
| 142:14 | 147:23 | **clear** 14:24 | 135:22 | **comments** | **composition** |
| 143:17 | 148:6 152:8 | 19:3 24:16 | 143:12 | 150:3 | 6:15 |
| 147:24 | 153:9,21 | 29:3 33:22 | 177:11,13 | **commercial** | **compound** |
| 156:5 163:4 | 154:4,8,11 | 35:24 36:3 | **Coate's** 23:11 | 148:17,22 | 150:5 |
| 163:9 167:6 | 154:18 | 36:9 42:2 | 26:19 34:6 | 164:18 | **Comptroller** |
| 167:9 | 155:7,13 | 50:10 52:2 | **Cobra** 16:22 | **commited** | 51:6 |
| **CLAIRE** | 156:2,13,13 | 135:9 | 16:24 76:14 | 18:17 | **computed** |
| 2:23 | 157:14,18 | 139:20 | 116:4,5,6,8 | **commits** | 71:25 |
| **clarification** | 157:23,23 | 142:22 | 116:9,14 | 18:18 | **computered** |
| 128:10 | 158:6,13 | 143:9,10 | 144:25 | **common** | 71:23 |
| **class** 12:19 | 159:7,16 | 144:3,19 | 145:6 | 77:24 | **concealed** |
| 12:25 13:3 | 160:16 | 145:11 | **code** 7:4,12 | **communica...** | 57:10 |
| 13:9,17 | 161:6,8,12 | 150:23,25 | 8:22 141:20 | 141:18 | **concept** |
| 14:3,5,8,11 | 161:12 | 151:2 152:2 | **codefendant** | 142:8 | 25:12 |
| 14:25 15:2 | 162:2,10,13 | 155:20 | 15:13,17 | 172:13 | 172:17 |
| 15:3,17 | 163:2 | **clearly** 14:14 | **coincide** 76:8 | **communica...** | **concerned** |
| 17:5 18:2 | 166:11,19 | 23:6 35:10 | **colleague** 5:6 | 141:13 | 126:11 |
| 19:9,13 | 166:21 | 59:20,25 | 63:4 | **communica...** | 127:5 |
| 21:4,6 | 167:7,10,16 | 67:10,11 | **colleagues** | 80:25 | **concerning** |
| 22:20 25:10 | 167:19,25 | 68:9 91:20 | 5:25 | 175:22 | 18:16 53:10 |
| 25:21,25 | 168:8,11 | 137:10 | **collusion** | **company** | **concluded** |
| 26:25 34:17 | 169:2 170:5 | 143:16 | 102:2 | 13:12 44:8 | 176:7 |
| 35:3,5,16 | 170:7 | 151:11 | **Com** 112:12 | 86:2,20 | **concludes** |
| 40:12,25 | 171:17 | **clerk** 43:16 | 112:15,19 | 99:18 101:7 | 30:24 |

conclusion 14:21
conditions 172:7
Conduct 141:23
conducted 149:22
conducting 8:24
confidentia... 78:17
conflict 137:13
conformati... 6:11
confronted 145:9
connection 23:14 108:2 117:23 141:12 147:7
Connie 63:7 63:10,15 81:10,11
consider 76:5 116:25 117:5,19 128:13
considerati... 96:15,21,22 97:4,7,8,16 97:20 169:25 170:13
considering 164:6
consistent 147:4,4
consistently 140:4
constitute 8:7
constitutes 68:5
constitution 53:4 104:17

113:25
consult 130:25,25
contact 9:9 64:22 175:20
contacting 64:15
contained 67:4 117:2 164:8
contains 12:10 18:15
contemplat... 40:7
content 85:21
context 97:20 153:11,17
contingency 74:23
continue 102:14 138:19
contract 24:16 33:25 36:4 65:15 67:20 68:18 76:20 95:19 95:22,25 96:4,10,12 96:21 97:6 98:7,9,10 98:11,11 99:6 117:16 144:20 145:11 148:23 163:6 164:15,16 164:17,18 166:5 171:21 172:8
contracts 36:4
contradicts 19:3

contrary 33:21
control 175:14
controversy 7:2 18:19 33:12,18,23 104:7 108:10 113:10,15 114:22 122:3,14 132:9 147:6 149:13
conveniently 146:14,19
conversation 52:10 82:2 150:2 152:16
conversatio... 9:8 73:3 120:9,14
cooperate 10:15
cooperation 9:14
copies 11:8
copy 74:5 124:24 175:8,10
correct 42:23 46:21 57:17 61:21 62:12 64:4,5,10 64:24 65:11 69:11,13 71:20,24 77:16,17,20 89:25 90:2 91:22 92:2 102:25 103:25 104:23 105:11,12 108:16 109:7,8,12

110:5,17,20 114:6 118:12 124:6
correctly 54:24 55:16 126:20
costs 32:3 108:2
counsel 5:11 6:4 9:6,11 11:12 28:18 71:12 73:4 81:4,5 85:11 87:4 116:12 146:15 147:21 175:5
counselors 86:13
conversatio... 9:8 73:3 counterpart 175:10
country 172:3
COUNTY 178:5
couple 23:4 120:5 152:25
course 74:22 106:4 125:6 143:7 152:15 154:4 167:16
court 11:22 13:10,18,21 15:6,10 17:13 18:6 18:10 20:11 23:2 24:21 27:20 30:19 31:3,7,22 35:7 40:11 40:24 41:4 48:6,7 75:4

76:23 77:2 109:6,11,18 109:24 115:3 121:5 121:13 126:6 134:22 135:5 138:19 140:8,21 146:16,20 146:21 147:24 148:3 149:18 153:25 158:14,17 159:6 162:13 163:8,25 165:11 166:2,12 167:11,25 168:25 171:7 172:18,20 courts 157:16 172:24
covenance 100:22
covers 100:10
creation 112:8
Credit 159:23
cross 7:18 77:4 79:7 111:8,10,11 173:21
cross-exam... 84:21 87:22 89:2 165:5
cross-motion 30:17
CSFP 156:4
currency 163:19

current 99:15 140:6,9
customer 13:8,12 134:19 148:20 156:8,8 158:3 159:11 160:22 165:14,17 169:14,18
customers 148:15
cut 132:5

**D**

D 4:2 177:2
damage 72:21
damaged 174:13
damageed 174:8
damages 71:22 72:18 72:25 73:8 74:20 75:9 76:9 101:4
date 38:15,20 38:25 41:10 57:25 58:7 58:10,17 59:7 61:19 72:12 100:14 101:10 115:22 124:16
dated 37:15 37:19,23 38:13,18,23 177:11,13 177:17
day 17:3 43:22,22 44:5 50:7

50:12 58:22
59:17,25
60:6 119:8
129:9 130:2
130:3,4
153:23
178:18
**days** 59:8
60:8 116:25
117:5,11,15
117:18
118:4,17
128:12
129:5,7
130:21
131:14,17
131:25
132:2,6
**DEA** 131:20
**deal** 86:9
133:4
**dealer** 46:3
**Dealers** 53:7
104:19
114:3
**dealing** 13:4
**dealt** 126:22
**December**
20:23 63:25
**decide** 8:19
11:21 28:11
40:9 115:5
131:25
135:24,25
136:3
143:22
171:19
**decided**
78:22 81:13
117:12,20
154:9
**decides** 135:6
**deciding** 40:8
114:16
**decision** 29:7
30:7 32:9
34:7,8

112:13
175:3,6,18
**declaratory**
26:11 31:21
32:15
**deductions**
123:7,15,19
124:3
**deem** 7:21
**deeply**
142:11
**defend**
152:19
173:8
**defendant**
140:14
162:12
**defendants**
30:18 31:18
40:19
**defendant's**
57:5
**defending**
32:4
**defense** 14:19
31:9 151:23
152:12
**deference**
31:3
**defrauded**
160:25
**degree** 42:18
**deja** 16:4
**delivery**
175:6
**delve** 148:18
**demonstrate**
145:4
**demonstrat...**
146:9
**denial** 163:22
**denied**
152:24
**denies** 87:6
**depended**
92:22 93:14
**depending**

168:12
**describes**
22:3 24:20
**description**
21:22 177:9
**designate**
148:5
**desk** 44:21
45:2
**detail** 22:4
84:16
**determinat...**
31:6 41:17
41:19
**determine**
7:7 11:4
115:16
**determined**
30:11 32:12
32:22 33:14
35:19
147:25
166:12
**determines**
175:18
**determining**
164:11
**difference**
150:13
153:13,19
165:2
167:20
**different**
65:6 70:3,4
84:23 128:8
151:9 155:8
157:5 158:5
164:13
165:14
**direct** 11:12
56:9 87:25
88:11 110:7
111:7
135:15
**directed**
11:22
118:24

175:22
**directing**
29:24
**directly**
103:21
141:19
175:21
**directors**
99:15
159:15
**directs** 7:10
**disability**
86:12,14
127:12,22
141:11
**disabled**
142:2
151:22
**disagrees**
89:17
**disallow**
19:13
**disaparaged**
102:25
**discharges**
99:13
**disciplinary**
8:12 135:14
139:16
**discipline**
139:17
**disclose**
103:21
**disclosures**
4:15,18,20
**disconnected**
112:25
**discrepanci...**
44:3
**discretion**
149:9
**discriminat...**
144:9
**discriminat...**
47:6 48:4
85:25 159:4
159:5

164:16
169:21,22
**discriminat...**
158:15
**discuss** 52:23
53:15 65:6
120:18
**discussed**
52:12 70:12
87:12
162:24
**Discussion**
108:22
**disinterest**
30:21
**dismissed**
30:13 31:19
31:25
**dismissing**
163:14
**disparage**
102:19
**disparage...**
102:17
**disposal**
175:12
**disposed** 8:16
30:2
**dispositively**
172:5
**dispute** 6:25
7:9 8:15,20
12:12 23:10
33:11,17
143:21
144:15,23
147:20
148:16
149:3,8
154:25
156:10
164:20
165:9 170:2
172:22
**disregard**
30:21
132:12

**district**
139:19
140:21
163:25
164:5
172:20
**divisions**
99:13
**document**
11:5 41:23
59:6,14
60:12 61:11
70:20 71:4
71:9 72:9
72:11,17
123:18
145:3
177:20
**documentary**
10:21
**documenta...**
86:7 130:17
**documents**
21:18 23:16
87:9 175:12
**doing** 103:7
106:19
135:11,11
135:17
136:25
152:4
173:14
**dollars** 98:15
**door** 88:11
**Doris** 1:22
4:12
**doubt** 18:7
59:5,13
60:10,14
**DOW** 85:24
86:11,18
87:7 88:6
123:7
127:10,23
**drafted** 152:5
**dressing**
138:21

due 31:3
  150:13
duly 38:9
dust 170:21
duty 8:24 9:2

**E**

E 1:19,19 2:2
  2:2,14 4:2,2
  38:8,8
  177:2,8
  178:1,1
EAB 2:21
earlier
  151:14,20
early 58:9
easier 37:8
easily 28:5
  29:25 32:11
easy 136:17
  152:9
educational
  42:16
effect 26:12
effort 12:3
  33:20
egregiously
  145:8
eight 145:13
  146:6
  170:11,18
  172:9 173:7
  173:13
either 8:15
  33:15 53:23
  84:13 110:4
  112:16
  163:6 174:8
  175:7
elaborate
  125:17
elapsed
  119:18
  120:2
elicited 87:21
eligibile 18:5
eligible 18:3

emphasize
  170:10
employed
  42:21 45:15
employee
  60:2 64:15
  158:16,20
  169:14,20
  169:23
  171:8,12,14
  171:16
employees
  8:21 47:9
  99:16
employment
  58:17,18,23
  59:8 99:22
  99:23
  148:21
  158:22
  164:15
encompassed
  135:2
  163:11
  167:7
encouraged
  11:10
ended 47:15
  126:24
  145:17
enforce 8:2
  116:12
  134:18
  139:21
enforceabil...
  26:6
enforceable
  23:9 29:11
  143:20
enforcing
  12:24
engaging 9:8
entail 43:18
entered 16:11
  91:15
  136:19
entire 67:5

entitled 7:1
  114:12,18
  121:9
entity 100:25
environment
  47:6
equal 71:23
Equally
  143:10
equipped
  14:8 154:7
error 150:5
  164:6
ESQ 2:7,8,14
  2:15,16,20
  2:23 3:2,3
ESQS 2:4,11
established
  34:2
esteem 63:20
estimate
  60:18 76:8
estimated
  72:21,24
  73:2
et 1:11 4:6
ethical 27:12
  141:20
ethics 8:23
  142:6
evade 147:18
event 107:22
events 48:14
everybody
  4:22 13:23
  36:5 39:24
  70:2,16
everyday
  94:8 154:2
evidence 10:7
  10:20,22,22
  11:6 14:16
  24:15 25:3
  25:7 35:20
  36:11,17
  112:6 139:6

142:25
  143:6
eviscerate
  32:24
  111:14
exact 12:16
  55:8 81:25
  88:25
exactly 17:19
  17:20,23
  20:13 21:7
  26:17 94:15
  143:13,13
  155:18
examination
  39:2 54:6
examine 7:19
examined
  38:10
examining
  77:4
example 13:3
  43:24 45:6
  125:7 135:5
  135:8
  144:24
  145:23
  156:4
  157:17
  159:19,21
exception
  101:24
  114:21
  115:2
excessive
  161:3
exchange
  12:15 19:19
  19:20 20:2
  20:9 21:21
  23:18,21
  33:16 44:3
  44:24 48:9

48:17 53:5
  97:7 104:18
  114:2 117:6
  154:7
  157:21
  159:2
exchanged
  169:25
exclude
  134:4
excuse 33:18
execute 175:8
  175:9
executed 6:23
  10:5 17:4
  59:6 64:3
execution
  90:15
  131:23
exercise
  19:21
exhaustively
  174:25
Exhibit 10:8
  30:10 37:13
  37:17,21
  38:12,16,21
  39:4 41:7
  45:21 49:20
  52:17 56:8
  56:12,17,18
  56:21 57:20
  58:12 61:15
  61:17 69:15
  72:8,10,14
exhibits 11:9
  37:10 177:9
exist 87:9
  154:5
  156:14
existed 86:21
expect 28:14
expedite
  175:5
expending
  170:19
experience

88:16
explain
  142:17
exposure
  44:8 48:8
  48:16,19
  49:15
expressed
  63:10 83:6
  142:21
expressly
  17:24
extend 30:17
extends 9:2
extension
  15:4 16:22
  16:23
extent 15:19
  80:22
  100:22
  147:3

**F**

F 1:19 38:8,8
  178:1
face 33:20
  35:24
  140:21
  149:12
  152:3
fact 12:20,23
  27:18 41:19
  70:14 75:17
  93:5,15
  102:24
  109:14
  112:7
  152:18
  158:14
  161:9
  163:17
facts 33:8
  171:4
failed 26:22
fair 89:21
  97:2 174:20
fairly 32:11

**fairness** 8:25
170:23
173:6,25,25
**faith** 30:3
172:24
**fall** 163:9
**false** 58:25
68:15,21
69:8,10,12
69:20,21
70:21 91:6
125:15
**familiar**
25:12
158:19
**family** 83:11
83:19,20,22
**far** 60:2 74:7
126:10
127:4
138:13
**favor** 109:16
**favors** 144:14
**February**
23:19,21
42:25 73:15
**federal** 8:9
11:22 13:18
15:10 31:3
31:7,19
109:23
121:5,13
140:20
146:16
172:19,19
**fee** 16:15
**feel** 16:4
**fees** 108:4
123:8
**felt** 164:4
**fictionally**
35:5
**fifth** 29:6
**figure** 138:2
151:6,14
**figured** 121:7
**file** 26:22

47:20,23
78:10 80:18
101:2
109:23
112:23,24
133:23
**filed** 7:9
19:16,17
30:8 41:3,8
42:5 80:6
80:14 101:3
103:24
**files** 20:25
140:7
**final** 7:12
8:17 90:20
**finally** 22:7
107:20
**finance** 42:17
42:19
**financial**
46:8,10
65:7
**find** 14:20
**finding**
107:22
139:4,11
**fine** 37:5,12
38:3 61:16
81:2 85:18
102:15
115:21
132:7,13
174:17
**fired** 61:20
61:24
**firm** 5:4,15
5:21 20:7
32:17 43:2
46:13 63:22
150:22
160:11
**firms** 155:12
156:6
157:23
158:2
161:15

**first** 21:9
23:5 24:14
29:24 32:6
34:8 37:9
38:9 43:14
46:22 49:24
50:11,13,16
51:9,15
58:15 61:2
62:14 64:7
64:22 65:8
73:14,17
74:2 75:3
78:9 80:3
90:16 91:12
91:13 95:5
99:6 102:10
115:5 130:8
137:17
152:22
153:4
155:11
158:7 159:9
159:23
165:17
166:7
**five** 20:24
41:20 51:21
95:12,25
**five-page**
72:9,11
177:20
**flat-out** 27:6
27:10
167:22
**flip** 173:9
**floor** 44:2,24
**flora** 20:18
**focus** 95:23
**follow** 88:17
111:10
**followed**
126:9
**following**
21:23
**follows** 38:11
**forbid** 17:22

19:8 21:3
171:9
**forebear**
134:9
**foreclose**
40:10
**forego**
172:23
**foreign**
163:19
**forever** 27:2
**forfeit** 107:23
**forfeiture**
28:19
**form** 122:25
158:20
**former** 99:15
140:6,9
171:8,11,13
171:16
**formerly**
141:5
**forms** 12:16
**formulate**
166:9
**formulated**
166:17
**forth** 7:8 13:5
20:8 21:21
90:20 92:7
93:10 94:21
96:16 99:20
137:5 154:4
**forum** 18:6
27:15
157:15
**forums** 154:7
**forward** 14:6
32:20 48:23
81:14
117:12
122:9
139:12
**forwarded**
175:4
**found** 78:14
168:2

51:21 59:8
60:8 135:4
29:5
**fragment**
94:17 96:6
96:14 97:19
**fragments**
96:5,8
**framing**
35:12
**frankly**
137:16
139:12
147:18
**fraud** 13:4
163:4 166:3
**Friedman**
14:4
**friend** 17:18
19:23 84:6
**friends** 83:12
83:20,22
84:2
**front** 18:13
29:6 37:19
38:17 39:22
41:8 42:4
73:7 127:3
147:22
177:13
**full** 42:12,13
88:19 90:20
115:25
125:13,18
131:25
174:20
**fully** 31:11
**function**
44:10,12
45:12
**fund** 154:16
**fundamental**
155:15
**fundament...**
147:19
168:2

**fundraiser**
50:4 51:4
58:7 129:24
**funny** 105:2
**further** 19:14
53:25 70:14
91:14
100:21
112:6
122:17
124:8,11
125:4 131:7
131:8
132:15
139:25
149:14
178:12
**furthermore**
12:20

**G**

**G** 4:2 30:10
38:8
**gag** 52:3
**Garrison**
2:11 5:22
**general** 6:4
162:5
**generally**
153:11
**gentleman**
106:17
**gentlemen**
21:13
**Gerard** 2:14
5:20 54:10
**getting** 30:21
84:18 88:19
89:8 123:4
130:6,12
**gist** 52:10
**give** 16:9
25:8 43:24
53:22 98:18
98:20
105:24
109:10

[188]

123:3
given 23:16
31:15 32:3
106:12
107:10
123:9 129:6
go 4:21 14:6
14:22 15:5
17:13 20:20
24:21 31:22
32:16 35:6
52:6,9
59:21 65:9
66:22 74:25
76:23 77:2
81:13 82:22
84:16 89:8
90:3,7 99:2
99:5 100:9
107:20
109:11
111:15
117:12
121:5,13
122:9 126:5
126:6
130:18
139:12
146:4,16
149:13
150:8 151:5
153:22
154:25
157:16
161:17,21
167:10
171:6
174:11
gobbledego...
163:15
goes 20:12
106:10
113:23
going 4:7
11:19 14:16
14:17 23:3
25:15 27:5

28:15 32:24
34:20 37:10
37:14,17,21
49:2 63:12
70:5,14
76:4 85:13
86:9,12
87:4 95:9
97:17,18
106:21
107:5
109:18
110:2,4
111:2
112:16
114:9 123:9
127:9,10,11
127:16
137:3 138:8
149:2,15,19
149:21
151:25
154:11,24
154:25
166:5,7,9
169:12,12
good 11:18
16:2 54:8,9
63:17 84:5
94:5 176:4
gotten 22:10
granted
140:21
great 133:4
Green 50:5
50:15,18
119:17
127:19
129:2 130:8
130:10
grievance
26:15,24,24
grounds
24:14
group 77:22
111:15,16
125:24,25

Grubman's
161:2
guess 49:2
52:6 62:23
117:4
152:10
168:22
Gun 165:25
166:24
167:13
168:20
guys 127:8

**H**

H 2:7 38:8
177:8
half 131:18
halls 19:25
hand 9:22
122:8
178:18
handle 14:8
154:8
handpicked
142:10,14
hands 40:21
handsomely
144:17
handwriting
58:2
handwritten
175:8
happen 70:5
127:17
145:2
154:24
happened
19:15 63:23
76:7 89:16
170:3
happy 10:15
38:4 138:16
Harper 2:14
5:19,20 6:9
6:19 15:25
27:22 28:4
28:9 29:20

32:20 35:14
36:21 37:5
37:25 38:5
39:12 46:17
54:7,10
56:15,19
61:16 79:5
84:19 85:2
88:16,21
89:21
102:12
106:9,15
107:4,14
108:18
124:10
131:8,11,21
132:8,14,21
133:2,15,24
134:8 140:2
140:3
149:17
159:10,13
160:6,10,23
161:23
165:4 169:4
169:7
174:24
177:6
head 146:20
148:6
hear 14:13,16
16:19 20:19
36:25 37:2
39:24 85:11
150:21
154:11
heard 13:10
16:6 39:17
46:16
106:20
138:23
139:6
150:10,11
157:15
158:8 159:8
160:14
174:21

hearing 4:4
7:3 11:20
14:21 37:18
38:17 48:21
77:3 87:21
88:8 148:11
164:5
177:12
heart 106:10
held 55:4,5
172:20
help 97:2
148:14
153:2
HENICK 3:3
hereinafter
99:18
hereunto
178:18
Hernandez
63:7,8
71:19 81:10
81:11,23
82:10,14,25
83:5 84:4,5
85:4
hey 78:19
84:17 86:8
130:11
hold 84:24
131:17
169:9
173:12
honest 65:19
146:14
hope 11:19
29:25
103:17
153:2
hoping 134:9
hostile 47:5
hundreds
153:24
hypothetical
28:23
156:25

**I**

IBM 45:7
idea 39:21,21
57:14 80:18
80:20 81:6
112:25
140:25
173:24
identical
19:17 21:2
35:2 166:20
identificati...
10:23 38:14
38:19,24
61:18 72:12
identified
140:12
identify
72:13
ignored
31:12
immediately
131:24
impermissi...
33:24
impose
139:17
inaccurate
24:4
inappropri...
35:22 36:12
include 13:17
23:17 34:20
64:15
included 31:9
34:4 95:15
166:19
includes 9:20
140:11
including
17:9 23:19
31:17 90:19
100:14
103:20
108:3
inclusion
30:3

**inconsistent**
18:25
**incorrect**
61:23 65:14
**incurred**
32:3 108:2
**indemnify**
107:25
**independe...**
112:2
164:19
**indicate** 4:23
**indicated**
30:19
125:12
**indirectly**
103:22
**individual**
23:13 27:16
28:13 29:12
30:4,11
31:10,18
34:11,21
35:2,8
63:19 77:15
111:14
144:5,6,8
144:22
147:24
148:18,19
150:9,23
166:13,20
167:18
**individuali...**
170:8
**individually**
148:7
**individuals**
31:8 32:2
146:4
159:22
163:5
**individual's**
7:17
**industry**
12:22 43:8
48:10

**148:15**
153:23
157:18,25
**inference**
144:18
**information**
57:3,12
**informed**
129:25
**initially**
47:13 62:4
135:25
**initiate** 8:10
**initiated** 8:14
134:21
**injuries**
71:22
**injustice**
174:2
**inquire**
147:11
**inspire**
133:11
**instance**
64:22
**instruction**
27:25 89:3
**integrated**
24:25
**integrity** 9:2
**intend** 10:8
10:18 14:25
33:3 134:6
137:10,12
146:6
**intended**
14:10 35:17
36:7
**intending**
47:22
**intent** 40:23
53:12
136:12,16
137:21
138:24
139:4
142:19,20

142:22
145:25
146:2
156:16,17
168:12
**intention**
12:4 22:6
47:19 75:8
136:4,6
168:13,16
168:17
171:19,20
**intentional**
35:15
**intentions**
40:9 87:13
88:2 138:13
151:18,19
**interested**
14:18
178:15
**interesting**
21:16 23:4
**interject**
162:22
**interpret**
19:10 97:10
97:11
**interpretat...**
18:23 19:3
33:13,25
104:9
113:17
146:25
147:8
**interpretat...**
13:22 70:4
**interpreted**
15:12
**interpreting**
40:23
**interpretion**
108:11
**interrupt**
24:10 84:20
**interrupted**
27:23

**interruptions**
7:16
**intimidation**
32:5
**introduce**
33:21 37:9
**introduced**
51:8 61:3
**introduction**
4:7
**invalid** 21:6
**investigation**
8:12
**invited** 51:3,6
**involuntary**
26:4
**involved** 70:3
161:11
163:20
**involving**
23:25 101:9
**irrefutably**
172:5
**irrelevant**
85:17
112:15
**Island** 128:23
**issue** 11:21
22:4,16,18
24:3 27:12
27:15 35:11
47:6,17
75:9 77:24
88:5 89:9
89:10
101:25
106:6 126:3
131:12
155:15
158:6
161:15
**issues** 43:20
63:12 102:8
148:19
150:15

**J**
**J** 38:8 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1

130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
**Jack** 159:24
**jail** 142:7
**January**
16:13 46:18
60:18 67:14
**Jeff** 86:8
127:14,20
127:21
**Jeffrey** 1:5
4:5,25
42:14 50:21
168:16
**Jersey** 172:2
**job** 43:14,17
44:14,18,19
59:18 85:24
86:10,20
127:23
**John** 20:7
**join** 32:19
63:18
**judge** 18:13
18:13 20:16

20:17,21
21:8,11,12
21:16 22:6
23:2,11
24:2,24
26:18,19
29:9 30:8
30:10 32:22
34:6 37:15
37:19 38:13
38:17 39:14
39:19,25
41:8 42:2
73:7 135:21
143:12
144:2 151:3
164:5 168:9
168:20
177:10,13
**judges** 77:6
**judge's** 28:10
**judgment**
26:11 31:21
32:15
**judicata**
28:20
**judicial**
157:2,4,9
**Julia** 3:3 6:3
**juries** 77:9
**jurisdiction**
19:21 20:4
20:10 30:16
31:8
**jurisdictio...**
31:6 150:15
**jurisdictions**
141:24
**jury** 110:4
**J.VAUGHN**
177:5

**K**

**keep** 168:15
**Kenneth** 3:2
5:10
**kept** 107:15

**key** 44:7
**killed** 12:2
**kind** 137:12
143:22,24
144:14
**kinds** 154:10
**knew** 63:11
69:21 70:20
97:16
108:15
109:17
110:2 115:9
130:20
147:5 152:3
**know** 9:18,20
10:14 11:23
27:10 53:9
55:8 58:3
59:23 64:11
70:9 71:6
75:11 78:2
82:12 93:24
96:18,20,22
97:21 103:2
106:13
117:4
124:17
126:8 127:2
128:7 134:8
135:22
136:15
141:12
152:15
153:25
154:19
158:18
162:7 164:2
168:6
**knowing** 25:9
25:13 26:4
126:23
146:23
172:15
**knowledge**
22:13,23
41:22 57:5
103:10

142:2
154:15
157:19
**known** 19:23
25:18 43:2
78:17 89:20
100:12
162:6
**Krupman**
159:24
**Kurlantzick**
1:20 4:9

**L**

**lack** 30:15
**lacked** 26:23
**ladies** 21:13
**languag**
18:16
**language**
36:9 142:23
143:9
144:20
152:2
158:20
**large** 45:3
**largely** 87:18
**larger** 75:22
**laste** 59:7
**law** 5:4,15,20
7:10 22:24
23:12 32:17
32:23 46:13
100:23
144:13
145:23
171:24
**laws** 8:9
33:25
**lawsuit** 47:20
47:23
101:22
103:24
112:18
159:4,5
161:21

162:9
**lawsuits**
154:20
**lawyer** 56:8
57:4 63:11
63:16,20
73:7 94:6
95:16,18
131:2
141:15,15
142:10,14
142:16,17
172:10,12
**lawyers** 20:6
25:11
141:11
142:4 153:2
163:21
**lawyer's** 82:3
**leading**
123:22
**leave** 24:7
45:17
106:21
165:22
175:15,25
**leaves** 24:8
**led** 48:14
**Leeds** 1:8,9
2:19 4:6
5:17 15:4,7
16:12,15
20:6 46:13
46:23 47:3
47:4,8 48:3
50:23 51:3
55:12,14,19
57:4 59:18
60:17,22,23
62:5,10,20
64:3,7 65:9
66:21 67:14
69:25 71:21
74:18,23
83:14 84:17
86:2 87:6,8
115:8,11

123:11
124:4,25
125:8,23
126:7
127:15
136:22
150:22
152:11
168:5
**left** 46:10
57:15 58:9
59:15 62:2
130:2
136:13
139:2,8
175:12
**legal** 16:15
24:3 29:11
41:17,19,23
65:5 103:22
116:11
163:14
174:8
**legally** 23:9
83:13
143:20
**length** 165:21
169:24
**Lenny**
127:15
**letter** 21:19
22:8,12
23:20,21,23
**letters** 24:4
**let's** 39:22
58:11 66:22
67:25 82:22
90:3,10,15
91:9,12
93:13 99:5
**Lewis** 1:20
2:23 4:9
5:14,15
6:18 29:21
36:15 41:16
47:24 86:5
86:25 88:9

89:9,11
108:25
109:3 111:9
111:25
113:4
122:16
123:21
124:11
132:24,25
145:16
159:11
162:21
165:3,16
169:16
174:23
177:7
**liaison** 44:23
**Liberty** 1:15
**license** 43:9
43:12
**licensed** 43:7
**Liddle** 2:4
5:5
**Lidowitz**
157:22
**lie** 68:19
**lied** 68:17
**lieu** 109:17
**life** 27:24
94:8
**limitations**
70:13 157:3
**limited** 10:17
**Lindbergh**
1:22 4:12
4:13,17
124:12,21
125:3
**line** 39:8
40:16 74:11
74:25
100:13
**lines** 86:17
**list** 137:2,19
**listed** 22:13
**listen** 89:4
**lists** 22:10

litigate 24:22
litigating
  40:12
litigation
  163:4
little 47:16
  91:10 128:6
  128:10
  134:7
lived 170:13
Liza 2:15
  5:25
LLP 1:9
long 44:13
  45:14 51:18
  79:19 80:14
  128:23
  129:18
longer 91:10
long-term
  86:12
  127:12,22
look 52:16
  57:18 62:14
  72:7 89:6
  127:8
  149:20
  166:5,7
looked
  115:12
looking 32:9
  32:10 63:11
  72:18
  124:15
  126:2
  148:14
lost 27:14
lot 70:12
  159:21
lots 11:25
  103:18
  169:8
loud 39:23
  57:2 66:25
  73:16 90:16
Lubow 1:21
  4:10,11,19

129:3
lunch 10:10
Lynch 13:13
  155:24
  156:3,11

**M**

M 2:15,16
mailed 74:5
makers 29:7
making
  17:20 20:14
  26:9 44:7
  110:15
  131:14
  140:23
  143:15
management
  49:6,7
mandatory
  140:12,17
mangling
  153:5
March 30:8
mark 61:13
  72:8
marked 10:6
  10:23 38:14
  38:18,24
  56:8 61:12
  61:18 72:11
marriage
  178:14
match 22:15
matter 1:3
  7:22 8:3,11
  8:20 12:8
  23:12 30:2
  30:19,25
  33:4 34:7
  34:10 47:3
  47:10 70:15
  101:9
  114:15
  138:10
  178:16
matters 7:7

140:11
maximum
  100:22
McCall 50:5
  51:5 58:7
  129:24
mean 55:11
  55:18 65:17
  83:11 87:10
  88:14 92:21
  93:2,18
  94:3,8
  98:20
  112:21
  146:22
  153:10,16
  153:24
  154:13,17
  155:25
  157:7,10
  158:13
meaning
  13:20 18:21
  33:19,22
  36:2,3 44:3
  46:7 48:5
  108:5 142:9
meaningless
  107:9
means 25:23
  65:15 92:19
  92:24 93:23
  93:25 94:14
  96:18 97:22
  98:16
  100:23
  113:21
  131:16
  151:7 155:5
meant 93:21
  96:7 156:22
measure
  88:19
mechanisms
  144:15
mediation
  17:2 48:21

54:20,23
  75:18,19,23
  75:24 76:2
  76:3 109:15
  144:11
mediator
  54:25 55:25
mediators
  56:3 109:16
  109:21
  110:3
mega 157:22
member
  112:17
  134:16,20
  134:21,24
  140:6,7,9
  140:10
  160:16
  162:2
  175:20
members 9:9
  20:5 83:20
  135:7
mention 82:3
  85:21
mentioned
  60:16 82:5
  84:2,7
men's 51:15
  51:17,19
  66:4
merits 10:20
  87:5
Merrill 13:13
  155:24
  156:3,10
message
  97:19
met 62:20
  119:10
  130:7
micro 156:20
midafterno...
  10:10
midmorning
  10:9

MillBerg
  157:21
mind 36:7
  59:12
minus 123:15
minute 64:17
  106:23
minutes
  51:21,21
  95:12 96:2
misleading
  24:5
misunderst...
  134:6
model 141:22
moment 56:9
Monday 1:17
money 78:20
  107:10,12
  107:15
month 61:4
months 20:24
  76:15
Morelli 1:8,9
  2:19 4:6
  5:17 9:21
  9:25 15:5,7
  16:12,15
  20:6 35:21
  46:14,23
  47:4,8 48:3
  50:23 51:4
  55:12,14,20
  57:4 59:18
  60:17,22,23
  62:5,10,21
  64:4,7 65:9
  66:21 67:14
  69:25 71:21
  74:18,24
  83:15 84:17
  86:2 87:6,8
  115:8,11
  119:4,6,10
  120:10,14
  121:12

122:7,12
  123:12
  124:4 125:2
  125:8,23
  126:8
  127:15
  136:22
  150:22
  152:12
  168:5
morning
  11:18 14:23
  16:2 54:8,9
  140:24
motion 17:17
  140:19
  163:23
  167:5
  171:10
move 28:8
  140:15
  141:8
moving 31:12
multiple
  31:15
mutual
  154:16

**N**

N 2:2 4:2
  38:8 177:2
name 4:23
  5:14,19
  17:6 42:12
  42:13 45:24
  54:10 68:18
  68:20 82:4
  147:22
  153:5
named 20:5
  30:12
names 17:7
  22:11 56:5
narrow 22:18
NASD 4:4
  6:24 7:9,24
  8:20 12:16

12:17,25
14:7,7
17:11,21,24
18:7 19:2
20:20,21
21:3 22:16
23:19,22,24
33:15 48:9
48:17
134:15
137:15
140:5
148:12,12
153:8 154:6
155:3,7,17
155:22
156:12,24
157:20
158:25
170:4 171:3
171:5
**NASDAQ**
55:6
**Nathan** 1:21
4:10
**National** 53:6
104:18
114:2
**near** 155:18
**necessarily**
59:9
**need** 6:10
9:16 10:12
29:15
104:14
133:7
134:11
151:14
**negotiate**
16:16 62:11
64:8
**negotiated**
64:16,23
148:7
**negotiating**
62:6
**neither**

100:23
169:18,18
**net** 124:5
**neutral** 8:19
8:23
**never** 14:5
27:7,17,22
86:14,15
109:20
121:15,16
122:13
151:2 152:8
152:17
154:14
162:19
**nevertheless**
13:17
**new** 1:16,16
2:6,6,13,13
2:22 12:15
19:18,19,25
20:9 21:20
33:16 48:9
48:16 51:5
53:5 55:9
100:7
104:17
113:25
141:21
157:20
158:25
171:25
172:2 178:3
178:5,8
**news** 99:2
**nickel** 16:25
**nine** 145:12
146:7
170:16,17
**nobody's**
157:19
**nod** 28:18
**Non** 102:17
**nonmembers**
20:20
**nonsensical**
167:23

**north** 17:6
**Notary** 178:7
**note** 42:9
86:25 141:2
**notified** 60:5
**notion**
171:18
**notwithsta...**
148:3
**November**
45:19 46:24
50:6 58:9
62:21 63:24
63:25
**NSAD** 34:16
**number**
37:13,17
38:12,16,21
39:4 45:3
48:20 69:10
69:12 84:13
135:17,18
**numbers**
75:25

### O
**O** 1:19 4:2
**oath** 9:17
136:17
**oaths** 6:24
**object** 24:11
27:6,21
39:12 79:3
80:21 87:23
88:20
101:22
104:13
111:6
115:17
**objected**
106:11
**objecting**
27:8 106:13
**objection** 6:7
10:25 36:23
41:16 85:12
86:5 87:2

89:12
102:13
105:19
106:8
107:17
113:2
**objections**
7:18 11:4
11:13
**objective**
146:2
**obligation**
116:13
**obtain** 6:11
**obvious**
130:15
**Obviously**
136:22
**occupies**
170:23
**occupy**
170:24
**occurred**
27:11 78:10
80:4
**occurrence**
154:2
**occurring**
101:10
**October** 12:7
23:20 37:23
38:23 58:18
59:6 60:3,7
80:7 83:4
108:16
177:17
**offend** 28:4
**offended**
28:3
**offer** 148:16
**offered** 25:7
**office** 43:20
44:9,11,22
44:25 45:12
66:9,12
119:8,12,16
120:11

128:22
161:11
officers 99:15
159:15
oh 36:6
okay 38:7
65:23 74:8
80:8,13
85:17
136:14
old 84:13
85:11
once 20:13,25
54:14
onerous
156:24
one-on-one
75:8 111:18
ongoing
112:20
open 131:17
175:16
opened 88:11
opening
10:16 11:16
24:9 27:9
27:23 46:16
145:18
**Operations**
43:16
opinion
37:14 38:12
177:10
opportuniti...
31:15
147:14,15
opportunity
28:21
174:21
oppose
155:13
opposed 73:9
89:7
opposing
10:24
opposition
31:13 32:7

**opt** 135:7
**opted** 161:16
161:20
**option**
158:15
**options** 22:13
34:18
**oral** 92:7
93:7,15,21
93:21,23,24
94:2,8,14
94:21
**orally** 60:4
94:24
**order** 23:15
37:15 38:13
52:3 122:24
131:9
146:17
147:18
175:5
177:10
**organization**
100:24
**original**
21:19 74:17
**ought** 170:24
**outcome**
178:15
**overlooks**
140:4
**overrule**
21:15 31:5
**overruled**
36:23 40:3
89:12
107:18
113:3
123:24
**o'clock** 59:18

### P
**P** 2:2,2 4:2
**Pace** 42:17
**page** 28:10
39:6 40:13
56:24 57:23

| | | | | | |
|---|---|---|---|---|---|
| 58:11,15 | 74:19 84:14 | 111:20 | 140:15 | 24:15 | 170:24,24 |
| 72:20 74:8 | 86:22 89:24 | 112:5 | 175:19 | **permission** | **plain** 19:22 |
| 74:25 99:6 | 133:6 | **participation** | **party's** 40:23 | 32:15 | 142:22 |
| 100:20 | 135:19 | 8:5 111:16 | 151:17 | 110:21 | **plaintiff** |
| 151:8 | **papers** 10:5 | **particular** | **pass** 108:18 | **permit** 17:10 | 30:20 40:24 |
| 168:22 | 31:12 167:5 | 48:15,21 | **passes** 132:6 | 17:12 40:2 | 57:10 78:7 |
| 177:3,9 | **paperwork** | 63:22 70:6 | **patience** | 101:3 | 143:15 |
| **pages** 67:15 | 60:8 72:3 | 153:16 | 176:3 | 157:16 | **plaintiffs** |
| 133:12 | **paragraph** | **particularly** | **Paul** 2:11 | **permitted** | 40:11 |
| **paid** 78:6 | 52:17 56:10 | 148:8 | 5:21 | 100:23 | **plaintiff's** |
| 105:24 | 56:20,23 | 168:23 | **pay** 16:14 | **person** 47:7 | 23:17 28:17 |
| 115:10 | 58:14 62:14 | **parties** 4:24 | 72:21 74:21 | 63:21 68:20 | 57:5,8,10 |
| 116:4,6,8,9 | 62:15 64:12 | 6:12 7:8,17 | 116:17 | 100:24 | **plausible** |
| 144:10 | 66:23 67:8 | 9:3,6,11 | 138:18 | 134:16,20 | 19:10 34:19 |
| 145:10 | 68:21 74:14 | 10:4,18,24 | **paying** 78:19 | 140:7,10 | **playing** 28:23 |
| 170:12 | 75:3 90:6 | 11:6,9,10 | **payment** 57:9 | 141:5 | **Plaza** 1:15 |
| **panel** 4:8 7:3 | 90:13 99:11 | 11:12,16 | 115:25 | 144:21 | 2:21 55:9 |
| 7:6 8:4,6,9 | 102:16 | 12:5,22 | 116:14 | 175:23 | **plead** 26:13 |
| 9:4,9 11:3 | 104:11 | 13:25 20:4 | 117:7 165:6 | **personal** | **pleading** |
| 11:10,13,23 | 107:21 | 30:22 32:11 | **payments** | 41:22 | 155:6 |
| 13:7 20:15 | 108:8 113:9 | 33:3 35:17 | 57:9 76:14 | **personally** | 156:24 |
| 22:5 29:15 | 116:20,23 | 38:2 40:9 | **pending** | 141:14 | **pleadings** |
| 29:17,17 | **paralegal** 6:5 | 41:18,20 | 167:7 | 163:20 | 10:3 |
| 30:24 31:4 | **pardon** 37:6 | 65:6 67:3,6 | **people** 44:7 | **pertaining** | **please** 4:24 |
| 39:15,19,23 | **parents** | 68:3 132:10 | 47:14 48:22 | 43:21 | 9:21 10:14 |
| 55:13 56:8 | 99:13 | 136:4,12 | 51:7 77:23 | **pertains** | 11:12 42:13 |
| 56:12,18 | **parole** 24:15 | 138:14 | 86:3 110:15 | 93:25 | 61:6 65:4 |
| 135:18 | 25:2 35:20 | 145:25 | 111:21 | **phone** 127:14 | 69:6 |
| 137:25 | **part** 32:6 | 148:25 | 127:13 | **phones** 127:7 | **point** 4:16 |
| 139:9,14,18 | 35:3,11 | 152:18 | 136:18,19 | **phrase** 35:23 | 6:11 44:6 |
| 143:21 | 49:5,7 52:4 | 156:19 | 156:17 | 36:3 67:7 | 47:24 48:11 |
| 146:22 | 56:16,21 | 158:11 | 162:7 | 91:18 92:4 | 52:2,14 |
| 150:13 | 58:9 60:24 | 165:10 | 164:19 | 108:6 | 78:19 83:6 |
| 151:17 | 83:12 88:7 | 168:13 | **percent** 77:11 | 114:21 | 88:18 89:21 |
| 153:22 | 88:10 91:12 | 171:20,21 | 84:8 85:22 | 155:4 | 109:20 |
| 155:14 | 106:5,22 | 174:19 | 85:23,23 | **pick** 128:23 | 121:11 |
| 157:21 | 128:3 | 175:4,7,24 | 86:16 | **picture** | 125:25 |
| 158:19 | 137:13 | 178:13 | **perceptions** | 125:13,18 | 135:8 |
| 165:24 | 162:8 | **partner** | 70:4 | **piece** 21:2 | 145:13 |
| 169:8 175:7 | 167:10 | 82:20 | **perfect** 170:6 | 36:11 74:18 | 150:2 |
| 175:17,18 | 169:2 | **partners** | **period** | 133:6 | 168:24 |
| 175:21 | 170:14 | 50:22 | 118:11,20 | **place** 86:14 | **pointed** |
| **panel's** 6:14 | **participant** | **parts** 146:10 | 120:8 | 86:15 87:23 | 12:21 |
| 8:4 175:6 | 5:13 | 146:11,12 | **periods** | 102:10 | 165:23 |
| **paper** 21:2 | **participants** | **party** 10:16 | 132:10 | 126:16 | **policy** 34:2 |
| 67:22,25 | 10:11 | 15:9,15 | 155:6 | 128:23 | **portion** 25:3 |
| 70:7,10 | **participated** | 35:25 46:5 | **permissible** | 152:18 | 25:4 61:7 |

| | | | | | |
|---|---|---|---|---|---|
| 74:23 85:6 | 129:19 | 108:24 | 68:11 98:25 | 46:8,9,10 | 83:17 84:9 |
| 113:6 | **presents** | 111:12 | 101:18 | 47:9 48:23 | 97:5,6 |
| **position** | 22:18 | 134:13 | 104:7 | 49:3,9,12 | 99:13 100:2 |
| 148:9 | **press** 57:7 | 166:23 | 171:22 | 52:6 54:11 | 100:3 |
| **positive** 33:2 | 132:18 | **proceeding** | **promises** | 54:21 57:15 | 101:17,18 |
| 33:7 34:3,5 | **presume** 32:8 | 6:8 8:5,25 | 87:8 89:23 | 59:15,21 | 101:20 |
| 34:23 | **presumed** | 28:14 30:5 | 95:23 97:4 | 60:2 61:21 | 102:19,25 |
| **possessing** | 172:5,6 | 48:13,15 | 97:5 98:22 | 61:25 63:13 | 103:19 |
| 22:23 | **presumes** | 105:21 | 100:21 | 72:19 74:17 | 105:7,10 |
| **possession** | 171:24 | 109:6 114:5 | 103:18 | 74:21 78:15 | 107:23,25 |
| 118:12 | **pretty** 29:3 | 149:16 | 107:6 165:6 | 78:19 83:8 | 142:16 |
| **possibilities** | 43:19,25 | **proceedings** | 165:7,8 | 86:3 89:25 | 144:11 |
| 34:14 | 44:23 51:25 | 1:1 143:23 | **prompting** | 95:22 98:14 | **public** 52:6,8 |
| 136:14 | 92:10 | 143:25 | 82:15 | 98:15,19,23 | 52:9 126:3 |
| **possible** | 100:19 | 178:11 | **properly** | 102:3 | 126:5 178:8 |
| 10:25 13:22 | 144:3 | **process** 9:3 | 6:23 | 103:11,14 | **publicly** |
| 31:16 | 155:18 | 16:19 22:15 | **proposed** | 110:12,16 | 103:24 |
| 103:15 | **prevailing** | 49:15 | 9:24 11:8 | 112:4 115:7 | **punitive** |
| 136:9 161:6 | 53:4 104:16 | 109:15 | **propriety** | 117:13 | 134:22,24 |
| **possibly** 58:8 | 113:24 | 111:14 | 145:19 | 121:6 | 147:23 |
| 58:10 | **previously** | 144:12 | **prosecute** | 126:22 | **purchaser** |
| 118:13 | 20:16 | 147:21 | 48:4 | 127:6 130:3 | 154:17 |
| 136:24 | **prior** 43:22 | 149:8 157:2 | **prove** 10:18 | 132:21 | 161:25 |
| **posthearing** | 44:5 46:25 | 157:4,9 | 130:17 | 134:17 | **purports** |
| 133:23 | 81:17 129:5 | 172:22 | **proved** 87:12 | 135:9,15 | 22:4 |
| **potentially** | **private** 112:3 | **processes** | 87:19 | 136:21 | **purpose** |
| 32:17 | 112:9,13 | 172:25 | **proven** 102:5 | 137:17,18 | 41:25 62:6 |
| **precisely** | 140:14 | **professional** | **provides** | 137:24 | 86:4,13 |
| 140:22 | 164:8 | 141:21,23 | 132:5 | 138:6,7,19 | 174:16 |
| **preclude** | **privilege** | 166:4 | **providing** | 139:13 | **purposes** |
| 7:23 | 25:16 142:5 | **professionals** | 11:8 | 141:15,17 | 12:17 86:18 |
| **predecessors** | **probably** | 163:7 | **provision** | 141:25 | 164:10 |
| 99:17 | 13:24 37:8 | **prohibit** | 32:25 117:2 | 142:18,21 | **pursuant** |
| **preparing** | 46:24 47:13 | 157:14 | 120:23 | 145:8 | 7:12 8:21 |
| 148:10 | 50:6 78:4 | **prohibited** | 153:7 | 150:21 | 12:14 17:10 |
| **presence** 9:11 | 152:10 | 12:23 25:4 | 154:23 | 151:21,24 | 17:14 |
| **present** 3:1 | **problem** | 155:25 | **Pru** 43:4 | 156:21 | 107:24 |
| 5:9 6:8 | 88:10 | **prohibits** | **Prudential** | 157:25 | 140:18 |
| 55:10,11 | **procedural** | 12:19 18:8 | 1:10 5:23 | 168:5,18 | 155:16,22 |
| 71:6,9 | 25:23 | **promise** 21:5 | 6:19 12:9 | 177:16 | 156:11 |
| 110:3 | **procedure** | 99:25 | 12:23 13:13 | **Prudential's** | 158:12 |
| **presentation** | 7:5 30:12 | 104:22 | 15:4,13,21 | 137:21 | **pursue** 78:22 |
| 10:19 24:3 | **procedures** | 123:2 | 16:21 22:21 | **PSI** 57:7,9 | **pursuing** |
| 36:17 | 53:3 170:3 | 165:10 | 37:23 38:23 | 58:18,23 | 161:18 |
| **presented** | **proceed** | 169:10 | 42:21 43:5 | 62:7,12 | **put** 18:4 |
| 127:21 | 15:24 39:16 | **promised** | 43:15 44:25 | 64:9,23 | 32:20 39:22 |
| 129:10,12 | 40:25 54:3 | 29:8 64:8 | 45:15,23 | 71:8,11 | 70:10 86:3 |

127:24
128:2
136:17
137:18
141:6,7
147:22
151:23
152:6,12
163:15
puts 148:8
putting 150:5
P&S 44:22
P.C 1:8
P.M 176:6

**Q**
qualificatio...
19:14 88:15
qualified
151:23
152:19
quality
147:19
question
13:19 14:9
35:13 61:6
62:18 68:24
69:3,6
75:15 78:23
79:6 84:22
85:3 88:25
89:4,5,13
89:18 105:8
105:17
106:10
107:2,4,13
107:14
113:5
115:18,18
124:13
128:10
146:22,25
149:6
153:15
156:15
157:13
159:10

161:19
173:20
questions
7:20 18:17
89:6 94:7
118:23
122:20
128:6
147:14
148:18
152:25
165:19
quintessent...
145:22
quite 143:6
145:5
quote 25:10
88:2 143:15
quoted
149:18
151:14

**R**
R 1:19 2:2
4:2 38:8
178:1
race 159:4
racial 169:20
Radler 2:20
5:16
raise 9:22
raised 162:16
162:19
163:2 173:4
read 10:3
23:24 26:19
28:25 29:2
39:9,13,23
40:15 53:13
56:23 57:2
58:14 61:6
61:8 64:12
65:3,22
66:2,4,6,8
66:16,25
67:25 68:3
68:12 69:19

73:14,16,24
73:25 74:13
75:3,13
85:2,5,7
90:16,18
91:12 92:16
96:3,13
107:21
113:4,7
121:17
133:5
135:21
146:12,13
151:19,25
153:7 155:4
155:14
171:23,25
reading 28:9
39:14 75:15
reads 99:11
ready 11:15
36:16
real 162:12
realized
78:12 115:7
115:20
really 36:7
125:12
138:9 139:2
139:9
173:14
reason 8:6
10:13 59:4
60:10,13
81:16 89:14
115:12
121:22
138:4
142:20
150:4 158:9
reasonable
108:4
reasons 49:3
78:16
106:12
130:15
169:8

**REBECCA**
2:8
rebuttal
150:18
recall 49:23
59:2,3
60:19 66:15
75:25 76:2
76:16,18,21
77:10 79:16
79:17,19
81:15
115:23
124:22
received 10:7
11:6 42:18
43:11 57:8
107:24
115:25
147:13
165:6
receiving
131:19
recission
105:20,22
106:2,16
recognize
58:4
recognized
34:19
recollection
58:21 82:13
recommen...
71:18
record 34:9
36:22 42:4
42:12 61:7
85:6 87:2
108:21,22
113:6
135:21
175:16
recorded
127:7
recovery
108:3
recross 124:9

redirect 7:19
123:21
refer 74:10
141:4
146:21
165:24
170:3
reference
153:7,8
referral 8:10
8:13 135:14
139:18
150:14
referred 63:4
146:24
referring
159:12
160:20
165:2
refers 166:25
reform 154:3
refrain 9:7
refresh 58:20
refused 57:7
regard
165:11
regarding
22:14 33:12
87:7,13,14
109:11
116:14
119:6
120:15
163:5,18
regulatory
139:15
rehear
173:17
related 18:20
104:8
108:11
113:11
124:13
163:4
178:13
relating
99:21

relationship
4:24 78:15
128:11
release 90:20
100:3,10
101:24
102:4
116:25
117:6,12,19
117:21
119:9,14,15
119:20,21
119:25
120:4,12
122:7,24,25
123:10,18
123:25
124:2
128:13
131:13
released
100:6 123:4
releases
99:12
releasing
121:18,21
relevance
111:24,25
112:21
relevancy
87:11 111:6
relevant
111:22
149:25
163:16
relied 92:5,19
94:20 95:2
138:12
relief 101:4
135:13
relies 141:4
reluctant
128:7
remain 44:13
45:14
175:16
remainder

32:13
**remarkable**
168:24
**remember**
27:8 54:24
55:3,16
56:4,5 58:6
59:19,24
60:3,9 66:6
66:10 71:2
76:17 78:25
79:9,10,13
79:15 80:16
80:17 81:25
83:21,25
126:19
144:6 146:5
**remind** 150:9
**remiss** 150:8
**rendered**
7:11 8:17
**repeat** 69:3,3
**repeating**
133:8
**repetitive**
11:11
**rephrase**
62:17
**reply** 31:14
168:22
**Reported**
1:24
**reports** 161:2
**represent** 5:7
5:16,22
46:14 47:4
54:11 98:12
**representat...**
92:6,24
93:3,20
94:20
**representat...**
6:2 110:12
112:18
**representat...**
6:13 9:7,12
**represented**

47:8 93:4
96:11 97:14
98:7,13
160:12
164:19
**representing**
74:18
**represents**
67:5 102:18
**request** 9:5
22:22
152:23
175:24
**required**
19:11 31:14
65:5
**requirement**
32:23
**requireme...**
165:18
**requires**
33:11 34:3
**res** 28:19
**rescinded**
105:23
**research**
156:3
159:25
**resolution**
6:25 7:10
8:21 144:15
147:20
148:17
170:2
172:22
**resolved** 60:5
164:20
**resources**
170:20
**respect** 9:15
10:21 29:16
47:9 134:25
136:6 149:7
158:6
170:14
**respectfully**

9:5 88:9
170:22
**respond**
106:8,14
173:4
**responded**
18:14 37:4
**respondent**
2:10,18
5:17,24
6:21 30:4
31:11 46:5
**respondents**
1:12 30:18
31:2 32:18
61:14,17
69:15 72:8
72:10,13
150:10
177:18
**Responden...**
124:17
**response**
17:17 30:16
96:25
143:12
150:3
**responsibil...**
43:18
141:21
**responsible**
11:7 175:11
**rest** 48:22
74:14 75:13
132:18,25
149:14
**rests** 132:22
**retain** 62:11
175:13
**retained**
46:13 48:3
60:17 62:5
63:5,22
69:16 82:10
**retainer**
16:11,14
46:21 60:25

61:2 62:9
63:17 64:3
64:6,13,14
64:21,25
125:9,21,23
126:12,14
126:17,18
126:25
**retainers**
127:3
**reveal** 80:24
**reversed**
164:9
**reverts**
163:22
**review** 10:24
51:18
118:16
131:2
**reviewing**
118:19
**revocation**
122:8
**revoke** 118:5
118:20
132:3
147:15
**Rifkind** 2:11
5:21
**Rigby** 3:3 6:3
**right** 7:24
9:22 19:6
22:19 25:10
25:16,18,21
25:24 26:2
29:18 36:13
40:24 46:19
62:7,8
67:15 70:8
70:24 75:20
76:12,15,23
77:19 88:6
98:3 99:5
101:18
103:3,14
104:4
108:13

109:11
111:12
133:17,21
140:18
141:8,18
142:13
153:25
168:10
172:13,23
**rights** 14:10
15:2 16:22
16:24 25:15
53:20
121:10
132:11
154:18
172:18
173:2
**Rivkin** 2:20
5:16
**road** 141:20
**Robbinson**
5:5
**Robin** 5:6
**ROBINSON**
2:4
**room** 4:22
5:9 9:10
13:24 25:11
51:15,17,19
66:5 141:12
175:25
**Roper** 82:5,7
82:11,16,18
**rule** 11:3
12:17,18
19:20,23
39:11 40:5
40:22
134:14
135:9,9,16
137:14
139:20
140:4,19
141:2,3,6,8
141:22
154:5

155:12
171:9,9
**ruled** 15:10
23:7 143:18
**rules** 8:8
12:14 17:10
17:11,21,24
18:9 19:2
21:3 28:19
33:15 53:4
53:10
104:17
113:25
114:4,9
133:18
134:8,15
140:5,13
147:11
149:15
153:8 155:2
155:17,19
155:22
156:12,25
157:8,8,9
157:14
158:12,13
158:23
159:2 171:3
171:5
**ruling** 21:15
21:23 22:5
23:11 28:15
29:15 30:7
**rulings** 19:8
**running** 51:5

----
**S**
----

**S** 1:5 2:2 4:2
4:5 38:8
177:8
**Saenger** 2:8
5:6 22:8
**Samuel** 2:16
5:25
**saw** 49:23
50:11,13,16
51:14 73:17

127:18
130:8
saying 21:3
 29:7 31:21
 81:16 85:16
 96:12
 103:16
 106:18
 107:2
 112:22
 122:8
 123:19
 124:2 155:8
 156:22
 159:18
 160:4
 161:10
 167:2
says 12:12
 22:9,12
 52:20 65:13
 72:21 93:19
 94:19
 100:10,21
 102:17
 103:20
 104:15
 108:9 113:9
 116:23
 117:16
 118:3
 128:12
 131:23
 137:23
 140:5
 142:18
 144:2
 145:24
 149:11
 151:8
 154:23
 155:19
 157:6,6
 158:4,5,20
 168:2 171:9
scope 18:17
scores 25:19

screen 85:15
se 129:16
second 21:9
 21:14,25
 24:18 28:16
 65:4 91:9
 131:19
 163:22
 164:3
secret 115:8
 115:9 168:4
section
 148:13
secure 175:13
Securites
 15:21
securities
 1:10 5:23
 6:20 8:9
 12:9 13:4
 16:21 22:22
 38:23 42:22
 43:8,15
 46:11 48:10
 53:6 104:19
 148:16
 153:23
 157:24
 163:3
 164:17
 166:3
 177:17
security 43:9
 43:12 114:3
 157:18
see 14:18
 28:17 67:24
 72:20 74:4
 97:9 99:23
 100:4,15
 101:5,11
 102:20
 103:8,15
 104:20
 111:6 122:6
 139:3
seeing 51:2

seek 64:15,23
 65:9 116:11
 134:18
 146:17
seeking 26:11
seen 11:23
 73:21,22
 74:2,3
segue 145:5
selected 8:18
selecting
 141:17
selection
 22:15 71:12
self-evident
 33:19
self-incrimi...
 25:17
semicolon
 91:13
semicolons
 91:11
sense 138:5
 153:21
 170:6
sent 13:18
 20:22 31:2
 138:25
 142:6
 163:24
 164:10
sentence
 40:16,17
 64:18 65:4
 67:8 68:2
 74:13 75:16
 90:10,16,23
 91:2,6,9,12
 92:9,17
 94:17 95:5
 96:13 97:24
sentences
 39:10
separate 30:6
 135:4
separation
 58:16 99:22

September
 12:6 22:25
 26:20 37:19
 38:18
 177:14
Series 43:9
serve 8:18
 16:3 30:18
served 31:10
 41:15,20
service 41:13
 41:18,23
services
 163:7
set 7:7 23:16
 90:20 92:7
 93:10 94:21
 96:16 99:20
 135:4
 171:21
 178:18
setting 21:21
settle 98:14
 110:22
 111:3 166:8
settled 8:15
 12:8 49:18
 74:16 86:17
 104:10
 109:4
 110:19
 113:18,21
 145:10
 164:2
 170:17
settlement
 12:5 14:12
 15:15 16:17
 17:4,16
 18:22 22:21
 33:9,10
 37:22 38:21
 43:22 44:6
 45:21 49:21
 49:24 51:8
 52:18 57:19
 62:6,11

64:9,16,23
65:10 76:6
82:23 83:4
83:7 84:9
88:4 90:3
99:8 108:9
110:8
111:17,18
112:10
116:13
117:24
118:11
119:6
120:15,19
123:14
127:4 128:4
129:16
144:24
148:7,23,24
162:10
177:15
settles 144:21
settling 109:6
 109:10
 126:4 170:9
seven 118:4
 118:17
 130:21
 132:2,6
seven-day
 118:10,20
sex 159:3
 169:21
share 112:12
 112:14
 155:23
 159:14
 160:15,17
 161:25
shareholders
 99:16
shares 45:3,6
Shari 2:23
 5:14
Sheldon 2:16
 6:2
shelters

163:19
Sherwood
 42:14
shifting
 143:2
shocked
 137:16,18
short 11:20
 14:18 39:22
 131:15
 133:6
shorter 157:2
shorthand
 153:9 170:4
show 23:15
 56:7 61:11
 137:3
showed 50:20
 138:6
showing 76:2
shown 10:23
 30:20 73:19
 86:24
side 13:25
 17:6,8 37:3
 173:10
sign 51:16
 52:9 60:21
 61:2 70:20
 88:13,14
 110:12
 119:14
 127:2
 131:18,24
 144:4
 160:18
signature
 57:22 68:5
 128:14,17
signed 12:6
 14:12 38:2
 45:21 46:20
 50:7,12,15
 50:17 53:18
 58:21 60:7
 60:25 62:9
 63:16 66:17

| | | | | | |
|---|---|---|---|---|---|
| 68:10,17,20 | sky 112:22 | 138:3 | 93:14,20,25 | stricken | 99:17 |
| 68:22 69:22 | small 45:10 | spends 19:24 | 94:21 | 88:24 | sue 101:2,18 |
| 71:3,9 | 174:13 | spent 81:17 | 107:12 | 149:24 | 101:20 |
| 78:14 83:3 | Smith 160:7 | spirit 176:4 | 123:6 124:2 | 152:24 | 102:9 121:6 |
| 87:14 91:7 | 160:12 | spoke 83:2,5 | 124:14,18 | strictly 126:4 | 123:2 |
| 91:21 95:19 | 161:13 | 129:15 | 124:24 | strongly | 142:13 |
| 95:24 | 162:11 | ss 178:4 | 125:16 | 27:20 | 159:15 |
| 106:19 | sole 88:5 | staff 6:25 | 134:10 | stuck 152:4 | 162:16 |
| 119:9,11,13 | solicit 29:14 | 175:23 | 135:12 | stuff 70:13 | sued 103:3,5 |
| 119:15,16 | Solomon | standard | statements | subject 7:13 | 103:13 |
| 119:20,24 | 160:7,12 | 25:5 26:4 | 7:8 11:16 | 40:6 47:3 | 159:21,22 |
| 120:2,3,12 | 161:13 | 33:24 | 42:3 60:11 | 140:11,16 | suggest 36:10 |
| 122:24 | 162:11 | 146:20 | 133:17 | 142:4 | 40:20 |
| 123:10 | somebody | 158:19 | States 140:20 | submission | 142:24 |
| 125:21,22 | 13:7 71:15 | standing | stating 59:16 | 7:22 10:6 | 170:23 |
| 126:12,18 | 111:19 | 170:11 | 72:17 | 18:8 30:10 | suggested |
| 128:19,25 | 170:15 | 173:6 | statment | 34:24 | 13:21 35:14 |
| 129:7,9 | somewhat | start 4:7 | 21:21 | submissions | suggesting |
| 130:9 136:5 | 52:3 | 29:23 40:4 | statute 157:3 | 23:18 32:10 | 161:6 |
| 136:18 | sorry 56:19 | 46:22 88:19 | statutory | submit 27:16 | suggestion |
| 143:8 | 153:14 | 90:6 145:16 | 154:4 | 28:12 31:24 | 133:3 |
| 159:17 | 160:9 | started 47:13 | 165:18 | 133:5 149:2 | suing 49:9 |
| 171:14 | sought | starting | stayed 45:23 | 157:7,10,13 | Suisse 159:23 |
| 172:4 | 135:13 | 36:17 | Steve 119:4 | submited | suit 103:11 |
| signing 22:20 | 146:18 | state 17:25 | 127:14 | 75:17 | 126:9 |
| 88:3 96:16 | sound 46:18 | 19:18,19 | 128:21 | submitted | 159:19 |
| 118:4 | south 17:8 | 20:2 21:20 | stock 12:15 | 6:23 7:2 | 160:20 |
| 126:25 | southern | 33:16 42:13 | 19:18,20 | 10:4 18:2 | 161:17 |
| 129:5 | 164:4 | 48:16 51:6 | 20:2,9 | 33:4 75:19 | 163:3 |
| 156:18 | so-called | 53:5 104:17 | 21:20 23:18 | 75:22 | suits 162:15 |
| signs 13:12 | 167:18 | 113:25 | 23:20 33:16 | 124:23 | support 12:2 |
| similar | speak 119:3,5 | 159:2 | 48:9,16 | submitting | 44:19 139:7 |
| 157:25 | speaking | 174:19 | 53:5 104:18 | 75:25 | Suppose |
| simple 171:4 | 153:11 | 178:3,8 | 113:25 | subsection | 156:23 |
| simply 14:7 | specialist | stated 34:25 | 154:6 | 134:15 | Supreme |
| 18:4 25:22 | 44:20 | 42:12 84:11 | 157:21 | subsequently | 172:18 |
| 31:4 | specific 77:23 | statement | 159:2 | 64:2 147:17 | sure 13:6 |
| sit 59:5 60:11 | 124:16 | 10:17 12:21 | 160:15,17 | subsidiaries | 27:13 42:11 |
| 70:9 | specifically | 19:4 22:2 | 161:4,14 | 99:14 | 44:7 133:19 |
| sitting 5:12 | 17:12 73:3 | 22:17 23:22 | stood 73:7 | substance | 152:7 |
| 51:11 | 99:20 | 24:9 27:9 | stop 64:17 | 80:24 | 153:18 |
| situation | 126:13 | 27:23 28:10 | 113:12 | 129:12 | 162:18 |
| 65:7 70:6 | 127:6,20 | 34:9 42:7 | 145:14 | substantive | surfaced |
| 125:19 | 132:4 | 46:17 58:25 | story 28:25 | 25:14,24 | 81:20 |
| 139:9 | 135:13 | 70:17,18 | 128:8 | 26:2 172:17 | suspected |
| six 17:3 76:15 | 136:5 171:6 | 91:24 92:6 | street 55:7,9 | 172:23 | 100:13 |
| skills 22:12 | speculate | 92:24 93:5 | 85:25 | successors | swear 136:17 |

sweep 168:25
sweeping
18:16
swore 9:23
sworn 38:9
54:23
system
144:13

**T**
T 177:8 178:1
178:1
table 51:12
170:25
take 10:9,12
34:17 36:21
43:19 52:16
54:13 57:18
72:7 90:10
126:2
131:25
165:22
175:2,14
taken 178:11
talk 67:21,23
67:24 84:13
88:22
talked 60:24
89:22 94:11
talking 12:18
27:11 46:23
75:12 84:11
105:19
106:15
117:15
119:22,23
125:8 126:7
126:13
133:11
134:17
151:16
talks 148:13
task 65:8
Tavern 50:5
50:14,17
119:17
127:19

129:2 130:7
130:10
tax 163:19
taxable
127:11
technically
168:10
tell 55:2
59:12 68:25
73:6 93:22
94:16 97:11
121:8,12
122:12
162:19
172:11
telling 39:18
65:14 70:15
95:14 96:5
96:8 115:14
127:8
Ten 133:12
term 68:4
terms 22:14
32:21 79:4
90:19 95:8
95:10,15
96:4,10,11
98:2,5,8
117:24
118:16
120:18
129:15
133:9 172:7
testified
54:13,22
147:16
149:4
testify 14:14
48:24 49:4
145:20
testimony
7:17 14:17
24:11,12,19
33:21 87:7
95:11,13
106:21
125:7 137:8

137:9
138:10,23
143:3
145:22
147:3
149:24
150:11
152:24
168:4,19
173:18
thank 9:13
15:23,25
16:2 29:19
29:21,22
36:14,19
41:2 54:2,4
60:15
108:25
122:18
129:3 131:4
139:23
145:14
150:16
152:20,21
176:3
theory 73:10
174:9
thereof 18:23
104:9
108:12
113:18
thing 12:4
13:15 19:15
33:6 34:22
64:7 65:14
70:8,8 78:5
85:9 92:10
98:24
136:23
137:24
138:12
150:7
152:11
159:7
things 21:16
23:4 70:11
76:22 84:10

84:12,15
86:23 94:5
94:6,23
128:3
130:13,16
130:19
135:4 136:8
151:10
168:25
169:11
think 13:23
14:22,23
24:2,7 27:8
29:3 35:11
37:8 40:18
74:19 78:18
78:20 85:16
87:23,25
88:23,24
89:10
104:14
111:16
115:15
124:25
131:10
132:4,8
133:7,10,14
133:16
134:5 144:3
144:18
145:21
151:7
152:10
153:12
154:21
167:20
169:7,10,11
169:16
174:10
thinks 138:17
Third 2:5
24:25
thought
27:24 39:20
53:23 78:5
78:10,18
80:3 97:15

136:9,21,25
156:22
thousands
162:7
three 13:22
21:18 34:13
37:9 51:20
127:13
136:8 151:9
thrust 24:19
Thyne 3:2
5:10
Thyne's
82:20
time 10:13
19:24 21:9
21:10 29:6
29:23 30:17
37:7 42:2
42:20 43:3
43:8 45:4
46:12 47:20
47:23,25
49:17,25
50:11,13,16
51:9,15
52:7 53:18
54:19 68:13
69:21 70:21
72:25 73:4
73:14,17
74:2 78:9
80:23 81:4
81:14 82:25
83:3,24
84:25 85:12
87:3 90:11
91:3,6,21
95:6 109:21
117:20
118:8,10
119:18,19
119:20,25
120:2,15
122:13
126:20
127:8

128:15
131:16,22
132:10
142:5
145:14
150:6 155:6
156:18
158:7
171:23
172:20,21
173:5,16
175:25
timeline 16:9
times 42:8
66:14 125:6
173:21
today 5:5,9
14:14 17:20
29:23 40:20
46:6 48:14
59:5 60:11
72:3 73:17
87:19 102:7
106:3
135:20
told 63:15
73:12 84:17
87:3 95:4
95:25 97:15
98:4 121:15
126:8 130:4
152:13
tone 79:4,6
Tony 48:25
top 86:6
100:20
151:8
tops 51:21
133:13
tort 154:3
total 45:16
totality 53:8
totally 65:19
70:12
112:15
tougher
157:8

**trade** 44:19
  45:7 160:24
  162:4
  169:19
**traded** 45:3
**traders** 44:22
  44:23
**trades** 43:21
  43:23
**trading** 44:21
  45:2
**transaction**
  165:21
**transactions**
  44:4
**transcript**
  26:20 37:18
  38:16 39:5
  39:8 73:15
  133:5,10
  143:11
  144:2 151:9
  177:12
  178:10
**transpiring**
  125:14
**trees** 11:25
**trial** 110:4
**true** 68:10,13
  68:21 69:15
  70:9,17
  91:24 95:5
  95:6 96:2
  102:5,11
  117:3 138:9
  143:4,5
  145:2
  165:20
  178:10
**truth** 70:17
  162:20
  173:10
**try** 130:18
  142:7 146:5
**trying** 52:7
  88:17 95:21
  95:23 102:8

105:2
133:16
139:21
169:17
170:20
**turn** 39:6
  40:13 41:6
  56:20 58:11
  73:22 74:8
**turned**
  146:19
**two** 34:18
  39:10,18
  67:15 96:5
  96:8 120:6
  125:14
  128:15,20
  128:24
  136:14,14
  156:19
  161:14
  164:18
  165:10
**two-week**
  120:8
**type** 124:22
**typed** 124:19
**typical** 13:8
  13:13,14
**Typically**
  13:6

  **U**

**U** 38:8
**ultimate**
  162:9
**ultimately**
  164:2
**unadressed**
  174:2
**unambiguo...**
  24:17
  142:22
  143:9,11
  144:20
  145:11
  148:4

150:24,25
151:2
**unambiguo...**
  17:25
  148:25
**unauthoriz...**
  160:24
  162:4
**underlying**
  26:23 73:9
  103:23
**understand**
  64:19 65:21
  65:24 67:9
  67:10,11
  68:7 75:14
  90:23 91:2
  91:18 92:9
  92:11,15,17
  92:18,23
  93:8,12,23
  94:13,17,18
  95:14,18,20
  96:6,9
  97:13 98:2
  98:5,6,8
  100:18,19
  101:14,15
  101:16
  102:13,22
  103:16,17
  106:18,24
  108:5
  113:14,20
  114:20
  117:17
  118:7
  142:15
  143:4
  146:11
  153:15
  154:22
  155:10
  158:10
  159:20
  174:15
**understand...**

88:17
**understand...**
  53:2 67:5
  68:6 97:3
  157:12
  160:19
**understands**
  75:10 90:19
  106:23
**understood**
  27:14,19
  60:6 65:25
  66:19,20
  68:4,12
  69:19,23,24
  91:20 95:6
  95:7,10
  96:3,10
  98:7 114:3
  121:24
  122:2
  123:17
  143:3
  146:10
  147:5 149:4
  149:10,11
  171:23,24
  172:6
**unenforcea...**
  36:5
**unfair** 142:11
  145:8
**unhappiness**
  83:6
**unhappy**
  84:8,15
**Uniondale**
  2:21
**unique** 77:15
  148:8 170:8
**uniquely**
  141:25
  151:22,22
  152:19
**United**
  140:20
**unknown**

100:12
**unmistake...**
  144:18
**unremarka...**
  169:3
**unsuspected**
  100:13
**untrue** 27:6
  27:10 143:6
**uphold**
  132:12
  170:20
**upset** 85:22
**use** 38:5
  133:21
  157:17
**uses** 151:19
**utmost** 29:16
**U-4** 158:18
**U4** 158:24

  **V**

**V** 38:8
**valid** 23:8
  131:13
  143:19
**various** 41:18
  57:6
**Vaughn** 1:5
  4:5,25,25
  5:11 6:7
  9:19,24
  12:6 14:10
  14:13,24
  16:10,18
  18:12,24
  19:6,16
  20:5,12,22
  20:25 22:9
  23:12 24:13
  25:8 27:2
  27:13 28:11
  29:8,14
  34:20,25
  35:12,17,20
  36:20 37:11
  37:23 38:22

39:1,4 40:1
41:1,2 42:1
42:5,11,14
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1,11
52:1 53:1
54:1,8 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1,5
70:1 71:1
72:1,14
73:1 74:1
74:15,16,22
75:1,7 76:1
77:1 78:1
79:1 80:1
80:22 81:1
82:1 83:1
84:1 85:1,9
86:1 87:1
87:14 88:1
88:22 89:1
89:12,14
90:1,11,17
91:1,14
92:1 93:1
94:1 95:1
96:1 97:1,5
97:6 98:1
99:1,12
100:1,21
101:1 102:1
102:17
103:1 104:1
105:1 106:1
106:4 107:1
107:21
108:1 109:1
109:4 110:1

| | | | | | |
|---|---|---|---|---|---|
| 111:1,12 | 172:1 173:1 | **W** | 161:17 | 91:25 | 142:19,20 |
| 112:1,2,4 | 173:19 | waive 14:10 | wants 24:21 | 109:14,21 | 150:6 |
| 113:1 114:1 | 174:1,7 | 14:25 25:15 | 29:2 88:23 | 112:3 | 151:24 |
| 115:1 116:1 | 175:1 176:1 | 27:2 53:13 | 111:15 | 120:11 | 177:3 |
| 116:23 | 177:1,16 | 137:11 | 171:3 | 122:6 | 178:17 |
| 117:1 118:1 | **Vaughn's** | 139:5 | warned | 129:24 | witnesses |
| 119:1 120:1 | 5:12 14:17 | waived 22:19 | 26:21 | 130:11 | 7:19 9:18 |
| 121:1 122:1 | 17:6 22:17 | 154:18 | warns 26:21 | 148:11 | 9:24 132:20 |
| 122:23 | 58:17 81:4 | 168:10 | wasn't 55:24 | 164:3 | 132:24 |
| 123:1 124:1 | 88:2 99:22 | waiver 25:9 | 61:24 78:16 | weren't | 137:19 |
| 124:15 | 124:18 | 25:13,17,21 | 80:11 81:3 | 61:20 110:4 | won 27:18 |
| 125:1,5 | 137:9 | 25:22 26:5 | 83:24 | 129:6 | wondered |
| 126:1 127:1 | 138:15 | 28:19 35:15 | 125:12 | we've 22:10 | 124:18 |
| 128:1 129:1 | 143:2 | 131:20 | 131:13 | 163:15 | wondering |
| 130:1 131:1 | 144:16 | 137:12 | 137:6 138:9 | **Wharton** | 107:8 155:3 |
| 132:1,16 | 145:21 | 146:23 | 143:5 | 2:11 5:22 | word 64:18 |
| 133:1 134:1 | 149:24 | 172:16 | 172:12 | whatsoever | 67:7 92:14 |
| 134:23 | 164:24 | waiving | way 40:20,21 | 82:14 | 92:19,24 |
| 135:1 136:1 | 166:13,18 | 53:20 | 89:22 97:14 | **WHEREOF** | 93:23,24 |
| 136:20 | **Vaught's** | walk 107:6 | 102:19 | 178:17 | 94:2,8,13 |
| 137:1,4,23 | 34:10 | Wall 85:25 | 111:2 | white 19:22 | 97:3,18 |
| 138:1,11 | **Velazquez** | want 26:16 | 114:15 | wife 5:12 | 150:10,11 |
| 139:1 140:1 | 2:15 5:25 | 36:24 37:2 | 116:17 | 55:23,24 | 151:18 |
| 141:1,14,19 | **Verbal** 94:9 | 45:18 50:10 | 117:14 | 83:23,24 | words 23:10 |
| 142:1,3,8 | versus 4:5 | 55:5 59:23 | 135:19 | **William** 1:24 | 26:14 68:8 |
| 142:12 | 165:25 | 61:12 67:21 | 155:8 | 178:7,22 | 75:2,5 |
| 143:1 144:1 | view 77:25 | 67:22 87:17 | 158:17 | window | 86:19 93:8 |
| 145:1,19 | 139:10 | 90:7 104:12 | 167:3,21 | 138:21 | 94:10 |
| 146:1,9,15 | vindicate | 106:7,13 | 168:21 | wisdom | 113:14 |
| 147:1,5,21 | 172:25 | 107:7,12 | 178:15 | 145:23 | 127:25 |
| 148:1 149:1 | violation 8:7 | 113:12 | website | wished 115:6 | 129:6 146:3 |
| 149:3 150:1 | 135:16 | 122:9 130:4 | 148:12,12 | witness 39:13 | 149:17 |
| 151:1 152:1 | 139:20 | 133:23 | week 129:22 | 39:14 41:21 | 155:9 167:9 |
| 152:14,17 | 141:2 | 136:15 | weeks 120:6 | 49:12 84:20 | work 47:5 |
| 153:1 154:1 | vis-a-vis | 173:3,5,17 | 120:6 | 85:18 | 81:21,22 |
| 155:1 156:1 | 166:4 | 175:13 | 128:21,24 | 108:19 | 86:21 |
| 157:1 158:1 | void 102:4 | wanted 27:13 | **Weiss** 2:11 | 123:22 | worked |
| 159:1 160:1 | voluminous | 49:2 52:7 | 5:21 157:22 | 124:20,23 | 44:20 |
| 161:1 162:1 | 133:12 | 63:13 70:19 | well-recog... | 125:10,20 | 144:13,16 |
| 163:1 164:1 | voluntarily | 106:14 | 101:23 | 126:17 | 145:6 |
| 165:1,4 | 62:2 91:15 | 117:21 | went 16:18 | 128:16,20 | 159:24 |
| 166:1 167:1 | voluntary | 126:5,6,23 | 20:17,18 | 129:8,14,21 | 160:7 |
| 167:14 | 25:9,13,19 | 135:20,22 | 21:11 23:2 | 130:23 | 170:16 |
| 168:1,17 | 90:15 | 135:23 | 44:4 47:15 | 131:3 | working |
| 169:1,9 | 172:16 | 144:10 | 51:25 54:21 | 132:17 | 44:21 81:18 |
| 170:1,9 | vote 110:25 | 147:12 | 70:11 74:23 | 137:2,19 | 85:24 86:11 |
| 171:1,13,22 | vu 16:4 | 152:7 | 75:24 88:12 | 138:24 | 127:9 |

**works** 111:22
**world** 112:12
112:15,19
112:20
148:17
154:14,17
155:23
159:14,16
159:19
161:3,14,25
162:8,10
**wouldn't**
98:25
**writing** 59:16
93:15 118:5
129:17
132:3
**written** 92:6
93:7,21
94:10,21
98:11 122:8
**wrong** 35:13
40:18 78:21
88:6 156:3
167:22
**wrote** 57:25

**X**
**X** 1:2,13
59:22 98:15
177:2,8

**Y**
**Y** 38:8 59:22
**yeah** 83:9
108:17
117:4 119:2
**year** 46:25
60:24
**years** 17:3
44:15 45:16
117:15
145:12,13
146:6,7
158:25
170:11,17
170:17,18

172:10
173:7,13
**York** 1:16,16
2:6,6,13,13
2:22 12:15
19:18,19
20:2,9
21:20 33:16
48:9,16
51:5 53:5
55:9 104:17
113:25
141:22
157:20
159:2
171:25
178:3,5,9

**Z**
**Z** 59:22

**$**
**$200,000**
16:20,23
71:23 72:22
75:18 76:11
86:10 98:19
104:25
105:7,10,24
107:7
114:17
117:7
123:14
124:3
127:10
138:18
144:10
147:12,13
174:12

**0**
**05** 20:23
**06** 20:24
26:20
**0600534** 4:5

**1**
**1** 8:22 10:8

37:14 38:12
41:7 56:8
56:12,17,18
56:21 58:11
58:14 61:15
61:17 62:15
64:12 69:12
69:15 86:15
177:10,19
**1:30** 176:6
**10** 168:22
**10B5** 154:2
160:16
**100** 77:11
84:8 85:22
85:22,23,23
**10018** 2:13
**10022** 2:6
**10216-F**
140:4
**10301** 137:14
141:4
**10301-D**
134:14
**10301-D3**
135:10
**108** 177:7
**11** 74:11
**11556** 2:22
**12** 37:16
38:14
177:11
**121** 177:5
**1285** 2:12
**13** 45:16
**14** 39:6 52:17
56:10,20,23
108:8 113:9
**15** 23:23
40:13
107:21
**16** 90:6,13
116:20
**19** 39:8
**1985** 42:17
**1998** 12:7
16:13 37:24

38:24 46:18
57:16 58:19
59:7 60:7
60:18 67:14
78:3 83:4
108:16
177:17
**1999** 79:12
79:14

**2**
**2** 37:17 38:16
39:5 72:8
72:10,14
100:20
124:17
135:18
177:12,20
**2nd** 23:21
**20** 30:8
**20,000** 45:6
**2000** 81:17
**2003** 81:18
**2004** 79:22
79:23 80:7
80:9,10,11
80:12 81:16
83:2
**2005** 37:16
38:14 79:25
177:11
**2006** 23:23
30:9 37:20
38:18 73:15
177:14
**2007** 1:17 4:4
178:11,19
**21** 116:25
117:5,11,14
117:18
128:12
129:5,7
131:14,17
131:25
**23** 1:17 4:4
58:18 60:3
60:7 178:11

**27** 59:7
**28th** 23:20

**3**
**3** 37:21 38:21
40:16 45:21
49:20 52:17
57:20 58:12
72:20 75:2
134:15
177:15
**30thank**
176:2
**36** 177:5
**38** 177:11,14
177:17

**4**
**4** 56:24 57:23
59:18 99:11
151:8
**400** 47:15

**5**
**5** 28:10 37:20
38:18 67:14
73:15
177:14
**5th** 26:20
178:18
**50** 47:14
111:21
141:23
**54** 177:6

**6**
**6** 66:23 69:10
**61** 177:19

**7**
**7** 43:9 68:21
74:8
**72** 177:20

**8**
**800** 2:5
**85** 42:25

**9**
**9** 74:25
102:16
**97** 62:23
63:25
**98** 45:18,19
50:6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

JEFFREY S. VAUGHN, individually and on :
behalf of those class members similarly :
situated,                               :

                    Plaintiff,          :        04 Civ. 8391 (DLC)

                                        :        OPINION AND ORDER
          -v-                           :

LEEDS, MORELLI & BROWN, P.C., LEEDS,    :
MORELLI & BROWN, L.L.P., LEEDS &        :
MORELLI, LEEDS, MORELLI & BROWN,        :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL :
FINANCIAL, INC., LENARD LEEDS, STEVEN   :
A. MORELLI, JEFFREY K. BROWN, and JOHN  :
DOES, JAMES VAGNINI, FREDERIC DAVID     :
OSTROVE, ROBERT JOHN VALLI, JR.,        :
DISCRIMINATION ON WALL STREET, INC. and :
DISCRIMINATION ON WALL STREET           :
MANHATTAN, INC., and JOHN DOES, ESQS.   :
1-10 and JANE DOES, ESQS., 1-10 a       :
fictitious designation for presently    :
and unknown licensed attorneys,         :
professionals and/or unknown persons or :
entities,                               :

                    Defendants.         :
                                        :
------------------------------------X


Appearances:

For the Plaintiff:

Blaine H. Bortnick
Jeffrey Liddle
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York  10022


For Defendants Leeds, Morelli & Brown,
P.C., Leeds, Morelli & Brown, L.L.P.,
Leeds & Morelli, Leeds, Morelli &
Brown, Lenard Leeds, Steven A. Morelli,
Jeffrey K. Brown, James Vagnini,
Frederic David Ostrove, and Robert John
Valli, Jr.:

Daniel T. Hughes
Kevin L. Spagnoli
Litchfield Cavo LLP
420 Lexington Avenue, Suite 1750
New York, New York  10170

For Defendant Prudential Securities,
Inc. and Prudential Financial, Inc.:

Gerard E. Harper
Theodore V. Wells, Jr.
Beth S. Frank
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
1285 Avenue of the Americas
New York, New York  10019

DENISE COTE, District Judge:

The plaintiff, Jeffrey S. Vaughn ("Vaughn"), has brought this putative class action against his employer and the lawyers he retained to represent him in an employment discrimination dispute against his employer, alleging that the settlement agreement that resolved the dispute (the "Agreement") was a product of secret collusion between his employer and his lawyers. The defendants have moved to dismiss this action and to compel arbitration, relying on an arbitration provision in the Agreement.  Vaughn contends that the arbitration provision does not control, because the arbitration rules provided for in the Agreement do not permit class actions, and his lawyers are not parties to the Agreement.  For the following reasons, the motion to compel arbitration is granted and the case is stayed until the resolution of the arbitration proceedings.

2

## BACKGROUND

The following facts are taken from Vaughn's amended complaint unless otherwise noted. In 1998, Vaughn retained lawyers from Leeds, Morelli & Brown, P.C. (collectively "Leeds Defendants"), to assert employment discrimination claims against his employer, Prudential Securities Incorporated, for which Prudential Financial Inc. is a successor in interest (collectively "Prudential Defendants"). Vaughn pursued these claims through alternative dispute resolution procedures including mediation. The dispute between Vaughn and the Prudential Defendants produced the Agreement dated October 27, 1998. The Agreement, which is incorporated by reference in the Complaint and on which Vaughn has relied in part in bringing this action, granted the Prudential Defendants a general release of claims in exchange for $200,000.00. The Agreement also contains the following arbitration provision:

> <u>Any claim or controversy arising out of or related to this Agreement or the interpretation thereof</u> will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc. Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof. The governing law of this Agreement shall be the substantive and procedural law of the State of New York.

(Emphasis supplied.)

Vaughn alleges that the Leeds Defendants and Prudential Defendants had a "secret agreement" dated February 13, 1998 that was part of an employment discrimination dispute resolution system that the Leeds Defendants had established, and that would

3

enable the Prudential Defendants to cap damages paid to various plaintiffs and settle numerous claims with plaintiffs represented by the Leeds Defendants at one time with a lump sum payment while providing direct payment of attorney's fees to the Leeds Defendants. Vaughn claims that he only learned of the existence of the secret agreement in or about October 2004. He initiated this action on October 25, 2004, and filed an amended complaint ("Complaint") on March 15, 2005.

Vaughn has styled this action as a class action based on his allegation that hundreds of other Prudential employees with discrimination claims against the company were adversely affected by collusion between the Leeds Defendants and the Prudential Defendants based on this or other secret agreements. Vaughn asserts claims for common law fraud, conspiracy to defraud, aiding and abetting fraud, tortious interference with a contract, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Racketeer Influenced Corrupt Organization Act ("RICO").

The Prudential Defendants and the Leeds Defendants both have filed motions to dismiss or to compel arbitration. The Prudential Defendants contend that because the Agreement contains an arbitration provision, this matter should be referred to arbitration, and that this Court does not have subject matter jurisdiction because the only mechanism conferring federal question jurisdiction is the RICO claim, which the Prudential Defendants argue is time-barred and insufficiently pleaded. The Leeds Defendants advance similar arguments, and add, among other

4

things, that the arbitration clause equitably estops Vaughn from pursuing his claims in federal court notwithstanding the fact that the Leeds Defendants are not parties to the Agreement. Vaughn argues among other things that because the arbitration rules provided for in the Agreement do not permit class actions, and he has styled his claim as a class action, this matter should not be referred to arbitration.

## DISCUSSION

### 1. The Prudential Defendants

The FAA was designed to "ensure judicial enforcement of privately made agreements to arbitrate." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219 (1985). The FAA represents "a strong federal policy favoring arbitration as an alternative means of dispute resolution." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004) (citation omitted). Therefore, "under the FAA, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). The FAA requires that a contract provision to arbitrate disputes arising out of the contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Under the FAA, unless parties have unambiguously provided

5

for an arbitrator to decide questions of arbitrability, it is for courts to decide whether the parties agreed to arbitrate. Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005). A court deciding a motion to compel arbitration must resolve four issues: (1) whether the parties agreed to arbitrate; (2) the scope of the agreement to arbitrate; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. JLM Indus., 387 F.3d at 169. In this case, the Prudential Defendants and Vaughn agree that all of Vaughn's claims are arbitrable and that Vaughn agreed to the arbitration provision. They merely dispute whether the scope of the arbitration provision includes claims styled as class actions.

In the absence of "clear and unmistakable evidence to the contrary" in an arbitration clause, only in limited circumstances will a court "assume that the parties intended courts, not arbitrators, to decide a particular arbitration-related matter." Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003) (citation omitted). "These limited instances typically involve matters of a kind that contracting parties would likely have expected a court to decide." Id. (citation omitted). "They include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Id. The question of whether arbitration clauses "forbid class arbitration . . . does not fall into this narrow

6

exception" because it involves "neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties." <u>Id.</u> Thus, in a case where an arbitration clause provided that the parties "agreed to submit to the arbitrator '[a]ll disputes, claims, or controversies arising from or relating to this contract,'" the Supreme Court held that a dispute about whether the arbitration clause "forbids the use of class arbitration procedures . . . is a dispute 'relating to this contract.'" <u>Id.</u> at 451 (emphasis in original).[1]  In such a case, it was apparent that the parties "agreed that an arbitrator, not a judge, would answer the relevant question." <u>Id.</u> at 452.

The arbitration clause in the Agreement contains "sweeping language concerning the scope of the questions committed to arbitration," <u>id.</u> at 453, as it commits to arbitration "<u>[a]ny claim or controversy arising out of or related to this Agreement or the interpretation thereof</u>." (Emphasis supplied.)  Vaughn claims that because the arbitration clause states that the contemplated arbitration will use the "rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc.," and those rules do not permit class action arbitrations, the parties could not have intended that the class action he now brings would be arbitrated.  This interpretation,

---

[1]  In <u>Bazzle</u>, an issue was whether arbitration clause language providing that disputes "shall be resolved . . . by one arbitrator selected by <u>us</u> [Green Tree] with consent of <u>you</u> [Green Tree's customer]" forbade class action arbitrations because the "consent of you" language was arguably inconsistent with multiple claimants.  <u>Bazzle</u>, 539 U.S. at 450.

7

however, contradicts the clear statement that the arbitration
clause applies to "any" claim or controversy related to the
Agreement. Even assuming that Vaughn is right, and the
applicable arbitration rules do, indeed, forbid class action
arbitrations under all circumstances, it would be plausible to
interpret the arbitration clause to require all claims to be
arbitrated and to disallow class actions with no further
qualifications or caveats. Here, as in <u>Bazzle</u>, the question is
"not whether the parties wanted a judge or an arbitrator to
decide <u>whether they agreed to arbitrate a matter</u>," but rather
"what <u>kind of arbitration proceeding</u> the parties agreed to."
<u>Bazzle</u>, 539 U.S. at 452 (emphasis in original). This question
"concerns contract interpretation and arbitration procedures,"
and is therefore "for the arbitrator, not the courts, to decide."
<u>Id.</u> at 453. The Prudential Defendants' motion to compel
arbitration is accordingly granted.[2]


2.  The Leeds Defendants

    The common law doctrine of estoppel may bind a nonsignatory
to an arbitration agreement. <u>JLM Indus.</u>, 387 F.3d at 177. <u>See</u>
<u>also</u> <u>Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.</u>,

---

    [2] The defendants argue that the Complaint fails to state a
claim for a RICO violation, and therefore, there is no basis for
federal subject matter jurisdiction. Because the Complaint has a
RICO claim that on its face is "neither clearly immaterial and
made solely for the purpose of obtaining jurisdiction nor wholly
insubstantial and frivolous," <u>Lyndonville Sav. Bank & Trust Co.</u>
<u>v. Lussier</u>, 211 F.3d 697, 701 (2d Cir. 2000), there is subject
matter jurisdiction over this action as of now.

271 F.3d 403, 404, 406 (2d Cir. 2001); Thomson-CSF, S.A. v. Am.

Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995); Camferdam v.

Ernst & Young Int'l, Inc., No. 02 Civ. 10100 (BSJ), 2004 WL

307292, at *6 (S.D.N.Y. Feb. 13, 2004).

> [U]nder principles of estoppel, a non-signatory to an
> arbitration agreement may compel a signatory to that
> agreement to arbitrate a dispute where a careful review
> of the relationship among the parties, the contracts
> they signed, and the issues that had arisen among them
> discloses that the issues the nonsignatory is seeking
> to resolve in arbitration are intertwined with the
> agreement that the estopped party has signed.

JLM Indus., 387 F.3d at 177 (citation omitted) (emphasis

supplied). See also Denney v. BDO Seidman, L.L.P., 412 F.3d 58,

70 (2d Cir. 2005); Contec, 398 F.3d at 209; Choctaw, 271 F.3d at

406.

   The Leeds Defendants argue that under this standard, they

may compel Vaughn to arbitrate his claims against them, because

he alleges a close relationship, in the form of a conspiracy,

between both sets of defendants, and because the claims Vaughn

raises against the Leeds Defendants are intertwined with the

Agreement.  Vaughn concedes that his claims against the Leeds

Defendants are related to the Agreement, but argues that the

relationship between the Leeds Defendants and the Prudential

Defendants was not close enough to warrant estoppel in this case,

because they did not have a relationship with each other

independent of Vaughn's alleged conspiracy.

   Vaughn's argument misconstrues the governing legal standard.

The Second Circuit has held that a claim against an alleged co-

conspirator may not "always be intertwined to a degree sufficient

9

to work an estoppel," and that "[t]he inquiry remains a fact-specific one."  JLM Indus., 387 F.3d at 178 n.7 (emphasis supplied).  Nonetheless, "[a]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  Denney, 412 F.3d at 70 (quoting Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000)).  In a putative class action where the plaintiff taxpayers accused an accounting firm and a bank, among others, of conspiring to lure them into participating in unlawful tax shelter schemes, and the plaintiffs had an arbitration agreement with the accounting firm but not the bank, the Second Circuit held:

> Having alleged in this RICO action that the [nonsignatory bank] and [signatory accounting firm] defendants acted in concert to defraud plaintiffs, and that defendants' fraud arose in connection with [the accounting firm's] tax-strategy advice, plaintiffs cannot now escape the consequences of those allegations by arguing that the [bank] and [accounting firm] defendants lack the requisite close relationship, or that plaintiffs' claims against the [bank] defendants are not connected to [the bank's] relationship with the accounting firm].

Denney, 412 F.3d at 70 (citation omitted).  Vaughn's basic premise that Second Circuit precedent requires that the defendants have a close relationship independent of the alleged conspiracy is consequently incorrect.[3]

---

[3]  To the extent that Vaughn cites district court opinions that predate Denney for the proposition that a close relationship independent of the alleged conspiracy is required for a "close relationship," this Court respectfully declines to follow them.

10

Vaughn contends that the Leeds Defendants had a complex scheme to settle employment discrimination claims _en masse_, and that this scheme involved capping liability for employers such as the Prudential Defendants in exchange for direct payment of attorney's fees by the employers. He alleges that his employment discrimination claim was swept up by this scheme because the Leeds Defendants had a comprehensive, secret agreement with the Prudential Defendants to process his claim, among others, and that this agreement adversely affected the settlement of his claim. These allegations of civil RICO conspiracy involve close cooperation and collusion between Vaughn's employer and his lawyers. This theory of liability has been described elsewhere as one that "can only succeed" if the plaintiff proves his "allegation that all Defendants conspired and acted together." _Camferdam_, 2004 WL 307292, at *7.[4] Vaughn therefore alleges precisely the type of "substantially interdependent and concerted misconduct" that estops him from avoiding arbitration of his claims with the Leeds Defendants. _Denney_, 412 F.3d at 70

---

See _In re Currency Conversion Fee Antitrust Litig._, 361 F. Supp. 2d 237, 264 (S.D.N.Y. 2005); _Orange Chicken, LLC v. Nambe Mills, Inc._, No. 00 Civ. 4730 (AGS), 2000 WL 1858556, at *5 (S.D.N.Y. Dec. 19, 2000).

[4] In _Camferdam_, where the district court required taxpayers who had arbitration agreements with an accounting firm, and who were suing the accounting firm and a nonsignatory law firm for conspiring to create unlawful tax shelters on the taxpayers' behalf, to arbitrate claims against the law firm, the court also noted that the complaint alleged a "close relationship" between the entities involved, because "[a] civil conspiracy is a kind of partnership, in which each member becomes the agent of the other." _Camferdam_, 2004 WL 307292, at *6 (citation omitted).

11

(citation omitted).  The Leeds Defendants' motion to compel arbitration is therefore granted.

## CONCLUSION

The defendants' motions to compel arbitration are granted. The case is stayed until the resolution of the arbitration proceedings and is transferred to the Court's suspense docket.

SO ORDERED:

Dated:    New York, New York
          August 12, 2005

_____
DENISE COTE
United States District Judge

12

6955VAUC                    order to show cause

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JEFFREY S. VAUGHN,

4                  Plaintiff,

5           v.                        04 Civ. 8391 (DLC)

6   LEEDS, MORELLI & BROWN, P.C.,
    et al.,
7
                   Defendants.
8
    ------------------------------x
9
                                      September 5, 2006
10                                    4:00 p.m.
    Before:
11
                     HON. DENISE L. COTE,
12
                                      District Judge
13
                       APPEARANCES
14
    LIDDLE & ROBINSON, L.L.P.
15        Attorneys for Plaintiffs
    BY:  BLAINE H. BORTNICK
16
    LITCHFIELD CAVO
17        Attorneys for Leeds, Morelli & Brown
    BY:  DANIEL HUGHES
18        KEVIN SPAGNOLI

19  PAUL WEISS RIFKIND WHARTON & GARRISON, L.L.P.
         Attorneys  for Defendant Prudential Securities &
20  Prudential Financial
    BY:  LIZA VELAZQUEZ
21        SAM SHELDEN

22

23

24

25

6955VAUC                    order to show cause

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JEFFREY S. VAUGHN,

4                    Plaintiff,

5              v.                              04 Civ. 8391 (DLC)

6    LEEDS, MORELLI & BROWN, P.C.,
     et al.,
7
                    Defendants.
8
     ------------------------------x
9
                                              September 5, 2006
10                                            4:00 p.m.
     Before:
11
                         HON. DENISE L. COTE,
12
                                              District Judge
13
                              APPEARANCES
14
     LIDDLE & ROBINSON, L.L.P.
15       Attorneys for Plaintiffs
     BY:  BLAINE H. BORTNICK
16
     LITCHFIELD CAVO
17       Attorneys for Leeds, Morelli & Brown
     BY:  DANIEL HUGHES
18       KEVIN SPAGNOLI

19   PAUL WEISS RIFKIND WHARTON & GARRISON, L.L.P.
         Attorneys  for Defendant Prudential Securities &
20   Prudential Financial
     BY:  LIZA VELAZQUEZ
21       SAM SHELDEN

22

23

24

25

6955VAUC                      order to show cause

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, for the plaintiff, are you

3     ready to proceed?

4          MR. BORTNICK:  We are.

5          THE DEPUTY CLERK:  Please state your name for the

6     record.

7          MR. BORTNICK:  Blaine Bortnick of Liddle & Robinson.

8          THE DEPUTY CLERK:  Who do you have with you at counsel

9     table?

10          MR. BORTNICK:  I'm sorry.  Rebecca Saenger.  Your

11     Honor, Ms. Saenger is not admitted to this court.  She is an

12     associate at our firm.

13          THE DEPUTY CLERK:  For the defendant, please state

14     your name for the record and the party you represent.

15          MR. HUGHES:  Daniel Hughes of the law firm Litchfield

16     Cavo, representing the Leeds Morelli & Brown defendants and

17     with me is Kevin Spagnoli, an associate with my law firm.

18          THE COURT:  Thank you.

19          MS. VELAZQUEZ:  Liza Velazquez of Paul, Weiss,

20     Rifkind, Wharton & Garrison for the Prudential defendants.  And

21     with me is my colleague Sam Shelden.

22          THE COURT:  Great.  Welcome to everyone.

23          I was presented with an order to show cause and it

24     isn't my practice to sign them ex parte unless there is good

25     reason.  Plaintiff's counsel were unavailable last week and so

6955VAUC                    order to show cause

1    we put the matter over until today to give everybody an

2    opportunity to be heard.

3           This is a matter that was referred to arbitration

4    sometime ago now, and I thought it might be helpful for me to

5    give the parties a sense of where we stand.  And after you hear

6    from me, if counsel want to be heard orally today on the

7    matter, fine.  If you want to set a briefing schedule and put

8    this matter over for oral argument at a later date, fine.

9           But, I thought it might be helpful, as I said, to

10   begin with an overview statement from me.

11          In connection with this order to show cause I have

12   been given a set of documents.  They include some of the

13   plaintiff's submissions to the New York Stock Exchange and the

14   NASD, including an October 28th 2005 letter to the New York

15   Stock Exchange, a February 2nd, 2006 statement of claim to the

16   NASD, and an August 15th, 2006 letter to the NASD.  I think the

17   presentation of the legal issue in those letters is inaccurate

18   and misleading.

19          The plaintiff clearly agreed to the arbitration of his

20   claims and I ruled that the arbitration agreement was valid and

21   enforceable and that legally was not in dispute.

22          I referred this matter to arbitration so that the

23   arbitrator can decide what the intention of the parties was in

24   entering into that arbitration agreement, including deciding

25   what kind of arbitration proceeding the parties had agreed to.

6955VAUC                    order to show cause

1       Now, the arbitrator, as I see it, could decide at

2   least three different things and there may be more but, for

3   instance, the arbitrator could decide that the parties had

4   intended to disallow class actions.  The arbitrator could

5   decide that the parties had agreed to arbitrate individual

6   claims but had reserved unto themselves the right to litigate

7   class claims.  The arbitrator could decide that the party had

8   agreed to arbitrate all claims, individual or class claims.

9       So, the parties disputed what the intention -- what

10  their intention was in entering into this arbitration agreement

11  and I want to refer to the Paul Weiss reply brief on the

12  underlying motions in which Paul Weiss argued, at page 3, that,

13  "It was for the arbitrator, not the Court, to interpret the

14  parties' intentions."

15      And of course Paul Weiss argued, and I expect it will

16  argue to the arbitrator, that, "When one reads the agreement

17  and when the arbitrator reads the agreement, the arbitrator

18  should conclude that the parties never intended to allow class

19  actions at all."

20      I didn't rule on that.  I ruled that it is for the

21  arbitrator to interpret the agreement and decide what the

22  parties' intentions were.

23      Let's deal with a hypothetical.  Let us say the

24  arbitrator decides that the arbitration clause and the parties'

25  intention in entering into the arbitration agreement disallows

6955VAUC                    order to show cause

1    the plaintiff from bringing any class action lawsuit.  That, of

2    course, would allow the plaintiff to continue through the

3    arbitration process with an individual claim.  And, depending

4    on what arbitration decision came out of that process -- again,

5    I'm just talking about hypothetical -- somebody would move to

6    vacate or confirm the arbitration award.

7            In that context, in Federal Court here the parties

8    would have the ability, either before me or eventually on

9    appeal, and of course to the extent that the law permitted, to

10   raise issues concerning whether I had erred in sending the

11   matter to arbitration, whether the arbitrator had erred in

12   ruling that no class action litigation or arbitration was

13   permitted, and challenging the merits of the results of the

14   arbitration.  Again, to the extent permitted by governing law.

15           Now, should Mr. Vaughn decide that he doesn't want to

16   submit an individual claim to the arbitration proceeding I

17   expect -- but I'm not going to rule on this -- that he can't

18   get a second bite at the apple -- and I see plaintiff's counsel

19   nodding in agreement -- that either forfeiture or waiver rules

20   or res judicata would apply.  And that's it.

21           He had an opportunity to arbitrate the claim -- again,

22   we are playing with our hypothetical -- he didn't arbitrate it,

23   end of story.

24           That is, of course, if he were successful on appeal in

25   overturning my decision to send the dispute to arbitration or

6955VAUC                    order to show cause

1   the arbitrator's ruling, he would be foreclosed.

2          But this, it seems to me, his decision to make.  I

3   can't force him, and shouldn't, to make a particular claim to

4   the arbitrator but there may be consequences from that.

5          Now, I think, if I understand what's happening here,

6   Mr. Vaughn is not submitting his individual claim to the

7   arbitrator.  I may not understand this correctly but if that's

8   what's happening, sobeit.

9          But, I think I would be derelict not to make sure that

10  I mention the potential ethical issue here for plaintiff's

11  counsel.  There may be a serious conflict of interest dividing

12  the plaintiff's interest from those of his counsel on this

13  particular point because if that's the strategy being pursued,

14  Mr. Vaughn may risk losing his right to have his claim ever

15  addressed and lose the right for all recovery.

16         So, I have this order to show cause.  I'm happy to

17  hear the parties this afternoon.  I'm happy to set a briefing

18  schedule.  Or, I'm happy to say that you have my views, do

19  before the arbitrator what you will, and depending on what

20  happens, all in good time I may have some legal issues to

21  confront again.

22         Okay.  Mr. Bortnick?

23         MR. BORTNICK:  Yes, your Honor.  I have to say I

24  largely agree with everything that your Honor said here.

25         The way that the claim was presented initially to the

6955VAUC                    order to show cause

1    New York Stock Exchange before it rejected jurisdiction and

2    then subsequently to the NASD, was brought, only essentially it

3    was as a class in the sense that if there was -- if the

4    arbitration panel were to decide at some point in the future

5    that the arbitration clause means that class actions have been

6    waived, then there wouldn't be a one-on-one individual

7    arbitration.  Mr. Vaughn was not intending to bring a

8    one-on-one individual arbitration.

9              The reason here is not a particular secret.  I think

10   it was even presented to your Honor in papers on the motions

11   below or at a conference below.  Mr. Vaughn, when he settled

12   his original case with Prudential with Leeds, Morelli

13   representing him, presented a piece of paper that said I think

14   these are my damages in a certain amount.  And Prudential

15   agreed to pay that certain amount to Mr. Vaughn less, of

16   course, the contingency fee portion that went to Leeds, Morelli

17   and Brown.

18             The theory behind the class action of which Mr. Vaughn

19   was bringing was fully understanding but something different.

20             When you have a large group of people that are

21   settling and the allegation is that each of the settling

22   plaintiffs, the class members had a contingency fee taken from

23   their settlement and the allegation is unbeknownst to them,

24   Prudential was paying Leeds, Morelli and Brown quite a

25   substantial amount of legal fees unbeknownst to them, that that

6955VAUC                    order to show cause

1   amounted essentially to a bribe and, under New York Law, the

2   class can recover the amount of that payment from, by

3   Prudential to Leeds, Morelli and Brown, because that is an

4   amount under New York Law that a party would have been willing

5   to pay to the plaintiffs in this case.

6           That was the theory of the class action.

7           Mr. Vaughn has always understood all along that in his

8   particular case on the one-on-one arbitration he recovered,

9   minus attorney's fees, what he was asking for.  And that's not

10  the theory --

11          So, the theory of the class action was that there was

12  a secret payment made by Prudential to Leeds, Morelli and Brown

13  unbeknownst to Mr. Vaughn and the other potential class

14  plaintiffs and that is the amount of damages that were being

15  sought.

16          Now, it could be that the -- and if the arbitrators,

17  the arbitration panel, I think it would be a panel of three,

18  decide on the other hand that the arbitration clause which

19  says, Arbitrated pursuant to the rules of the New York Stock

20  Exchange or the NASD, which in this case have, for all intents

21  and purposes, I think it is the exact identical rule, no class

22  actions allowed, we don't hear class actions, you didn't waive

23  your class action claims, then we're automatically back in

24  court with the class action.

25          Now, I am certainly --

6955VAUC                      order to show cause

1        THE COURT:  But if I decide that you did waive your
2    class action claims --

3        MR. BORTNICK:  Mr. Vaughn did not have any intention
4    to bring a one-on-one arbitration because he has a damages
5    issue here.  And he understands that.

6        However, that being said, I think it is probably,
7    since your Honor has raised the concern -- to go and talk to
8    him one more time and say Mr. Vaughn -- because it is very easy
9    to amend the arbitration claim and just go back and say, well,
10   in the alternative, if the Court -- if the arbitration panel
11   decides class actions have been waived, therefore we bring an
12   individual one-on-one arbitration based on a fraud,
13   essentially, based on that secret agreement.

14       And so, I think it is probably appropriate to give
15   him, based on your Honor's concerns, that we should probably
16   ask him one more time if that's how he would want to proceed in
17   the alternative, recognizing that is the issue that he has had
18   and the decision he made before.

19       It is a very simple change to make in the arbitration
20   statement of claim.  And we will go back and do that, but I do
21   think it is fair to point out, your Honor, that since last
22   December the defendants in this case, Prudential and Leeds,
23   Morelli and Brown, have known that the claim, as it is now
24   positioned in front of the NASD, is the claim we have been
25   bringing all along.  And it is only last week where they're

6955VAUC                    order to show cause

1   suddenly raising an objection to the way we've presented the

2   claim to now the NASD.  But, they've known about this since

3   December when they obtained a copy of the New York Stock

4   Exchange statement of claim.  They obtained a copy of the NASD

5   statement of claim, not what they were served -- they were

6   served on July 27 and I understand they got it on or about

7   August 1, but we certainly gave them a courtesy copy of it not

8   because we were required to, but because they felt we were --

9   they wanted us to and we agreed.

10           My records don't show whether we did it back in

11  February but we certainly did it in May.

12           So, we've known about this for a long time, so this

13  came as a surprise to us now that they're complaining about the

14  way we presented it.

15           And sort of today is the first day I could even

16  actually address it.  I am more than happy to go back and talk

17  to Mr. Vaughn and iterate to him one more time:  The Judge has

18  also raised this concern now and I think it is probably

19  appropriate that we do it.

20           And you understand, because I do agree with your

21  Honor, that if it is presented in the way it is presented and

22  there is no one-on-one arbitration claim, if Mr. Vaughn doesn't

23  amend the statement of claim -- and he could do it at a later

24  time, he doesn't have to do it now, he could do it within the

25  context of what has been presented to the NASD -- but, if he

6955VAUC                    order to show cause

1   chooses not to proceed one on one, then I agree with your

2   Honor, he would not be able to come back and make some kind of

3   claim at a future date.  He would lose it forever.  I think

4   that is absolutely correct.

5         THE COURT:  I don't think the formulation in the

6   papers that you have submitted to the New York Stock Exchange

7   or the NASD has been, in each instance, consistent with the

8   description of what I put on the record today.  But, that is

9   for you and the defendants to litigate before the arbitrator.

10        MR. BORTNICK:  The arbitrators have a copy of the

11  order, I believe.  They should.  No arbitration panel has been

12  appointed yet.  The last letter you saw from us to the NASD,

13  there is a form letter that goes out from the NASD from the

14  processing center and it says here is a list of arbitrator

15  skills, customer complaints, this or that, and you can rank 1

16  through 4 and we will try to accommodate you.

17        And then we wrote back saying we don't think these fit

18  what we want.  And we wrote George Friedman as the director of

19  arbitration because we didn't want a data inputter to look at

20  the letter and just toss it but we wanted to have some kind of

21  personal attention.  We copied them on it because that's how we

22  see this claim.

23        The arbitration panel will have that order and they

24  can make a decision as to whether it should be allowed to be a

25  class action.  And, in that case, they'll say take it back to

6955VAUC                    order to show cause

1   Court.

2          But, I guess then because of what your Honor says, you

3   probably -- I guess I should probably request to let me go

4   ahead and have one more conversation with our client and tell

5   him what your Honor said.  I think it is the right thing to do.

6          THE COURT:  Do the defendants wish to be heard?

7          MR. HUGHES:  Just briefly, your Honor.  Daniel Hughes

8   on behalf of the Leeds defendants.

9          I received the papers from plaintiff's counsel and

10  their filings on August 1st of '06, the last date that

11  Mr. Bortnick stated.

12         The reason we are here is because the submission to

13  the NASD which is presently pending states:  Accordingly,

14  Vaughn respectfully requests that the arbitrators issue an

15  order and decision declaring that the Vaughn may pursue his

16  class action claims against defendants in court and directing

17  defendants to withdraw their objections.

18         So, this, to us, did not seem to be an objective

19  presentation of your Honor's decision for the arbitrators to

20  decide what is the intent of the parties to arbitrate.

21         We are faced now with an August 15th deadline and I

22  was wondering if we could figure out a way to extend that

23  deadline for Mr. Bortnick to file additional papers and for us

24  to have an additional extension to respond to those papers.

25         THE COURT:  I am not going to deal with arbitration

6955VAUC                    order to show cause

1   scheduling issues.

2          Is there anything else?

3          MS. VELAZQUEZ:  Your Honor, Liza Velazquez from Paul

4   Weiss for the Prudential defendants.

5          Your Honor, we have been here before you on these

6   issues three times now.  I believe your Honor's August 12th,

7   2005 order was crystal clear:  Vaughn must arbitrate his claims

8   against Prudential and submit to the arbitrators the question

9   of the format of how that arbitration should proceed.

10         He went to the NASD late last year.  We weren't

11  provided with a copy of those papers at the time they were

12  presented to the NASD but we subsequently learned that --

13  excuse me.  He went to the NYSE.  We subsequently learned that

14  he asked the NYSE to overrule this Court's order that

15  notwithstanding the August 12th, 2005 order he can go ahead and

16  come back to court and basically do what the F.A.A. doesn't

17  permit him to do, which is to get an interlocutory appeal but

18  from an arbitral forum.

19         Then, your Honor, we were served with his NASD papers

20  on or about August 1st.

21         Respectfully, I would say to Mr. Bortnick that there

22  was no proceeding until we were served with those papers, so we

23  could not approach the Court about what had transpired until we

24  were served with the papers on August 1st.

25         Again, in our view, he is asking the NASD to overrule

6955VAUC                    order to show cause

1    this Court and to send him back to court with his claims even

2    though the Court has already decided those claims are

3    arbitrable.

4          I submit that the three options that your Honor set

5    forth earlier today are, they're far afield from what

6    Mr. Bortnick and plaintiff are requesting from the NASD.  He is

7    not submitting his claims against Prudential or any of these

8    parties to arbitration at all.  Instead, he is rehashing what

9    has already been litigated before this Court and we

10   respectfully submit to your Honor that it would be unfair and

11   prejudicial to Prudential to have to relitigate those issues

12   again before the NASD.

13         THE COURT:  Well, I don't think that the plaintiff's

14   papers, Mr. Vaughn's papers have correctly framed the issue for

15   the arbitrators, but I don't think defense counsel are either.

16         The issue that was in dispute and that I submitted to

17   arbitration was for an interpretation of the arbitration

18   agreement, and that was for the arbitrator to decide the

19   parties' intentions.  I did not rule that everything had to be

20   subject to arbitration.  I contemplated, therefore, that the

21   arbitrator, in deciding the parties' intentions, might decide

22   that the agreement to arbitrate does not foreclose the

23   plaintiff from coming to court and litigating a class action.

24         But the plaintiff is not, in its submissions to the

25   arbitrators to date, has not clearly stated the issue for the

6955VAUC                    order to show cause

1    arbitrators to decide about the parties' intent and the scope
2    of that intent.

3           But, I think it would be wrong for the defendants to
4    characterize it the way you are today in court to suggest that
5    the arbitrators' hands are bound in some way such that they
6    couldn't rule in interpreting the parties' intent that the
7    plaintiff has the right to come to court and proceed on a class
8    action.  And I refer you, again, to your reply brief on the
9    underlying motion practice.

10          So, I don't think there is a need for further argument
11   or briefing of this issue.

12          It seems to me that what I'm going to do -- we have a
13   court reporter here because this is complicated -- is that I'm
14   going to endorse the order to show cause to reflect that after
15   having heard from all parties, I decline to issue the order to
16   show cause without prejudice to any parties' rights to argue at
17   a later point in time that their rights have been infringed in
18   some way.  And then we will just see how the arbitration
19   process plays itself out.

20          If a party misrepresents or misleads the arbitrator,
21   or doesn't ask for the appropriate relief, I don't know how
22   that will play out in court before me later but everybody's
23   rights are preserved.  You can challenge whatever happens
24   through the arbitration process when it is ripe for such a
25   challenge.

6955VAUC                    order to show cause

1    Not hearing any objection, I will so endorse the order

2    to show cause.  If you want to wait afterwards, we can get you

3    a copy of that endorsement.

4    Since you are all here, I thought I would just address

5    the 54(B) motion that's pending before me too.

6    This motion is governed by the rule and Second Circuit

7    authority interpreting the rule.  And I have looked most

8    recently at O'Bert, 331 F.3d at 40 to 41, a Second Circuit

9    2003, decision.  It indicates, among other things, that where

10   the decision to direct the entry of a partial judgment in

11   advance of the final adjudication of all the claims must be

12   considered in light of the goal of judicial economy as served

13   by the historic federal policy against piecemeal appeals.

14   And, with this policy in mind, the power to enter a

15   partial judgment should be exercised sparingly, bearing in mind

16   that not all dismissals of individual claims should be

17   immediately appealed even if they are, in some sense, separable

18   from the remaining unresolved claims.

19   The power should generally be reserved for the

20   infrequent harsh case and certification should be granted only

21   if there exists some danger of hardship or injustice through

22   delay which would be alleviated by immediate appeal.

23   I'm going to deny the 54(B) motion.

24   First of all, there is no showing of error to suggest

25   to me that it, because of that, needs immediate review.  The

6955VAUC                    order to show cause

1  plaintiff is arbitrating the claims against the five dismissed

2  individual defendants.  And the issues with respect to those

3  five dismissed individual defendants will be reviewed in the

4  ordinary course through the confirmation or vacating

5  proceedings that will follow the arbitration decision.

6        I haven't seen any showing of hardship or injustice

7  and I do not find, principally for the reasons pointed out by

8  defense counsel and their opposition, that judicial economy

9  would be served by a 54(B) finding at this point.

10        Thanks so much and good luck to all of you.

11                          o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

Made and entered into this ____ day of October 1998, by and between Jeffrey Vaughn and Prudential Securities Incorporated ("PSI").

WHEREAS, Vaughn has alleged certain claims arising out of Vaughn's employment with PSI and separation therefrom; and

WHEREAS, PSI denies all such claims; and

WHEREAS, PSI and Vaughn have agreed to amicably resolve any and all such claims;

NOW, THEREFORE, in full and complete settlement of such claims and in consideration of the mutual promises and covenants set forth herein, Vaughn and PSI agree as follows:

1.     Separation From Employment.   Vaughn's last day of employment at PSI shall be October 23, 1998.

2.     Payment by PSI.   Upon the expiration of seven (7) days following Vaughn's execution of this Settlement Agreement and General Release (the "Agreement"), PSI shall pay to Vaughn, in a single lump-sum payment, the total agreed-upon amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), as payment in full for all alleged personal injury or other non-wage claims, including , but not limited to, any claims for emotional distress and general, special and consequential damages.  The parties acknowledge and agree that PSI shall file a form 1099-misc reflecting the above payment.

3.     Medical Benefits.   PSI agrees to continue Vaughn's health plan coverage through October 31, 1998.  Thereafter, Vaughn will be eligible to continue the plan coverage pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  If Vaughn elects to continue health plan coverage pursuant to COBRA, PSI will pay Vaughn's COBRA premiums through and including April 30, 1999, or until Vaughn obtains other employment or is eligible for any other group health plan coverage, whichever comes first.  Thereafter, Vaughn will be responsible for the payment of any COBRA premiums through the remainder of Vaughn's eligibility.

4.     Release by Vaughn.   In consideration for PSI's commitment to the various arrangements described in the preceding paragraphs, and in lieu of any other benefits, as a full and final settlement, Vaughn hereby releases and discharges PSI, its parent, divisions, subsidiaries and affiliates and their current and former directors, officers, shareholders, agents and employees, and each of their predecessors, successors, and assigns thereinafter "the Company"), from any and all claims and causes of action (except for the benefits specifically set forth in this Agreement) arising out of or related to Vaughn's employment or separation from employment, including, but not limited to, any claims for salary, bonuses, severance pay, vacation pay or any benefits under the Employee Retirement Income Security Act (except for vested benefits which are not affected by this Agreement), sexual harassment, or discrimination based on race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, citizenship status, pregnancy, medical condition or disability (as defined by the Americans with Disabilities Act, or any other state or local law), age, or any other unlawful discrimination (under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990, Title VII of the Civil Rights Act, as amended, or any other federal, state, or local laws), breach of implied or express contract, breach of promise, misrepresentation, negligence, fraud, estoppel, defamation, infliction of emotional distress, retaliation, whistleblower rights, violation of public policy or wrongful or constructive discharge, and for attorneys' fees, that Vaughn, his heirs, executors, administrators, successors, and assigns now have, ever had or may hereafter have, whether known or unknown, suspected

Vaughn Settlement Agreement
October 1998
Page 2

or unsuspected, up to and including the date of this Agreement. Vaughn further agrees, promises and covenants that, to the maximum extent permitted by law, neither he, nor any person, organization, or other entity acting on his behalf has or will file, charge, claim, sue or cause or permit to be filed, charged or claimed, any action for damages or other relief (including injunctive, declaratory, monetary relief or other) against the Company involving any matter occurring in the past up to the date of this Agreement, or involving or based upon any claims, demands, causes of action, obligations, damages or liabilities which are the subject of this Agreement (other than an action to enforce the terms herein).

5.    **No Admission of Liability.** Neither this Agreement, nor anything contained herein shall be construed as an admission by the Company that it has in any respect violated or abridged any Federal, State, or local law or any right or obligation that it may owe or may have owed to Vaughn. No final findings or final judgments have been made and Vaughn does not purport and will not claim to be a prevailing party, to any degree or extent, nor will this Agreement or its terms be admissible in any proceeding other than in a proceeding for breach of the terms contained herein.

6.    **Cooperation by Vaughn.** Vaughn agrees to cooperate with and make himself readily available to PSI or its General Counsel, as PSI may reasonably request, to assist it in any matter, including giving truthful testimony in any litigation or potential litigation, over which Vaughn may have knowledge, information or expertise.

7.    **Confidential and Proprietary Information of PSI.** Vaughn understands and agrees that all books, records, documents and information, whether written or not, pertaining to PSI's business activities, are the confidential and proprietary property of PSI (hereinafter referred to as "trade secrets and confidential and proprietary information"). Vaughn warrants, covenants, and agrees that he will not disclose any of PSI's trade secrets and confidential and proprietary information to any person or entity not employed, owned by, or otherwise affiliated with PSI. Vaughn further agrees that he shall not be entitled to copies, in any form, of such trade secrets and confidential and proprietary information and that he shall immediately return to PSI any copies of such information currently in his possession.

8.    **Reemployment or Reinstatement.** Vaughn agrees not to apply for employment or reemployment with PSI, and that PSI has no obligation, contractual or otherwise, to rehire, reemploy or recall him in the future.

9.    **Nondisparagement.** Vaughn represents that he has not and agrees that he will not in any way disparage PSI, its current and former officers, directors and employees, or the Company, or make or solicit any comments, statements, or the like to the media or to others that may be considered to be derogatory or detrimental to the good name or business reputation of any of the aforementioned parties or entities.

10.   **Testimony Required by Law or Regulatory Authority.** Vaughn further agrees that he will not at any time discuss any matter concerning PSI with anyone adverse or potentially adverse to PSI on any matter including employment claims or customer claims, without the prior written consent of Counsel for PSI. Nothing contained herein, however, shall preclude Vaughn from discussing any matter concerning PSI with any governmental regulatory or self-regulatory agency. Further, if required by a governmental regulatory agency or self-regulatory agency to provide testimony or information regarding the PSI, Vaughn will cooperate with said regulatory agency. If compelled to testify by a validly served subpoena in any legal proceeding or by regulatory authority, Vaughn will testify truthfully as to all matters concerning his employment at PSI.

11.   **Confidentiality of Agreement.** Vaughn agrees not to disclose or cause to be disclosed, either directly or indirectly, to any person or organization, except to his legal and

Vaughn Settlement Agreement
October 1998
Page 3

financial advisor(s), or as required by law, or governmental regulatory or self-regulatory authority, any information regarding the amount of, terms of, or facts or circumstances underlying this Agreement.

12.    Indemnification.   Vaughn expressly warrants and represents to PSI that he will indemnify PSI against, and hold PSI harmless from, the tax consequences, if any, of PSI's not withholding taxes from, or reporting to the Internal Revenue Service as income, the aforementioned payment, including, but in no way limited to, any and all taxes, interest, and/or penalties incurred in connection therewith.

13.    Entire Agreement and Severability.   The parties hereto agree that this Agreement may not be modified, altered or changed except by a written agreement signed by the parties hereto.  The parties acknowledge that this constitutes the entire agreement between them superseding all prior written and oral agreements.  If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect.

14.    Arbitration.   Any claim or controversy arising out of or related to this Agreement or the interpretation thereof will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc.  Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof.  The governing law of this Agreement shall be the substantive and procedural law of the State of New York.

15.    Breach of Agreement.   Should Vaughn violate any provision of this Agreement, the Company may apply for appropriate relief.  In any proceeding to enforce the terms of this Agreement, the Agreement may be introduced under seal in order to maintain its confidentiality.  Vaughn understands and agrees that the damage to the Company due to any such breach will be extremely difficult to determine.  Because of this difficulty, Vaughn agrees that in the event of a finding of such breach, he will forfeit to PSI all amounts received pursuant to this Agreement, and he shall indemnify PSI for any and all costs incurred in connection with any such recovery, including reasonable attorneys' fees.  Notwithstanding any such relief, all of the other terms of this Agreement, including, without limitation, Vaughn's release of claims, shall remain in full force and effect.  The remedies provided for in this provision shall not be construed to be exclusive and do not bar any other claims for relief.

16.    Voluntary Execution.   Vaughn acknowledges that he has carefully read this Agreement and understands all of its terms including the full and final release of claims set forth above.  Vaughn further acknowledges that he has voluntarily entered into this Agreement; that he has not relied upon any representation or statement, written or oral, not set forth in this Agreement; that the only consideration received for executing this Agreement is as set forth herein; that the consideration received for executing this Agreement is greater than that to which he may otherwise be entitled; and that this document gives him the opportunity and encourages him to have this Agreement reviewed by his attorney and tax advisor.  Vaughn also acknowledges that he has been afforded at least twenty-one days to consider the release provision contained herein and that he has seven days after signing this Agreement to revoke it in writing.  Accordingly, no payments required under this Agreement shall be made until the expiration of seven days following Vaughn's execution of the Agreement.

11/10/2004 17:43   19738824988                    EMPLOYMENT AND LABOR                    PAGE 11/11
OCT 26 1998 14:45 FR PSI LAW DEPT.                 212 214 1918 TO 915167475024        P.05/07

Vaughn Settlement Agreement
October 1998
Page 4

_IN WITNESS WHEREOF_, the parties hereto evidence their agreement by their
signatures.

PRUDENTIAL SECURITIES INCORPORATED

Date:              BY:

Date:    10/27/98   _____
                    JEFFREY VAUGHN

*P-1*

# LEEDS & MORELLI

*Attorneys at Law*

ONE OLD COUNTRY ROAD • SUITE 282 • CARLE PLACE, N.Y. 11514
TELEPHONE: (516) 873-9550

## RETAINER

JEFFREY VAUGHN hereby retains the law firm of LEEDS &
MORELLI, ESQS., to represent him with respect to his labor action
against Prudential Securities.

1.    This retainer will only include the contacting of the
employer to seek a negotiated settlement.  If legal action is
required then the parties will discuss a different financial
situation.

2.   In the event of a settlement, JOSEPH DI STEFANO, hereby
agrees that the proceeds thereof will be split one-third (1/3) to
Leeds & Morelli, Esq., as attorneys, and two-thirds (2/3) to
JEFFREY VAUGHN.  No disbursements relating to the settlement of
the matter will be deducted from the proceeds of the settlement.
JEFFREY VAUGHN will receive two-thirds (2/3) of the total
settlement figure, and Leeds & Morelli, Esqs. will receive the
remaining one-third (1/3).

3.    In the event this matter is not settled, JEFFREY VAUGHN
is not responsible for any costs or disbursements incurred as a
result of settlement efforts.

4.   The client understands that he is retaining a law firm
and that although the named partners will review and supervise
all of the work product, associate attorneys and paralegal staff
will also be involved in work, labor and services performed in
the representation of client.

5.   The parties hereto understand and acknowledge that no
results can or will be guaranteed.  The firm of LEEDS & MORELLI
warrant that they will perform services in a professional manner
and use their best efforts in that regard.

6.   There are no other agreements between the parties other than those contained herein.   This agreement represents the entire understanding of the parties.


7.   All parties have read and understood each and every term herein and the signature below constitutes an acknowledgment of such understanding

Dated: January 5, 1998

_____
LEEDS & MORELLI, ESQS.

_____
JEFFREY VAUGHN

Jeffrey S. Vaughn
355 Clinton ave.  Apt 6D
Brooklyn N.Y.  11238

Jeffrey K. Brown
Leeds & Morelli
One Old Country road
Carle place N.Y. 11514
Suite 282

Mr. Brown I have worked at Prudential Securities for 13 years from February 1985 to present. My story is as follows:

º  1985 I started at Pru-Securities as a operations clerk trainee and full time employee.  I worked under Anthony Carannante my salary 12,000 annually (starting receptionist made 15,000 ) I worked under a highly racist envi(o)ment, Mr. Carannante often made racial statements referring to blacks as bros or brothers, he also made racial statements about other ethnic groups calling them gooks, wetbacks, etc.  He also said if your name does not end in a vowel you will not be promoted. At the time I was attending college for business mgt.  In the evenings at interborough institute. Mr carannante made statements from time to time when he needed me stay and work late that "which is more important school or your job" eventually I was indirectly forced to dropout.

º  1986-1989 While working for tony I also worked partime for and with Rolf Roland the president of international arbitrage trading desk from the hours of 5:00 am till 9:30 am at which time I resume with my normal duties in equity operations I learned a lot from Mr. Roland as he was considered to be one of wall streets finest in currency trading. I receive twenty hours overtime and a car into work in the morning. I also began to train a number of new employees who began in operations and in no time they went on to become apart of the equity trading group. When I ask about going to the trading desk his response was " you can make a decent living in operations " Prudential has had in the thirteen years that I have worked for them one black male on the trading desk his name is Calvin Chambers. Calvin got on the  trading desk through the mother company Prudential Insurance.  Pru-Ins has a program that takes students from different universities and shows them the different arms of the pru and they pick a area to work.Calvin chose the equity trading desk.  Within six months to a year Calvin file a report with human resources about one the head VP'S making racial slurs and statements to him, shortly Calvin left the firm and the VP went on to be the head trader at our Chicago office.

º  1990 to 1994 I began to apply for different positions on the trading desk, I spoke to Ronald Riddle the head of equity sales traders and ask for an interview for a spot on the retail trading his response was when the time comes I will call you I did not get an interviewI also spoke with Marty Brophy the head trader of the equity desk and told him of my  background and my experience he said I was very valuable to the firm but still I did not get an interview.

1994 we move to 1 N.Y. plaza the day before the whole dept.move I was ask to carry a computer hardrive to the new building because they needed it setup that night. While lifting the hardrive into a van I hurt my back , I immediately went to a specialist who diagnose me with a severe lumbosacral strain, I was told by my doctor that I needed immediate bed rest. This was Nov. 22 1994. When I told mgt.of my problem they totally disregarded it and said to me just live with it . Feb 2, 1995 my condition had got worst my doctor insisted that I stay in bed and therapy for at least three weeks. Again my request were ignored. Finally I went to employee relations and spoke to Ken Rotondo and he suggest that I take a medical leave of absence , so I did so.  When I returned to work eight weeks later I not allowed to go to therapy for one and a half hours a day.

1995 to present I ask for an interview with Peter Kahn of pru's NYSE floor services I was recommended highly by sales traders and some mgt. Mike liotti started at pru and trained under me he was hired in 1995 with no prior experience and less than a year at the firm he was promoted to the same job that I interviewed for. Prudential has stonewall me from moving up in the company because of my color.

## KEYS

- NO BLACK TRADERS ON THE EQUITY DESK THE OTC (OVER THE COUNTER) THE COVERTIBLE BOND DESK OR THE INTERNATIONAL DESK

- NO PROMOTIONS

- RACIST ENVIORMENT

- ONLY HIRE FROM OUTSIDE/ FRIENDS AND FAMILY FROM ACCTS. WE DO BUSINESS WITH.

- THEY HAVE PEOPLE INCLUDING VP'S ON THE TRADING DESK WITH NO COLLEGE EXPERIENCE.

- THEY HAD PEOPLE WORKING ON THE DESK BEFORE OR WITHOUT THEIR LICENCES

| 1990 | salary | 25,000 | | | |
| | bonus | 500 | | | |
| | | | | | |
| 1991 | salary | 27,500 | | | |
| | bonus | 750 | | | |
| | | | | | |
| 1992 | salary | 30,275 | | | |
| | bonus | 2500 | | | |
| | | | | | |
| 1993 | salary | 29,700 | | | |
| | bonus | 1125 | | | |
| | | | | | |
| 1994 | salary | 33200 | | | |
| | bonus | 1400 | | | |
| | | | | | |
| 1995 | salary | 29,100 | | | |
| | bonus | 2500 | | | |
| | | | | | |
| 1996 | salary | 31,266 | | | |
| | bonus | 4000 | | | |
| | | | | | |
| 1997 | salary | 35,700 | | | |
| | bonus | | | | |
| | | | back pay damages | estimated 200,000 | |
| | | | | | |

I started at Prudential Securities in Feb. 1985 as a operations clerk trainee. My starting salary was 12,000 annually, I also were attending college at Interboro Institute for my A.S. in business mgt. From 1985 to 1997 I worked in capital markets operations and trade support for block trading desk. I also worked for the president of the International Arbitrage trading desk. I worked closely with Rolf Roland as his liaison and other duties such as monitoring foreign currency price fluctuations, enter orders /London trading desk and prepare daily reports from the hours of 5:00 am to 10:00am. With operation and trader asst. Experience I then began to inquire about positions on the equity trading desk. I was passed over by those who came in the firm after me and they were also given larger starting salaries and move to the equity trading desk with less qualifications than myself also within one to two years time.

## FACTS:

- Their are no male black traders on the block desk, otc or convertible bond or international desk

- Their are people without college degrees on the desk.

- Their people hire on the desk without a Series 7 license

- Their are black employees with a license and are not trading

## VIEWS

I truly have been a victim of racist incedents that are in violation of my civil rights I want to sue prudential on these grounds.

I want to go public with my story

If I settle with pru it is under these condition only:

- that I be compensated for damages mental, physical and emotional.
- I don't want to work for the pru any longer
- I want a letter of recommendation stating the position I am suppose to have
- policy changes / outside evaluation periodically