UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JEFFREY S. VAUGHN, individually and on behalf of
those class members similarly situated,

Index No. 04 Civ. 8391 (DLC)

Plaintiffs,

-against-

**NOTICE OF CROSS-MOTION**

LEEDS, MORELLI & BROWN, P.C., LEEDS, MORELLI
& BROWN, L.L.P., LEEDS & MORELLI, LEEDS,
MORELLI & BROWN, PRUDENTIAL SECURITIES,
INC., PRUDENTIAL FINANCIAL, INC., LENARD
LEEDS, STEVEN A. MORELLI, JEFFREY K. BROWN,
and JOHN DOES, JAMES VAGNINI, FREDERIC
DAVID OSTROVE, ROBERT JOHN VALLI, JR.,
DISCRIMINATION ON WALL STREET, INC. and
DISCRIMINATION ON WALL STREET
MANHATTAN, INC. and JOHN DOES, ESQS. 1-10 and
JANE DOES, ESQS. 1-10 a fictitious designation for
presently and unknown licensed attorneys, professionals
and/or unknown persons or entities,

Defendants.
--------------------------------------------------------------------X

**PLEASE TAKE NOTICE**, defendants, LEEDS, MORELLI & BROWN, P.C., (also

incorrectly sued herein as LEEDS, MORELLI & BROWN, L.L.P., LEEDS & MORELLI,

LEEDS, MORELLI & BROWN) and JEFFREY K. BROWN, by their attorneys Rivkin Radler

LLP, will move before the United States District Court, Southern District of New York, the

Honorable Denise L. Cote, U.S.D.J., presiding, at the United States District Courthouse, 500

Pearl Street, New York, New York, on such day as the parties may agree and the Court may

direct, for an Order, pursuant to 9 U.S.C. 9, 9 U.S.C.10 and Fed. R. Civ. P. 12(b)(b), lifting the

Court's stay of the action, confirming the Arbitration Award by the National Association of

Securities Dealers dated May 10, 2007, and upon confirmation, dismissing this action on the

grounds that plaintiff is precluded from bringing a class action in the federal court and for whatever further and different relief that to this Court may seem just, proper, and equitable.

## Grounds for Motion

The cross-moving defendants seek confirmation request the Arbitration Award be confirmed under the applicable standard for confirmation in the Second Circuit. Upon confirmation, the action should be dismissed, in its entirety, on the grounds that the Arbitration Award provided a final, binding resolution of the only open issue before the Court, when it concluded that plaintiff is precluded from prosecuting a federal court class action.

## Supporting Papers

This motion is based on the pleadings and papers on file in this action, this Notice of Cross- Motion, the Declaration of Shari Claire Lewis, dated September 12, 2007 and the exhibits annexed thereto, the accompanying Memorandum of Law and the evidence and argument presented at a hearing of this motion to be scheduled by the Court.

Dated: Uniondale, New York
        September 12, 2007

Respectfully submitted,

RIVKIN RADLER LLP
Attorneys for Defendants,
LEEDS MORELLI & BROWN, P.C., (also incorrectly sued herein as LEEDS, MORELLI & BROWN, LLP, LEEDS & MORELLI, LEEDS, MORELLI & BROWN) and JEFFREY K. BROWN

By: /s/Shari Claire Lewis (SL-0527)
    926 Reckson Plaza
    Uniondale, New York 11556-0926
    (516) 357-3000
    RR File No.: 007559-00005

2

TO:   LIDDLE & ROBINSON, L.L.P.
       800 Third Avenue
       New York, New York 10022
       Facsimile No.:  (212) 687-1505

       PAUL, WEISS, RIFKIND, WHARTON & GARRISON
       1285 Avenue of the Americas
       New York, New York 10019-6064
       Facsimile No.:  (212) 757-3990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JEFFREY S. VAUGHN, individually and on behalf of
those class members similarly situated,

Index No. 04 Civ. 8391 (DLC)

Plaintiffs,

-against-

LEEDS, MORELLI & BROWN, P.C., LEEDS, MORELLI
& BROWN, L.L.P., LEEDS & MORELLI, LEEDS,
MORELLI & BROWN, PRUDENTIAL SECURITIES,
INC., PRUDENTIAL FINANCIAL, INC., LENARD
LEEDS, STEVEN A. MORELLI, JEFFREY K. BROWN,
and JOHN DOES, JAMES VAGNINI, FREDERIC
DAVID OSTROVE, ROBERT JOHN VALLI, JR.,
DISCRIMINATION ON WALL STREET, INC. and
DISCRIMINATION    ON    WALL    STREET
MANHATTAN, INC. and JOHN DOES, ESQS. 1-10 and
JANE DOES, ESQS. 1-10 a fictitious designation for
presently and unknown licensed attorneys, professionals
and/or unknown persons or entities,

**DECLARATION OF
SHARI CLAIRE LEWIS IN
OPPOSTION TO
PLAINTIFF'S MOTION AND
IN SUPPORT OF
DEFENDANTS' CROSS-
MOTION**

Defendants.
-------------------------------------------------------------------X

I, Shari Claire Lewis, pursuant to 28 U.S.C. § 1746, hereby declare the following:

1.      I am a partner in the law firm of Rivkin Radler LLP, attorneys for defendants,

LEEDS, MORELLI & BROWN, P.C. (incorrectly sued herein as LEEDS, MORELLI &

BROWN, LLP, LEEDS & MORELLI, AND LEEDS, MORELLI & BROWN) and JEFFREY

K. BROWN (collectively "Leeds Defendants") in the abovementioned matter. I submit this

Declaration in opposition to the motion by plaintiff, JEFFREY VAUGHN, to vacate, (except to

the extent that he requests that this Court's stay be lifted), and in support of the cross-motion by

the Leeds Defendants to confirm the arbitration award by the National Association of Securities

Dealers ("NASD"), and upon confirmation, dismiss this action on the grounds that plaintiff is precluded from bringing a class action in the federal court.

2.      Many exhibits in support of the cross-motion were also submitted by plaintiff in connection with his motion.  Nevertheless, for the Court's convenience, copies of all exhibits relied on by the Leeds Defendants are submitted herewith and cross-referenced to plaintiff's submission where appropriate.

3.      Annexed hereto as Exhibit "A" is the NASD Arbitration Award dated May 10, 2007, in the arbitration proceeding entitled, *Vaughn v. Leeds, Morelli & Brown, P.C. et. al.* NASD Resolution Arbitration Number 06-00534. It is likewise designated as Exhibit "A" to plaintiff's submission.

4.      Annexed hereto as Exhibit "B" is the transcript of a hearing conducted on September 5, 2006 in the matter *Vaughn v. Leeds, Morelli &Brown et. al.*, 04 Civ. 8391, Hon. Judge Denise Cote presiding.  It is likewise designated as Exhibit "D" to plaintiff's submission.

5.      Annexed hereto as Exhibit "C" is the Settlement Agreement and General Release between plaintiff and codefendant PRUDENTIAL SECURITIES, INC. dated October 27, 1998. It is likewise designated as Exhibit "E" to the plaintiff's submission.

6.      Annexed hereto as Exhibit "D" is the transcript of the arbitration hearing conducted before the NASD on April 23, 2007 in the arbitration proceeding entitled, *Vaughn v. Leeds, Morelli & Brown, P.C. et. al.* NASD Resolution Arbitration Number 06-00534. It is likewise designated as Exhibit "B" to the plaintiff's submission.

7.      Annexed hereto as Exhibit "E" is the Court's Order of August 12, 2005, in the matter of *Vaughn v. Leeds, Morelli &Brown et. al.*, 2005 U.S. Dist. LEXIS 16792 (S.D.N.Y.

Aug. 12, 2005) Hon. Denise Cote, presiding. It is likewise designated as Exhibit "C" to the plaintiff's submission.

8.      Annexed hereto as Exhibit "F" is this Court's Order dated December 27, 2005, in the matter of in the matter of *Vaughn v. Leeds, Morelli &Brown et. al.* 04 Civ. 8391, in which this Court adhered to its prior ruling of August 12, 2005 and the case remained stayed

9.      Annexed hereto as Exhibit "G" is this Court's Order dated March 20, 2006 in the matter of in the matter of *Vaughn v. Leeds, Morelli &Brown,* 2006 U.S. Dist. LEXIS 11615 (S.D.N.Y. March 20, 2006) in which this Court dismissed the claims brought against individual defendants, Lenard Leeds, Steven A. Morelli, James Vannini, Frederic David Ostrove and Robert John Valli for lack of personal jurisdiction and otherwise denied the motion to dismiss by the remaining Leeds Defendants with leave to renew following arbitration.

10.     Based upon the foregoing exhibits and the accompanying Memorandum of Law it is respectfully requested that Plaintiff's motion be denied, except to the extent that the Court's stay should be lifted, and that the Leeds Defendants' cross-motion be granted in its entirety and for whatever further and different relief that to this Court may seem just, proper and equitable.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: Uniondale, New York
        September 12, 2007

                        /s/Shari Claire Lewis (SL-0527)
                        SHARI CLAIRE LEWIS

EXHIBIT "A"

**NASD Dispute Resolution**
www.nasd.com
Northeast Region
One Liberty Plaza ● 165 Broadway ● 27th Floor
New York NY ● 10006-1400 ● 212-858-4200 ● Fax 301-527-4873



May 10, 2007

Shari Claire Lewis, Esq.
Rivkin Radler LLP
926 Reckson Plaza
Uniondale, NY  11556-0926

Subject:       NASD Dispute Resolution Arbitration Number 06-00534
               Jeffrey S. Vaughn v. Leeds, Morelli & Brown, P.C., Leeds, Morelli & Brown, L.L.P.,
               Prudential Securities, Inc., et al.

Dear Ms. Lewis:

In accordance with NASD Rules, I enclose the decision reached by the arbitrators in the above-referenced matter.

<u>Responsibility to Pay Monetary Award</u>

Pursuant to NASD Rule,[1] the responsible party must pay any monetary awards within 30 days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction. If an award is not paid within 30 days, the responsible party must pay post-judgment interest at the legal rate or as provided in the award by the arbitrators.

<u>Tracking Payment of Award</u>

NASD Dispute Resolution has implemented a system of monitoring and tracking compliance with arbitration awards by members and associated persons. We request prevailing claimants to notify us in writing when their awards have not been paid within 30 days of receipt of the award, and require member firms to certify in writing that they have complied with awards against them or their associated persons. The 30-day period ends on:  June 11, 2007.

Written notification concerning award compliance or lack thereof must be directed to:

Jennifer Kozielski
NASD Dispute Resolution
One Liberty Plaza,
165 Broadway, 52nd Floor
New York, NY 10006
212-858-4481 (tel) 301-527-4761 (fax)

---

[1]Customer Code Rule 12904
Industry Code Rule 13904
Old Code Rule 10330(h)

### Expedited Suspension Proceedings for Non-Payment of Awards

Members and associated persons who do not comply with an award in a timely manner are subject to expedited suspension proceedings as set forth in Rule 9554, which is part of the NASD Manual.

### Right to File Motion to Vacate Award

All awards are **final** and are not subject to review or appeal by the arbitration panel or by NASD Dispute Resolution. Any party wishing to challenge the award must make a motion to vacate the award **in a federal or state court** of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. Parties and counsel should consult federal and state statutes and case law to determine the appropriate court, standards, and time limitations in their individual circumstances. NASD Dispute Resolution is not authorized to provide legal advice concerning a motion to vacate.

A motion to vacate, confirm, or modify an arbitration award is a matter only between the parties to the arbitration. NASD Dispute Resolution is not a proper party to post-award motions and should not be named as a party to any post-award motion. However, for cases filed on or after April 12, 2004, if the award contains expungement relief, or if a party seeks expungement relief in court, there may be a duty to name NASD as a party as provided in Rule 2130.

### Questions Concerning Award

Please direct any questions regarding this award to me. **The parties must not contact the arbitrators directly.**

### Forum Fees

Enclosed is an invoice that reflects the fees assessed and any outstanding balances. Fees are payable to NASD Dispute Resolution.

If a refund is due, it will be sent under separate cover. All refunds, even if payment is made by a non-party on behalf of a party, will be made payable to the party and will be sent in care of the party's representative.

### Arbitration Evaluation

As a service organization, the primary goals of NASD Dispute Resolution are the integrity of its process and the satisfaction of its clients. To ensure that we are meeting your needs and satisfying our commitment to you, **we need to hear from you.** If you have not already done so, please take the time to complete an evaluation of our services, the process, and the arbitrator(s) assigned to your case. For your convenience, we have now made it possible for you to evaluate our services using the Internet. Please direct your Web browser to http://www.nasd.com/arbevaluation. If you do not have Internet access, or have difficulty completing the evaluation online, you may complete the paper version of the evaluation that was previously provided to you and mail it to the address indicated.

If you need another paper copy of the evaluation form, please contact the undersigned.  <u>Whenever possible, however, please use the new online version, as it will help us to review your feedback in a more expeditious and analytical manner.</u>  Your feedback is a valuable and necessary component in our efforts to serve you better.

Very truly yours,

Archna Curry
Case Administrator
212-858-4200  Fax: 301-527-4904

KA:CW1:LC09A
idr:4/07

RECIPIENTS:

 Jeffrey L. Liddle, Esq., Jeffrey S. Vaughn
 Liddle & Robinson, L.L.P., 800 Third Avenue, New York, NY  10022

 Gerard E. Harper, Esq., Prudential Equity Group, LLC
 Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, NY  10019-6064

 Shari Claire Lewis, Esq., Leed Morelli & Brown, P.C.,
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Leeds Morelli & Brown, L.L.P
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Leeds & Morelli
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Leeds Morelli & Brown
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Lenard Leeds
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Steven A. Morelli
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Shari Claire Lewis, Esq., Jeffrey K. Brown
 Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY  11556-0926

 Gerard E. Harper, Esq., Prudential Financial Inc.
 Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, NY  10019-6064

 Shari Claire Lewis, Esq., James Vagnini

Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY 11556-0926

Shari Claire Lewis, Esq., Frederic David Ostrove
Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY 11556-0926

Shari Claire Lewis, Esq., John Robert Valli, Jr.
Rivkin Radler LLP, 926 Reckson Plaza, Uniondale, NY 11556-0926

Company Office, Discrimination On Wall Street Inc.
Discrimination on Wall Street Inc., One Old Country Road, Carle Place, NY 11514

Company Officer, Discrimination on Wall St. Manhattan,
Discrimination on Wall St. Manhattan Inc, One Old Country Road, Carle Place,
NY 11514

**Award**
**NASD Dispute Resolution**

---

In the Matter of the Arbitration Between:

Jeffrey S. Vaughn (Claimant) vs. Leeds, Morelli & Brown, P.C., Leeds Morelli & Brown, L.L.P., Prudential Securities, Inc., Leeds & Morelli, Leeds Morelli & Brown, Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown, Prudential Financial, Inc., James Vagnini, Frederic Ostrove, John Robert Valli, Jr., Discrimination on Wall Street, Inc., and Discrimination on Wall St. Manhattan, Inc. (Respondents)

Case Number:    06-00534         Hearing Site: New York, New York

---

Nature of the Dispute:  Associated Person vs. Member, and Non-Members.

## REPRESENTATION OF PARTIES

Claimant Jeffrey S. Vaughn hereinafter referred to as "Claimant": Blaine H. Bortnick Esq., and Jeffrey S. Liddle, Esq., Liddle & Robinson, L.L.P, New York, NY.

Respondents Leeds, Morelli & Brown, P.C. ("Leeds P.C."), Leeds Morelli & Brown, L.L.P ("Leeds L.L.P"), Leeds & Morelli ("Leeds & Morelli"), Leeds Morelli & Brown ("Leeds Morelli & Brown"), Lenard Leeds ("L. Leeds"), Steven A. Morelli ("S. Morelli"), Jeffrey K. Brown ("Brown"), James Vagnini ("Vagnini"), Frederic David Ostrove ("Ostrove"), and John Robert Valli, Jr. ("Valli"), hereinafter referred to as "Leeds Respondents":  Shari Clare Lewis, Esq., Rivkin Radler LLP, Uniondale, NY.

Respondent Prudential Equity Group, LLC ("PEG"), and Prudential Financial, Inc. ("PFI") hereinafter referred to as "Prudential Respondents" :  Gerard E. Harper, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

Respondent Discrimination on Wall Street, Inc. ("Discrimination Inc.") did not enter an appearance in this matter.
Respondent Discrimination on Wall St. Manhattan, Inc. ("Discrimination Manhattan") did not enter an appearance in this matter.

## CASE INFORMATION

Statement of Claim filed on or about:  February 2, 2006.
Claimant signed the Uniform Submission Agreement:  February 2, 2006.

Joint Statement of Answer filed by Leeds Respondents on or about:  September 15, 2006.
Leeds P.C. signed the Uniform Submission Agreement:  September 15, 2006.
Leeds L.L.P signed the Uniform Submission Agreement:  September 15, 2006.
Leeds & Morelli signed the Uniform Submission Agreement:  September 15, 2006.
Leeds Morelli & Brown signed the Uniform Submission Agreement:  September 15, 2006.
L. Leeds signed the Uniform Submission Agreement:  September 15, 2006.

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 2 of 5

S. Morelli signed the Uniform Submission Agreement:  September 15, 2006.
Brown signed the Uniform Submission Agreement:  September 15, 2006.
Vagnini signed the Uniform Submission Agreement:  September 15, 2006.
Ostrove signed the Uniform Submission Agreement:  September 15, 2006.
Valli signed the Uniform Submission Agreement:  September 15, 2006.

Joint Statement of Answer submitted by PEG and PFI on or about:  September 15, 2006.
PEG signed the Uniform Submission Agreement:  September 15, 2006.
PFI did not sign the Uniform Submission Agreement.

Discrimination Inc. did not file an Answer or sign the Uniform Submission Agreement.

Discrimination Manhattan did not file an Answer or sign the Uniform Submission Agreement.

## CASE SUMMARY

Claimant asserted the following cause of action:  violations of NASD rules.

Unless specifically admitted in their Answer, Leeds Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in their Answer, Prudential Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimant requested that the Panel issue an order declaring that Claimant may pursue his class action claims against Respondents in court, reimbursement of his filing fees, costs, and attorneys' fees, and that disciplinary action be brought against the Prudential Respondents.

Leeds Respondents requested dismissal of the Statement of Claim in its entirety.

Prudential Respondents requested dismissal of the Statement of Claim in its entirety, attorneys' fees, and costs.

## OTHER ISSUES CONSIDERED AND DECIDED

Respondents Discrimination on Wall Street, Inc., and Discrimination on Wall Street, Manhattan, Inc., did not file with NASD Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the terms of a Settlement Agreement dated October 27, 1988 and, are bound by the determination of the Panel on all issues submitted.

Upon review of the file and the representations made by the Claimant, the undersigned arbitrators (the "Panel") determined that Respondents Discrimination on Wall Street, Inc., and Discrimination on Wall Street, Manhattan, Inc., have been properly served with

the Statement of Claim and received due notice of the hearing, and that arbitration of the matter would proceed without said Respondents present, in accordance with the NASD Code of Arbitration Procedure (the "Code").

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims are dismissed in their entirety; the Settlement Agreement, dated October 27, 1998 precludes Claimant from bringing a Class Action in court.

2. Any and all relief not specifically addressed herein is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

**Filing Fees**
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | Waived |

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, Prudential Equity Group, LLC is a party.

| | |
|---|---|
| Member surcharge | = $1,500.00 |
| Pre-hearing process fee | = $ 750.00 |
| Hearing process fee | = $2,200.00 |

**Forum Fees and Assessments**
The Panel has assessed forum fees for each session conducted or each decision rendered on either a discovery-related motion on the papers or a contested motion for the issuance of a subpoena. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with Panel @ $1,000.00 | | | = $2,000.00 |
| Pre-hearing conferences: | December 7, 2006 | 1 session | |
| | March 20, 2007 | 1 session | |
| | | | |
| One (1) Hearing session @ $1,000.00 | | | = $1,000.00 |
| Hearing Date: | April 23, 2007 | 1 sessions | |
| Total Forum Fees | | | = $3,000.00 |

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 4 of 5

1. The Panel has assessed $3,000.00 of the forum fees jointly and severally to PEG and Leeds P.C.

## Fee Summary

1. PEG is solely liable for:

| | |
|---|---|
| Member Fees | = $4,450.00 |
| Total Fees | = $4,450.00 |
| Less payments | = $4,450.00 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

2. PEG and Leeds P.C. are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $3,000.00 |
| Total Fees | = $3,000.00 |
| Less payments | = $    0.00 |
| Balance Due NASD Dispute Resolution | = $3,000.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

Lewis S. Kurlantzick    -    Public Arbitrator, Presiding Chairperson
Nathan M. Lubow    -    Public Arbitrator
Doris Lindbergh, Esq.    -    Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_Lewis Kurlantzick_
Lewis S. Kurlantzick
Public Arbitrator, Presiding Chairperson

5/1/07
Signature Date


Nathan M. Lubow
Public Arbitrator

Signature Date


Doris Lindbergh, Esq.
Non-Public Arbitrator

Signature Date


May 10, 2007
Date of Service (For NASD Dispute Resolution use only)

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lewis S. Kurlantzick | - | Public Arbitrator, Presiding Chairperson |
| Nathan M. Lubow | - | Public Arbitrator |
| Doris Lindbergh, Esq. | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____

Lewis S. Kurlantzick
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____

Nathan M. Lubow
Public Arbitrator

5/7/07
_____
Signature Date

_____

Doris Lindbergh, Esq.
Non-Public Arbitrator

_____
Signature Date

May 10, 2007
_____
Date of Service  (For NASD Dispute Resolution use only)

TOTAL P.06

NASD Dispute Resolution
Arbitration No. 06-00534
Award Page 5 of 5

## ARBITRATION PANEL

Lewis S. Kurlantzick    -    Public Arbitrator, Presiding Chairperson
Nathan M. Lubow    -    Public Arbitrator
Doris Lindbergh, Esq.    -    Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

## Concurring Arbitrators' Signatures

_____          _____
Lewis S. Kurlantzick                    Signature Date
Public Arbitrator, Presiding Chairperson

_____          _____
Nathan M. Lubow                     Signature Date
Public Arbitrator

_____          May 3, 2007
Doris Lindbergh, Esq.                   Signature Date
Non-Public Arbitrator

May 10, 2007
Date of Service  (For NASD Dispute Resolution use only)

STATEMENT OF ACCOUNT

NASD Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY  10006

As of:  05/10/2007

TO: Shari Claire Lewis, Esq.
    Rivkin Radler LLP
    926 Reckson Plaza
    Uniondale, NY  11556-0926

FOR: Leed Morelli & Brown, P.C., (NMW)
     New York, NY

Invoice#: 06-00534-324-NY

Case Number: 06-00534
      Name: Jeffrey S. Vaughn v. Leeds, Morelli & Brown, P.C., Leeds,
            Morelli & Brown, L.L.P., Prudential Securities, Inc., et al.

| Date | Multiple Party | Description | Fees Owed | Credits | Check No. | Check Date |
|------|----------------|-------------|-----------|---------|-----------|------------|
| 05/04/2007 | * | Forum Fee | $3,000.00 | | | |

| | | |
|---|---|---|
| Mediation Fee Total: | $.00 | |
| Arbitration Fee Total: | $3,000.00 | |
| Total Fees: | $3,000.00 | |
| Credits To Date: | | $.00 |
| Credits By Others: | | $.00 |
| Less Credits To Others: | | $.00 |
| Less Refunds: | | $.00 |

Balance Due:                                    $3,000.00

* Transactions indicate joint and several responsibility

Others responsible for payment:

        Prudential Equity Group, LLC


Please Make Check Payable to:

NASD Dispute Resolution
W3690
PO Box 7777
Philadelphia, PA  19175-3690

CW1: RF02A

EXHIBIT "B"

~4193189.txt

1

6955VAUC                    order to show cause
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  JEFFREY S. VAUGHN,
 3
 4              Plaintiff,
 4
 5         v.                        04 Civ. 8391 (DLC)
 5
 6  LEEDS, MORELLI & BROWN, P.C.,
 6  et al.,
 7
 7              Defendants.
 8
 8  ------------------------------x
 9
 9                                   September 5, 2006
10                                   4:00 p.m.
10  Before:
11
11                    HON. DENISE L. COTE,
12
12                                   District Judge
13
13                         APPEARANCES
14
14  LIDDLE & ROBINSON, L.L.P.
15       Attorneys for Plaintiffs
15  BY:  BLAINE H. BORTNICK
16
16  LITCHFIELD CAVO
17       Attorneys for Leeds, Morelli & Brown
17  BY:  DANIEL HUGHES
18       KEVIN SPAGNOLI
18
19  PAUL WEISS RIFKIND WHARTON & GARRISON, L.L.P.
19       Attorneys  for Defendant Prudential Securities &
20  Prudential Financial
20  BY:  LIZA VELAZQUEZ
21       SAM SHELDEN
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

2

6955VAUC                    order to show cause
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel, for the plaintiff, are you
 3  ready to proceed?
 4              MR. BORTNICK:  We are.
 5              THE DEPUTY CLERK:  Please state your name for the
 6  record.
 7              MR. BORTNICK:  Blaine Bortnick of Liddle & Robinson.
 8              THE DEPUTY CLERK:  Who do you have with you at counsel
 9  table?
10              MR. BORTNICK:  I'm sorry.  Rebecca Saenger.  Your
11  Honor, Ms. Saenger is not admitted to this court.  She is an
                        Page 1

~4193189.txt

```
12  associate at our firm.
13          THE DEPUTY CLERK:  For the defendant, please state
14  your name for the record and the party you represent.
15          MR. HUGHES:  Daniel Hughes of the law firm Litchfield
16  Cavo, representing the Leeds Morelli & Brown defendants and
17  with me is Kevin Spagnoli, an associate with my law firm.
18          THE COURT:  Thank you.
19          MS. VELAZQUEZ:  Liza Velazquez of Paul, Weiss,
20  Rifkind, Wharton & Garrison for the Prudential defendants.  And
21  with me is my colleague Sam Shelden.
22          THE COURT:  Great.  Welcome to everyone.
23          I was presented with an order to show cause and it
24  isn't my practice to sign them ex parte unless there is good
25  reason.  Plaintiff's counsel were unavailable last week and so
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                3

6955VAUC                      order to show cause
```
 1  we put the matter over until today to give everybody an
 2  opportunity to be heard.
 3          This is a matter that was referred to arbitration
 4  sometime ago now, and I thought it might be helpful for me to
 5  give the parties a sense of where we stand.  And after you hear
 6  from me, if counsel want to be heard orally today on the
 7  matter, fine.  If you want to set a briefing schedule and put
 8  this matter over for oral argument at a later date, fine.
 9          But, I thought it might be helpful, as I said, to
10  begin with an overview statement from me.
11          In connection with this order to show cause I have
12  been given a set of documents.  They include some of the
13  plaintiff's submissions to the New York Stock Exchange and the
14  NASD, including an October 28th 2005 letter to the New York
15  Stock Exchange, a February 2nd, 2006 statement of claim to the
16  NASD, and an August 15th, 2006 letter to the NASD.  I think the
17  presentation of the legal issue in those letters is inaccurate
18  and misleading.
19          The plaintiff clearly agreed to the arbitration of his
20  claims and I ruled that the arbitration agreement was valid and
21  enforceable and that legally was not in dispute.
22          I referred this matter to arbitration so that the
23  arbitrator can decide what the intention of the parties was in
24  entering into that arbitration agreement, including deciding
25  what kind of arbitration proceeding the parties had agreed to.
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                4

6955VAUC                      order to show cause
```
 1          Now, the arbitrator, as I see it, could decide at
 2  least three different things and there may be more but, for
 3  instance, the arbitrator could decide that the parties had
 4  intended to disallow class actions.  The arbitrator could
 5  decide that the parties had agreed to arbitrate individual
 6  claims but had reserved unto themselves the right to litigate
 7  class claims.  The arbitrator could decide that the party had
 8  agreed to arbitrate all claims, individual or class claims.
 9          So, the parties disputed what the intention -- what
10  their intention was in entering into this arbitration agreement
11  and I want to refer to the Paul Weiss reply brief on the
12  underlying motions in which Paul Weiss argued, at page 3, that,
13  "It was for the arbitrator, not the Court, to interpret the
14  parties' intentions."
15          And of course Paul Weiss argued, and I expect it will
16  argue to the arbitrator, that, "When one reads the agreement
```
                                Page 2

~4193189.txt

17  and when the arbitrator reads the agreement, the arbitrator
18  should conclude that the parties never intended to allow class
19  actions at all."
20          I didn't rule on that.  I ruled that it is for the
21  arbitrator to interpret the agreement and decide what the
22  parties' intentions were.
23          Let's deal with a hypothetical.  Let us say the
24  arbitrator decides that the arbitration clause and the parties'
25  intention in entering into the arbitration agreement disallows
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              5
6955VAUC                      order to show cause
1   the plaintiff from bringing any class action lawsuit.  That, of
2   course, would allow the plaintiff to continue through the
3   arbitration process with an individual claim.  And, depending
4   on what arbitration decision came out of that process -- again,
5   I'm just talking about hypothetical -- somebody would move to
6   vacate or confirm the arbitration award.
7           In that context, in Federal Court here the parties
8   would have the ability, either before me or eventually on
9   appeal, and of course to the extent that the law permitted, to
10  raise issues concerning whether I had erred in sending the
11  matter to arbitration, whether the arbitrator had erred in
12  ruling that no class action litigation or arbitration was
13  permitted, and challenging the merits of the results of the
14  arbitration.  Again, to the extent permitted by governing law.
15          Now, should Mr. Vaughn decide that he doesn't want to
16  submit an individual claim to the arbitration proceeding I
17  expect -- but I'm not going to rule on this -- that he can't
18  get a second bite at the apple -- and I see plaintiff's counsel
19  nodding in agreement -- that either forfeiture or waiver rules
20  or res judicata would apply.  And that's it.
21          He had an opportunity to arbitrate the claim -- and
22  we are playing with our hypothetical -- he didn't arbitrate it,
23  end of story.
24          That is, of course, if he were successful on appeal in
25  overturning my decision to send the dispute to arbitration or
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              6
6955VAUC                      order to show cause
1   the arbitrator's ruling, he would be foreclosed.
2           But this, it seems to me, his decision to make.  I
3   can't force him, and shouldn't, to make a particular claim to
4   the arbitrator but there may be consequences from that.
5           Now, I think, if I understand what's happening here,
6   Mr. Vaughn is not submitting his individual claim to the
7   arbitrator.  I may not understand this correctly but if that's
8   what's happening, sobeit.
9           But, I think I would be derelict not to make sure that
10  I mention the potential ethical issue here for plaintiff's
11  counsel.  There may be a serious conflict of interest dividing
12  the plaintiff's interest from those of his counsel on this
13  particular point because if that's the strategy being pursued,
14  Mr. Vaughn may risk losing his right to have his claim ever
15  addressed and lose the right for all recovery.
16          So, I have this order to show cause.  I'm happy to
17  hear the parties this afternoon.  I'm happy to set a briefing
18  schedule.  Or, I'm happy to say that you have my views, do
19  before the arbitrator what you will, and depending on what
20  happens, all in good time I may have some legal issues to
21  confront again.
                         Page 3

~4193189.txt
```
22                Okay.  Mr. Bortnick?
23                MR. BORTNICK:  Yes, your Honor.  I have to say I
24    largely agree with everything that your Honor said here.
25                The way that the claim was presented initially to the
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                7

6955VAUC                         order to show cause
```
 1    New York Stock Exchange before it rejected jurisdiction and
 2    then subsequently to the NASD, was brought, only essentially it
 3    was as a class in the sense that if there was -- if the
 4    arbitration clause were to decide at some point in the future
 5    that the arbitration clause means that class actions have been
 6    waived, then there wouldn't be a one-on-one individual
 7    arbitration.  Mr. Vaughn was not intending to bring a
 8    one-on-one individual arbitration.
 9                The reason here is not a particular secret.  I think
10    it was even presented to your Honor in papers on the motions
11    below or at a conference below.  Mr. Vaughn, when he settled
12    his original case with Prudential with Leeds, Morelli
13    representing him, presented a piece of paper that said I think
14    these are my damages in a certain amount.  And Prudential
15    agreed to pay that certain amount to Mr. Vaughn less, of
16    course, the contingency fee portion that went to Leeds, Morelli
17    and Brown.
18                The theory behind the class action of which Mr. Vaughn
19    was bringing was fully understanding but something different.
20                When you have a large group of people that are
21    settling and the allegation is that each of the settling
22    plaintiffs, the class members had a contingency fee taken from
23    their settlement and the allegation is unbeknownst to them,
24    Prudential was paying Leeds, Morelli and Brown quite a
25    substantial amount of legal fees unbeknownst to them, that that
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                8

6955VAUC                         order to show cause
```
 1    amounted essentially to a bribe and, under New York Law, the
 2    class can recover the amount of that payment from, by
 3    Prudential to Leeds, Morelli and Brown, because that is an
 4    amount under New York Law that a party would have been willing
 5    to pay to the plaintiffs in this case.
 6                That was the theory of the class action.
 7                Mr. Vaughn has always understood all along that in his
 8    particular case on the one-on-one arbitration he recovered,
 9    minus attorney's fees, what he was asking for.  And that's not
10    the theory --
11                So, the theory of the class action was that there was
12    a secret payment made by Prudential to Leeds, Morelli and Brown
13    unbeknownst to Mr. Vaughn and the other potential class
14    plaintiffs and that is the amount of damages that were being
15    sought.
16                Now, it could be that the -- and if the arbitrators,
17    the arbitration panel, I think it would be a panel of three,
18    decide on the other hand that the arbitration clause which
19    says, Arbitrated pursuant to the rules of the New York Stock
20    Exchange or the NASD, which in this case have, for all intents
21    and purposes, I think it is the exact identical rule, no class
22    actions allowed, we don't hear class actions, you didn't waive
23    your class action claims, then we're automatically back in
24    court with the class action.
25                Now, I am certainly --
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                              Page 4

~4193189.txt
(212) 805-0300

9

6955VAUC                order to show cause
1              THE COURT: But if I decide that you did waive your
2     class action claims --
3              MR. BORTNICK: Mr. Vaughn did not have any intention
4     to bring a one-on-one arbitration because he has a damages
5     issue here.  And he understands that.
6              However, that being said, I think it is probably,
7     since your Honor has raised the concern -- to go and talk to
8     him one more time and say Mr. Vaughn -- because it is very easy
9     to amend the arbitration claim and just go back and say, well,
10    in the alternative, if the Court -- if the arbitration panel
11    decides class actions have been waived, therefore we bring an
12    individual one-on-one arbitration based on a fraud,
13    essentially, based on that secret agreement.
14             And so, I think it is probably appropriate to give
15    him, based on your Honor's concerns, that we should probably
16    ask him one more time if that's how he would want to proceed in
17    the alternative, recognizing that is the issue that he has had
18    and the decision he made before.
19             It is a very simple change to make in the arbitration
20    statement of claim.  And we will go back and do that, but I do
21    think it is fair to point out, your Honor, that since last
22    December the defendants in this case, Prudential and Leeds,
23    Morelli and Brown, have known that the claim, as it is now
24    positioned in front of the NASD, is the claim we have been
25    bringing all along.  And it is only last week where they're
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

6955VAUC                order to show cause
1     suddenly raising an objection to the way we've presented the
2     claim to now the NASD.  But, they've known about this since
3     December when they obtained a copy of the New York Stock
4     Exchange statement of claim.  They obtained a copy of the NASD
5     statement of claim, not what they were served -- they were
6     served on July 27 and I understand they got it on or about
7     August 1, but we certainly gave them a courtesy copy of it not
8     because we were required to, but because they felt we were --
9     they wanted us to and we agreed.
10             My records don't show whether we did it back in
11    February but we certainly did it in May.
12             So, we've known about this for a long time, so this
13    came as a surprise to us now that they're complaining about the
14    way we presented it.
15             And sort of today is the first day I could even
16    actually address it.  I am more than happy to go back and talk
17    to Mr. Vaughn and iterate to him one more time:  The Judge has
18    also raised this concern now and I think it is probably
19    appropriate that we do it.
20             And you understand, because I do agree with your
21    Honor, that if it is presented in the way it is presented and
22    there is no one-on-one arbitration claim, if Mr. Vaughn doesn't
23    amend the statement of claim -- and he could do it at a later
24    time, he doesn't have to do it now, he could do it within the
25    context of what has been presented to the NASD -- but, if he
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

6955VAUC                order to show cause
1     chooses not to proceed one on one, then I agree with your
2     Honor, he would not be able to come back and make some kind of
                            Page 5

~4193189.txt

3   claim at a future date.  He would lose it forever.  I think
4   that is absolutely correct.
5           THE COURT:  I don't think the formulation in the
6   papers that you have submitted to the New York Stock Exchange
7   or the NASD has been, in each instance, consistent with the
8   description of what I put on the record today.  But, that is
9   for you and the defendants to litigate before the arbitrator.
10          MR. BORTNICK:  The arbitrators have a copy of the
11  order, I believe.  They should.  No arbitration panel has been
12  appointed yet.  The last letter you saw from us to the NASD,
13  there is a form letter that goes out from the NASD from the
14  processing center and it says here is a list of arbitrator
15  skills, customer complaints, this or that, and you can rank 1
16  through 4 and we will try to accommodate you.
17          And then we wrote back saying we don't think these fit
18  what we want.  And we wrote George Friedman as the director of
19  arbitration because we didn't want a data inputter to look at
20  the letter and just toss it but we wanted to have some kind of
21  personal attention.  We copied them on it because that's how we
22  see this claim.
23          The arbitration panel will have that order and they
24  can make a decision as to whether it should be allowed to be a
25  class action.  And, in that case, they'll say take it back to
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
                                                         12
    6955VAUC            order to show cause
1   Court.
2           But, I guess then because of what your Honor says, you
3   probably -- I guess I should probably request to let me go
4   ahead and have one more conversation with our client and tell
5   him what your Honor said.  I think it is the right thing to do.
6           THE COURT:  Do the defendants wish to be heard?
7           MR. HUGHES:  Just briefly, your Honor.  Daniel Hughes
8   on behalf of the Leeds defendants.
9           I received the papers from plaintiff's counsel and
10  their filings on August 1st of '06, the last date that
11  Mr. Bortnick stated.
12          The reason we are here is because the submission to
13  the NASD which is presently pending states:  Accordingly,
14  Vaughn respectfully requests that the arbitrators issue an
15  order and decision declaring that the Vaughn may pursue his
16  class action claims against defendants in court and directing
17  defendants to withdraw their objections.
18          So, this, to us, did not seem to be an objective
19  presentation of your Honor's decision for the arbitrators to
20  decide what is the intent of the parties to arbitrate.
21          We are faced now with an August 15th deadline and I
22  was wondering if we could figure out a way to extend that
23  deadline for Mr. Bortnick to file additional papers and for us
24  to have an additional extension to respond to those papers.
25          THE COURT:  I am not going to deal with arbitration
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
                                                         13
    6955VAUC            order to show cause
1   scheduling issues.
2           Is there anything else?
3           MS. VELAZQUEZ:  Your Honor, Liza Velazquez from Paul
4   Weiss for the Prudential defendants.
5           Your Honor, we have been here before you on these
6   issues three times now.  I believe your Honor's August 12th,
7   2005 order was crystal clear:  Vaughn must arbitrate his claims
                        Page 6

~4193189.txt

8   against Prudential and submit to the arbitrators the question
9   of the format of how that arbitration should proceed.
10          He went to the NASD late last year.  We weren't
11  provided with a copy of those papers at the time they were
12  presented to the NASD but we subsequently learned that --
13  excuse me.  He went to the NYSE.  We subsequently learned that
14  he asked the NYSE to overrule this Court's order that
15  notwithstanding the August 12th, 2005 order he can go ahead and
16  come back to court and basically do what the F.A.A. doesn't
17  permit him to do, which is to get an interlocutory appeal but
18  from an arbitral forum.
19          Then, your Honor, we were served with his NASD papers
20  on or about August 1st.
21          Respectfully, I would say to Mr. Bortnick that there
22  was no proceeding until we were served with those papers, so we
23  could not approach the Court about what had transpired until we
24  were served with the papers on August 1st.
25          Again, in our view, he is asking the NASD to overrule
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                            14
    6955VAUC                order to show cause
1   this Court and to send him back to court with his claims even
2   though the Court has already decided those claims are
3   arbitrable.
4           I submit that the three options that your Honor set
5   forth earlier today are, they're far afield from what
6   Mr. Bortnick and plaintiff are requesting from the NASD.  He is
7   not submitting his claims against Prudential or any of these
8   parties to arbitration at all.  Instead, he is rehashing what
9   has already been litigated before this Court and we
10  respectfully submit to your Honor that it would be unfair and
11  prejudicial to Prudential to have to relitigate those issues
12  again before the NASD.
13          THE COURT:  Well, I don't think that the plaintiff's
14  papers, Mr. Vaughn's papers have correctly framed the issue for
15  the arbitrators, but I don't think defense counsel are either.
16          The issue that was in dispute and that I submitted to
17  arbitration was for an interpretation of the arbitration
18  agreement, and that was for the arbitrator to decide the
19  parties' intentions.  I did not rule that everything had to be
20  subject to arbitration.  I contemplated, therefore, that the
21  arbitrator, in deciding the parties' intentions, might decide
22  that the agreement to arbitrate does not foreclose the
23  plaintiff from coming to court and litigating a class action.
24          But the plaintiff is not, in its submissions to the
25  arbitrators to date, has not clearly stated the issue for the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                            15
    6955VAUC                order to show cause
1   arbitrators to decide about the parties' intent and the scope
2   of that intent.
3           But, I think it would be wrong for the defendants to
4   characterize it the way you are today in court to suggest that
5   the arbitrators' hands are bound in some way such that they
6   couldn't rule in interpreting the parties' intent that the
7   plaintiff has the right to come to court and proceed on a class
8   action.  And I refer you, again, to your reply brief on the
9   underlying motion practice.
10          So, I don't think there is a need for further argument
11  or briefing of this issue.
12          It seems to me that what I'm going to do -- we have a
                           Page 7

~4193189.txt

```
13    court reporter here because this is complicated -- is that I'm
14    going to endorse the order to show cause to reflect that after
15    having heard from all parties, I decline to issue the order to
16    show cause without prejudice to any parties' rights to argue at
17    a later point in time that their rights have been infringed in
18    some way.  And then we will just see how the arbitration
19    process plays itself out.
20             If a party misrepresents or misleads the arbitrator,
21    or doesn't ask for the appropriate relief, I don't know how
22    that will play out in court before me later but everybody's
23    rights are preserved.  You can challenge whatever happens
24    through the arbitration process when it is ripe for such a
25    challenge.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

```
6955VAUC                    order to show cause
1              Not hearing any objection, I will so endorse the order
2     to show cause.  If you want to wait afterwards, we can get you
3     a copy of that endorsement.
4              Since you are all here, I thought I would just address
5     the 54(B) motion that's pending before me too.
6              This motion is governed by the rule and Second Circuit
7     authority interpreting the rule.  And I have looked most
8     recently at O'Bert, 331 F.3d at 40 to 41, a Second Circuit
9     2003, decision.  It indicates, among other things, that where
10    the decision to direct the entry of a partial judgment in
11    advance of the final adjudication of all the claims must be
12    considered in light of the goal of judicial economy as served
13    by the historic federal policy against piecemeal appeals.
14             And, with this policy in mind, the power to enter a
15    partial judgment should be exercised sparingly, bearing in mind
16    that not all dismissals of individual claims should be
17    immediately appealed even if they are, in some sense, separable
18    from the remaining unresolved claims.
19             The power should generally be reserved for the
20    infrequent harsh case and certification should be granted only
21    if there exists some danger of hardship or injustice through
22    delay which would be alleviated by immediate appeal.
23             I'm going to deny the 54(B) motion.
24             First of all, there is no showing of error to suggest
25    to me that it, because of that, needs immediate review.  The
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

```
6955VAUC                    order to show cause
1     plaintiff is arbitrating the claims against the five dismissed
2     individual defendants.  And the issues with respect to those
3     five dismissed individual defendants will be reviewed in the
4     ordinary course through the confirmation or vacating
5     proceedings that will follow the arbitration decision.
6              I haven't seen any showing of hardship or injustice
7     and I do not find, principally for the reasons pointed out by
8     defense counsel and their opposition, that judicial economy
9     would be served by a 54(B) finding at this point.
10             Thanks so much and good luck to all of you.
11                            o0o
12
13
14
15
16
17
```

~4193189.txt

18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT "C"

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

Made and entered into this ____ day of October 1998, by and between Jeffrey Vaughn and Prudential Securities Incorporated ("PSI").

WHEREAS, Vaughn has alleged certain claims arising out of Vaughn's employment with PSI and separation therefrom; and

WHEREAS, PSI denies all such claims; and

WHEREAS, PSI and Vaughn have agreed to amicably resolve any and all such claims;

NOW, THEREFORE, in full and complete settlement of such claims and in consideration of the mutual promises and covenants set forth herein, Vaughn and PSI agree as follows:

1.    *Separation From Employment.*  Vaughn's last day of employment at PSI shall be October 23, 1998.

2.    *Payment by PSI.*  Upon the expiration of seven (7) days following Vaughn's execution of this Settlement Agreement and General Release (the "Agreement"), PSI shall pay to Vaughn, in a single lump-sum payment, the total agreed-upon amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), as payment in full for all alleged personal injury or other non-wage claims, including , but not limited to, any claims for emotional distress and general, special and consequential damages.  The parties acknowledge and agree that PSI shall file a form 1099-misc reflecting the above payment.

3.    *Medical Benefits.*  PSI agrees to continue Vaughn's health plan coverage through October 31, 1998.  Thereafter, Vaughn will be eligible to continue the plan coverage pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  If Vaughn elects to continue health plan coverage pursuant to COBRA, PSI will pay Vaughn's COBRA premiums through and including April 30, 1999, or until Vaughn obtains other employment or is eligible for other group health plan coverage, whichever comes first.  Thereafter, Vaughn will be responsible for the payment of any COBRA premiums through the remainder of Vaughn's eligibility.

4.    *Release by Vaughn.*  In consideration for PSI's commitment to the various arrangements described in the preceding paragraphs, and in lieu of any other benefits, as a full and final settlement, Vaughn hereby releases and discharges PSI, its parent, divisions, subsidiaries and affiliates and their current and former directors, officers, shareholders, agents and employees, and each of their predecessors, successors, and assigns (hereinafter "the Company"), from any and all claims and causes of action (except for the benefits specifically set forth in this Agreement) arising out of or related to Vaughn's employment or separation from employment, including, but not limited to, any claims for salary, bonuses, severance pay, vacation pay or any benefits under the Employee Retirement Income Security Act (except for vested benefits which are not affected by this Agreement), sexual harassment, or discrimination based on race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, citizenship status, pregnancy, medical condition or disability (as defined by the Americans with Disabilities Act, or any other state or local law), age, or any other unlawful discrimination (under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990, Title VII of the Civil Rights Act, as amended, or any other federal, state, or local laws), breach of implied or express contract, breach of promise, misrepresentation, negligence, fraud, estoppel, defamation, infliction of emotional distress, retaliation, whistleblower rights, violation of public policy or wrongful or constructive discharge, and for attorneys' fees, that Vaughn, his heirs, executors, administrators, successors, and assigns now have, ever had or may hereafter have, whether known or unknown, suspected

Vaughn Settlement Agreement
October 1998
Page 2

or unsuspected, up to and including the date of this Agreement. Vaughn further agrees, promises and covenants that, to the maximum extent permitted by law, neither he, nor any person, organization, or other entity acting on his behalf has or will file, charge, claim, sue, or cause or permit to be filed, charged or claimed, any action for damages or other relief (including injunctive, declaratory, monetary relief or other) against the Company involving any matter occurring in the past up to the date of this Agreement, or involving or based upon any claims, demands, causes of action, obligations, damages or liabilities which are the subject of this Agreement (other than an action to enforce the terms herein).

5.    _No Admission of Liability._ Neither this Agreement, nor anything contained herein shall be construed as an admission by the Company that it has in any respect violated or abridged any Federal, State, or local law or any right or obligation that it may owe or may have owed to Vaughn. No final findings or final judgments have been made and Vaughn does not purport and will not claim to be a prevailing party, to any degree or extent, nor will this Agreement or its terms be admissible in any proceeding other than in a proceeding for breach of the terms contained herein.

6.    _Cooperation by Vaughn._ Vaughn agrees to cooperate with and make himself readily available to PSI or its General Counsel, as PSI may reasonably request, to assist it in any matter, including giving truthful testimony in any litigation or potential litigation, over which Vaughn may have knowledge, information or expertise.

7.    _Confidential and Proprietary Information of PSI._ Vaughn understands and agrees that all books, records, documents and information, whether written or not, pertaining to PSI's business activities, are the confidential and proprietary property of PSI (hereinafter referred to as "trade secrets and confidential and proprietary information"). Vaughn warrants, covenants, and agrees that he will not disclose any of PSI's trade secrets and confidential and proprietary information to any person or entity not employed, owned by, or otherwise affiliated with PSI. Vaughn further agrees that he shall not be entitled to copies, in any form, of such trade secrets and confidential and proprietary information and that he shall immediately return to PSI any copies of such information currently in his possession.

8.    _Reemployment or Reinstatement._ Vaughn agrees not to apply for employment or reemployment with PSI, and that PSI has no obligation, contractual or otherwise, to rehire, reemploy or recall him in the future.

9.    _Nondisparagement._ Vaughn represents that he has not and agrees that he will not in any way disparage PSI, its current and former officers, directors and employees, or the Company, or make or solicit any comments, statements, or the like to the media or to others that may be considered to be derogatory or detrimental to the good name or business reputation of any of the aforementioned parties or entities.

10.    _Testimony Required by Law or Regulatory Authority._ Vaughn further agrees that he will not at any time discuss any matter concerning PSI with anyone adverse or potentially adverse to PSI on any matter including employment claims or customer claims, without the prior written consent of Counsel for PSI. Nothing contained herein, however, shall preclude Vaughn from discussing any matter concerning PSI with any governmental regulatory or self-regulatory agency. Further, if required by a governmental regulatory agency or self-regulatory agency to provide testimony or information regarding the PSI, Vaughn will cooperate with said regulatory agency. If compelled to testify by a validly served subpoena in any legal proceeding or by regulatory authority, Vaughn will testify truthfully as to all matters concerning his employment at PSI.

11.    _Confidentiality of Agreement._ Vaughn agrees not to disclose or cause to be disclosed, either directly or indirectly, to any person or organization, except to his legal and

Vaughn Settlement Agreement
October 1998
Page 3

financial advisor(s), or as required by law, or governmental regulatory or self-regulatory authority, any information regarding the amount of, terms of, or facts or circumstances underlying this Agreement.

   12.    *Indemnification.* Vaughn expressly warrants and represents to PSI that he will indemnify PSI against, and hold PSI harmless from, the tax consequences, if any, of PSI's not withholding taxes from, or reporting to the Internal Revenue Service as income, the aforementioned payment, including, but in no way limited to, any and all taxes, interest, and/or penalties incurred in connection therewith.

   13.    *Entire Agreement and Severability.* The parties hereto agree that this Agreement may not be modified, altered or changed except by a written agreement signed by the parties hereto. The parties acknowledge that this constitutes the entire agreement between them superseding all prior written and oral agreements. If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect.

   14.    *Arbitration.* Any claim or controversy arising out of or related to this Agreement or the interpretation thereof will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc. Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof. The governing law of this Agreement shall be the substantive and procedural law of the State of New York.

   15.    *Breach of Agreement.* Should Vaughn violate any provision of this Agreement, the Company may apply for appropriate relief. In any proceeding to enforce the terms of this Agreement, the Agreement may be introduced under seal in order to maintain its confidentiality. Vaughn understands and agrees that the damage to the Company due to any such breach will be extremely difficult to determine. Because of this difficulty, Vaughn agrees that in the event of a finding of such breach, he will forfeit to PSI all amounts received pursuant to this Agreement, and he shall indemnify PSI for any and all costs incurred in connection with any such recovery, including reasonable attorneys' fees. Notwithstanding any such relief, all of the other terms of this Agreement, including, without limitation, Vaughn's release of claims, shall remain in full force and effect. The remedies provided for in this provision shall not be construed to be exclusive and do not bar any other claims for relief.

   16.    *Voluntary Execution.* Vaughn acknowledges that he has carefully read this Agreement and understands all of its terms including the full and final release of claims set forth above. Vaughn further acknowledges that he has voluntarily entered into this Agreement; that he has not relied upon any representation or statement, written or oral, not set forth in this Agreement; that the only consideration for signing this Agreement is as set forth herein; that the consideration received for executing this Agreement is greater than that to which he may otherwise be entitled; and that this document gives him the opportunity and encourages him to have this Agreement reviewed by his attorney and tax advisor. Vaughn also acknowledges that he has been afforded at least twenty-one days to consider the release provision contained herein and that he has seven days after signing this Agreement to revoke it in writing. Accordingly, no payments required under this Agreement shall be made until the expiration of seven days following Vaughn's execution of the Agreement.

Vaughn Settlement Agreement
October 1998
Page 4


   *IN WITNESS WHEREOF*, the parties hereto evidence their agreement by their
signatures.


                    PRUDENTIAL SECURITIES INCORPORATED

Date:               _Eric Schwien_____
                    BY:

Date:      10/27/98  _Jeffrey Vaughn_____
                    JEFFREY VAUGHN

EXHIBIT "D"

[Page 1]

ARBITRATION PROCEEDINGS

AMERICAN ARBITRATION ASSOCIATION

-------------------------------------------X

In the Matter of the

Arbitration between

JEFFREY S. VAUGHN,

        Claimant,

     -and-

LEEDS, MORELLI & BROWN, P.C.,

LEEDS, MORELLI & BROWN, LLP,

PRUDENTIAL SECURITIES INC.,

et al.,

        Respondents.

-------------------------------------------X

           One Liberty Plaza

           New York, New York

           Monday, April 23, 2007

B E F O R E:

    LEWIS KURLANTZICK, Chairman

    NATHAN LUBOW, ARBITRATOR

    DORIS LINDBERGH, ARBITRATOR

Reported by:

William Byrne

| | |
|---|---|
| 1 | 1 |
| 2  A P P E A R A N C E S: | 2  P R O C E E D I N G S |
| 3  For the Claimant: | 3  THE CHAIRMAN:  This is the |
| 4  LIDDLE & ROBINSON, ESQS. | 4  hearing of April 23, 2007 NASD case |
| 5    800 Third Avenue | 5  0600534 Jeffrey S. Vaughn versus |
| 6    New York, New York 10022 | 6  Leeds Morelli & Brown et al.  We are |
| 7  BY:  BLAINE H. BORTNICK, ESQ. | 7  going to start with the introduction |
| 8      REBECCA A. SAENGER, ESQ. | 8  of the arbitration panel.  I am the |
| 9 | 9  chairman, Lewis Kurlantzick. |
| 10  For the Respondent: | 10  ARBITRATOR LUBOW:  Nathan |
| 11  PAUL, WEISS, RIFKIND, WHARTON & GARRISON, ESQS. | 11  Lubow, the arbitrator. |
| 12    1285 Avenue of the Americas | 12  ARBITRATOR LINDBERGH:  Doris |
| 13    New York, New York 10018 | 13  Lindbergh, the arbitrator. |
| 14  BY:  GERARD E. HARPER, ESQ. | 14  THE CHAIRMAN:  I have no |
| 15    LIZA M. VELAZQUEZ, ESQ. | 15  additional disclosures to make at |
| 16    SAMUEL M. SHELDON, ESQ. | 16  this point. |
| 17 | 17  ARBITRATOR LINDBERGH:  I have |
| 18  For the Respondent: | 18  no disclosures. |
| 19  Leeds Morelli & Brown | 19  ARBITRATOR LUBOW:  I have no |
| 20  RIVKIN RADLER, ESQ. | 20  disclosures to make. |
| 21    EAB Plaza Uniondale | 21  THE CHAIRMAN:  We will go |
| 22    New York 11556 | 22  around the room and if everybody |
| 23  BY: SHARI CLAIRE LEWIS, ESQ. | 23  would indicate your name and your |
| 24 | 24  relationship to the parties, please. |
| 25 | 25  MR. VAUGHN: Jeffrey Vaughn, |
| [Page 2] | [Page 4] |

| | |
|---|---|
| 1  ALSO PRESENT: | 1 |
| 2  KENNETH THYNE, ESQ. | 2  the claimant in this arbitration. |
| 3  JULIA HENICK RIGBY, ESQ. | 3  MR. BORTNICK:   Blaine |
| 4 | 4  Bortnick, I am with the law firm of |
| 5 | 5  Liddle & Robbinson.  With me today |
| 6 | 6  is my colleague Robin Saenger.  I |
| 7 | 7  represent the claimant in this |
| 8 | 8  action. |
| 9 | 9  Present in the room today, is |
| 10 | 10  Mr. Kenneth Thyne, who is also |
| 11 | 11  counsel for Mr. Vaughn.  Also Mr. |
| 12 | 12  Vaughn's wife is sitting there in |
| 13 | 13  the back, she is not a participant. |
| 14 | 14  MS. LEWIS:  My name is Shari |
| 15 | 15  Lewis, and I am from the law firm of |
| 16 | 16  Rivkin Radler.  I represent the |
| 17 | 17  respondent Leeds Morelli & Brown in |
| 18 | 18  this action. |
| 19 | 19  MR. HARPER:  My name is |
| 20 | 20  Gerard Harper.  I am from the law |
| 21 | 21  firm of from Paul Weiss Rifkind |
| 22 | 22  Wharton & Garrison.  I represent |
| 23 | 23  Prudential Securities, the |
| 24 | 24  respondent.  And with me are my |
| 25 | 25  colleagues Liza Velazquez and Samuel |
| [Page 3] | [Page 5] |

[2]  (Pages 2 to 5)

1
2  Sheldon as well as a representative
3  of my client Julia Rigby who is the
4  assistant general counsel, and I
5  have a paralegal here as well.
6      THE CHAIRMAN:  Do you have
7  any objection to Ms. Vaughn being
8  present during the proceeding?
9      MR. HARPER:  I don't.
10     THE CHAIRMAN:  We need to at
11 this point to obtain conformation
12 from the parties or the
13 representatives of the their
14 acceptance of the panel's
15 composition.
16     MR. BORTNICK:  Yes, we accept
17 for the claimant.
18     MS. LEWIS:  Yes, we accept.
19     MR. HARPER:  Prudential
20 Securities accepts for the
21 respondent.
22     THE CHAIRMAN:  We have
23 submitted our properly executed
24 oaths of arbitrators to the NASD
25 dispute resolution staff.  This
[Page 6]

1
2  administer or enforce.  If any
3  matter comes to the attention of the
4  panel during this panel's
5  participation in this proceeding
6  that this panel has reason to
7  believe may constitute a violation
8  of the association rules or the
9  federal securities laws, the panel
10 may initiate a referral of the
11 matter to the association for
12 disciplinary investigation.
13     If we make any such referral
14 it will only be initiated after this
15 dispute has been either settled or
16 otherwise disposed of or after a
17 final award has been rendered.
18     We have been selected to serve
19 as neutral arbitrators to decide the
20 matter, we are not NASD dispute
21 resolution employees.  Pursuant to
22 Canon 1 of the ABA, AAA Code of
23 Ethics we as neutral arbitrators
24 have the duty of conducting this
25 proceeding with fairness and
[Page 8]

1
2  controversy has been submitted to
3  the panel for hearing in accordance
4  with the Code of Arbitration
5  Procedure.
6      The panel is authorized to
7  determine each of the matters set
8  forth in the parties' statements and
9  filed with the NASD dispute
10 resolution unless the law directs
11 otherwise.  All the awards rendered
12 pursuant to the code will be final
13 and will not be subject to an
14 appeal.
15     We would appreciate it if no
16 interruptions are made during an
17 individual's testimony.  Parties are
18 entitled to make objections, cross
19 examine and redirect witnesses, and
20 the arbitrators may ask questions as
21 they deem appropriate.
22     The submission of the matter
23 to arbitration will not preclude any
24 right of the NASD that it otherwise
25 would be authorized to adopt,
[Page 7]

1
2  integrity.  That duty extends to all
3  parties and to this process,
4  therefore, on behalf of the panel I
5  respectfully request that all
6  parties and their counsel or
7  representatives refrain from
8  engaging in any conversations or
9  contact with the panel members
10 except within this room and in the
11 presence of all parties' counsel or
12 representatives.
13     We thank you for your
14 anticipated cooperation in that
15 respect.
16     I need to now administer the
17 oath to those who are or are likely
18 to be witnesses.  I don't know who
19 they are.  I assume Mr. Vaughn, and
20 I don't know whether that includes
21 Mr. Morelli but if it does please
22 raise your right hand.
23     (The chairman swore in the
24 proposed witnesses: Mr. Vaughn and
25 Mr. Morelli.)
[Page 9]

[3]  (Pages 6 to 9)

1
2      THE CHAIRMAN: The arbitrators
3   have read the pleadings that have
4   been submitted by the parties.
5   These papers along with executed
6   submission agreements will be marked
7   and received into evidence as
8   Arbitrator's Exhibit 1. We intend
9   to take a break midmorning,
10  midafternoon and for lunch.
11  However, if any of the participants
12  have need to take a break at any
13  other time or for any other reason
14  please let us know, and we will be
15  happy to cooperate with you.
16      Each party may make an opening
17  statement. It should be limited to
18  what the parties intend to prove and
19  should not be a presentation of the
20  evidence or of the merits of the
21  case with respect to documentary
22  evidence. That evidence will be
23  marked for identification shown to
24  the opposing parties for review and
25  possible objection to its

[Page 10]

1
2   been killed in support of that
3   effort, but it all boils down to one
4   thing what was the intention of the
5   parties to the settlement agreement,
6   when Mr. Vaughn signed a September
7   agreement back in October of 1998
8   where he settled his matter with
9   Prudential Securities. That's all.
10      The agreement contains an
11  arbitration clause, and the
12  arbitration clause says any dispute
13  arising out of the agreement shall
14  be arbitrated pursuant to the rules
15  of the New York Stock Exchange or
16  the NASD. Both forms have the exact
17  same rule. For purposes of the NASD
18  we are talking about the rule that
19  prohibits class actions from being
20  arbitrated and, in fact, furthermore
21  as pointed out in the statement of
22  claim that industry parties such as
23  Prudential are in fact prohibited
24  from enforcing agreements to compel
25  arbitration at the NASD of class

[Page 12]

1
2   admissibility.
3      The panel will rule on any
4   objections asserted and determine
5   whether the document will be
6   received in evidence. The parties
7   and attorneys are responsible for
8   providing copies of all proposed
9   exhibits to the other parties and to
10  the panel. Parties are encouraged
11  to avoid repetitive arguments and
12  parties and counsel please direct
13  all objections to the panel and not
14  to each other.
15      We are now ready for the
16  parties' opening statements
17  beginning with the claimant.
18      MR. BORTNICK: Good morning.
19  We are here for what I hope is going
20  to be a very short hearing because
21  we are here to decide just one issue
22  as directed by the federal court. I
23  know that the panel has seen
24  briefing upon briefing upon
25  briefing, and lots of trees have

[Page 11]

1
2   action claims. That's why we have,
3   for example, class actions that are
4   dealing with securities, fraud and
5   so forth.
6      Typically, as I'm sure this
7   panel well knows if somebody has a
8   typical customer case they have to
9   arbitrate it, but class actions are
10  heard in court. There are the
11  arbitration agreements when a
12  customer signs up with a company
13  like Prudential or Merrill Lynch or
14  anywhere else.
15      The same thing here. We have
16  an arbitration clause it doesn't
17  include class actions, nevertheless,
18  the federal court has sent to
19  arbitration the question of the
20  meaning of the arbitration clause.
21      Now the court suggested there
22  are three possible interpretations.
23  One of which I think everybody
24  probably agrees in the room, at
25  least from the parties' side it

[Page 13]

[4]  (Pages 10 to 13)

1
2  doesn't apply, which would be that
3  you could have a class arbitration.
4      I'm certain that Mr. Friedman
5  would never allow a class
6  arbitration to go forward with the
7  NASD. The NASD is simply not
8  equipped to handle a class action.
9  So the question is whether Mr.
10 Vaughn intended to waive his rights
11 to bring a class action when he
12 signed the settlement agreement.
13     You will hear Mr. Vaughn
14 testify today, the answer is clearly
15 no. And that will basically be all
16 the evidence you are going to hear.
17 Mr. Vaughn's testimony is going to
18 be short, and I'm interested to see
19 what the defense will be, but we
20 will find out. And that's it.
21     In conclusion of the hearing,
22 which I don't even think should go
23 beyond the morning, I think it will
24 be clear that Mr. Vaughn did not
25 intend to waive class action, his

[Page 14]

1
2  Chairman. Good morning, and thank
3  you for agreeing to serve.
4      I feel something like deja vu
5  all over again because we have made
6  this argument and heard Mr. Bortnick
7  make this argument over and over
8  again.
9      Let me give you a timeline
10 here, just briefly. Mr. Vaughn
11 entered into a retainer agreement
12 with what was then Leeds Morelli in
13 January of 1998 and he agreed in
14 that retainer agreement to pay a
15 legal fee and Leeds Morelli agreed
16 to attempt to negotiate a
17 settlement.
18     Mr. Vaughn went through a
19 process that we will hear about, and
20 he asked for $200,000 from
21 Prudential Securities and an
22 extension of his Cobra rights. And
23 he got $200,000 and an extension of
24 his Cobra rights. And so he got
25 every nickel he asked for in the

[Page 16]

1
2  rights to bring a class action, and
3  as such his class action against
4  Prudential and by extension Leeds
5  Morelli & Brown should go back to
6  court.
7      Leeds Morelli & Brown is here
8  only because even though they are
9  not a party to the agreement the
10 federal court ruled they get the
11 benefit of whatever the arbitration
12 clause is and how it is interpreted
13 as a codefendant with Prudential.
14     They are here even though they
15 are not a party to the settlement
16 agreement, but because they actually
17 are a codefendant in the class
18 action and, therefore, get the
19 benefits, to the extent there are
20 any benefits of an arbitration
21 clause that Prudential Securites
22 gets.
23     Thank you.
24     THE CHAIRMAN: Proceed.
25     MR. HARPER: Thank you, Mr.

[Page 15]

1
2  mediation.
3      Almost six years to the day of
4  when he executed that settlement
5  there arrives a class action with
6  Mr. Vaughn's name on the north side
7  of a caption and a bunch of names on
8  the south side of the caption
9  including my client. So we made
10 pursuant to the rules that permit us
11 to make it under the NASD rules,
12 specifically permit us in that
13 circumstance to go into court and
14 compel that he arbitrate pursuant to
15 an arbitration clause that was in
16 the settlement agreement.
17     And in response to that motion
18 to compel my friend, Mr. Bortnick,
19 made exactly the arguments that he
20 is making today. He made exactly
21 the argument that the NASD rules
22 forbid me to do what I did; he made
23 exactly that -- he argued that the
24 rules of the NASD expressly and
25 unambiguously state that a claim

[Page 17]

[5] (Pages 14 to 17)

1
2   submitted as a class action is not
3   eligible for arbitration.
4        Simply put because they are
5   not eligible for arbitration this
6   court is the appropriate forum.  It
7   is beyond doubt that the NASD
8   prohibits the submission of claims
9   and so, therefore, under those rules
10  this court cannot compel an
11  arbitration.
12       That is what Mr. Vaughn argued
13  in front of Judge Coate and Judge
14  Coate responded that the arbitration
15  clause in the agreement contains
16  sweeping languag concerning the
17  scope of the questions committed to
18  arbitration, as it commits to
19  arbitration any claim or controversy
20  arising out of or related to the
21  this agreement, meaning the
22  settlement agreement or even the
23  interpretation thereof.
24       And Vaughn claims that the
25  arbitration clause is inconsistent
                              [Page 18]

1
2   York State Stock Exchange than I do,
3   that you can't, it doesn't have
4   jurisdiction over parties other than
5   members.  And Mr. Vaughn had named
6   Leeds Morelli and a bunch of lawyers
7   from that firm and a bunch of John
8   Does and so forth.
9        So the New York Stock Exchange
10  said we have no jurisdiction over
11  this claim.  And so back to court
12  goes Mr. Vaughn and Mr. Bordnick.
13  And once more they make exactly the
14  same arguments that they are making
15  now to this panel, and that they had
16  previously made to Judge Coate.
17       So we went to Judge Coate and
18  said -- they went to the one flora
19  that won't hear claims against
20  nonmembers but the NASD does, so go
21  to the NASD.  And in that Judge
22  Coate again sent Mr. Vaughn off to
23  arbitration in December of '05.  And
24  then in May of '06, five months
25  later or so, Mr. Vaughn files once
                              [Page 20]

1
2   with the rules of the NASD, but this
3   interpretation contradicts the clear
4   statement that the arbitration
5   clause applies to any claim.  Even
6   assuming that Mr. Vaughn was right
7   and the applicable arbitration
8   rulings do apply and indeed forbid
9   class arbitration, that it would be
10  plausible to interpret the
11  arbitration clause required that all
12  the claims be arbitrated and to
13  disallow class action with no
14  further qualifications or caveats.
15       The next thing that happened
16  was that Mr. Vaughn filed a claim
17  identical to the claim he has filed
18  here with the New York State Stock
19  Exchange.  And the New York State
20  Stock Exchange has a rule that it
21  will not exercise jurisdiction.  It
22  is a plain black and white
23  rule certainly known to my friend
24  Mr. Bortnick who spends more time in
25  these halls than I do and in the New
                              [Page 19]

1
2   again an identical piece of paper
3   saying the rules of the NASD forbid
4   class actions, therefore, the
5   promise I made to arbitrate my claim
6   is invalid as to my class action
7   complaint, which is exactly the
8   argument that he had made to Judge
9   Coate the first time and the second
10  time.
11       And so we went into Judge
12  Coate.  We said, Judge Coate, he is
13  asking you ladies and gentlemen to
14  be the Second Circuit and to
15  overrule your ruling.  And one of
16  the interesting things that Judge
17  Coate said was that she had before
18  her three documents.  She had before
19  her the original letter to the NA --
20  rather to the New York State Stock
21  Exchange setting forth the statment
22  of claim and the description
23  following the ruling that she had
24  made.
25       Second she had before her the
                              [Page 21]

[6]  (Pages 18 to 21)

1
2  claim, the statement of claim in
3  this case, which again describes in
4  detail or purports to, the issue
5  before this panel and the ruling and
6  intention of Judge Coate.
7        Finally, she had before her a
8  letter that was from Ms. Saenger on
9  behalf of Mr. Vaughn, that says that
10 because we've gotten the lists with
11 your names on them among others, and
12 that the letter says the skills and
13 knowledge options listed in the
14 terms regarding the arbitration
15 selection process do not match the
16 issue before the NASD in this case.
17       Mr. Vaughn's statement of
18 claim presents a very narrow issue
19 of whether he waived his right to a
20 class action by signing the
21 settlement agreement with Prudential
22 Securities. Therefore, we request
23 an arbitration possessing knowledge
24 of the law of arbitration. And to
25 that comment on September when we

[Page 22]

1
2        And I think, said Judge Coate,
3  the presentation of the legal issue
4  in those letters is inaccurate and
5  misleading.
6        So we are just -- where does
7  that leave us? I think what it
8  leaves us with is that -- and I'll
9  make it now in an opening statement
10 rather than later on interrupt the
11 testimony -- I object, if I could do
12 it now, to any testimony from Mr.
13 Vaughn.
14       First, on the grounds there is
15 no parole evidence permissible here
16 because the contract is clear and
17 unambiguous.
18       Second, because the whole
19 thrust of his testimony, as Mr.
20 Bortnick describes it, is that he
21 wants to go back to court to
22 litigate his claim. And that has
23 already been adjudged something he
24 cannot do by Judge Coate.
25       Third, it is an integrated

[Page 24]

1
2  went into court, and asked Judge
3  Coate what is going on here, she
4  said a couple of interesting things.
5        She said, first, claimant
6  clearly agreed to arbitration of his
7  claims and I ruled that the
8  arbitration agreement was valid and
9  enforceable, and that legally was
10 not in dispute. In other words,
11 under Judge Coate's ruling there is
12 no -- as a matter of law Mr. Vaughn
13 must arbitrate his individual claim.
14       She then said in connection
15 with the order to show cause you
16 have been given a set of documents
17 that include some of the plaintiff's
18 submissions to the stock exchange
19 and to the NASD including a February
20 and October 28th letter to the stock
21 exchange, and a February 2nd letter,
22 a statement of claim to the NASD,
23 and the August 15, 2006 letter to
24 the NASD, the one I just read from
25 involving the arbitration.

[Page 23]

1
2  agreement as to which parole
3  evidence as to one portion or
4  another portion is prohibited.
5        Fourth, because the standard
6  or the argument that is being -- the
7  evidence that is being offered for,
8  is that Mr. Vaughn did not give a
9  knowing and voluntary waiver of his,
10 quote, right to a class action.
11       Well, the lawyers in the room
12 are familiar with the concept of
13 knowing and voluntary waiver and
14 what it applies to is substantive
15 rights. If I'm going to waive my
16 right to a privilege against
17 self-incrimination, my waiver of
18 that right must be known and
19 voluntary. But there are scores of
20 cases, and we cite them that say
21 that a waiver of a right to class
22 action is simply a waiver of a
23 procedural means by which a
24 substantive right is adjudicated,
25 and that the class action itself is

[Page 25]

[7]  (Pages 22 to 25)

1  not a substantive right.
2  And so, therefore, the
3  standard of knowing involuntary
4  waiver has nothing to do with the
5  enforceability of an arbitration
6  agreement.
7  The argument that the claimant
8  is making here is that he doesn't
9  have to arbitrate his claim, and he
10  is seeking a declaratory judgment
11  from you to that effect. He does
12  not even plead what his claim is.
13  In other words, there is no
14  grievance he brings before you other
15  than that he doesn't want to
16  arbitrate, which is exactly what
17  Judge Coate said he must do.
18  And if you read Judge Coate's
19  September 5th transcript of '06, she
20  warns Mr. Bortnick, she warned Mr.
21  Bortnick that if he failed to file a
22  claim that lacked the underlying
23  grievance here, the grievance
24  alleged in the class action, that

[Page 26]

THE CHAIRMAN:  Perhaps you
were not so offended.
MR. HARPER:  I don't offend
easily, when you have been at this a
while.
THE CHAIRMAN:  Why don't you
move on.
MR. HARPER:  I'm reading from
the judge's statement, page 5 now.
Now should Mr. Vaughn decide
that he doesn't what to submit an
individual claim to the arbitration
proceeding I expect, and I'm not
going to get a ruling on this now
but that he can't get a second bite
at the apple, and I see plaintiff's
counsel nod in agreement, a
forfeiture or waiver rules or res
judicata would apply, and that's it.
He had an opportunity to
arbitrate the claim. Again, we are
playing within our hypothetical, he
didn't arbitrate it and end of the
story. Mr. Bortnick can read into

[Page 28]

Mr. Vaughn would forever waive and
be barred from asserting that claim
and --
MR. BORTNICK:  I'm going to
object. That is not flat-out untrue
what she said. I have never, I
don't think I can remember objecting
to an opening statement but that is
flat-out untrue, and I know what
occurred because she was talking
about an ethical issue and she
wanted to make sure Mr. Vaughn
understood that if he lost in this
forum on this issue and he didn't
submit an individual claim then it
was gone. But it was never about
the fact that if he won in this, it
was always understood he would have
his claim in court and I strongly
object to that.
MR. HARPER: I've never
interrupted an opening statement in
my life, and I thought your
instruction --

[Page 27]

that whatever he wants. I read it,
I think it is pretty clear and so
I'll end as I began.
This is now the fourth or
fifth time I have been in front of
decision makers saying that Mr.
Vaughn promised to arbitrate, and he
is here. And Judge Coate said that
that's why he must arbitrate, it is
legal and enforceable and he must
arbitrate his individual claim.
And what Mr. Bortnick and Mr.
Vaughn are here to solicit from the
panel is a ruling that he need not
do so. And with the utmost respect
to this panel, the panel has no
right to do that.
THE CHAIRMAN:  Thank you, Mr.
Harper.
MS. LEWIS:  Thank you. I
would like to thank you all for your
time today. I would like to start
first directing your attention to
what I hope will be an easily

[Page 29]

[8]  (Pages 26 to 29)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119 Tel: 212-759-6014

1 disposed of matter, and that's the
2 bad faith inclusion of claims
3 against the individual respondent in
4 this proceeding.
5         Separate and apart from the
6 arbitration ruling in the decision
7 by Judge Coate filed on March 20,
8 2006, which is annexed to our
9 submission as Exhibit G by Judge
10 Coate determined that the individual
11 respondents named in this procedure
12 were dismissed from the case not
13 because of the arbitration clause
14 but because of the lack of
15 jurisdiction. And in response to a
16 cross-motion to extend their time to
17 serve these defendants in that
18 matter, the court indicated that the
19 plaintiff had shown a complete
20 disregard and disinterest in getting
21 them in as parties in this action.
22         So whether or not or whatever
23 this panel concludes as to the
24 arbitrability of this matter, these
25
[Page 30]

1 but those individuals should be
2 given all costs that they incurred
3 in defending what was brought from
4 nothing more than intimidation.
5 That's the first part. And again
6 because there has been no opposition
7 to that application, I presume that
8 that looking at this decision,
9 looking at the submissions by the
10 parties, that can be fairly easily
11 determined.
12         The remainder of the
13 application that applies to this
14 declaratory judgment for permission
15 to go back, which would apply
16 against the law firm or potentially
17 and one of the respondents, I
18 certainly join in the able argument
19 that was put forward by Mr. Harper
20 in terms of what has already been
21 determined by Judge Coate. There is
22 a requirement under the law that if
23 we are going to eviscerate an
24 arbitration provision, it has to be
25
[Page 32]

1 respondents cannot be sent back to
2 federal court. With due deference
3 to this panel there is simply no
4 authority for you to overrule the
5 jurisdictional determination of a
6 federal court that there is no
7 jurisdiction over these individuals.
8         That defense was included in
9 the answer served by the individual
10 respondent. It was fully brieved in
11 the moving papers. It was ignored
12 in the opposition by the claimant
13 and required our reply, when not
14 given multiple opportunities no
15 possible basis has or can be
16 advanced for including these
17 individual defendants and they have
18 been dismissed from the federal
19 action in an application for
20 declaratory judgment saying that
21 they can go back to court against
22 them.
23         And I would submit to you that
24 not only should they be dismissed
25
[Page 31]

1 said with positive assurance that
2 the parties did not intend to the
3 matter to be submitted for
4 arbitration.
5         The only thing that we can say
6 with positive assurance in this case
7 is based upon the facts that there
8 is a settlement clause in the
9 settlement agreement that applies to
10 this dispute that requires any claim
11 or controversy regarding the
12 agreement or its interpretation to
13 be determined by arbitration under
14 the rules of either the NASD or the
15 New York State Stock Exchange.
16         Now, any claim or dispute --
17 excuse me, any claim or controversy
18 is self-evident as to its meaning on
19 its face. And any effort to
20 introduce testimony contrary to the
21 clear meaning of any claim or
22 controversy must be arbitrated is
23 impermissible under the standard
24 contract interpretation laws and
25
[Page 33]

[9]  (Pages 30 to 33)

1
2  against established policy which
3  requires positive assurance that
4  something is not included, but we
5  have even more positive assurance
6  here based upon Judge Coate's
7  decision that said no matter what
8  else, the first decision, her
9  statement on the record later on, no
10 matter what else Mr. Vaught's
11 individual claims must be
12 arbitrated.
13      She said there were three
14 other possibilities, as Mr. Bortnick
15 said which all agree that one of
16 them is not likely, that the NSAD
17 will take a class arbitration.
18      The other two options that she
19 recognized as plausible did not
20 include Mr. Vaughn going back on his
21 individual claims.
22      And the next thing that we
23 have positive assurance about and we
24 have it because in their submission
25 Mr. Vaughn stated that his

[Page 34]

1
2  the meaning or even address the
3  meaning of a clear phrase in the
4  contract would make all contracts
5  unenforceable. Because everybody
6  could come in and say, oh, I changed
7  my mind and what I really intended
8  was this or that. It is just here
9  the language is so clear based upon
10 the agreement, which I suggest is
11 the piece of evidence in this case.
12 It would be inappropriate. That's
13 all I have to say right now.
14      THE CHAIRMAN: Thank you, Ms
15 Lewis.
16      We are ready for the
17 presentation of evidence starting
18 with the claimant.
19      MR. BORTNICK: Thank you, I
20 call Mr. Vaughn.
21      MR. HARPER: I take it for
22 the record, Mr. Chair, that you have
23 overruled my objection.
24      THE CHAIRMAN: No, I want to
25 to hear what he has to say before

[Page 36]

1
2  individual claim was identical to
3  and part of the class action claim,
4  that there is nothing that's
5  fictionally out there as a class
6  action that he can go back for, back
7  to court on and still arbitrate as
8  an individual claim because they are
9  one and the same.
10      So clearly what we have, and I
11 think part of the issue here, is
12 that Mr. Vaughn is asking, framing
13 the wrong question, it is not
14 whether, as Mr. Harper suggested
15 there is intentional waiver of the
16 class action but whether or not the
17 parties intended Mr. Vaughn to
18 arbitrate his claims. And that has
19 already been determined, and any
20 parole evidence by Mr. Vaughn or my
21 client Mr. Morelli, would be
22 inappropriate.
23      The phrase is apparent and
24 clear on its face, and to allow any
25 party or their attorney to attack

[Page 35]

1
2  and I also want to hear from the
3  other side. It is not no one has
4  responded to your argument.
5      MR. HARPER: Fine, I beg your
6  pardon.
7      MR. BORTNICK: At this time I
8  think it is probably easier if I
9  just introduce the first three
10 exhibits before we get going with
11 Mr. Vaughn.
12      THE CHAIRMAN: Fine.
13      MR. BORTNICK: Exhibit Number
14 1 is going to be the opinion and
15 order of Judge Coate dated August
16 12, 2005.
17      Exhibit Number 2 is going to
18 be the transcript of the hearing in
19 front of Judge Coate dated September
20 5, 2006.
21      And Exhibit 3 is going to be
22 the settlement agreement between Mr.
23 Vaughn and Prudential dated October
24 1998.
25      MR. HARPER: We have one

[Page 37]

[10] (Pages 34 to 37)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

1  signed by both parties.
2      MR. BORTNICK:  That's fine,
3  we would be happy to do that.
4      MR. HARPER:  Why don't we use
5  that one.
6      MR. BORTNICK:  Okay.
7  J E F F R E Y  S.  V A U G H N,
8  having been first duly sworn by a the
9  Chairman was examined andtestified as
10  follows:
11      (Exhibit Number 1, opinion and
12  order of Judge Coate dated August
13  12, 2005 marked for identification,
14  as of this date.)
15      (Exhibit Number 2, transcript
16  of the hearing in front of Judge
17  Coate dated September 5, 2006 marked
18  for identification, as of this
19  date.)
20      (Exhibit Number 3, settlement
21  agreement between Mr. Vaughn and
22  Prudential Securities, dated October
23  1998 marked for identification, as
24  of this date.)

[Page 38]

J. Vaughn

1      THE CHAIRMAN: I will permit
2  it, overruled.
3      Q.  Start with "I did not."
4      A.  "I did not rule that
5  everything had to be subject to
6  arbitration.  I contemplated, therefore,
7  that the arbitrator in deciding the
8  parties intentions might decide that their
9  agreement to arbitrate does not foreclose
10  the plaintiffs from coming to court and
11  litigating a class action."
12      Q.  If you turn over to page 15 --
13      A.  Yes.
14      Q.  -- and just read the next
15  sentence beginning at line 3 with "but"
16  just the one sentence.
17      A.  "But I think it would be wrong
18  for the defendants to characterize it the
19  way you are today, to suggest that the
20  arbitrators' hands are bound in some way
21  such that they couldn't rule in
22  interpreting the party's intent that the
23  plaintiff has the right to come to court
24  and proceed on a class action."

[Page 40]

J. Vaughn

1  EXAMINATION BY
2  MR. BORTNICK:
3      Q.  Mr. Vaughn, on Exhibit Number
4  2, the transcript, I would like you to
5  turn to page 14.
6      A.  Yes.
7      Q.  Line 19 of the transcript that
8  begins with "I did not," can you read that
9  through the next two sentences?
10      A.  I did not rule --
11      MR. HARPER:  I object.  You
12  can read this as well as the witness
13  is the witness reading what Judge
14  Coate said to the panel.
15      THE CHAIRMAN:  Proceed.
16      MR. BORTNICK:  We just heard
17  here two attorneys telling this
18  panel what the judge said.  I
19  thought it would be a much better
20  idea, it is a much better idea, it
21  is very short let's put it in front
22  of the panel and read it out loud,
23  so everybody can hear it what the
24  judge said why we are here.

[Page 39]

J. Vaughn

1
2      Q.  Thank you.  Mr. Vaughn, now,
3  you had actually filed a class action in
4  court?
5      A.  Yes.
6      Q.  If you turn to Arbitrator's
7  Exhibit 1, is this the amended complaint
8  that you filed in front of Judge Coate?
9      A.  Yes.
10      Q.  And the date of this amended
11  complaint is what?
12      Is there an affidavit of
13  service attached to it?
14      A.  Yes.
15      Q.  When was it served?
16      MS. LEWIS:  Objection.  There
17  has been a legal determination as to
18  the service on various parties.  In
19  fact the legal determination that
20  five of the parties were not served.
21  I do not believe that this witness
22  has any personal knowledge of
23  service of any legal document.
24      MR. BORTNICK:  The only
25  purpose here is to just, so that it

[Page 41]

[11]  (Pages 38 to 41)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

1  is all clear that at the time Judge
2  Coate made these statements on the
3  record, she had in front of her the
4  complaint that Mr. Vaughn had filed
5  a class action complaint and then
6  she thereafter made the statement
7  many times. That's all.
8      THE CHAIRMAN:  We will note
9  that.
10      Q.    Mr. Vaughn, I'm not sure you
11  stated your full name for the record,
12  would you please state your full name.
13      A.    Jeffrey Sherwood Vaughn.
14      Q.    Just very briefly, what's your
15  educational background?
16      A.    Finance at Pace in 1985.
17      Q.    You received what degree?
18      A.    BA in finance.
19      Q.    And there came a time where
20  you became employed by Prudential
21  Securities?
22      A.    That's correct.
23      Q.    When was that?
24      A.    In February of '85.

[Page 42]

J. Vaughn

1  that were done on the floor of the
2  exchange.  Breaks meaning discrepancies
3  between transactions that went on the
4  prior day.  Or like I said up to some
5  point, up until the settlement I was the,
6  one of the key people in making sure the
7  company had no exposure.
8      Q.    This was a back office
9  function?
10      A.    Yes, this was a back office
11  function.
12      Q.    And how long did you remain in
13  this job?
14      A.    For maybe four years I would
15  say.
16      Q.    And then what was your next
17  job?
18      A.    The next job was trade support
19  specialist, which I actually worked on the
20  block trading desk working with the
21  traders and the back office in P&S, and
22  pretty much a liaison between the traders
23  and the floor of the exchange and our
24  Prudential block office.

[Page 44]

J. Vaughn

1      Q.    And what was the firm known as
2  at the time?
3      A.    Pru Bache, I believe.
4      Q.    Prudential Bache?
5      A.    Yes.
6      Q.    Were you licensed in the
7  securities industry at any time such as a
8  Series 7 or any other security license?
9      A.    No.
10      Q.    Have you ever received a
11  security license?
12      A.    No.
13      Q.    What was your first job with
14  Prudential Securities?
15      A.    Operations clerk.
16      Q.    And what did those job
17  responsibilities entail?
18      A.    Pretty much to take care of
19  all back office issues that were
20  pertaining to trades that were done the
21  prior day or any day before the settlement
22  of trades.
23      Q.    Can you give me an example?
24      A.    Pretty much whatever breaks

[Page 43]

J. Vaughn

1      Q.    The block trading desk is a
2  large number of shares being traded at one
3  time?
4      A.    Yes.
5      Q.    For example, 20,000 shares of
6  IBM that would be a block trade?
7      A.    Yes.
8      Q.    A big one?
9      A.    No, a small one.
10      Q.    And this again was a back
11  office function?
12      A.    Yes, it was.
13      Q.    And how long did you remain
14  employed with Prudential?
15      A.    For a total of about 13 years.
16      Q.    When did you leave?
17      A.    In '98 I want to I believe it
18  was November of '98.
19      Q.    Was it before or after you
20  signed Exhibit 3 the settlement agreement?
21      A.    After.
22      Q.    And you stayed with Prudential
23  through all of its name changes?
24      A.    Yes, I did.

[Page 45]

[12]  (Pages 42 to 45)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

J. Vaughn

2  **Q.**   But it was always as a broker
3  dealer?
4  **A.**   Yes.
5  **Q.**   The respondent party here
6  today?
7  **A.**   Meaning.
8  **Q.**   Prudential Financial?
9  **A.**   Now it is Prudential
10 Financial, when I left it was Prudential
11 Securities.
12  **Q.**   Now, did there come a time
13 where you retained the law firm of Leeds
14 Morelli & Brown to represent you?
15  **A.**   Yes, I did.
16  **Q.**   You heard the opening
17 statement from Mr. Harper which said it
18 was January of 1998; does that sound about
19 right?
20  **A.**   That's when I signed the
21 retainer, that's correct.
22  **Q.**   When did you first start
23 talking with Leeds Morelli & Brown?
24  **A.**   Probably back in November the
25 prior year.

[Page 46]

J. Vaughn

2  **Q.**   And just very briefly what was
3  the subject matter that you asked Leeds
4  Morelli & Brown Leeds to represent you in?
5  **A.**   Briefly it was a hostile work
6  environment, a discrimination issue.
7  **Q.**   Were you the only person
8  represented by Leeds Morelli & Brown who
9  were employees of Prudential with respect
10 to this matter?
11  **A.**   No.
12  **Q.**   How many were there?
13  **A.**   Initially it probably started
14 out to be about maybe 50 people and as it
15 went on it ended up to be about 400 or a
16 little more maybe.
17  **Q.**   Over the same issue?
18  **A.**   Yes.
19  **Q.**   Was it your intention at that
20 time to file a lawsuit?
21  **A.**   Yes.
22  **Q.**   Where were you intending to
23 file a lawsuit at that time?
24  **MS. LEWIS:**   At what point in
25 time?

[Page 47]

J. Vaughn

2  **THE CHAIRMAN:**   When he
3  retained Leeds Morelli & Brown to
4  prosecute the discrimination case.
5  **A.**   Meaning where?
6  **Q.**   In court.
7  **A.**   In court.
8  **Q.**   Had you had exposure to the
9  New York Stock Exchange, the NASD or any
10 securities industry arbitration up until
11 that point?
12  **A.**   No.
13  **Q.**   Other than the proceeding we
14 are in today and events that led up to
15 this particular proceeding, have you ever
16 had any exposure to New York State Stock
17 Exchange or NASD arbitration?
18  **A.**   Yes.
19  **Q.**   What was your exposure?
20  **A.**   Well, number one, there was a
21 mediation hearing about my particular case
22 within the rest of the people who had come
23 forward from Prudential.  And then after
24 that there was a -- I had to testify
25 against Tony Carranate who came in and

[Page 48]

J. Vaughn

2  wanted to or I guess he was going after
3  Prudential for whatever reasons and I had
4  to testify against him.
5  **Q.**   In arbitration? He was part of
6  the management?
7  **A.**   He was part of the management.
8  Yes.
9  **Q.**   He was suing Prudential?
10  **A.**   Yes.
11  **Q.**   And you were brought in as a
12 witness for Prudential?
13  **A.**   Yes.
14  **Q.**   Have you ever had any other
15 exposure to the arbitration process?
16  **A.**   No.
17  **Q.**   Now, did there come a time
18 when your case settled?
19  **A.**   Yes.
20  **Q.**   And is Exhibit 3 your
21 settlement agreement?
22  **A.**   Yes, it is.
23  **Q.**   Do you recall when you saw
24 your settlement agreement for the first
25 time?

[Page 49]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119 Tel: 212-759-6014

```
 1          J. Vaughn
 2      A.    Yes, I do.
 3      Q.    When was that?
 4      A.    It was at a fundraiser for
 5  Carl McCall at Tavern on the Green
 6  probably in November of '98.
 7      Q.    Was it the day you signed your
 8  agreement?
 9      A.    Yes, it was.
10      Q.    So I just want to be clear,
11  you saw it for the first time that was the
12  day you signed it?
13      A.    The first time I saw my
14  agreement was in the bathroom of Tavern on
15  the Green that's where I signed it.
16      Q.    You saw it for the first time
17  and signed it in the bathroom at Tavern on
18  the Green?
19      A.    Yes.
20      Q.    Who showed it to you?
21      A.    Jeffrey Brown.
22      Q.    He was one of the partners of
23  Leeds Morelli & Brown?
24      A.    Yes.
25      Q.    What were the circumstances of
                                    [Page 50]
```

```
 1          J. Vaughn
 2  it to some point and just made it clear to
 3  me that this is somewhat of a gag order
 4  for the most part.  Just, you can't say
 5  anything, and you can't come back to
 6  Prudential and go public which I guess at
 7  the time we were trying, we wanted to make
 8  this public.  And they said that if you
 9  sign this you can't go public.  That was
10  the gist of the conversation.
11      Q.    Any other or anything else
12  that you discussed?
13      A.    No.
14      Q.    Just that point?
15      A.    Yes.
16      Q.    If you would take a look at
17  paragraph 14 of your of Exhibit 3 the
18  settlement agreement --
19      A.    Yes.
20      Q.    -- where it where it says
21  arbitration.
22      A.    Yes.
23      Q.    Did you discuss that clause at
24  all with Mr. Brown?
25      A.    No.
                                    [Page 52]
```

```
 1          J. Vaughn
 2  your seeing it in the bathroom?
 3      A.    We were invited there by Leeds
 4  Morelli & Brown to it was a fundraiser for
 5  Carl McCall he was running for New York
 6  State Comptroller, and we were invited and
 7  not only myself but a few other people
 8  were introduced to their settlement
 9  agreements there for the first time.  So I
10  just --
11      Q.    Mr. Vaughn, were you sitting
12  at table and he said here is your
13  agreement?  What were the circumstances.
14      A.    No, again, like I said I saw
15  it for the first time in the men's room.
16      Q.    Where did you sign it?
17      A.    In the men's room.
18      Q.    How long did you review it in
19  the men's room?
20      A.    Briefly, maybe about three or
21  four minutes or five minutes tops.
22      Q.    Was Mr. Brown there with you?
23      A.    Yes.
24      Q.    Did he say anything to you?
25      A.    Pretty much, he just went over
                                    [Page 51]
```

```
 1          J. Vaughn
 2      Q.    Did you have any understanding
 3  of what the arbitration procedures were
 4  under the prevailing constitution of rules
 5  of the New York State Stock Exchange Inc.
 6  or the National Association of Securities
 7  Dealers Inc.?
 8      A.    No, not in totality.
 9      Q.    Did you know whether they had
10  any rules concerning class actions?
11      A.    No, I didn't.
12      Q.    Did you have the intent to
13  waive a class action when you read it?
14      A.    No.
15      Q.    Did you discuss that clause
16  with Mr. Brown?
17      A.    No, not at all.
18      Q.    At the time you signed this
19  agreement, did you believe that you were
20  waiving your rights to bring a class
21  action based upon this agreement?
22      A.    No, and I didn't give it any
23  thought either.
24      MR. BORTNICK:  I have nothing
25  further.
                                    [Page 53]
```

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

| 1 | THE CHAIRMAN: Thank you, |
| 2 | you may proceed. |
| 3 | MR. BORTNICK: Thank you, Mr. |
| 4 | Chairman. |

1    J. Vaughn
2    THE CHAIRMAN:  Thank you,
3  you may proceed.
4    MR. BORTNICK:  Thank you, Mr.
5  Chairman.
6  EXAMINATION BY
7  MR. HARPER:
8    Q.    Good morning, Mr. Vaughn.
9    A.    Good morning.
10    Q.    My name is Gerard Harper, I
11  represent Prudential.
12    A.    Yes.
13    Q.    I take it you have testified
14  before at least once?
15    A.    Yes.
16    Q.    And that was in the
17  arbitration against Mr. Carranate?
18    A.    Yes.
19    Q.    And any other time?
20    A.    No, other than the mediation
21  that we went through with Prudential.
22    Q.    When you say you testified at
23  a mediation were you sworn in?
24    A.    If I remember correctly, yes.
25    Q.    And who was the mediator?
                              [Page 54]

1    J. Vaughn
2    A.    Yes.
3    Q.    How many mediators?
4    A.    I don't remember.
5    Q.    You don't remember the names?
6    A.    No.
7    Q.    Let me show you what your
8  lawyer marked as Panel Exhibit 1 just a
9  moment ago, and if I could direct your
10  attention to paragraph 14.
11    A.    Yes.
12    Q.    Panel Exhibit 1 --
13    THE CHAIRMAN:  Isn't that the
14  amended complaint?
15    MR. HARPER:  Yes.
16    MR. BORTNICK:  It is part of
17  Arbitrator Exhibit 1, it is not
18  Panel Exhibit 1.
19    MR. HARPER:  I'm sorry.
20    Q.    Could you turn to paragraph 14
21  of part of Arbitrator Exhibit 1 --
22    A.    Yes.
23    Q.    -- and read that paragraph 14,
24  page 4?
25    A.    Yes.
                              [Page 56]

1    J. Vaughn
2    A.    I can't tell you that, I don't
3  remember.
4    Q.    Where was it held?
5    A.    It was held in, I want to
6  believe it was the NASDAQ building over
7  here by across the street from I don't
8  know the exact address but it's across the
9  street from New York Plaza.
10    Q.    And who was present?
11    A.    I mean who was present, it
12  would have been Leeds, Morelli myself and
13  the panel.
14    Q.    Was Mr. Leeds and Mr. Morelli
15  there?
16    A.    If I remember correctly, yes,
17  they all were there.
18    Q.    When you say all, you mean
19  Leeds?
20    A.    Morelli and Brown was there.
21    Q.    And you were there?
22    A.    Yes.
23    Q.    Was your wife there?
24    A.    No, my wife wasn't there.
25    Q.    And the mediator was there?
                              [Page 55]

1    J. Vaughn
2    Q.    Can you read that out loud?
3    A.    "Upon information and belief,
4  Leeds Morelli & Brown and the lawyer
5  defendant's without plaintiff's knowledge
6  agreed to cap various claims under their
7  agreement with PSI and refused to press
8  plaintiff's claims until they received
9  payment from PSI which payments were
10  concealed from plaintiff and plaintiff's
11  class."
12    Q.    What is your information and
13  belief to that?
14    A.    I have no idea.
15    Q.    Now, you left Prudential in
16  1998?
17    A.    That's correct.
18    Q.    And why don't you take a look
19  at your settlement agreement which is
20  Exhibit 3?
21    A.    Yes.
22    Q.    And that is your signature on
23  page 4?
24    A.    Yes.
25    Q.    Who wrote the date in there,
                              [Page 57]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

| | |
|---|---|
| J. Vaughn | J. Vaughn |

J. Vaughn

1        J. Vaughn
2  is that your handwriting?
3    A.   I don't know.
4    Q.   Do you recognize that?
5    A.   No.
6    Q.   Do you remember whether that
7  was the date of the McCall fundraiser?
8    A.   Possibly because I believe I
9  left in the early part of November, so
10  that it could possibly be the date.
11    Q.   Well, let's turn to page 1 of
12  Exhibit 3.
13    A.   Yes.
14    Q.   Could you read paragraph 1,
15  the first page?
16    A.   Yes. "Separation from
17  employment, Vaughn's last date of
18  employment at PSI shall be October 23,
19  1998."
20    Q.   Does that refresh your
21  recollection that you signed this
22  agreement after your last day of
23  employment at PSI?
24    A.   No.
25    Q.   Is that statement false?

[Page 58]

1        J. Vaughn
2  was still an employee of Prudential as far
3  as I remember as of October 23.
4    Q.   So you could have been orally
5  notified that your claim had been resolved
6  and understood that your last day was to
7  be October 23, 1998 and then signed the
8  paperwork four days later?
9    A.   I can't say, I don't remember.
10    Q.   You have no reason to doubt as
11  you sit here today that the statements in
12  the document itself are accurate?
13    A.   No, I don't have a reason to
14  doubt it.
15    Q.   Thank you.
16        Now, you mentioned that you
17  retained Leeds & Morelli and your best
18  estimate was January of 1998; do you
19  recall that?
20    A.   Yes.
21    Q.   Did you sign an agreement with
22  Leeds & Morelli?
23    A.   Leeds & Morelli and myself we
24  talked in the latter part of the year
25  before I signed that retainer. So did I

[Page 60]

1        J. Vaughn
2    A.   I don't recall. I don't
3  recall.
4    Q.   But you have no reason to
5  doubt, as you sit here today, that you
6  executed the document on or about October
7  27, 1998 and that your laste date of
8  employment was four days before?
9    A.   No, I don't necessarily agree
10  with that.
11    Q.   If you don't agree with that,
12  then tell me what is in your mind that
13  makes you doubt the authenticity and
14  accuracy of the document?
15    A.   Because when I left Prudential
16  before I had anything in writing stating
17  what my last day was, I got a call from
18  Leeds Morelli & Brown at the job 4 o'clock
19  in the afternoon -- and I remember this
20  clearly -- they said if you choose to, you
21  do not have to go back to Prudential
22  anymore we have X, Y and Z for you, that's
23  it. You let us know what you want to do.
24        And that's what I remember.
25  It could have been that day, but clearly I

[Page 59]

1        J. Vaughn
2  sign a retainer when I first was
3  introduced to them, no, this took about a
4  month or so before I did.
5       MR. BORTNICK:  Would you
6  read back the question, please.
7       (A portion of the record was
8  read.)
9    Q.   Yes?
10    A.   Yes.
11    Q.   Let me show you a document
12  that will be marked as whatever you want
13  to mark it as?
14       MR. BORTNICK:  Respondents'
15  Exhibit 1.
16       MR. HARPER:  That's fine.
17       (Respondents' Exhibit 1,
18  agreement marked for identification,
19  as of this date.)
20    Q.   You weren't fired by
21  Prudential, correct?
22    A.   No.
23    Q.   I'm incorrect?
24    A.   No, I wasn't fired by
25  Prudential.

[Page 61]

[16]  (Pages 58 to 61)

```
 1              J. Vaughn
 2     Q.    You left voluntarily?
 3     A.    Yes.
 4     Q.    And now, when you initially
 5   retained Leeds Morelli, it was for the
 6   purpose of negotiating a settlement with
 7   PSI; isn't that right?
 8     A.    No, that is not right.
 9     Q.    When you signed the retainer
10   agreement with Leeds Morelli, you did so
11   to retain them to negotiate settlement
12   with PSI, correct?
13     A.    No.
14     Q.    Look at the first paragraph of
15   paragraph 1.
16     A.    Yes.
17     Q.    And let me rephrase the
18   question for you.
19     A.    Yes.
20     Q.    You say you met with Leeds
21   Morelli sometime in November --
22     A.    Yes.
23     Q.    -- of what I guess was '97.
24     A.    Yes.
25     Q.    Did you call them or did they
                              [Page 62]
```

```
 1              J. Vaughn
 2     Q.    And then you subsequently
 3   executed a retainer agreement with Leeds
 4   Morelli, correct?
 5     A.    That's correct.
 6     Q.    And in that retainer agreement
 7   the first thing that Leeds Morelli
 8   promised to do was to negotiate a
 9   settlement with PSI on your behalf,
10   correct?
11     A.    I don't know that.
12     Q.    Read paragraph 1 of the
13   retainer agreement.
14     A.    "The retainer will only
15   include the contacting of employee to seek
16   a negotiated settlement."
17     Q.    Stop for a minute.  Is there
18   any word in that sentence you don't
19   understand?
20     A.    No.
21     Q.    And so the retainer agreement
22   in the first instance was only to contact
23   PSI to seek a negotiated settlement,
24   correct?
25     A.    According to the retainer,
                              [Page 64]
```

```
 1              J. Vaughn
 2   call you?
 3     A.    I didn't call them.  I was
 4   referred to them by another colleague who
 5   had already retained them.
 6     Q.    Who?
 7     A.    Connie Hernandez.
 8     Q.    And what did Ms. Hernandez say
 9   to you and what did you say to her?
10     A.    Connie expressed to me that
11   she knew I was looking for a lawyer as
12   well because of the issues that were going
13   on at Prudential, and I wanted to do
14   something about it.
15          So Connie told me she already
16   had a lawyer that she had signed a
17   retainer for, she said they were good and
18   that maybe it would be better that I join
19   them rather than have an individual,
20   another lawyer, and not have the esteem it
21   would be if you had more than one person
22   being retained by a particular firm.
23     Q.    And that happened in around
24   November of?
25     A.    November, December of '97.
                              [Page 63]
```

```
 1              J. Vaughn
 2   yes.
 3     Q.    And then if you would read the
 4   second sentence, please.
 5     A.    "If legal action is required
 6   then the parties will discuss a different
 7   financial situation."
 8     Q.    So the first task that you
 9   gave Leeds Morelli was to go seek a
10   settlement of your claims?
11     A.    In correct.
12     Q.    Well --
13     A.    Whatever this says here is one
14   thing, I'm telling you that is incorrect.
15     Q.    So this contract means nothing
16   too?
17     A.    I didn't say it doesn't mean
18   anything.  You are asking me, and I'm
19   being totally honest with you, no, that is
20   not the case.
21     Q.    You didn't understand it when
22   you read it?
23     A.    You got to -- okay.
24     Q.    Did you understand?
25     A.    Yes, I understood.
                              [Page 65]
```

[17]  (Pages 62 to 65)

| | |
|---|---|
| 1        J. Vaughn | 1        J. Vaughn |
| 2    Q.   Did you read it? | 2  sentence. |
| 3    A.   Yes. | 3    A.   "All parties have read this, |

1        J. Vaughn
2    Q.    Did you read it?
3    A.    Yes.
4    Q.    Did you read it in the men's
5 room or somewhere else?
6    A.    I don't remember where I read
7 it.
8    Q.    Did you read it in their
9 office?
10    A.    I don't remember.
11    Q.    Have you ever been to their
12 office?
13    A.    Yes.
14    Q.    How many times?
15    A.    I don't recall.
16    Q.    And you read this before you
17 signed it?
18    A.    Yes.
19    Q.    And you understood it?
20    A.    I understood the agreement
21 that I had with Leeds & Morelli, again.
22    Q.    Now, let's go back to
23 paragraph 6 --
24    A.    Yes.
25    Q.    -- read that out loud.
                                    [Page 66]

1        J. Vaughn
2 sentence.
3    A.    "All parties have read this,
4 understood each and every term herein, and
5 the signature below constitutes an
6 acknowledgement of such an understanding."
7    Q.    Now do you understand all the
8 words there?
9    A.    Clearly.
10    Q.    Was that true when you signed
11 it, when you promised and acknowledged
12 that all, that you read it understood it;
13 was it true at the time?
14    A.    No.
15    Q.    It was false?
16    A.    Yes.
17    Q.    So you lied when you signed
18 your name to this contract?
19    A.    I didn't lie no more than the
20 person who signed above my name.
21    Q.    Was paragraph 7 true or false
22 when you signed it?
23    A.    I believe I just answered that
24 question.
25    Q.    Tell it to me again.
                                    [Page 68]

1        J. Vaughn
2    A.    "There are no other agreements
3 between the parties other than those
4 contained here in this agreement
5 represents the entire understanding of the
6 parties."
7    Q.    Is there any word or phrase in
8 that sentence or paragraph that you do not
9 understand?
10    A.    I understand it clearly.
11    Q.    You understand it clearly?
12    A.    Yes.
13    Q.    So whatever agreement you had
14 with Leeds & Morelli as of January 5, 1998
15 was in these two pages, right?
16    A.    According to this, yes.
17    Q.    According to this?
18    A.    Yes.
19    Q.    And so there was no other
20 contract between you?
21    A.    Again, do you want to talk
22 about what is on paper or do you want to
23 talk about what we agreed upon?
24    Q.    You see I can only talk about
25 what is on paper. Let's read the next
                                    [Page 67]

1        J. Vaughn
2    A.    No. When you asked him to
3 repeat the question, could you repeat the
4 answer --
5        THE CHAIRMAN:  Mr. Vaughn,
6 answer the question, please.
7    A.    The answer is yes again.
8    Q.    It is false?
9    A.    Yes.
10    Q.    And number 6 is false too?
11    A.    That is correct.
12    Q.    And number 1 is false too?
13    A.    That's correct.
14    Q.    Is there anything in
15 Respondents' Exhibit 1 that is true?
16    A.    Yes, I retained them.
17    Q.    That's it?
18    A.    That's it.
19    Q.    And you read an understood the
20 agreement, but it was a false agreement
21 you knew it to be false at the time you
22 signed it?
23    A.    Again, I understood the
24 agreement. I understood what's in the
25 agreement. Again, Leeds & Morelli as wel
                                    [Page 69]

[18]  (Pages 66 to 69)

J. Vaughn

1    J. Vaughn
2    as myself and everybody else who was
3    involved in this were under different
4    perceptions or different interpretations
5    of what was going to happen with this
6    particular situation.
7        Now, what's on paper is one
8    thing.  That is the only thing right now
9    we can sit here and say we know to be true
10   that's what was put on paper.  However,
11   there were other things that went on that
12   were discussed and totally a lot of this
13   stuff is maybe past the limitations of
14   even going into any further, but the fact
15   of the matter is I'm telling you as well
16   as everybody else in here that this may be
17   a statement in truth, but it's not a true
18   statement.
19       Q.    All I wanted from you was did
20   you sign the document that you knew was
21   false at the time?
22       A.    I answered that.
23       Q.    And you did that's what you
24   did, right?
25       A.    Yes.

[Page 70]

1    J. Vaughn
2        Q.    Now, and you don't remember
3    where you were when you signed this
4    document?
5        A.    No.
6        Q.    Do you know who was present?
7        A.    No.
8        Q.    Now, no one from PSI was
9    present when you signed this document?
10       A.    Absolutely not.
11       Q.    And PSI had absolutely nothing
12   to do with your selection of counsel?
13       A.    No, they didn't have anything
14   to do with it.
15       Q.    That was somebody you chose on
16   your own?
17       A.    Yes.
18       Q.    Based on recommendation from
19   Ms. Hernandez?
20       A.    That's correct.
21       Q.    You gave to Leeds & Morelli a
22   calculation of your injuries and damages
23   which you computered to equal $200,000,
24   correct?
25       A.    Actually it was computed to be

[Page 71]

1    J. Vaughn
2    more, but we don't have that in our
3    paperwork here today but, yes, it was
4    more.
5        Q.    It was more?
6        A.    Yes.
7        Q.    Let me take a look then.  Let
8    me mark as Respondents' Exhibit 2, a
9    five-page document.
10       (Respondents' Exhibit 2 a
11       five-page document marked for
12       identification, as of this date.)
13       Q.    Can you identify Respondents'
14   Exhibit 2 for me, Mr. Vaughn?
15       A.    Yes.
16       Q.    What is it?
17       A.    This is a document stating
18   what we were looking for in damages and
19   basically my complaint to Prudential.
20       Q.    And do you see on page 3 where
21   it says back pay damage estimated
22   $200,000?
23       A.    Yes.
24       Q.    Were they your estimated
25   damages at the time?

[Page 72]

1    J. Vaughn
2        A.    These were estimated based on
3    conversations that I had specifically
4    with -- in the counsel at the time, but
5    your answer is yes.
6        Q.    Did anybody ever tell you that
7    your lawyer stood up in front of Judge
8    Coate and said you had no damages on your
9    underlying claims as opposed to your
10   theory of the class action?
11       A.    No.
12       Q.    Nobody told you that?
13       A.    No.
14       Q.    So the first time you read the
15   transcript of February 5, 2006 when Mr.
16   Bortnick asked you to read it out loud, is
17   the first time you saw that today?
18       A.    Yes.
19       Q.    So he hadn't shown you that
20   before?
21       A.    I have seen it.
22       Q.    Turn to -- you have seen it?
23       A.    Yes.
24       Q.    Have you read it?
25       A.    Yes, I read it.  You asked me

[Page 73]

[19]  (Pages 70 to 73)

J. Vaughn

1  is this the first time I have seen it, I
2  said, no, I have seen it.
3      Q.    When did you see it?
4      A.    Whenever they mailed me a copy
5  of everything that we have gone through
6  thus far.
7      Q.    Okay. So turn to page 7 --
8      A.    Yes.
9      Q.    -- and if you will refer to
10  line 11?
11      A.    Yes.
12      Q.    Could you read the sentence to
13  the rest of paragraph beginning with "Mr.
14  Vaughn"?
15      A.    "Mr. Vaughn, when he settled
16  his original case with Prudential with
17  Leeds & Morelli representing him, a piece
18  of paper that said: I think these are my
19  damages is a certain amount, and
20  Prudential agreed to pay that certain
21  amount to Mr. Vaughn less, of course, the
22  contingency portion that went to Leeds
23  Morelli & Brown."
24      Q.    And if you go to page 9, line

[Page 74]

J. Vaughn

1  mediation. I do recall showing up at
2  mediation and based on what I had to say
3  they were going to assess what amount
4  would be what they would consider a
5  settlement.
6      Q.    And that amount just happened
7  to coincide with your estimate of what
8  your actual damages were?
9      A.    Yes.
10      Q.    And you got the $200,000,
11  right?
12      A.    Yes.
13      Q.    And you got the Cobra payments
14  on your behalf for six months, right?
15      A.    I don't recall.
16      Q.    You don't remember --
17      A.    I don't recall.
18      Q.    -- whether you got that
19  benefit out of the contract?
20      A.    I don't recall.
21      Q.    But you got those things
22  without having to go to court, right?
23      A.    Yes.
24      Q.    So you got what you asked for

[Page 76]

J. Vaughn

1  3, after the words "Mr. Bortnick." Could
2  you read the first paragraph there?
3      A.    "The court" --
4      Q.    No, after the words "Mr.
5  Bortnick."
6      A.    "Mr. Vaughn did not have any
7  intention to bring a one-on-one
8  arbitration because he has a damages issue
9  here and he understands that."
10      Q.    Do you know what Mr. Bortnick
11  was talking about?
12      A.    I have to read the rest of
13  this to understand that but, no, to answer
14  the question, just reading that one
15  sentence, no.
16      Q.    The fact is you submitted a
17  claim in mediation for $200,000; that's
18  the claim you submitted in mediation,
19  right?
20      A.    No.
21      Q.    You submitted a larger claim
22  in mediation?
23      A.    We went to mediation I don't
24  recall ever submitting any numbers to

[Page 75]

J. Vaughn

1  without having to go to court and without
2  having a hearing like this, nobody was
3  cross examining you, were they?
4      A.    No.
5      Q.    And there were no judges
6  there?
7      A.    No.
8      Q.    No juries there?
9      A.    Not that I recall.
10      Q.    And you got 100 percent of
11  what you asked for?
12      A.    Yes.
13      Q.    And you were asserting an
14  individual claim, a claim unique to you,
15  correct?
16      A.    Correct.
17      Q.    Not on behalf of a class, if
18  you will, right?
19      A.    That's correct.
20      Q.    What is a class action?
21      A.    A class action is a group of
22  people coming together for one specific
23  issue for a common cause that would be a
24  class action in my view.

[Page 77]

[20]  (Pages 74 to 77)

J. Vaughn

1
2     Q.    Did you know what a class
3 action was back in 1998?
4     A.    Again, that's probably I would
5 have thought the same thing.
6     Q.    Now, are you being paid to be
7 a plaintiff in this action?
8     A.    No, I'm not.
9     Q.    When is the first time the
10 thought occurred to you to file a class
11 action against my client and others?
12     A.    When I realized that from what
13 I believed is that the actual agreement
14 that I signed was when I found out they
15 had a relationship with Prudential for
16 whatever reasons, and that wasn't made
17 known to me under confidentiality I would
18 think of your client, then I thought at
19 that point, hey, Prudential paying you and
20 you are taking money from me. I think
21 that there's something wrong with this,
22 and that's when I decided to pursue it.
23     Q.    I asked you one question and I
24 said "when" not what, "when"?
25     A.    I don't remember.

[Page 78]

J. Vaughn

1
2     A.    Yes.
3     Q.    That is when the thought first
4 occurred to you?
5     A.    Yes.
6     Q.    And yet you filed a class
7 action in October of 2004?
8     A.    Okay.  Well, I could be off
9 but it had to be after 2004 or about
10 around 2004.
11     Q.    So it wasn't after 2004 it was
12 in 2004?
13     A.    Okay.
14     Q.    How long before you filed a
15 class action?
16     A.    I don't remember.  I don't
17 remember.
18     Q.    Now, whose idea was it to file
19 a class action?
20     A.    Whose idea?
21     MR. BORTNICK:    I will object
22 to the extent that if Mr. Vaughn had
23 an attorney at the time that he
24 should not reveal the substance of
25 the attorney-client communications.

[Page 80]

J. Vaughn

1
2     Q.    Was it --
3     MR. BORTNICK:  I will object
4 in terms of the tone here from Mr.
5 Harper.  If he can ask the same
6 question without the tone.
7     THE CHAIRMAN:    It is cross.
8     Q.    All I asked you is when?
9     A.    I don't remember.
10     Q.    You don't remember?
11     A.    No.
12     Q.    Was it in 1999?
13     A.    I don't remember.
14     Q.    So it could have been 1999?
15     A.    No, I don't remember.  I don't
16 recall.
17     Q.    You don't recall?
18     A.    No.
19     Q.    Do you recall how long it was
20 before you commenced the class action?
21     A.    It would have had to have been
22 after 2004.
23     Q.    After 2004?
24     A.    Yes.
25     Q.    So 2005?

[Page 79]

J. Vaughn

1
2     THE CHAIRMAN:  Fine.
3     MR. BORTNICK:    I wasn't Mr.
4 Vaughn's counsel at the time.  But
5 if he had other counsel.
6     Q.    Whose idea was it?
7     A.    Again, when this was brought
8 to my attention?
9     Q.    By whom?
10     A.    By Connie Hernandez.
11     Q.    Connie Hernandez brought it to
12 your attention?
13     A.    Yes.  Then I decided to go
14 forward with it.  When that time was I
15 don't recall.  It had to be somewhere
16 around 2004, and my reason for saying that
17 is because prior to that I spent from 2000
18 to 2003 working in Atlanta for Citigroup.
19 So when I got back up here is when this
20 all surfaced.
21     A.    Who do you work for now?
22     A.    I work for Bloomberg.
23     Q.    What did Mr. Hernandez say to
24 you and you say to her?
25     A.    I don't remember the exact

[Page 81]

[21]  (Pages 78 to 81)

| | |
|---|---|
| 1       J. Vaughn | 1       J. Vaughn |
| 2 conversation. | 2 friends you mentioned it to? |
| 3     **Q.**   Did she mention a lawyer's | 3     **A.**   No. |
| 4 name? | 4     **Q.**   How about Ms. Hernandez? |
| 5     **A.**   She mentioned Angela Roper, | 5     **A.**   Ms. Hernandez is a very good |
| 6 yes. | 6 friend. |
| 7     **Q.**   And did you call Angela Roper | 7     **Q.**   You mentioned to her you were |
| 8 or did she call you? | 8 unhappy that you got 100 percent of what |
| 9     **A.**   I called her. | 9 you asked for in the PSI settlement? |
| 10    **Q.**   And had Ms. Hernandez retained | 10    **A.**   Again, some of the things that |
| 11 Ms. Roper? | 11 we are talking about here are not stated |
| 12    **A.**   I don't know. | 12 in this because these were things that, |
| 13    **Q.**   And you have no recollection | 13 number one, were either too old to talk |
| 14 whatsoever what Ms. Hernandez said to you | 14 about or they are not on paper. |
| 15 in prompting you to make a call to Ms. | 15      The things that I was unhappy |
| 16 Roper? | 16 with, if I must go into detail about them, |
| 17    **A.**   No? | 17 was Leeds & Morelli told me that, hey, you |
| 18    **Q.**   Who is Ms. Roper? | 18 would be getting when you -- |
| 19    **A.**   My other attorney. | 19     MR. HARPER:  I have to |
| 20    **Q.**   Mr. Thyne's partner? | 20 interrupt the witness, this is |
| 21    **A.**   Yes. | 21 cross-examination. |
| 22    **Q.**   Now, let's go to the | 22     MR. BORTNICK:  The question |
| 23 settlement agreement? | 23 was, what were different -- |
| 24    **A.**   Yes. | 24     THE CHAIRMAN:  Hold on, one |
| 25    **Q.**   Between the time Mr. Hernandez | 25 at a time. |
|                  [Page 82] |                  [Page 84] |
| 1       J. Vaughn | 1       J. Vaughn |
| 2 spoke to you in about 2004 and the -- | 2     MR. HARPER:  If you read it |
| 3 between the time you signed your | 3 back the question is what did you |
| 4 settlement agreement in October 1998 and | 4 say to Ms. Hernandez. |
| 5 when you spoke to Mr. Hernandez at some | 5     THE CHAIRMAN:  Read it back. |
| 6 point, had you ever expressed unhappiness | 6    (A portion of the record was |
| 7 about your settlement agreement with | 7 read.) |
| 8 Prudential? | 8     THE CHAIRMAN:  Let me say one |
| 9    **A.**   Yeah. | 9 thing. Mr. Vaughn, do not make any |
| 10    **Q.**   To whom? | 10 assumptions that something is too |
| 11    **A.**   I mean it was just to family | 11 old for us to hear. If counsel has |
| 12 and friends for the most part, nobody | 12 some objection based on time to what |
| 13 legally. | 13 you are going to say they will make |
| 14    **Q.**   Did you ever complain to Leeds | 14 it, but don't make that assumption |
| 15 & Morelli? | 15 yourself. Don't screen yourself |
| 16    **A.**   No. | 16 from saying something you think is |
| 17    **Q.**   Did you ever complain to PSI? | 17 irrelevant. Okay. |
| 18    **A.**   No. | 18     THE WITNESS:  Fine. |
| 19    **Q.**   So other than family or | 19    **Q.**   Yes or no? |
| 20 friends -- what members of your family? | 20    **A.**   It is not yes or no. I did |
| 21    **A.**   I don't remember it was just | 21 not mention to her that I was content that |
| 22 family, just friends. | 22 I got 100 or upset I got 100 percent. It |
| 23    **Q.**   Your wife? | 23 was not 100 percent. 100 percent would |
| 24    **A.**   It wasn't my wife at the time. | 24 have been the job working for DOW, which |
| 25    **Q.**   Do you remember any of the | 25 was Discrimination on Wall Street, which |
|                  [Page 83] |                  [Page 85] |

[22]  (Pages 82 to 85)

J. Vaughn

1  J. Vaughn
2  is a company that Leeds & Morelli as well
3  as the people at Prudential had put
4  together for this purpose.
5      MS. LEWIS:  Objection.
6  A.    On top of that, which I have
7  documentation for and I don't have it with
8  us, but they also said that, hey, Jeff,
9  you are going to get out of this deal you
10 will get $200,000 you will have a job
11 working with DOW and you will get
12 long-term disability.  And I was going to
13 their counselors for the purpose of this
14 disability which never took place -- which
15 never took place as well as they took 1
16 percent of what -- or something along
17 those lines of the what I settled for for
18 purposes of DOW.
19     So in other words I was buying
20 into the company so I would have a job and
21 work for and none of that existed.  Again,
22 this is not on paper, this is something
23 that we agreed upon and these are things
24 that can be shown.
25     MS. LEWIS:  Can I note my
[Page 86]

J. Vaughn

1      objection for the record.  We have
2  been told time and again by every
3  counsel here that we were not going
4  into the merits of these claims, all
5  of which Leeds & Morelli denies.
6  And this testimony regarding DOW or
7  promises by Leeds & Morelli is not
8  only -- there's documents that exist
9  that aren't here.  I mean this has
10 no relevancy.  Even if it could be
11 proved to what is being discussed
12 here regarding the intentions of Mr.
13 Vaughn regarding when he signed the
14 agreement that said he will
15 arbitrate the claim.
16     MR. BORTNICK:  I want to
17 largely agree what we said, but what
18 can be proved, certainly not today,
19 but I certainly agree with what this
20 hearing was about, it was elicited
21 on cross-examination.  So I didn't
22 think it was my place to object, but
23 I do agree this is about what, as
24 she said, I think almost a direct
[Page 87]

J. Vaughn

1      quote what Mr. Vaughn's intentions
2  were at the signing of the
3  settlement agreement, that's the
4  sole issue I agree with her and
5  whether this DOW was right or wrong
6  or whatever is not part of this
7  hearing.
8      MS. LEWIS:  Respectfully,
9  part of the problem here was this
10 door was opened on direct when Mr.
11 Bortnick went well beyond, this is
12 the agreement did you sign it, did
13 you mean to sign it.  So he asked
14 about his qualifications and
15 experience and Mr. Harper
16 understandably is trying to follow
17 up on it, but at some point when we
18 start getting to the full measure of
19 the claims we have to object.
20     MR. HARPER:  I actually would
21 only say that Mr. Vaughn can talk
22 all he wants, but I think it all
23 should be stricken.  I think he is
24 not answering the exact question
[Page 88]

J. Vaughn

1      that I ask and on cross-examination
2  I would ask for instruction that he
3  listen to the question I ask and
4  answer only that question because if
5  you look at the questions I'm asking
6  as opposed to the answers I'm
7  getting, they all go to whatever
8  issue Mr. Bortnick and Ms. Lewis
9  think are an issue here.
10     THE CHAIRMAN:  Ms. Lewis'
11 objection is overruled.  Mr. Vaughn
12 is to answer the question.  However,
13 there's no reason why Mr. Vaughn has
14 to accept your characterization of
15 something that happened, if he
16 disagrees with it, if there is an
17 assumption built into your question
18 and he does not accept that
19 assumption, he can make that known.
20     MR. HARPER:  Fair point.
21 Q.    By the way, you just talked
22 about all these promises that were made to
23 you that aren't on paper, none of them
24 were made by Prudential, correct?
[Page 89]

| | |
|---|---|
| 1            J. Vaughn | 1            J. Vaughn |

```
 1               J. Vaughn
 2      A.      Correct.
 3      Q.      Let's go to the settlement
 4  agreement.
 5      A.      Yes.
 6      Q.      And start with paragraph 16
 7  because I want to to go over it with you
 8  carefully.
 9      A.      Yes.
10      Q.      Let's take it one sentence at
11  a time, Mr. Vaughn --
12      A.      Yes.
13      Q.      -- paragraph 16.
14      A.      Yes.
15      Q.      "Voluntary execution," let's
16  read the first sentence out loud.
17      A.      "Vaughn acknowledges that he
18  has carefully read this agreement and
19  understands all of its terms including the
20  full and final release of claims set forth
21  above.
22      Q.      Is there anything in that
23  sentence that you do not understand?
24      A.      No.
25      Q.      Is there anything in that
                                    [Page 90]
```

```
 1               J. Vaughn
 2  correct?
 3      A.      Yes.
 4      Q.      The next phrase.
 5      A.      "That he has not relied upon
 6  any representation or statement written or
 7  oral not set forth in this agreement."
 8      Q.      Is there anything about that
 9  sentence that you do not understand?
10      A.      Pretty much the whole thing.
11      Q.      You don't understand any of
12  it?
13      A.      No.
14      Q.      And what word don't you
15  understand?
16      A.      Anything that I just read in
17  that sentence there I do not understand.
18      Q.      Do you understand what the
19  word "relied" means?
20      A.      Yes.
21      Q.      What does it mean?
22      A.      Depended upon.
23      Q.      Do you understand what the
24  word "representation of statement" means?
25      A.      Yes.
                                    [Page 92]
```

```
 1               J. Vaughn
 2  sentence that you did not understand at
 3  the time?
 4      A.      No.
 5      Q.      Is there anything in that
 6  sentence that was false at the time you
 7  signed the agreement?
 8      A.      No.
 9      Q.      Let's do the second sentence,
10  and this is a little longer one, so maybe
11  we will break it down by semicolons. But
12  let's read the first part of the sentence
13  up to the first semicolon.
14      A.      "Vaughn further acknowledge
15  that he has voluntarily entered into this
16  agreement."
17      Q.      Is there anything about that
18  phrase you do not understand?
19      A.      No.
20      Q.      And you understood it clearly
21  at the time you signed the agreement,
22  correct?
23      A.      Yes.
24      Q.      And that statement is true
25  when you went into the agreement; is that
                                    [Page 91]
```

```
 1               J. Vaughn
 2      Q.      What does it mean?
 3      A.      Representation of someone who
 4  is being represented.
 5      Q.      A fact or statement?
 6      A.      Yes.
 7      Q.      "Written or oral," do you
 8  understand those words?
 9      A.      Yes.
10      Q.      And "not set forth in this
11  agreement"?
12      A.      That I don't understand.
13      Q.      So let's break it down that
14  you have not depended upon any statement
15  of the fact whether in writing or oral
16  that isn't in the agreement?
17      A.      No.
18      Q.      No, what does it mean?
19      A.      Well, because you said it says
20  here: Any representation or statement
21  written or oral, what is meant by oral?
22      Q.      You tell me. Do you
23  understand what the word "oral" means?
24      A.      I know what the word "oral"
25  means as it pertains to this statement.
                                    [Page 93]
```

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

1     J. Vaughn
2     Q.     What does the word "oral"
3     mean?
4     A.     I'm asking you.
5     Q.     One of the good things and bad
6     things about being a lawyer is that I get
7     to ask the questions. So what does the
8     word "oral" mean to you in everyday life?
9     A.     Verbal.
10    Q.     In other words not written
11    down but talked?
12    A.     Yes.
13    Q.     So we understand what the word
14    "oral" means?
15    A.     Exactly.
16    Q.     So now tell me what in this
17    sentence fragment you do not understand?
18    A.     I don't understand again where
19    it says: That he has not -- that he has
20    not relied upon any representation or
21    statement written or oral not set forth in
22    this agreement.
23          There were things that were
24    said orally that are not in this
25    agreement.

[Page 94]

J. Vaughn

1     J. Vaughn
2     minutes ago that it was accurate and true,
3     that you had carefully read and understood
4     all the terms of the contract and now you
5     are telling me two fragments later that
6     you didn't understand what that fragment
7     meant.
8     A.     I'm telling you two fragments
9     later that I did not understand all of the
10    terms. I understood what the contract
11    represented, I did not all of the terms in
12    the contract is what I'm saying.
13    Q.     Read the next sentence
14    fragment.
15    A.     "That the only consideration
16    for signing this agreement is as set forth
17    herein."
18    Q.     Do you know what that means?
19    A.     No.
20    Q.     Do you know what
21    "consideration" is in a contract?
22    A.     Yes, I know what consideration
23    is.
24    Q.     What is it?
25    A.     (No response.)

[Page 96]

J. Vaughn

1     J. Vaughn
2     Q.     On which you relied?
3     A.     Yes.
4     Q.     But you just told me that the
5     first sentence was true and that you
6     understood it to be true at the time,
7     which is that you understood all of its
8     terms?
9     A.     I'm not going to say I
10    understood all of its terms.
11    Q.     You are changing the testimony
12    you gave me five minutes ago?
13    A.     I'm not changing my testimony,
14    I'm telling you I did not understand all
15    of the terms included in this. I'm not a
16    lawyer.
17    Q.     But you said a few -- I
18    understand you are not a lawyer, but you
19    signed a contract.
20    A.     I understand.
21    Q.     And you are trying against
22    Prudential to get around the contract, and
23    I'm trying to focus on the promises you
24    made to my client when you signed the
25    contract. And you told me not five

[Page 95]

J. Vaughn

1     J. Vaughn
2     Q.     Let me help you. Is it fair
3     to say that your understanding of the word
4     "consideration" is the promises that
5     Vaughn makes to PSI and the promises that
6     PSI makes to Vaughn in a contract that is
7     consideration and exchange of
8     consideration?
9     A.     I can see that, but that's not
10    what I would interpret it as.
11    Q.     You tell me what you interpret
12    it as.
13    A.     I don't understand this the
14    way it is being represented here.
15    Q.     I thought you just told me you
16    knew what consideration is?
17    A.     Again, you are going to ask me
18    about a word or are you going to ask me
19    about a message fragment?
20    Q.     Consideration in the context
21    of this agreement; do you know what it
22    means?
23    A.     No.
24    Q.     So that's another sentence
25    that you acknowledge that you don't

[Page 97]

[25]  (Pages 94 to 97)

| | J. Vaughn |
|---|---|
| 1 | J. Vaughn |
| 2 | understand the terms? |
| 3 | A. Right. |
| 4 | Q. Even though you told me you |
| 5 | did understand all the terms? |
| 6 | A. Again, I understand what or |
| 7 | understood what the contract represented. |
| 8 | I did not understand all of the terms in |
| 9 | the contract. |
| 10 | Q. What did this contract, this |
| 11 | contract, the written contract, what did |
| 12 | it represent? |
| 13 | A. What it represented to me was |
| 14 | that Prudential -- I have agreed to settle |
| 15 | with Prudential on X amount of dollars, |
| 16 | and that was it, that's what that means to |
| 17 | me. |
| 18 | Q. Did you give anything to |
| 19 | Prudential for that $200,000? |
| 20 | A. What do you mean did I give |
| 21 | anything to them. |
| 22 | Q. Did you make any promises to |
| 23 | Prudential? |
| 24 | A. That the only thing that I |
| 25 | promised was that it wouldn't be something |

[Page 98]

1 J. Vaughn
2 that would go to the news.
3    Q. That's it?
4    A. That was it.
5    Q. All right. Well, let's go
6 back to the first page of the contract --
7    A. Yes.
8    Q. -- of the settlement
9 agreement.
10    A. Yes.
11    Q. And in paragraph 4 it reads:
12    "Vaughn hereby releases and
13 discharges PSI, its parents, divisions,
14 subsidiaries and affiliations and their
15 current and former directors, officers,
16 shareholders, agents and employees and
17 each of their predecessors, successors and
18 assigns, hereinafter the company, from any
19 and all claims and causes of action except
20 for the benefits specifically set forth in
21 this agreement arising out of or relating
22 to Vaughn's employment or separation from
23 employment." Do you see that?
24    A. Yes.
25    Q. Isn't that a promise that you

[Page 99]

1 J. Vaughn
2 made to PSI in this agreement? You gave
3 PSI a release from all claims and causes
4 of action; do you see that?
5    A. Yes.
6    Q. And yet having released all
7 those claims you are bringing a new one?
8    A. Yes.
9    Q. And if you go down and it
10 says: "That the release covers any claims
11 that you ever had or may hereafter have,
12 whether known or unknown" -- this is the
13 last line -- "suspected or unsuspected up
14 to and including the date of this
15 agreement." Do you see that?
16    A. Yes.
17    Q. Is there anything in there you
18 don't understand?
19    A. I pretty much understand that.
20    Q. And then on the top of page 2
21 it says: Vaughn further agrees, promises
22 and covenance, that to the maximum extent
23 permitted by law neither he" that means
24 you "for any person organization or other
25 entity acting on his behalf, has or will

[Page 100]

1 J. Vaughn
2 file, charge, claim, sue or cause to be or
3 permit to be filed, charge or claim any
4 actions for damages or other relief -- "
5 do you see that?
6    A. Yes.
7    Q. -- "against the company" --
8    A. Yes.
9    Q. -- "involving any matter
10 occurring in the past up to the date of
11 this agreement." Do you see that?
12    A. Yes.
13    Q. Is there anything there you
14 don't understand?
15    A. I understand it.
16    Q. You understand that was
17 something else you gave to PSI, you
18 promised not to sue PSI, right?
19    A. Yes.
20    Q. And you did sue PSI again?
21    MR. BORTNICK: I will
22 object. The basis of the lawsuit
23 which is on a well-recognized
24 exception to a release is not an
25 issue here. The claim in that being

[Page 101]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119  Tel: 212-759-6014

```
 1              J. Vaughn
 2     there is a collusion between his
 3     attorneys and Prudential, that would
 4     void a release if --
 5          THE CHAIRMAN: If proven true.
 6          MR. BORTNICK: That is not
 7     here for today, but he is asking him
 8     about these issues and trying to
 9     make it seem as if he can't even sue
10     them in the first place which is not
11     true.
12          MR. HARPER: I don't
13     understand the objection, so I will
14     continue with my examination.
15          THE CHAIRMAN: Fine.
16     Q.    Then down on paragraph 9 it
17     says: "Non disparagement. Vaughn
18     represents that he has not and agrees that
19     he will not in any way disparage PSI." Do
20     you see that?
21     A.    Yes.
22     Q.    Do you understand it?
23     A.    Yes.
24     Q.    But in fact you have
25     disaparaged PSI, correct?
                              [Page 102]
```

```
 1              J. Vaughn
 2     A.    Yes.
 3     Q.    So you breached that too,
 4     right?
 5     A.    Yes.
 6     Q.    And then you also said or
 7     promised that any claim or controversy
 8     arising out of or related to this
 9     agreement or interpretation thereof will
10     be settled by arbitration. That is in
11     paragraph --
12          MR. BORTNICK: I want to
13     object.
14     A.    I think you need to say it,
15     how it says --
16     Q.    Under the then prevailing
17     constitution rules of the New York State
18     Stock Exchange Inc. or the National
19     Association of Securities Dealers Inc. Do
20     you see that.
21     A.    Yes.
22     Q.    You made that promise too?
23     A.    Correct.
24     Q.    Now, you still have my
25     $200,000?
                              [Page 104]
```

```
 1              J. Vaughn
 2     A.    I don't know, have I?
 3     Q.    Well, you sued them, right?
 4     A.    No.
 5     Q.    You haven't sued us?
 6     A.    No.
 7     Q.    What are we doing here?
 8     A.    Again, we are here to see if
 9     this is -- if I can -- if I had any
10     knowledge that I could not bring a class
11     action suit against Prudential and the
12     answer to that is no.
13          However, have I sued
14     Prudential right now, this is we are here
15     to see if that's possible. Do you
16     understand what I'm saying?
17     Q.    I do. I hope you understand
18     that I believe you made lots of promises
19     to PSI that you've broken in this
20     agreement including the one that says that
21     you will not disclose directly or
22     indirectly except to legal advisors if
23     circumstances underlying this agreement
24     which you publicly filed a lawsuit,
25     correct?
                              [Page 103]
```

```
 1              J. Vaughn
 2     A.    Are you trying to be funny?
 3     Q.    No.
 4     A.    What does that have to do with
 5     why we are here?
 6     Q.    What it has to do with, I gave
 7     you $200,000 or that is to say PSI did.
 8          THE CHAIRMAN: Ask a question
 9     only.
10     Q.    PSI gave you the $200,000, is
11     that correct?
12     A.    Correct.
13     Q.    You still have it?
14     A.    That's not here or there.
15     Q.    Yes or no?
16          THE CHAIRMAN: Answer the
17     question.
18          MR. BORTNICK: I have an
19     objection. We are not talking about
20     this is not about a recission
21     proceeding. He is asking about
22     recission and about whether this
23     agreement should be rescinded. We
24     paid you $200,000, you give it back
25     to us.
                              [Page 105]
```

[27]  (Pages 102 to 105)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

J. Vaughn

1        J. Vaughn
2     Recission has nothing to to
3 what we are here for today. Of
4 course, Mr. Vaughn cashed the check
5 or part of the check he got. That
6 is not the issue.
7     THE CHAIRMAN: Do you want to
8 respond to the objection?
9     MR. HARPER: I'm asking him a
10 question and it goes to the heart.
11     THE CHAIRMAN: He objected to
12 it and he's given his reasons for
13 objecting. I want to know whether
14 you wanted to respond.
15     MR. HARPER: I'm not talking
16 about recission or anything else.
17 I'm here because this gentleman is
18 saying he didn't understand what he
19 was doing when he signed the
20 agreement. And you have heard the
21 testimony, and I'm going to leave it
22 for the most part as it is that he
23 understands one minute and doesn't
24 understand it the next.
25     THE CHAIRMAN: So you are
[Page 106]

1        J. Vaughn
2 any and all costs incurred in connection
3 with any such recovery including
4 reasonable attorneys' fees.
5     Do you understand the meaning
6 of that phrase?
7     A. Yes.
8     Q. In paragraph 14 of the
9 settlement agreement where it says: "Any
10 claim or controversy arising out or
11 related to the agreement the interpretion
12 thereof," it doesn't say except class
13 actions, right?
14     A. No, it doesn't.
15     Q. You knew what a class action
16 was in October of 1998, correct?
17     A. Yeah.
18     MR. HARPER: I pass the
19 witness.
20     THE CHAIRMAN: Off the
21 record.
22     (Discussion off the record.)
23     THE CHAIRMAN: You may
24 proceed.
25     MS. LEWIS: Thank you.
[Page 108]

1        J. Vaughn
2 saying this question is appropriate
3 because --
4     MR. HARPER: This question is
5 appropriate because if he is going
6 to walk away from the promises he
7 made to me, I want the $200,000
8 back. I am wondering why if this
9 agreement is so meaningless to him
10 he hasn't given me the money back.
11     MR. BORTNICK: That's a
12 statement. I want my money back is
13 not the question.
14     MR. HARPER: The question is:
15     Q. Have you kept the money?
16     A. Yes.
17     THE CHAIRMAN: Objection is
18 overruled.
19     A. Yes.
20     Q. And finally let me go to
21 paragraph 15, and read: "Vaughn agrees in
22 the event of finding of a breach of the
23 agreement, he will forfeit to PSI all
24 amounts received pursuant to this
25 agreement, and he shall indemnify PSI for
[Page 107]

1        J. Vaughn
2 EXAMINATION BY
3 MS. LEWIS:
4     Q. Mr. Vaughn, when you settled
5 your claim you were aware you were not
6 settling it in any court proceeding; isn't
7 that correct.
8     A. That's correct.
9     Q. And you were aware that by
10 settling it, you were agreeing to give up
11 the right to go to court regarding a
12 claim; isn't that correct?
13     A. Yes.
14     Q. And in fact when you went
15 through the mediation process before the
16 mediators where you argued in favor of
17 your claim, you knew that was in lieu of
18 going to court; didn't you?
19     A. Yes.
20     Q. There was never a point in
21 time when you went to the mediators and
22 you said, well, if I don't like what you
23 say then I can still file in federal
24 court; did you?
25     A. No, I didn't say that.
[Page 109]

[28] (Pages 106 to 109)

J. Vaughn

2    **Q.**   And you knew that by going to
3 the mediators to present your claim you
4 weren't going to have a jury trial either;
5 is that correct?
6    A.   Yes.
7    **Q.**   And I would like to direct
8 your attention back to the settlement
9 agreement.
10    A.   Yes.
11    **Q.**   Did anyone other than you and
12 a representative of the Prudential sign
13 the agreement?
14    A.   No.
15    **Q.**   There were other people making
16 claims against Prudential; is that
17 correct?
18    A.   Yes.
19    **Q.**   This only settled your claim?
20    A.   Yes, that's correct.
21    **Q.**   Did you have to get permission
22 from any of the other claimants to settle
23 your claim?
24    A.   No.
25    **Q.**   Did they have a vote because

[Page 110]

J. Vaughn

2 is that Mr. Vaughn independently
3 went into a private agreement
4 between Mr. Vaughn and Prudential
5 and nobody else participated in it.
6 And this is further evidence of the
7 fact that the class action is an
8 after-the-fact creation that has
9 nothing to do with the private
10 settlement agreement.
11    MR. BORTNICK:  If I had gone
12 out and bought a share of World Com
13 that was my private decision perhaps
14 with my broker to buy a share of
15 World Com.  It is totally irrelevant
16 as to whether I'm going to be either
17 a class member or a class
18 representative of a lawsuit against
19 World Com or a class action against
20 World Com which had been ongoing.
21    I mean there is no relevance.
22 It is like saying the sky is blue so
23 you can't file a class action or you
24 can file a class action.  It is a
25 disconnected idea.

[Page 112]

J. Vaughn

2 it was going to affect their claim one way
3 or another as to whether or not you settle
4 your claim?
5    MR. BORTNICK:  I will
6 object.  I don't see any relevancy
7 even to what has been on direct or
8 cross or what has been brought up.
9    MS. LEWIS:  This would be my
10 cross.  So I don't have to follow on
11 his cross, but the claim is that Mr.
12 Vaughn has the right to proceed in a
13 class action and that he can
14 eviscerate his individual process
15 because he wants to go in a group
16 and I think the group participation
17 in his settlement and whether or not
18 this is a one-on-one settlement or
19 something that somebody else
20 participated in because all of these
21 claims about 50 other people in the
22 works is very relevant.
23    THE CHAIRMAN:  And the
24 relevance is?
25    MS. LEWIS:  And the relevance

[Page 111]

J. Vaughn

2    THE CHAIRMAN:  The objection
3 is overruled.
4    MS. LEWIS:  Read back
5 question.
6    (A portion of the record was
7 read.)
8    A.   No.
9    **Q.**   Now in paragraph 14 it says,
10 does it not: "Any claim or controversy
11 arising out of or related to this
12 agreement"?  I want to stop there.
13    A.   Yes.
14    **Q.**   Do you understand the words
15 "any claim or controversy"?
16    A.   Yes.
17    **Q.**   "Will be or the interpretation
18 thereof will be settled by an
19 arbitration."
20    Do you understand what that
21 means will be settled by arbitration?
22    A.   Yes.
23    **Q.**   And then it goes on to say:
24    "Under the prevailing
25 constitution rules of New York State Stock

[Page 113]

[29]  (Pages 110 to 113)

J. Vaughn

1    J. Vaughn
2    Exchange or National Association of
3    Security Dealers Inc." you understood
4    those would be the rules you would be
5    proceeding on for an arbitration; is that
6    correct?
7        A.    Yes.
8        Q.    Did you ask about what those
9    rules were going to be?
10       A.    No.
11       Q.    Did you ask whether or not you
12   would be be entitled to bring a class
13   action?
14       A.    No.
15       Q.    Did it matter to you one way
16   or the other in deciding to accept
17   $200,000 whether or not you would still be
18   entitled to bring a class action?
19       A.    No.
20       Q.    Did you understand that there
21   was any exception to the phrase, "any
22   claim or controversy" that would be
23   brought under the arbitration?
24       A.    No.
25       Q.    Did you ask if there was any
[Page 114]

J. Vaughn

1    J. Vaughn
2        A.    It would have to be after
3        Q.    Was it before or after they
4    paid you your Cobra?
5        A.    Again, Cobra is something
6    nobody paid me any Cobra or anything like
7    that.  If it was in there it's in there.
8    No one paid me Cobra or anything.
9        Q.    Nobody paid your Cobra?
10       A.    No.
11       Q.    Did you ever seek legal
12   counsel asking someone to enforce the
13   obligation in the settlement agreement
14   regarding a payment of Cobra?
15       A.    No.
16       Q.    Is that something that you
17   didn't pay attention to one way or the
18   other?
19       A.    No.
20       Q.    In paragraph 16 --
21       A.    Yes.
22       Q.    -- towards the end of the
23   paragraph it says: "Vaughn also
24   acknowledges that he has been afforded at
25   least 21 days to consider the release
[Page 116]

J. Vaughn

1    J. Vaughn
2    exception that you could still bring
3    something in court?
4        A.    No.
5        Q.    When did you first decide that
6    you wished to bring a class action?
7        A.    When I realized Prudential had
8    a secret agreement with Leeds & Morelli --
9    when I say secret because I knew nothing
10   about it, and that they were being paid by
11   Leeds & Morelli as well as by myself.  So
12   I looked at that as a reason.
13       Q.    When you say -- I asked you
14   for when.  So why are you telling me what
15   was the basis that you think you have a
16   claim.  When did you determine that?
17           MR. BORTNICK:  I object to
18       the question because the question
19       was when, and his answer was when I
20       realized.
21           THE CHAIRMAN:  That's fine.
22       Q.    What was the date?
23       A.    I don't recall.
24       Q.    Was it before or after you
25   received full payment?
[Page 115]

J. Vaughn

1    J. Vaughn
2    provision contained herein."  Was that
3    true?
4        A.    I don't know, I guess, yeah.
5        Q.    You had 21 days to consider
6    whether to release this claim in exchange
7    for payment of $200,000?
8        A.    Yes.
9        Q.    And you did that?
10       A.    Yes.
11       Q.    And after that 21 days you
12   decided to go forward and release the
13   claim against Prudential?
14       A.    This has been way beyond 21
15   days, we are talking about years now.
16       Q.    It says in the contract --
17       A.    I understand that.
18       Q.    -- that you had 21 days to
19   consider the release before you accepted
20   it, and you took that time and decided you
21   wanted to release this claim?
22       A.    Yes.
23       Q.    And in connection with that
24   you had the terms of the settlement
25   agreement?
[Page 117]

[30]  (Pages 114 to 117)

J. Vaughn

1           J. Vaughn
2    A.    Yes.
3    Q.    And then it also says that you
4  have seven days after signing this
5  agreement to revoke it in writing.
6    A.    Yes.
7    Q.    Did you understand that at the
8  time?
9    A.    Yes.
10   Q.    And during that seven-day time
11 period, you had the settlement agreement
12 in your possession; isn't that correct?
13   A.    Possibly.
14   Q.    Did you ask anybody for it?
15   A.    No.
16   Q.    Did you review its terms in
17 those seven days?
18   A.    Yes.
19   Q.    And after reviewing and during
20 that seven-day period you did not revoke
21 this agreement?
22   A.    No.
23   Q.    Was there any questions that
24 you directed to anybody about the
25 agreement?

[Page 118]

J. Vaughn

1           J. Vaughn
2    A.    Yeah.
3    Q.    Who did you speak with?
4    A.    Steve Morelli.
5    Q.    When did you speak with Mr.
6  Morelli regarding the settlement
7  agreement?
8    A.    The day I came into his office
9  and signed a release for the check.
10   Q.    So you met with Mr. Morelli
11 and you signed the agreement in his
12 office?
13   A.    Not the agreement I signed the
14 release for the check. I had to sign a
15 release for it. So I signed that in his
16 office, the agreement was signed in the
17 bathroom at Tavern on the Green.
18   Q.    How much time elapsed between
19 the time you were in the bathroom and the
20 time you signed the release?
21   A.    When you say the release, you
22 are talking about the agreement or are you
23 talking about the check?
24   Q.    You just said you signed the
25 release. I'm asking you how much time

[Page 119]

J. Vaughn

1           J. Vaughn
2  elapsed between the time you signed
3  whatever you signed in the bathroom the
4  agreement and the release?
5    A.    It had to be maybe a couple of
6  weeks, maybe two weeks or something like
7  that.
8    Q.    During that two-week period
9  did you have any conversations with Mr.
10 Morelli?
11   A.    When I went into his office
12 and signed the release for the check, yes.
13   Q.    Other than that, did you have
14 any other conversations with Mr. Morelli
15 at any time regarding a settlement
16 agreement?
17   A.    No.
18   Q.    Did you discuss the terms of
19 the settlement agreement when you took the
20 check?
21   A.    No.
22   Q.    Did you ask him about the
23 arbitration provision?
24   A.    No.
25   Q.    Did you ask him about the

[Page 120]

J. Vaughn

1           J. Vaughn
2  class actions?
3    A.    No.
4    Q.    Did you ask him whether or not
5  I will be able to go to federal court
6  after this and sue Prudential again?
7    A.    No, because I figured that he
8  is my attorney, he would tell me that.
9    Q.    That you would be entitled --
10   A.    What my rights are at that
11 point.
12   Q.    Did Mr. Morelli tell you you
13 cannot go to federal court?
14   A.    No.
15   Q.    He never told you that?
16   A.    Never.
17   Q.    You read the agreement and it
18 said that you were releasing all claims?
19   A.    Yes.
20   Q.    Did you ask him: What is this
21 I'm releasing all my claims?
22   A.    No, I had no reason to ask him
23 that
24   Q.    Because you understood that?
25   A.    Yes.

[Page 121]

[31]  (Pages 118 to 121)

J. Vaughn

1  
2  **Q.**  You understood that you had to
3  arbitrate any claim or controversy under
4  the agreement?
5  **A.**  Yes.
6  **Q.**  When you went to see Mr.
7  Morelli for the release of the check, did
8  you hand him a written revocation saying I
9  don't want to go forward with this
10  agreement?
11  **A.**  No.
12  **Q.**  Did you tell Mr. Morelli at
13  that time I never agreed to arbitrate any
14  claim or controversy after this?
15  **A.**  No.
16  **MS. LEWIS:**  I have nothing
17  further.
18  **THE CHAIRMAN:**  Thank you.
19  **MR. BORTNICK:**  I have some
20  questions.
21  **EXAMINATION BY**
22  **MR. BORTNICK:**
23  **Q.**  Mr. Vaughn, when you say that
24  you signed a release in order to get the
25  check, was that a release in the form of

[Page 122]

J. Vaughn

1  release, it was a statement saying these
2  are the deductions from the $200,000 and
3  here is the Leeds & Morelli Brown check
4  for the net?
5  **A.**  Correct.
6  **MR. BORTNICK:**  Nothing
7  further.
8  **THE CHAIRMAN:**  Any recross.
9  **MR. HARPER:**  No.
10  **MS. LEWIS:**  Nothing further.
11  **ARBITRATOR LINDBERGH:**  I have
12  a question.  It is related to your
13  statement.
14  Mr. Vaughn, I'm looking for
15  the date to be specific so that you
16  can know it.  It is Respondent's 2,
17  Mr. Vaughn's statement.  I wondered
18  if you typed that yourself?
19  **THE WITNESS:**  No, I didn't.
20  **ARBITRATOR LINDBERGH:**  Do you
21  recall who did type it?
22  **THE WITNESS:**  I submitted a
23  statement which I have a copy of but
24  this I think was done at Leeds &

[Page 124]

J. Vaughn

1  an agreement like I promise not to sue, or
2  was it I give you the check and you are
3  released, I'm acknowledging I'm getting a
4  check?
5  **A.**  That was a statement with the
6  deductions on it for DOW and for their
7  fees and the amount of the check that was
8  going to be given to me, that's what I
9  signed that release for.
10  **Q.**  That was a check from Leeds &
11  Morelli?
12  **A.**  Yes.
13  **Q.**  It was the $200,000 settlement
14  minus certain deductions?
15  **A.**  Yes.
16  **Q.**  And if I understood what you
17  said, the release was just a document
18  saying these are the deductions?
19  **A.**  Yes.
20  **MS. LEWIS:**  This is redirect.
21  Why are you leading the witness like
22  this?
23  **THE CHAIRMAN:**  Overruled.
24  **Q.**  The release when you call it a

[Page 123]

J. Vaughn

1  Morelli.
2  **ARBITRATOR LINDBERGH:**  Nothing
3  further.
4  **THE CHAIRMAN:**  Mr. Vaughn,
5  several times in the course of your
6  testimony, for example, when you
7  were talking about the Leeds Morelli
8  retainer agreement --
9  **THE WITNESS:**  Yes.
10  **THE CHAIRMAN:**  -- you
11  indicated that that wasn't really
12  the full picture of what was
13  transpiring between the two of you.
14  Sometimes you called it a false
15  statement or whatever.
16  Could you elaborate on that as
17  to what the full picture was as you
18  saw it in this situation?
19  **THE WITNESS:**  Certainly.
20  Again, when we signed this retainer
21  or myself when I signed this
22  retainer for Leeds & Morelli, we
23  were or we had a bit of a group at
24  that point.  The group had or was

[Page 125]

[32]  (Pages 122 to 125)

J. Vaughn

1  very much looking to take this
2  public, this was not an issue of
3  settling, this was strictly we
4  wanted to go public with it and we
5  wanted it to be -- and go to court.
6
7  After talking with Leeds &
8  Morelli, you know, they told us to
9  do otherwise and we followed suit
10 with that. However, as far as the
11 agreement is concerned they, again,
12 when I signed not the retainer --
13 are we talking about specifically
14 the retainer.
15 THE CHAIRMAN:  That is one
16 place.
17 THE WITNESS:  The retainer --
18 again, the retainer was signed
19 somewhere after, and if I remember
20 correctly, somewhere around the time
21 that we had already been or where we
22 had already dealt with Prudential
23 and knowing what they wanted to do
24 with the cases.  And we ended up
25 signing the retainer afterwards.  I

[Page 126]

J. Vaughn

1  put into this, but yes these are the
2  things you will get as part of your
3  settlement.
4  So that's why when you asked
5  questions about that I was a little
6  reluctant because I know of a
7  different story.
8  THE CHAIRMAN:  One other
9  question.  A little clarification
10 about the relationship between the
11 21 days that the agreement says that
12 you had to consider the release and
13 the signature in the bathroom; how
14 did those two -- what was the time?
15 THE WITNESS:  For the
16 signature --
17 THE CHAIRMAN:  You said you
18 signed it in the bathroom.
19 THE WITNESS:  It was about two
20 weeks afterwards, Steve called me to
21 come down to his office in Carle
22 Place, Long Island to pick up my
23 check and that was two weeks after I
24 signed this in the bathroom at

[Page 128]

J. Vaughn

1  know we did not all of us sign it up
2  front, the retainers.
3  As far as the settlement
4  agreement is concerned, again, and I
5  specifically said it over Prudential
6  phones which were recorded at the
7  time:  Look, you guys are telling me
8  that I'm going to be working for
9  DOW, I'm going to get $200,000 that
10 is not taxable and I'm going to get
11 long-term disability.
12 The three people who were on
13 the phone was Jeff Brown, Steve
14 Morelli and Lenny Leeds, and all of
15 them agreed that's what was going to
16 happen.
17 Now when I saw this in the
18 bathroom at Tavern on the Green, I
19 specifically asked Jeff, who was the
20 one who presented it to me:  Jeff,
21 what about the long-term disability
22 what about the job for DOW.  That
23 could not be put into this -- in his
24 words, that could not actually be

[Page 127]

J. Vaughn

1  Tavern on the Green.
2  ARBITRATOR LUBOW:  Thank you.
3  Had you not been afforded at
4  least 21 days prior to signing it?
5  In other words, you weren't given
6  this 21 days before you signed it?
7  THE WITNESS:  No, not at all.
8  I signed it the same day it was
9  presented to me.
10 THE CHAIRMAN:  And had you
11 been presented with the substance of
12 this?
13 THE WITNESS:  Other than what
14 I've just spoke about what the terms
15 were of my settlement nothing per se
16 in writing.
17 THE CHAIRMAN:  And how long
18 before had that been presented to
19 you?
20 THE WITNESS:  It would have to
21 have been like I say maybe a week or
22 so before.  It was whenever that
23 fundraiser for Carl McCall went on,
24 that's when they informed me

[Page 129]

[33]  (Pages 126 to 129)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

1  basically and the day I left
2  Prudential for the day that was the
3  day they told me if you don't want
4  to come back you don't have to come
5  back, this is what you are getting.
6  Later on I met them at Tavern on the
7  Green, where I first saw this
8  agreement and signed it there at
9  Tavern on the Green. And even then
10 they went on to say, hey, this is
11 what you are getting. This is,
12 there are certain things that aren't
13 in here, that is for whatever
14 obvious reasons but you will get
15 those things. And, again,
16 documentation, I have to prove that
17 they did try to go after those
18 things.
19     THE CHAIRMAN: And you knew
20 you had seven days to back out of
21 this?
22     THE WITNESS: Yes.
23     THE CHAIRMAN: You didn't
24 consult -- did you consult another

[Page 130]

J. Vaughn

1  but, he does have seven days to
2  revoke it in writing and the
3  agreement, I think, specifically
4  provides that we don't cut the check
5  until the seven days passes.
6     THE CHAIRMAN: Fine.
7     MR. HARPER: I don't think
8  there is a controversy between the
9  parties that those time periods were
10 within the claimants' rights to
11 uphold or disregard.
12     THE CHAIRMAN: Fine.
13     MR. HARPER: I have nothing
14 further.
15     MR. BORTNICK: Mr. Vaughn is
16 our only witness we have nothing
17 more to press, we rest.
18     THE CHAIRMAN: Do you have
19 any witnesses?
20     MR. HARPER: Prudential
21 rests?
22     THE CHAIRMAN: Do you have
23 any witnesses, Ms. Lewis?
24     MS. LEWIS: We rest.

[Page 132]

J. Vaughn

1  lawyer to review this?
2     THE WITNESS: No.
3     THE CHAIRMAN: Thank you very
4  much.
5     MR. BORTNICK: Nothing
6  further.
7     MR. HARPER: Nothing further
8  order.
9     MR. BORTNICK: I think Mr.
10 Harper is about to say there is not
11 an issue as as to whether the
12 release was valid because he wasn't
13 afforded 21 days. We are not making
14 the claim he was short changed in
15 the time. It means they have to
16 hold the agreement open for 21 days
17 and he can sign it within half a
18 second of receiving it, that's
19 actually a DEA waiver.
20     MR. HARPER: And it has
21 nothing to do with the time of the
22 execution, as Mr. Bortnick says he
23 can sign it immediately or he can
24 decide to take the full 21 days, and

[Page 131]

J. Vaughn

1     MR. HARPER: Can I make a
2  suggestion while we have burdened
3  you with a great deal, I would like
4  to read the transcript and submit a
5  very, very short piece of paper.
6     I don't think we need, I would
7  just be repeating whatever I said in
8  terms of the closing, and if I have
9  a transcript I might think it might
10 inspire me but I'm not talking
11 anything voluminous. Ten pages
12 tops.
13     MR. BORTNICK: I think, Mr.
14 Harper, I appreciate what he is
15 trying to say. I think we have the
16 right for closing statements I
17 believe under the rules.
18     THE CHAIRMAN: Sure.
19     MR. BORTNICK: I would like
20 to use my right.
21     THE CHAIRMAN: You say you
22 want to file a posthearing brief?
23     MR. HARPER: Yes.
24     MR. BORTNICK: So we can

[Page 133]

[34]  (Pages 130 to 133)

| | |
|---|---|
| 1        J. Vaughn | 1        J. Vaughn |
| 2   argue after the closing about that? | 2   and she said, no, it is for the |

J. Vaughn
argue after the closing about that?
THE CHAIRMAN: Yes. One
doesn't exclude the other.
MR. BORTNICK: I think I may
have misunderstood him. I intend to
burden you a little.
MR. HARPER: I know the rules
say it, but I was hoping to forebear
from the closing statement.
MR. BORTNICK: You need not
to.
THE CHAIRMAN: Proceed.
MR. BORTNICK: Rule 10301-D,
subsection 3 of the NASD rules. No
member or associated person -- we
are talking about Prudential here --
shall seek to enforce any agreement
to arbitrate against a customer,
other member or person associated
with the member who has initiated in
court a punitive class action --
that would be Mr. Vaughn -- or is a
member of a punitive or certified
class, with respect to any claims

[Page 134]

J. Vaughn
encompassed by the class action
unless and until -- and there's a
four separate things set out. For
example, unless and until the court
decides not to certify the class or
one of the class members opt out,
for example. But the point of the
rule is clear, Prudential under rule
10301-D3 is not even allowed to be
doing what it is doing here, and
that's why a statement of claim we
have specifically sought the relief
of a disciplinary referral against
Prudential because it is a direct
violation of this rule what they are
doing here, that's number one.
Number 2, this panel has had
way too much paper on why we are
here, and that's why I wanted today
read into the record what Judge
Coate said. She wanted to know --
she wanted the arbitrators to
decide, not her, because we had
initially argued she should decide

[Page 135]

J. Vaughn
and she said, no, it is for the
arbitrators to decide what was the
intention of the parties when the
agreement was signed. Specifically,
what was the intention with respect
to class actions.
She came up with three things
that she thought might be possible.
And one of them no one is arguing.
No one is arguing that it was the
intent of the parties to have class
arbitration, so we are left with
two, two possibilities. Okay.
So we want to know what the
intent of the agreement is. That's
easy, we swear, we put under oath
and ask the people that signed the
agreement, the people that entered
into the agreement, Mr. Vaughn and,
well, I thought Prudential.
Obviously, Leeds & Morelli
can't do it. The only thing they
possibly could have done, and I
thought they might be doing because

[Page 136]

J. Vaughn
Mr. Brown was on the witness list
because maybe he was going to show
up and said I advised Mr. Vaughn
that so forth and so on, but he
didn't say that, he wasn't here to
say that.
The only testimony you had is
Mr. Vaughn's testimony, and he
clearly said I didn't intend to
waive a class action. I did not
intend to make some kind of waiver
with conflict with the other part of
rule 10301 which has no class
actions at the NASD.
I was frankly shocked that
Prudential, at least at first I was
shocked that Prudential did not put
any witnesses on their witness list
and did not have anybody appear to
say what Prudential's intent was,
because then you would have a "he
said, she said." Mr. Vaughn says
one thing and Prudential would say
the other, and the panel would have

[Page 137]

[35]  (Pages 134 to 137)

| | J. Vaughn |
|---|---|
| 1 | J. Vaughn |
| 2 | to figure it out. |
| 3 | We can only speculate, but |
| 4 | perhaps the best reason, the one |
| 5 | that makes the most sense is that |
| 6 | nobody from Prudential showed up is |
| 7 | because no one from Prudential was |
| 8 | going to come here and say something |
| 9 | that wasn't true. But it really |
| 10 | doesn't matter the only testimony |
| 11 | you have is Mr. Vaughn, that is the |
| 12 | only thing that can be relied on as |
| 13 | far as what were the intentions of |
| 14 | the parties not what is the basis of |
| 15 | Mr. Vaughn's class action case, not |
| 16 | whether he was happy with his |
| 17 | attorneys, not whether he thinks he |
| 18 | has to pay $200,000 back to |
| 19 | Prudential to continue in court. |
| 20 | That is all just more than |
| 21 | window dressing. It is the circus |
| 22 | around why we are here. And you |
| 23 | only heard testimony from one |
| 24 | witness about intent and that's why |
| 25 | this case was sent here, and so |

[Page 138]

1    J. Vaughn
2    MR. HARPER:  Yes.
3    MR. HARPER:  Mr. Bortnick,
4    consistently overlooks Rule 10216-F
5    of the NASD rules which says, if a
6    member or a current or former
7    associated person of a member files
8    in court of the claim against a
9    member or current or former
10   associated person of a member that
11   includes matters that are subject to
12   mandatory arbitration, identified by
13   the rules of the association or by
14   private agreement, the defendant
15   party may move to compel arbitration
16   of the claims that are subject to
17   mandatory arbitration.
18       Pursuant to that right and
19   that rule we made a motion to compel
20   that the United States federal
21   district court granted in the face
22   of precisely the argument Mr.
23   Bortnick is making to you this
24   morning.
25       So the idea that we were in

[Page 140]

1    J. Vaughn
2    really there is nothing left to do.
3    I don't see how there could be any
4    finding that there was an intent to
5    waive class action claims because
6    you heard no competent evidence that
7    would support that.
8        So we are left here in the
9    situation where the panel really, at
10   least in my view, has no choice but
11   to make a finding that the class
12   action can go forward and, frankly,
13   that Prudential should be, at least
14   that the panel doesn't have the
15   ability for a regulatory
16   disciplinary -- not to actually
17   impose the discipline, but it has
18   the panel to make the referral to
19   the appropriate district because it
20   is a clear violation of the rule in
21   trying to enforce a no class action
22   clause that they are not allowed to.
23       MR. BORTNICK:  Thank you.
24       THE CHAIRMAN:  Anything
25   further?

[Page 139]

1    J. Vaughn
2    violation of this rule, and I note
3    that the rule on which Mr. Bortnick
4    relies 10301, does not refer to a
5    formerly associated person. They
6    could have put that in the rule,
7    they didn't, but they did put it in
8    the rule on your right to move to
9    compel.
10       Now, I'm at something of a
11   disability here because the lawyers
12   in the room know that in connection
13   with a communication between Mr.
14   Vaughn and his personally chosen
15   lawyer the lawyer Prudential had
16   absolutely nothing to do with
17   selecting for him. Prudential had
18   no right at all to communicate with
19   Mr. Vaughn directly that's an
20   ethical road in the Code of
21   Professional Responsibilities in New
22   York and in every model Rule of
23   Professional Conduct in the 50
24   jurisdictions.
25       So Prudential is uniquely

[Page 141]

[36]  (Pages 138 to 141)

J. Vaughn

1  disabled from having any knowledge
2  of what was said between Mr. Vaughn
3  and his lawyers that was subject to
4  a privilege at the time. And one
5  that would have sent us to ethics
6  jail had we attempted to try and
7  communicate with Mr. Vaughn about
8  the meaning of the agreement that
9  was for his handpicked lawyer to do,
10 and it is deeply unfair for Mr.
11 Vaughn to come in here and say he
12 has a right to sue me because his
13 handpicked lawyer he claims he
14 didn't understand the agreement that
15 between PSI and his lawyer because
16 his lawyer didn't explain it to him.
17 Now, Mr. Bortnick says Prudential
18 has no witness on intent and the
19 reason we have no witness on intent
20 is because Prudential expressed its
21 intent in plain, clear, unambiguous
22 language in the agreement and for
23 Mr. Bortnick to suggest that the
24 only evidence before you is Mr.

[Page 142]

J. Vaughn

1  Vaughn's ever changing ever shifting
2  testimony about what he understood
3  and didn't understand what was true
4  and what wasn't true is the only
5  evidence before you is quite untrue.
6     Of course, you have before you
7  the agreements that he signed that
8  very clear and unambiguous language
9  in them. Equally clear and
10 unambiguous is the transcript of
11 Judge Coate in response again to
12 exactly the arguments exactly the
13 arguments that Mr. Bortnick is
14 making to you, quote, the plaintiff
15 clearly agreed to the arbitration of
16 his claims.
17     And I ruled that the
18 arbitration agreement was valid and
19 enforceable and that legally was not
20 in dispute, and that what this panel
21 was to decide was what kind of
22 arbitration proceedings we would
23 have, what kind of arbitration
24 proceedings we would have, is what

[Page 143]

J. Vaughn

1  the judge says in her transcript.
2     So I think it is pretty clear
3  when you sign on to a arbitration
4  clause with an individual claim,
5  remember all he had was a individual
6  claim, not a class claim. He had an
7  individual claim that he was
8  discriminated against. And he said
9  he wanted to be paid $200,000, and
10 he was by PSI in a mediation
11 process.
12     The system worked. The law
13 favors these kind of alternative
14 dispute resolution mechanisms. And
15 in Mr. Vaughn's case, it worked very
16 handsomely for him. And it would be
17 I think an unmistakeable inference
18 arising from the clear and
19 unambiguous language of the contract
20 that when a person settles an
21 individual claim and agrees to
22 arbitrate any dispute over the
23 settlement agreement. For example,
24 if he doesn't get his Cobra, which I

[Page 144]

J. Vaughn

1  happen to believe not to be true,
2  but I don't have the document here
3  to demonstrate it as a statutory
4  segue, so it would be quite bizarre
5  for Cobra not to have worked in
6  those circumstances. It is
7  egregiously unfair for Prudential to
8  have to be confronted again by
9  someone it settled with and be paid
10 in a clear and unambiguous contract,
11 what is now almost nine years ago or
12 eight years ago, at some point it is
13 time to stop. Thank you.
14     THE CHAIRMAN: You are next
15     MS. LEWIS: Let me start with
16 this, which is where we ended when
17 we were opening. Which is the
18 propriety of having Mr. Vaughn
19 testify at all.
20     And I think that Mr. Vaughn's
21 testimony was the quintessential
22 example of the wisdom of the law
23 that says when you have an agreement
24 the intent of the parties is the

[Page 145]

[37]  (Pages 142 to 145)

J. Vaughn

1 objective intent, based upon the
2 words in that agreement, and not the
3 ability of the individuals to go
4 back and try to remember what they
5 did or did not intend eight years
6 ago or nine years ago, whatever it
7 is.
8
9     Mr. Vaughn demonstrated that
10 he understood certain parts and
11 other parts maybe did not understand
12 other parts, he didn't read some.
13 Maybe he didn't read others very
14 conveniently. And let us be honest,
15 Mr. Vaughn, and his counsel will
16 have to go back to federal court in
17 order to seek his money, they have
18 not sought any money here. They
19 have conveniently turned the
20 standard on its head, the court did
21 not refer to this court or to the
22 panel I mean the question of whether
23 or not there was a knowing waiver of
24 class actions. What was referred
25 was a question of the interpretation

[Page 146]

J. Vaughn

1 arbitrated, can be brought back to
2 court, notwithstanding that
3 unambiguous clause because he has
4 chosen to designate himself as the
5 head of a class, when based upon an
6 individually negotiated settlement
7 puts this in a particularly unique
8 position.
9
10     Now in preparing for this
11 hearing I actually went onto the
12 NASD website, and the NASD website
13 has a section that talks about we
14 are not just looking to help the
15 industry and the customers and the
16 securities, we can offer dispute
17 resolution to the commercial world
18 and delve into individual questions
19 and individual issues.
20     This is not a customer claim,
21 this is not even an employment
22 claim. This is a commercial
23 contract, a settlement agreement.
24 And in that settlement agreement,
25 the parties unambiguously agreed

[Page 148]

J. Vaughn

1 of the arbitration clause. And the
2 testimony to the extent that it was
3 consistent at all, was consistent
4 with Mr. Vaughn knew and understood
5 that any claim or controversy
6 arising in connection with the
7 agreement or its interpretation was
8 to be arbitrated.
9
10     And whether or not or what the
11 rules were, he didn't inquire, he
12 didn't care, he wanted his $200,000
13 and he received his $200,000. He
14 had opportunities to ask questions,
15 he had opportunities to revoke, he
16 didn't, as he testified, he just
17 didn't care. That subsequently in
18 order to evade and, frankly,
19 fundamentally attack the quality of
20 the alternative dispute resolution
21 process, Mr. Vaughn, and his counsel
22 can put his name in front of a
23 punitive class action and claim that
24 his individual claims that the court
25 has already determined must be

[Page 147]

J. Vaughn

1 they were going to submit any claim
2 or dispute and Mr. Vaughn has
3 testified that he understood that
4 that should be the end of the
5 question that that should be this
6 body in respect for arbitration and
7 the alternative dispute process
8 should have the discretion to say,
9 he understood the clause, he
10 understood everything, and it says
11 on its face any claim or
12 controversy. And we will go no
13 further than that because the rest
14 was just the rules that were going
15 to be applied in that proceeding.
16
17     In other words, as Mr. Harper
18 aptly quoted what the court said:
19 What the arbitration is going to
20 look like, not whether or not an
21 arbitration was going to be
22 conducted or not.
23     I would ask again that Mr.
24 Vaughn's testimony be stricken
25 because it should not be relevant to

[Page 149]

[38]  (Pages 146 to 149)

J. Vaughn

1  this conversation. And point out in
2  response to Mr. Bortnick's comments
3  that is the reason why we didn't
4  compound the error by putting any
5  witness on at this time.
6      The last thing is I would be
7  remiss if I didn't go back and
8  remind about the individual
9  respondents, you heard no word of
10 testimony or heard no word in
11 argument they do not belong here and
12 in due difference to the panel there
13 has been no referral to
14 jurisdictional issues nor could
15 there be. Thank you.
16     MR. BORTNICK:   I have a very
17 brief rebuttal.
18     THE CHAIRMAN:  Yes.
19     MR. BORTNICK:  Over and over
20 I hear from Prudential as well as
21 the Leeds & Morelli firm the
22 individual that this is clear and
23 unambiguous, the arbitration clause
24 is clear and unambiguous. If it was

[Page 150]

J. Vaughn

1  language and it is clear on its
2  face, but instead to say:  We knew
3  what we were doing when we stuck
4  this in the agreement. We drafted
5  the agreement and we put this clause
6  in because we wanted to make sure .
7  there would never be a class action.
8  That is easy to do, but they didn't.
9      I think we probably can guess
10 why.  The same thing for the Leeds &
11 Morelli defense.  You could have put
12 on Mr. Brown when he said:  I told
13 Mr. Vaughn that, but they didn't
14 and, of course, we know why it's
15 because that conversation with Mr.
16 Vaughn and Mr. Brown never took
17 place; so, in fact, these parties
18 are uniquely qualified to defend.
19 Thank you.
20     THE CHAIRMAN:  Thank you.
21 First of all, we are complete here.
22 If that was a request that his
23 testimony be stricken, it is denied.
24 And I have a couple of questions for

[Page 152]

J. Vaughn

1  so clear and unambiguous, we never
2  would have been here. The judge
3  would have said:  Off to arbitration
4  you go. Instead she said, the
5  arbitrators have to figure out what
6  it means, and I can think of, she
7  says at the top of page 4 of the
8  transcript at least three different
9  things and maybe there are more. It
10 was clearly ambiguous to her at
11 least.
12     And that's why she said, and I
13 quoted earlier, you need to figure
14 out the arbitrator -- she said the
15 arbitrator, but we are talking about
16 a panel here -- what are the party's
17 intentions, that is the word she
18 uses "intentions." We read that
19 earlier.
20     And so Prudential is not
21 uniquely disabled, it is uniquely
22 qualified to put on a defense here.
23 Bring up the Prudential witness who
24 is not going to say I can read the

[Page 151]

J. Vaughn

1  the lawyers which I hope will help
2  us.
3      First of all, Mr. Bortnick, I
4  apologize for mangling your name
5  before.  Why isn't it appropriate to
6  read the reference in the provision.
7  The reference to the NASD rules as
8  shorthand for no class actions.
9      MR. BORTNICK:  You mean in
10 this context or generally speaking?
11     THE CHAIRMAN:  I don't think
12 it makes a difference.
13     MR. BORTNICK:  I'm sorry, I
14 just don't understand the question.
15 You mean in this particular case or
16 this context or other.
17     THE CHAIRMAN:  I'm not sure
18 there is any difference.
19     MR. BORTNICK:  There is in
20 the sense there are class actions as
21 the panel is aware that go on every
22 day against the securities industry.
23 I mean there must be hundreds in
24 court right now, you know, that's an

[Page 153]

[39]  (Pages 150 to 153)

J. Vaughn

1 everyday occurrence, all the 10B5
2 cases, the tort reform, and so
3 forth. Of course there are class
4 actions that exist. And the rule is
5 there because the NASD for the stock
6 exchange are equipped as forums to
7 handle the administration of a class
8 action. They've decided there are
9 certain kinds of cases they are not
10 going to hear, class actions are one
11 of them.
12        It doesn't mean that I as a
13 buyer, and I never bought World Com
14 at least not to my knowledge I
15 bought a mutual fund, but as a
16 purchaser of World Com doesn't mean
17 I've waived my rights to a class
18 action against you know there were
19 lawsuits against --
20        THE CHAIRMAN: I don't think
21 you understand me. There is a
22 provision here it says: Here is
23 what is going to happen if there is
24 a dispute, we are going to go to

[Page 154]

J. Vaughn

1 bringing a class action against
2 Merrill Lynch for wrong research or
3 CSFP is a better example because
4 those were the claims that were made
5 by other firms not me. So everybody
6 has the same agreement when you have
7 a customer agreement in a customer
8 case, I agree to -- if I have a
9 dispute with my broker, Merrill
10 Lynch, I agree to arbitrate pursuant
11 to the rules of the NASD but not for
12 class actions, that's why the class
13 actions exist.
14        Moreover, it is a question of
15 what is the intent of the actual
16 people, what is the intent to them
17 at the time they are signing it, the
18 two parties to get down to the
19 micro. And that's why I said
20 Prudential should have had someone
21 saying what they thought it meant.
22        THE CHAIRMAN: Suppose the
23 NASD has more onerous pleading
24 rules -- just hypothetical -- than a

[Page 156]

J. Vaughn

1 arbitration under the rules of the
2 NASD. And I'm wondering why it is
3 not appropriate to read that phrase
4 as "just as it means whatever the
5 time periods are for pleading in the
6 NASD as no class actions" it is a
7 different way of saying it, in other
8 words.
9        MR. BORTNICK: I understand.
10 First of all, because this is also
11 the rule that firms aren't allowed
12 to oppose a class action claim that
13 I read to the panel. But the
14 fundamental issue here is by
15 agreeing to arbitrate, pursuant to
16 the rules of the NASD -- which is
17 pretty near exactly what the
18 agreement says -- the rules are
19 clear, just like anyone else that is
20 arbitrating, I agree to arbitrate
21 pursuant to the rules of NASD if I
22 buy a share of World Com from my
23 broker at Merrill Lynch. It doesn't
24 mean I have been prohibited from

[Page 155]

J. Vaughn

1 judicial process, has a shorter
2 statute of limitations than the
3 judicial process; how is that
4 different from the case where the
5 claimant says -- the claimant says I
6 didn't mean to submit to those
7 rules, those rules are tougher than
8 the rules in the judicial process, I
9 didn't mean to submit to those.
10        MR. BORTNICK: Again,
11 perhaps, I'm not understanding the
12 question. He is agreeing to submit
13 to rules that prohibit class actions
14 from being heard in this forum, but
15 permit them to go on in the courts.
16 That's why I use the example of all
17 security industry class action
18 cases. To my knowledge nobody's
19 ever argued to any NASD or New York
20 stock exchange panel when MillBerg
21 Weiss or Burnstein Lidowitz the mega
22 class action firms bring a class
23 action case against the securities
24 industry like Prudential or similar

[Page 157]

[40]  (Pages 154 to 157)

J. Vaughn

```
1    firms.  No one has ever made the
2    argument, you have a customer
3    agreement that says you only -- that
4    says something different.  But with
5    respect to the issue of class
6    actions, this is the first time I
7    ever heard the argument being made.
8    And the reason -- and I don't
9    understand why it is being made
10   because the parties agreed to
11   arbitrate pursuant to rules.  And
12   those rules mean class actions are
13   in court.  And in fact certain
14   discriminations at the option of the
15   employee under most circumstances
16   are also in the court by the way.
17       The U-4, which I know the
18   panel is familiar with has standard
19   form language that says the employee
20   agrees to bring all actions arising
21   out of that employment to
22   arbitration, but also in the rules
23   but not in the U4 was a change some
24   years ago to the NASD and the New
```
[Page 158]

J. Vaughn

```
1    accounts at --
2        THE CHAIRMAN:  I assume that
3    is what you are saying?
4        MR. BORTNICK:  Yes.
5        MR. HARPER:  He actually
6    worked at Solomon Smith Barney.
7        MR. BORTNICK:  Yes, I'm
8    sorry.
9        MR. HARPER:  And they were
10   arbitrated because my firm
11   represented Solomon Smith Barney in
12   those arbitrations.
13       What I heard Mr. Bortnick say,
14   is that if he buys a share of stock
15   he can't be a member of a 10B5 class
16   action.  When I buy a share of stock
17   I don't sign an arbitration
18   agreement.  My understanding is that
19   I assume he was referring to a suit
20   against the broker.
21       MR. BORTNICK:  The customer
22       MR. HARPER:  If it is a claim
23   of say an unauthorized trade or if
24   it is a claim that I was defrauded
```
[Page 160]

J. Vaughn

```
1    York State Stock Exchange rules that
2    said:  If you have a sex
3    discrimination lawsuit, race
4    discrimination lawsuit, you may
5    choose to bring that in court.  So
6    it is the same thing here.  Class
7    actions, they can't be heard here.
8        THE CHAIRMAN:  The first
9    question to Mr. Harper and Ms.
10   Lewis:  Is this like the customer
11   case he is referring to?
12       MR. HARPER:  No, because if I
13   buy a share of World Com, and then
14   sue the officers and directors of
15   World Com in a class action, I
16   haven't signed any arbitration.
17       MR. BORTNICK:  I'm saying,
18   for example, the World Com suit, as
19   you understand it, that is one
20   example they sued a lot of
21   individuals but they also sued
22   Credit Suisse, First Boston, where I
23   believe Mr. Jack Krupman worked for
24   bad research.  You have brokerage
```
[Page 159]

J. Vaughn

```
1    by Mr. Grubman's analyst reports
2    into acquiring excessive World Com
3    stock, that's an arbitration.
4        THE CHAIRMAN:  And you are
5    suggesting it's a possible class
6    action?
7        MR. BORTNICK:  There are class
8    actions and, in fact, now that you
9    are saying it, it is a case I'm not
10   involved in in my office -- there is
11   a class action or was a class action
12   against Solomon Smith Barney over
13   World Com stock because our two
14   firms have an issue as to whether
15   one of our clients opted out of the
16   suit because he wanted to go to
17   arbitration or pursuing it in
18   arbitration, and there is a question
19   of whether he opted out of the
20   lawsuit and is allowed to go to
21   arbitration.
22       And Mr. Harper was very
23   careful, he did not say that a
24   purchaser of a share of World Com
```
[Page 161]

[41]  (Pages 158 to 161)

J. Vaughn

1 can't be a member of a class because
2 again the broker -- what he said if
3 it was an unauthorized trade or
4 something like that in general, but
5 he knows that there are, I don't
6 know, thousands of people that
7 bought World Com that was part of
8 the lawsuit and the ultimate
9 settlement of the World Com class
10 action in which Solomon Smith Barney
11 was a defendant, those are real
12 class actions in court.
13     THE CHAIRMAN:  And were these
14 suits in which the arbitration
15 clause was raised as you can't sue
16 us?
17     MR. BORTNICK:  I'm sure it
18 was never raised, to tell you the
19 truth.
20     MS. LEWIS:  If I may
21 interject because there are cases
22 there that are out there that we
23 have cited to you that we discussed,
24 where that circumstance has been

[Page 162]

J. Vaughn

1 ultimately settled. So we don't know
2 where it went. But the Second
3 Circuit felt that the southern
4 district judge who was hearing it
5 was so in error for not considering
6 the arbitration clauses that were
7 contained in these other private
8 agreements that they were reversed
9 and sent it back for purposes of
10 determining whether what, if
11 anything, had to be arbitrated.
12     Here we are in a different
13 circumstance. We have not an
14 employment contract, not a
15 discrimination contract, not a
16 securities contract. We have a
17 commercial contract between two
18 independently represented people
19 which resolved the dispute and it is
20 from that the claim that we are
21 addressing is arising. And whether
22 or not as we have argued, Mr.
23 Vaughn's claim --
24     THE CHAIRMAN:  What is the

[Page 164]

J. Vaughn

1 raised and there is a class action
2 suit in addition with the securities
3 fraud litigation and related claims
4 were made regarding individuals who
5 would either have a contract for
6 services or professionals. And the
7 court makes an analysis as to
8 whether or not the claims fall
9 within the arbitration clause and
10 whether or not they are encompassed
11 with the classic action.
12     So what Mr. Bortnick has been
13 dismissing as just so much legal
14 gobbledegook that we've put before
15 the arbitrators is very relevant
16 here. In fact, Mr. Bortnick cited
17 several cases in regarding the
18 foreign currency tax shelters, but I
19 personally was involved in
20 representing lawyers. And the
21 Second Circuit reverts to the denial
22 of the motion to compel arbitration
23 in that case, and it was sent back
24 to the district court and the case

[Page 163]

J. Vaughn

1 difference you are referring to?
2     MS. LEWIS:  Because Mr.
3 Vaughn, as Mr. Harper was addressing
4 in cross-examination, made certain
5 promises an received payment for
6 those promises. And one of the
7 promises made was: I will arbitrate
8 any claim or dispute and that is a
9 promise between two parties without
10 regard to anybody else and the court
11 has --
12     THE CHAIRMAN:  How is that
13 different from the customer
14 agreement?
15     MS. LEWIS:  Because the
16 customer agreements, first of all,
17 have certain statutory requirements,
18 and they have certain questions as
19 to whether or not there is even true
20 arm's length transaction. And here
21 is your agreement take it or leave
22 it. But even those cases I pointed
23 out, and refer the panel to the
24 Canon versus Gun Allen case. In

[Page 165]

[42]  (Pages 162 to 165)

J. Vaughn

1 that case the court said, well, yes
2 it is a securities fraud claim but
3 vis-a-vis the professional it has a
4 contract, we are going to look at
5 what should be arbitrated and we are
6 going to look at that first.
7 Because if we settle an arbitration
8 that is going to formulate what has
9 to be addressed, if anything has to
10 be addressed in class action.
11     Here, the court has determined
12 Mr. Vaughn's individual claim must
13 be arbitrated. So if we address
14 that or had we addressed that, had
15 it been brought in arbitration it
16 might have formulated whether or not
17 Mr. Vaughn's claim could ever be
18 included in a class action if his
19 individual claim is identical to
20 what he would claim as a class
21 action.
22     THE CHAIRMAN: Proceed.
23     MR. BORTNICK: Yes. The Gun
24 Allen case she refers to, and I'm

[Page 166]

J. Vaughn

1 fundamentally says that there was
2 something, that he called it a
3 secret in his testimony, between
4 Leeds & Morelli and Prudential
5 attorneys that he didn't know about
6 that affected the agreement. So he
7 brought a class action, and the
8 judge said, well, he could have
9 technically waived his right to
10 bring a class action at all
11 depending on what his intent or what
12 the intention of the parties were to
13 the agreement.
14     And that's why I keep coming
15 back to the intention of Jeffrey
16 Vaughn and the intention of
17 Prudential. And you only had the
18 testimony on one because that's what
19 if judge said. In the Gun Allen
20 case the way they characterize it on
21 page 10 of their I guess reply
22 brief, is not a particularly
23 remarkable point. You only, you
24 can't sweep into court things that

[Page 168]

J. Vaughn

1 not saying I agree with her
2 characterization of it, but the way
3 they characterized it in their
4 motion papers was that there was no
5 arbitration for claims that were
6 encompassed by a pending class
7 action.
8     In other words, claims that
9 are part of the class action go to
10 court and don't get arbitrated,
11 that's what their characterization
12 of the Gun Allen case is.
13     The case that Mr. Vaughn
14 brought, he is the one bringing the
15 class action claim so, of course,
16 the claim that he would otherwise
17 have, the so-called individual claim
18 is the class action claim, there is
19 no difference and it's just to think
20 of it any other way is just not only
21 flat-out wrong, but it is
22 nonsensical.
23     He has brought a claim, a
24 class action claim in court that

[Page 167]

J. Vaughn

1 are not part of the class action,
2 that's unremarkable.
3     MR. HARPER: I have something
4 else.
5     THE CHAIRMAN: Yes.
6     MR. HARPER: I think there
7 are lots of reasons why this panel
8 should hold Mr. Vaughn to his
9 promise, but I think one of the
10 things that, Mr. Chairman, I think
11 you are going to, is what is going
12 on between this and the typical
13 customer and/or the typical employee
14 claim.
15     And I think what Ms. Lewis has
16 been trying to say is because it is
17 neither, it is neither a customer
18 complaining about a trade nor is it
19 an employee complaining about racial
20 or sex discrimination or age
21 discrimination.
22     It is an employee complaining
23 about an arm's length agreement that
24 exchanged consideration, and had a

[Page 169]

[43]  (Pages 166 to 169)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

J. Vaughn

1  J. Vaughn
2  dispute resolution clause that
3  happened to refer to the procedures
4  of the NASD, and which is shorthand
5  for no class action, which makes
6  perfect sense because there was no
7  class action to begin with, it was a
8  unique individualized claim that Mr.
9  Vaughn was settling.
10      And I can't emphasize enough,
11  how I'm standing here eight years
12  later having paid all the
13  consideration having lived up to my
14  part of the bargain in every respect
15  and I'm still arguing with somebody
16  who hasn't worked for me in nine
17  years who settled with me nine years
18  ago or eight years ago, or whatever
19  it is, and I'm still expending
20  resources trying to uphold an
21  agreement that has dust on it.
22      And I would respectfully
23  suggest that fairness occupies a
24  place or ought to occupy a place at
25  the table.

[Page 170]

1  J. Vaughn
2  the cases in New Jersey and the
3  cases all across the country you
4  signed an agreement, you are
5  dispositively presumed, irrefutably
6  presumed to have understood the
7  terms and conditions of that
8  contract.
9      And you cannot come in eight
10  years later and say: My lawyer
11  didn't tell me this. And to say it
12  to me, when I wasn't his lawyer and
13  when I had no right to communicate
14  with him.
15      This is not about knowing and
16  voluntary waiver because that
17  concept applies only to substantive
18  rights, and the Supreme Court, every
19  federal circuit, every federal
20  district court has held time and
21  time again that to agree to an
22  alternate dispute resolution process
23  is not to forego a substantive right
24  because the courts have faith in
25  these processes to vindicate those

[Page 172]

1  J. Vaughn
2  Mr. Bortnick can cite all the
3  rules he wants about the NASD, but
4  he can't address the simple facts
5  that the rules of the NASD
6  specifically allowed me to go into
7  court to compel arbitration against
8  a former employee. That is what the
9  rule says. The rule does not forbid
10  me to make a motion to compel
11  arbitration against a former
12  employee.
13      Mr. Vaughn was a former
14  employee when he signed the
15  agreement and when he got the check.
16  And he was a former employee when he
17  brought the class action. And so
18  the notion that we are here to
19  decide about the intention of the
20  parties when the intention of the
21  parties is set out in a contract
22  that Mr. Vaughn promised me he
23  understood and read at the time,
24  that the law presumes he understood
25  and read. The cases in New York and

[Page 171]

1  J. Vaughn
2  rights.
3      MR. BORTNICK:  I want to
4  respond. It has been raised several
5  time here and and I want to address
6  this fairness issue. I'm standing
7  here eight years later having to
8  defend.
9      The flip answer to the other
10  side of that is the truth here at
11  least the claim in this case is if
12  we don't hold you to account for
13  what you did eight years ago, you
14  get away with doing something really
15  bad, and so that's why you are here.
16      THE CHAIRMAN:  One at a time.
17  We don't want to rehear the
18  testimony.
19      MR. BORTNICK:  Mr. Vaughn
20  said it came up in a question
21  several times during cross, what the
22  case is about and what the class
23  action complaint is about.
24      And so this whole idea of
25  fairness, The fairness is not to let

[Page 173]

[44]  (Pages 170 to 173)

J. Vaughn

1  an injustice be gone unaddressed.
2  And that's why the class action is
3  here because this is just like any
4  other class action, the amount --
5  that is why it is a class action,
6  the amount, Mr. Vaughn has been
7  damageed either there's a legal
8  theory it has to do with the amount
9  of the -- I don't think we have to
10 go there. It is not about the
11 $200,000, but the amount that he is
12 damaged is so small that it
13 doesn't --
14      THE CHAIRMAN:  We understand
15 the purpose of class actions.
16      MR. BORTNICK:  Fine.
17      THE CHAIRMAN:  Will each of
18 the parties state affirmatively
19 whether you had a full and fair
20 opportunity to be heard.
21      MR. BORTNICK:  Yes.
22      MS. LEWIS:  Yes.
23      MR. HARPER:  Yes,
24 exhaustively, Mr. Chairman.

[Page 174]

J. Vaughn

1      THE CHAIRMAN:  We will take
2  that for a yes. The decision will
3  be forwarded to the parties and/or
4  their counsel in order to expedite
5  the delivery of the panel's decision
6  to the parties, the panel may either
7  execute a handwritten copy of the
8  award or each arbitrator may execute
9  a counterpart copy of the award.
10 And ASD is not responsible for the
11 disposal of any documents left here.
12 So if you want to retain secure
13 control of them, you should take
14 them with you when you leave.
15      The record will remain open
16 until the panel arrives at a
17 decision or the panel determines
18 that it is closed. No party will
19 contact any member of the
20 arbitration panel directly. All
21 communications are to be directed to
22 the staff person assigned to this
23 case. We request that the parties
24 leave the room at the same time.

[Page 175]

J. Vaughn

1  30 thank you very much.
2      Thank you for your patience
3  and good spirit.
4
5      (Whereupon, at 1:30 P.M., the
6  arbitration was concluded.)

[Page 176]

J. Vaughn

INDEX

WITNESS    EXAMINATION BY     PAGE

J.VAUGHN  Mr. Bortnick      36, 121
          Mr. Harper        54
          Ms. Lewis         108

E X H I B I T S

EXHIBITS    DESCRIPTION    PAGE

1 Opinion and order of Judge
Coate dated August 12, 2005       38
2 Transcript of the hearing in
front of Judge Coate dated
September 5, 2006                 38
3 Settlement agreement between
Mr. Vaughn and Prudential
Securities, dated October 1998    38
RESPONDENTS'
1 Agreement                       61
2 Five-Page document              72

[Page 177]

[45]  (Pages 174 to 177)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

```
 1     C E R T I F I C A T E
 2
 3   STATE OF NEW YORK  )
 4                      )  : ss.
 5   COUNTY OF NEW YORK )
 6
 7        I, WILLIAM BYRNE, a Notary
 8   Public within and for the State of New
 9   York, do hereby certify that the within is
10   a true and accurate transcript of the
11   proceedings taken on April 23, 2007.
12        I further certify that I am not
13   related to any of the parties to this
14   action by blood or marriage and that I am
15   in no way interested in the outcome of this
16   matter.
17        IN WITNESS WHEREOF, I have
18   hereunto set my hand this 5th day of May,
19   2007.
20
21        _____
22        WILLIAM BYRNE
23
24
25
```

[Page 178]

EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                    :

JEFFREY S. VAUGHN, individually and on  :
behalf of those class members similarly  :
situated,  :
  :
                  Plaintiff,  :     04 Civ. 8391 (DLC)
  :
      -v-  :     OPINION AND ORDER
  :

LEEDS, MORELLI & BROWN, P.C., LEEDS,  :
MORELLI & BROWN, L.L.P., LEEDS &  :
MORELLI, LEEDS, MORELLI & BROWN,  :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL :
FINANCIAL, INC., LENARD LEEDS, STEVEN  :
A. MORELLI, JEFFREY K. BROWN, and JOHN  :
DOES, JAMES VAGNINI, FREDERIC DAVID  :
OSTROVE, ROBERT JOHN VALLI, JR.,  :
DISCRIMINATION ON WALL STREET, INC. and :
DISCRIMINATION ON WALL STREET  :
MANHATTAN, INC., and JOHN DOES, ESQS.  :
1-10 and JANE DOES, ESQS., 1-10 a  :
fictitious designation for presently  :
and unknown licensed attorneys,  :
professionals and/or unknown persons or :
entities,  :
  :
                  Defendants.  :
  :
----------------------------------------X


Appearances:

For the Plaintiff:

Blaine H. Bortnick
Jeffrey Liddle
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York  10022


For Defendants Leeds, Morelli & Brown,
P.C., Leeds, Morelli & Brown, L.L.P.,
Leeds & Morelli, Leeds, Morelli &
Brown, Lenard Leeds, Steven A. Morelli,
Jeffrey K. Brown, James Vagnini,
Frederic David Ostrove, and Robert John
Valli, Jr.:

Daniel T. Hughes
Kevin L. Spagnoli
Litchfield Cavo LLP
420 Lexington Avenue, Suite 1750
New York, New York  10170


For Defendant Prudential Securities,
Inc. and Prudential Financial, Inc.:

Gerard E. Harper
Theodore V. Wells, Jr.
Beth S. Frank
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
1285 Avenue of the Americas
New York, New York  10019


DENISE COTE, District Judge:

The plaintiff, Jeffrey S. Vaughn ("Vaughn"), has brought this putative class action against his employer and the lawyers he retained to represent him in an employment discrimination dispute against his employer, alleging that the settlement agreement that resolved the dispute (the "Agreement") was a product of secret collusion between his employer and his lawyers. The defendants have moved to dismiss this action and to compel arbitration, relying on an arbitration provision in the Agreement.  Vaughn contends that the arbitration provision does not control, because the arbitration rules provided for in the Agreement do not permit class actions, and his lawyers are not parties to the Agreement.  For the following reasons, the motion to compel arbitration is granted and the case is stayed until the resolution of the arbitration proceedings.

**BACKGROUND**

The following facts are taken from Vaughn's amended complaint unless otherwise noted. In 1998, Vaughn retained lawyers from Leeds, Morelli & Brown, P.C. (collectively "Leeds Defendants"), to assert employment discrimination claims against his employer, Prudential Securities Incorporated, for which Prudential Financial Inc. is a successor in interest (collectively "Prudential Defendants"). Vaughn pursued these claims through alternative dispute resolution procedures including mediation. The dispute between Vaughn and the Prudential Defendants produced the Agreement dated October 27, 1998. The Agreement, which is incorporated by reference in the Complaint and on which Vaughn has relied in part in bringing this action, granted the Prudential Defendants a general release of claims in exchange for $200,000.00. The Agreement also contains the following arbitration provision:

> <u>Any claim or controversy arising out of or related to</u>
> <u>this Agreement or the interpretation thereof</u> will be
> settled by arbitration under the then prevailing
> constitution and rules of the New York Stock Exchange,
> Inc., or the National Association of Securities
> Dealers, Inc. Judgment based upon the decision of the
> arbitrators may be entered in any court having
> jurisdiction thereof. The governing law of this
> Agreement shall be the substantive and procedural law
> of the State of New York.

(Emphasis supplied.)

Vaughn alleges that the Leeds Defendants and Prudential Defendants had a "secret agreement" dated February 13, 1998 that was part of an employment discrimination dispute resolution system that the Leeds Defendants had established, and that would

enable the Prudential Defendants to cap damages paid to various
plaintiffs and settle numerous claims with plaintiffs represented
by the Leeds Defendants at one time with a lump sum payment while
providing direct payment of attorney's fees to the Leeds
Defendants.  Vaughn claims that he only learned of the existence
of the secret agreement in or about October 2004.  He initiated
this action on October 25, 2004, and filed an amended complaint
("Complaint") on March 15, 2005.

Vaughn has styled this action as a class action based on his
allegation that hundreds of other Prudential employees with
discrimination claims against the company were adversely affected
by collusion between the Leeds Defendants and the Prudential
Defendants based on this or other secret agreements.  Vaughn
asserts claims for common law fraud, conspiracy to defraud,
aiding and abetting fraud, tortious interference with a contract,
breach of fiduciary duty, breach of contract, breach of the
implied covenant of good faith and fair dealing, and violations
of the Racketeer Influenced Corrupt Organization Act ("RICO").

The Prudential Defendants and the Leeds Defendants both have
filed motions to dismiss or to compel arbitration.  The
Prudential Defendants contend that because the Agreement contains
an arbitration provision, this matter should be referred to
arbitration, and that this Court does not have subject matter
jurisdiction because the only mechanism conferring federal
question jurisdiction is the RICO claim, which the Prudential
Defendants argue is time-barred and insufficiently pleaded.  The
Leeds Defendants advance similar arguments, and add, among other

4

things, that the arbitration clause equitably estops Vaughn from
pursuing his claims in federal court notwithstanding the fact
that the Leeds Defendants are not parties to the Agreement.
Vaughn argues among other things that because the arbitration
rules provided for in the Agreement do not permit class actions,
and he has styled his claim as a class action, this matter should
not be referred to arbitration.

## DISCUSSION

1.  The Prudential Defendants

The FAA was designed to "ensure judicial enforcement of
privately made agreements to arbitrate." Dean Witter Reynolds
Inc. v. Byrd, 470 U.S. 213, 219 (1985).  The FAA represents "a
strong federal policy favoring arbitration as an alternative
means of dispute resolution." JLM Indus., Inc. v. Stolt-Nielsen
SA, 387 F.3d 163, 171 (2d Cir. 2004) (citation omitted).
Therefore, "under the FAA, 'any doubts concerning the scope of
arbitrable issues should be resolved in favor of arbitration,
whether the problem at hand is the construction of the contract
language itself or an allegation of waiver, delay, or a like
defense to arbitrability.'" Id. (quoting Moses H. Cone Mem'l
Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).  The
FAA requires that a contract provision to arbitrate disputes
arising out of the contract "shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract." 9 U.S.C. § 2.

Under the FAA, unless parties have unambiguously provided

5

for an arbitrator to decide questions of arbitrability, it is for courts to decide whether the parties agreed to arbitrate. <u>Contec Corp. v. Remote Solution Co.</u>, 398 F.3d 205, 208 (2d Cir. 2005). A court deciding a motion to compel arbitration must resolve four issues: (1) whether the parties agreed to arbitrate; (2) the scope of the agreement to arbitrate; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. <u>JLM Indus.</u>, 387 F.3d at 169. In this case, the Prudential Defendants and Vaughn agree that all of Vaughn's claims are arbitrable and that Vaughn agreed to the arbitration provision. They merely dispute whether the scope of the arbitration provision includes claims styled as class actions.

In the absence of "clear and unmistakable evidence to the contrary" in an arbitration clause, only in limited circumstances will a court "assume that the parties intended courts, not arbitrators, to decide a particular arbitration-related matter." <u>Green Tree Fin. Corp. v. Bazzle</u>, 539 U.S. 444, 452 (2003) (citation omitted). "These limited instances typically involve matters of a kind that contracting parties would likely have expected a court to decide." <u>Id.</u> (citation omitted). "They include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." <u>Id.</u> The question of whether arbitration clauses "forbid class arbitration . . . does not fall into this narrow

6

exception" because it involves "neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties." <u>Id.</u>  Thus, in a case where an arbitration clause provided that the parties "agreed to submit to the arbitrator '[a]ll disputes, claims, or controversies arising from or relating to this contract,'" the Supreme Court held that a dispute about whether the arbitration clause "forbids the use of class arbitration procedures . . . is a dispute 'relating to this contract.'"  <u>Id.</u> at 451 (emphasis in original).[1]  In such a case, it was apparent that the parties "agreed that an arbitrator, not a judge, would answer the relevant question." <u>Id.</u> at 452.

The arbitration clause in the Agreement contains "sweeping language concerning the scope of the questions committed to arbitration," <u>id.</u> at 453, as it commits to arbitration "[a]ny claim or controversy arising out of or <u>related to this Agreement or the interpretation thereof</u>."  (Emphasis supplied.)  Vaughn claims that because the arbitration clause states that the contemplated arbitration will use the "rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc.," and those rules do not permit class action arbitrations, the parties could not have intended that the class action he now brings would be arbitrated.  This interpretation,

---

[1]  In <u>Bazzle</u>, an issue was whether arbitration clause language providing that disputes "shall be resolved . . . by one arbitrator selected by <u>us</u> [Green Tree] with consent of <u>you</u> [Green Tree's customer]" forbade class action arbitrations because the "consent of you" language was arguably inconsistent with multiple claimants.  <u>Bazzle</u>, 539 U.S. at 450.

however, contradicts the clear statement that the arbitration clause applies to "any" claim or controversy related to the Agreement.  Even assuming that Vaughn is right, and the applicable arbitration rules do, indeed, forbid class action arbitrations under all circumstances, it would be plausible to interpret the arbitration clause to require all claims to be arbitrated and to disallow class actions with no further qualifications or caveats.  Here, as in Bazzle, the question is "not whether the parties wanted a judge or an arbitrator to decide whether they agreed to arbitrate a matter," but rather "what kind of arbitration proceeding the parties agreed to." Bazzle, 539 U.S. at 452 (emphasis in original).  This question "concerns contract interpretation and arbitration procedures," and is therefore "for the arbitrator, not the courts, to decide." Id. at 453.  The Prudential Defendants' motion to compel arbitration is accordingly granted.[2]

2.  The Leeds Defendants

    The common law doctrine of estoppel may bind a nonsignatory to an arbitration agreement.  JLM Indus., 387 F.3d at 177.  See also Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,

---

[2]  The defendants argue that the Complaint fails to state a claim for a RICO violation, and therefore, there is no basis for federal subject matter jurisdiction.  Because the Complaint has a RICO claim that on its face is "neither clearly immaterial and made solely for the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous," Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 701 (2d Cir. 2000), there is subject matter jurisdiction over this action as of now.

8

271 F.3d 403, 404, 406 (2d Cir. 2001); <u>Thomson-CSF, S.A. v. Am.</u>
<u>Arbitration Assoc.</u>, 64 F.3d 773, 776 (2d Cir. 1995); <u>Camferdam v.</u>
<u>Ernst & Young Int'l, Inc.</u>, No. 02 Civ. 10100 (BSJ), 2004 WL
307292, at *6 (S.D.N.Y. Feb. 13, 2004).

> [U]nder principles of estoppel, a <u>non-signatory</u> to an
> arbitration agreement <u>may compel a signatory</u> to that
> agreement <u>to arbitrate</u> a dispute where a careful review
> of the relationship among the parties, the contracts
> they signed, and the issues that had arisen among them
> discloses that the issues the nonsignatory is seeking
> to resolve in arbitration are intertwined with the
> agreement that the estopped party has signed.

<u>JLM Indus.</u>, 387 F.3d at 177 (citation omitted) (emphasis
supplied). <u>See also</u> <u>Denney v. BDO Seidman, L.L.P.</u>, 412 F.3d 58,
70 (2d Cir. 2005); <u>Contec</u>, 398 F.3d at 209; <u>Choctaw</u>, 271 F.3d at
406.

The Leeds Defendants argue that under this standard, they
may compel Vaughn to arbitrate his claims against them, because
he alleges a close relationship, in the form of a conspiracy,
between both sets of defendants, and because the claims Vaughn
raises against the Leeds Defendants are intertwined with the
Agreement. Vaughn concedes that his claims against the Leeds
Defendants are related to the Agreement, but argues that the
relationship between the Leeds Defendants and the Prudential
Defendants was not close enough to warrant estoppel in this case,
because they did not have a relationship with each other
independent of Vaughn's alleged conspiracy.

Vaughn's argument misconstrues the governing legal standard.
The Second Circuit has held that a claim against an alleged co-
conspirator may not "<u>always</u> be intertwined to a degree sufficient

9

to work an estoppel," and that "[t]he inquiry remains a fact-specific one." JLM Indus., 387 F.3d at 178 n.7 (emphasis supplied). Nonetheless, "[a]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Denney, 412 F.3d at 70 (quoting Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000)). In a putative class action where the plaintiff taxpayers accused an accounting firm and a bank, among others, of conspiring to lure them into participating in unlawful tax shelter schemes, and the plaintiffs had an arbitration agreement with the accounting firm but not the bank, the Second Circuit held:

> Having alleged in this RICO action that the [nonsignatory bank] and [signatory accounting firm] defendants acted in concert to defraud plaintiffs, and that defendants' fraud arose in connection with [the accounting firm's] tax-strategy advice, plaintiffs cannot now escape the consequences of those allegations by arguing that the [bank] and [accounting firm] defendants lack the requisite close relationship, or that plaintiffs' claims against the [bank] defendants are not connected to [the bank's] relationship with the accounting firm].

Denney, 412 F.3d at 70 (citation omitted). Vaughn's basic premise that Second Circuit precedent requires that the defendants have a close relationship independent of the alleged conspiracy is consequently incorrect.[3]

---

[3] To the extent that Vaughn cites district court opinions that predate Denney for the proposition that a close relationship independent of the alleged conspiracy is required for a "close relationship," this Court respectfully declines to follow them.

10

Vaughn contends that the Leeds Defendants had a complex scheme to settle employment discrimination claims en masse, and that this scheme involved capping liability for employers such as the Prudential Defendants in exchange for direct payment of attorney's fees by the employers. He alleges that his employment discrimination claim was swept up by this scheme because the Leeds Defendants had a comprehensive, secret agreement with the Prudential Defendants to process his claim, among others, and that this agreement adversely affected the settlement of his claim. These allegations of civil RICO conspiracy involve close cooperation and collusion between Vaughn's employer and his lawyers. This theory of liability has been described elsewhere as one that "can only succeed" if the plaintiff proves his "allegation that all Defendants conspired and acted together." Camferdam, 2004 WL 307292, at *7.[4] Vaughn therefore alleges precisely the type of "substantially interdependent and concerted misconduct" that estops him from avoiding arbitration of his claims with the Leeds Defendants. Denney, 412 F.3d at 70

---

See In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 264 (S.D.N.Y. 2005); Orange Chicken, LLC v. Nambe Mills, Inc., No. 00 Civ. 4730 (AGS), 2000 WL 1858556, at *5 (S.D.N.Y. Dec. 19, 2000).

[4] In Camferdam, where the district court required taxpayers who had arbitration agreements with an accounting firm, and who were suing the accounting firm and a nonsignatory law firm for conspiring to create unlawful tax shelters on the taxpayers' behalf, to arbitrate claims against the law firm, the court also noted that the complaint alleged a "close relationship" between the entities involved, because "[a] civil conspiracy is a kind of partnership, in which each member becomes the agent of the other." Camferdam, 2004 WL 307292, at *6 (citation omitted).

(citation omitted).  The Leeds Defendants' motion to compel arbitration is therefore granted.

## CONCLUSION

The defendants' motions to compel arbitration are granted. The case is stayed until the resolution of the arbitration proceedings and is transferred to the Court's suspense docket.

SO ORDERED:

Dated:    New York, New York
          August 12, 2005

```
                            Denise Cote
                         DENISE COTE
               United States District Judge
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                    :
JEFFREY S. VAUGHN, individually and on   :
behalf of those class members similarly  :
situated,                                :
                    :
          Plaintiff,     :     04 Civ. 8391 (DLC)
                    :
       -v-              :        ORDER
                    :
LEEDS, MORELLI & BROWN, P.C., LEEDS,     :
MORELLI & BROWN, L.L.P., LEEDS &         :
MORELLI, LEEDS, MORELLI & BROWN,         :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL  :
FINANCIAL, INC., LENARD LEEDS, STEVEN    :
A. MORELLI, JEFFREY K. BROWN, and JOHN   :
DOES, JAMES VAGNINI, FREDERIC DAVID      :
OSTROVE, ROBERT JOHN VALLI, JR.,         :
DISCRIMINATION ON WALL STREET, INC. and  :
DISCRIMINATION ON WALL STREET            :
MANHATTAN, INC., and JOHN DOES, ESQS.    :
1-10 and JANE DOES, ESQS., 1-10 a        :
fictitious designation for presently     :
and unknown licensed attorneys,          :
professionals and/or unknown persons or  :
entities,                                :
                    :
          Defendants.    :
                    :
----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/27/05

DENISE COTE, District Judge:

    Having reviewed letters from plaintiff, dated December 7 and

16, 2005 and from defendants, dated December 13, 14, 20, and two

dated December 15, 2005, it is hereby

    ORDERED that the case remains stayed and on the Court's

suspense docket pursuant to the Opinion and Order dated August

12, 2005.

SO ORDERED:

Dated:    New York, New York
          December 27, 2005

                            _____
                                DENISE COTE
              United States District Judge

EXHIBIT "F"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

JEFFREY S. VAUGHN, individually and on  :
behalf of those class members similarly :
situated,                               :
                                        :
                    Plaintiff,          :          04 Civ. 8391 (DLC)
                                        :
          -v-                           :                ORDER
                                        :
LEEDS, MORELLI & BROWN, P.C., LEEDS,    :
MORELLI & BROWN, L.L.P., LEEDS &        :
MORELLI, LEEDS, MORELLI & BROWN,        :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL :
FINANCIAL, INC., LENARD LEEDS, STEVEN   :
A. MORELLI, JEFFREY K. BROWN, and JOHN  :
DOES, JAMES VAGNINI, FREDERIC DAVID     :
OSTROVE, ROBERT JOHN VALLI, JR.,        :
DISCRIMINATION ON WALL STREET, INC. and :
DISCRIMINATION ON WALL STREET           :
MANHATTAN, INC., and JOHN DOES, ESQS.   :
1-10 and JANE DOES, ESQS., 1-10 a       :
fictitious designation for presently    :
and unknown licensed attorneys,         :
professionals and/or unknown persons or :
entities,                               :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

DENISE COTE, District Judge:

     Having reviewed letters from plaintiff, dated December 7 and

16, 2005 and from defendants, dated December 13, 14, 20, and two

dated December 15, 2005, it is hereby

     ORDERED that the case remains stayed and on the Court's

suspense docket pursuant to the Opinion and Order dated August

12, 2005.

SO ORDERED:

Dated:    New York, New York
          December 27, 2005

                         _____
                                   DENISE COTE
                         United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/27/05

EXHIBIT "G"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
JEFFREY S. VAUGHN, individually and on :
behalf of those class members similarly :
situated,                              :
                                       :
                 Plaintiff,            :          04 Civ. 8391 (DLC)
                                       :
         -v-                           :          MEMORANDUM OPINION
                                       :              AND ORDER
LEEDS, MORELLI & BROWN, P.C., LEEDS,   :
MORELLI & BROWN, L.L.P., LEEDS &       :
MORELLI, LEEDS, MORELLI & BROWN,       :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL :
FINANCIAL, INC., LENARD LEEDS, STEVEN  :
A. MORELLI, JEFFREY K. BROWN, and JOHN :
DOES, JAMES VAGNINI, FREDERIC DAVID    :
OSTROVE, ROBERT JOHN VALLI, JR.,       :
DISCRIMINATION ON WALL STREET, INC. and :
DISCRIMINATION ON WALL STREET          :
MANHATTAN, INC., and JOHN DOES, ESQS.  :
1-10 and JANE DOES, ESQS., 1-10 a      :
fictitious designation for presently   :
and unknown licensed attorneys,        :
professionals and/or unknown persons or :
entities,                              :
                                       :
                 Defendants.           :
                                       :
---------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/06

DENISE COTE, District Judge:

    This Opinion and Order addresses an application for an

extension to serve five individual defendants.  On October 25,

2004, Jeffrey S. Vaughn ("Vaughn") filed a putative class action

against his employer and Leeds, Morelli & Brown, P.C. ("Leeds"),

the law firm he retained to represent him in an employment

discrimination dispute with his employer.  Vaughn's employer

moved to compel arbitration, and through an Opinion and Order of

August 12, 2005, that motion was granted and this case was stayed

pending resolution of the arbitration proceeding.  Vaughn v.

Leeds, Morelli & Brown, P.C., et al., 04 Civ. 8391 (DLC), 2005 WL

1949468 (S.D.N.Y. Aug. 12, 2005).

The following actions relevant to the request for an extension to serve certain individual defendants associated with Leeds occurred before the stay was issued. On November 29, 2004, the Court endorsed a stipulation between plaintiff, Leeds and Jeffrey K. Brown ("Brown"), an attorney at Leeds, extending the two defendants' time to answer, with the agreement that neither defendant would assert any defense related to improper service. At some point before January 12, 2005, plaintiff's current counsel replaced his original attorney. An endorsement of January 12, 2005 approved an agreement between the plaintiff's current counsel and Leeds extending Leeds' time to respond to the plaintiff's amended complaint. At the request of plaintiff, the initial pretrial conference was adjourned from January 21 to March 4. On February 23, the agreement further extending Leeds' time to respond to the amended complaint was approved by the Court. Neither the January 12 nor February 23 document referred to Brown, who had been served, or to any of the individual defendants associated with Leeds who had yet to be served. In late February, the 120 days to effect service expired. The plaintiff made no request to extend the time to serve any defendant.

As of the conference on March 4, the plaintiff had still not served an amended complaint; he was ordered to file his first amended complaint by March 15, 2005. On April 22, 2005, the lawyers from Leeds and individual attorneys associated with that law firm (collectively "Leeds Defendants") moved to dismiss the

2

amended complaint, arguing _inter alia_ that the plaintiff had not served five individual defendants (Lenard Leeds, Steven A. Morelli, Janes Vagnini, Frederic David Ostrove, Robert John Valli, Jr.) who are associated with the firm.  In response to the motion to dismiss, Vaughn moved for an extension of time to serve these defendants.  To this day, plaintiff has not filed any affidavit of service reflecting service of either the complaint or the amended complaint on any defendant.

It is undisputed that the only individual defendant associated with Leeds that was served by the plaintiff is Brown. The plaintiff has not provided any reason for failing to serve five individual defendants within the 120 days required by Rule 4, Fed. R. Civ. P., or made any showing of diligence.  The plaintiff asserts that he relied on his first counsel to serve all defendants, but has not provided any explanation from that prior counsel for the failure to timely serve all defendants.

While it is no longer required that a plaintiff's request to extend time to serve be supported by good cause, _see_ _Henderson v. United States_, 517 U.S. 654, 662 (1996) (citing to Advisory Committee Notes on Rule 4, Fed. R. Civ. P.), that change in the law does not make an inquiry into diligence or the circumstances surrounding the failure to serve irrelevant.  If service is not waived, then a party is required to file proof with the Clerk of Court.  Fed. R. Civ. P. 4(l).  Any review of the docket sheet would have shown that no proof of service had been filed in this case.  Moreover, a review of the stipulations entered between November 29 and February 23 would have shown that the only Leeds

3

Defendants who had executed stipulations were Leeds and Brown. Indeed, it was plaintiff's current counsel who executed the stipulations endorsed on January 12 and February 23, neither of which makes any reference to any individual defendant associated with Leeds. This reflects an utter lack of concern regarding the individual Leeds Defendants, including the issue of whether service had been made within the time allowed by the federal rules. Given the failure of the plaintiff to explain adequately the absence of timely service on the five individual defendants, their motion to dismiss is granted.

Conclusion

The motion by Lenard Leeds, Steven A. Morelli, James Vagnini, Federic David Ostrove, and Robert John Valli, Jr. to dismiss the complaint is granted. The remainder of the motion to dismiss filed by the Leeds Defendants is denied with leave to be renewed through a letter request filed within 30 days of the stay being lifted.

SO ORDERED:

Dated:    New York, New York
          March 20, 2006

DENISE COTE
United States District Judge

4