**Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

JEFFREY S. VAUGHN, individually and on behalf of
those Class Members similarly situated,

              Plaintiff,

      -against-

LEEDS, MORELLI & BROWN, P.C., LEEDS,
MORELLI & BROWN, L.L.P., LEEDS & MORELLI,
LEEDS, MORELLI & BROWN, PRUDENTIAL
SECURITIES, INC., PRUDENTIAL FINANCIAL,
INC., LENARD LEEDS, STEVEN A. MORELLI,
JEFFREY K. BROWN, JAMES VAGNINI,
FREDERIC DAVID OSTROVE, ROBERT JOHN
VALLI, JR., DISCRIMINATION ON WALL
STREET, INC. DISCRIMINATION ON WALL
STREET, MANHATTAN, INC., JOHN DOES, 1-10
AND JANE DOES, 1-10 a fictitious designation for
presently unknown licensed attorneys, professionals
and/or unknown persons or entities,

              Defendants.

-------------------------------------------------------- X

Case No. 04 Civ. 8391 (DLC)

**Oral Argument Requested**

## MEMORANDUM OF LAW IN OPPOSITION TO
## PRUDENTIAL DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................... iii-v

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    A.    Background ................................................................................. 3

    B.    Procedural History ...................................................................... 5

ARGUMENT

I.    PLAINTIFF'S CLASS ACTION CLAIMS
    ARE NO ELIGIBLE FOR ARBITRATION ......................................... 7

    A.    Both the NYSE and NASD Prohibit Class Arbitration ................. 7

    B.    An NYSE or NASD Arbitration Panel Will Exceed
        The Scope of Its Authority By Considering This Claim ............. 10

II.    PLAINTIFF HAS PROPERLY PLEADED
    AND TIMELY BROUGHT RICO CLAIMS ...................................... 11

    A.    The Standard On A Motion to Dismiss ..................................... 11

    B.    Plaintiff's RICO Claims Are Timely .......................................... 12

    C.    Plaintiff Has Properly Plead RICO Claims ................................ 13

        1.    Plaintiff Specifically Alleges a Provision of Section 1962 ........ 13

        2.    Plaintiff Has Pleaded At Least Two Predicate Acts ............... 15

        3.    Plaintiff Has Pleaded a Pattern of Racketeering Activity
            Under RICO ...................................................................... 18

            a.  Plaintiff Has Sufficiently Alleged "Closed-Ended"
               Continuity ..................................................................... 19

i

b.  Plaintiff Has Sufficiently Alleged "Open-Ended Continuity"..................................................21

4.  Plaintiff Has Pleaded Causation.................................................22

5.  Plaintiff Has Pleaded a Conspiracy Claim Under Section 1962(d).......22

III.  VAUGHN SHOULD BE PERMITTED TO AMEND HIS PLEADING IF THE COURT DEEMS HIS ALLEGATIONS TO BE INSUFFICIENT..................................................22

CONCLUSION..................................................24

## TABLE OF AUTHORITIES

Page(s)

**CASES**

A. Terzi Production v. Theatrical Protect. Union, 2 F.Supp. 2d 485 (S.D.N.Y. 1998) ..................16

ABF Capital Management v. Askin Capital Management, 957 F.Supp. 1308 (S.D.N.Y. 1997).......16

Ades v. Deloitte & Touche, 799 F.Supp. 1493 (S.D.N.Y. 1992)............................................12, 13

Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 107 S.Ct. 2759
    L.Ed.2d 121 (1987). ...........................................................................................................12

Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F.Supp. 505 (S.D.N.Y. 1990). .......................13, 14

Azrielli v. Cohen Law Offices, 21 F.3d 512 (2d Cir.1994) ........................................................13

Bernheim v. Litt, 79 F.3d 318 (2d Cir. 1996) ...........................................................................11

Blythe v. Deutsche Bank, 2005 WL 53281 (S.D.N.Y. 2005) .......................................................9

Casio Computer Co. v. Sayo 2000 WL 1877516 at *15 ............................................................22

Champ. V. Siegel Trading Co., 55 F.3d 269 (7th Cir. 1995) .......................................................9

Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229 (2d Cir. 1999)...........................18

Continental Realty Corporation v. J.C. Penney Company, 729 F.Supp 1452 (S.D.N.Y. 1990).......19

Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546 (S.D.N.Y. 2000) .....................18

Gagliardi v. Village of Pawling, 18 F.3d 188 (2d Cir. 1994)......................................................11

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, 903 F.2d 176
    (2d Cir. 1996) ..................................................................................................................13

GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463 (2d Cir. 1995)............19, 21

Goodman v. New York City Off-Track Betting Corp., 1999 WL 269959, *11 (S.D.N.Y.),
    aff'd, 201 F.3d 431 (2d Cir. 1999) ...................................................................................24

Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003) ......................................................10

H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989). ..................................................18

iii

Hartzog v. Reebok Intern. Ltd., 77 F. Supp.2d 478 (S.D.N.Y. 1999) .......................... 11

Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532
  (1992) ............................................................................................................ 22

Howard v. Klynveld Peat Marwick Goerdeler, 977 F. Supp. 654 n.7 (S.D.N.Y. 1997),
  aff'd. 173 F.3d 844 (2nd Cir. 1999). ....................................................................... 9

Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697 (2d Cir. 1994. .............. 11

Katz v. Feinberg, 167 F. Supp. 2d 556 (S.D.N.Y. 2001), aff'd, 290 F.3d 95 (2d Cir. 2002) ........... 10

Lesavoy v. Lane,  304 F.Supp.2d 520 (S.D.N.Y. 2004) ............................................... 14

Martens v. Smith Barney, Inc., 181 F.R.D. 243 (S.D.N.Y. 1998) ..................................... 9

McNulty v. New York Dept. of Finance, 941 F. Supp. 452 (S.D.N.Y. 1996) ............................ 11

Mead v. Schaub, 757 F.Supp. 319 (S.D.N.Y. 1991) .................................................. 20

Nielsen v. Piper, Jaffray & Hopwood, Inc., 66 F.3d 145 (7th Cir. 1995) ................................ 8

Oboler v. Ins. Co. of North America, 194 WL 414438 (S.D.N.Y. 1994) ................................ 13

Reynolds v. East Dyer Development Co., 852 F.2d 1249 (7th Cir. 1989) ................................ 14

Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119 (2d Cir. 1991) ............................... 11, 23

Salomon Inc. Shareholders' Derivative Litigation, No. 91 Civ. 5500, 1994 WL 533595
  (S.D.N.Y. 1994) ................................................................................................. 9

Scher v. Equitable Life Assurance Society of the United States, 866 F.Supp. 776
  (S.D.N.Y. 1994) ................................................................................................. 8

Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974). ................................. 16

Schmuck v. United States, 489 U.S. 705,  109 S.Ct. 1443, 103 L.Ed2d 734 (1989) ................... 16

Sedima, S.P.R.L. v. Imrex, Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346
  (1985) ............................................................................................................ 13

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir.1994) .................................. 16, 17

Spira v. Nick, 876 F.Supp. 553 (S.D.N.Y. 1995) .................................................... 16

*Sumitomo Copper Litigation*, 104 F.Supp.2d 314 (S.D.N.Y. 2000)................................13, 17

*United States v. Altman*, 48 F.3d 96 (2d Cir.1995) ..........................................................15

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) ..........................................18

*United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997)....................................................15

## Rules

Fed. R. Civ. P. 12(b)(6).....................................................................................................11
NYSE Arbitration Rule 600(d) ..................................................................................9, 10
NASD Code of Arbitration Procedure Rule 10301(d)(1-3)................................................8
NASD Code of Arbitration Procedure Rule 10301(d)(2) ...............................................8, 10
18 U.S.C. § 1962 .......................................................................................................13, 14
18 U.S.C. § 1962(1)(A) ....................................................................................................17

v

Plaintiff, Jeffrey S. Vaughn, (hereinafter "Vaughn") individually and on behalf of those Class Members similarly situated, (collectively, "Plaintiff"), respectfully submits this memorandum of law in opposition to the motion of defendants, Prudential Securities Incorporated and Prudential Financial Inc. (collectively, "PSI"), to dismiss Plaintiff's Amended Complaint in its entirety.

## PRELIMINARY STATEMENT

As a result of the Defendants' wrongful and illegal actions, Plaintiff asserts claims for common law fraud, conspiracy to defraud, aiding and abetting fraud, tortious interference with a contract, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Racketeer Influenced Corrupt Organization Act ("RICO").

PSI now seeks to avoid litigating Vaughn's claims in the federal court system. PSI incorrectly asserts that this Court should dismiss the action and compel arbitration of Vaughn's claims on the ground that the settlement agreement Vaughn executed with PSI contained an arbitration provision precluding this Court from considering Vaughn's contentions. The Settlement Agreement and General Release with PSI dated October 27, 1998 (the "Settlement Agreement"), contains an arbitration clause which states "[a]ny claim or controversy arising out of or related to this [Settlement] Agreement or the interpretation thereof will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc."

The arbitration rules of both the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"), however, expressly state that class action

claims are not eligible for arbitration. Since the claims here constitute a class action ineligible for arbitration, it is appropriate and proper for this Court to hear them.

Alternatively, Defendants attempt to dismiss the Amended Complaint for lack of subject matter jurisdiction on the grounds that Plaintiff's RICO claims are time barred and improperly pleaded. The allegations in Plaintiff's Amended Complaint must stand, however, because Plaintiff has properly pleaded and timely brought his RICO claims.

Accordingly, PSI's motion to dismiss Vaughn's Amended Complaint must be denied.

2

## STATEMENT OF FACTS

### A.  Background

Plaintiff Jeffrey Vaughn is a resident of the State of New York and a former employee of PSI. (Am. Cplt. ¶ 1.) Mr. Vaughn brings claims individually and on behalf of all Class Members.

Defendant Prudential Securities Incorporated is a corporation with offices in New York State and for which the New Jersey-based Prudential Financial Inc. is a successor in interest. (Am. Cplt. ¶ 2.) Defendant Leeds, Morelli & Brown, P.C., Leeds, Morelli & Brown, L.L.P., Leeds & Morelli, and Leeds, Morelli & Brown, (hereinafter collectively "Leeds-Morelli"), was either a professional corporation, a partnership, L.L.C. or other entity practicing law in the State of New York. (Am. Cplt. ¶ 3.) It conducted its practice of law through the individual defendants.

In or about 1998, Vaughn and the other Class Members retained Leeds-Morelli to assert claims of racial discrimination against PSI. (Am. Cplt. ¶ 18.)  Over 500 other PSI employees joined in retaining the same law firm for the same purpose. (Am. Cplt. ¶ 24.) Leeds-Morelli, the former lawyers for Plaintiff, conspired and entered into a written secret agreement or agreements (the "Secret Agreements") with PSI. There is at least one Secret Agreement dated February 13, 1998 between Leeds-Morelli and PSI. (Am. Cplt. ¶ 12.) Upon information and belief, several other subsequent agreements exist, including one from May 1999 and November 2001. Id. The Secret Agreements provided, among other things, for a cap on Plaintiff's and the Class Members' claims, prevented them from suing in court, and provided for the payment of fees by PSI directly to Leeds-Morelli without disclosure to Plaintiff or the Class Members. The

3

existence of the Secret Agreements was not known to Plaintiff until in or about October 2004.
(Am. Cplt. ¶ 12-13.) Vaughn and the other Class Members resolved their claims against PSI in
accordance with the advice rendered to them by Leeds-Morelli. (Am. Cplt. ¶ 19.)

Leeds-Morelli had a system for processing employment discrimination claims
against numerous large corporations, including PSI. (Am. Cplt. ¶ 34.) Leeds-Morelli's clients,
however, including the Plaintiff here, were never told and did not know of this agreement to
protocol. (Am. Cplt. ¶ 33.) This system involved Defendants Discrimination on Wall Street,
Inc. and Discrimination on Wall Street, Manhattan, Inc., (collectively, "D.O.W.S."), who held
themselves out as charitable, non-profit institutions dedicated to eradicating racial bias in
employment in the financial industry. Instead, these institutions were business corporations
which were the alter ego of Leeds-Morelli and functioned primarily to solicit business for Leeds-
Morelli. (Am. Cplt. ¶ 10.)

Leeds-Morelli's system consisted of several steps, the first two of which
consisted of: (1) Leeds-Morelli's solicitation of clients using runners to induce African-
American and other minority employees to retain the Leeds-Morelli to pursue claims against
their corporate employer; and (2) Leeds-Morelli's meetings with prospective clients in which
Leeds-Morelli obtained written retainer agreements providing for a one-third contingency fee for
asserting such claims. (Am. Cplt. ¶ 33.) Leeds-Morelli then approached the corporate employer
and proposed that the employer advance money to Leeds-Morelli in exchange for Leeds-
Morelli's clients' agreement to participate in a secret and confidential settlement scheme. (Am.
Cplt. ¶ 33.) This settlement scheme consisted of a three-step alternate dispute resolution process
which involved an informal meeting between the client and a representative of the corporate
employer to seek to settle the claim at an early stage; followed by a mediation also seeking to

4

settle the claim; and then, failing settlement, a binding mediation.   The clients waived their rights to trial by jury.   Typically, if not always, claims were settled and never reached the "binding mediation" stage. Id.

The scheme worked so that Leeds-Morelli and PSI would enter into an illegal aggregate settlement to resolve all of the claims for a lump sum, again without disclosure to the clients.  Leeds-Morelli deceived the clients by telling them that their claims were being pursued, when in fact the claims had already been resolved or the recovery was capped by agreement between Leeds-Morelli and PSI. (Id.)

**B.    <u>Procedural History</u>**

Plaintiff commenced this action by filing a Complaint on October 25, 2004.  In that Complaint, Vaughn sought damages on behalf of himself and a class of similarly situated persons under Rule 23 of the Federal Rules of Civil Procedure.  The plaintiff class consists of all persons who were represented by Leeds-Morelli with claims against PSI and whose rights were affected by the Secret Agreements between Leeds-Morelli and PSI, including the agreement dated February 13, 1998.  The Class is further divided into a subclass of those individuals who donated money to D.O.W.S. (the "Subclass"). (Am. Cplt. ¶ 23).

These agreements give rise to five claims against PSI; (1) aiding and abetting a fraud by Leeds-Morelli on their clients; (2) civil RICO; (3) civil RICO conspiracy; (4) tortious interference with the contact between the Leeds Firm and its clients; and (5) civil fraud conspiracy. (Am. Cplt. ¶¶ 53-58, 59-69, 70-74, 88-92, 93-96.)

At a preliminary conference on March 4, 2005, prior to any defendant answering, the Court directed Plaintiff to file an Amended Complaint by March 15, which Plaintiff did.  On

April 22, 2005, Defendants PSI moved this Court to dismiss the Amended Complaint and to compel Plaintiff to arbitrate the claims contained in the Amended Complaint.

6

## ARGUMENT

### I.

### PLAINTIFF'S CLASS ACTION CLAIMS
### ARE NOT ELIGIBLE FOR ARBITRATION

**A.**     **Both the NYSE and NASD Prohibit Class Arbitration**

PSI erroneously contends that Plaintiff's class claims must be compelled to arbitration at either the New York Stock Exchange, Inc., ("NYSE") or the National Association of Securities Dealers, Inc., ("NASD"). The rules of both the NYSE the NASD, however, expressly and unambiguously state that a claim submitted as a class action is not eligible for arbitration. Simply put, since Plaintiff's claims are ineligible for arbitration at either entity, this Court is the appropriate forum for the adjudication of Plaintiff's claims.

The NYSE and NASD arbitration rules are incorporated into the Settlement Agreement's arbitration clause. It is beyond doubt that those rules not only prohibit the submission of class arbitration claims, but further prohibit PSI from seeking to enforce the arbitration clause. The arbitration clause in the Settlement Agreement states:

> Any claim or controversy arising out of or related to this Agreement or the interpretation thereof will be settled by arbitration **under the then prevailing constitution and rules of the New York Stock Exchange Inc., or the National Association of Securities Dealers, Inc.** Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof. The governing law of this Agreement shall be the substantive and procedural law of the State of New York. (emphasis added).

Both the NYSE and the NASD arbitration rules share identical language regarding the nonarbitrability of Class Action claims. Critically, the NYSE arbitration rules state:

7

    (i)    A claim submitted as a class action shall not be eligible for arbitration under the Rules of the New York Stock Exchange, Inc.[1]

    (ii)    Any claim filed by a member or members of a putative or certified class action is also **ineligible for arbitration at the New York Stock Exchange, Inc. [NASD] if the claim is encompassed by a putative or certified class action filed in federal or state court**, or is ordered by a court to a non SRO arbitration forum for class-wide arbitration. However, such claims shall be eligible for arbitration in accordance with Rule 600(a) or pursuant to the parties' contractual agreement, if any, if a claimant demonstrated that it has elected not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.[2]

    (iii)    **No member**, allied member, member organization and/or associated person **shall seek to enforce any agreement to arbitrate against a customer, member, allied member, member organization and/or associated person that has initiated in court a putative class action** or is a member of a putative or certified class with respect to any claims encompassed by the class action....

NYSE Rule 600(d)(i-iii) and NASD Code of Arbitration Procedure Rule 10301(d)(1-3)(emphasis added).

Under these rules, this Court cannot compel arbitration. See <u>Nielsen v. Piper, Jaffray & Hopwood, Inc.</u>, 66 F.3d 145 (7th Cir. 1995) (finding class action claim outside the scope of arbitration agreement since NASD and NYSE rules bar arbitration of such claims and recognizing court adjudication of class actions); <u>Scher v. Equitable Life Assurance Society of the United States</u>, 866 F.Supp. 776 (S.D.N.Y. 1994) (although the Form U-4 contains an arbitration

---

[1] NASD Code of Arbitration Procedure Rule 10301(d)(1) differs only, providing "...under this Code at the Association."

[2] NASD Code of Arbitration Procedure Rule 10301(d)(2) differs only, providing, "...an arbitral forum not sponsored by a self-regulatory organization for classwide arbitration..."

clause, class action suits are not subject to NASD arbitration); Martens v. Smith Barney, Inc., 181 F.R.D. 243 (S.D.N.Y. 1998) (compelling arbitration of plaintiffs' class action would frustrate their reasonable expectation that the Form U-4 arbitration clause did not cover class actions); compare In re Salomon Inc. Shareholders' Derivative Litigation, No. 91 Civ. 5500, 1994 WL 533595 (S.D.N.Y. 1994) (NYSE Rule 600(d) prohibits the submission of class actions for arbitration but not shareholder derivative actions).

In an effort avoid their unambiguous obligation to defend in court, PSI cites a completely inapposite case, Howard v. Klynveld Peat Marwick Goerdeler, 977 F. Supp. 654, 655 n.7 (S.D.N.Y. 1997), aff'd. 173 F.3d 844 (2nd Cir. 1999). In Howard, the plaintiff entered into an employment agreement which required any dispute arising out of Howard's employment to be arbitrated under the rules of the American Arbitration Association ("AAA"). Although the issues before the court concerned service of process, jurisdiction, and dismissal of a duplicative action, in dicta the court stated that because plaintiff agreed to arbitrate her claims, she could not avoid arbitration by pursuing class claims in court. The AAA, unlike the NYSE or NASD, specifically has rules allowing and governing class arbitration. See Rules 1-12, American Arbitration Association, Supplementary Rules for Class Arbitrations.[3]

Howard has no application here, where the NYSE and the NASD rules explicitly prohibit PSI from even attempting to compel arbitration of class claims. Rather, this case is much more akin to Blythe v. Deutsche Bank, 2005 WL 53281 (S.D.N.Y. 2005), where Deutsche Bank conceded that because plaintiffs were members of a putative class, it was prohibited under

---

[3] The dicta is supported by Champ. V. Siegel Trading Co., 55 F.3d 269, 276-277 (7th Cir. 1995). Champ simply makes the unremarkable statement that FRCP 81(a)(3) does not provide a district court authority to reform the parties' arbitration agreement to order class arbitration where the arbitration agreement is silent with respect to class arbitration. Id.

the NASD arbitration rules from seeking to compel arbitration until after either a denial of class certification or upon exclusion of the plaintiffs from a certified class. Id. at *3.

    Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003), also cited by PSI, appears to be a passing suggestion that this Court does not even have the power to decide this issue. In Green Tree, the arbitration clause was silent on the issue of class arbitrability, and the Supreme Court merely held that the interpretation of whether that silence permitted class arbitration, as opposed to one-on-one arbitration, is for an arbitrator to decide. The Supreme Court nevertheless noted that courts decide "certain gateway matters, such as whether the …arbitration clause applies to a certain type of controversy." Id. at 452. The issue before this Court is not about whether a class arbitration can be had, since the NYSE and NASD rules prohibit it. The issue presented by PSI is a "gateway" issue -- to be decided by this Court.

## B.    An NYSE or NASD Arbitration Panel Will Exceed The Scope of Its Authority By Considering This Claim

    "An arbitration board exceeds the scope of its authority when it modifies, rewrites, or holds contrary to clear and unambiguous contractual language." Katz v. Feinberg, 167 F. Supp. 2d 556, 572 (S.D.N.Y. 2001), aff'd, 290 F.3d 95 (2d Cir. 2002 "Because arbitration is a creature of contract, the arbitrability of an issue derives fundamentally from the parties agreement to arbitrate. Thus, the scope of the arbitrators' authority depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." Id. at 565-66. (citations omitted) Since the parties here executed arbitration agreements that did not allow for arbitral submission of claims included within putative or certified class actions, [4] "it

---

[4] NASD Code of Arbitration Procedure Rule 10301(d)(2) and NYSE Arbitration Rule 600(d)(ii).

10

follows inexorably" that an Arbitration Panel will exceed the scope of its authority by hearing and issuing an award on those claims. Id. at 572.

II.

**PLAINTIFF HAS PROPERLY PLEADED
AND TIMELY BROUGHT RICO CLAIMS**

A.    The Standard On A Motion To Dismiss

On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in favor of the plaintiff. See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 699-700 (2d Cir. 1994. The plaintiff "need provide only a short and plain statement of the claim showing that the pleader is entitled to relief." Hartzog v. Reebok Intern. Ltd., 77 F. Supp.2d 478, 479 (S.D.N.Y. 1999 (citing FRCP 8(a)). "Indeed, the pleading of evidence should be avoided." Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 124 (2d Cir. 1991; see also Hartzog, supra ("An evidentiary standard is not a proper measure of whether a complaint fails to state a claim").

The issue for the Court to determine is not whether a plaintiff will ultimately prevail on his claims. See Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996. A complaint may thus be properly dismissed "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." McNulty v. New York Dept. of Finance, 941 F. Supp. 452, 454 (S.D.N.Y. 1996 (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 191 (2d Cir. 1994).

11

Moreover, Federal Rule 9(b) provides, in relevant part, that "[i]n all averments of fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of the mind of a person may be averred generally." FRCP 9(b). "Rule 9(b) must be read, however, in conjunction with Federal Rule of Civil Procedure 8(a), which requires a 'short and plain statement of the claims showing that the pleader is entitled to relief.'" Ades v. Deloitte & Touche, 799 F.Supp. 1493, 1498 (S.D.N.Y. 1992. "On a motion to dismiss on Rule 9(b) grounds, a court must assume the truth of the plaintiff's allegations and draw all inferences in favor of the pleader." Id. emphasis added.)

**B.    Plaintiff's RICO Claims Are Timely**

Contrary to PSI's allegation, Plaintiff's RICO claims were timely brought. The existence of the Secret Agreements was not known to Plaintiff until in or about October 2004. (Am. Cplt. ¶ 12)  As PSI concedes, "Plaintiff had four years from the date he discovered or should have discovered" his injury. (PSI Br. at 14.)  Therefore, October 2004 is the effective date from which the four-year statute of limitation governing RICO claims runs. Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

Defendant PSI argues that the date on which the Settlement Agreement was signed, October 27, 1998 started the statutory period. (PSI Br. p. 14)  However, given that Plaintiff discovered the existence of the Secret Agreements only in October 2004, the four-year statutory period must be calculated from that date. The limitations period begins to run when a plaintiff knew or should have known of his injury. Rotella v. Wood, 528 U.S. 549, 120 S.Ct.

12

1075, 1080, (2000); see also, In re Sumitomo Copper Litigation, 104 F.Supp.2d 314, 322

(S.D.N.Y. 2000).[5]

### C.    Plaintiff Has Properly Plead RICO Claims

To establish a RICO claim, a plaintiff must plead (1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity. See Sedima, S.P.R.L. v. Imrex, Co., Inc., 473

U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); Azrielli v. Cohen Law Offices, 21

F.3d 512, 520 (2d Cir.1994); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F.Supp. 505, 511

(S.D.N.Y. 1990).

PSI alleges that Plaintiff has failed to state a RICO violation since he has not

adequately pleaded (1) the specific provision of 18 U.S.C. § 1962 that PSI violated, (2) "two

predicate acts, essential elements of any RICO action," (3) "a legally cognizable pattern of

racketeering activity," (4) causation, and (5) a claim for RICO conspiracy.

### 1.    Plaintiff Specifically Alleges a Provision of Section 1962

The gravamen of PSI's argument is that it somehow has not been "adequately

alert[ed]" to Plaintiff's RICO claims because Plaintiff has not specifically identified one of the

four subsections upon which the Complaint is based.  (PSI Br. at 16.)  18 U.S.C. §1962 contains

four short subsections, a-d, and none of these subsections is further divided.  Contrary to PSI's

allegation, Plaintiff specifies that Defendants violated subsection (c) of 18 U.S.C. § 1962. (Am.

Cplt. ¶ 62).

---

[5] PSI's citations to Oboler v. Ins. Co. of North America, 194 WL 414438 (S.D.N.Y. 1994) and Gary Plastic
Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, 903 F.2d 176 (2d Cir. 1996) are irrelevant. Both cases
dealt with the denial of class certification because not all of the elements of FRCP 23 had been met. Class
certification is not before this Court.

13

Even if Plaintiff had not identified a specific sub-section, PSI's argument still fails. PSI relies on Atlantic Gypsum Co. v. Lloyds Int'l Corp. for the proposition that because Plaintiff has not specifically identified which one of the four subsections of Section 1962 was violated, the Court should find Plaintiff's pleadings deficient. In Atlantic Gypsum, the Court wrote:

> "[F]ailure to plead a specific subsection of §1962 may alone constitute grounds to dismiss a RICO complaint, because it fails to inform defendant of the unlawful conduct in which they allegedly engaged. Reynolds v. East Dyer Development Co., 852 F.2d 1249, 1251 (7th Cir. 1989). Because all plaintiffs' claims are dismissed under Rule 9(b), it is unnecessary to decide if their failure to properly plead a specific subsection ... also warrant[s] dismissal of the RICO counts.

Id. at 511 n. 4. Reynolds, cited in both Atlantic Gypsum and by PSI, does not help PSI. In Reynolds, the amended complaint was "woefully unclear about what the enterprise was, and about the defendants' conduct relating to the enterprise. For another, the amended complaint neglected to mention exactly what section of RICO the defendants allegedly violated." Reynolds at 1251. The Reynolds Court nevertheless found that plaintiff's lawsuit was pursuant to § 1962(c), but upheld the district court's dismissal of it given that the amended complaint was so poorly written that it warranted sanctions. Id. Here, even if Plaintiff had failed to identify a specific subsection, PSI's position is nonetheless untenable since it cannot seriously argue, and does not argue, that it is unaware of what Plaintiff is claiming, which is the basis of the Atlantic Gypsum and Reynolds decisions.[6]

---

[6] Lesavoy v. Lane, 304 F.Supp.2d 520 (S.D.N.Y. 2004), also cited by PSI, adds nothing to its argument. In Lesavoy, plaintiffs failed to comport with the heightened particularity requirements of FRCP 9(b). PSI does not claim plaintiff has failed in that requirement. As a result of the failure to comport with FRCP 9(b), the court dismissed the RICO claims "for failure to plead with the requisite particularity." Id. The court further noted that the complaint alleged that all four subparts of 18 U.S.C. § 1962 were transgressed, and "rarely can a defendant simultaneously violate all four." Id.

2.    **Plaintiff Has Pleaded At Least Two Predicate Acts**

Contrary to PSI's allegations, the amended complaint adequately pleads at least two predicate acts based on PSI's participation in racketeering activities. Plaintiff specifically pleaded that PSI committed mail fraud:

> The letter dated September 22, 1999 from counsel for Prudential Securities to Leeds stating, among other things, that the "mediation process ... came to a grinding halt on August 1, 1999 because of your firm's [Leeds-Morelli] fees claim", that Leeds-Morelli had refused to proceed with the mediations until its claim for fees was resolved, and that the claims of Plaintiff and the other Class Members had been capped as a result of an agreement by Leeds-Morelli and Prudential Securities, with Leeds-Morelli attorneys referring to the claims of Plaintiff and the other Class Members as "'cap cases.'"

(Am. Cplt. ¶ 68(b)(5))

Plaintiff specifically pleaded multiple instances of wire fraud:

> (1) The aforementioned September 22, 1999 letter from counsel for Prudential Securities to Leeds which was sent via facsimile in addition to mail (Am. Cplt. ¶ 68(c)(1));

> (2) Vaughn's Settlement Agreement and General Release dated October 27, 1998 which was sent from the Prudential Securities Law Department via facsimile to Leeds-Morelli (Am. Cplt. ¶ 68(c)(2)); and

> (3) Numerous telephone conversations regarding the Secret Agreements by and between the Defendants in furtherance of the racketeering activities. (Am. Cplt. ¶ 68(c)(3)).

The elements of mail or wire fraud are (1) a scheme or artifice to defraud, (2) for the purpose of obtaining money or property, or of depriving another of the intangible right of honest services, and (3) the use of the mails or wires in furtherance of the scheme. United States v. Altman, 48 F.3d 96, 101 (2d Cir.1995); United States v. Trapilo, 130 F.3d 547, 551 (2d Cir.1997). As the Trapilo Court stated:

15

> "The thing which is condemned is (1) the forming of the scheme to defraud, however and in whatever form it may take, and (2) a use of mail and wire communications in its furtherance. If that is satisfied, nothing more is required." Id.

PSI's complaint, however, is not that the predicate acts of mail or wire fraud are not pleaded, but rather that they do not meet the particularity requirement of FRCP 9(b). (PSI Br. at 17) However, here Plaintiff has met the time and content requirements of Rule 9(b) in that the Amended Complaint "(1) specif[ied] the statements that the plaintiff contends were fraudulent, (2) identif[ied] the speaker, (3) state[d] where and when the statements were made, and (4) explain[ed] why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994) (internal citations omitted).[7] PSI complains that Plaintiff has not identified "a single false statement or actionable omission by Prudential, let alone allege facts giving rise to an inference that the same were fraudulent." (PSI Br. at 17).

PSI's reliance that something it did must be false is wrong. As the court stated in A. Terzi Production v. Theatrical Protect. Union, 2 F.Supp. 2d 485 (S.D.N.Y. 1998):

> The Supreme Court held in Schmuck v. United States, 489 U.S. 705, 714-15, 109 S.Ct. 1443, 103 L.Ed2d 734 (1989) that to establish a "scheme to defraud," a defendant's mailings or wires need not themselves contain false or misleading statements, so long as they further an underlying scheme which itself has a fraudulent, deceptive purpose. The Court based its holding on the recognition that mailings could be perfectly innocuous, yet still perform a necessary component of a master plan to defraud. Id. at 714-15, 109 S.Ct. 1443 (upholding mail fraud violation where defendant's routine business mailings of title documents furthered fraudulent scheme to purchase used cars, roll back their odometers, and resell them to unwitting purchasers at artificially inflated prices based on low mileage reading); Spira v. Nick, 876 F.Supp. 553, 557-58 (S.D.N.Y. 1995) (allegations of embezzlement through deceptive tactics satisfied "scheme to defraud" element although complaint did not allege particular

---

[7] In any event, since most of the facts are to this day solely in the possession of the defendants, this is a case where "it is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant." ABF Capital Management v. Askin Capital Management, 957 F.Supp. 1308, 1327 (S.D.N.Y. 1997), citing Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974).

16

> fraudulent statements); In re Sumitomo Copper Litig., 995 F.Supp. 451,
> 453 (S.D.N.Y. 1998) (plaintiffs not required to allege that mailings or
> wire communications contained false or misleading information where
> Complaint set forth detailed allegations of how they furthered defendants'
> underlying scheme to manipulate copper prices in the market by making
> false statements to the market place and regulators).

Id. at 501, n.12.

Here, the September 22, 1999 letter from PSI's counsel and the sending of

Vaughn's Settlement Agreement clearly further the underlying scheme at issue in this action –

the secret pay-off of Plaintiff's attorneys in exchange for a cap on liability and the assurance that

the claims would never see the light of day in court. The complaint plainly apprises PSI of this,

comporting with the intention of Rule 9(b) to provide "defendant with fair notice of plaintiff's

claim." Shields at 1124.

As another predicate act, Plaintiff pleads bribery:

> A pattern of racketeering activity involving commercial bribing and
> commercial bribe receiving in violation of New York Penal Law
> §180.03 and §180.08 as set forth above. The Secret Agreements
> provided for payments to Leeds-Morelli in excess of $1,000.00 and
> caused economic harm exceeding $250.00." (Am. Cplt. ¶ 68(d)).

Racketeering activity includes acts or threats involving bribery which are

chargeable under State law,[8] 18 U.S.C. § 1961(1)(A). PSI concedes that in New York,

commercial bribery and commercial bribe receiving qualify as predicate acts under RICO.

Instead, PSI argues that the bribery did not cause an injury to Plaintiff. Plaintiff's allegation is

that PSI bribed his attorneys, resulting in a sham settlement process with capped claims. How is

that not an injury to Plaintiff?

---

[8] Violations of commercial bribery and bribe receiving statutes. New York Penal Law §§ 180.03, 180.80.

PSI cites Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546 (S.D.N.Y. 2000) in support of this "no injury" proposition, yet Cougar is not at all supportive. In Cougar Audio, the complaint alleged, in relevant part, that the defendant entered into a contract to purchase audio equipment from the plaintiff manufactured by a particular third party. The third party allegedly paid defendants an undisclosed sum for directing the manufacture of the audio equipment to it. The plaintiff alleged, without any factual basis, that these payments must have been passed on to it in the form of inflated prices, yet never alleged that it had any bearing on the ultimate value of the transaction. This assumption by plaintiff, without more was deemed speculative by the court. In other words, bribery was merely inferred.

Here, the allegation that PSI paid Leeds-Morelli what amounts to protection money is very different than a speculative inference of bribery based upon conjecture about a possibly inflated price in a contract. The Complaint, at minimum, alleges that the Secret Agreement(s) provided bribe payment(s) in exchange for, among other things, a cap on PSI's liability. The September 22, 1999 letter even references that cap. This is not speculative. It is in writing between the Defendants.[9]

### 3.    Plaintiff Has Pleaded a Pattern of Racketeering Activity Under RICO

In order to sufficiently allege a pattern of racketeering activity, a plaintiff must allege that defendants' acts "'amount to or pose a threat of continued criminal activity.'" Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999), citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). "The continuity necessary to

---

[9] Neither does United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir. 1994), also cited by PSI, lend it support. There, in a criminal case, the Second Circuit refused to affirm a mail fraud conviction where the theory underlying it -- that the alleged bribe inflated the cost of property to a town -- was not argued to the jury. Id. at 1220.

18

prove a pattern can be either "'closed-ended continuity,'" or "'open-ended continuity.'"  Id.
Plaintiff has sufficiently alleged both.

a.    **Plaintiff has Sufficiently Alleged "Closed-Ended" Continuity**

The Second Circuit has held that in order to establish closed-ended continuity a
plaintiff must show:

> 'a series of related predicates extending over a substantial period of
> time.  Predicate acts extending over a few weeks or months ... do not
> satisfy this requirement ....   Although closed ended continuity is
> primarily a temporal concept, other factors such as the number and
> variety of predicate acts, the number of both participants and victims,
> and the presence of separate schemes are also relevant in determining
> whether closed-ended continuity exists.

Id. (internal citations omitted).

The temporal requirement does not exclude from RICO multiple acts of
racketeering "simply because they achieve their objective quickly or because they further but a
single scheme." GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463, 467 (2d
Cir. 1995).  "Rather, a plaintiff must provide some basis for a court to conclude that defendants'
activities were "'neither isolated or sporadic.'"  Id.  Acts committed over a period of two years
meet this requirement.  Id.

Plaintiff alleges acts that span at least from February 1998, when the first Secret
Agreement was executed, through at least October 2001 when Leed-Morelli reported that the
"mediation process" with PSI was still ongoing, some three and a half years.[10]  This is far
different than the situation in Continental Realty Corporation v. J.C. Penney Company, 729
F.Supp 1452 (S.D.N.Y. 1990), cited by PSI.

---

[10] Discovery will undoubtedly turn up evidence of hundreds of telephone calls and letters (mail and wire fraud) over
an even longer time period, given that the Defendants were dealing with hundreds of victims.

19

In Continental Realty, the RICO claim was based upon a single transaction, in which the plaintiff alleged that J.C. Penney falsely represented that it had received a competing bid from Home Depot for the purchase of property, thus causing plaintiff to raise its bid. Plaintiff also alleged that the defendants concealed information concerning marketable title in order to steer the sale to Home Depot. The alleged scheme lasted just over eight months. The court found that the defendants' actions were "narrowly directed toward a single allegedly fraudulent goal," "involved one victim," "one group of perpetrators," and "a limited goal (fraud and breach of contract in one real estate transaction)." Id. at 1455.

Here, the facts could not be more different. Plaintiff alleges a scheme stretching over at least three and a half years, broadly directed at 500 or more victims. PSI improperly argues that the scheme lasted only from February-October, 1998. That is not what is alleged in the complaint.[11]

PSI also cites Mead v. Schaub, 757 F.Supp. 319 (S.D.N.Y. 1991), for the proposition that continuity cannot be met where the scheme is terminable in nature. This proposition is incorrect. See Continental Realty at 1454 (plaintiff is no longer required to allege an ongoing scheme having no demonstrable ending point). The plaintiff in Mead simply alleged that the defendants fraudulently induced him to accept employment in order to capture his client bases -- one narrow plan, one victim, and the solitary goal of defrauding one person. That is a far cry from this action.

---

[11] If the court were to accept PSI's eight month temporal argument, however, then PSI effectively concedes "open-ended continuity." Because PSI's temporal argument relies only upon the time period between the signing of the first Secret Agreement in February 1998 and Vaughn's execution of the Settlement Agreement in March 1998, then PSI leaves the door open to the threat of future racketeering activity as against the victims who settled their claims against PSI after Vaughn. See Section 3(b), infra.

b.    **Plaintiff Has Sufficiently Alleged "Open-Ended Continuity"**

With respect to open-ended continuity, a plaintiff must allege "'past conduct that by its nature projects into the future with a threat of repetition ....'" GICC Capital Corp. at 465-466, citing H.J. Inc., 492 U.S. at 241-242. Where the enterprise "primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacredit at 243. Here, plaintiff meets this test.

First, the enterprise itself -- consisting of PSI and the other defendants -- regularly operated to defraud Plaintiff and the other Class Members. That was the whole point of the enterprise. Under the above test, this alone is enough.

Second assuming the validity of PSI's argument that the alleged activity involved only Vaughn, then it follows that the illegal conduct was repeated numerous times thereafter. Vaughn's Settlement Agreement was executed in October, 1998. Many settlements were thereafter reached with the other victims. The scheme was still ongoing in October 2001. See, e.g. GICC Capital Corp. at 466 (noting that a series of fraudulent sales of securities, coupled with the fact that defendants were trying to continue to sell them, permitted a jury finding of a RICO pattern concerning open-ended continuity).

Third, the threat of future repetition is alleged in paragraph 34 of the Amended Complaint. It alleges that this scheme has been repeated numerous times, including with Prudential Insurance, PSI's parent. See, e.g., GICC Capital Corp. at 466 (noting that a one time mailing of 8,000 copies of fraudulent documents in connection with a condominium concession

plan was sufficient for open-ended continuity, since there was a basis to infer that similar mailings would occur in the future).

### 4.   Plaintiff Has Pleaded Causation

The Supreme Court has interpreted RICO to require a "direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Contrary to PSI's argument, there can be no other interpretation of causation between PSI's conduct and Plaintiff's injury because Plaintiff was the direct target of the Defendants' Secret Agreement(s) and therefore, the entire scheme. Plaintiff's injury could not be anything but foreseeable and intended by Defendants. PSI complains that Plaintiff does not plead the equivalent of "if I knew that PSI bribed my attorneys, I would have not hired them and not entered into the phony mediation process which resulted in the Settlement Agreement." The undisclosed agreement to cap PSI's liability to plaintiff and keep his claim out of court constitutes a loss to Plaintiff. PSI must certainly understand that is exactly the point of this action.

### 5.   Plaintiff Has Pleaded a Conspiracy Claim under section 1962(d)

PSI, citing Casio Computer Co. v. Sayo 2000 WL 1877516 at *15, argues that "[w]here no cause of action for substantive violations of RICO is stated, the RICO conspiracy claim cannot stand." (PSI Br. at 19)[12]   PSI, however, departs from the wrong premise for their argument since Plaintiff has adequately alleged the requisite elements for a RICO claim. Moreover, Casio states that in order to adequately distinguish a cause of action under Section

---

[12] PSI citation is in error. The correct Westlaw page is 23

1962(d) from (c), "the complaint must allege a conscious agreement among all Defendants to commit at least two predicate acts." Id. at *22. As detailed above, it is the conscious agreement among all the Defendants that forms the basis of this action.

PSI additionally argues that Plaintiff has not asserted the nature of the agreement which forms the basis of the conspiracy. It relies only on paragraphs 71-72 of the Complaint. Paragraph 70, however, incorporates all of the prior allegations, including all of the alleged deficiencies—what the agreement was, who entered into it, what actions were taken in furtherance of it, etc. The whole point of incorporation by reference is to not be overly repetitive. PSI well knows the agreement was the "Secret Agreement(s)," that the "Secret Agreement(s)" amounted to the bribing of Plaintiff's counsel, and the acts in furtherance of the "Secret Agreement(s)," including the Settlement Agreement, are well-documented in the Complaint. There is no "separate flaw" in Plaintiff's allegation under section 1962(d). The RICO conspiracy allegation is much more than a "conclusory add-on at the end of a complaint."

IV.

## VAUGHN SHOULD BE PERMITTED TO AMEND HIS PLEADING IF THE COURT DEEMS HIS ALLEGATIONS TO BE INSUFFICIENT

If the Court finds that the allegations in Plaintiff's Amended Complaint are insufficient to set forth the claims sought to be dismissed by PSI, Mr. Vaughn requests that he be granted leave to amend his pleading to include any further allegations deemed necessary. "As a matter of procedure, when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted." Ricciuti, 941 F.2d at 123; see also Goodman v. New York City Off-Track Betting Corp., 1999

23

WL 269959, *11 (S.D.N.Y.), aff'd, 201 F.3d 431 (2d Cir. 1999 ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.")(citations omitted).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that PSI's Motion to Dismiss the Amended Complaint be denied in its entirety.

Dated: New York, New York
       May 24, 2005

LIDDLE & ROBINSON, L.L.P.

By: _____
     Blaine H. Bortnick (BB 3686)
     Jeffrey L. Liddle (JL 8256)
     Attorneys for Plaintiff
     800 Third Avenue
     New York, New York 10022
     (212) 687-8500

24

**Exhibit C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

JEFFREY S. VAUGHN, individually and on    :
behalf of those class members similarly   :
situated,                                 :
                                          :
                    Plaintiff,            :        04 Civ. 8391 (DLC)
                                          :
          -v-                             :        OPINION AND ORDER
                                          :
LEEDS, MORELLI & BROWN, P.C., LEEDS,      :
MORELLI & BROWN, L.L.P., LEEDS &          :
MORELLI, LEEDS, MORELLI & BROWN,          :
PRUDENTIAL SECURITIES, INC., PRUDENTIAL   :
FINANCIAL, INC., LENARD LEEDS, STEVEN     :
A. MORELLI, JEFFREY K. BROWN, and JOHN    :
DOES, JAMES VAGNINI, FREDERIC DAVID       :
OSTROVE, ROBERT JOHN VALLI, JR.,          :
DISCRIMINATION ON WALL STREET, INC. and   :
DISCRIMINATION ON WALL STREET             :
MANHATTAN, INC., and JOHN DOES, ESQS.     :
1-10 and JANE DOES, ESQS., 1-10 a         :
fictitious designation for presently      :
and unknown licensed attorneys,           :
professionals and/or unknown persons or   :
entities,                                 :
                                          :
                    Defendants.           :
                                          :
-----------------------------------------------X

Appearances:

For the Plaintiff:

Blaine H. Bortnick
Jeffrey Liddle
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York  10022

For Defendants Leeds, Morelli & Brown,
P.C., Leeds, Morelli & Brown, L.L.P.,
Leeds & Morelli, Leeds, Morelli &
Brown, Lenard Leeds, Steven A. Morelli,
Jeffrey K. Brown, James Vagnini,
Frederic David Ostrove, and Robert John
Valli, Jr.:

Daniel T. Hughes
Kevin L. Spagnoli
Litchfield Cavo LLP
420 Lexington Avenue, Suite 1750
New York, New York 10170

For Defendant Prudential Securities,
Inc. and Prudential Financial, Inc.:

Gerard E. Harper
Theodore V. Wells, Jr.
Beth S. Frank
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019

DENISE COTE, District Judge:

The plaintiff, Jeffrey S. Vaughn ("Vaughn"), has brought
this putative class action against his employer and the lawyers
he retained to represent him in an employment discrimination
dispute against his employer, alleging that the settlement
agreement that resolved the dispute (the "Agreement") was a
product of secret collusion between his employer and his lawyers.
The defendants have moved to dismiss this action and to compel
arbitration, relying on an arbitration provision in the
Agreement.  Vaughn contends that the arbitration provision does
not control, because the arbitration rules provided for in the
Agreement do not permit class actions, and his lawyers are not
parties to the Agreement.  For the following reasons, the motion
to compel arbitration is granted and the case is stayed until the
resolution of the arbitration proceedings.

2

**BACKGROUND**

The following facts are taken from Vaughn's amended complaint unless otherwise noted. In 1998, Vaughn retained lawyers from Leeds, Morelli & Brown, P.C. (collectively "Leeds Defendants"), to assert employment discrimination claims against his employer, Prudential Securities Incorporated, for which Prudential Financial Inc. is a successor in interest (collectively "Prudential Defendants"). Vaughn pursued these claims through alternative dispute resolution procedures including mediation. The dispute between Vaughn and the Prudential Defendants produced the Agreement dated October 27, 1998. The Agreement, which is incorporated by reference in the Complaint and on which Vaughn has relied in part in bringing this action, granted the Prudential Defendants a general release of claims in exchange for $200,000.00. The Agreement also contains the following arbitration provision:

> <u>Any claim or controversy arising out of or related to this Agreement or the interpretation thereof</u> will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc. Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof. The governing law of this Agreement shall be the substantive and procedural law of the State of New York.

(Emphasis supplied.)

Vaughn alleges that the Leeds Defendants and Prudential Defendants had a "secret agreement" dated February 13, 1998 that was part of an employment discrimination dispute resolution system that the Leeds Defendants had established, and that would

3

enable the Prudential Defendants to cap damages paid to various plaintiffs and settle numerous claims with plaintiffs represented by the Leeds Defendants at one time with a lump sum payment while providing direct payment of attorney's fees to the Leeds Defendants. Vaughn claims that he only learned of the existence of the secret agreement in or about October 2004. He initiated this action on October 25, 2004, and filed an amended complaint ("Complaint") on March 15, 2005.

Vaughn has styled this action as a class action based on his allegation that hundreds of other Prudential employees with discrimination claims against the company were adversely affected by collusion between the Leeds Defendants and the Prudential Defendants based on this or other secret agreements. Vaughn asserts claims for common law fraud, conspiracy to defraud, aiding and abetting fraud, tortious interference with a contract, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Racketeer Influenced Corrupt Organization Act ("RICO").

The Prudential Defendants and the Leeds Defendants both have filed motions to dismiss or to compel arbitration. The Prudential Defendants contend that because the Agreement contains an arbitration provision, this matter should be referred to arbitration, and that this Court does not have subject matter jurisdiction because the only mechanism conferring federal question jurisdiction is the RICO claim, which the Prudential Defendants argue is time-barred and insufficiently pleaded. The Leeds Defendants advance similar arguments, and add, among other

4

things, that the arbitration clause equitably estops Vaughn from
pursuing his claims in federal court notwithstanding the fact
that the Leeds Defendants are not parties to the Agreement.
Vaughn argues among other things that because the arbitration
rules provided for in the Agreement do not permit class actions,
and he has styled his claim as a class action, this matter should
not be referred to arbitration.

### DISCUSSION

1. The Prudential Defendants

The FAA was designed to "ensure judicial enforcement of
privately made agreements to arbitrate." Dean Witter Reynolds
Inc. v. Byrd, 470 U.S. 213, 219 (1985). The FAA represents "a
strong federal policy favoring arbitration as an alternative
means of dispute resolution." JLM Indus., Inc. v. Stolt-Nielsen
SA, 387 F.3d 163, 171 (2d Cir. 2004) (citation omitted).
Therefore, "under the FAA, 'any doubts concerning the scope of
arbitrable issues should be resolved in favor of arbitration,
whether the problem at hand is the construction of the contract
language itself or an allegation of waiver, delay, or a like
defense to arbitrability.'" Id. (quoting Moses H. Cone Mem'l
Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).  The
FAA requires that a contract provision to arbitrate disputes
arising out of the contract "shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract."  9 U.S.C. § 2.

Under the FAA, unless parties have unambiguously provided

5

for an arbitrator to decide questions of arbitrability, it is for
courts to decide whether the parties agreed to arbitrate.  Contec
Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005).
A court deciding a motion to compel arbitration must resolve four
issues: (1) whether the parties agreed to arbitrate; (2) the
scope of the agreement to arbitrate; (3) if federal statutory
claims are asserted, whether Congress intended those claims to be
nonarbitrable; and (4) if some, but not all, of the claims are
arbitrable, whether to stay the balance of the proceedings
pending arbitration.  JLM Indus., 387 F.3d at 169.  In this case,
the Prudential Defendants and Vaughn agree that all of Vaughn's
claims are arbitrable and that Vaughn agreed to the arbitration
provision.  They merely dispute whether the scope of the
arbitration provision includes claims styled as class actions.

     In the absence of "clear and unmistakable evidence to the
contrary" in an arbitration clause, only in limited circumstances
will a court "assume that the parties intended courts, not
arbitrators, to decide a particular arbitration-related matter."
Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003)
(citation omitted).  "These limited instances typically involve
matters of a kind that contracting parties would likely have
expected a court to decide."  Id. (citation omitted).  "They
include certain gateway matters, such as whether the parties have
a valid arbitration agreement at all or whether a concededly
binding arbitration clause applies to a certain type of
controversy."  Id.  The question of whether arbitration clauses
"forbid class arbitration . . . does not fall into this narrow

6

exception" because it involves "neither the validity of the
arbitration clause nor its applicability to the underlying
dispute between the parties." _Id._  Thus, in a case where an
arbitration clause provided that the parties "agreed to submit to
the arbitrator '[a]ll disputes, claims, or controversies arising
from or relating to this contract,'" the Supreme Court held that
a dispute about whether the arbitration clause "forbids the use
of class arbitration procedures . . . is a dispute 'relating to
this contract.'"  _Id._ at 451 (emphasis in original).[1]  In such a
case, it was apparent that the parties "agreed that an
arbitrator, not a judge, would answer the relevant question."
_Id._ at 452.

    The arbitration clause in the Agreement contains "sweeping
language concerning the scope of the questions committed to
arbitration," _id._ at 453, as it commits to arbitration "[a]ny
claim or controversy arising out of or related to this Agreement
or the interpretation thereof."  (Emphasis supplied.)  Vaughn
claims that because the arbitration clause states that the
contemplated arbitration will use the "rules of the New York
Stock Exchange, Inc., or the National Association of Securities
Dealers, Inc.," and those rules do not permit class action
arbitrations, the parties could not have intended that the class
action he now brings would be arbitrated.  This interpretation,

---

[1]  In _Bazzle_, an issue was whether arbitration clause
language providing that disputes "shall be resolved . . . by one
arbitrator selected by _us_ [Green Tree] with consent of _you_ [Green
Tree's customer]" forbade class action arbitrations because the
"consent of you" language was arguably inconsistent with multiple
claimants.  _Bazzle_, 539 U.S. at 450.

however, contradicts the clear statement that the arbitration clause applies to "any" claim or controversy related to the Agreement.  Even assuming that Vaughn is right, and the applicable arbitration rules do, indeed, forbid class action arbitrations under all circumstances, it would be plausible to interpret the arbitration clause to require all claims to be arbitrated and to disallow class actions with no further qualifications or caveats.  Here, as in <u>Bazzle</u>, the question is "not whether the parties wanted a judge or an arbitrator to decide <u>whether they agreed to arbitrate a matter</u>," but rather "what <u>kind of arbitration proceeding</u> the parties agreed to." <u>Bazzle</u>, 539 U.S. at 452 (emphasis in original).  This question "concerns contract interpretation and arbitration procedures," and is therefore "for the arbitrator, not the courts, to decide." <u>Id.</u> at 453.  The Prudential Defendants' motion to compel arbitration is accordingly granted.[2]

### 2.   The Leeds Defendants

The common law doctrine of estoppel may bind a nonsignatory to an arbitration agreement.  <u>JLM Indus.</u>, 387 F.3d at 177.  <u>See also Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.</u>,

---

[2]  The defendants argue that the Complaint fails to state a claim for a RICO violation, and therefore, there is no basis for federal subject matter jurisdiction.  Because the Complaint has a RICO claim that on its face is "neither clearly immaterial and made solely for the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous," <u>Lyndonville Sav. Bank & Trust Co. v. Lussier</u>, 211 F.3d 697, 701 (2d Cir. 2000), there is subject matter jurisdiction over this action as of now.

8

271 F.3d 403, 404, 406 (2d Cir. 2001); Thomson-CSF, S.A. v. Am.
Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995); Camferdam v.
Ernst & Young Int'l, Inc., No. 02 Civ. 10100 (BSJ), 2004 WL
307292, at *6 (S.D.N.Y. Feb. 13, 2004).

> [U]nder principles of estoppel, a non-signatory to an
> arbitration agreement may compel a signatory to that
> agreement to arbitrate a dispute where a careful review
> of the relationship among the parties, the contracts
> they signed, and the issues that had arisen among them
> discloses that the issues the nonsignatory is seeking
> to resolve in arbitration are intertwined with the
> agreement that the estopped party has signed.

JLM Indus., 387 F.3d at 177 (citation omitted) (emphasis
supplied).  See also Denney v. BDO Seidman, L.L.P., 412 F.3d 58,
70 (2d Cir. 2005); Contec, 398 F.3d at 209; Choctaw, 271 F.3d at
406.

     The Leeds Defendants argue that under this standard, they
may compel Vaughn to arbitrate his claims against them, because
he alleges a close relationship, in the form of a conspiracy,
between both sets of defendants, and because the claims Vaughn
raises against the Leeds Defendants are intertwined with the
Agreement.  Vaughn concedes that his claims against the Leeds
Defendants are related to the Agreement, but argues that the
relationship between the Leeds Defendants and the Prudential
Defendants was not close enough to warrant estoppel in this case,
because they did not have a relationship with each other
independent of Vaughn's alleged conspiracy.

     Vaughn's argument misconstrues the governing legal standard.
The Second Circuit has held that a claim against an alleged co-
conspirator may not "always be intertwined to a degree sufficient

9

to work an estoppel," and that "[t]he inquiry remains a fact-specific one." JLM Indus., 387 F.3d at 178 n.7 (emphasis supplied). Nonetheless, "[a]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Denney, 412 F.3d at 70 (quoting Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000)). In a putative class action where the plaintiff taxpayers accused an accounting firm and a bank, among others, of conspiring to lure them into participating in unlawful tax shelter schemes, and the plaintiffs had an arbitration agreement with the accounting firm but not the bank, the Second Circuit held:

> Having alleged in this RICO action that the [nonsignatory bank] and [signatory accounting firm] defendants acted in concert to defraud plaintiffs, and that defendants' fraud arose in connection with [the accounting firm's] tax-strategy advice, plaintiffs cannot now escape the consequences of those allegations by arguing that the [bank] and [accounting firm] defendants lack the requisite close relationship, or that plaintiffs' claims against the [bank] defendants are not connected to [the bank's] relationship with the accounting firm].

Denney, 412 F.3d at 70 (citation omitted). Vaughn's basic premise that Second Circuit precedent requires that the defendants have a close relationship independent of the alleged conspiracy is consequently incorrect.[3]

---

[3] To the extent that Vaughn cites district court opinions that predate Denney for the proposition that a close relationship independent of the alleged conspiracy is required for a "close relationship," this Court respectfully declines to follow them.

10

Vaughn contends that the Leeds Defendants had a complex scheme to settle employment discrimination claims en masse, and that this scheme involved capping liability for employers such as the Prudential Defendants in exchange for direct payment of attorney's fees by the employers. He alleges that his employment discrimination claim was swept up by this scheme because the Leeds Defendants had a comprehensive, secret agreement with the Prudential Defendants to process his claim, among others, and that this agreement adversely affected the settlement of his claim. These allegations of civil RICO conspiracy involve close cooperation and collusion between Vaughn's employer and his lawyers. This theory of liability has been described elsewhere as one that "can only succeed" if the plaintiff proves his "allegation that all Defendants conspired and acted together." Camferdam, 2004 WL 307292, at *7.[4] Vaughn therefore alleges precisely the type of "substantially interdependent and concerted misconduct" that estops him from avoiding arbitration of his claims with the Leeds Defendants. Denney, 412 F.3d at 70

---

See In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 264 (S.D.N.Y. 2005); Orange Chicken, LLC v. Nambe Mills, Inc., No. 00 Civ. 4730 (AGS), 2000 WL 1858556, at *5 (S.D.N.Y. Dec. 19, 2000).

[4] In Camferdam, where the district court required taxpayers who had arbitration agreements with an accounting firm, and who were suing the accounting firm and a nonsignatory law firm for conspiring to create unlawful tax shelters on the taxpayers' behalf, to arbitrate claims against the law firm, the court also noted that the complaint alleged a "close relationship" between the entities involved, because "[a] civil conspiracy is a kind of partnership, in which each member becomes the agent of the other." Camferdam, 2004 WL 307292, at *6 (citation omitted).

11

(citation omitted).  The Leeds Defendants' motion to compel arbitration is therefore granted.

## CONCLUSION

The defendants' motions to compel arbitration are granted. The case is stayed until the resolution of the arbitration proceedings and is transferred to the Court's suspense docket.

SO ORDERED:

Dated:    New York, New York
          August 12, 2005

                                    _____
                                         DENISE COTE
                              United States District Judge

12