# Exhibit O

# LIDDLE & ROBINSON, L.L.P.

800 THIRD AVENUE
NEW YORK, N.Y. 10022
———
(212) 687-8500
FACSIMILE: (212) 687-1505
www.liddlerobinson.com

MIRIAM M. ROBINSON (RETIRED)
———
JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

E-MAIL: jliddle@liddlerobinson.com

JEFFREY ZIMMERMAN
STEPHEN J. STEINLIGHT
ANDREA M. PAPARELLA
REBECCA A. SAENGER
LISA D. SIDMAN
GINA N. WEINBERG
DAVID H. FELDSTEIN
AMY L. STUTIUS*
———
*AWAITING ADMISSION TO THE BAR

February 20, 2007

**VIA MAIL AND FACSIMILE/ (301) 527-4873**
Lewis S. Kurlantzick, Doris Lindbergh, Esq.
    and Nathan M. Lubow
c/o Archna Curry, Case Administrator
NASD Dispute Resolution, Inc.
One Liberty Plaza
165 Broadway – 16th Floor
New York, NY 10006

Re:  Jeffrey S. Vaughn, individually and on behalf of those class members
     similarly situated v. Leeds, Morelli & Brown, P.C., Leeds, Morelli &
     Brown, L.L.P., Leeds & Morelli, Leeds, Morelli & Brown, Prudential
     Securities, Inc., Prudential Financial, Inc., Lenard Leeds, Steven A.
     Morelli, Jeffrey K. Brown, James Vagnini, Frederic David Ostrove,
     Robert John Valli, Jr., DISCRIMINATION ON WALL STREET, INC.,
     DISCRIMINATION ON WALL STREET MANHATTAN, INC., and
     JOHN DOES, 1-10 and JANE DOES, 1-10 a fictitious designation for
     presently and unknown licensed attorneys, professionals and/or unknown
     persons or entities; NASD DR Arbitration No. 06-00534

Dear Mr. Kurlantzick, Ms. Lindbergh, and Mr. Lubow:

        We represent the Claimant, Jeffrey S. Vaughn ("Vaughn").  Pursuant to
the briefing schedule established during the initial pre-hearing conference on December
7, 2006, we hereby submit Mr. Vaughn's Brief in Response, which jointly responds to the

LIDDLE & ROBINSON, L.L.P.                    2                    February 20, 2007
The Arbitration Panel

Motion for Judgment on the Pleadings submitted by Prudential Securities, Inc. (together with Prudential Financial, Inc., "PSI"), and the Memorandum of Law submitted by the law firm of Leeds, Morelli, and Brown, P.C. and individual attorneys (collectively, the "Leeds Respondents").

The arguments presented in the two briefs submitted by Respondents serve only to obfuscate the relatively straightforward matter before the Panel by introducing irrelevant issues. Respondents' efforts to confound the Panel with irrelevant case law must fail in the face of the simple order issued by Judge Cote: "to interpret the agreement and decide what the parties' intentions were." (September 5, 2006 Transcript of Proceedings in *Vaughn v. Leeds, Morelli & Brown, P.C., et al.*, S.D.N.Y. Case No. 04 Civ. 08391 (DLC), attached to Claimant's Initial Brief as Exhibit B, p. 4:20-22.)

## The PSI Respondents Misstate the Order of the District Court

The PSI Brief misstates the directive of the District Court. PSI claims that "this Panel cannot, as a matter of law, send Vaughn back to Court to litigate those claims." (PSI Brief, at 2.) Judge Cote clearly stated the exact opposite. In the hearing on September 6, 2006, Judge Cote explained, "I contemplated, therefore, that the arbitrator, in deciding the parties' intentions, might decide that the agreement to arbitrate does not foreclose the plaintiff from coming to court and litigating a class action." (Exhibit B, p. 14:20-23.) The Panel clearly has the option of dismissing this arbitration and permitting Mr. Vaughn to pursue his claims in the District Court.

This principle is recognized by the Leeds Respondents, who summarize Judge Cote's order as such:

> The Court recognized that there were at least three alternatives that the arbitrators could reach as to the intention of the parties, i.e., that the parties intended to disallow class actions, that the parties agreed to arbitrate individual claims and *reserved litigation for class allegations* or that the parties agreed to arbitrate both individual and class claims. (Leeds Brief, at 7.) (emphasis added)

The PSI Respondents summarize this order similarly. (PSI Brief, p. 12.) Yet, the PSI Respondents engage in legal contortions by declaring that the possibility of litigating class claims still requires Mr. Vaughn to arbitrate his individual claims. (PSI Brief, at 12-13.) PSI even argues that no class action can exist because "all putative class members similarly situated to Vaughn would have their individual claims compelled to arbitration and could not serve as class representatives in any class action in court." (PSI Brief, at 13.) In fact, in the September 5, 2006 Order, Judge Cote specifically addressed this issue.

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                    3                    February 20, 2007

> But, I think it would be wrong for the defendants [PSI and Leeds] to characterize it the way you are today in court to suggest that the arbitrators' hands are bound in some way such that they couldn't rule in interpreting the parties' intent that the plaintiff [Mr. Vaughn] has the right to come to court and proceed on a class action. (Exhibit B, p. 15:3-8.)

The suggestion that Mr. Vaughn and any potential class members would be prevented from joining a class because they would be compelled to arbitrate their individual claims is ridiculous. PSI's argument directly contradicts Judge Cote's Order that the Panel could find that Mr. Vaughn and the potential members of the class may indeed proceed with their class claims in court. PSI must concede what their co-Respondents have already acknowledged – that the Panel is well within its rights and the directive of the District Court to send Mr. Vaughn's claim back to court for class action litigation.

### Mr. Vaughn Is Not Seeking Class Arbitration

PSI cites several cases to bolster its assertion that "where an arbitration agreement does not explicitly provide for a collective or representative procedure, a plaintiff may not press forward with anything more than his or her individualized claims in arbitration." This appears under the heading "Vaughn May Not Avoid His Agreement To Arbitrate By Asserting A Class Claim." (PSI Brief, at 14.) However, no case cited by PSI stands for that claim.

These cases simply state the unremarkable and well-settled legal principle that a court is without power to order class arbitration, as opposed to a court class action. Each case cited by PSI concerns whether a District Court may consolidate individual arbitration claims and compel *class arbitration*. Mr. Vaughn is not seeking to compel class arbitration, and these cases are therefore irrelevant.

PSI further employs circular reasoning to assert that, since Mr. Vaughn must arbitrate any individual claims, he cannot serve as the class representative. (PSI Brief, at 3.) Mr. Vaughn has conceded that the arbitration clause in the Settlement Agreement requires him to arbitrate any *individual* claims relating to the Settlement Agreement. However, this does not preclude Mr. Vaughn from bringing *class claims* to court.

### Court Decisions Support the Dismissal of Arbitration
### Pending the Outcome of the Court Class Action

Mr. Vaughn's situation is hardly novel. In fact, courts have routinely found that, pursuant to the NASD Rules, arbitration cannot be compelled when there is a putative class action. The courts have made these findings even in the face of the public

policy favoring arbitration, which the Respondents rely upon so heavily. However, when a putative class action exists, the courts have clearly found that strict application of the NASD Rules in individual cases outweighs any general public policy. For example, in *Miron v. BDO Seidman, LLP*, the Eastern District of Pennsylvania relied upon the clear language of NASD Code of Arbitration Procedure Rule 10301(d)(3) in denying a motion to compel arbitration. (*Miron v. BDO Seidman, LLP*, 342 F.Supp.2d 324, 331-32 (E.D.Pa. 2004). The same language was relied upon in *King v. Deutsche Bank AG*, 2005 WL 611954, at *5 - *6 (D.Or. March 8, 2005), and *Blythe v. Deutsche Bank AG*, 2005 WL 53281, at *3 (S.D.N.Y. Jan. 7, 2005). There is ample authority, from the NASD Rules, Judge Cote's Order, and prior rulings in Federal Court, for the Panel to conclude that Mr. Vaughn's claims should be sent back to District Court so that he can pursue class action litigation.

## Respondents Misstate the NASD Code of Arbitration Procedure

The Leeds Respondents' Brief misstates the clear language of the NASD Code of Arbitration Procedure. The rules do not "expressly preclude class action treatment of [a] claim," but rather prevent a party from compelling arbitration when a putative class action on the same issues exists. (Leeds Brief, at 1). The NASD Rules do not prevent Mr. Vaughn from bringing a class action in court.

Respondents seek to enforce their selective reading of the NASD Code of Arbitration Procedure upon Mr. Vaughn. They rely on Rule 10301(d)(1) for the premise that Mr. Vaughn's claim is not eligible for arbitration, yet they fail to recognize that Rule 10310(d)(3) prohibits enforcing an agreement to arbitrate against a member of a putative class action. Respondents' unwillingness to acknowledge or address this provision belies their understanding that it clearly harms their claims.

## Mr. Vaughn Did Not Intend to Waive His Right to Pursue a Class Action

The Leeds Brief is correct in stating that "The Only Issue Before This Panel Is The Intention Of The Parties To The Arbitration Provision," yet on its next point, it jumps to the unfounded conclusion that, "it was the intent of the parties to require individual, non-class arbitration of any dispute under the Settlement Agreement." (Leeds Brief, at 9.) The Leeds Respondents cannot presume Mr. Vaughn's intent. Moreover, Mr. Vaughn's testimony will indicate that he did not intend to waive his right to a class action when he signed the Settlement Agreement. The Leeds Respondents also cite the "objective manifestation" doctrine in their examination of Mr. Vaughn's intent. In fact, application of the objective manifestation doctrine to this matter requires

following the simple language of the NASD Rules, and therefore the dismissal of all motions to compel in the face of a putative class action.

Furthermore, PSI asserts that Mr. Vaughn implicitly waived his right to a class action by signing the Settlement Agreement that requires controversies to be resolved according to the rules of the NYSE or the NASD. Again, a simple reading of the NASD Code of Arbitration Procedure confirms this. NASD Rule 10301(d) does not prohibit a claimant from pursuing a class action, it protects Mr. Vaughn from being compelled to arbitrate when a putative class action encompassing those claims has already been filed.

The PSI Respondents also contradict Judge Cote's Order by asserting that Mr. Vaughn's intent in signing the Settlement Agreement should not be considered. Judge Cote clearly stated, "The issue that was in dispute and that I submitted to arbitration was for an interpretation of the arbitration agreement, and that was for the arbitrator to decide the parties intentions." (Ex. B., p. 14:16-19.) The Leeds Respondents acknowledge this in their brief, noting that, "[b]ased upon the binding decision of the Federal Court and sole issue submitted by Vaughn for determination, this proceeding is limited to resolving the question of the intent of the parties … ." (Leeds Brief, at 8.) Clearly, the Panel has been directed to consider the parties' intent and has the authority to do so.

## The Merits of Mr. Vaughn's Claim Are Not at Issue

The Leeds Brief also seeks to raise issues related to the merits of Mr. Vaughn's claim and the merits of class certification. These issues are categorically irrelevant to this proceeding and not before this Panel. However, Mr. Vaughn's claim (and the claim for damages) is clearly based on his right to recover, under New York law, any bribe or kickback that was exchanged in relation to the settlement of his claim against PSI as negotiated by the Leeds Respondents. Mr. Vaughn is prepared to present his claim for class certification at the appropriate time, and he will not burden the Panel presently with this wholly irrelevant issue.

## Conclusion

The issue presented to the Panel by Mr. Vaughn pursuant to the Order of Judge Cote is clear: to interpret the arbitration agreement in the Settlement Agreement in accordance with the parties' intentions. Mr. Vaughn asserts a straightforward answer to this question – Mr. Vaughn did not intend to waive his rights to pursue a class action and the NASD Code of Arbitration Procedure specifically precludes Respondents from compelling arbitration while a putative class action exists, as it does in the instant case.

LIDDLE & ROBINSON, L.L.P.                    6                    February 20, 2007
The Arbitration Panel

(The federal class action case is currently stayed.)   In light of this, Mr. Vaughn respectfully requests that the Panel rule accordingly and permit Mr. Vaughn to pursue his class action against Respondents in court, an outcome that Judge Cote recognized as viable and in compliance with the relevant laws and NASD Rules.

Dated: New York, New York
       February 20, 2007

                                        Respectfully submitted,

                                        LIDDLE & ROBINSON, L.L.P.

                                        By: _____
                                            Jeffrey L. Liddle
                                            Blaine H. Bortnick
                                            Rebecca A. Saenger
                                        Attorneys for Claimants
                                        800 Third Avenue
                                        New York, New York 10022
                                        (212) 687-8500

cc:    Gerard E. Harper, Esq.
       Shari Claire Lewis, Esq.

Westlaw

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

H
Briefs and Other Related Documents
Miron v. BDO Seidman, LLP,E.D.Pa.,2004.
    United States District Court,E.D. Pennsylvania.
    Amihai MIRON, Ayala Miron, AM Partners, AM
Tuckerstown Investors, Inc., and AM Tuckerstown
        Investors, LLC, Plaintiffs,
            v.
    BDO SEIDMAN, LLP, Robert J. Dudzinsky,
    Deutsche Bank AG, David Parse, Deutsche Bank
    Securities, Inc. d/b/a Deutsche Bank Alex Brown, a
    Division of Deutsche Bank Securities, Inc., Raggi &
    Weinstein, LLP, CPAs & Consultants, and Bob
            Raggi, Defendants.
            **No. CIV.A.04-968.**

            Oct. 20, 2004.

**Background:** Investors who allegedly suffered
losses in tax shelter investment brought action
against tax consultant and securities brokers.
Defendants moved to compel **arbitration.**

**Holdings:** The District **Court,** Joyner, J., held that:

(1) consulting agreement was not void due to
mutual fraud, making its **arbitration clause** valid
and enforceable;

(2) claims regarding consultant's tax planning and
marketing activities fell within scope of consulting
agreement's **arbitration clause;**

(3) brokers were prohibited by National Association
of Securities Dealers (NASD) rules from seeking
**arbitration** of investors' claims under **arbitration
clause** of their agreements; and

(4) brokers could not enforce **arbitration clause** in
consulting agreement under alternative estoppel
theory.

Motions granted in part and denied in part.
West Headnotes
**[1] Alternative Dispute Resolution 25T ⟵112**

25T Alternative Dispute Resolution
    25TII **Arbitration**
        25TII(A) Nature and Form of Proceeding
            25Tk112 k. Contractual or Consensual
Basis. Most Cited Cases
    (Formerly 33k1.1 **Arbitration**)
A party cannot be required to submit to **arbitration**
any dispute which he has not agreed so to submit.

**[2] Alternative Dispute Resolution 25T ⟵134(1)**

25T Alternative Dispute Resolution
    25TII **Arbitration**
        25TII(B) Agreements to **Arbitrate**
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most
Cited Cases
    (Formerly 33k6.2 **Arbitration**)

**Alternative Dispute Resolution 25T ⟵143**

25T Alternative Dispute Resolution
    25TII **Arbitration**
        25TII(B) Agreements to **Arbitrate**
            25Tk142 Disputes and Matters **Arbitrable**
Under Agreement
                25Tk143 k. In General. Most Cited
Cases
    (Formerly 33k7.5 **Arbitration**)
Under the Federal **Arbitration** Act and
Pennsylvania law, a district **court** must compel
**arbitration** if it finds (1) that a valid **arbitration**
agreement exists between the parties, and (2) that
the dispute before it falls within the scope of this
agreement. 9 U.S.C.A. § 1 et seq.

**[3] Alternative Dispute Resolution 25T ⟵139**

25T Alternative Dispute Resolution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

Page 2

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk136 Construction
25Tk139 k. Construction in Favor of
**Arbitration**. Most Cited Cases
(Formerly 33k7.1 **Arbitration**)
Any doubts concerning the scope of **arbitrable**
issues should be resolved in favor of **arbitration**.

**[4] Alternative Dispute Resolution 25T ⊂⟫139**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to Arbitrate
25Tk136 Construction
25Tk139 k. Construction in Favor of
**Arbitration**. Most Cited Cases
(Formerly 33k7.1 **Arbitration**)
The presumption of **arbitrability** is particularly
strong when the **arbitration clause** in question is
broad.

**[5] Alternative Dispute Resolution 25T ⊂⟫210**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(D) Performance, Breach, Enforcement,
and Contest
25Tk204 Remedies and Proceedings for
Enforcement in General
25Tk210 k. Evidence. Most Cited
Cases
(Formerly 33k23.10 **Arbitration**)
To overcome presumption in favor of **arbitration**
as applied to broad **arbitration** agreements, a party
must either establish the existence of an express
provision excluding the grievance from **arbitration**
, or provide the most forceful evidence of a purpose
to exclude the claim from **arbitration**.

**[6] Alternative Dispute Resolution 25T ⊂⟫134(3)**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to **Arbitrate**
25Tk131 Requisites and Validity
25Tk134 Validity
25Tk134(3) k. Validity of Assent.
Most Cited Cases

(Formerly 33k6.2 Arbitration)
Tax consulting agreement was not void due to
mutual fraud, making its **arbitration clause** valid
and enforceable; agreement specified that
consultant would provide consulting and tax advice
relating to sales transactions and business
expansions in question, client entered into the
agreement for the purpose of implementing a tax
savings strategy with respect to its substantial gains
in connection with prior asset sale, and tax planning
services actually provided to client were closely tied
to the services described in the agreement.

**[7] Alternative Dispute Resolution 25T ⊂⟫143**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk142 Disputes and Matters Arbitrable
Under Agreement
25Tk143 k. In General. Most Cited
Cases
(Formerly 33k7.5 Arbitration)
Client's claims regarding consultant's tax planning
and marketing activities fell within scope of
consulting agreement's arbitration clause, which
governed any claim arising in connection with the "
performance or breach" of the agreement; claim that
consultant committed fraud in marketing tax shelter
strategy arose from performance or breach of the
agreement, which client entered into for the purpose
of implementing a tax savings strategy with respect
to the sale of business holdings.

**[8] Alternative Dispute Resolution 25T ⊂⟫137**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to Arbitrate
25Tk136 Construction
25Tk137 k. In General. Most Cited
Cases
(Formerly 33k7.5 **Arbitration**)

**Alternative Dispute Resolution 25T ⊂⟫143**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to Arbitrate

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

25Tk142 Disputes and Matters **Arbitrable** Under Agreement
25Tk143 k. In General. Most Cited Cases
(Formerly 33k7.5 **Arbitration**)
When an **arbitration clause** provides for **arbitration** of all matters "arising under" or " arising out of" a particular agreement, the **clause** is typically construed broadly to suggest that a given dispute is **arbitrable**. 9 U.S.C.A. § 1 et seq.

**[9] Alternative Dispute Resolution 25T ⚙414**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(I) Exchanges and Dealer Associations
25Tk411 Relations Between Customer-Investors and Broker-Dealers
25Tk414 k. Performance, Breach, Enforcement, and Contest of Agreement. Most Cited Cases
(Formerly 33k91 **Arbitration**, 160k11(11.1))
Securities brokers are prohibited by National Association of Securities Dealers (**NASD**) rules from seeking **arbitration** of investors' claims under **arbitration clause** of their agreements with investors, where investors were members of putative class in pending **class action** brought against the brokers.

**[10] Alternative Dispute Resolution 25T ⚙141**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to **Arbitrate**
25Tk141 k. Persons Affected or Bound. Most Cited Cases
(Formerly 33k7.3 **Arbitration**)
Because **arbitration** is a matter of contract, exceptional circumstances must apply before a **court** will impose a contractual agreement to **arbitrate** on a non-contracting party.

**[11] Alternative Dispute Resolution 25T ⚙141**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(B) Agreements to **Arbitrate**
25Tk141 k. Persons Affected or Bound.

Most Cited Cases
(Formerly 33k7.3 **Arbitration**)
There are five established theories under which non-signatories may be bound to the **arbitration** agreements of others: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.

**[12] Alternative Dispute Resolution 25T ⚙182(1)**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk177 Right to Enforcement and Defenses in General
25Tk182 Waiver or Estoppel
25Tk182(1) k. In General. Most Cited Cases
(Formerly 33k23 **Arbitration**)
Where the party seeking enforcement of the **arbitration clause** is a willing non-signatory, an alternative theory of reverse estoppel may apply.

**[13] Alternative Dispute Resolution 25T ⚙413**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(I) Exchanges and Dealer Associations
25Tk411 Relations Between Customer-Investors and Broker-Dealers
25Tk413 k. Agreements to **Arbitrate**. Most Cited Cases
(Formerly 33k91 **Arbitration**, 160k11(11.1))

**Alternative Dispute Resolution 25T ⚙414**

25T Alternative Dispute Resolution
25TII **Arbitration**
25TII(I) Exchanges and Dealer Associations
25Tk411 Relations Between Customer-Investors and Broker-Dealers
25Tk414 k. Performance, Breach, Enforcement, and Contest of Agreement. Most Cited Cases
(Formerly 33k23 **Arbitration**)
Investors' allegations that securities brokers conspired with investors' tax consultant in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

connection with investment in tax shelter did not entitle the brokers to invoke **arbitration** provision in consulting agreement as consultant's agents.

**[14] Alternative Dispute Resolution 25T⊄⇒ 182(1)**

25T Alternative Dispute Resolution
  25TII **Arbitration**
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk177 Right to Enforcement and Defenses in General
        25Tk182 Waiver or Estoppel
          25Tk182(1) k. In General. Most Cited Cases
    (Formerly 33k23.3(1) **Arbitration**)
Traditional theory of equitable estoppel allows signatories of **arbitration** agreements to impose **arbitration** on non-signatories when the non-signatory knowingly embraces, exploits, or receives the benefits of the agreement containing the **arbitration clause, despite** having never signed it.

**[15] Alternative Dispute Resolution 25T⊄⇒ 182(1)**

25T Alternative Dispute Resolution
  25TII **Arbitration**
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk177 Right to Enforcement and Defenses in General
        25Tk182 Waiver or Estoppel
          25Tk182(1) k. In General. Most Cited Cases
    (Formerly 33k23.3(1) **Arbitration**)
"Alternative estoppel" will bind a signatory to an **arbitration** agreement to **arbitrate** at a non-signatory's insistence where there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.

**[16] Alternative Dispute Resolution 25T⊄⇒ 182(1)**

25T Alternative Dispute Resolution
  25TII **Arbitration**

25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk177 Right to Enforcement and Defenses in General
        25Tk182 Waiver or Estoppel
          25Tk182(1) k. In General. Most Cited Cases
    (Formerly 33k23.3(1) **Arbitration**)
The two-part test for alternative estoppel, under which signatory to an **arbitration** agreement will be bound to **arbitrate** at a non-signatory's insistence, requires a **court** to determine whether there is a close relationship between the entities involved, and examine the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract.

**[17] Alternative Dispute Resolution 25T⊄⇒ 182(1)**

25T Alternative Dispute Resolution
  25TII **Arbitration**
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk177 Right to Enforcement and Defenses in General
        25Tk182 Waiver or Estoppel
          25Tk182(1) k. In General. Most Cited Cases
    (Formerly 33k23.3(1) **Arbitration**)
Non-signatories seeking enforcement of an **arbitration** agreement under alternative estoppel theory must show that the claims against them are intimately founded in and intertwined with the underlying obligations of the contract to which they were not a party.

**[18] Alternative Dispute Resolution 25T⊄⇒ 182(1)**

25T Alternative Dispute Resolution
  25TII **Arbitration**
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk177 Right to Enforcement and Defenses in General
        25Tk182 Waiver or Estoppel
          25Tk182(1) k. In General. Most Cited Cases

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

(Formerly 33k23.3(1) **Arbitration**)
The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is always the sine qua non of an appropriate situation for applying equitable estoppel, so as to **permit** nonsignatory defendant to enforce contract's **arbitration clause.**

**[19] Alternative Dispute Resolution 25T ☜414**

25T Alternative Dispute Resolution
    25TII **Arbitration**
        25TII(I) Exchanges and Dealer Associations
            25Tk411     Relations    Between
Customer-Investors and Broker-Dealers
            25Tk414   k.  Performance,  Breach,
Enforcement, and Contest of Agreement. Most Cited Cases
    (Formerly   33k91,   33k23.3(1)   **Arbitration,**
160k11(11.1))
Securities brokers that were nonsignatories to investor's tax consulting agreement could not enforce the agreement's **arbitration clause** under alternative estoppel theory; investor's claims against the brokers for Racketeer Influenced and Corrupt Organizations Act (RICO) violations, unjust enrichment, breach of contract, breach of fiduciary duty, unethical, excessive, and illegal fees, and civil conspiracy did not depend on and were not intertwined with the consulting agreement.

**[20] Alternative Dispute Resolution 25T ☜191**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk190 Stay of Proceedings Pending Arbitration
            25Tk191 k. In General. Most Cited Cases
    (Formerly 33k23.9 Arbitration)
Federal Arbitration Act's (FAA) requirement that a court stay "the trial of the action" suggests that the proceedings must be stayed in their entirety, even when the action encompasses both arbitrable and non-arbitrable claims. 9 U.S.C.A. § 1 et seq.

*326 David Stewart Clancy, Jeven R. Sloan, W. Ralph Canada, Jr., Shore Deary LLP, David R. Deary, Fowler, Wiles, Norton and Keith, Dallas, TX, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuykendall and Whatley, Birmingham, AL, Kenneth I. Trujillo, Kathryn C. Harr, Trujillo Rodriquez & Richards, Philadelphia, PA, Othni J. Lathram, Whatley Drake LLC, Birmingham, AL, for Plaintiffs.
Daniel J. Layden, Piper Rudnick LLP, Philadelphia, PA, Benjamin Sokoly, Christine E. Harding, Lawrence M. Hill, Richard A. Nessler, Seth C. Farber, Dewey Ballantine LLP, New York, NY, Cheryl A. Krause, Hangley Aronchick Segal & Pudlin, M. Scott Gemberling, Jay S. Rothman, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

JOYNER, District Judge.
Via the motions now pending before this Court, Defendants BDO Seidman, LLP and Robert J. Dudzinsky (collectively, the "BDO Defendants") and Defendants *327 Deutsche Bank AG, Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown, a division of Deutsche Bank Securities, Inc., and David Parse (collectively, the "Deutsche Bank Defendants") move to compel arbitration and dismiss or stay this action; Defendants Raggi & Weinstein LLP and Bob Raggi (the "Raggi Defendants") move to dismiss this action. For the reasons outlined below, the BDO Defendants' motion shall be GRANTED, the Deutsche Bank Defendants' motion shall be DENIED, and the Raggi Defendants' motion shall be DENIED without prejudice. All proceedings shall be stayed pending resolution of arbitration between Plaintiffs and the BDO Defendants.

*Factual Background*

On July 24th, 2000, Plaintiff Amihai Miron entered into a consulting agreement (the "BDO Agreement") with Defendant BDO Seidman. The BDO Agreement included the following language:
WHEREAS, Client or its designee is interested in transferring, by sale, lease or otherwise, some of its assets and limiting its financial exposure. (Such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

business operations, the "Business" and such transfer, as further defined in Paragraph 2 below, the "Transaction");
WHEREAS, BDO is in the business of providing accounting and consulting services; and
WHEREAS, Client desires BDO to provide certain tax and business consulting services in connection with the Transaction, and BDO desires to provide such services to Client, all upon the terms and conditions herein.

The BDO Agreement established that the BDO Defendants would provide "consulting services in conjunction with the sale of business assets including assistance in structuring the Transaction, [and] assisting Client and/or its advisors in determining a tax treatment for the Transaction[.]" BDO Agreement, § 2(a). The Agreement also contained the following mandatory arbitration clause:
If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved .... then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the Commonwealth of Pennsylvania..." BDO Agreement, § 8(d).

The sale transaction referred to in the BDO Agreement had in fact been completed in May 2000, two months before the Agreement was signed, and the BDO Defendants admit they played no part in structuring this transaction.

The services that the BDO Defendants did in fact provide related to foreign exchange digital option contracts (FX Contracts), marketed as a tax shelter called Currency Options Bring Reward Alternatives (COBRA). According to Plaintiffs' Complaint, the Raggi Defendants recommended the COBRA tax savings strategy to Plaintiffs once they became aware that Plaintiffs expected substantial gains from the May 2000 sale transaction. Complaint, ¶¶ 55, 56. Plaintiffs agreed to engage in the COBRA strategy based in large part on all of the Defendants' representations regarding the likelihood of payout under this strategy, the legality of the tax strategy,

the likelihood of potential challenges by the IRS, and the independence of Jenkens & Gilchrist, the law firm providing opinion letters to participating clients. Complaint, ¶ 37, 66.

In order to implement the COBRA tax strategy, and in connection with the formation of several entities through which Plaintiffs planned to engage in FX Contracts, Plaintiff Amihai Miron opened three brokerage accounts with Defendant Deutsche Bank Securities, Inc. On August 24, 2000, Mr. Miron executed three identical*328 account agreements (the "DB Agreements"), binding on all Plaintiffs and the Deutsche Bank Defendants, containing the following arbitration clause:
I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance, or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

Plaintiffs, who claim financial losses as a result of the COBRA tax strategy, allege that Defendants defrauded them by misrepresenting the possibility of profit under the FX Contracts, failing to disclose that Defendants had "virtually unlimited discretion" to determine whether the FX Contracts would in fact pay out, misrepresenting the likelihood of IRS challenges, and failing to keep Plaintiffs apprised of IRS developments such that Plaintiffs could protect their financial and legal interests. Plaintiffs now bring claims against Defendants alleging RICO violations, civil conspiracy, breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, professional malpractice, unjust enrichment, excessive and illegal fees, and seek a declaratory judgment that the BDO Agreement and the FX Contracts are unenforceable.

The BDO Defendants have moved to compel arbitration on the basis of the BDO Agreement § 8(d) arbitration clause. The Deutsche Bank Defendants have moved to compel arbitration on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
(Cite as: 342 F.Supp.2d 324)

the basis of the arbitration clauses in both the DB Agreement and the BDO Agreement. The Raggi Defendants move to dismiss the claims against them on a variety of grounds.

## Discussion

### I. FAA Requirements for Arbitration

[1] At its heart, arbitration is a matter of contract. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

[2] Under the Federal Arbitration Act and Pennsylvania law, a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement. *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 553 (3rd Cir.1992); *See* 9 U.S.C. § 3.

[3] The Supreme Court has held that a presumption of arbitrability exists where a contract contains an arbitration clause, and that an order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003); *see also Tripp v. Renaissance Advantage Charter Sch.*, No. 02-9366, 2003 U.S. Dist. LEXIS 19834 at *7, 2003 WL 22519433 at *2 (E.D.Pa.2003) (quoting *Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222, 228 (3rd Cir.1997)).

[4][5] The presumption of arbitrability is particularly strong when the arbitration clause in question is broad. *AT & T*, 475 U.S. at 657, 106 S.Ct. 1415; *Brayman Constr. Corp. v. Home Ins.*

*Co.*, 319 F.3d 622, 625 (3rd Cir.2003); *329Tripp*, 2003 U.S. Dist. LEXIS 19834 at *11, 2003 WL 22519433 at *3. To overcome this presumption as applied to broad arbitration agreements, a party must either establish the existence of an express provision excluding the grievance from arbitration, or provide "the most forceful evidence of a purpose to exclude the claim from arbitration." *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *United Steelworkers of Am.*, 363 U.S. at 584-85, 80 S.Ct. 1347).

### II. Arbitration of Plaintiffs' Claims Against BDO

This Court finds that Plaintiffs' claims against the BDO Defendants must be submitted to arbitration, because § 8(d) of the BDO Agreement is a valid arbitration agreement, and the claims against the BDO Defendants fall within the scope of this agreement.

#### A. Validity of the BDO Arbitration Agreement

[6] As to the first part of the *McAlister* test, we find that the BDO Agreement contains a "valid arbitration agreement" between Plaintiffs and the BDO Defendants. *McAlister*, 958 F.2d at 553. Nothing suggests that the parties did not intent to be bound by the § 8(d) arbitration clause, and the facts of this case do not indicate that the BDO Agreement is void due to fraud.

Plaintiffs compare the facts of this case to those in *Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d 338 (S.D.N.Y.2004), dealing with a similar tax planning strategy and consulting agreement, and urge this Court to follow the holding of that case. In *Denney*, the United States District Court for the Southern District of New York refused to compel arbitration on the grounds that the consulting agreement at issue (and, by extension, the arbitration clause within the agreement) was void due to mutual fraud. *Denney*, 340 F.Supp.2d at 347, 2004 WL 936843 at *6-7. Judge Scheindlin based her finding of mutual fraud on a number of factors, including both parties' admission that the tax shelter services provided by defendant BDO Seidman had "nothing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

Page 8

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

to do with" the transaction at the heart of the consulting agreement, and that the agreement was drawn up as "some kind of trick" to prevent third parties from discovering the true nature of the consulting relationship between Denney and BDO. *Id.* at 346, 2004 WL 936843 at *5-6. These admissions, coupled with Judge Scheindlin's concern over the "extraordinarily vague language" of the agreement, led her to conclude that "both sides were in on the wink and the nod;" this conclusion was not challenged by either party. *Id.* at 347, 2004 WL 936843 at *5-6.

While the language of the BDO Agreement in this case is indeed similar to the language of the consulting agreement in *Denney*, we find that the facts of the instant case are not similarly suggestive of mutual fraud. First, it is far from clear that the parties in this case "entered into agreements that described consulting work that was never performed. " *Id.* at 346, 2004 WL 936843 at *5-6. Both Miron's and Denney's agreements with BDO specified that BDO would provide consulting and tax advice relating to the transactions and expansions in question. However, unlike the agreement in *Denney*, which identified expanding business operations as the client's only goal, the BDO Agreement identified one of Plaintiffs' goals as "limiting [their] financial exposure" in connection with the May 2000 sale transaction. While it is true that this transaction was complete by the time the BDO Agreement was signed (as was also the case in *Denney*), Plaintiffs indicate in their Complaint that they entered into the Agreement for the purpose of implementing a tax savings strategy, specifically with respect to the "substantial gains" from the May 2000 *330 transaction cited in the BDO Agreement. *See* Complaint, ¶ 55-56, ¶ 66. Thus, while the BDO Defendants may not have performed all of the consulting work described in the BDO Agreement, they appear to have provided " tax ... consulting services in connection with the Transaction" as specified in the Whereas clauses.

Furthermore, the record in this case, unlike in *Denney*, includes no admissions suggestive of mutual fraud. The BDO Defendants affirm that the tax planning services actually provided to Plaintiffs in this case were closely tied to the services described in the BDO Agreement. Neither Plaintiffs nor the BDO Defendants have made any statements suggesting that they intended, respectively, to conceal the true nature of the services provided. Finally, both parties affirmatively deny that the BDO Agreement was a " wink and a nod" arrangement. Because the record in this case does not suggest a mutual intent to enter into a fraudulent agreement, we find that the **arbitration clause** within the BDO Agreement is valid and enforceable.

### B. *Scope of the BDO Arbitration Agreement*

[7] In light of the presumption of arbitrability under the FAA, we find that Plaintiffs' claims regarding the BDO Defendants' tax planning and marketing activities fall within the scope of the BDO Agreement's broad **arbitration clause.**

[8] When an **arbitration clause** provides for **arbitration** of all matters "arising under" or " arising out of" a particular agreement, the **clause** is typically construed broadly to suggest that a given dispute is **arbitrable.** *Medtronic Ave Inc. v. Cordis Corp.,* 100 Fed.Appx. 865, 868-69 (3rd Cir.2004) (compelling **arbitration** where the **arbitration clause** was broad and governed "any dispute, claim, or controversy arising from or relating to this Agreement or alleged breaches thereof"); *Berkery v. Cross Country Bank,* 256 F.Supp.2d 359, 366 (E.D.Pa.2003) (compelling **arbitration** where the **arbitration clause** was broad and covered "all claims, demands, or disputes " that "in any way relate to or arise out of this Agreement"); *Battaglia v. McKendry,* 233 F.3d 720, 727 (3rd Cir.2000).

The BDO Agreement **arbitration clause** is broad on its face, governing "any dispute, controversy or claim aris[ing] in connection with the performance or breach of this Agreement." While Plaintiffs contend that the inclusion of the limiting phrase "in connection with the performance or breach of this Agreement" supports a narrower reading of the clause, this position is consistent neither with Third Circuit precedent nor with the United States District Court for the Southern District of New York's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

second decision in *Denney*, upon which Plaintiffs rely. *Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d at 352, 2004 WL 1367179 at *4 (S.D.N.Y.2004) (holding that the arbitration clause within a BDO Seidman consulting agreement, covering "any dispute, controversy or claim [that] arises in connection with the performance or breach of this Agreement," was to be broadly construed).

Plaintiffs will not succeed in rebutting the presumption of arbitrability in this case, as they have failed to present "the most forceful evidence" of an intent to exclude their claims from arbitration, such that this Court could find "with positive assurance" that no interpretation of the BDO Agreement arbitration clause would cover the claims. *See AT & T*, 475 U.S. at 650, 106 S.Ct. 1415. The heart of Plaintiffs' Complaint with respect to the BDO Defendants is that BDO defrauded Plaintiffs by marketing the COBRA tax strategy without informing Plaintiffs that this strategy might be subject to IRS challenges. Plaintiffs deny that these fraudulent*331 activities are related in any way to the services agreed to in the BDO Agreement, and allege that the services actually provided by the BDO Defendants in connection with the COBRA tax strategy were performed pursuant to "oral or implied contracts." Complaint, ¶ 223. However, as this Court emphasized above, § 2(a) of the BDO Agreement specifically required the BDO Defendants to provide "consulting services in conjunction with the sale of business assets including assistance ... in determining a tax treatment for the Transaction...," and identified as one of Plaintiffs' goals "limiting [their] financial exposure" in connection with the Transaction. In their Complaint, Plaintiffs admit that they entered into the BDO Agreement for the purpose of implementing a tax savings strategy with respect to the "substantial gains from the sale of certain business holdings in 2000," the very same Transaction referred to in the Agreement. *See* Complaint, ¶ 55-56, ¶ 66. Plaintiffs' allegations against the BDO Defendants all relate to the COBRA tax savings strategy, which was tailored to meet Plaintiffs' financial needs resulting from the Transaction by providing a favorable tax treatment for its proceeds. Given that Plaintiffs' claims regarding the faulty tax strategy arguably arose "in connection with the performance or breach" of an agreement to assist Plaintiff "in determining a tax treatment for the Transaction" (language of the BDO Agreement), this **Court** cannot say "with positive assurance" that no interpretation of the **arbitration clause** would cover the current dispute. *See AT & T*, 475 U.S. at 650, 106 S.Ct. 1415. Therefore, we will grant the BDO Defendant's motion to compel **arbitration** with respect to the claims against them.

### III. *Arbitration of Plaintiffs' Claims Against Deutsche Bank*

The Deutsche Bank Defendants seek to compel **arbitration** of Plaintiffs' claims against them based on the **arbitration clauses** in the DB Agreements, or, alternatively, based on the **arbitration clause** in the BDO Agreement. We find that neither the DB Agreements nor the BDO Agreement require that Plaintiffs' claims against the Deutsche Bank Defendants be sent to **arbitration** at this time.

### A. *Arbitration under the DB Agreement*

[9] Both Plaintiffs and the Deutsche Bank Defendants admit that the DB Agreement contains a valid **arbitration clause**, and agree that this dispute would normally fall within the scope of that **clause**. *See McAlister*, 958 F.2d at 553. Both parties further admit that the Deutsche Bank Defendants are prohibited by National Association of Securities Dealers Rules (**NASD** Rules) from seeking **arbitration** at this point in time due to the pendency of the **class action** litigation in *Denney v. Jenkens & Gilchrist*, No. 03-5460 (S.D.N.Y.2003). **NASD** Rule 10301(d)(3) prohibits members from seeking enforcement of an **arbitration** agreement against a member of a putative or certified **class** with respect to any claims encompassed by the **class action** until:
(A) the **class** certification is denied; (B) the **class** is decertified; (C) the customer, other member or person associated with a member is excluded from the **class** by the **court**; or (D) the customer, other member or person associated with a member elects not to participate in the putative or certified **class**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

Page 10

342 F.Supp.2d 324
(Cite as: 342 F.Supp.2d 324)

action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the **court**. NASD Code of **Arbitration** Procedure Rule 10301(d)(3).

Because Plaintiffs are members of the putative *Denney* class as it is currently defined, the Deutsche Bank Defendants may *332 not seek to compel **arbitration** on the basis of the DB Agreement.

### B. *Arbitration Under the BDO Agreement*

In the alternative, the Deutsche Bank Defendants move to compel **arbitration** of Plaintiffs' claims against them pursuant to the **arbitration clause** within the BDO Agreement, which this **Court** has already found to be valid as applied to Plaintiffs' claims against the BDO Defendants. The issue yet to be resolved is whether Plaintiffs' claims against the Deutsche Bank Defendants, non-signatories to the BDO Agreement, likewise fall within its scope. We find that they do not.

The Deutsche Bank Defendants offer three theories as to why the claims against them should be arbitrated pursuant to the BDO Agreement. First, they argue that because the BDO Agreement arbitration clause is broad, the presumption of arbitrability should apply to all claims arising in connection with BDO's performance under the agreement, even those claims asserted against non-signatories. However, the presumption of arbitrability has never been extended to claims by or against non-signatories. *See, e.g., Medtronic Ave Inc. v. Cordis Corp.*, 100 Fed.Appx. 865, 868 (3rd Cir.2004) (quoting the 7th Circuit's finding in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Ltd.*, 1 F.3d 639, 642 (7th Cir.1993) that a broad arbitration clause covered "any dispute *between the contracting parties* that is in any way connected to their contract") (emphasis added).

[10][11][12] Because arbitration is a matter of contract, exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party. *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 779 (2nd Cir.1995); *see also AT & T*

*Tech.*, 475 U.S. at 650, 106 S.Ct. 1415. There are, however, five established theories under which non-signatories may be bound to the arbitration agreements of others: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *Amkor Technology, Inc. v. Alcatel Business Systems*, 278 F.Supp.2d 519, 521 (E.D.Pa.2003) (citing *Thomson-CSF*, 64 F.3d at 776). Furthermore, where the party seeking enforcement of the arbitration clause is a willing non-signatory, as here, an alternative theory of reverse estoppel may apply. *Thomson-CSF*, 64 F.3d at 779. The Deutsche Bank Defendants contend that they can enforce the BDO arbitration agreement as to the claims against them under two of these theories-agency and equitable estoppel.

[13] Agency logic has been applied by the Third Circuit to bind non-signatories to arbitration agreements. *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1122 (3rd Cir.1993) (binding a non-signatory business entity to the arbitration agreement of it "corporate sister"). The Deutsche Bank Defendants cite a string of non-binding cases to persuade this Court to consider them agents of the BDO Defendants simply because both parties have been accused of civil conspiracy. *See Camferdam v. Ernst & Young Intern., Inc.*, No. 02-10100, 2004 WL 307292 at *6 (S.D.N.Y.2004) ("A civil conspiracy is a kind of partnership, in which each member becomes the agent of the other," quoting *Roberson v. Money Tree*, 954 F.Supp. 1519, 1529 (M.D.Ala.1997)). This we decline to do, in part because no court in this Circuit has ever concluded that an agency relationship can arise solely as a result of allegations of conspiracy. *See Reibstein v. CEDU/Rocky Mt. Academy*, No. 00-1781, 2000 U.S. Dist. LEXIS 18206 at 26, 2000 WL 1858718 at *8 (E.D.Pa.2000) (outlining the four types of agency under Pennsylvania law). Furthermore, it seems somewhat *333 disingenuous for the Deutsche Bank Defendants to admit an agency relationship for the purposes of compelling **arbitration** while simultaneously defending against substantive charges of conspiracy.

[14] With respect to equitable estoppel, there are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

two theories of estoppel under which the Deutsche Bank Defendants may be able to compel **arbitration** . The first and more traditional theory allows signatories to impose **arbitration** on non-signatories when the non-signatory knowingly embraces, exploits, or receives the benefits of the **agreement containing the arbitration clause, despite** having never signed it. *See E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3rd Cir.2001); *Thomson-CSF,* 64 F.3d at 778; *Bannett v. Hankin,* 331 F.Supp.2d 354, 359-60 (E.D.Pa.2004) (compelling arbitration by estoppel where the signatory's claims against a non-signatory "make reference to or presume the existence of" the written agreement, or "arise out of and relate directly to" the agreement). This theory is somewhat inapplicable in this case given that here, the non-signatory Defendants are seeking to enforce the arbitration agreement. Furthermore, there is no evidence that the Deutsche Bank Defendants had any duties or received any direct benefits under the terms of the BDO Agreement.

[15][16][17] The more appropriate theory of estoppel in this case is "alternative estoppel," which will bind a signatory to arbitrate at a non-signatory's insistence where there is an "obvious and close nexus" between the non-signatories and the contract or the contracting parties. *Reibstein,* 2000 WL 1858718 at *5. The two-part test for alternative estoppel requires a court to determine whether there is a "close relationship between the entities involved," and examine the "relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract." *E.I. DuPont,* 269 F.3d at 199 (citing *Thomson-CSF,* 64 F.3d at 779); *see also Bannett,* 331 F.Supp.2d at 360. To satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are "intimately founded in and intertwined with" the underlying obligations of the contract to which they were not a party. *E.I. DuPont,* 269 F.3d at 199 (citing *Thomson-CSF,* 64 F.3d at 779).

[18][19] We find the theory of alternative estoppel is inappropriate here because Plaintiffs' claims against the Deutsche Bank Defendants are not "

intimately founded in" or "intertwined with" the BDO Agreement. *Id.* The essential question in situations such as these is whether Plaintiffs would have an independent right to recover against the non-signatory Defendants even if the contract containing the arbitration clause were void. *Massen v. Cliff,* 02-9282, 2003 U.S. Dist. LEXIS 7392 at *14, 2003 WL 2012404 at *4 (S.D.N.Y.2003). " The plaintiffs *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir.2002) (rev'd on other grounds, *PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003)) (emphasis added). In *In re Humana,* the Eleventh Circuit held that equitable estoppel was inappropriate where plaintiffs brought a RICO suit against a non-signatory defendant, because the RICO claims were based on a statutory remedy apart from any available remedy for breach of the underlying contract. *In re Humana,* 285 F.3d at 976

We find the Eleventh Circuit's reasoning compelling. In the instant case, Plaintiffs' *334 claims against the Deutsche Bank Defendants (specifically, claims of RICO violations, unjust enrichment, breach of contract, breach of fiduciary duty, unethical, excessive, and illegal fees, and civil conspiracy) are completely independent of the BDO Agreement. Nowhere in Plaintiffs' Complaint are the allegations against the Deutsche Bank Defendants tied to any obligations these Defendants had or benefits they may have received under the terms of the BDO Agreement (which in fact makes no mention of Deutsche Bank). Were this Court to find the BDO Agreement void, invalid, or unenforceable, Plaintiffs would still have valid causes of action against the Deutsche Bank Defendants grounded both in common law and statutory remedies. Because Plaintiffs' claims against the Deutsche Bank Defendants do not depend on and are not intertwined with the BDO Agreement, these Defendants cannot enforce the BDO arbitration clause under a theory of alternative estoppel.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

Page 12

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

IV. *Disposition of the Present Action*

This Court is required under the plain language of § 3 of the FAA to stay Plaintiffs' claims against the BDO Defendants pending arbitration. [FN1] *See Lloyd v. Hovensa,* 369 F.3d 263, 269 (3rd Cir.2004) (holding that the plain language of the FAA affords a court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration).

> FN1. "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added)

[20] We find that a stay is likewise appropriate with respect to Plaintiffs' remaining claims against the Raggi Defendants and the Deutsche Bank Defendants. Although these claims are not subject to arbitration, the FAA's requirement that a court stay "the trial of the action" suggests that the proceedings must be stayed in their entirety, even when the action encompasses both arbitrable and non-arbitrable claims. *See Feinberg v. Ass'n of Trial Lawyers Assur.,* No. 01-6966, 2002 U.S. Dist. LEXIS 21518 at *7-8, 2002 WL 31478866 at *2-3 (E.D.Pa.2002) (court elected to stay entire proceedings pending arbitration even though only some of plaintiffs' claims were covered by the arbitration agreement); *Davies v. Ecogen Inc.,* No. 98-299, 1998 U.S. Dist. LEXIS 5363 at *3, 1998 WL 229780 at *1 (E.D.Pa.1998) ("[C]ourts have typically granted stays when there are both arbitrable and non-arbitrable claims in the same action and significant overlap exists between parties and issues"); *see also Landis v. North American*

*Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (finding that a court's power to stay proceedings is incidental to the power to control its docket "with economy of time and effort for itself, for counsel, and for litigants"). Because there is substantial overlap in the charges against these various Defendants, particularly with respect to the RICO and civil conspiracy claims, we elect to stay the entirety of the proceedings pending arbitration of the claims against the BDO Defendants.

An appropriate Order follows.

### ORDER

AND NOW, this 20th day of October, 2004, upon consideration of the BDO Defendants' Motion to Compel Arbitration and Dismiss or Stay this Action (Doc. No. *335 38) and all responses thereto (Docs. No. 44, 51, 59, 66), the Deutsche Bank Defendants' Motion to Compel Arbitration and Dismiss or Stay this Action (Doc. No. 40) and all responses thereto (Docs. No. 45, 49, 53), and the Raggi Defendants' Motion to Dismiss (Docs. No. 42, 43) and all responses thereto (Docs. No. 61, 68), it is hereby ORDERED that:

(1) The BDO Defendants' Motion to Compel Arbitration is GRANTED;

(2) The Deutsche Bank Defendants' Motion to Compel Arbitration is DENIED;

(3) The Raggi Defendants' Motion to Dismiss is DENIED WITHOUT PREJUDICE.

Plaintiffs and the BDO Defendants are hereby DIRECTED to proceed with arbitration pursuant to the terms and conditions contractually agreed to by those parties in the Agreement dated July 24, 2000. It is further DECREED that the proceedings before this Court shall be STAYED pending resolution of arbitration.

E.D.Pa.,2004.
Miron v. BDO Seidman, LLP
342 F.Supp.2d 324

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

342 F.Supp.2d 324

Page 13

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

Briefs and Other Related Documents (Back to top)

• 2006 WL 1760202 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of the Motion of Deutsche Bank AG, Deutsche Bank Securities Inc. and David Parse to Dismiss Plaintiffs' Complaint (May 12, 2006) Original Image of this Document (PDF)
• 2006 WL 1357878 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Deutsche Defendants' Motion to Dismiss (Apr. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 1031504 (Trial Motion, Memorandum and Affidavit) Motion of Defendants Deutsche Bank AG, Deutsche Bank Securities Inc. and David Parse to Dismiss Plaintiffs' Complaint (Mar. 27, 2006) Original Image of this Document (PDF)
• 2004 WL 2901615 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendants BDO Seidman, LLP and Robert J. Dudzinsky in Further Support of Cross-Motion to Compel the Return of Privileged Document (Sep. 13, 2004)
• 2004 WL 2032068 (Trial Motion, Memorandum and Affidavit) Raggi & Weinstein and Bob Raggi's Reply to Plaintiffs' Response to These Defendants' Motion to Dismiss (Aug. 18, 2004)
• 2004 WL 2696391 (Trial Motion, Memorandum and Affidavit) Raggi & Weinstein and Bob Raggi's Reply to Plaintiffs' Response to These Defendants' Motion to Dismiss (Aug. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 2032067 (Trial Motion, Memorandum and Affidavit) Opposition of Defendants BDO Seidman, LLP and Robert J. Dudzinsky to Plaintiffs' Motion to Supplement the Record and Cross-Motion to Compel the Return of Privileged Document (Aug. 16, 2004)
• 2004 WL 2696382 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendants BDO Seidman, LLP and Robert J. Dudzinsky in Further Support of Their Motion to Compel Arbitration and Dismiss the Complaint or Stay Action (Jun. 28, 2004) Original Image of this Document (PDF)
• 2004 WL 2901616 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendants BDO Seidman, LLP and Robert J. Dudzinsky in Further Support of Their Motion to Compel Arbitration and Dismiss the Complaint or Stay Action (Jun. 28,

2004)
• 2004 WL 1484976 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Motion of Deutsche Bank AG, Deutsche Bank Securities Inc. and David Parse to Compel Arbitration and Dismiss the Complaint (Jun. 24, 2004)
• 2004 WL 2696373 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Motion of Deutsche Bank AG, Deutsche Bank Securities Inc. and David Parse to Compel Arbitration and Dismiss The Complaint (Jun. 24, 2004) Original Image of this Document (PDF)
• 2004 WL 1484977 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to BDO Defendants' Motion to Compel Arbitration and Dismiss the Complaint or Stay Action (Jun. 10, 2004)
• 2004 WL 1484978 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Deutsche Defendants' Motion to Compel Arbitration and Dismiss the Complaint (Jun. 10, 2004)
• 2004 WL 1484979 (Trial Motion, Memorandum and Affidavit) Defendants Raggi and Raggi & Weinstein's Memorandum of Law in Support of Fed. R. Civ. P 12(b)(6) Motion to Dismiss (Jun. 07, 2004)
• 2004 WL 2696360 (Trial Motion, Memorandum and Affidavit) Defendants Raggi and Raggi & Weinstein's Memorandum of Law in Support of Fed. R. Civ. P 12(b)(6) Motion to Dismiss (Jun. 7, 2004) Original Image of this Document (PDF)
• 2004 WL 1145876 (Trial Motion, Memorandum and Affidavit) Motion of Defendants BDO Seidman, LLP and Robert J. Dudzinsky to Compel Arbitration and Dismiss the Complaint or Stay Action (May. 14, 2004)
• 2004 WL 2696348 (Trial Motion, Memorandum and Affidavit) Motion of Defendants Bdo Seidman, LLP and Robert J. Dudzinsky to Compel Arbitration and Dismiss the Complaint or Stay Action (May. 14, 2004) Original Image of this Document (PDF)
• 2:04cv00968 (Docket) (Mar. 4, 2004)
• 2004 WL 2696330 (Trial Pleading) Complaint (2004) Original Image of this Document (PDF)
• 2004 WL 771397 (Trial Pleading) Complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 14

342 F.Supp.2d 324

342 F.Supp.2d 324
**(Cite as: 342 F.Supp.2d 324)**

(Jan. 01, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw Attached Printing Summary Report for SAENGER,REBECCA 5576172

Your Search:                      class action permitted in court despite arbitration clause NASD
Date/Time of Request:             Thursday, February 15, 2007 13:03:00 Central
Client Identifier:                VAUGHN
Database:                         ALLFEDS
Citation Text:                    342 F.Supp.2d 324
Lines:                            798
Documents:                        1
Images:                           0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
King v. Deutsche Bank AgD.Or.,2005.Only the
Westlaw citation is currently available.
United States District Court,D. Oregon.
Michael L.E. KING, et al., Plaintiffs,
v.
DEUTSCHE BANK AG, et al., Defendants.
**No. CV 04-1029-HU.**

March 8, 2005.

John S. Stone, Preston Bunnell & Stone, Portland,
David R. Deary, W. Ralph Canada, Stewart Clancy,
Jeven R. Sloan, Deary Montgomery Defeo &
Canada, Dallas, TX, for plaintiffs.
Keith Dubanevich, Garvey Schubert Barer,
Portland, Seth C. Farber, Dewey Ballantine, New
York, NY, for defendants Deutsche Bank AG;
Deutsche Bank Securities, Inc., d/b/a Deutsche
Bank Alex Brown, a division of Deutsche Bank
Securities, Inc.; Craig Brubaker; David Parse.
Kerry J. Shepherd, Markowitz, Herbold, Glade &
Mehlhaf, Portland, for defendants BDO Seidman
LLP, Michael Kerekes, and Robert Greisman.
Peter C. Richter, Sarah Lowinger, Miller Nash,
Portland, for defendants Lincoln National
Corporation, d/b/a Lincoln Financial Group;
Lincoln Financial Advisors Corporation; Michael
Nelson; James Siegfried.

FINDINGS AND RECOMMENDATION
HUBEL, Magistrate J.
*1 This is an action by three groups of plaintiffs
(the "King plaintiffs," the "Mulholland plaintiffs,"
and the "Allen plaintiffs") against four groups of
defendants, investment advisors and accountants
(the "Deutsche Bank defendants," the "Lincoln
defendants," the "BDO defendants," and the "
Brown defendants"). Plaintiffs assert claims under
the Racketeering Influenced and Corrupt
Organization Act (RICO), 18 U.S.C. § 1965, breach
of fiduciary duty, fraud, breach of contract or
breach of the duty of good faith and fair dealing,
negligent misrepresentation, professional
malpractice, declaratory judgment, unjust
enrichment, and civil conspiracy.

*1 The matters before the court are the Deutsche
defendants' motion to arbitrate or stay claims (doc.
# 37), the BDO defendants' motion to arbitrate or
stay claims (doc. # 43), the Lincoln defendants'
motion to dismiss (doc. # 53), and the BDO
defendants' motion to strike and to seal certain
portions of plaintiffs' briefs and supporting evidence
(doc. # 63). The court heard oral argument on the
motions January 7, 2005.

Factual Allegations

*1 The Amended Complaint alleges that plaintiffs
were induced by the defendants to enter into a tax
shelter scheme involving foreign exchange digital
options contracts. The scheme is variously referred
to under its marketing name of COBRA, which
stands for Currency Options Bring Reward
Alternatives, and as "tax-advantaged digital-option
transactions."

*1 Plaintiffs allege that the COBRA scheme, and a
plan to market it to wealthy investors, was initially
developed by defendants Deutsche Bank AG,
Deutsche Bank Securities d/b/a Deutsche Bank
Alex Brown (DB Alex Brown), Craig Brubaker, an
employee of Deutsche Bank, David Parse, also an
employee of Deutsche Bank and/or DB Alex
Brown, Richard Judd, an employee of Deutsche
Bank and/or DB Alex Brown (collectively the "
Deutsche Bank defendants") and Jenkens &
Gilchrist ("Jenkens,"), a 600-lawyer law firm with
offices in nine major cities throughout the United
States.[FN1] Plaintiffs allege on information and
belief that Paul Daugerdas, a partner at Jenkens,
Dan Brooks, defendant David Parse, and certain
other unknown individuals associated with the
Deutsche defendants participated in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

development of COBRA.

> FN1. Jenkens is not a named defendant because of the pendency of a proposed class action settlement in the Southern District of New York. The class action case is called *Denney et al. v. Jenkens & Gilchrist, et al.*, No. 03-CV-5460 (S.D.N.Y.) and was filed August 28, 2003. The class action was filed by the same lawyers that appear in this case, on behalf of other individuals with purportedly similar claims. The pendency of this case is one of the grounds for the defendants' motion to stay, which is discussed below.

**\*1** COBRA was marketed as a tax shelter, with the following steps. First, each investor formed a single-member limited liability company (LLC) to enter into foreign currency digital option transactions with Deutsche Bank. The option transactions were governed by an agreement called the FX contract, pursuant to which the investor entered into two opposing transactions. The investor sold a short option and purchased a long option in almost identical amounts on a foreign currency with different (but only different by a very small amount) strike prices, each to expire in 30 days. The cost of the long option was partly offset by the premium earned on the sale of the short option.

**\*1** On all of the FX contracts the "trigger" (i.e., the event which causes a payoff) occurred when the spot rate on the underlying currency pair (Euro/American dollar, for example) was at or above a specific spot rate on a certain date at a certain time. Under the terms of the FX contracts, Deutsche Bank was authorized to use discretion in selecting the spot rate on expiration and to determine when and if the event was triggered. The range of spot rates available to Deutsche Bank was larger than, and included, the range of "winning" spot rates defined in the FX contract. Thus, because Deutsche Bank, as the "calculation agent," could choose to accept or disregard any spot rate, Deutsche Bank is alleged to always have had the ability to decide whether the FX contract paid out.

Plaintiffs allege that the result-unknown to the investors-was that the investors had virtually no chance of a payout.

**\*2** Through the LLC, the investor contributed the options to a general partnership. After 30 days, the long and short options expired in or out of the money, resulting in a modest gain or loss, depending on the exchange rate between the U.S. dollar and the relevant foreign currency at that time.

**\*2** The investor then made a capital contribution, consisting of cash, stock, or other capital assets, to the partnership. If cash was contributed, it was used to purchase either stock or foreign currencies, depending on whether the investor ultimately wished to create a capital or an ordinary loss.

**\*2** The investor then contributed the partnership interest to an S Corporation, causing the partnership to be terminated as a matter of law. The S Corporation then sold the assets over a period of time. The partnership assets had a basis that was artificially increased by the amount paid for the long option. (The short option was considered a contingent liability, whose value was unknown at the time of its contribution to the partnership, and ignored.) As a result, the sale of the assets created a substantial unrealized short-term capital loss and/or ordinary loss.

**\*2** The Deutsche defendants allegedly recruited the other defendants to assist them in locating wealthy clients and marketing the COBRA strategy to them. BDO Seidman developed a written strategy, called the BDO Wolfpack Manual, on how to sell the COBRA strategy. The investors were told that a major law firm (Jenkens) would prepare an independent opinion letter confirming that the COBRA transaction was legal and providing the investors with "insurance" in the event of an IRS audit.

**\*2** The Amended Complaint alleges that the defendants, and others not named as defendants such as Jenkens, structured the FX transactions so that the investors would pay commissions and fees in amounts between 5.5% and 9.5% of the tax savings the investor wished to achieve. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

defendants shared these fees among themselves, so that between 1% and 5% went to the Deutsche defendants as the "spread" between the two positions in the FX contract (i.e., the difference between what was paid for buying one position and what was received for selling the other), 3% went to Jenkens for having developed the FX transactions and producing for each investor an opinion letter on the legality of the transactions, and 1.5% went to others (the "Marketing Participants") who presented and recommended the FX contracts as a tax strategy to their clients.

*2 On December 27, 1999, the Internal Revenue Service (IRS) issued Notice 1999-59, entitled, "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS gave notice that "certain types of transactions" were being "marketed to taxpayers for the purpose of generating tax losses" that involved the taxpayers claiming tax losses for capital outlays that they had in fact recovered. The IRS gave notice that it would not recognize such artificial losses. The Amended Complaint alleges that the defendants told plaintiffs who had entered into the COBRA strategy in 1999 that this IRS Notice did not affect their participation in the strategy. However, plaintiffs allege that as a result of Notice 1999-59, defendants knew or should have known that the IRS would not recognize the purported losses arising from the COBRA strategy.

*3 In 2000, the IRS issued another notice, Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This notice referred to Notice 1999-59 and described the transactions marketed to the plaintiffs by the defendants. The IRS stated that the "purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes."

*3 Defendant Michael Kerekes, a lawyer who worked for BDO Seidman and who promoted the COBRA scheme out of BDO Seidman's offices, analyzed Notice 2000-44 and concluded that 1) the COBRA scheme failed to meet the IRS's definition of "economic substance" as described in Notice

2000-44; and 2) the contracts between BDO Seidman and its clients had not been written to specify the services being rendered in connection with COBRA and, thus, certain of Notice 2000-44's requirements might apply. Although these conclusions were shared with Jenkens, the plaintiffs and other clients were given only a "watered down" version that did not highlight the concerns articulated by Kerekes. Defendants did not retract, modify or qualify their tax and other advice to plaintiffs, or the opinions expressed in the Jenkens opinion letters. The defendants continued to represent that the COBRA strategy was a legal tax shelter, and that plaintiffs were not required to disclose or register the COBRA transactions on their federal tax returns. The defendants continued to promote the COBRA strategy after Notice 2000-44 was issued, even though at least the BDO defendants had internally concluded that the Notice raised serious concerns.

*3 In early 2000 and 2001, Jenkens sent the plaintiffs virtually identical opinion letters about the propriety of the COBRA strategy. The opinion letters reassured the plaintiffs that entering into the options would not create problems with the IRS. The opinion letters issued in 2000 stated that IRS Notice 1999-59 had no effect on its earlier opinions; the opinion letters issued in 2001 did not mention Notice 1999-59.

*3 The Brown defendants prepared the 2000 tax returns for the King plaintiffs. The BDO defendants prepared the 1999 tax returns for some of the Allen plaintiff entities. The Amended Complaint alleges that the "Vjon Harten Defendants" prepared the 2000 tax returns for the Mulholland plaintiffs, but there is no reference to any Vjon Harten defendants in the caption of the case or in the part of the Amended Complaint which identifies the various parties.

*3 The Amended Complaint alleges that the accountant defendants represented to the plaintiffs that the COBRA strategy was a legal tax shelter. Relying on this, the plaintiffs included the premiums they paid for the long option, but not the premiums they received for the short option, in their tax bases for computing their respective capital

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

losses and ordinary income in their 1999 and 2000 tax returns.

*4 In late 2001, the IRS offered a "Tax Amnesty Program" ("Amnesty Program"), a voluntary disclosure program for taxpayers. Under the Amnesty Program, taxpayers who disclosed their involvement in strategies like COBRA would avoid liability for penalties for underpayment of taxes without conceding liability for back taxes or interest. The Amended Complaint alleges that although each defendant knew of the Amnesty Program and its applicability to the plaintiffs, they either failed to inform plaintiffs of the program, thereby depriving the plaintiffs of the opportunity to join the Amnesty Program and avoid the assessment of penalties, or advised them not to take advantage of it. None of the plaintiffs participated in the Amnesty Program.

*4 In June 2003, the IRS issued new regulations, retroactive to October 18, 1999. The Regulations invalidate the COBRA strategy. Because the regulations were retroactive, they invalidated the COBRA strategy that the plaintiffs had used.

*4 Plaintiffs were all audited by the IRS for the tax returns on which they claimed losses resulting from the COBRA strategy. On May 5, 2004, in Notice 2004-46, the IRS offered to settle with plaintiffs [FN2] and other taxpayers involved in similar schemes as follows: the taxpayers would pay to the IRS all the taxes avoided, all interest due, and a 10% penalty for each tax shelter; they would be allowed to deduct 50% of the fees and other "out of pocket" costs. Taxpayers who did not accept this offer were to be assessed all taxes and interest, the maximum penalty of 40%, and lose all deductions. The Amended Complaint alleges that because of the "extremely harsh result that would occur if these plaintiffs did not settle with the IRS," all of the plaintiffs have "reluctantly accepted" the IRS settlement offer and now owe the IRS back taxes, interest and penalties.

FN2. All the plaintiffs in this case were included in the settlement offer except for the Allen plaintiffs.

*4 Plaintiffs allege that in addition to the back taxes, interest and penalties, they are out substantial amounts of money paid in fees to the defendants and to retain new tax and legal advisors. They allege that the defendants also caused plaintiffs to " forgo other legitimate tax saving opportunities."

Legal Contentions

*4 Plaintiffs allege that the FX contracts and the COBRA scheme constituted a scheme to defraud them, in that the defendants failed to disclose 1) the true unlikelihood that the FX contracts would pay out; 2) that the Deutsche defendants had virtually unlimited discretion to determine whether the FX contracts would pay out and therefore could ensure that they did not; 3) that the FX contracts had no reasonable possibility of a profit, at least not in excess of the fees paid and that, in reality, the net effect of the options they were purchasing and selling was no more than a wager on where the price of the underlying currency would be at a certain time on a given date; and 4) that COBRA, on which Jenkens provided "independent" legal advice, was in fact a strategy devised by Jenkens. Plaintiffs assert that the defendants breached their fiduciary duties to plaintiffs, intentionally deceiving them by aggressively marketing the COBRA strategy, giving the plaintiffs little time to consider the transactions, charging the plaintiffs exorbitant fees, and failing to disclose that the transactions would fail to achieve their intended purpose of avoiding the payment of taxes.

*5 Plaintiffs allege that the defendants, along with Jenkens, conspired to defraud the plaintiffs for the purpose of receiving and splitting millions of dollars in fees. These fees were not tied to, or reflective of, time or effort expended, but rather to the tax losses each investor intended to claim. In pursuance of this conspiracy, they marketed the COBRA strategy to their clients, provided them with opinion letters from Jenkens that confirmed the legal propriety of the COBRA strategy, and concealed the illegality of the scheme.

*5 For their RICO claim, plaintiffs assert that the defendants constitute a "Solicitation Enterprise"

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

and an "FX Enterprise." The solicitation enterprise consists of the Deutsche defendants, Jenkens, the BDO defendants, the Lincoln defendants, and all other marketing participants who solicited participants in the FX contracts offered by the Deutsche defendants for the alleged purpose of tax liability reduction. The FX enterprise consists of all defendants and all other persons or entities who participated in the implementation, sale and/or development of FX contracts.

*5 Plaintiffs assert further that the defendants acted with malice, with knowledge that their conduct was unlawful, and that their conduct obstructed, delayed or affected interstate commerce. The predicate acts include mail and wire fraud. Plaintiffs further allege a pattern of racketeering activity as defined by RICO, by committing and/or conspiring to or aiding and assisting in transactions involving at least two acts of racketeering activity for the past ten years.

*5 Additionally, plaintiffs assert claims for declaratory judgment and unjust enrichment against all defendants, breach of contract or, alternatively, breach of the duty of good faith and fair dealing (against the Deutsche defendants and the BDO defendants), breach of fiduciary duty (against all defendants), fraud (against all defendants), negligent misrepresentation and professional malpractice (against all defendants), breach of contract/professional malpractice (against all defendants except the Deutsche defendants), declaratory judgment that any written BDO Seidman Consulting agreement is inapplicable to all the claims asserted, and civil conspiracy.

Motions

I. Deutsche defendants' motion to stay the proceedings

*5 When plaintiffs opened their brokerage accounts with Deutsche Bank, they signed Account Agreements which contained a mandatory arbitration clause:
*5 I agree to arbitrate with you any controversies which may arise, whether or not based on events

occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

*5 See, e.g., Declaration of Keith S. Dubanevich, Exhibit 1, ¶ 19 (Account Agreement for MK Investing, LLC). However, the defendants concede that under another provision of the Account Agreements, they cannot compel plaintiffs to arbitrate *at this time:*6 No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until 1) the class certification is denied; or 2) the class is decertified; or 3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

*6 This provision is based on National Association of Securities Dealers (**NASD**) Rule 10301(d)(3).

*6 The plaintiffs in this case are members of a putative class in an action pending in the Southern District of New York, *Denney et al. v. Jenkens & Gilchrist et al.*, No. 03-CV-5460, filed August 28, 2003). In that case, the court has preliminarily certified a settlement class with respect to the claims against Jenkens, and plaintiffs are members of that class.

*6 The Deutsche defendants concede that so long as the plaintiffs are members of a putative class in *Denney*, they cannot be compelled to arbitrate. But, they argue, the choices open to plaintiffs are 1) becoming part of one or more classes in *Denney* and litigating their claims there; or 2) going to arbitration. Regardless of which event occurs, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Deutsche defendants assert, plaintiffs are not entitled to commence and maintain a separate action in this court and hold arbitration at bay. Consequently, they argue, this action should be stayed until one of the two events occurs.

*6 Plaintiffs respond that the Deutsche defendants are essentially asking this court for an advisory opinion as to whether the Deutsche defendants may, at some later time, be entitled to compel arbitration *if* the plaintiffs' claims are not resolved as part of the *Denney* class. They contend that because the defendants are not *presently* allowed to enforce their arbitration rights, they should not be allowed to "obtain indirectly and under the guise of fairness what they are prohibited from obtaining directly" under the arbitration agreements.

*6 Plaintiffs argue further that some of them do not fall within the *Denney* case for a variety of reasons, among them that the Mulholland plaintiffs were not clients of Class Counsel at the time the most recent complaint in *Denney* was filed, and some of the claims asserted in this case were not brought as class claims in *Denney.*

*6 Under the terms of the Account Agreements, the pending litigation in *Denney* precludes the Deutsche defendants from enforcing their right to compel arbitration. Nothing in the language of the Account Agreements gives the defendants the right to a stay of litigation during periods when the defendants are shut out of arbitration. The defendants argue that such a right can be inferred from the provision that " Neither you nor I waive any right to seek equitable relief pending arbitration." However, I disagree that this language can be interpreted to mean that the parties agreed to confer upon the Deutsche defendants the right to obtain a stay of all other litigation while class litigation was pending.

*7 The conditions for a discretionary stay are also not established. The power to stay proceedings is " incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort," and within the sound discretion of the district court. *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). In the exercise of that

discretion, the court weighs the competing interests of the parties. *Id.* at 254-55. However, that discretion is abused by a stay of indefinite duration in the absence of a pressing need. *Id.* at 255.

*7 Deutsche seeks a stay of indefinite duration, but has made no showing of hardship or inequity in being required to go forward. *Id.* The possibility that, at some point in the indefinite future, the plaintiffs' claims will either be resolved as part of the class action in *Denney* or subject to arbitration is not sufficient to justify a stay, particularly when the *Denney* court has not yet certified a litigation class.[FN3] See *Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 864 (9th Cir.1979) (stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time).

> FN3. On June 14, 2004, the *Denney* court stayed the action during the pendency of defendants' appeal. Canada Declaration, Exhibit C, p. 1-14.

*7 I recommend that the motion for stay be denied.

## II. Motion to strike

*7 The BDO defendants move to strike and to seal plaintiffs' response to the BDO defendants' motion to compel arbitration and the Canada Declaration filed in support of that motion. The basis for the motion is that these documents refer to a memorandum written by Michael Kerekes and dated August 11, 2000, which is subject to attorney-client privilege. The issue of whether the Kerekes Memorandum is privileged has been adjudicated in other courts; see, e.g., *United States v. BDO Seidman,* 2004 WL 1470034 (N.D.Ill. June 29, 2004) (holding that the Kerekes Memorandum was privileged); *Miron v. BDO Seidman,* No. 04-968 (E.D.Pa. October 2004)(holding that the Kerekes Memorandum was privileged, but for purposes of that case only [FN4]) and *Denney v. Jenkens & Gilchrist,* No. 03-5460(SAS) (S.D.N.Y. November 2004) (holding that even if the Kerekes Memorandum was privileged, the privilege had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 7

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

been waived). The BDO defendants assert that the Superior Court of California, County of San Francisco, has also determined that the Kerekes Memorandum is privileged, in *Anna Ng. v. BDO Seidman et al.*, CGC-04-434497.

> FN4. Judge Joyner, the judge in *Miron*, was aware that the Kerekes Memorandum had been produced to the plaintiffs by Jenkens and could simply be produced to them again for purposes of other cases.

*\*7* The *Denney* court held an evidentiary hearing on the issue. In a similar case also filed in the Southern District of New York, *Blythe et al. v. Deutsche Bank et al.*, No. 04 Civ. 5867(SAS), the judge presiding over the *Denney* case again held that the attorney-client privilege had been waived.

*\*7* The elements of attorney-client privilege are 1) when legal advice of any kind is sought 2) from a professional legal adviser in his or her capacity as such, 3) the communications relating to that purpose, 4) made in confidence 5) by the client 6) are, at the client's instance, permanently protected 7) from disclosure by the client or by the legal adviser, 8) unless the protection is waived. *United States v. Martin*, 278 F.3d 988, 999 (9th Cir.2002). Issues concerning application of the attorney client privilege in the adjudication of federal law are governed by federal common law. *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir.1992). The party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication. *Ralls v. United States*, 52 F.3d 223, 225 (9th Cir.1995). Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed. *Weil v. Investment Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981).

*\*8* Attorney-client privilege may be waived by inadvertent disclosure of privileged matters. *Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir.2001). But when there has been an involuntary disclosure, the privilege will be preserved if the privilege holder has made efforts reasonably designed to protect the

privilege. Conversely, the privilege will be deemed waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter. *Id.* at 1131-32.

A. Is the Kerekes Memorandum privileged?

*\*8* Michael Kerekes, the author of the Kerekes Memorandum, is a partner at BDO Seidman and, at the time the Memorandum was written, was a member of BDO Seidman's Tax Solutions Opinions Committee. The Memorandum is addressed to David Dreier, a lawyer at White & Case, LLP, BDO Seidman's outside counsel, and to the BDO Seidman Tax Solutions Opinion Committee, the members of which are unnamed in the Memorandum. Copies were sent to Denis Field and Mike Lichner, both of BDO Seidman. The Memorandum was produced to the plaintiffs by Jenkens.

*\*8* The Memorandum discusses the effective date of IRS Notice 2000-44 with respect to the requirement that BDO Seidman maintain lists of taxpayers participating in certain types of tax shelter transactions. However, although the Memorandum is addressed to Mr. Dreier, among others, it does not on its face seek legal advice from him. The first paragraph of the Memorandum disclaims any discussion of whether the Notice should be viewed as having any effect on the substantive law relating to the tax shelter transactions or any discussion of whether there are arguments that the list-keeping requirement is either invalid or inapplicable to the transactions.

*\*8* The Memorandum's third paragraph is titled " Provisional Conclusion" and states that it "seems fairly clear" that the list-keeping requirement should not apply to transactions in which the clients signed their engagement letters before August 11, 2000, but probably does apply to transactions in which the engagement letters were signed after that date, and to transactions first offered to clients on or after August 11, 2000.

*\*8* The Memorandum contains an extensive analysis of the basic list-keeping requirement, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

amendments to the regulation, the effective date provision of the amendment, and the relationship of the effective date provision to various transactions. At the end of this discussion, the Memorandum says:

*8 It seems that we will need to form our own conclusions on this issue, at least temporarily, as White & Case will probably not have a definitive view on the subject until Larry Hill returns a week from Monday. I don't think BDO can be without a policy during the coming week.

*8 Exhibit E, p. 5. The Memorandum ends with the following sentence: "I would very much welcome comments or alternative readings," presumably from all of the other recipients.

*8 Mr. Kerekes says in the second paragraph of the Memorandum that parts of the Memorandum " reflect discussions with David Dreier, Bob Greisman and Paul Shanbrom;" Mr. Dreier is also included within the request for "comments or alternative readings." These statements suggest that Mr. Dreier is being solicited for legal advice.

*9 I conclude that BDO Seidman has met its burden of proving that the Kerekes Memorandum is privileged. However, I find that the privilege has been waived by disclosure, either deliberate or inadvertent.

### B. Involuntary waiver of the privilege

*9 Inadvertence of disclosure does not, as a matter of law, prevent the occurrence of waiver. *Weil,* 647 F.2d at 24. But when attorney-client privilege has been inadvertently waived, the privilege can be preserved if the holder of the privilege can show efforts reasonably designed to protect the privilege. *Gomez,* 255 F.3d 1131-32.

*9 There is no evidence in this case from which it can be inferred that BDO Seidman guarded the confidentiality of the Kerekes Memo with sufficient care to justify application of this exception; indeed, BDO Seidman failed to take even such an elementary precaution as labeling the Kerekes Memorandum privileged or confidential.

### C. Deliberate waiver of the privilege

*9 Waiver of attorney-client privilege may be effected by implication, and the subjective intent of the party asserting the privilege is only one factor to be considered in determining whether waiver should be implied. *Weil,* 647 F.2d at 24. BDO Seidman denies that the Memorandum was intentionally sent to Jenkens by anyone at BDO Seidman. According to a declaration from Michael Kerekes, he has no recollection or record of sending a copy of the Memorandum to Jenkens or to anyone other than those listed on the Memorandum. The recipients of the Memorandum, including Robert Greisman, David Dreier, Charles Bee, Lawrence Cohen, Lorin Luchs, Paul Shanbrom, and Adrian Dicker, also deny any recollection of sending a copy to Jenkens.

*9 However, according to an affidavit submitted by Donna Guerin, a Jenkens shareholder, dated August 24, 2004, she was faxed a copy of the Memorandum, along with a copy of a BDO Seidman Consulting Agreement, by Mr. Greisman on January 19, 2001. See Canada Affidavit, Exhibit 4. Ms. Guerin says she specifically recalls receiving these materials from Mr. Greisman by fax, and having conversations with Mr. Greisman and others at BDO Seidman about the contents of the Memorandum. *Id.* According to Ms. Guerin, Mr. Greisman on other occasions sent her e-mails and writings he had received from others at BDO Seidman. *Id.* She offers the example of a fax she received from Mr. Greisman on Monday, January 22, 2001, also relating to the list-keeping requirements (the January 22 fax). She has submitted a copy of the January 22 fax, which shows that it was sent from BDO Seidman's Chicago office. *Id.* at Exhibit 1-B. The January 22 fax is a memorandum dated September 7, 2000, written by Mr. Greisman, titled "New IRS List-Keeping Rules for Various Transactions." *Id.*

*9 In an affidavit dated September 12, 2004, Mr. Greisman states that he was in Los Angeles at a meeting, and then on a plane back to Chicago, on January 19, 2001. Mr. Greisman states that his file from that meeting does not contain the Memorandum, he does not recall taking the Memorandum with him to Los Angeles. He states

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.