Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

further that the Los Angeles hotel where he attended the meeting did not charge anyone from BDO Seidman for a facsimile, and he has no record copy of the fax or copy of the cover letter. Declaration of Kerry Shepherd, Exhibit C. Mr. Greisman states in his affidavit that he also has no record or recollection of having sent the January 22 fax to Ms. Guerin. *Id.* at p. 3. [FN5]

> FN5. Mr. Greisman has since admitted sending the January 22 fax to Ms. Guerin.

**\*10** Ms. Guerin has filed a Supplemental Affidavit in which she says that the conversation she had with Mr. Greisman at the time he sent the fax of the Kerekes Memorandum to her was that he **\*10** wanted Jenkens to reconsider the text of opinion letters that it planned to send to those clients that Jenkens had advised who were also clients of BDO, to harmonize such text to comport with the text of BDO memos to their clients. As part of the back-up for his argument, Greisman sent me the [Kerekes] Memorandum.

**\*10** Exhibit 9, p. 2.

**\*10** A memorandum to the Tax Opinion Committee dated January 25, 2001, written by Mr. Greisman, and titled, "Summary from January 19, 2001 Meeting," contains a paragraph which says, "We still need to resolve "list issue" with J & G. (Greisman, Kerekes and Shanbrom)." The memorandum goes on to say, "Pam and Lorin will follow-up on issues related to list-keeping requirements." Government Exhibit A-32, filed in *United States of America v. BDO Seidman*, No. 02 C 4822 (N.D.Ill.).

**\*10** This document casts doubt on Mr. Greisman's credibility in several ways. First, it shows that the meeting in Los Angeles on January 19, 2001 was a meeting of the Tax Opinion Committee, the same committee designated, along with Mr. Dreier, as recipients of the Kerekes Memorandum. Second, Mr. Greisman's minutes of the January 19, 2001 meeting show that coordinating list keeping requirements with Jenkens was a topic of discussion-the same topic explored in the Kerekes

Memorandum. This evidence supports Ms. Guerin's testimony and casts doubt on that of Mr. Greisman. It also answers BDO Seidman's rhetorical question about why Mr. Greisman should have taken the four-month-old Kerekes Memorandum with him to the Los Angeles meeting.

**\*10** BDO Seidman makes much of a number of odd circumstances surrounding the fax itself, suggesting that the fax was not sent from BDO Seidman. The fax shows a date of January 19, 2001, and page two of the fax (page five of the Kerekes Memorandum) shows a time of 3:21 p.m. Page three of the fax (page six of the Memorandum) shows a time of 3:22. Page four of the fax (page seven of the Memorandum) shows a time of 3:23. The next page of the fax bears a time of 3:55 (more than 30 minutes after the preceding page), and is page one of a Consulting Agreement. The next page of the fax is page two of the Consulting Agreement, and also shows a time of 3:55. Then comes page three of the Consulting Agreement, showing a time of 3:56. The remaining three pages of the Consulting Agreement are missing; instead, at 3:58, page one of the Kerekes Memorandum is faxed. Then at 3:59, pages two and three of the Kerekes Memorandum appear. The next faxed page is page four of the Kerekes Memorandum, showing a time of 4:00.

**\*10** The fax line on the Kerekes Memorandum, which shows the date as 1-19-2001, the time, the word "from" and a page number preceded by the letter "P." It looks completely different from the standard BDO Seidman fax line, which shows the date with slashes and the year as a two-digit number (1/19/01), gives the time on a 24-hour clock (e.g., 17:36), displays the BDO Seidman telephone number preceded by an icon of a telephone, the name "BDO Seidman LLP," and an icon and three-digit number for the page designation (for example, 002).

**\*11** I do not find this evidence persuasive, since it merely tends to show that the January 19, 2001 fax of the Kerekes Memorandum was not sent to Ms. Guerin from BDO Seidman. Since there is no dispute that Mr. Greisman was not at BDO Seidman on January 19, the absence of identifying BDO Seidman marks on the fax does not tend to disprove

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

that Mr. Greisman could have sent it or had it sent to Ms. Guerin. The evidence that the Kerekes Memorandum's pages were faxed out of order and mixed in with pages from a Consulting Agreement is perplexing, but it does not tend to disprove that Mr. Greisman sent the fax or caused it to be sent to Ms. Guerin, particularly in view of Ms. Guerin's testimony that the *contents* of the Kerekes Memorandum were discussed between herself and Mr. Greisman. Regardless of the circumstances under which the Kerekes Memorandum was faxed to Ms. Guerin-faxed by Mr. Guerin or someone else, intentionally or inadvertently-Mr. Greisman's discussion with Ms. Guerin of the *contents* of Kerekes Memorandum on January 19, 2001 shows not only that Mr. Greisman knew Ms. Guerin had the Kerekes Memorandum, but also that Mr. Greisman had apprised her of its contents. The conversation and the provision of the Kerekes Memorandum both waived the privilege.

*11 I find Ms. Guerin's testimony more credible than Mr. Greisman's, because she has a specific recollection that Mr. Greisman sent her the Kerekes Memorandum and of what they discussed that day, while Mr. Greisman relies merely on his failure to recall sending or discussing the Kerekes Memorandum. Further, the evidence shows that the topic under discussion in Los Angeles by the Tax Opinion Committee on January 19, 2001, the list-keeping requirements, was the same topic discussed in the Kerekes Memorandum, and the minutes of the January 19, 2001 meeting specifically mention the coordination of list-keeping requirements with Jenkens. This makes it logical that Mr. Greisman would have faxed a copy of the Kerekes Memorandum to a lawyer at Jenkens that day. That conclusion is reinforced by Mr. Greisman's acknowledgment that he and Ms. Guerin discussed list-keeping requirements on January 22, 2001, three days later, and that Mr. Greisman sent her another BDO Seidman analysis of list-keeping, written by himself, on that date. It is worth noting that initially, Mr. Greisman denied sending the January 22 fax as well.

*11 BDO Seidman points to Ms. Guerin's failure to produce time records or other evidence that she received the fax or discussed it with Mr. Greisman

on January 19, 2001. However, Ms. Guerin is not a party to this litigation and has no obligation to come forward with any evidence at all. The BDO defendants have the burden of proof on the privilege issue.

*11 I find that Mr. Greisman either faxed the Kerekes Memorandum to Ms. Guerin himself or caused to be faxed to her on January 19, 2001, and that Mr. Greisman and Ms. Guerin discussed its contents at that time.

### D. Authority to waive the privilege

*12 The BDO defendants assert that even if Mr. Greisman did send the fax to Mr. Guerin on January 19, 2001, he did not have authority to waive the attorney-client privilege on behalf of BDO Seidman.

*12 The power to waive the corporate attorney-client privilege rests with the corporation's management, and is normally executed by its officers and directors. *United States v. Chen,* 99 F.3d 1495, 1502 (9th Cir.1996). BDO Seidman argues that although Mr. Greisman is a partner at BDO Seidman, he is one of 200 such partners, and is not an officer or director of the firm, or a member of the firm's management. However, this argument does not persuade me that Mr. Greisman did not have authority. The evidence shows that, even if Mr. Greisman did not have inherent authority to waive the privilege, BDO Seidman conferred that authority upon him.

*12 The Kerekes Memorandum was sent to Mr. Greisman as a member of BDO Seidman's Tax Opinion Committee, not as an individual. The Tax Opinion Committee represented BDO Seidman's interests with respect to the tax shelter transactions being conducted by BDO Seidman with its clients. As a member of the Tax Opinion Committee, Mr. Greisman had authority from BDO Seidman to possess the Kerekes Memorandum, and to discuss its contents with other persons in BDO Seidman and with BDO Seidman's legal counsel.

*12 In view of the allegedly close working relationship between the Jenkens firm and BDO

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Seidman in the tax shelter transactions, which BDO Seidman does not deny, I find improbable BDO Seidman's contention that Mr. Greisman did not have authority to share with Jenkens the thoughts and analysis contained in the Kerekes Memorandum. Jenkens clearly shared BDO Seidman's interests in the tax shelter transactions and participated closely with BDO Seidman in the planning and execution of those transactions. Ms. Guerin's example-initially denied, but now admitted by Mr. Greisman-of the January 22 fax, received just three days after the Kerekes Memorandum was faxed, and on the same subject as the Kerekes Memorandum, is telling.

E. Common interest rule

*12 Alternatively, the BDO defendants assert that the Kerekes Memorandum is protected from disclosure under the common interest rule. The " common interest" rule protects communications made when a nonparty sharing the client's interests is present at a confidential communication between attorney and client. *United States v. Zolin,* 809 F.2d 1411, 1417 (9th Cir.1987), *affirmed in part, reversed in part on other grounds,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The BDO defendants argue that the common interest doctrine extends to situations "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel," citing *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y.1995) and an unpublished decision from the Ninth Circuit, *United States v. Montgomery,* 1993 WL 74314 (9th Cir.1993). I do not find this argument persuasive for several reasons.

*13 First, at the time the Kerekes Memorandum was sent to Jenkens, there is no evidence of ongoing litigation involving Jenkens and BDO Seidman as joint defendants, nor is there any evidence that they would have pursued a common legal strategy in the event of such litigation. Ms. Guerin's supplemental affidavit indicates that the discussion she had with Mr. Greisman about the Kerekes Memorandum was unrelated to litigation strategy-it concerned the language of the opinion letters Jenkens was sending

to BDO Seidman's clients.

*13 Second, the theory of the common interest doctrine is inconsistent with the inadvertent waiver theory propounded by the BDO defendants. And third, as Judge Scheindlin observed in *Denney,* the fact that Jenkens has produced the Kerekes Memorandum during discovery in numerous actions, without invoking the joint defense privilege, is persuasive evidence that Jenkens was unaware of any joint defense strategy.

*13 I recommend that the court's oral order sealing the transcript be vacated, and that the BDO defendants' motion to strike and seal the Kerekes Memorandum and references to the Kerekes Memorandum in the briefing papers be denied.

III. BDO defendants' motion to compel arbitration and stay action

*13 Only the Allen plaintiffs (Brian Allen, Kathleen Allen, BGA Montgomery Investments, Parts Voice Investments, and Compu-Time, Inc.) have claims against BDO Seidman. The BDO defendants move to compel arbitration of the Allen plaintiffs' claims, pursuant to a Consulting Agreement entered into by Brian Allen. The BDO defendants also move to stay the claims of the other plaintiffs, who do not assert claims against BDO Seidman, arguing that doing so would serve the interests of judicial economy.

*13 The Consulting Agreement provides that it is to be governed in accordance with the laws of the State of New York. Kerekes Declaration, Exhibit A, ¶ 3.

*13 An agreement to arbitrate is like any other contract. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. University,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). When ruling on a motion to compel arbitration, the court first determines whether a valid agreement to arbitrate exists. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). If a valid agreement exists, the court then determines whether the dispute falls within the scope of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 12

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

agreement. *Hartford Accident and Indemnity Co. v. Swiss Reinsurance America Corp.,* 246 F.3d 219, 226 (2d Cir.2001).

**\*13** The Federal Arbitration Act (FAA) creates a body of federal substantive law governing arbitrability, applicable to any arbitration agreement that is within the coverage of the FAA. *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

### A. Validity of the Consulting Agreement

**\*13** Plaintiffs urge me to adopt the reasoning of the *Denney* court, which found the Consulting Agreement void on the basis of mutual fraud, because the language of the Consulting Agreement did not describe the services BDO Seidman actually provided.

**\*14** Under the language of the Consulting Agreement, BDO Seidman agrees to
**\*14** provide the following consulting services to you and your company: consulting services in conjunction with ongoing planing for your corporation, including planing for future operations and/or orderly termination and liquidation of the corporation, assisting you and your company in evaluating the various options [for the corporation] and their consequences, providing numerical computations (based on information provided by you) to illustrate those consequences, coordinating with your legal counsel, estate planners and financial advisors to coordinate the resolution of matters relating to your corporation with other business, legal and financial matters, and such other services as you may request that relate to the above-listed services.

**\*14** Declaration of Brian Allen, Exhibit B, p. 1.

**\*14** In *Denney,* the court found that although plaintiffs' Consulting Agreements with BDO Seidman provided for assistance in "business expansions" and the "transfer, sale or lease" of their businesses, the plaintiffs had already sold their businesses at the time they entered into the

Consulting Agreements, and BDO Seidman never provided services to them in connection with their business activities. The court concluded, based upon this evidence and the "extraordinarily vague language contained in the consulting agreements" that BDO Seidman and plaintiffs engaged in mutual fraud when they executed the consulting agreements, " because neither party to the transaction wanted third parties to "know the nature of the contracts into which they entered, or that BDO had contracted with plaintiffs to provide tax shelter advice." Canada Declaration, Exhibit C, p. 17.

**\*14** Plaintiffs argue that the court's analysis in *Denney* applies to this case as well. According to the Declaration of Brian Allen, he owned 100% of the capital stock in Compu-Time, Inc., (CTI) an Oregon corporation. In March 1999, CTI sold substantially all of its assets to Parts Voice, LLC (PV), thereby acquiring a 20% interest in PV. Mr. Allen states that at his first meeting with Michael Nelson of Lincoln Financial and Michael Kerekes of BDO Seidman, they "talked only about the tax transaction; no advice was given with respect to the already completed sale of the CTI assets." Allen Declaration, p. 2. Mr. Allen states that although CTI was used in the last step of the COBRA strategy, BDO Seidman did not provide any of the services listed in the Consulting Agreement because CTI's business operations and activities had ended upon the sale. *Id.* at p. 3.

**\*14** The Opinion Letter prepared by Jenkens, attached to the Allen Declaration as Exhibit A, tells a somewhat different story. According to that document, on November 17, 1999, Mr. Allen contributed the digital currency options to PV, which was treated as a partnership for federal income tax purposes, as a contribution to capital. Allen Declaration, Exhibit A, p. 2. PV had been formed for the purpose of making income and gains from investment transactions, and was engaged in investment activities. *Id.* On December 17, 1999, Mr. Allen contributed shares in other companies to PV as a contribution to capital. *Id.* On December 21, 1999, Mr. Allen contributed his interest in PV to CTI as a contribution to capital. According to the Opinion Letter, CTI had been formed for the purpose of making investments.

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

*15 On the basis of this evidence, I am not persuaded that the Consulting Agreement describes consulting work that was never done for the Allen plaintiffs. The evidence shows that CTI and PV were the entities used to implement the tax shelter transactions, and such phrases in the Consulting Agreement as "planning for ... orderly termination and liquidation of the corporation," [FN6] " evaluating the various options and their consequences," "providing numerical computations ... to illustrate those consequences," and " coordinating with your legal counsel, estate planners and financial advisors to coordinate the resolution of matters relating to your corporation with other business, legal and financial matters," can reasonably be interpreted to encompass tax advice, including assistance in the identification and implementation of a tax shelter strategy.

> FN6. The "corporation" referred to in the Consulting Agreement is never identified by name.

*15 Although plaintiffs argue, on the basis of the Kerekes Memorandum, that BDO Seidman made an effort to draft Consulting Agreements so as to conceal the true nature of the services being provided to clients engaging in the COBRA transactions,[FN7] there is no evidence to show that BDO Seidman's clients were deceived by the language of the Consulting Agreements, or that Mr. Allen entered into the Consulting Agreements with the intention of deceiving third parties. I therefore find no evidence indicative either of fraud in the inducement or of mutual fraud, and no grounds for invalidating the Consulting Agreements.

> FN7. Mr. Kerekes says in his Memorandum:
> Our engagement letters have been structured not to make clear exactly what services we were providing in return for our fee. In order to fall clearly within the protection of the date the engagement letters were signed, we might wish to send letters to our clients clarifying that one of the services is consulting with respect to

their current hedge fund transaction, or some such innocuous but clear language.

**B. Scope of the arbitration agreement**

*15 The scope of an arbitration agreement is a matter of federal substantive law. *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 719 (9th Cir.1999); *Clausen v. Watlow Elec. Mfg. Co.,* 242 F.Supp.2d 877, 882 (D.Or.2002). The standard for demonstrating arbitrability is not high. *Simula,* 175 F.3d at 719. A court interpreting an arbitration agreement must give due regard to the federal policy favoring arbitration; ambiguities as to the scope of the arbitration clause are resolved in favor of arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *AT & T Techs. Inc. v. Comm. Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)("in the absence of any express provision excluding a particular grievance from arbitration ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.")

*15 The arbitration provision of the Consulting Agreement states:
*15 If any dispute, controversy or claim arises in connection with the performance or breach of this agreement, and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York and the then current Commercial Arbitration Rules of the American Arbitration Association, except that no prehearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO Seidman, LLP office providing the relevant services exists, unless the parties agree to a different location. Such arbitration shall be conducted before a panel of three persons.... The arbitration panel shall have no authority to award nonmonetary or equitable relief, and any monetary award shall not include punitive damages.

*16 *Id.,* ¶ 5.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*16** Contractual language such as "all disputes arising in connection with" an agreement is interpreted broadly to reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract," including statutory claims. *Simula Inc. v. Autoliv, Inc.,* 175 F.3d at 721.

**\*16** The plaintiffs assert that this broad phrase is narrowed by the limitation to "performance or breach of this agreement," arguing that the Allen plaintiffs are explicitly *not* claiming that BDO Seidman failed to perform under or breached the Consulting Agreement .[FN8] The plaintiffs argue that the dispute between them relates to the COBRA strategy marketed by BDO Seidman, not the services enumerated in the Consulting Agreement.

> FN8. However, the Allen plaintiffs have asserted a breach of contract claim against BDO. See Amended Complaint ¶¶ 216-220. They allege that the BDO and Deutsche Defendants "breached their agreements with Plaintiffs (including but not limited to, the FX Contracts) and their duty of good faith and fair dealing." *Id.* at ¶ 218.

**\*16** For the reasons already discussed, I am not persuaded that the services enumerated in the Consulting Agreement exclude BDO Seidman's activities in presenting the COBRA tax shelter strategy to the plaintiffs and assisting them in its implementation. I therefore disagree with plaintiffs' contention that the claims asserted in the Amended Complaint have "nothing to do with" the Consulting Agreement. Further, the Consulting Agreement is the *only* agreement between BDO Seidman and the plaintiffs, the only instrument which could conceivably provide the basis for the services rendered by BDO Seidman and the fees paid for those services by the Allen plaintiffs, and the only agreement upon which a breach of contract claim could be based.

**\*16** Because 1) there is no express provision excluding claims arising from the COBRA strategy from arbitration, or 2) any evidence of a purpose on the part of the Allen plaintiffs and BDO Seidman to exclude claims arising from the COBRA strategy from arbitration; 3) the arbitration clause is broad; and 4) any doubts are to be resolved in favor of arbitrability, I recommend that the motion to compel arbitration be granted. However, I recommend that BDO's motion to stay be applied only to the claims asserted against BDO by the Allen plaintiffs. BDO has made no showing that would justify staying this action as to any other parties.

### IV. Lincoln Defendants' Motion to Dismiss

**\*16** The only claims asserted against the Lincoln defendants are by the Allen plaintiffs. The allegations in the Amended Complaint which concern the Allen plaintiffs are that the Lincoln defendants introduced the Allen plaintiffs to the COBRA strategy through an initial presentation in Portland. The Allens then met with Mr. Kerekes and decided to engage in the strategy in October 1999.

**\*16** The Lincoln defendants move to dismiss all the claims asserted against them for failure to state a claim. The Lincoln defendants move to dismiss claims one, two and three, asserted under RICO, 18 U .S.C. § 1961 *et seq.,* because 1) they are preempted by the Private Securities Litigation Reform Act of 1995 (PSLRA), which amended 18 U.S.C. § 1964(c) to eliminate as a predicate for civil claims under RICO any conduct actionable as securities fraud; 2) plaintiffs have failed to allege some of the requisite elements of a RICO claim, such as "operation or management" of an enterprise, "particularity," and conspiracy; and 3) there is no RICO claim for "aiding and abetting."

**\*17** The Lincoln defendants move to dismiss claim four (declaratory judgment and unjust enrichment claims) for failure to allege the invalid contracts to which the Lincoln defendants were parties or to allege who paid whom for what. They move to dismiss claims six, seven and eight (breach of fiduciary duty, fraud, and negligent misrepresentation/professional malpractice, respectively) for failure to plead the elements of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

those claims with particularity and failure to allege a special relationship.[FN9]

> FN9. The common law claims for breach of contract and of the duty of good faith and fair dealing is not asserted against the Lincoln defendants.

*17 The Lincoln defendants move to dismiss claim nine (breach of contract/professional malpractice) for failure to allege the existence of any contract between the Allen plaintiffs and the Lincoln defendants with respect to the COBRA strategy. They move to dismiss claim 10, requesting declaratory judgment as to plaintiffs' damages, because it seeks a declaration that plaintiffs are entitled to damages based on their other claims and plaintiffs have failed to plead sufficient facts in support of those underlying claims. They move to dismiss claim 11, for civil conspiracy, because plaintiffs fail to allege with particularity a "meeting of the minds" between the Lincoln defendants and the other alleged co-conspirators and fail to allege in what manner and with whom the Lincoln defendants conspired.

*17 The Lincoln defendants also move to dismiss the Allen plaintiffs' claim for punitive damages under Or.Rev.Stat. § 31.725, and their claims for compensatory damages based on improperly taken deductions, interest and penalties payable to the IRS, for failure to state a claim.

*17 Dismissal for failure to state a claim is proper only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### A. RICO claims

*17 Claim One is for violation of 18 U.S.C. § 1962(c), which provides that it
*17 shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

*17 Claim Two is for violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a) or (c) of this section."

*17 Claim Three is a claim for violation of 18 U.S.C. § 2 by "seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(c)."

### 1. Preemption by the PSLRA

*17 Section 10(b) of the Securities Exchange Act makes it "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j.

*18 SEC Rule 10b-5 provides that
*18 [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*18 The phrase "in connection with" in § 10(b) is to be "construed not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes." *SEC v. Zandford,* 535 U.S. 813, 819,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)(internal quotation and citation omitted).

*18 In 1995, RICO was amended by the PSLRA, to provide, "Any person injured in his business or property by reason of a violation of [RICO] may sue * * * except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). The purpose of this amendment was to "address a significant number of frivolous actions based on alleged securities law violations" so as to "deprive plaintiffs of the right to bring securities fraud-based RICO claims." *Scott v. Boos*, 215 F.3d 940, 945 (9th Cir.2000).

*18 The Lincoln defendants argue that claims one, two and three should be dismissed because the Allen plaintiffs' claims are based on alleged conduct that would be actionable as securities fraud. The defendants make three arguments. First, they argue that the COBRA strategy involved the purchase and sale of currency options, interests in S Corporations, and publicly-traded stock, all three of which are included in the definition of "security," see 15 U.S.C. § 71b(a)(1)(definition of security includes notes, stock, investment contracts, and "any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency;" *Landreth Timber Co. v. Landreth*, 471 U.S. 681, (sale of all outstanding stock in closely-held corporation was sale of securities).[FN10]

> FN10. The Lincoln defendants further contend that the Allen plaintiffs' interests in BGA Monterey Investments LLC and Parts Voice Investments LLC, which were transferred and used to effectuate the COBRA transactions, are arguably securities as well, citing *Robinson v. Glynn*, 349 F.3d 166, 174 (4th Cir.2003)(interests in manager-managed LLCs may often be securities); *SEC v. Parkersburg Wireless LLC*, 991 F.Supp. 6, 7-8 (D.D.C.1997) (sale of interest in LLC was sale of securities); *Nutek Information Systems v.*

*Arizona Corp. Comm.*, 194 Ariz. 104, 977 P.2d 826, 836 (Ariz.Ct.App.1998)(under Arizona blue sky law's definition of security, which is "substantially similar" to the federal definition, membership interests in LLC were securities).

*18 Second, they argue that plaintiffs' allegations that the Lincoln defendants induced the plaintiffs to enter the COBRA transactions by means of false and misleading statements, although alleged as mail and wire fraud, could and should have been alleged as securities fraud, see SEC Rule 10b-5 and *Zandford*, 535 U.S. at 822 (for purposes of securities fraud, "[i]t is enough that the scheme to defraud and the sale of securities coincide.")

*18 Third, the Lincoln defendants argue that other courts have dismissed RICO claims based on tax strategies the same as, or similar to, the COBRA strategy in this case, as preempted by the PSLRA. These cases include *Seippel v. Jenkens & Gilchrist*, 2004 WL 1907315 at *5 (S.D.N.Y. August 25, 2004) (dismissing RICO claims involving same tax strategy at issue in this case); *Jacobini v. KPMG*, 314 F.Supp.2d 1172 (M.D.Fla.2004); and *Loftin v. KPMG LLP*, 2003 WL 22225621 (S.D.Fla. Nov.12, 2003)(both involving a similar tax strategy).

*19 In *Seippel*, the complaint alleged that plaintiff William Seippel, a senior executive of a company, was planning to change his employment, exercise his stock options, and sell the stock. Ernst & Young was Seippel's employer's auditor and provided tax advice and other financial services to Seippel and other senior executives. Through this relationship, Ernst & Young knew of Seippel's plans and the substantial gains that he would recognize when he engaged in the stock options transaction. Acting on this knowledge, Charles Paul of Ernst & Young approached the Seippels and advised them about the COBRA scheme. The Seippels agreed to engage in the scheme to reduce their tax liability for the gains that would be realized from exercising the stock option.

*19 Seippel formed various entities, including an S corporation, an LLC, and a partnership. The LLC entered into the currency options transactions.

Not Reported in F.Supp.2d                                                      Page 17

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

purchasing long options and selling short options on foreign currency exchanges through Deutsche Bank. The options had an expiration date of December 23, 1999. On December 2, 1999, Seippel, through the LLC, contributed his currency options to a partnership. On December 12, 1999, the partnership purchased Canadian dollars. On December 27, 1999, Seippel contributed his partnership interest to an S Corporation. The partnership was liquidated and the Canadian dollars were distributed to the S Corporation. On December 29, the S Corporation sold all of its investments. The Seippels claimed a $12 million loss on their tax returns. The Seippels were subsequently audited by the IRS, and required to make tax payments of over $5 million and interest and penalty payments of over $1 million. They brought an action against Jenkens and Deutsche Bank, among others, asserting claims for RICO, fraud, breach of fiduciary duty, negligent misrepresentation, breach of contract, professional malpractice, and unjust enrichment. The defendants moved against the RICO claims on the ground that the Seippels' allegations were actionable as securities fraud, and therefore barred by the PSLRA.

**\*19** The court noted that the predicate acts alleged were, as in this case, "transmitting fraudulent information and materials through the interstate mails and wires, as well as otherwise using the interstate mails and wires in furtherance of a common plan to commit racketeering activity." 341 F.Supp. at 372. The court then considered whether the conduct alleged by the Seippels would have been actionable as securities fraud.

**\*19** The court rejected the Seippels' argument that the PSLRA exception did not apply because they had not alleged that any defendant misrepresented the value of Mr. Seippel's stock options. The court relied on *Zandford*, 535 U.S. at 819, in which the Supreme Court made it clear that the scheme to defraud and the sale of securities need only " coincide" to be actionable as securities fraud.

**\*19** The court held that the Seippels' complaint described a "single fraudulent scheme 'in connection with' the sale of Mr. Seippel's stock." 341 F.Supp. at 373. The sale of the stock was an " integral part" of the scheme, since without it "there

would have been no gain for the COBRA transaction to offset," and under the Seippels' allegations, the reason the defendants approached the Seippels was that they knew of the planned sale of the stock. *Id.* The court concluded, "Having alleged in their Amended Complaint that defendants' acts were part of a single fraudulent scheme, the Seippels cannot now divide the scheme into its various component acts." *Id.* The court dismissed the RICO claims.

**\*20** The *Loftin* and *Jacobini* cases involved tax shelter strategies different from the COBRA strategy at issue here. However both, like *Seippel*, involved representations and opinion letters-later proved to be wrong-that tax shelters involving transactions designed to effect a "basis shift" enabling the investor to recognize a capital loss, would pass muster with the IRS. The predicate acts alleged in *Loftin* and *Jacobini* were mail and wire fraud, but in each case, the purchase and sale of securities was part of the tax shelter strategy.

**\*20** Plaintiffs argue that the facts of this case are distinguishable from those of *Seippel, Loftin* and *Jacobini*, because this case involves *digital* options, which places them somehow outside the definition of securities. They rely on language from the *Seippel* case, in which the court noted that digital options were "significantly different" from the strategies used in the *Loftin* and *Jacobini* cases. However, I find plaintiffs' reliance on this observation from *Seippel* to be misplaced. The *Seippel* case involved exactly the same digital option transactions that were used in this case, and the court concluded that plaintiffs' RICO claims were precluded by the PSLRA. The *Loftin* and *Jacobini* cases did not involve options of any kind, but rather shares of stock.

**\*20** Plaintiffs also attempt to distinguish *Seippel* on the ground that in *Seippel*, the plaintiffs were approached about the COBRA scheme because of a large *future* stock sale, while in this case, the Allen plaintiffs were approached *after* they had realized a gain from the sale of Allen's interest in Parts Voice LLC. I find this a distinction without a difference. In this case and in *Seippel*, the objective was to avoid paying taxes on gains realized from the sale of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 18

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

stock. The date on which the gains accrued is immaterial. Moreover, there is another stock transaction in this case which was absent from *Seippel*: here, the Allen plaintiffs contributed stock to the partnership, while in *Seippel*, the plaintiffs contributed Canadian dollars. The Allen plaintiffs' partnership subsequently sold all of its stock. The Allen plaintiffs' contribution of stock to the partnership, and the subsequent liquidation of the partnership assets, were integral to the COBRA strategy.

**\*20** Plaintiffs also argue that the use of stock was merely incidental to the COBRA scheme, because COBRA merely required the contribution of something with value to the partnership. While I agree that implementation of the COBRA strategy did not necessarily require the Allens to contribute securities to the partnership, the fact remains that the Allen plaintiffs' contribution was in the form of stock, and the artificially inflated basis created by the series of options transactions was meant to, and did, attach to that stock.

**\*20** Plaintiffs argue that the COBRA scheme involved transactions "more akin to wagers or lotteries on the movements of foreign currency prices" rather than the physical exchange of securities. They quote from *Lehman Brothers Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,* 179 F.Supp.2d 159 (S.D.N.Y.2001), where the court held that digital transactions did not fall within either the foreign currency definition or the "investment contract" definition of "security" under New York's Martin Act, despite Martin Act's broader definition of security than the federal act.

**\*21** This argument is flawed for two reasons. First, the COBRA scheme, as implemented by the Allen plaintiffs, involved more than the digital options. As discussed, it also involved the contribution of stock to the partnership and the subsequent sale of that stock. Further, the issue of the PSLRA's bar on RICO claims was not before the court in the *Lehman Brothers* case.

**\*21** Plaintiffs' final argument is that the proper focus for the analysis is not on whether the conduct

pleaded as predicate offenses is "actionable" as securities fraud, and not on whether the conduct at issue was "intrinsically connected to, and dependent upon" conduct actionable as securities fraud. Plaintiffs rely on *Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 330 (3d Cir.1999). In *Bald Eagle,* the plaintiffs, school districts, brought a class action under RICO against a bank acting as the custodian of the districts' assets seeking to recover funds lost as the result of an alleged Ponzi scheme. The court held that the action relied on conduct actionable as fraud, and was thus barred by the PSLRA.

**\*21** The district court held that the conduct underlying the RICO claims was "intrinsically connected to, and dependent upon conduct which would be actionable under Federal securities law." 189 F.3d at 330. The Court of Appeals held that the "proper focus" of the analysis was on whether the conduct was "actionable" as securities fraud, *id.,* but held that the district court's opinion made it clear that the district court had properly "found the conduct alleged as predicate acts was so closely connected to and dependent upon conduct undertaken in connection with the purchase or sale of securities that it was actionable as securities fraud." *Id.*

**\*21** To the extent that the *Bald Eagle* court applied a stricter standard than the *Zandford* court's requirement that the scheme to defraud and the sale of securities "coincide," the *Bald Eagle* standard has been overruled by the later Supreme Court opinion in *Zandford.*

**\*21** I recommend that the motion to dismiss the RICO claims as barred under the PSLRA be granted.

### 2. Is Claim One deficient for failure to allege that the Lincoln defendants had a part in directing the operation or management of the enterprises' affairs?

**\*21** Defendants assert that the plaintiffs have failed to state a claim for violation of 18 U.S.C. § 1962(c) because they have failed to allege that the Lincoln defendants had a part in directing the operation or management of the enterprises' affairs, as required

Not Reported in F.Supp.2d                                                                                      Page 19

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

by RICO. The Lincoln defendants rely on *Reves v. Ernst & Young,* 507 U.S. 179 (1993), where the Supreme Court interpreted the RICO requirement that a defendant "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs, 18 U.S.C. § 1962(c), to mean that the defendant must be involved in the "operation or management" of the enterprise. The Court held:

*21 In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*22 507 U.S. at 179.

*22 The only facts alleged specifically against the Lincoln defendants are that Nelson "made the initial presentation," in July 1999 and that Kerekes, Nelson and Siegfried "pitched" the FX strategy to the Allen plaintiffs in August 1999. Amended Complaint ¶¶ 72, 73. The Amended Complaint contains allegations about what Kerekes said at the August 1999 meeting, but no indication of what Nelson said in July 1999 and what, if anything, Nelson and Siegfried said in August 1999.

*22 The Amended Complaint also alleges that Deutsche Bank negotiated the fees, see ¶ 58, that the fees were based on the plaintiffs' anticipated tax savings, ¶ 40, and that some percentage of the fees went to "the Marketing Participants" who "introduc[ed] and recommend[ed] the FX Contracts, as part of various tax strategies, to long-time clients who trusted them." Amended Complaint ¶ 40.

*22 The Lincoln defendants assert that none of the allegations against them amounts to anything more than the introduction of the Allen plaintiffs to Kerekes; there is no allegation that the Lincoln defendants played any role in the events that followed. The Lincoln defendants contend that the Amended Complaint does not allege that the Lincoln defendants played any role in designing the

strategy, making or implementing decisions about the strategy, explaining the strategy and the tax consequences to the plaintiffs, or implementing the FX transactions. Rather, they argue, the allegations show that the series of transactions which comprised the COBRA strategy were the product of others, specifically Jenkens and Deutsche Bank.

*22 The Lincoln defendants argue that courts in this jurisdiction have held that limited involvement in the purported enterprise is not sufficient to satisfy the "direction" requirement, citing *Baumer v. Pachl,* 8 F.3d 1341, 1344 (9th Cir.1993).

*22 In *Baumer,* the complaint alleged that plaintiffs were investors in a California limited partnership known as "Golden Hills Estates," formed by non-defendants Erdy and EPA.

*22 The complaint alleged that in 1976, Erdy and EPA commenced public sales of fractional partnership interests in "Klamath Country Reserve." Approximately five years later, Erdy and EPA began public sales of limited partnership interests in Golden Hills, allegedly in an effort to make payment to the Klamath plaintiffs and others. However, the California Department of Corporations concluded that the Golden Hills transactions constituted illegal sales of unregistered securities, and demanded that no further sales be undertaken.

*22 Erdy and EPA subsequently enlisted the aid of defendant Pachl, an attorney, who undertook by use of United States mail numerous efforts to perpetuate the alleged fraud, including the preparation of letters to the Department of Corporations and others, allegedly designed to forestall and cover up the fraud by minimizing or mischaracterizing the allegedly improper activities of Erdy and EPA. Plaintiffs alleged further that Pachl knowingly filed a false partnership agreement in which he inflated the number of limited partners, and mailed copies of the false agreement to create the impression that Golden Hills was formed and operated legally. Pachl subsequently assisted Erdy in bankruptcy proceedings and sent two letters to the limited partners in this regard. In one letter, Pachl allegedly made misrepresentations to limited partners about

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Golden Hills' assets.

**\*23** Erdy and EPA also enlisted the help of defendant Yow, a licensed real estate appraiser. Yow misrepresented the appraised value of the property, and this appraisal was used to enhance the perceived attractiveness of the Golden Hills property by means of communicating this information by mail to present and future investors.

**\*23** Defendants moved to dismiss the RICO claims against Pachl and Yow. The district court granted the motion, and the Court of Appeals affirmed. The Court of Appeals relied on *Reves* to hold that Pachl's involvement, consisting of the preparation of two letters, a partnership agreement, and assistance in the bankruptcy proceeding in which he again sent two letters, was insufficient to impute liability. The court noted that the allegedly fraudulent scheme began five years before Pachl became involved, "his role thereafter was at best sporadic," and he "at no time held any formal position in the limited partnership," playing no part in directing the affairs of the enterprise. 8 F.3d at 1344. The court cited with approval a Third Circuit case, *Univ. of Md. at Baltimore et al. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993), in which the court held that the mere provision of goods or services that ultimately benefit the enterprise "does not mean that one becomes liable under RICO as a result."

**\*23** Plaintiffs counter that although there may have been other players more involved in the affairs of the enterprise than the Lincoln defendants, the Lincoln defendants were nonetheless "at the very core of this scheme" because it was the trust reposed in the Lincoln defendants by the Allen plaintiffs which made the scheme possible. Plaintiffs characterize the Lincoln defendants as " front-line" solicitors, and therefore "critical players" in the enterprises.

**\*23** The question of whether these allegations are sufficient to state a claim that the Lincoln defendants at least indirectly participated in the conduct of the enterprise's affairs is a difficult one. Nothing in these allegations about the July and August 1999 meetings suggests that the Lincoln

defendants directed the operation or management of the affairs of the "solicitation enterprise." The allegation that the Lincoln defendants received a fee based on the Allen plaintiffs' anticipated tax savings might be sufficient if it were coupled with an allegation that the Lincoln defendants knew or should have known of the relationship between the fees paid and the outcome of the tax shelter strategy. But in the absence of any alleged fact indicating such knowledge or awareness of the COBRA scheme, plaintiffs have not stated a claim that the Lincoln defendants participated in the conduct or management of a RICO scheme's affairs.

**\*23** A comparison of the allegations in this case with the facts of the *Baumer* case also demonstrates that plaintiffs' allegations are insufficient. The court in *Baumer* noted that Pachl had allegedly made numerous efforts to perpetuate the fraud, including the preparation of letter designed to cover up the fraud; knowingly filed a false partnership agreement and mailed copies of it to further the impression that Golden Hills operated legally; and made misrepresentations to limited partners about Golden Hills' assets. These actions are far more extensive, and suggest considerably more knowledge about and control over the fraud than the actions alleged against the Lincoln defendants here. I conclude, therefore, that under *Baumer* the plaintiffs' allegations are insufficient to generate liability. I recommend that Claim One be dismissed with leave to replead if my recommendation to dismiss Claim One as barred under PSLRA is not adopted.

### 3. Is Claim One deficient for failure to allege with particularity 1) the predicate acts, 2) the "pattern" requirement, and 3) each element of the predicate acts for a RICO claim?

**\*24** Claim One is asserted under 18 U.S.C. § 1962(c), which states:
**\*24** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

*24 A "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(c). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" comprises a series of named criminal acts or violations of enumerated statutes. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires proof of at least two predicate acts of racketeering activity within a 10-year period. 18 U.S.C. § 1961(5). The predicate acts must be related and must amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also Cooper Industries, Inc. v. Lagrand Tire Chains*, 205 F.Supp.2d 1157, 1165 (D.Or.2002)("[C]ourts have determined that a pattern must be based on at least two acts of racketeering, must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.")

### a. Pleading of predicate acts

*24 The Lincoln defendants assert that RICO claims based upon predicate acts involving fraud must be pleaded with the particularity required by Rule 9(b), which means that the complaint must allege the time, place, speaker, and content of the alleged misrepresentations. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.1989). When fraud claims involve multiple defendants, the complaint must satisfy Rule 9(b) particularity requirements for *each* defendant. *See In re Worlds of Wonder Securities Litigation*, 694 F.Supp. 1427, 1432 (N.D.Cal.1988).

*24 The defendants argue that even though plaintiffs are required to plead with particularity each of the elements of mail and wire fraud, their allegations do not include even one specific example of mail and wire fraud that was committed by the Lincoln defendants. While plaintiffs have alleged that "defendants" in general violated mail and wire fraud statutes, and have pleaded six

specific communications between the plaintiffs and the defendants, none of these specific communications involves any of the Lincoln defendants. The only two alleged communications involving the Allen plaintiffs are 1) a fax from Mr. Kerekes to Mr. Allen, attaching the form used to transfer funds to Deutsche Bank; and 2) a fax from Mr. Allen to defendant David Parse, an employee of Deutsche Bank, attaching letters authorizing the wire transfer of funds.

*25 The plaintiffs have not responded to this contention, offering only legal generalizations to the effect that the pleading requirements of fraud are not onerous. Moreover, plaintiffs themselves cite to the language from *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir.2003)("Averments of fraud must be accompanied by the who, what, when, where and how of the misconduct charged") and to *Riley v. Brazeau*, 612 F.Supp. 674, 677 (D.Or.1985)(complaint must allege the time, place and nature of the allegedly fraudulent activities). Plaintiffs have not directed the court to any specific allegations involving the Lincoln defendants that would meet these who, what, where, when and how requirements. Instead, they rely on the general allegations in the complaint about "defendants" and various "failures to disclose."

*25 The plaintiffs argue that it is not necessary that they allege a predicate act of mail and wire fraud by each member of the RICO conspiracy. They rely on cases holding that all conspirators are liable for the acts of their co-conspirators. See, e.g., *Oki Semiconductor Co. v. Wells Fargo Bank Nat. Ass'n*, 298 F.3d 768, 774-75 (9th Cir.2002) and *Sec. Investor Prot. Corp. v. Vigman*, 908 F.2d 1461, 1468 (9th Cir.1990), *rev'd on other grounds sub nom. Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)("All conspirators are liable for the acts of their co-conspirators.") However, the Lincoln defendants counter that these conspiracy cases were analyzed under 18 U.S.C. § 1962(d), the RICO conspiracy statute, (i.e., Claim Two) not § 1962(c), which is the statute relevant to Claim One.

*25 Section 1962(c) provides for the liability of "any person employed by or associated with" the

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

enterprise who conducts or participates in the enterprise's affairs through a pattern of racketeering activity. Plaintiffs' allegations against "defendants" in general do not satisfy the requirement that the elements of the offense be pleaded against "any person." Because the plaintiffs have not pleaded the who, what, when and where of the predicate acts of fraud against the Lincoln defendants, their allegations do not satisfy the specificity requirements of Rule 9(b).

### b. Pleading the pattern requirement

**\*25** The Lincoln defendants assert that RICO's pattern requirement requires proof of "at least two acts of racketeering activity" within a 10-year period. 18 U.S.C. § 1961(5). A pattern of racketeering is demonstrated by showing that the racketeering predicate acts are related and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Cooper Industries, Inc. v. Lagrand Tire Chains,* 205 F.Supp.2d 1157, 1165 (D.Or.2002). The Lincoln defendants argue that plaintiffs have failed to satisfy this requirement because they have not alleged that the Lincoln defendants themselves committed at least two predicate acts or caused others to do so. The plaintiffs have not responded to this contention.

**\*26** I recommend that Claim One be dismissed for failure to plead the fraudulent predicate acts with particularity and for failure to plead the pattern requirement of 18 U.S.C. § 1962(c), with leave to replead, if my recommendation that Claim One be dismissed as barred under PSLRA is not adopted.

### 4. Should Claim Two be dismissed for failure to allege the existence of a RICO conspiracy?

**\*26** The Lincoln defendants assert that Claim Two must be dismissed because plaintiffs have failed to allege the existence of a RICO conspiracy. "To establish a violation of section 1962(d), plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. America Online,* 208 F.3d 741, 751 (9th Cir.2000). Further,
**\*26** A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). A defendant must also have been aware of the essential nature and scope of the enterprise and intended to participate in it. *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993).

**\*26** *Howard,* 208 F.3d at 751. The Lincoln defendants argue that the plaintiffs have not alleged that they 1) made an agreement that was a substantive violation of section 1962(c) or 2) agreed to commit, or participated in the commission of, any predicate offenses; or 3) were aware of the " essential nature and scope of the enterprise and intended to participate in it." They argue that plaintiffs' statement that the alleged misrepresentations and omissions "give rise to an inference" (Amended Complaint, ¶ 199) that the defendants agreed to conspire to commit mail and wire fraud is conclusory and insufficient to establish liability. They also argue that the plaintiffs' allegations that the Lincoln defendants engaged in a RICO conspiracy do not state a violation of 18 U.S.C. § 1962(d). (Amended Complaint, ¶¶ 195-202).

**\*26** The plaintiffs respond that a RICO conspiracy defendant need not himself commit or agree to commit predicate acts, and that a violation of § 1962(c) is not a prerequisite to a violation of § 1962(d). *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *Dooley v. Crab Boat Owners Assoc.,* 2004 WL 902361 at *8 (N.D.Cal.2004). The plaintiffs assert that the *Salinas* Court found that for purposes of conspiracy it " suffices that [defendant] adopt the goal of furthering or facilitating the criminal endeavor." 522 U.S. at 65 . They also rely on the *Howard* case's holding that the defendant "must have been aware of the essential nature and scope of the criminal enterprise and intended to participate in it." 208 F.3d at 751.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 23

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*26** The Lincoln defendants reply that even under this standard, plaintiffs have failed to allege facts that would make out a conspiracy claim, since they have even failed to allege either that the Lincoln defendants adopted the goal of furthering or facilitating the criminal endeavor, or that they were aware of the essential nature and scope of the enterprise and intended to participate in it.

**\*27** I disagree with plaintiffs' contention that they are not required to plead predicate acts against the Lincoln defendants to make out a conspiracy claim against them. The *Howard* court held to the contrary, saying, "[T]he failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy." 208 F.3d at 751. But even if I accepted plaintiffs' argument that they were only required to allege that the Lincoln defendants were aware of the nature and scope of the criminal enterprise and adopted the goal of furthering it, plaintiffs have failed to make even those allegations.

**\*27** I recommend that Claim Two be dismissed with leave to replead if my recommendation that Claim Two be dismissed as barred under PSLRA is not adopted.

### 5. RICO claim for aiding and abetting

**\*27** The Lincoln defendants assert that Claim Three must be dismissed because there is no cause of action for aiding and abetting a RICO violation. They rely on *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164,182 (1994), in which the Supreme Court held that liability for aiding and abetting would not be read into a statute: "Congress has not enacted a general civil aiding and abetting statute.... Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."

**\*27** *Central Bank* was a § 10(b) securities fraud case, but courts in other jurisdictions have applied its holding to RICO claims. See, e.g., *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 656,

657 (3d Cir.1998)( "Because the text of the RICO statute does not encompass a private cause of action for aiding and abetting a RICO violation," such an action "cannot survive the Supreme Court's decision in *Central Bank of Denver.*").

**\*27** The Lincoln defendants acknowledge that the question of whether the Ninth Circuit would allow claims for aiding and abetting a RICO violation after *Central Bank* "appears not to have been definitively answered yet," but they note one district court case, *Westways World Travel v. AMR Corp.*, 182 F.Supp.2d 952, 961 (N.D.Cal.2001) stating, " The majority of courts which have addressed the issue since *Central Bank of Denver* have concluded that there is no basis to distinguish Section 1962(c) under RICO from Section 10(b), and thus there is no aiding and abetting liability under Section 1962(c)." [FN11] The *Westways* court did not decide the issue, dismissing the RICO claim on other grounds.

FN11. These cases include *Rolo*, 155 F.3d at 657, *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 255-56 (S.D.N.Y.1997), *In re Lake States Commodities, Inc.*, 936 F.Supp. 1461, 1475 (N.D.Ill.1996), and *Department of Economic Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449 (S.D.N.Y.1996).

**\*27** The plaintiffs respond that the "prevalent view" is that civil liability for aiding and abetting can attach, and they cite cases to that effect.[FN12] The Lincoln defendants distinguish these cases on the grounds that all but one, including the decisions of the Fifth, Eleventh, and District of Columbia Circuit Courts of Appeals cited as authority in *Cox*, were decided before the Supreme Court's decision in *Central Bank of Denver*, and the one case decided after *Central Bank of Denver*, *Park v. Jack's Food Systems, Inc.*, 907 F.Supp. 914 (D.Md.1995), nonetheless relies on precedent that predates *Central Bank of Denver* and does not discuss the relevance of *Central Bank of Denver*.

FN12. *Cox v. Administrator U.S. Steel &*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 24

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

*Carnegie*, 17 F.3d 1386 (11th Cir.1994), *Rodriguez v. Banco Cent.*, 727 F.Supp. 759, 773 (D.P.R.1989), *Park v. Jack's Food Systems, Inc.*, 907 F.Supp. 914 (D.Md.1995), *Independent Drug Wholesalers Group, Inc. v. Denton*, 833 F.Supp. 1507 (D.Kan.1993).

**\*28** I conclude that aiding and abetting liability does not survive *Central Bank of Denver*.

6. Even if an aiding and abetting claim were permitted, have plaintiffs failed to allege the requisite participation in the "operation or management" of the enterprise?

**\*28** The Lincoln defendants argue that the courts which either allow aiding and abetting liability under § 1962(c) or have not yet decided the issue have still held that aiding and abetting claims must satisfy the "operation or management" requirement. They rely on *Westways*, 182 F.Supp.2d at 961-62.

**\*28** In *Westways*, the court found it unnecessary to determine the continued viability of aiding and abetting liability under § 1962(c) because even if such liability survived *Central Bank of Denver*, plaintiffs failed to allege that the defendant participated in the operation or management of an enterprise, as required in *Reves*. The *Westways* court cited several cases holding that aiding and abetting claims must satisfy this requirement. *United States v. Antar*, 53 F.3d 568, 581 (3d Cir.1995); *United States v. Viola*, 35 F.3d 37 (2d Cir.1994); *Early v. K-Tel Int'l, Inc.*, 1999 WL 181994 (N.D.Ill.1999); *Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.*, 1998 WL 1962212 (S.D.N.Y.1998); *Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y.1998); *In re American Honda Motor Co., Inc., Dealerships Relations Litigation*, 965 F.Supp. 716 (D.Md.1997).[FN13]

FN13. The court notes that some of these cases are from the same jurisdictions, and later than, the cases cited above holding that aiding and abetting liability does not survive *Central Bank of Denver*.

**\*28** The Lincoln defendants note that, as discussed above, plaintiffs have failed to satisfy the "operation or management" requirement of *Rives*, so that even if plaintiffs can assert an aiding and abetting claim, they have failed to plead it properly. The plaintiffs have not responded to this argument.

7. Does 18 U.S.C. § 2 permit civil liability?

**\*28** The Lincoln defendants assert that 18 U.S.C. § 2 governs criminal, not civil, liability. They rely on *Rolo* case, where the Court of Appeals for the Third Circuit held, "Criminal liability for aiding and abetting a violation of § 1962 is imposed by reference to the general aiding and abetting statute, 18 U.S.C. § 2. This provision has no application to private causes of action." 155 F.3d at 657. The plaintiffs have not responded to this argument.

**\*28** I recommend that Claim Three be dismissed with prejudice on the grounds that aiding and abetting liability is probably foreclosed by *Central Bank of Denver* and because RICO's aiding and abetting provision has no application to private causes of action, if my recommendation that Claim Three be dismissed as barred by PSLRA is not adopted. If my recommendation to dismiss Claim Three with prejudice is not adopted on any of these grounds, I recommend that Claim Three be dismissed with leave to replead.

B. Claim Four

**\*28** The Lincoln defendants contend that Claim Four, which asserts a claim for declaratory judgment based on unjust enrichment with respect to the FX contracts, should be dismissed because plaintiffs have failed to allege that the Lincoln defendants' interests are adverse to those of the Allen plaintiffs.

**\*29** The plaintiffs have alleged that the FX contracts they executed with Deutsche Bank are unenforceable for lack of consideration, because Deutsche Bank retained unlimited discretion to determine whether they would pay out and because the tax strategy transactions were illusory. Plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

therefore seek to recover "all fees paid" to defendants on an unjust enrichment theory.

**\*29** The Lincoln defendants argue that this claim, regardless of whether it is brought under the Oregon Declaratory Judgments Act, Or.Rev.Stat. § 28.010-28.160 or the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, must be dismissed because plaintiffs have failed to allege a justiciable controversy between persons whose interests are adverse. See *Scott v. Pasadena Unified Sch. Dist.,* 306 F.3d 646, 658 (9th Cir.2002)(under the federal Declaratory Judgment Act, plaintiff must establish standing by showing that there is a substantial controversy, between parties with adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment) and *Green v. Cox,* 44 Or.App. 183, 186, 605 P.2d 1198 (1980) (elements of a declaratory relief action under Oregon law are 1) justiciable controversy 2) between adverse parties, 3) where the party seeking relief has a legally protectible interest and 4) the claim is ripe).

**\*29** The Lincoln defendants assert that the Amended Complaint contains no allegations that tie the Lincoln defendants to the development or implementation of the FX contracts, the negotiations by which the Allen plaintiffs entered into the FX contracts, or the performance of those contracts, and no allegations that identify any stake the Lincoln defendants may have had in the FX contracts that was adverse to the Allen plaintiffs' interests.

**\*29** The plaintiffs have not squarely confronted this contention. They cite their general allegations against "defendants" and argue that the Lincoln defendants have been unjustly enriched by accepting and retaining fees "under circumstances demonstrating that it would be inequitable for Defendants, including the Lincoln Defendants, to retain the benefit." The plaintiffs assert, "Unless Lincoln concedes it owes to the Allen plaintiffs a refund of any consideration received under their arrangements with the other Defendants, the parties' interests are certainly adverse and in need of resolution." Plaintiffs' Memorandum, p. 34.

**\*29** The mere assertion that the Lincoln defendants accepted fees is not sufficient to make their interests adverse to those of the plaintiffs. There is not a plain and concise statement that these fees were related to the FX Contracts, or an explanation of how they were allocated to the Lincoln defendants. The general references to conduct by the " defendants" similarly does not suffice to show adverse interests between the Allen plaintiffs and the Lincoln defendants.

**\*29** I recommend that Claim Four be dismissed with leave for the Allen plaintiffs to replead, if they can, a concrete adverse interest between themselves and the Lincoln defendants with respect to the FX contracts they executed with Deutsche Bank.

### C. Claim Seven

**\*30** The Lincoln defendants assert that the common-law fraud claim should be dismissed for failure to plead each element of fraud with particularity. See, e.g., *Nisson v. Tillman,* 213 Or. 133, 138, 323 P.2d 329 (1958)(pleading must allege each element of fraud) and *Vess,* 317 F.3d at 1103 (Rule 9(b)'s particularity requirement applies to state-law causes of action). The Lincoln defendants contend that the plaintiffs have failed to allege the time, place and nature of the allegedly fraudulent activities, see *Riley,* 612 F.Supp. at 677, and have further failed to specify the role of each defendant in the fraud. *Id.;* see also *Newman v. Comprehensive Care Corp.,* 794 F.Supp. 1513, 1527 (D.Or.1992)(generic references to "defendants " fail to reach the level of particularity required by Rule 9(b)). The Lincoln defendants argue that the plaintiffs have failed to identify the time, place and nature of the misrepresentations alleged to have been made by them, and have failed to identify the " specific examples of misfeasance for which the Lincoln defendants are allegedly responsible." Defendants' Memorandum, p. 18.

**\*30** Plaintiffs' response to this argument is to reiterate their allegations about the conduct of " defendants." They also argue that *Newman* is distinguishable because "the role of the Lincoln Defendants, a trusted fiduciary who introduced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Allen to the Strategy and to BDO Seidman is clear from the pleadings," and because unlike *Newman*, it is "clear from the Complaint what misrepresentations and omissions were made by the Lincoln Defendants (among others)-the Strategy is legitimate and you have an opinion letter..."

**\*30** Plaintiffs have failed to plead their common-law fraud claim with the requisite particularity against the Lincoln defendants. I recommend that this claim be dismissed with leave to replead.

D. Should Claims Six (breach of fiduciary duty) and Eight(negligent misrepresentation/professional malpractice) be dismissed for failure to plead the fraudulent elements of these claims with particularity, and should Claims Six, Eight and Nine (breach of contract/professional malpractice) be dismissed for failure to plead the existence and breach of a special relationship?

**\*30** The Lincoln defendants argue that the plaintiffs' failure to plead their underlying fraud claims with particularity is also fatal to Claims Six and Eight because Rule 9(b) requires pleading with particularity for all "averments of fraud." *Vess*, 317 F.3d at 1103. In *Vess*, the court held:

**\*30** In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud, " and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

**\*31** 317 F.3d at 1103-04. The Lincoln defendants argue that in *Vess*, the court held that allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements "regardless of the cause of action in which they appear," because such allegations are damaging to a defendant's reputation. *Id.* at 1104. *Vess* involved the application of Rule 9(b) to averments of fraud in a California state statutory claim for unfair business practices. However, the

defendants argue that the same standard has been applied to other types of claims "grounded in fraud," including breach of fiduciary duty claims. See, e.g., *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1404-05 (9th Cir.1996) (claims under Section 11 of the Securities Act of 1933); *Krieger v. Gast*, 2000 WL 288442 at \*8 (W.D.Mich.2000) (breach of fiduciary duty claims that involve fraud); *Torchetti v Int'l Bus. Machs. Corp.*, 986 F.Supp. 49, 51 (D.Mass.1997) (same); *Burt v. Danforth*, 742 F.Supp. 1043, 1051 (E.D.Mo.1990)(same). The Lincoln defendants contend that plaintiffs' allegations under these claims are insufficient because all three are grounded in fraud, but fail to plead the elements of the claims with the particularity required of fraud claims. The defendants point out that in these claims, as in the common-law fraud claim, plaintiffs have failed to identify which defendant is responsible for each example of misconduct. They point out that of the 69 suballegations, none refers to the Lincoln defendants by name. Accordingly, they argue, these claims should be dismissed.

**\*31** The plaintiffs respond that the *Vess* case involved application of Rule 9(b) to California state claims of unfair business practices, but that there is no Ninth Circuit or Oregon case specifically applying Rule 9(b) to the state law claims involved in this case.

**\*31** In the absence of such authority, they assert that they need only comply with the requirements of Rule 8 of the Federal Rules of Civil Procedure, which is to provide a "short and plain statement" showing that they are entitled to relief. The plaintiffs argue that at most, "even if some allegations of these other claims are based on fraud," other parts of the claims are not based on fraud, so that the heightened pleading requirements should apply only to the allegations that involve fraud. *Vess*, 317 F.3d at 1104. I agree that the specificity requirement applies only to elements of claims that are based on fraud.

**\*31** In the alternative, the Lincoln defendants argue that Claims Six, Eight and Nine all fail because the plaintiffs have not alleged facts showing the existence of a special relationship between the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Allen plaintiffs and the Lincoln defendants, a prerequisite for all three claims.

**\*31** For claims based on breach of fiduciary duty, no fiduciary duty will be implied unless a plaintiff properly pleads that the parties have a "special relationship." *Bennett v. Farmers Ins. Co.,* 332 Or. 138, 159, 26 P.3d 785 (2001). Oregon courts find the existence of a "special relationship" when **\*32** the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely on the latter to achieve a desired outcome or resolution.

**\*32** *Conway v. Pacific University,* 324 Or. 231, 240, 924 P.2d 818 (1996).

**\*32** To state a claim for professional negligence, or malpractice, the plaintiff must allege and prove 1) a duty that runs from the defendant to the plaintiff; 2) a breach of that duty; 3) resulting harm measurable in damages; and 4) causation. *Varner v. Eves,* 164 Or.App. 66, 73, 990 P.2d 357 (1999).

**\*32** The tort of negligent misrepresentation requires that one party in a relationship owe a duty "beyond the common law duty to exercise reasonable care to prevent foreseeable harm to the other party." *Conway,* 324 Or. at 236, 924 P.2d 818. However, the law does not imply a tort duty "simply because one party to a business relationship begins to dominate and to control the other party's financial future;" rather, a duty is imposed "only when that relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf." *Bennett,* 332 Or. at 161-62, 26 P.3d 785.

**\*32** The Lincoln defendants contend that the plaintiffs have failed to state a claim for professional malpractice, negligent misrepresentation, or breach of fiduciary duty because they have not pleaded the existence of a special relationship between the Allen plaintiffs and

the Lincoln defendants *with respect to the tax strategy.* In other words, plaintiffs have not pleaded, and could not plead, that the Lincoln defendants exercised independent judgment with respect to the tax strategy or that the Allen plaintiffs relinquished control over the tax strategy to the Lincoln defendants. The Lincoln defendants reiterate that the Amended Complaint alleges merely that they introduced the Allen plaintiffs to BDO Seidman, and argue that this is not sufficient to hold them responsible as fiduciaries or as professionals.

**\*32** The plaintiffs respond that although the words " special relationship" were not used in the Amended Complaint, sufficient facts were pleaded to show such a relationship because the Amended Complaint alleges that the Lincoln defendants "agreed to be the Allens' financial advisor and trusted fiduciary." See Amended Complaint ¶¶ 74-75. Therefore, they argue, it is "without question" that the Lincoln defendants owed a duty to Allen and that the Allen plaintiffs relied on the Lincoln defendants for advice to further his economic interest. The plaintiffs argue that the Lincoln defendants " exploited" this trusting relationship and their position as Allen's advisor, and breached their duty by introducing Allen to BDO Seidman "and then by making material misrepresentations and omissions which were relied on by Allen to his (and the other Allen Plaintiffs') detriment. (citing Amended Complaint, ¶¶ 74-77, 78, 227 and 240). The plaintiffs argue that the role of the Lincoln defendants was "critical" to the Allen plaintiffs' decision to enter the COBRA transactions, because without the expertise provided by the Lincoln defendants, the Allen plaintiffs did not have the ability to understand them.

**\*33** In reply, the Lincoln defendants point out that the plaintiffs have not disputed that claims for negligent misrepresentation, professional malpractice and breach of fiduciary duty all require proof of a "special relationship," and point out that the plaintiffs have not pleaded, and cannot plead, that the Lincoln defendants exercised independent judgment with respect to the COBRA strategy or that the Allen plaintiffs relinquished control over their participation in the strategy to the Lincoln defendants. The defendants point, again, to the only

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

allegation specifically against them, which is that they introduced Mr. Allen to representatives of BDO Seidman and participated in the preliminary meetings. Thus, they argue, even if it could be argued that the Lincoln defendants had a special relationship with the Allen plaintiffs with respect to some unrelated previous financial services, the limited role alleged in the Amended Complaint undermines the plaintiffs' argument that they acted in a fiduciary capacity or with other heightened duties with respect to the COBRA transactions.

**\*33** The Lincoln defendants further assert that plaintiffs have not only failed to plead the existence of a special relationship, they have failed to plead a *breach* of that special relationship. They argue that the plaintiffs allege that "defendants" breached their duties to the plaintiffs, but the majority of these allegations clearly do not apply to the Lincoln defendants because they relate to things that occurred either before or after their involvement. The Lincoln defendants point out that no facts are alleged from which it could be inferred that the Lincoln defendants knew or should have known of the problems with the COBRA strategy at the time they referred the Allen plaintiffs to BDO Seidman.

**\*33** I recommend that Claims Six and Eight be dismissed with leave to replead the elements of these claims that sound in fraud with the requisite particularity, and that Claims Six, Eight and Nine be dismissed with leave for the Allen plaintiffs to conform their pleadings to the requirements that they allege facts showing the existence of a special relationship between themselves and the Lincoln defendants and the breach of that relationship.

### E. Claim Nine (breach of contract/professional negligence)

**\*33** The Lincoln defendants assert that in plaintiffs' claim for breach of contract and professional negligence arising from contract, they 1) fail to allege that the Lincoln defendants are parties to any of the alleged contracts, and 2) fail to identify the parties, dates, or substance of any of the oral or written contracts that govern the COBRA tax strategy-contracts on the basis of which plaintiffs

attempt to impose liability on the Lincoln defendants.

**\*33** Plaintiffs respond that a breach of contract claim is subject to Rule 8, not to the heightened requirements of Rule 9(b), and that the Amended Complaint does allege that the Allen plaintiffs entered into oral and written contracts with the Lincoln defendants. Amended Complaint ¶ 246. The plaintiffs argue that "in connection with" the contracts, the Lincoln defendants were required and expected to meet all applicable standards of care, including the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct. *Id.*

**\*34** In reply, the Lincoln defendants assert that the plaintiffs have failed to allege in the Amended Complaint that they were parties to *any* of the alleged contracts, including the FX Contracts. They point out that ¶ 246 of the Amended Complaint fails to refer specifically to the Lincoln defendants or to the nature of any contract they purportedly had with the Allen plaintiffs regarding the COBRA strategy. They argue that the plaintiffs' inability to allege the *existence* of a contract with the Lincoln defendants regarding the COBRA strategy necessitates the dismissal of the breach of contract claim.

**\*34** Paragraph 246 of the Amended Complaint alleges:

**\*34** Plaintiffs entered into oral and written contracts with these Defendants to provide Plaintiffs with professionally competent legal advice, accounting advice and services, tax advice and services, and tax return preparation services. In connection therewith, these Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct.

**\*34** The existence of a written or oral contract between plaintiffs and the Lincoln defendants is not specifically alleged. Other allegations about the Lincoln defendants do not suggest that the Lincoln defendants provided the Allen plaintiffs with legal advice, accounting advice and services, tax advice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

and services, or tax return preparation services.

**\*34** I conclude that the Allen plaintiffs have failed to plead any facts supporting the existence of a contract, oral or written, upon which to base their claim against the Lincoln defendants for breach of contract, or the provision of professional services upon which to ground a claim for professional negligence. I recommend that Claim Nine be dismissed, with leave to replead.

### F. Claim 10 (declaratory judgment)

**\*34** This claim seeks a declaration that plaintiffs are entitled to damages based on their other claims. See Amended Complaint ¶ 254. The Lincoln defendants assert that Claim 10 should be dismissed because it is premised on the other allegations asserted in the Amended Complaint, which fail to state claims against the Lincoln defendants as discussed above. They rely on *In re Joint E. and So. Dist. Asbestos Litigation,* 14 F.3d 726, 731 (2d Cir.1993)(because operation of Declaratory Judgment Act is procedural and does not expand jurisdiction, a court can enter a declaratory judgment only in favor of a party who has a substantive right to such relief.)

**\*34** In response, the plaintiffs state that the declaratory judgment claim was put in the Amended Complaint because at the time the Amended Complaint was filed, their IRS audits had not been fully resolved and therefore the plaintiffs could not ascertain the full extent of their damages. In light of this circumstance, the plaintiffs anticipated that the defendants might argue that because the full extent of the Allen plaintiffs' damages were not ascertainable, the plaintiffs' claims were premature and for that reason they put in a claim for declaratory judgment. The Allen plaintiffs concede that, as soon as their damages are fully ascertainable, "the need for and appropriateness of this declaratory judgment claim will likely cease to exist."

**\*35** In reply, the Lincoln defendants point out that the plaintiffs fail to explain why, "given that this declaratory judgment claim is premised on the other

allegations asserted in the complaint that fail to state claims against the Lincoln defendants, the court should delay in dismissing the claims." Reply Memorandum, p. 19. The Lincoln defendants argue that because plaintiffs have pleaded insufficient facts in support of these underlying claims, their request for declaratory relief is without foundation under *Asbestos Litigation* and should be dismissed.

**\*35** I recommend that Claim 10 be dismissed with leave to replead.

### G. Claim 11 (civil conspiracy)

**\*35** The Lincoln defendants contend that Claim 11 should be dismissed because 1) the alleged conspiracy is linked to fraud, and plaintiffs have failed to plead fraud with the requisite particularity; and 2) plaintiffs' allegations are vague and conclusory. In the alternative, the Lincoln defendants assert that the Amended Complaint fails to plead facts showing a "meeting of the minds."

**\*35** For the first argument, the Lincoln defendants rely on *Krieger,* in which the district court in Michigan applied Rule 9(b) to a conspiracy claim because the claim was "grounded in fraud," on *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985) (Rule 9(b) applies where "fraud lies at the core of the action" and in actions alleging conspiracy to defraud or conceal) and on *Cohabaco Cigar Co. v. United States Tobacco Co.,* 1998 WL 773696 (N.D.Ill.1998) (to successfully allege a conspiracy claim pursuant to Rule 9(b), "a plaintiff must identify, with particularity, the nature of the conspiracy and each defendant's role in the conspiracy .") The defendants argue that plaintiffs have alleged a conspiracy based on marketing and implementing the "fraudulent and illegal COBRA strategy," that is, a conspiracy grounded in fraud, but they have failed to allege the nature of the alleged conspiracy or the role of each defendant in the fraud. The Lincoln defendants assert that the conspiracy allegations are too vague and conclusory to satisfy the requirements of Rule 9(b).

**\*35** Plaintiffs' response is that the Lincoln defendants have failed to cite any Ninth Circuit

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

authority to support their contention that the heightened pleading requirements of Rule 9(b) apply to this claim, but even if they did, that their pleadings are sufficient. But plaintiffs once again cite to their allegations against "defendants," and not to any specific allegations against the Lincoln defendants. Plaintiffs argue that these allegations, " when read in their proper context," demonstrate that the Lincoln defendants, along with all the other defendants, conspired and committed overt acts.

*35 Plaintiffs' argument is unpersuasive. A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. See, e.g., *Vieux v. East Bay Reg'l Park Dist.,* 906 F.2d 1330, 1343 (9th Cir.1990); *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999). General allegations from which the necessary element of intent cannot be inferred with respect to each defendant are insufficient.

*36 The Lincoln defendants also argue that the Amended Complaint fails to allege the required " meeting of minds" for a civil conspiracy. They rely on *Bonds v. Landers,* 279 Or. 169, 174, 566 P.2d 513 (1977), which held that a civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means," so that to plead a claim for civil conspiracy, the plaintiff must allege facts showing 1) two or more persons; 2) an object to be accomplished; 3) a meeting of minds on the object or course of action; 4) one or more unlawful overt acts; and 5) damages as the proximate result thereof.

*36 The Lincoln defendants argue that the plaintiffs have failed to allege any specific facts showing that there was any meeting of the minds between themselves and the other defendants with respect to the COBRA strategy, a critical element of a civil conspiracy claim. They cite two cases, *Lawver v. Lawver,* 86 Or.App. 721, 726, 740 P.2d 1220 (1987) (plaintiffs who "merely plead in a vague and conclusory manner that the named persons 'have conspired with and among each other' to achieve the allegedly fraudulent objectives" fail to plead a

claim for civil conspiracy) and *Yanney v. Koehler,* 147 Or.App. 269, 935 P.2d 1235 (1997)(holding that plaintiffs failed to plead the "meeting of the minds" element because the allegations were vague and conclusory).

*36 The plaintiffs have not responded to this argument.

*36 I recommend that Claim 11 be dismissed with leave to plaintiffs to replead the fraud elements of this claim with particularity and to identify the Lincoln defendants' role and conduct in the alleged conspiracy.

H. Punitive damages claim

*36 The Lincoln defendants assert that plaintiffs' claim for punitive damages should be stricken on the basis of Oregon's statutory prohibition on pleading punitive damages in an initial pleading. Or.Rev.Stat. § 31.725. Judges Aiken and Stewart of this court have held that Or.Rev.Stat. 31.725 conflicts with the Federal Rules of Civil Procedure and therefore does not apply in diversity cases. See *Pruett v. Erickson Air-Crane Co.,* 183 F.R.D. 248, 252 (D.Or.1998) and *Burkhart v. L.M. Becker & Co.,* 2004 WL 1920196 (D.Or.2004). However, the Lincoln defendants argue that a Ninth Circuit case, *Kuntz v. Lamar Corp.,* 385 F.3d 1177, 2004 WL 2125950 (9th Cir.2004), decided a month after *Burkhart,* overrules these cases.

*36 In *Kuntz,* a diversity personal injury case brought in federal district court in Idaho, the district court denied plaintiffs leave to amend the complaint to add a claim for punitive damages. On appeal, the Ninth Circuit analyzed the relevant Idaho statute, which like the Oregon statute provides that a party may seek punitive damages only with leave of court and provides that the court must allow amendment to the pleadings to claim punitive damages if "the moving party [establishes] * * * a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages," and concluded that the district court had not abused its discretion in denying leave to amend because the plaintiffs had not made the requisite showing.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 31

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*37** The defendants also cite *United States ex rel. Newsham v. Lockheed Missiles*, 190 F.3d 963, 973 (9th Cir.1999)(special state procedures required by California's Anti-Strategic Lawsuits Against Public Participation did not conflict with the federal rules and would be applied in a federal diversity suit).

**\*37** I have reviewed the *Kuntz* and *Newsham* cases and conclude that they do not directly overrule this court's decisions in *Burkhart* and *Pruett*. I therefore recommend that this motion be denied.

### I. Compensable damages

### 1. Tax deductions

**\*37** The Lincoln defendants argue that a plaintiff cannot recover future tax write-offs or disallowed tax deductions as damages because these liabilites " resulted from the ineluctable requirements of the Internal Revenue Code, rather than from any wrongful conduct on the part of the defendants." *DCD Programs Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir.1996). In *Leighton*, a case brought under the federal securities laws, the court held that taxes paid to the IRS in settlement of liabilities from disallowance of tax deductions are not recoverable as tort damages. 90 F.3d at 1447-50. In that case, the defendants had marketed limited partnership interests as tax shelters. When the IRS disallowed the deductions, plaintiffs settled with the IRS and then sued the defendants for lost tax benefits. The court rejected the argument that the disallowed tax deductions were compensable "out of pocket" losses because "[i]f the partners had not purchased limited partnership interests in the first instance, they would still have had to pay the taxes in question, based on their overall income situation. *Id.* at 1447, 1449-50. The Lincoln defendants also cite other out of jurisdiction cases.

**\*37** The defendants argue that the plaintiffs seek in this case to recover for the loss of tax deductions they never would have taken had they known the truth about the COBRA transaction, and that they should not be entitled to do so.

**\*37** The plaintiffs deny that they are seeking to recover any back taxes. Plaintiffs are bound by their representation of the limitation of this claim. I recommend, therefore, that this motion be denied as moot.

### 2. Interest

**\*37** The defendants argue that plaintiffs have failed to plead an entitlement to recover the interest paid to the IRS because they are not entitled to the windfall of having "reaped the benefits of having the money for the requisite period" and then being reimbursed by the Lincoln defendants "for the interest charged by the IRS for having the money during that period." They rely on *Streber v. Hunter*, 221 F.3d 701, 734 (5th Cir.2000). The Fifth Circuit held in *Streber* that a plaintiff can recover only the " interest differential," that is, the difference between the interest earned on the tax savings and the interest paid to the IRS for possessing the money unlawfully. *Id.* at 735. In *Streber*, the court held that to recover interest differential, the plaintiff must prove the amount of interest earned on the tax savings before being audited by, or accepting the amnesty offered by, the IRS.

**\*38** The plaintiffs respond that they should not be required to plead the "interest differential" because it is "not necessarily the law in this court." They point out that *Streber* is a Fifth Circuit case applying Texas law, and that other courts have differed on whether a plaintiff can recover interest paid to the IRS, regardless of whether he earned interest on or otherwise benefited from the money he was allowed to keep. They cite *Dail v. Dail*, 212 Ill.App.3d 66, 156 Ill.Dec. 445, 570 N.E.2d 1167, 1169 (Ill.App.1991)(applying Illinois law and holding that plaintiff can recover interest paid to IRS); *Ronson v. Talesnick CPA*, 33 F.Supp.2d 347, 352-53 (D.N.J.1999), *superseded on other grounds, Emilien v. Stull Tech. Corp.*, 2003 WL 21675343 (3d Cir.2003) (applying New Jersey law and holding that plaintiff can recover interest paid to the IRS, minus any benefits the plaintiff received from having the back taxes in hand); *Ecker v. Cold Storage, Inc. v. Behl*, 943 F.Supp. 1230, 1235 (E.D.Cal.1996)(applying California law and holding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

that interest is not a proper element of damage).

*38 I agree with the court's reasoning in *Streber*, and conclude that plaintiffs' recovery should be limited to the differential interest rate.

### 3. Penalties

*38 The Lincoln defendants argue that the plaintiffs are not entitled to recover penalties paid to the IRS because they failed to take advantage of the 2002 amnesty program, and the plaintiffs have not alleged that their failure to take advantage of the program was in any manner attributable to advice given to them by the Lincoln defendants. They point out that the plaintiffs have admitted in the Amended Complaint that it was their failure to enter into the amnesty program which resulted in the penalties, because the penalties would have been waived had the plaintiffs participated in the amnesty program.

*38 In response, plaintiffs cite to two cases, one a California federal case and one an Illinois state case, allowing plaintiffs to recover penalties paid to the IRS. *Sarto v. United States*, 563 F.Supp. 476, 478 (N.D.Cal.1983) and *Dail v. Dail*, 156 Ill.Dec. 445, 570 N.E.2d at 1169. However, the plaintiffs do not respond to the argument that, even if penalties are recoverable, they have failed to plead facts sufficient to show either that the Lincoln defendants prevented the plaintiffs from taking advantage of the amnesty program, or that despite the amnesty program, they were still required to pay penalties.

*38 I recommend that this claim be dismissed with leave to plead facts showing either that the Lincoln defendants prevented the plaintiffs from taking advantage of the amnesty program, or that, despite the amnesty program, some action by the Lincoln defendants resulted in the Allen plaintiffs being required to pay penalties.

### Conclusion

*38 I recommend that the Deutsche defendants' motion to compel arbitration and stay (doc. # 37) be DENIED, that the BDO defendants' motion to compel arbitration and stay be GRANTED, with respect only to the claims between the Allen plaintiffs and BDO; that the BDO defendants' motion to strike and to seal the record (doc. # 63) be DENIED; and that the Lincoln defendants' motion to dismiss (doc. # 53) be GRANTED in part and DENIED in part, as follows: the motion to dismiss claims one, two and three as barred under the PSLRA be granted or, alternatively, that claim one be dismissed with leave to replead, claim two be dismissed with leave to replead, and claim three be dismissed with prejudice as barred by the PSLRA, or foreclosed by *Central Bank of Denver*, or, alternatively, that it be dismissed for failure to plead participation with leave to replead; that claims four, five, six, seven, eight, nine, ten and eleven be dismissed with leave to replead; that the motion to dismiss the claim for punitive damages be denied; that the motion to dismiss the claim for back taxes be denied as moot; that the motion to dismiss the claim for interest be denied; and that the motion to dismiss the claim for penalties be granted with leave to replead.

### Scheduling Order

*39 The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due March 23, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 6, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

D.Or.,2005.
King v. Deutsche Bank Ag
Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1466919 (Trial Pleading) Lincoln Defendants' Answer to Plaintiffs' Second Amended Complaint (Apr. 24, 2006) Original Image of this Document (PDF)
• 2005 WL 3285284 (Trial Motion, Memorandum

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 611954 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Deutsche Bank Ag, Deutsche Bank Securities Inc., Craig Brubaker, David Parse and Richard F. Judd's Response to Objections to the Magistrate Judge's Recommendations on Motion to Dismiss (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 2866775 (Trial Motion, Memorandum and Affidavit) Objections of Deutsche Bank AG, Deutsche Bank Securities Inc., Craig Brubaker, David Parse and Richard F. Judd to the Magistrate Judge's Recommendation on Their Motion to Dismiss (Sep. 27, 2005) Original Image of this Document (PDF)
• 2004 WL 3337489 (Trial Motion, Memorandum and Affidavit) BDO Defendants' Reply in Support of Motion to Strike and Seal (Dec. 10, 2004) Original Image of this Document (PDF)
• 2004 WL 3338204 (Trial Motion, Memorandum and Affidavit) BDO Defendants' Reply in Support of Motion to Compel Arbitration and Stay Action (Dec. 10, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3338196 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendants Lincoln Financial Advisors Corporation, Lincoln National Corporation d/b/a Lincoln Financial Group, Michael Nelson, and James Siegfried (""The Lincoln Defendants") in Further Support of Their Motion to Dismiss Complain t (Dec. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 3338193 (Trial Motion, Memorandum and Affidavit) Motion to Strike and Motion to Seal Plaintiffs' Response to the BDO Defendants' Motion to Compel Arbitration and the Declaration of W. Ralph Canada, Jr. Filed in Support Thereof (Nov. 22, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3337453 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Complaint by Defendants Lincoln Financial Advisors Corporation, Lincoln National Corporation d/b/a Lincoln Financial Group, Michael Nelson, and James Siegfried ""the Lincoln Defendants" (Nov. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 3337469 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion to Dismiss Complaint by Defendants Lincoln Financial Advisors Corporation, Lincoln National Corporation d/b/a Lincoln Financial Group,

Michael Nelson, and James Siegfried (the ""Lincoln Defendants") (Nov. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 3337433 (Trial Motion, Memorandum and Affidavit) Defendants BDO Seidman LLP, Michael Kerekes, and Robert Greisman's Memorandum in Support of Motion to Compel Arbitration and Stay Action (Oct. 15, 2004) Original Image of this Document (PDF)
• 3:04cv01029 (Docket) (Jul. 28, 2004)
• 2004 WL 3337404 (Trial Pleading) Complaint (2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for SAENGER,REBECCA 5576172**

| | |
|---|---|
| Your Search: | "NASD" /s "10301(d)(3)" |
| Date/Time of Request: | Thursday, February 15, 2007 17:50:00 Central |
| Client Identifier: | VAUGHN |
| Database: | ALLFEDS |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 2229 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Blythe v. Deutsche Bank AGS.D.N.Y.,2005.
     United States District Court,S.D. New York.
     Franklin W. BLYTHE, et al., Plaintiffs,
                         v.
     DEUTSCHE BANK AG; Deutsche Bank
Securities, Inc., d/b/a Deutsche Bank Alex Brown, a
Division of Deutsche Bank Securities, Inc.; Craig
Brubaker; David Parse; Todd Clendening; BDO
Seidman LLP; Christopher Truit; Morry Gottlieb;
Paul Shanbrom; Robert Greisman; Thom Taylor;
     and Charles McNealy, Defendants.
            **No. 04 Civ. 5867(SAS).**

                   Jan. 7, 2005.

David R. Deary, W. Ralph Canada, Jeven R. Sloan,
Stewart Clancy, Deary Montgomery Defeo &
Canada, Dallas, Texas, Joe R. Whatley, Jr., Othni J.
Latham, Whatley Drake L.L.C., Birmingham,
Alabama, Jeffrey H. Daichman, Kane & Kessler,
P.C., New York, New York, Ernest Cory, Cory
Watson Crowder & Degaris, Birmingham,
Alabama, for Plaintiffs.
Lawrence M. Hill, Seth C. Farber, Dewey
Ballantine, L.L.P., New York, New York, for the
Deutsche Bank Defendants.
Michael R. Young, J. Bennett Capers, Anamika
Samanta, Wilkie Farr & Gallagher, L.L.P., New
York, New York, for the BDO Defendants.

            *OPINION AND ORDER*
SCHEINDLIN, J.

          I. INTRODUCTION

*1 Plaintiffs allege that defendants violated the
Racketeer Influenced and Corrupt Organizations
Act, 18 U.S.C. § 1962, and are liable for damages
and other relief arising from unjust enrichment,
breach of contract, breach of the duty of good faith
and fair dealing, breach of fiduciary duty, fraud,

negligent     misrepresentation,     professional
malpractice, and civil conspiracy.[FN1] BDO now
moves to compel arbitration with respect to certain
plaintiffs, and to stay the proceedings with respect
to the remaining plaintiffs.[FN2] Deutsche Bank
moves to stay the proceedings with respect to all
plaintiffs.[FN3]

     FN1. Plaintiffs fall into six groups. The "
     Blythe Plaintiffs" are Franklin W. Blythe,
     Connie D. Blythe, Luther J. Blythe, Molly
     D.    Blythe,    FWB    Westinghouse
     Investments, LLC, LJB Westinghouse
     Investments, LLC, and Blythe Brothers
     Partners, and Blythe Brothers Investors,
     Inc. The "Ramsey Plaintiffs" are Barnwell
     S. Ramsey, Individually and as the Grantor
     and Trustee of the Barnwell S. Ramsey
     Grantor Trust; Vicki P. Ramsey; BSR
     Sims Investments, LLC; Davidson
     Partners, and Davidson Investors, Inc. The
     "Zimmerman Plaintiffs" are Jordan
     Zimmerman, JRB Pelican Point
     Investments, LLC, Pelican Point Partners,
     and Pelican Point Investors, Inc. The "
     Baker Plaintiffs" are JRB Pelican Point
     Investments, LLC; Pelican Point Partners;
     Pelican Point Investors, Inc.; Mitchell W.
     Baker and Eva T. Baker. The "Mosley
     Plaintiffs"   are   MWB   Pinecrest
     Investments, LLC; Pinecrest Investors,
     Inc.; Jerry L. Mosley; Margaret A. Mosley;
     Jimmy J. Mosley; Margaret Mosley; Carey
     Winters; Dorothy Winters, and the Bakers.
     The "Ekaireb Plaintiffs" are JLM Grant
     Investments, LLC; JJM Ouachita
     Investments, LLC; CW Roberts
     Investments, LLC; Progressive
     Investments; MMW Holdings, Inc. and
     Hannah Ekaireb, M.D., individually and in
     her capacity as grantor of the Hannah
     Ekaireb Living Trust and as a
     representative of the Estate of Huskel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

Ekaireb and the Huskel Ekaireb Living Trust. According to the Complaint and plaintiffs' brief, the Hannah Ekaireb Living Trust and the Huskel Ekaireb Living Trust themselves are members of the Ramsey Plaintiffs group; this is presumably an error.

FN2. "BDO" refers to the defendants BDO Seidman, LLP, Christopher Truitt, Morry Gottlieb, Paul Shanbrom, Robert Greisman, Thom Taylor and Charles McNealy.

FN3. "Deutsche Bank" refers to the defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., David Parse, Todd Clendening, and Craig Brubaker.

## II. BACKGROUND

**\*1** This case arises out of tax and consulting services marketed by defendants. The Complaint alleges that defendants defrauded plaintiffs through the marketing and sale of a tax shelter (a strategy involving digital options or swaps on foreign currency sometimes known as "COBRA") which they knew or should have known the IRS would challenge as lacking economic substance.

**\*1** Plaintiffs allege that the tax shelter scheme was developed by Deutsche Bank in concert with the law firm of Jenkens & Gilchrist, P .C. ("Jenkens"). [FN4] Deutsche Bank agreed to act as the counter-party to the tax shelter transactions. Jenkens and Deutsche Bank recruited BDO and others to market the schemes to high net-worth clients, including plaintiffs.

FN4. Jenkens is not named as a defendant.

**\*1** The Blythe Plaintiffs were introduced to the scheme through their longtime accountant Christopher Truitt, an employee of BDO. The Ramsey Plaintiffs were introduced to the scheme by their accountant, Charles McNealy, also an employee of BDO. The Zimmerman Plaintiffs were introduced to the scheme through their accountant

Morry Gottlieb, an employee of BDO. The Baker, Ekaireb and Mosley Plaintiffs contacted Jenkens and/or Deutsche Bank directly to learn about COBRA, without dealing with BDO.

**\*1** All individual plaintiffs in this case are members of a putative settlement class with Jenkens in *Denney v. Jenkens & Gilchrist,*[FN5] also before this Court. The Jenkens settlement class has been preliminarily certified. [FN6] Plaintiffs are also members of other putative classes in *Denney* that have not yet been preliminarily certified. None of the plaintiffs in this case have opted out of the Jenkens class.[FN7] Deutsche Bank AG, Deutsche Bank Securities, and BDO Seidman are named as defendants in *Denney* . The individual defendants in this case are not named as defendants in *Denney.* Some, but not all, of the claims asserted by plaintiffs here are encompassed by *Denney.*[FN8]

FN5. 03 Civ. 5460.

FN6. *See Denney v. Jenkens & Gilchrist,* No. 03 Civ. 5460, 2004 WL 1197251 (S.D.N.Y. May 19, 2004) (preliminarily certifying class).

FN7. *See* Affidavit of W. Ralph Canada, Plaintiffs' counsel ("Canada Aff.") ¶ 6.

FN8. Although plaintiffs in this case are members of the *Denney* class, they assert certain claims here on their behalf-*e.g.,* for fraud-which are asserted in *Denney* on behalf of the named plaintiffs, but *not* on behalf of the class. *See* Complaint, Seventh Cause of Action; *Denney* Second Amended Complaint, Eighth Cause of Action. *See also* Transcript of December 15, 2004 Conference.

### A. BDO's Motion to Compel Arbitration and Stay the Proceedings

#### 1. The Blythe/BDO Agreement

**\*1** On June 30, 1998, Luther J. Blythe entered into

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
(Cite as: Not Reported in F.Supp.2d)

Page 3

a consulting agreement with BDO. This agreement contained the following language:

*1 WHEREAS, Mr. Blythe is interested in transferring, by sale, lease or otherwise, an interest in certain investments, primarily investments in entities owning various golf properties;

*2 WHEREAS, BDO is in the business of providing accounting and consulting services; and

*2 WHEREAS, Mr. Blythe desires BDO to provide certain Consulting services in connection with any potential transactions, and BDO desires to provide such services ... [FN9]

> FN9. Blythe/BDO Agreement, Ex. 2 to the Affidavit of Michael R. Young, counsel to BDO ("Young Aff.").

*2 The consulting agreement requires BDO to provide the following services:

*2 consulting services in conjunction with any potential transaction, including assistance in determination of sales price and allocations thereof, assistance in structuring the Transaction, assisting Mr. Blythe and/or its advisors in structuring a reorganization qualifying as a nontaxable merger, income and estate planning for Mr. Blythe, and assisting Mr. Blythe in discussions and/or negotiations with potential purchasers of the golf course investments, on a specifically requested basis. For purposes of this Agreement, (i) the term " Transaction" shall mean the transfer, whether by sale, merger or otherwise, of all or any portion of the golf course investments.[FN10]

> FN10. Id.

*2 The Blythe/BDO Agreement also contains a mandatory arbitration clause, providing for arbitration of "any dispute, controversy or claim [that] arises in connection with the performance or breach of this Agreement." [FN11]

> FN11. Id.

### 2. The Zimmerman/BDO Agreement

*2 On September 30, 1999, Jordan B. Zimmerman entered into a consulting agreement with BDO. This agreement contains the following language:

*2 WHEREAS, [Zimmerman] is interested in transferring, by sale, lease or otherwise, any or all of his business operations ( ... such transfer [is referred to as] the "Transaction");

*2 WHEREAS, BDO is in the business of providing accounting and consulting services; and

*2 WHEREAS, [Zimmerman] desires BDO to provide certain tax and business consulting services in connection with the Transaction, and BDO desires to provide such services ... [FN12]

> FN12. Zimmerman/BDO Agreement, Ex. 3 to Young Aff.

*2 The consulting agreement requires BDO to provide the following services:

*2 consulting services in connection with the Transaction, including assistance in structuring the Transaction, assisting the client in determining a tax treatment for the Transaction, and the preparation of 1999 and 2000 income tax returns that would reflect the Transaction.[FN13]

> FN13. Id.

*2 The Zimmerman/BDO Agreement also contains a mandatory arbitration clause identical to that in the Blythe/BDO Agreement.

### 3. The Unsigned Ramsey/BDO Agreement

*2 BDO has submitted an unsigned consulting agreement between BDO and, among others, Barnwell S. Ramsey. The agreement appears to be in draft form. Its provisions are similar to those of the Blythe and Zimmerman Agreements, and it contains an identical arbitration clause.

*2 On the basis of the Blythe and Zimmerman

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

Agreements, BDO moves to compel the Blythe and Zimmerman Plaintiffs to arbitrate their claims. Having been unable to locate a signed agreement with the Ramsey Plaintiffs, BDO does not seek to compel that group to arbitrate, but requests that the Court stay their claims pending certification of the class in *Denney,* on the ground that if the class action in *Denney* is certified, it will encompass the Ramsey Plaintiffs' claims.

**B. Deutsche Bank's Motion to Stay the Proceedings**

\*3 The Baker, Mosley and Ekaireb Plaintiffs opened brokerage accounts with DB Alex. Brown in 2000. Through individual members or entities within each group, these plaintiffs signed Account Agreements.[FN14] Each Account Agreement contains an identical arbitration clause:

> FN14. *See* 2000 Account Agreements, Exs. 1-11 to Declaration of Marla Alhadeff, Director and Senior Counsel of Deutsche Bank AG, in Support of Deutsche Bank's Motion to Stay ("Alhadeff Decl.").

\*3 I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.
\*3 However, the clauses go on to provide that:
\*3 No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the punitive [sic] class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court.[FN15]

FN15. *See, e.g.,* Alhadeff Decl. Ex. 1 ¶ 19 ("Class Action Provision").

\*3 This Class Action Provision is based on **NASD Rule 10301(d)(3),** which provides that:
\*3 No member or associated person shall seek to enforce any agreement to arbitrate against a customer, other member or person associated with a member who has initiated in court a putative class action or is a member of a putative or certified class with respect to any claims encompassed by the class action unless and until: (A) the class certification is denied; (B) the class is decertified; (C) the customer, other member or person associated with a member is excluded from the class by the court; or (D) the customer, other member or person associated with a member elects not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.[FN16]

FN16. **NASD** Rule **10301(d)(3).**

\*3 The Blythe, Zimmerman and Ramsey Plaintiffs executed transactions with Deutsche Bank in 1999. The Account Agreements signed by these plaintiff groups did not contain arbitration clauses.

\*3 Deutsche Bank argues that it will be entitled to compel the Baker, Mosley and Ekaireb Plaintiffs to arbitrate. However, Deutsche Bank concedes that, because these plaintiffs are members of the putative class in *Denney,* it cannot, pursuant to the Class Action Provision and **NASD** Rule **10301(d)(3),** *presently* compel them to arbitrate any claims encompassed by *Denney;* rather, Deutsche Bank argues that it will be able to compel the Baker, Mosley and Ekaireb plaintiffs to arbitrate if and when class certification in *Denney* is denied or those plaintiffs are excluded from the class.

\*3 Although Deutsche Bank has no arbitration agreement with the Blythe and Zimmerman Plaintiffs, Deutsche Bank argues that it is entitled to compel those plaintiffs to arbitrate through their arbitration agreements with BDO, because plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

allege that BDO acted in concert with Deutsche Bank. However, in light of **NASD Rule 10301(d)(3 )**, Deutsche Bank does not seek to compel arbitration against these plaintiffs at this time.

*4 Deutsche Bank argues that it *is* entitled to compel arbitration now as to all claims that are *not* encompassed by *Denney*. However, Deutsche Bank does not (yet) seek to do so, recognizing that it would be "wasteful and inefficient." [FN17] Instead, Deutsche Bank asks that the Court stay the Blythe, Zimmerman, Baker, Mosley and Ekaireb Plaintiffs' claims pending certification of the class in *Denney*. Deutsche Bank argues that, if the *Denney* class is certified, and those plaintiffs do not opt out of it, then their claims will be resolved as part of the *Denney* class action; or, if the *Denney* class is not certified or those plaintiffs opt out, then Deutsche Bank will be entitled to compel arbitration as to all of their claims. Deutsche Bank argues that there is no scenario in which those plaintiffs' claims will ever proceed in this action.

> FN17. December 17, 2004 Letter to the Court from Deutsche Bank at 2.

*4 Finally, although neither Deutsche Bank nor BDO appears to have an arbitration agreement with the Ramsey Plaintiffs, Deutsche Bank asks the Court to stay the Ramsey Plaintiffs' claims. Deutsche Bank argues that "the fact that the Ramsey Plaintiffs may still choose to opt into [sic] any certified *Denney* litigation class warrants a stay of their claims until they make such a decision. It makes no sense to litigate these claims in an individual lawsuit if they eventually will be resolved as part of such a class action." [FN18]

> FN18. Deutsche Bank's Memorandum of Law in Support of Motion to Stay at 11.

### III. LEGAL STANDARD

*4 The determination of whether a dispute is arbitrable under the FAA comprises two questions: " (1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and

if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." [FN19] To find a valid agreement to arbitrate, a court must apply the "generally accepted principles of contract law." [FN20] "[A] party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation." [FN21] A court should consider only "whether there was an objective agreement with respect to the entire contract." [FN22]

> FN19. *Hartford Acc. and Indem. Co. v. Swiss Reinsurance Amer. Corp .*, 246 F.3d 219, 226 (2d Cir.2001) (quotation omitted).

> FN20. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987).

> FN21. *Id.*

> FN22. *Id.*

*4 Because there is "a strong federal policy favoring arbitration ... where [ ] the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." [FN23] Thus, the Second Circuit has emphasized that

> FN23. *Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir.2002) (quotation marks and citations omitted).

*4 any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, [f]ederal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. [FN24]

> FN24. *Collins & Aikman Prods. Co. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

*Building Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995). *See also WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997).

*4 However, although federal policy favors arbitration, it is a matter of consent under the FAA, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." [FN25]

FN25. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) (quotation omitted).

*5 The Second Circuit has established a three-part inquiry for determining whether a particular dispute falls within the scope of the arbitration agreement. [FN26] *First,* "a court should classify the particular clause as either broad or narrow." [FN27] *Second,* if the clause is narrow, "the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause . " [FN28] "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." [FN29] *Third,* if the arbitration clause is broad, " 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.' " [FN30] "In the end, a court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." [FN31]

FN26. *See id.*

FN27. *Id.*

FN28. *Id.* (quoting *Rochdale Vill., Inc. v. Public Serv. Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)).

FN29. *Id.*

FN30. *Id.* (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 23 (2d Cir.1995)).

FN31. *Id.* at 225.

## IV. DISCUSSION

### A. BDO's Motion to Compel Arbitation [FN32]

FN32. BDO states that "[i]f the Court believes additional facts are necessary to evaluate the arbitrability of this dispute, we would be pleased to engage in discovery on that issue." BDO's Reply Memorandum of Law ("BDO Reply Mem.") at 9. The Court makes its decision on the record before it. If BDO wishes to engage in discovery on this issue, it may do so and again move to compel arbitration if it believes newly discovered facts warrant such a motion.

*5 In *Denney,* BDO sought to compel arbitration of the *Denney* plaintiffs' claims on the basis of consulting agreements almost identical to those at issue here (the "*Denney* Agreements"). In an Opinion and Order dated April 28, 2004, I denied BDO's motion to compel arbitration, finding that the *Denney* Agreements were mutually fraudulent, because they were intended to conceal the nature of the work BDO was performing. [FN33] In a subsequent Opinion and Order, dated June 14, 2004, I found, as an additional ground for denying BDO's motion to compel arbitration, that the *Denney* Agreements did not encompass the *Denney* plaintiffs' dispute. [FN34]

FN33. *Denney v. Jenkens & Gilchrist,* 340 F.Supp.2d 338 (S.D.N.Y.2004) ("*Denney I* ").

FN34. *Denney v. Jenkens & Gilchrist,* 340 F.Supp.2d 348 (S.D.N.Y.2004).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

*5 Like the *Denney* Agreements, the consulting agreements here contain misleading language, from which "[i]t appears that neither plaintiffs nor BDO wanted any third party to know the nature of the contracts into which they entered, or that BDO had contracted with plaintiffs to provide tax shelter advice. As a result, they entered into agreements that described consulting work that was never performed and was different from the consulting services that were actually provided." FN35

FN35. *Denney I*, 340 F.Supp.2d at 346-47.

*5 The *Denney* Agreements, like those at issue here, described services in connection with the sale of plaintiffs' business operations, rather than the tax shelter services actually provided. As an indication of the fraudulent nature of the *Denney* Agreements, I noted that plaintiffs had in fact already sold their business operations before they entered into consulting agreements, and so the services described were never performed. Similarly, here, Zimmerman had already sold his business operations prior to the time he and BDO entered into the consulting agreement, and the services described were never performed. FN36

FN36. *See* Affidavit of Jordan Zimmerman in Support of Plaintiffs' Opposition ¶ 10. BDO played a minor role with respect to the sale of one of the Blythe Plaintiffs' properties, as described in the consulting agreements. *See* Affidavit of Franklin Blythe in Support of Plaintiffs' Opposition ¶ 9.

*6 Moreover, since my decision in *Denney*, new evidence of the fraudulent nature of BDO's consulting agreements has come to light. In a recently discovered internal memorandum ("the Kerekes Memorandum"), dated August 11, 2000, FN37 Michael Kerekes, a principal at BDO and a member of the committee at BDO responsible for tax shelters, states that the agreements "have been structured *not to make clear* exactly what services we were providing in return for our fee." FN38 This memorandum strongly supports my finding of

mutual fraud.

FN37. *See* Canada Aff. ¶¶ 7-8. The copy of the Kerekes Memorandum submitted to the Court in connection with plaintiffs' opposition to BDO's motion was destroyed pursuant to the October 19, 2004 Order of Judge J. Curtis Joyner of the Eastern District of Pennsylvania, finding, for the purposes of the case before him, *Miron v. BDO Seidman, LLP*, No. 04 Civ. 968, that the document was privileged. *See* Ex. E to Canada Aff. BDO continues to assert that the Kerekes Memorandum is privileged. In *Denney v. Jenkens & Gilchrist*, No. 03 Civ. 5460, 2004 WL 2712200 (S.D.N.Y. Nov. 23, 2004), I determined that any privilege that might have attached to the Kerekes Memorandum was waived in early 2001, when BDO shared it with Jenkens & Gilchrist. The memorandum itself is attached as Exhibit A to the *Denney* Plaintiffs' Notice of Motion to Lift Stay, filed October 21, 2004.

FN38. Canada Aff. ¶ 8 (emphasis added). In the memorandum, Kerekes discusses whether BDO's tax shelters were subject to the IRS' list-keeping requirements. Following the quoted language, he goes on to suggest that "[i]n order to fall clearly within the protection of the date the engagement letters were signed, we might wish to send letters to our clients clarifying that one of the services is consulting with respect to their current hedge fund transaction or some such innocuous but clear language." *Id.*

*6 Because the consulting agreements containing the arbitration clauses are mutually fraudulent, the contracts cannot be enforced.FN39 Therefore, there is no valid agreement to arbitrate. BDO's motion to compel arbitration must be denied.

FN39. *See Denney I*, 340 F.Supp.2d at 347 (citing *Gardenier v. Tubbs*, 21 Wend.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

169, 169 (N.Y. 1839); *Jackson v. Ashton,* 36 U.S. 229, 239 (1837); Richard A. Lord, *Williston on Contracts,* § 19:79 (4th ed.1998); Morris R. Cohen, *The Basis of Contract,* 46 Harv. L.Rev. 553, 562 (1933)).

*6 BDO argues that "even evidence of 'mutual fraud' would not render the arbitration agreements inoperative, for arbitration agreements are separable from the underlying agreements in which they are embedded." [FN40] BDO relies on *Prima Paint,* in which the Supreme Court "announced what has become known as the severability doctrine-that ' arbitration clauses as a matter of federal law are ' separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." ' [FN41] BDO's reliance on *Prima Paint* is misplaced.

FN40. BDO's Memorandum of Law in Support of Motion to Compel Arbitration ( "BDO Mem.") at 11 (citing *Prima Paint Corp. v. Flood & Conklin Mfg Co.,* 388 U.S. 395 (1967)).

FN41. *Sphere Drake Ins. Ltd v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 31 (2d Cir.2001) (quoting *Prima Paint,* 388 U.S. at 402).

*6 The Second Circuit elucidated the holding of *Prima Paint* in *Sphere Drake.* Where the underlying contract in which an arbitration clause is contained is *void,* arbitration may not be compelled; where the underlying contract is merely *voidable,* the arbitration clause is severable from the contract, and arbitration may be compelled unless the arbitration clause itself is voidable.[FN42] The *Sphere Drake* court offered "a good example of a void contract[:] when parties fail to agree to essential contract terms, the agreement does not come into existence-it is void and wholly unenforceable." [FN43] By contrast, where a party alleges fraud in the inducement, the contract is merely voidable, not

void, and arbitration must be compelled. [FN44]

FN42. *See id.* at 31-32.

FN43. *Id.* at 31 (citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673 (2d Cir.1972)). *See also Opals on Ice Lingerie v. Bodylines, Inc.,* No. 99 Civ. 3761, 2002 WL 718850 (E.D.N.Y. Mar. 5, 2002) (holding that fraud in the factum, in the form of the forgery of a party's signature, renders underlying contract void and arbitration may not be compelled).

FN44. *See Sphere Drake,* 263 F.3d at 32 (citing *Prima Paint* ). There is no allegation here that any party was fraudulently induced to enter into these contracts. Rather, the contracts themselves appear to be fraudulent.

*6 Because they are mutually fraudulent, the consulting agreements are not merely voidable, but void *ab initio.* The consulting agreements describe services that were (with the exception of limited services performed for Blythe) never rendered nor intended to be rendered, and conceal the real substance of the parties' agreement-the provision of tax shelter advice. The consulting agreements do not represent a meeting of the minds of the parties, but are merely a sham or cover for their real agreement.[FN45] The consulting agreements are therefore void, and the arbitration clauses are not enforceable. [FN46]

FN45. *See Denney I,* 340 F.Supp.2d at 346 (noting that plaintiffs' counsel "went so far as to acknowledge that the consulting agreements 'appear to be some kind of trick [ ] in the sense [that] I think the use of the word 'cover' may well be appropriate in reality.' ").

FN46. *See Camping Constr. Co. v. District Council of Iron Workers, Local 378,* 915 F.2d 1333, 1340 (9th Cir.1990) (courts "

Not Reported in F.Supp.2d                                                                                     Page 9

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

must determine whether a contract *ever* existed; unless that issue is decided in favor of the party seeking arbitration, there is no basis for submitting any question to an arbitrator.").

**\*6** Moreover, the consulting agreements do not cover the tax shelter services at issue here. The language of the arbitration clauses is broad, because it covers "any dispute, controversy or claim [that] arises in connection with the performance or breach of this Agreement." However, this dispute is not subject to arbitration because plaintiffs' allegations do not arise in connection with the performance or breach of the contracts. The underlying dispute here is wholly unrelated to the obligations encompassed by the contracts, and does not constitute even a collateral matter. The consulting agreements only involve services in connection with the transfer of assets and investments; they do not relate in any way to the tax shelter transactions which are at issue here. Plaintiffs' claims do not implicate issues of the construction of the consulting agreement or the parties' rights and obligations under it. As in *Denney*, the consulting agreements simply do not cover the plaintiffs' claims.[FN47]

> FN47. In an argument that appears to be directed toward my decision in *Denney I & II*, rather than the present matter, BDO characterizes the consulting agreements in *Denney* as using "broad, generalized language ... to capture the full breadth of the services to be provided. The parties may use generalized language in anticipation of additional follow-up services." BDO Reply Mem. at 5 n. 8. BDO's argument (insofar as it is addressed to the present motion) misses the point. The consulting agreements do not use broad, generalized language that might encompass the tax shelter services; rather, they specifically describe very different services.

**\*7** I note again that, since my opinion in *Denney*, new evidence has come to light supporting my findings. The Kerekes Memorandum makes it clear

that BDO deliberately drafted its agreements so as *not* to cover the tax shelter services that are at issue here. Instead, the tax shelter services appear to have been provided pursuant to oral understandings between the parties, which do not, of course, contain arbitration clauses.

**\*7** For the foregoing reasons, BDO's arbitration agreements are void, and inapplicable to this dispute. There is therefore no need to consider the argument that Deutsche Bank is entitled to compel arbitration pursuant to these agreements.

### B. The Motions to Stay

**\*7** A district court has discretion to stay a case pursuant to "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."[FN48] However, such a stay is appropriate only in "rare circumstances."[FN49] "[T]he burden of making out the justice and wisdom of a departure from the beaten track l[ies] heavily on the [party seeking a stay in favor of another action] and discretion [is] abused if the stay [is] not kept within the bounds of moderation."[FN50]

> FN48.                              *Nederlandse Erts-Tankersmaatschappij, N.V., v. Isbrandtsen Co.,* 339 F.3d 440, 441 (2d Cir.1964) (citing *Landis v. North American Co.,* 299 U.S. 248, 254 (1936)).

> FN49. *Landis,* 299 U.S. at 255.

> FN50. *Id.* at 256.

**\*7** BDO argues that the Ramsey Plaintiffs' claims should be stayed pending resolution of class certification issues in *Denney*, to conserve judicial and party resources.[FN51] Deutsche Bank argues that the entire case "should be stayed pending resolution of the class issues in *Denney*. It simply makes no sense for Plaintiffs to be permitted to litigate their case on both a class-wide basis and in a separate, individual action simultaneously."[FN52]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

FN51. BDO's motion seeks a stay only as to the Ramsey Plaintiffs, arguing that the Zimmerman and Blythe Plaintiffs' claims should go to arbitration. Of course, it would make no sense in terms of efficiency to stay *only* the Ramsey Plaintiffs' claims, while permitting other claims to proceed. Accordingly, I will consider BDO's motion in conjunction with Deutsche Bank's motion to stay the action in its entirety.

FN52. December 17, 2004 Letter to the Court from Deutsche Bank at 1.

*7 I am not persuaded that the drastic remedy of a stay is justified here. *Denney* is at an early stage; it is unlikely, although possible, that class certification issues in *Denney* will be resolved within a year. It is important to note that *Blythe* includes claims that are *not* encompassed by *Denney.* Plaintiffs in this case should not be required to wait for a year, and perhaps more, for their individual claims-those not encompassed in *Denney*-to advance.

*7 Indeed, at defendants' urging, pre-trial proceedings in *Denney* as to BDO and Deutsche Bank have been stayed by orders of the Second Circuit, pending appeal of my decisions in *Denney I & II.*[FN53] It would be entirely improper to stay plaintiffs' claims against BDO and Deutsche Bank in favor of *Denney,* while the *Denney* plaintiffs are barred from proceeding as to those defendants. Moreover, while proceedings in *Denney* as to those defendants are stayed, the class issues in *Denney* cannot be resolved; *Denney* is effectively dead in the water. Contrary to Deutsche Bank's argument, therefore, plaintiffs are not presently able to litigate their case in *Denney* and in *Blythe* simultaneously, even insofar as those cases overlap.

FN53. *See* December 30, 2004 Order of the Court of Appeals for the Second Circuit in *Denney v. Jenkens & Gilchrist,* 04-2654-CV (staying proceedings as to BDO) and January 5, 2005 Order of the Court of Appeals for the Second Circuit in *Denney v. Jenkens & Gilchrist,* 04-2654 (staying proceedings as to Deutsche Bank).

*7 Once all appeals from my decisions here and in *Denney I & II* are complete, it is likely that some or all of the claims of the plaintiffs in both cases will proceed in this Court.[FN54] At that time, there will be no great hardship to defendants, nor any untoward drain on judicial resources, in allowing *Blythe* to proceed alongside *Denney.*[FN55] To the extent that *Blythe* and *Denney* overlap, the Court has the power to manage the two cases so as to avoid duplication of efforts. Defendants' motion to stay is therefore denied.

FN54. In *Blythe,* defendants appear to have no arbitration agreements with certain plaintiffs, and may never be able to enforce arbitration agreements against others so long as *Denney* proceeds. In *Denney I,* I noted that "defendants in this action have failed to submit any evidence that all putative class members entered into identical agreements containing an arbitration clause. Thus, defendants' motion to compel arbitration and dismiss the complaint in its entirety is inappropriate with respect to the unidentified, putative class members." *Denney I,* 340 F.Supp.2d at 346. It is likely, therefore, that at least part of *Denney* and *Blythe* will proceed in this Court, regardless of the outcome of any appeal.

FN55. Deutsche Bank indicates that it may move to compel arbitration of all claims not encompassed by *Denney* if the present motion to stay is denied. If Deutsche Bank brings-such a motion, it is possible that it may be able to compel arbitration as to the Zimmerman and Blythe Plaintiffs; I do not decide that issue here. Deutsche Bank cannot, of course, compel arbitration with respect to the Baker, Mosley and Ekaireb Plaintiffs on the basis of BDO's consulting agreements, which have been found here to be void and inapplicable to the present dispute. If Deutsche Bank chooses to compel arbitration as to some plaintiff groups and claims but not others, Deutsche

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806
**(Cite as: Not Reported in F.Supp.2d)**

Bank will be forced to proceed in two separate fora. However, that burden would be of Deutsche Bank's own making, and cannot justify a stay of this entire action.

## V. CONCLUSION

*8 For the foregoing reasons, defendants' motions to compel arbitration and for a stay are denied. The Clerk of the Court is directed to close these motions [# 10, 21]. A conference is scheduled for January 17, 2005 at 4:00 p.m.
*8 SO ORDERED.

S.D.N.Y.,2005.
Blythe v. Deutsche Bank AG
Not Reported in F.Supp.2d, 2005 WL 53281 (S.D.N.Y.), RICO Bus.Disp.Guide 10,806

Briefs and Other Related Documents (Back to top)

• 1:04cv05867 (Docket) (Jul. 28, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for SAENGER,REBECCA 5576172**

| | |
|---|---|
| Your Search: | "NASD" /s "10301(d)(3)" |
| Date/Time of Request: | Thursday, February 15, 2007 17:49:00 Central |
| Client Identifier: | VAUGHN |
| Database: | ALLFEDS |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 593 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.