# Exhibit P

# LIDDLE & ROBINSON, L.L.P.

800 THIRD AVENUE

NEW YORK, N.Y. 10022
_____

(212) 687-8500

FACSIMILE: (212) 687-1505

www.liddlerobinson.com

MIRIAM M. ROBINSON (RETIRED)
_____

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

E-MAIL: bbortnick@liddlerobinson.com

JEFFREY ZIMMERMAN
STEPHEN J. STEINLIGHT
ANDREA M. PAPARELLA
REBECCA A. SAENGER
LISA D. SIDMAN
DINA N. WEINBERG
DAVID H. FELDSTEIN
AMY L. STUTIUS*
_____

*AWAITING ADMISSION TO THE BAR

March 6, 2007

<u>**VIA MAIL AND FACSIMILE/ (301) 527-4873**</u>
Lewis S. Kurlantzick, Doris Lindbergh, Esq.
    and Nathan M. Lubow
c/o Archna Curry, Case Administrator
NASD Dispute Resolution, Inc.
One Liberty Plaza
165 Broadway – 16th Floor
New York, NY 10006

Re:    Jeffrey S. Vaughn, individually and on behalf of those class members similarly situated v. Leeds, Morelli & Brown, P.C., Leeds, Morelli & Brown, L.L.P., Leeds & Morelli, Leeds, Morelli & Brown, Prudential Securities, Inc., Prudential Financial, Inc., Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown, James Vagnini, Frederic David Ostrove, Robert John Valli, Jr., DISCRIMINATION ON WALL STREET, INC., DISCRIMINATION ON WALL STREET MANHATTAN, INC., and JOHN DOES, 1-10 and JANE DOES, 1-10 a fictitious designation for presently and unknown licensed attorneys, professionals and/or unknown <u>persons or entities; NASD DR Arbitration No. 06-00534</u>

Dear Mr. Kurlantzick, Ms. Lindbergh, and Mr. Lubow:

    We represent the Claimant, Jeffrey S. Vaughn ("Vaughn"). Pursuant to the briefing schedule established during the initial pre-hearing conference on December 7, 2006, we hereby submit Mr. Vaughn's Brief in Reply, which jointly responds to the

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                               2                               March 6, 2007

Memorandum of Points and Authorities in Opposition to Claimant's Motion to Dismiss, submitted by Prudential Securities, Inc. (together with Prudential Financial, Inc., "PSI"), and the Opposing Memorandum of Law submitted by the law firm of Leeds, Morelli, and Brown, P.C. and individual attorneys (collectively, the "Leeds Respondents"). In their most recent briefs ("PSI Brief" and "Leeds Brief," respectively), Respondents continue to distort the order of the District Court and submit irrelevant arguments to the Panel.

## The Order of the District Court is Clear

        In her September 5, 2006 Order, Judge Cote clearly defined the role of the Panel as one of interpreting the Settlement Agreement and determining the intentions of the parties:

> The issue that was in dispute and that I submitted to arbitration was for an interpretation of the arbitration agreement, and that was for the arbitrator to decide the parties' intentions. I did not rule that everything had to be subject to arbitration. I contemplated, therefore, that the arbitrator, in deciding the parties' intentions, might decide that the agreement to arbitrate does not foreclose the plaintiff from coming to court and litigating a class action. ... But, I think it would be wrong for the defendants [Leeds Respondents and PSI] to characterize it the way you are today in to court to suggest that the arbitrators' hands are bound in some way such that they couldn't rule in interpreting the parties' intent that the plaintiff has the right to come to court and proceed on a class action. (Ex. B, p. 14:16 – 15:8.)

> Now, the arbitrator, as I see it, could decide at least three different things and there may be more but, for instance, the arbitrator could decide that the parties had intended to disallow class actions. The arbitrator could decide that the parties had agreed to arbitrate individual claims but had reserved unto themselves the right to litigate class claims. The arbitrator could decide that the party had agreed to arbitrate all claims, individual or class claims. (Exhibit B, p. 4:1-8.)

> I ruled that it is for the arbitrator to interpret the agreement and decide what the parties' intentions were. (Exhibit B, p. 4:20-22)

(September 5, 2006 Transcript of Proceedings in *Vaughn v. Leeds, Morelli & Brown, P.C., et al.*, S.D.N.Y. Case No. 04 Civ. 08391 (DLC), attached to Claimant's Initial Brief as Exhibit B.)

        While Judge Cote did conclude that the arbitration clause was valid, (and Claimant does not dispute that), Judge Cote further explained that it was not clear how

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                    3                        March 6, 2007

the arbitration clause affected Mr. Vaughn's class claims. She stayed the federal case pending the decision of the Arbitration Panel on that issue. In doing so, Judge Cote acknowledged three possible outcomes. Any argument, therefore, that asserts that Judge Cote's order forces the Panel's hand and requires arbitration of individual claims only, is without merit.

Respondents repeatedly assert that "the Panel cannot, as a matter of law, send Vaughn back to Court to litigate his claims – as part of a class action or otherwise." (PSI Brief, at 3.) This plainly contradicts a clear statement by Judge Cote (as cited above): "But, I think it would be wrong for the defendants [Leeds Respondents and PSI] to characterize it the way you are today in to court to suggest that the arbitrators' hands are bound in some way such that they couldn't rule in interpreting the parties' intent that the plaintiff has the right to come to court and proceed on a class action." Pursuant to the District Court Order, the Panel may, as a matter of law, send Mr. Vaughn back to court to litigate his claims as part of a class action.

## Respondents Did Not Draft a Settlement Agreement That Prohibited Class Actions

If the Respondents, in drafting the Settlement Agreement, had wanted to prohibit class actions, it would have been quite simple to insert a clause saying exactly that. However, the Settlement Agreement specifically refers to two fora for arbitration. The arbitration clause at issue reads:

> Any claim or controversy arising out of or related to this Agreement or the interpretation thereof will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc.

Respondents explicitly chose to be governed by the rules of the NASD. The NASD Code of Arbitration Procedure Rule 10301(d)(3) specifically addresses situations such as the instant case. The Rule prohibits a member from seeking to enforce any agreement to arbitrate against a member of a putative class action on any claims encompassed by the class action. Therefore, according to the very terms of the Settlement Agreement, this arbitration should dismissed in favor of the federal class action.

## Mr. Vaughn Is Not Breaching The Settlement Agreement

Respondents now claim that Mr. Vaughn, in applying the rules selected by the drafters, is seeking to "breach" the Settlement Agreement. In fact, the opposite is true. Mr. Vaughn has repeatedly conceded that his individual claims are subject to arbitration according to the Settlement Agreement. However, Mr. Vaughn is not pursuing individual claims, but class claims. According to the terms of the Settlement Agreement, Mr. Vaughn may pursue a class action in court. It is the Respondents who

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                    4                    March 6, 2007

seek to breach the Agreement by selecting which of the NASD rules to follow, and which to ignore.

## Judge Cote Directed the Panel to Consider the Parties' Intent

The District Court gave the Panel a mandate, as cited above. The District Court considered whether evidence of the parties' intent was relevant and admissible, and determined that it was. In arguing that the Panel should completely disregard any evidence of intent, Respondents are asking the Panel to ignore and act in contravention to an explicit instruction and order of a federal judge.

The Leeds Respondents rely on Oldroyd v. Elmira Savings Bank, FSB, (134 F.3d 72 (2d Cir. 1998), for the premise that there is a strong public policy favoring arbitration and that policy can supersede a party's intent. The court in Oldroyd considered the arbitrability of claims brought under 12 U.S.C. § 1831j, the whistleblower protection provision of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989). The argument against arbitrability in that case rested, in part, on the legislative intent of Congress in passing FIRREA. There is no such claim at issue and the Oldroyd decision is irrelevant to the issue of arbitrability currently before Panel.

Furthermore, the Oldroyd case cites a Supreme Court case for the overarching principle that, "the FAA [Federal Arbitration Act] does not require parties to arbitrate when they have not agreed to do so, ... nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement ...." Oldroyd, at 76, citing Volt Info. Sciences v. Board of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). By incorporating by reference the NASD Code of Arbitration Procedure, and its rules regarding class actions, Respondents agreed that all putative class actions may proceed in court. This overcomes any presumption in favor of arbitration. Mr. Vaughn's intent in signing the Settlement Agreement adds further weight to the argument that his class claims should not be subject to arbitration.

## Respondents Eviscerate the Policy Behind Class Actions

Respondents harp on the fact that "it has been determined that [Mr. Vaughn's] individual claims are subject to arbitration." (Leeds Brief, at 12-13.) They cite case law indicating that individual claims may be subject to arbitration, even when class claims are not. (See Cannon v. GunAllen Financial, Inc., 2007 WL 189601 (M.D. Tenn. Jan. 22, 2007). In these arguments, Respondents rely on the false premise that Mr. Vaughn's individual claims are separable and distinct from his class claims. In fact, the opposite is true. Mr. Vaughn's only claims are the claims he has brought as a class

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                    5                         March 6, 2007

action.[1]   The <u>Cannon</u> decision recognizes that when "arbitration claims are comprehensively included within the claims asserted by the class," arbitration may be precluded. <u>Cannon</u>, at *4. There is no distinction between his "individual" and class claims – all of Mr. Vaughn's claims are common to the class.

As Respondents note, "Vaughn has conceded that he has not brought his individual claims for determination to this Panel because he is not able to prove that he has sustained any category of individual damages." (Leeds Brief, at 13.) This is precisely why Mr. Vaughn seeks to pursue a class action, and his intentions are aligned with the basic policy behind class actions. The Supreme Court has established:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), <u>citing</u> <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344 (7th Cir. 1997). Respondents may not eviscerate the policy underlying class actions by requiring Mr. Vaughn, and all other putative class members, to bring their claims individually to arbitration, when the NASD Rules and the District Court have permitted them to consolidate their claims and pursue a class action in court.

### The Validity of Mr. Vaughn's Class Claims Is Not Before the Panel

Respondents argue that Mr. Vaughn is not an appropriate class representative and that his class claims are not valid. Neither of these issues is before the Panel. Whether Mr. Vaughn's claims meet the requirements of Federal Rule of Civil Procedure 23 is for the District Court to decide. NASD Rule 10301(d)(3) refers simply to a "putative class action." Whether the class is properly certified or whether Mr. Vaughn may be the class representative is not presently at issue. The only dispute before this Panel is whether a "putative class action" exists. It does exist, and the NASD Rules therefore prohibit any motion to compel arbitration involving claims encompassed by the class action.

### Conclusion

In light of the foregoing, Mr. Vaughn respectfully requests that the Panel permit Mr. Vaughn to pursue his class action against Respondents in court, an outcome

---

[1] For example, in addition to the claims common to the class, Mr. Vaughn could have claims that were specific only to him. This is not the case.

LIDDLE & ROBINSON, L.L.P.

The Arbitration Panel                           6                    March 6, 2007

that Judge Cote recognized as viable and in compliance with the applicable laws and NASD Rules.

Dated: New York, New York
          March 6, 2007

                                          Respectfully submitted,

                                          LIDDLE & ROBINSON, L.L.P.

                                          By: _____
                                               Blaine H. Bortnick
                                               Jeffrey L. Liddle
                                               Rebecca A. Saenger
                                          Attorneys for Claimants
                                          800 Third Avenue
                                          New York, New York 10022
                                          (212) 687-8500

cc:      Gerard E. Harper, Esq.
         Shari Claire Lewis, Esq.

Westlaw

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
**(Cite as: 134 F.3d 72)**

▷

Briefs and Other Related Documents
Oldroyd v. Elmira Savings Bank, FSBC.A.2 (N.Y.),1998.
United States Court of Appeals,Second Circuit.
Richard OLDROYD, Plaintiff-Appellee,
v.
ELMIRA SAVINGS BANK, FSB,
Defendant-Appellant.
No. 315, Docket 97-7249.

Submitted Oct. 7, 1997.
Decided Jan. 14, 1998.

Former employee sued former employer for breach of employment contract and for retaliatory discharge under whistleblower provision of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). The United States District Court for the Western District of New York, Larimer, Chief Judge, 956 F.Supp. 393, entered order which, inter alia, denied arbitration of retaliatory discharge claim. Former employer appealed. The Court of Appeals, Miner, Circuit Judge, held that: (1) employee's retaliatory discharge was within scope of arbitration provision, and (2) Congress did not intend to preclude arbitration of retaliatory discharge claims under whistleblower provision of FIRREA.

Order vacated in part.
West Headnotes
[1] ⇐114

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases
        (Formerly 33k2 Arbitration)
Federal Arbitration Act (FAA) creates body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of FAA. 9 U.S.C.A. § 1 et seq.

[2] **Commerce 83** ⇐**80.5**

83 Commerce
    83II Application to Particular Subjects and Methods of Regulation
        83II(I) Civil Remedies
            83k80.5 k. Arbitration. Most Cited Cases
Any arbitration agreement affecting interstate commerce is subject to Federal Arbitration Act (FAA). 9 U.S.C.A. §§ 1, 2.

[3] ⇐192

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk190 Stay of Proceedings Pending Arbitration
                25Tk192 k. Elements. Most Cited Cases
    (Formerly 33k23.9 Arbitration)
Court asked to stay proceedings pending arbitration must resolve four issues: first, it must determine whether parties agreed to arbitrate; second, it must determine scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if court concludes that some, but not all, of claims in case are arbitrable, it must then decide whether to stay balance of proceedings pending arbitration. 9 U.S.C.A. § 1 et seq.

[4] ⇐213(5)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk204 Remedies and Proceedings for Enforcement in General
                25Tk213 Review
                    25Tk213(5) k. Scope and Standards of Review. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
(Cite as: 134 F.3d 72)

(Formerly 33k23.25 Arbitration)
De novo review is applied to district court's determination of whether proceedings should be stayed pending arbitration. 9 U.S.C.A. § 1 et seq.

[5] ☞143

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk142 Disputes and Matters Arbitrable Under Agreement
            25Tk143 k. In General. Most Cited Cases
      (Formerly 33k6.2 Arbitration)
Where parties to arbitration agreement specifically have excepted certain type of claim from mandatory arbitration, it is duty of federal courts to enforce such limitations. 9 U.S.C.A. § 1 et seq.

[6] ☞114

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases
      (Formerly 33k2 Arbitration)

☞143

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk142 Disputes and Matters Arbitrable Under Agreement
            25Tk143 k. In General. Most Cited Cases
      (Formerly 33k6.2 Arbitration)
Federal Arbitration Act (FAA) does not require parties to arbitrate when they have not agreed to do so, nor does it prevent parties who do agree to arbitrate from excluding certain claims from scope of their arbitration agreement; it simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms. 9 U.S.C.A. § 1 et seq.

[7] ☞113

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
      (Formerly 33k1.2 Arbitration)
Strong federal policy favors arbitration as alternative means of dispute resolution. 9 U.S.C.A. § 1 et seq.

[8] ☞138

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk136 Construction
            25Tk138 k. Liberal or Strict Construction. Most Cited Cases
      (Formerly 33k7.1 Arbitration)

☞139

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk139 Construction
            25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
      (Formerly 33k7.1 Arbitration)
Court construes arbitration clauses as broadly as possible, resolving any doubts concerning scope of arbitrable issues in favor of arbitration. 9 U.S.C.A. § 1 et seq.

[9] ☞210

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk204 Remedies and Proceedings for Enforcement in General
            25Tk210 k. Evidence. Most Cited Cases
      (Formerly 33k23.10 Arbitration)
Arbitration clause contained in employment agreement, making arbitrable any dispute, controversy, or claim arising under or in connection with agreement, was prototypical broad arbitration

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
(Cite as: 134 F.3d 72)

Page 3

provision justifying presumption of arbitrability. 9 U.S.C.A. § 1 et seq.

[10] ⚮146

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk146  k.  Employment  Disputes. Most Cited Cases
        (Formerly 33k7.5 Arbitration)
Bank employee's claim for retaliatory discharge under whistleblower provision of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) was within scope of employment contract clause making arbitrable any dispute, controversy, or claim arising under or in connection with agreement; employee's conclusory allegation that he did not intend for clause to encompass retaliatory discharge claim did not rebut presumption of arbitrability created by broad arbitration clause, and, even without such presumption, retaliatory discharge touched matters covered by agreement, more than half of which related to termination. 9 U.S.C.A. § 1 et seq.

[11] ⚮143

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk143  k.  In General. Most Cited Cases
        (Formerly 33k7.5 Arbitration)
In determining whether particular claim falls within scope of arbitration agreement, court focuses on factual allegations in complaint rather than legal causes of action asserted, and if allegations underlying claim touches matters covered by parties' arbitration agreement, then claim must be arbitrated, whatever legal labels is attached to it. 9 U.S.C.A. § 1 et seq.

[12] ⚮121

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk118 Matters Which May Be Subject to Arbitration Under Law
                25Tk121  k.  Statutory  Rights  and Obligations. Most Cited Cases
        (Formerly 33k3.3 Arbitration)
Congress did not intend to preclude arbitration of retaliatory discharge claims under whistleblower provision of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); such intent could not be inferred from portions of FIRREA contemplating litigation, or from fact that arbitrators don't impose the kind of sanctions which Congress thought sufficient to prevent frivolous FIRREA suits, i.e., Rule 11 sanctions for failing to properly investigate before signing pleadings. 9 U.S.C.A. § 1 et seq.; Federal Deposit Insurance Act, § 2[33], as amended, 12 U.S.C.A. § 1831j; Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

[13] ⚮121

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk118 Matters Which May Be Subject to Arbitration Under Law
                25Tk121  k.  Statutory  Rights  and Obligations. Most Cited Cases
        (Formerly 33k3.3 Arbitration)
Federal statutory claims can be subject of arbitration, absent contrary congressional intent. 9 U.S.C.A. § 1 et seq.

[14] ⚮121

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk118 Matters Which May Be Subject to Arbitration Under Law
                25Tk121  k.  Statutory  Rights  and Obligations. Most Cited Cases
        (Formerly 33k3.3 Arbitration)
Duty to enforce arbitration agreements is not diminished when party bound by agreement raises claim founded on statutory rights. 9 U.S.C.A. § 1 et

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
(Cite as: 134 F.3d 72)

seq.

[15] ⟐210

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement,
and Contest
            25Tk204 Remedies and Proceedings for
Enforcement in General
                25Tk210 k. Evidence. Most Cited
Cases
    (Formerly 33k23.10 Arbitration)
Congress may override presumption in favor of
arbitration by manifesting its intention to do so. 9
U.S.C.A. § 1 et seq.

[16] ⟐210

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement,
and Contest
            25Tk204 Remedies and Proceedings for
Enforcement in General
                25Tk210 k. Evidence. Most Cited
Cases
    (Formerly 33k23.10 Arbitration)
If Congress intends to override presumption in
favor of arbitration, its intention will be
discoverable in text of statute, its legislative history,
or inherent conflict between arbitration and statute's
underlying purposes. 9 U.S.C.A. § 1 et seq.

[17] ⟐210

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement,
and Contest
            25Tk204 Remedies and Proceedings for
Enforcement in General
                25Tk210 k. Evidence. Most Cited
Cases
    (Formerly 33k23.10 Arbitration)
Burden of showing legislative intent to override
presumption in favor of arbitration lies with party
opposing arbitration. 9 U.S.C.A. § 1 et seq.

*74 Peter H. Bouman, Coughlin & Gerhart, L.L.P.,
Binghamton, NY, for Plaintiff-Appellee.
Edward B. Hoffman, Sayles, Evans, Brayton,
Palmer & Tifft, Elmira, NY (James D. Young,
Sayles, Evans, Brayton, Palmer & Tifft, Elmira,
NY, of counsel), for Defendant-Appellant.

Before:  KEARSE, MINER and CABRANES,
Circuit Judges.
MINER, Circuit Judge:
Defendant-appellant Elmira Savings Bank, FSB
appeals from so much of an order of the United
States District Court for the Western District of
New York (Larimer, C.J.) as denies a motion to stay
proceedings pending arbitration of plaintiff-appellee
Richard Oldroyd's retaliatory discharge claim
brought pursuant to 12 U.S.C. § 1831j, the
whistleblower protection provision of the Financial
Institutions Reform, Recovery, and Enforcement
Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103
Stat. 183 (1989), and directs that such claim be
prosecuted in the district court because it was not
within the scope of the arbitration clause contained
in Oldroyd's employment contract.

For the reasons that follow, we vacate the portion of
the order of the district court subject of this appeal,
with instructions that Oldroyd's retaliatory
discharge claim promptly proceed to arbitration.

## BACKGROUND

Plaintiff-appellee Richard Oldroyd was hired by
defendant-appellant Elmira Savings Bank ("ESB")
in 1985. By 1994, Oldroyd had been promoted to
the position of vice-president and director of
Management Information Systems at ESB. In
January of 1994, Oldroyd claims to have informed
senior bank officials that Robert Gamer, head of
ESB's Consumer Loan Department, had been
making a series of illegal loans. Oldroyd claims
that he was told to "keep quiet" about this criminal
activity. In February of 1994, ESB renewed
Oldroyd's written employment contract, which
contained the following arbitration clause:
Any dispute, controversy or claim arising under or
in connection with this Agreement shall be settled
exclusively by arbitration, conducted before a Panel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

Page 5

134 F.3d 72, 13 IER Cases 1025
**(Cite as: 134 F.3d 72)**

of three (3) arbitrators in Elmira, New York, in accordance with the rules of the American Arbitration Association then in effect.

Oldroyd alleges that, in April of 1994, he informed the United States Treasury Department's Office of Thrift Supervision ("OTS") about the illegal activities at ESB and that, thereafter, he told ESB's president, Robert Carges, of his contact with OTS. OTS subsequently commenced an investigation that led to Gamer's prosecution and conviction on bank fraud charges.

Oldroyd claims that, because he provided information to OTS, ESB senior management subjected him to a course of discriminatory treatment, including what amounted to a demotion and unreasonable job demands. For example, on June 21, 1995, Michael Hosey, then-Executive Vice-President of ESB, ordered Oldroyd to vacate his office and move to what is alleged to have been a storage area in the building's basement, affording Oldroyd no access to ESB's computer system. Additionally, Oldroyd alleges that Hosey stripped him of his supervisory status and staff. As a result of such treatment by *75 his superiors, Oldroyd claims that he suffered a nervous breakdown on June 21, 1995, which left him unable to return to work. Oldroyd does not dispute the fact that he did not provide ESB with information concerning his illness, but he alleges that ESB had access to such information through its insurance carrier once Oldroyd filed a worker's compensation claim.

ESB claims that Oldroyd had failed for nearly two years to develop and implement an important Disaster Relief Plan (the "Plan") required by OTS. The Plan was necessary to enable ESB to function in the event that a natural disaster disabled ESB's facilities. ESB further asserts that, because of the potentially serious consequences of its failure to comply with this OTS requirement, it relieved Oldroyd on Wednesday, June 21, 1995, of all of his duties except those relating to the Plan. It is undisputed that Oldroyd did not arrive at work on Monday, June 26, 1995, and that he informed ESB the following day that he was ill and would not be returning to work in the near future. Oldroyd did not return to work at all. ESB alleges, however,

that (1) Oldroyd failed to provide any specific information concerning his illness, despite ESB's repeated requests for documentation; (2) ESB informed Oldroyd by letter dated October 10, 1995 that his salary would be discontinued due to the lack of medical documentation corroborating his illness; and (3) Oldroyd's employment accordingly was terminated on or about October 20, 1995 for abandonment of his job.

In May of 1996, Oldroyd brought an action in the United States District Court for the Western District of New York, alleging retaliatory discharge under 12 U.S.C. § 1831j, the whistleblower protection provision of FIRREA. Section 1831j provides, in pertinent part, as follows:
No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee ... provided information to any Federal Banking agency or to the Attorney General regarding-(A) a possible violation of any law or regulation; or (B) gross mismanagement, a gross waste of funds, an abuse of authority ... by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j. In addition to his claim of retaliatory discharge, Oldroyd also asserted a claim for breach of his employment contract. In August of 1996, ESB moved to stay the federal action pending arbitration of both claims, and for other relief.

In January of 1997, the district court found that the breach of contract claim was both arbitrable and within the scope of the employment contract's arbitration clause. The court also found that, although the retaliatory discharge claim under 12 U.S.C. § 1831j was arbitrable, it was not within the scope of the employment contract's arbitration clause. Accordingly, the district court ordered that the breach of contract claim be arbitrated and that the retaliatory discharge claim proceed in the district court. ESB now appeals from so much of the order as denies arbitration of the retaliatory discharge claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

Page 6

134 F.3d 72, 13 IER Cases 1025
**(Cite as: 134 F.3d 72)**

## DISCUSSION

The sole issue on appeal is whether the district court erred in refusing to stay the district court proceedings on Oldroyd's retaliatory discharge claim pending arbitration.

[1][2] The Federal Arbitration Act (the "FAA") creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Any arbitration agreement affecting interstate commerce, such as the one at issue, is subject to the FAA. *Id.; see* 9 U.S.C. §§ 1 & 2. Section 3 of the FAA provides for stays of federal proceedings pending arbitration under appropriate circumstances. *See generally* 9 U.S.C. § 3.

[3][4] A court asked to stay proceedings pending arbitration must resolve four issues: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those *76 claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration. *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987) (citation omitted). We review a district court's determinations on these issues *de novo*. *Id.* at 846; *see also Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2d Cir.1995)(*De novo* standard of review is used when reviewing district court's determination of the scope of an arbitration clause); *New York v. Oneida Indian Nation*, 90 F.3d 58, 60 (2d Cir.1996)("[w]e review *de novo* a district court's determination of the arbitrability of a claim.").

In this case, we need only address the second and third elements. We see no reason to disturb the determination of the district court that there was an agreement by the parties to arbitrate. Indeed, neither party contests the district court's finding that an agreement to arbitrate is contained in Oldroyd's

employment contract. Additionally, since the arbitrability of the retaliatory discharge claim is the only claim before us, the fourth element is inapplicable to the instant case.

### I. The Scope of the Agreement to Arbitrate

ESB argues that the district court erred in finding that Oldroyd's retaliatory discharge claim was outside the scope of the arbitration clause contained in his employment contract. We agree.

[5][6] Where the parties to an arbitration agreement specifically have excepted a certain type of claim from mandatory arbitration, it is the duty of federal courts to enforce such limitations. *Oneida Indian Nation*, 90 F.3d at 62. As the Supreme Court has instructed,

the FAA does not require parties to arbitrate when they have not agreed to do so, ... nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement.... It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.

*Volt Info. Sciences v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989) (citation omitted).

[7][8] There is a strong federal policy favoring arbitration as an alternative means of dispute resolution. *See David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir.1991). In accordance with that policy, we will " construe arbitration clauses as broadly as possible," *Collins & Aikman Prod. Co. v. Building Sys.*, 58 F.3d 16, 19 (2d Cir.1995) (citation and quotation omitted), resolving "any doubts concerning the scope of arbitrable issues ... in favor of arbitration." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25, 103 S.Ct. at 941-42; *see also McMahan Sec. Co. v. Forum Capital Markets L.P.*, 35 F.3d 82, 86 (2d Cir.1994). Moreover, we have held that "the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said *with positive assurance*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

Page 7

134 F.3d 72, 13 IER Cases 1025
(Cite as: 134 F.3d 72)

*that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute."* *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997)(emphasis supplied)(quotation and citation omitted).

[9] The arbitration clause contained in Oldroyd's employment agreement represents the prototypical broad arbitration provision. *See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 832 (2d Cir.1988)(noting the distinction between "broad" clauses that purport to refer to arbitration all disputes arising out of a contract and "narrow" clauses that limit arbitration to specific types of disputes). The clause makes arbitrable "[a]ny dispute, controversy or claim arising under or in connection with [Oldroyd's employment agreement]." We have previously held that this is precisely the kind of broad arbitration clause that justifies a presumption of arbitrability. *See e.g., Collins & Aikman Prod. Co.,* 58 F.3d at 20 (holding that a clause "submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause.") (citation *77 omitted, alterations in original). Therefore, Oldroyd's retaliatory discharge claim is presumptively within the scope of the arbitration clause contained in Oldroyd's employment agreement.

[10] Oldroyd has supplied no evidence to rebut this presumption. Rather, he provides only a conclusory allegation that he did not intend for the arbitration clause in his employment agreement to encompass a claim for retaliatory discharge. In his view, "arbitration was to be used only to interpret or enforce particular provisions of the [employment] contract." But Oldroyd provides no basis for such a narrow construction of his agreement to arbitrate. Because we cannot say "with positive assurance" that a claim for retaliatory discharge was not within the scope of the arbitration clause, we cannot say that the presumption in favor of arbitration has been overcome in this case.

[11] Moreover, even without such a presumption, the contractual language is sufficiently broad to encompass a claim of retaliatory discharge. We find untenable Oldroyd's contention that a claim for retaliatory discharge does not constitute "a claim relating to" the agreement governing the terms and conditions of his employment. "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc.,* 815 F.2d at 846. "If the allegations underlying the claims 'touch matters' covered by the parties' [contracts], then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* (quoting *Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 624-25 n. 13, 105 S.Ct. 3346, 3352-53 n. 13, 87 L.Ed.2d 444 (1985)).

In alleging retaliatory discharge, Oldroyd asserts that he was unlawfully terminated by his employer because he informed OTS of the illegal loan activity occurring at ESB. Inasmuch as more than half of Oldroyd's employment contract relates to the subject of termination from employment, there can be no doubt that a retaliatory discharge claim touches matters covered by the employment contract. For example, the contract addresses such matters as what constitutes "cause" for termination, benefits to be provided after termination, notice requirements for termination, termination upon change of control, and related matters. Accordingly, we conclude that since Oldroyd alleges that he was terminated under circumstances giving rise to a retaliatory discharge claim, such claim touched upon matters covered by the employment agreement and therefore is clearly within the scope of the agreement's arbitration clause.

The district court, in finding that Oldroyd's retaliatory discharge claim was beyond the scope of the arbitration clause contained in Oldroyd's employment contract, failed to undertake the broad reading that we have mandated for construing such clauses. In determining that there was "no clear agreement" in the arbitration clause that a retaliatory discharge claim is subject to arbitration under the arbitration clause in this case, *see Oldroyd v. Elmira Savings Bank, F.S.B.,* 956 F.Supp. 393, 398 (W.D.N.Y.1997)("*Oldroyd I* "), the district court also failed to recognize the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
(Cite as: 134 F.3d 72)

Page 8

presumption of arbitrability and Oldroyd's failure to overcome it.

## II. Legislative Intent

[12] Oldroyd argues that claims under FIRREA's whistleblower protection provision are not arbitrable. Specifically, he contends that arbitration of his 1831j claim is contrary to the intent of Congress. We reject the contention.

[13][14][15][16][17] It is well settled that federal statutory claims can be the subject of arbitration, absent a contrary congressional intent. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). In other words, the "duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *Id.* Congress, however, may override the presumption in favor of arbitration by manifesting its intention to do so. *Id.* "If such an intention exists, it will be discoverable in the text of the *78 [statute], its legislative history, or an ' inherent conflict' between arbitration and the [statute's] underlying purposes." *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. The burden of showing such legislative intent lies with the party opposing arbitration. *Id.; McMahon,* 482 U.S. at 227, 107 S.Ct. at 2337-38 (holding that the party seeking to avoid arbitration has the burden of showing that Congress intended to preclude a waiver of a judicial forum for the federal claims at issue).

Oldroyd cites nothing in the text of FIRREA or its legislative history that explicitly precludes arbitration of claims arising under Section 1831j. To support his contention that Congress intended to prevent parties from arbitrating such claims, Oldroyd cites wording in the Act that relates to federal litigation. For example, § 1831j makes reference to the filing of "a civil action in the appropriate United States district court," burdens of proof and a limitations period. We are not persuaded by this argument.

The fact that portions of the statute contemplate litigation of § 1831j claims does not demonstrate congressional intent to preclude arbitration of such claims. As the district court determined, it would make little sense to use references to limitations periods, burdens of proof and filings in federal district court as a litmus test for determining whether Congress intended to foreclose arbitration. Several other federal statutes, under which claims have been held to be arbitrable by this Circuit and the Supreme Court, contain similar provisions in their enforcement sections. *See, e.g., Gilmer,* 500 U.S. 20, 111 S.Ct. 1647 (holding arbitrable claims pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*); *Bird v. Shearson Lehman/American Express, Inc.,* 926 F.2d 116 (2d Cir.1991)(holding arbitrable claims pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988)); *Mitsubishi,* 473 U.S. at 636-37, 105 S.Ct. at 3358-59 (holding arbitrable claims pursuant to the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*).[FN1]

FN1. The relevant enforcement sections can be found at 29 U.S.C. § 1132 (ERISA) , 29 U.S.C. § 626 (ADEA), and 15 U.S.C. § 9, 15 (Sherman Antitrust Act).

Oldroyd also cites portions of § 1831j's legislative history in which Congress explained the deletion of certain provisions of the House bill providing for awards of attorneys' fees to defendant financial institutions in cases where employee plaintiffs have filed suit in bad faith. H.R. Conf. Rep. No. 101-222, at 444 (1989), *reprinted in* 1989 U.S.C.A.A.N. 432, 483. The conference report also indicates that the provision was deleted on the expectation that application of Fed.R.Civ.P. 11 would be sufficient to prevent the filing of frivolous suits. *Id.* Like the district court, we are unpersuaded by Oldroyd's contention that Congress intended to preclude arbitration of 1831j claims because arbitrators do not impose Rule 11 sanctions.

Oldroyd also argues that allowing a retaliatory discharge claim to be arbitrated rather than litigated would defeat the purpose behind FIRREA, i.e.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

134 F.3d 72

134 F.3d 72, 13 IER Cases 1025
**(Cite as: 134 F.3d 72)**

combatting fraud in the thrift industry. *See generally,* H. Rep. No. 101-54(I), at 300-303 (1989) , *reprinted in* 1989 U.S.C.A.A.N. 86, 96-99. Oldroyd contends that this goal is more easily achieved in federal court where, among other things, the proceedings are public, judges are experienced in applying federal law, and appellate review is available. However, as the district court properly noted, in light of the strong federal policy favoring arbitration, courts have not been persuaded by the existence of these unique features of the federal system in examining the arbitrability of other federal claims. *See Oldroyd I,* 956 F.Supp. at 398.[FN2] In examining Oldroyd's contention that the purposes of FIRREA will be contravened by *79 the use of arbitration rather than enforcement in federal courts, we find no basis for concluding that FIRREA is distinguishable from the ADEA, ERISA and the Sherman Antitrust Act. Oldroyd simply has failed to demonstrate that Congress, in enacting the whistleblower protection provision at issue in this case, intended to preclude a waiver of a judicial forum for claims arising under that provision.

    FN2. Oldroyd further argues that Section 1 of the Federal Arbitration Act excludes from coverage arbitration clauses contained in employment agreements covering workers engaged in interstate commerce. We have repeatedly held that Section 1's exclusion "for contracts of employment of seamen, railroad employees, or any other class of employees engaged in foreign or interstate commerce," is limited to workers involved in the transportation industries. *See, e.g., Maryland Casualty Co. v. Realty Advisory Bd.,* 107 F.3d 979, 982 (2d Cir.1997). We decline Oldroyd's invitation to reject the holdings of our prior cases on this issue.

### CONCLUSION

In sum, we hold that: (1) Oldroyd's claim of retaliatory discharge, pursuant to 12 U.S.C. § 1831j, was within the scope of the broad arbitration clause in Oldroyd's employment agreement; and (2) Oldroyd has not met his burden of showing that

Congress, in enacting § 1831j of the Act, intended to preclude arbitration of retaliatory discharge claims brought under that section of the Act. The district court, therefore, erred in denying ESB's motion for a stay of the district court proceedings pending arbitration with respect to Oldroyd's retaliatory discharge claim. Accordingly, we vacate the order of the district court to the extent that it denies arbitration of that claim, with instructions that the parties proceed to arbitration forthwith.

C.A.2 (N.Y.),1998.
Oldroyd v. Elmira Sav. Bank, FSB
134 F.3d 72, 13 IER Cases 1025

Briefs and Other Related Documents (Back to top)

• 1997 WL 34602515 (Appellate Brief) Brief for Plaintiff-Appellee Richard Oldroyd (May 23, 1997)
• 1997 WL 34602514 (Appellate Brief) Brief for Defendant-Appellant the Elmira Savings Bank, FSB (Apr. 22, 1997)
• 97-7249 (Docket) (Feb. 28, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Slip Copy                                                                                          Page 1

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Cannon      v.     GunnAllen      Financial,
Inc.M.D.Tenn.,2007.Only the Westlaw citation is
currently available.
United States District Court,M.D.
Tennessee,Nashville Division.
Gene and Frances CANNON, et al., Plaintiffs,
v.
GUNNALLEN FINANCIAL, INC., et al.,
Defendants.
No. 3:06-0804.

Jan. 22, 2007.

Harold Naill Falls, Jr., John B. Veach, III, Falls &
Veach, Nashville, NC, for Plaintiffs.
Douglas C. Salzenstein, Honigman, Miller,
Schwartz & Cohn, Detroit, MI, James Franklin
Sanders, Thomas H. Dundon, Neal & Harwell,
Nashville, TN, Lara Fetsco Phillip, Raymond W.
Henney, Honigman, Miller, Schwartz & Cohn,
Detroit, MI, for Defendants.

### MEMORANDUM
ALETA A. TRAUGER, United States District
Judge.
**\*1** Pending before the court is the Motion to
Dismiss and to Compel Arbitration filed by the
defendants (Docket No. 22), to which the plaintiffs
have responded (Docket No. 31), the defendants
have replied (Docket No. 35), and the plaintiffs
have filed a surreply (Docket No. 38). For the
reasons discussed herein, the defendant's motion
will be stayed pending the court's receipt of further
information from the parties.

### FACTUAL BACKGROUND AND
### PROCEDURAL HISTORY

**\*1** All of the claims in this case stem from the
plaintiffs' dealings with P. Michael Tansil, a

stockbroker who, when the plaintiffs first
encountered him, was a registered representative of
GunnAllen Financial. (*See* Docket No. 15 at 3.)
According to the plaintiffs, Tansil "invested
plaintiffs' assets in an unsuitable and excessively
risky fashion and engaged in excessive and
unnecessary trading." (*Id.*) In addition, they allege
that "Tansil conducted trading in plaintiffs' accounts
during a period of time in which it was not lawful
for him to engage in the securities business in the
state of Tennessee." (*Id.*) The plaintiffs also assert
that GunnAllen Financial, which hired Tansil in
2002 following his termination by First Union
Securities, never informed the plaintiffs that Tansil
had previously been terminated or that he continued
to be the subject of "numerous customer claims." (
*See id.* at 3-4.) They also claim that, "[d]uring Mr.
Tansil's employment with GunnAllen Financial,
GunnAllen Financial failed to supervise his
activities in the diligent manner required by the
rules and regulations of the National Association of
Securities Dealers (NASD) and other securities
agencies." (*Id.* at 4.)

**\*1** In August 2005, the New York Stock Exchange
Division of Enforcement ("NYSE") filed a number
of charges against Tansil based on his allegedly
improper dealings with clients. (*See id.*) Soon
thereafter, GunnAllen Financial represented to the
NASD that it had terminated its relationship with
Tansil on August 26, 2005 due to his acts of "
product misrepresentation." (*See id.*) As a result of
this termination, assert the plaintiffs, Tansil was no
longer legally permitted to transact business as a
securities agent in Tennessee. (*See id.*)

**\*1** The plaintiffs claim that, despite this fact, Tansil
continued to manage and make trades in their
accounts. (*See id.* at 5.) They also allege that both
Tansil and GunnAllen failed to disclose to them
Tansil's termination and the pending NYSE charges
against him. (*See id.*)

**\*1** In addition to Tansil and GunnAllen Financial,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 2

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
(Cite as: Slip Copy)

the plaintiffs have made claims against (1) GunnAllen Holdings, a Florida corporation that, according to the plaintiffs, owned one hundred percent of GunnAllen Financial during the time relevant to this case; (2) Richard Frueh, a Florida resident who, during the time relevant to this case, was GunnAllen Financial's chairman and chief executive officer; (3) Mark Ellis, a Florida resident who, since July 2005, has been GunnAllen Financial's chief compliance officer; (4) Richard Nummi, a Florida resident who, until July 2005, was GunnAllen Financial's chief compliance officer; and (5) Stephen Saunders, a Florida resident who, from January 2002 to August 2005, was Tansil's direct supervisor. (See id. at 2-3.)

*2 The defendants have moved to dismiss all of the plaintiffs' claims and to compel the claims to arbitration pursuant to the plaintiffs' arbitration agreements. (See Docket No. 22 at 1.) They also assert that "[a]ll of Plaintiffs' claims against Defendants GunnAllen Holdings, Inc. and Richard A. Frueh should be dismissed for lack of personal jurisdiction" and that "[a]ll of Plaintiffs' claims against GunnAllen Holdings, Inc. also should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiffs have failed to state a claim against it." (See id.)

### DISCUSSION

*2 In their First Amended Complaint, the plaintiffs enumerate a variety of claims against the defendants. (See Docket No. 15 at 18-25.) Among these claims are one class action claim and five non-class ones. (See id.)

*2 A dispute between the parties has arisen as to the proper mechanism for addressing the latter claims, i.e., whether they should be sent to arbitration or resolved in this court. The plaintiffs do not dispute the defendants' assertion that they "entered into various agreements with GunnAllen Financial containing provisions requiring them to arbitrate controversies that may arise between them and GunnAllen Financial concerning any transaction or GunnAllen Financial's business." (See Docket No. 23 at 3.) Rather, the plaintiffs focus on the meaning

behind the section of these agreements that pertains to class actions. They recite a version of this section that reads as follows:
*2 No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class action who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court.

*2 (See Docket No. 31 at 4 (emphasis added).)

*2 The plaintiffs argue that this language " preclude[s] defendants from compelling arbitration with respect to the plaintiffs non-class claims." (See id.) Specifically, they maintain that "the use of a semicolon ... as well as the word 'or' following the semicolon ... requires the conclusion that the subsequent phrase 'with respect to any claims encompassed by the putative class action' modifies only the phrase 'who is a member of a putative class who has not opted out of the class.' " (See id. at 12.) In other words, the plaintiffs assert that all of their claims are free from arbitration because each of them "is a person who has initiated in court a putative class action." (See id.)

*2 The defendants cite a different version of this section that does not include the "; or who is a member of a putative class action" portion of the plaintiffs' recitation:
*2 No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (I) the class certification is denied; or (II) the class is decertified; or (III) the customer is excluded from the class by the court....

*3 (See Docket No. 23 at 13 (emphasis in original).)

*3 To the defendants, "Plaintiffs' semicolon argument is nonsensical." (See Docket No. 35 at 5.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

They argue that, regardless of how the court decides to treat the plaintiffs' class claims, the language above requires it to "compel Plaintiffs' individual claims to arbitration." (*See* Docket No. 23 at 13.)

**\*3** The variation in the language cited by the parties appears to stem, at least in part, from the fact that the plaintiffs, throughout the years they did business with GunnAllen Financial, signed a number of different agreements that, at some times, contained the language they now recite in their pleadings and, at others, contained the language the defendants now quote. (*Compare* Docket No. 27, Ex. Part 1 at 11-12 (Beasley Medallion Account Agreement, signed July 10, 2002, reflects the language cited by the plaintiffs) *with* Docket No. 27, Ex. Part 1 at 15-Exhibit Part 2 at 1 (Beasley Option Agreement and Approval Form, signed March 31, 2004, reflects the language cited by the defendants).)

**\*3** The defendants assert that "the most recent arbitration agreements ... between each of the named Plaintiffs and GunnAllen Financial" all contain the language they recite.[FN1] (*See* Docket No. 23 at 13.) The plaintiffs do not address this discrepancy, although they do indicate that the language reflected in their version of the agreement is that required by NASD Conduct Rule 3110(f)(6). (*See* Docket No. 31 at 6.) While the defendants are NASD members (*see* Docket No. 23 at 1 n. 1), the plaintiffs "are not NASD members and are not bound by the NASD's conduct rules" (*see* Docket No. 31 at 14). Accordingly, the plaintiffs claim, "the only issue here is what the parties intended by the language in their agreements." (*See id.*)

> FN1. An examination of the defendants' submission of what appear to be the most recent arbitration agreements signed by the plaintiffs reveals that most, but not all, of these agreements do reflect the language put forth by the defendants. (*Compare* Docket No. 27, Ex. Part 1 at 7 (appears to be most recent arbitration agreement signed by Gene and Frances Cannon and reflects the language cited by defendants) *with* Docket No. 27, Ex. Part 12 at 10 (7 (appears to be most recent arbitration

agreement signed by Stephen and Donna Hughes and reflects the language cited by plaintiffs).)

**\*3** The court need not determine, for the purposes of this analysis, which version of the agreements controls here with respect to each of the plaintiffs. As discussed below, even under the version of the agreement put forth by the plaintiffs, which presents a closer question as to whether the plaintiffs' non-class claims should be compelled to arbitration while the class ones remain in this court, the court finds that the plaintiffs' non-class claims are suitable for arbitration.

### I. In accordance with Sixth Circuit precedent, non-class claims may be sent to arbitration, despite the fact that they were brought along with nonarbitrable class claims, as long as they are not encompassed by those class claims.

**\*3** This court has previously outlined-but not decided-the question in this case, *i.e.*, whether non-class claims may be sent to arbitration when they are brought by a plaintiff who also asserts nonarbitrable class claims. *See French v. First Union Secs.*, 209 F.Supp.2d 818, 833 (M.D.Tenn.2002) (indicating Judge Nixon's determination that "this is a difficult issue which, thankfully [due to his dismissal of the underlying class claims], this Court need not fully resolve").

**\*4** The Sixth Circuit in 2005 provided important guidance as to the resolution of this issue when it emphasized that the "plain meaning" of another portion of the NASD regulations, which contains language that is somewhat similar to the plaintiffs' version of the class action non-arbitration clause, "is that arbitration is precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group v. Capwill*, 148 Fed. App'x 413, 417 (6th Cir.2005) (interpreting NASD Rule 10301(d)(2), which states that "any claim filed by a member or members of a putative or certified class action is ... ineligible for arbitration at [the NASD] if the claim is encompassed by a putative or certified class action"). That same year, it also indicated that a claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

arising from the same factual underpinnings as one bound for arbitration need not also be arbitrated based on this factual commonality. *See Simon v. Pfizer Inc.,* 398 F.3d 765, 776 (6th Cir.2005) (declining to send a claim to arbitration where it overlapped factually with another arbitrable claim, yet had an independent legal basis).

**\*4** Notably, the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (citing 9 U.S.C. § 9 (2000)). "[T]he mere presence in a suit of ... non-arbitrable claims ... will not defeat enforcement under the Act ... regarding those claims which are arbitrable." *S. Elec. Health Fund v. Kelley,* 308 F.Supp. 847, 852 (M.D.Tenn .2003) (internal quotations omitted). "While general principles of contract interpretation govern whether arbitration is appropriate, any questions or doubts should be resolved in favor of arbitration." *Third Nat'l Bank in Nashville v. Wedge Group Inc.,* 749 F.Supp. 851, 853 (M.D.Tenn.1990) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (recognizing the "broad federal policy favoring arbitration")); *see also Simon,* 398 F.3d at 773 n. 12 ("Where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (quoting *United Steelworkers of Am. v. Mead Corp.,* 21 F.3d 128, 131 (6th Cir.1994) ).

**\*4** With these principles in mind, the court finds that the plaintiffs' version [FN2] of the agreement, like the NASD rule interpreted in *Liberte Capital Group,* requires that "arbitration [be] precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group,* 148 Fed. App'x at 417. The defendants' version of the arbitration agreement

is even more similar to the language considered by the Sixth Circuit in *Liberte Capitol Group* than is the plaintiffs' version. As such, the defendants' version, too, would require that "arbitration [be] precluded only if the arbitration claims are comprehensively included within the claims asserted by the class." *See Liberte Capital Group,* 148 Fed. App'x at 417. Thus, the court must determine whether the plaintiffs' class claim encompasses their non-class ones.

> FN2. T o also agree with the plaintiffs that the "encompassed by" language pertains only to the portion of their version of the arbitration agreement that follows the semicolon, *i.e.,* to members of the putative class who have not opted out of the class action, would be to create an unworkable dichotomy under which claims brought by members of a putative class could be sent to arbitration far more often than claims brought by "any person who has initiated in court a putative class action."

**A. The plaintiffs' non-class claims are not encompassed by their putative class action.**

**\*5** Here, the plaintiffs' putative class claim states that, "[b]y ... making trades in the accounts of plaintiffs ... after he was terminated by GunnAllen Financial, Mr. Tansil transacted business as a securities agent ... in violation of the Tennessee Securities Act" and that "[d]efendants ... are liable ... for Mr. Tansil's violations ... because [they] had the power ... to control the activities of Mr. Tansil and because they provided material assistance to Mr. Tansil's unlawful conduct." (Docket No. 15 at 19.) The plaintiffs also assert that "GunnAllen Financial is also liable for the securities law violations of Mr. Tansil pursuant to the doctrine of *respondeat superior....*" *(Id.)*

**\*5** The plaintiffs' non-class claims involve, among other things, the defendants' alleged fraudulent deception of them and their failure to disclose material information to them, as well as the defendants' violation of the Tennessee Consumer Protection Act, negligence, and breach of their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

fiduciary duties to the plaintiffs. (*See id.* at 20-24.) These claims stem from actions taken by the defendants throughout the time that Tansil was employed by GunnAllen Financial, as well as after he was fired. (*See id.*)

**\*5** Remembering that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," the court finds that the plaintiffs' class claim does not encompass their non-class ones. *Mitsubishi Motors Corp.,* 473 U.S. at 626. Rather, an examination of the breadth of the individual claims in this case reveals that these claims extend far beyond the plaintiffs' putative class action, which stems only from activities following Mr. Tansil's termination. Thus, at least some of the plaintiffs' claims are suitable for arbitration.[FN3]

> FN3. The plaintiffs base their entire argument in favor of resolving their non-class claims outside of arbitration on the notion that such is mandated by the class action-related language in the parties' arbitration agreement. (*See* Docket No. 31 at 3-4, 11-17.) They do not otherwise assert that their non-class claims somehow fall outside the scope of the parties' agreement that "all controversies between the Plaintiff[s] and GunnAllen Financial arising out of any transaction between them, or GunnAllen Financial's business, shall be submitted to arbitration." (*See* Docket No. 27 at 2.)

**B. The parties have not supplied the court with the information it needs to determine which of the plaintiffs' individual claims are appropriate for arbitration.**

**\*5** The following individuals are plaintiffs in this case: Gene and Francis Cannon, Russell and Marie Beasley, Roger and Rachel Parker, James and Sylvia Parker, Jerry Vogel, Richard S. Graham, Carolyn Curt, Sam Finney, James C. Elliott, Chad and Marilyn Meadow, John and Andrea Moore, Stephen and Donna Hughes, and James V. Pinkston. (*See* Docket No. 15 at 5-15.) GunnAllen

Financial, Inc., GunnAllen Holdings, Inc., Richard Frueh, Marc Ellis, Richard Nummi, and Stephen Saunders are all listed as defendants. (*See id.* at 2-3.)

**\*5** As indicated previously, each of the plaintiffs listed above signed at least one arbitration agreement in connection with their transactions with Tansil and GunnAllen Financial. The defendants maintain that "[t]he individual defendants are entitled to invoke arbitration even though they did not sign the agreements." (*See* Docket No. 23 at 13 n. 7 (citing *Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281 (6th Cir.1990) (cautioning that, if a party "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as defendants in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified") (internal quotation omitted)).) In connection with these arguments, the defendants have submitted a wide variety of the plaintiffs' signed agreements and portions thereof. The plaintiffs, who devote the bulk of their arguments on this topic to the now-rejected assertion that no claim in this case should go to arbitration, neither state an opinion as to whether their arbitration agreements require them to arbitrate each of their non-class claims against each of the defendants here nor offer the most recent versions of their arbitration agreements.

**\*6** The Supreme Court has emphasized that " arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). The Court has made clear that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide." *Howsam,* 537 U.S. at 84. In making this decision, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). An exception to courts' general power to make this determination, however, arises where there exists "clear and unmistakable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
(Cite as: Slip Copy)

evidence" that the parties agreed to submit such questions to an arbitrator. *See First Options of Chicago, Inc.*, 514 U.S. at 944.

*6 The parties have not supplied the court with the information it needs to determine (1) whether there exists "clear and unmistakable evidence" that the parties agreed to arbitrate "question[s] of arbitrability"; or (2) presuming that such evidence does not exist, whether the arbitration agreements encompass all of the plaintiffs' non-class claims and each of the defendants they have listed. Simply put, the court cannot decipher which of the many arbitration agreements submitted by the defendants provides the controlling arbitration language with respect to each of the plaintiffs.

*6 The defendants have submitted a number of different types of agreements for many of the plaintiffs. (*See, e.g.,* Docket No. 27, Ex. Part 6 at 8-9 (Vogel Option Agreement and Approval Form, signed approximately April 6, 2004); Docket No. 27, Ex. Part 7 at 5-6 (Vogel Roth IRA Adoption Agreement, signed March 31, 2004).) Many of these agreements contain varying language about which parties are required to arbitrate their disputes and which disputes must be sent to arbitration. (*See, e.g., id.*)

*6 In addition, some of what appear to be the plaintiffs' most recent agreements contain arbitration language that differs from that in the most recent agreements of their cohorts. (*Compare* Docket No. 27, Ex. Part 15 at 4-5 (Pinkston IRA Adoption Agreement, signed Sept. 27, 2004) *with* Docket No. 27, Ex. Part 9 at 7-8 (Elliott Option Agreement and Approval Form, signed May 28, 2004).) Finally, no arbitration language at all is available for one of the plaintiffs. (*See* Docket No. 27, Ex. Part 8 at 14-15 (Finney New Account Form).)

*6 While the court has determined that, as a general rule, the plaintiffs' non-class claims are appropriate for arbitration, it needs clearer information from the parties in order to determine which of these claims fall under the agreements and which of the parties are bound by them. Specifically, the court requests that both the plaintiffs and the defendants submit

what they maintain are the controlling arbitration agreements as to each of the plaintiffs. Further, they shall brief the following points: (1) whether, under each of these agreements, it is for the court to decide which parties are bound by the agreements, *see First Options of Chicago, Inc.,* 514 U.S. at 944; (2) which parties are bound by the controlling arbitration agreements, assuming that such a decision is appropriate for the court; and (3) which of the plaintiffs' non-class claims fall under the rubric of these agreements.

*7 Upon receipt of these submittals, the court, if appropriate, will make a determination as to which of the plaintiffs' non-class claims will be sent to arbitration, and against which parties that arbitration will take place.

## II. The plaintiffs' class claim will be stayed in this court pending the resolution of the non-class claims that proceed to arbitration.

*7 The defendants have dedicated a significant portion of their pleadings to the argument that the plaintiffs' class claim must fail because it cannot survive Rule 23 analysis. (*See* Docket No. 23 at 6-14.) The plaintiffs make no effort to refute the defendants' arguments but, instead, claim that "at this stage, plaintiffs' class claims are to be tested by the standards of Rule 12(b)(6), not by the standards of Rule 23." (*See* Docket No. 31 at 1.)

*7 "[A]t an early practicable time" after the commencement of a class action, a court is required to conduct a "rigorous analysis" into whether the requirements of Rule 23 have been met, such that class certification is appropriate. *See* Fed.R.Civ.P. 23(c)(1); *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In order for a class to be certified under Rule 23, the plaintiffs must first establish the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

*Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir.1998). Once they have met these requirements, the plaintiffs must also demonstrate that the class should be certified under at least one of the three categories of class actions described in Rule 23(b). *See* Fed.R.Civ.P. 23(b); *In re Am. Med. Sys., Inc.,* 75 F.3d at 1079.

**\*7** The Sixth Circuit has emphasized that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *See In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996) (quoting *Falcon,* 457 U.S. at 160). It has also noted that "ordinarily the [class certification] determination should be predicated on more information than the pleadings will provide" and that "[t]he parties should be afforded an opportunity to present evidence on the maintainability of the class action." *See In re Am. Med. Sys., Inc.,* 75 F.3d at 1079 (quoting *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974)). Indeed, Rule 23 itself was modified in 2003 to reflect the reality that "[t]ime may be needed to gather information necessary to make the certification decision." *See* Fed. R. Civ. P 23(c)(1)(A) advisory committee's 2003 note.

**\*7** In this court, the certification decision is invariably made on the basis of a fully briefed motion for class certification, the timing of which is usually set at the initial case management conference (which has not yet been held in this case). The pleadings do not provide the court with the detailed information it needs to conduct the requisite, "rigorous" Rule 23 analysis. *See Falcon,* 457 U.S. at 161. Indeed, the plaintiffs have not even submitted argument pertaining to whether they are able to meet the Rule's requirements. Without more information, the court is unable to decide, at this point, whether class certification is appropriate.[FN4]

FN4. For instance, the court does not have enough information to determine whether the plaintiffs' putative class is so numerous that the joinder of all of its members would be impracticable. In analyzing joinder impracticability, the court should consider the number of class members, their

geographical dispersion, whether they are identifiable, their fear of harassment, and the size of their claims, as well as judicial efficiency and whether the class action is injunctive in nature. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* §§ 24:16-18 (4th ed.2003); *see also Saur v. Snappy Apple Farms, Inc.,* 203 F.R.D. 281, 286 (W.D.Mich.2001). The plaintiffs have alleged only that "there are more than fifty members of the Plaintiff Class." (*See* Docket No. 15 at 16.) While they have provided geographic information as to the approximately twenty named members of the current class, they have not indicated the location of the remaining members, nor have they discussed a number of the other numerosity factors. (*See id.* at 5-15.) While the relatively small number of plaintiffs here does not necessarily preclude the certification of their case as a class action, the court must carefully consider the other factors that define the numerosity inquiry in order to determine if such is appropriate. *See In re Am. Med. Sys.,* 75 F.3d at 1076 (recognizing that "the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement") (citing *Afro Am. Patrolmen's League v. Duck,* 75 F.3d 1069, 1076 (6th Cir.1974)). It cannot do so here without more information.

**\*8** Additionally, the resolution in arbitration of the plaintiffs' non-class claims may affect the composition of their putative class. While the plaintiffs seek "recissionary damages, plus interest and attorney's fees" through their class action, they hope to recover the same from some of their non-class claims. (*See, e.g,* Docket No. 15 at 20 (listing plaintiffs' class action damages), 21 (seeking the same damages, among other things, via Count One of plaintiffs' non-class claims).) Because "[i]t goes without saying that the courts can and should preclude double recovery by an individual," this court must prevent plaintiffs who recover via their individual claims everything they seek in their class ones from pursuing their class claims in this court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 8

Slip Copy, 2007 WL 189601 (M.D.Tenn.)
**(Cite as: Slip Copy)**

*See Liberte Capital Group,* 148 Fed. App'x at 417 (quoting *Gen. Tel. Co. of the Nw. v. EEOC,* 446 U.S. 318, 333, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)). The Sixth Circuit has recognized the power of district courts, when confronted with class action claims whose individual counterparts are being arbitrated, to take steps to ensure that double recovery does not occur. *See Liberte Capital Group,* 148 Fed. App'x at 417 ("We are convinced that ... the district court is quite capable of ensuring that no double recovery occurs should [plaintiffs pursuing both individual and class claims] eventually prevail in the arbitration."). Thus, the plaintiffs' class claims will be stayed in this court pending the resolution of their non-class claims in arbitration. [FN5]

FN5. As noted above, the defendants have moved to dismiss all of the plaintiffs' claims against Richard Frueh for lack of personal jurisdiction and against GunnAllen Holdings for lack of personal jurisdiction and failure to state a claim. ( *See* Docket No. 22 at 1.) If these defendants are bound by the arbitration agreements and the plaintiffs, in arbitration, recover all of the damages they seek against them, any decision by the court on these motions would be rendered moot. *See Liberte Capital Group,* 148 Fed. App'x at 417 (noting that courts "can and should preclude double recovery by an individual"). As such, these motions by the defendants will also be stayed pending the resolution of any claims heard against them in arbitration.

## CONCLUSION

*8 Although the court finds that the plaintiffs' class claim does not encompass their non-class ones and that, as such, some of their non-class claims must be arbitrated pursuant to their arbitration agreements, the parties have not provided the court with the information it needs to determine the particular claims that are appropriate for-and the particular parties that will be bound by-this arbitration. The defendants' motion to dismiss plaintiffs' non-class

claims from this court and to compel them to arbitration will be stayed pending the court's receipt of this information from the parties. In addition, the plaintiffs' class claims, which will remain in this court pursuant to their arbitration agreements, will be stayed pending the resolution of the non-class claims that proceed to arbitration. Finally, the defendants' motions to dismiss all of the plaintiffs' claims against Richard Frueh for lack of personal jurisdiction and against GunnAllen Holdings for lack of personal jurisdiction and failure to state a claim will be stayed pending the resolution of any claims heard against these defendants in arbitration.

*8 An appropriate order will enter.

M.D.Tenn.,2007.
Cannon v. GunnAllen Financial, Inc.
Slip Copy, 2007 WL 189601 (M.D.Tenn.)

Briefs and Other Related Documents (Back to top)

• 3:06cv00804 (Docket) (Aug. 21, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.