283 F.3d 595
(Cite as: 283 F.3d 595, *611)

deferring public policy questions to the arbitrator is in conflict with the decision in Green Tree allowing the court to invalidate an arbitration agreement based on prohibitive costs.

We disagree. Both decisions articulate similar scopes of inquiry for district courts evaluating arbitration agreements, first, whether there was an arbitration agreement, and second, whether that agreement was valid. Great Western, 110 F.3d at 228; Green Tree, 531 U.S. at 90, 121 S.Ct. 513 ("[W]e first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."). Both decisions recognize the strong presumption in favor of arbitration and that doubts " 'concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " Great Western, 110 F.3d at 228 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25, 103 S.Ct. 927 (1983)); see also Green Tree, 531 U.S. at 91, 121 S.Ct. 513 (citing Moses H. Cone Mem'l Hosp., 460 U.S. at 24, 103 S.Ct. 927). Great Western held that the question of whether the arbitration agreement validly waived certain rights afforded by New Jersey law could be presented in the arbitral forum, but also evaluated that claim on the merits and found that the claimant had not demonstrated any New Jersey policy against arbitration. 110 F.3d at 231-32. Because Great Western did not foreclose the ability of courts to examine public policy arguments, it is not in conflict with the holding of Green Tree, and has not been overruled. [FN5]

FN5. The PHRC filed an amicus brief arguing that requiring a victim of employment discrimination to pay fees to protect her rights is contrary to the public policy of Pennsylvania guaranteeing a costless forum for enforcing her rights, and that the arbitration agreement did not foreclose the claimant's opportunity to bring a claim before the PHRC. Blair's administrative complaint was dismissed by the PHRC for failure of proof or failure to cooperate. The question whether arbitration is contrary to Pennsylvania public policy is not at issue in this case, and we do not reach to decide it.

Finally, Scott argues that this court should affirm the earlier order of the District Court dismissing Blair's complaint "with prejudice" because Blair did

not file for arbitration within one year, as provided for in the arbitration agreement. The District Court did not address the statute of limitations outside of recognizing Blair's argument that the statute of limitations in the arbitration agreement conflicts with the underlying statutory limitations periods. We agree with the District Court that this question, and others relating to the statute of limitations, [FN6] should be deferred to the arbitrator.

FN6. For example, Blair argues that the one-year limitation period in the agreement with Scott conflicts with the incorporated AAA rules that provide that timeliness should be based on the statutes of limitations in the underlying statutes on which the claims are based, and that the ambiguity should be construed against the maker of the contract. See, e.g., Burne v. Franklin Life Ins. Co., 451 Pa. 218, 301 A.2d 799, 804 (1973).

IV.
CONCLUSION

For the reasons set forth above, we will reverse the decision of the District Court *612 and remand for further factual inquiry into the costs of arbitration and Blair's ability or inability to pay for arbitration.

Diane BLAIR, v. Scott Specialty GASES Diane Blair, Appellant., 2001 WL 34095112 (Appellate Brief) (C.A.3 2001), Appellant's Brief

BLAIR, v. SCOTT SPECIALTY GASES, et al. Diane Blair, Appellant., 2001 WL 34094973 (Appellate Brief) (C.A.3 May 14, 2001), Brief of the Equal Employment Opportunity Commission as Amicus Curiae in Support of the Appellant

Diane BLAIR, Appellant, v. Scott Specialty GASES, Thomas Barford, and Jerry Stump, Appellees., 2001 WL 34095113 (Appellate Brief) (C.A.3 June 7, 2001), Appellees' Brief

Diane BLAIR, Appellant, v. SCOTT SPECIALTY GASES, Thomas Barford, and Jerry Stump, Appellees., 2001 WL 34094975 (Appellate Brief) (C.A.3 June 13, 2001), Addendum to Appellees' Brief

Diane BLAIR, Plaintiff/Appellant, v. SCOTT SPECIALTY GASES, Thomas Barford, and Jerry

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



283 F.3d 595
(Cite as: 283 F.3d 595, *612)

Stump, Defendants/Appellees., 2001 WL 34094974
(Appellate Brief) (C.A.3 June 21, 2001), Appellant
Diane Blair's Reply Brief

   283 F.3d 595, 88 Fair Empl.Prac.Cas. (BNA)
464, 82 Empl. Prac. Dec. P 41,005

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

43 F.Supp.2d 395
81 Fair Empl.Prac.Cas. (BNA) 31
(Cite as: 43 F.Supp.2d 395)

Page  34

United States District Court,
S.D. New York.

Lewis J. HART, Jr., Plaintiff,
v.
CANADIAN IMPERIAL BANK OF
COMMERCE, CIBC, Inc., CIBC Wood Gundy
Securities,
Inc., CIBC Wood Gundy Securities Corp. and
CIBC Oppenheimer Corp. (Successor in
Interest to CIBC Wood Gundy Securities, Corp.),
Defendants.

No. 98 CIV 4068 (WCC).

March 26, 1999.

Former employee of investment banking and
brokerage corporation, which was a member of the
National Association of Securities Dealers, Inc.
(NASD) and a member organization of the New
York Stock Exchange (NYSE), brought
discrimination claims against employer under Title
VII and the Age Discrimination in Employment Act,
in addition to various state contract and tort claims.
On employer's motions to dismiss and to compel
arbitration, the District Court, William C. Conner,
Senior District Judge, held that: (1) arbitration
clause contained in securities industry registration
application signed by employee was valid and
enforceable; (2) employee was bound by version of
NASD code that required arbitration of
employment-related disputes; (3) employee was
bound by versions of NYSE rules that required
arbitration of employment-related disputes; (4)
employee's action fell within scope of NASD and
NYSE compulsory arbitration provisions; (5)
employee failed to prove that he could not
effectively vindicate his ADEA and Title VII rights
in NASD or NYSE arbitral forum; and (6) issue of
whether management of employer conspired to
deprive employee of judicial forum fell within scope
of arbitration agreement.

Motion to compel arbitration granted, motion to
dismiss denied.

West Headnotes

[1] Alternative Dispute Resolution    420
25Tk420

(Formerly 33k92  Arbitration, 160k11(12))
A signed securities industry registration application
containing an arbitration clause constitutes an
express arbitration agreement enforceable under the
Federal Arbitration Act (FAA).  9 U.S.C.A. § 1 et
seq.

[2] Alternative Dispute Resolution    421
25Tk421

(Formerly 33k92  Arbitration, 160k11(12))
Former employee of investment banking and
brokerage corporation, who signed securities
industry registration application containing
arbitration clause, could not avoid enforcement of
arbitration clause under the Federal Arbitration

Act (FAA) through claim of duress or coercion,
though employee claimed he was required to accept
position with corporation and that signing form was
condition of his continued employment, where
employee chose to accept position and consistently
turned down opportunities to interview for other
jobs. 9 U.S.C.A. § 2.

[3] Alternative Dispute Resolution    134(3)
25Tk134(3)

(Formerly 33k6.2  Arbitration)
To establish duress or coercion as defense to
enforcement of arbitration agreement under the
Federal Arbitration Act (FAA), plaintiff must show
a threat, which was unlawfully made, and caused
involuntary acceptance of contract terms, because
the circumstances permitted no other alternative.  9
U.S.C.A. § 2.

[4] Alternative Dispute Resolution    420
25Tk420

(Formerly 33k92  Arbitration, 160k11(12))
Unequal bargaining power between investment
banking and brokerage corporation employee and
employer, standing alone, would not render
unenforceable arbitration clause contained in
securities industry registration application signed by
employee.

[5] Alternative Dispute Resolution    420
25Tk420

(Formerly 33k92  Arbitration, 160k11(12))
Arbitration clause contained in securities industry
registration application signed by employee of
investment banking and brokerage corporation was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395)

Page 35

valid and enforceable, though employee was not provided with copies of relevant manuals or rules of the National Association of Securities Dealers, Inc. (NASD) or the New York Stock Exchange (NYSE), where there was no indication that employee was coerced or defrauded into agreeing to arbitration clause, section of form containing arbitration clause contained a paragraph in which applicant swore or affirmed that applicant read and understood the items and instructions on form, and employee acknowledged the authenticity of his signature on form.

**[6] Alternative Dispute Resolution    134(1)**
25Tk134(1)

(Formerly 33k6.2  Arbitration)
Agreements to arbitrate statutory claims do not have to be shown to be knowing and voluntary in order to be enforceable; party does not forgo substantive rights afforded by a statute by agreeing to arbitrate but only submits to their resolution in an arbitral, rather than a judicial, forum.

**[7] Release    15**
331k15

Requirement of ADEA that waiver of a right or claim under statute be knowing and voluntary refers only to substantive rights, not procedural ones. Age Discrimination in Employment Act of 1967, § 7(f)(1), 29 U.S.C.A. § 626(f)(1).

**[8] Alternative Dispute Resolution    419**
25Tk419

(Formerly 33k92  Arbitration, 160k11(12))
Former employee of investment banking and brokerage corporation, who signed securities industry registration application containing an arbitration clause, was bound by version of National Association of Securities Dealers, Inc. (NASD) code that required arbitration of employment-related disputes, including statutory discrimination cases, which was in effect on date he commenced statutory employment discrimination, contract, and tort action against NASD member employer.

**[9] Alternative Dispute Resolution    419**
25Tk419

(Formerly 33k92  Arbitration, 160k11(12))
Former employee of investment banking and brokerage corporation, who signed securities industry registration application containing an arbitration clause, was bound by versions of New

York Stock Exchange (NYSE) rules that required arbitration of employment-related disputes, including statutory discrimination cases, which were in effect on date he commenced statutory employment discrimination, contract, and tort action against employer that was a member organization of the NYSE.

**[10] Alternative Dispute Resolution    419**
25Tk419

(Formerly 33k92  Arbitration, 160k11(12))
Amendment to New York Stock Exchange (NYSE) rules that excluded claims of employment discrimination from mandatory arbitration unless the parties agreed to arbitrate claim after it arose was not retroactive.

**[11] Alternative Dispute Resolution    419**
25Tk419

(Formerly 33k92  Arbitration, 160k11(12))
Statutory employment discrimination, contract, and tort action brought by former employee of investment banking and brokerage corporation, which was a member of the National Association of Securities Dealers, Inc. (NASD) and a member organization of the New York Stock Exchange (NYSE), fell within the scope of NASD and NYSE compulsory arbitration provisions as they existed at time employee brought action. 9 U.S.C.A. § 1 et seq.

**[12] Alternative Dispute Resolution    419**
25Tk419

(Formerly 33k92  Arbitration, 160k11(12))
The Federal Arbitration Act (FAA) requires courts to construe arbitration provisions of the National Association of Securities Dealers, Inc. (NASD) and the New York Stock Exchange (NYSE) as broadly as possible and to resolve any doubts concerning the scope of arbitrable issues in favor of arbitration. 9 U.S.C.A. § 1 et seq.

**[13] Alternative Dispute Resolution    210**
25Tk210

(Formerly 33k23.10  Arbitration)
Broadly worded arbitration provisions create a presumption of arbitrability such that a court must compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. 9 U.S.C.A. § 1 et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395)

**[14] Alternative Dispute Resolution   419**
25Tk419
(Formerly 33k92 Arbitration, 160k11(12))
Former employee of investment banking and brokerage corporation was required by arbitration agreement contained in securities industry registration application to arbitrate his ADEA claim against employer, absent showing that arbitration was explicitly precluded by ADEA or that there was an inherent conflict between arbitration and the ADEA's underlying purpose. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[15] Alternative Dispute Resolution   419**
25Tk419
(Formerly 33k92 Arbitration, 160k11(12))
Title VII, as amended, did not preclude compulsory arbitration of Title VII employment discrimination claim brought by former employee of investment banking and brokerage corporation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[16] Alternative Dispute Resolution   419**
25Tk419
(Formerly 33k92 Arbitration, 160k11(12))
Former employee of investment banking and brokerage corporation failed to prove that he could not effectively vindicate his statutory rights under the ADEA and Title VII in either the National Association of Securities Dealers, Inc. (NASD) or the New York Stock Exchange (NYSE) arbitral forum, absent showing of actual bias in the arbitration system.

**[17] Alternative Dispute Resolution   419**
25Tk419
(Formerly 33k92 Arbitration, 160k11(12))
Issue of whether management of banking and brokerage corporation conspired to deprive former employee of his rights to a judicial forum for his Title VII and ADEA claims against employer fell within scope of arbitration agreement signed by employee, requiring submission of issue to arbitration under the Federal Arbitration Act (FAA).

**[18] Alternative Dispute Resolution   133(2)**
25Tk133(2)
(Formerly 33k6.2 Arbitration)
The Federal Arbitration Act (FAA) mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. 9 U.S.C.A. § 1 et seq.

\*397 Brinton & January, White Plains, NY (Robert L. Brinton, Clayton S. Byrne, of Counsel), for Plaintiff.

Skadden, Arps, Slate, Meagher & Flom LLP, New York City (Jay S. Berke, Carl G. Guida, of Counsel), for Defendants.

OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

In this employment discrimination action, plaintiff Lewis J. Hart, Jr. ("Hart") asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. and the Age Discrimination \*398 in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., as well as various state contract and tort claims against the defendants. Defendants move to dismiss Count V of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim and, simultaneously, for an order pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. staying this action and compelling arbitration of all causes of action not dismissed by the Court. For the reasons discussed below, defendants' motion to compel arbitration and to stay judicial proceedings pending such arbitration is granted. The Court reserves decision on defendants' motion to dismiss.

BACKGROUND

The following facts are undisputed. In 1990, plaintiff commenced his employment with defendant CIBC, Inc. [FN1] as a Vice President and Director. Hart was hired to develop the company's capabilities in the area of electric power financing and related advisory services. He was promoted to Managing Director of CIBC, Inc. in 1992 and then to Co-Head of the Global Power Group in 1995. As Co-Head of the Global Power Group, Hart was responsible for developing and implementing a plan to turn CIBC Wood Gundy Securities, Corp. ("Wood Gundy Corp.") into a full-service provider of investment banking services and products in the global power industry. To this end, in or about January of 1996, Hart was asked to serve as

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395                                             Page 37
(Cite as: 43 F.Supp.2d 395, *398)

Managing Director of Wood Gundy Corp., the American investment banking/brokerage subsidiary of the Bank. [FN2]

> FN1. CIBC, Inc. is a wholly-owned subsidiary of a non-party corporation named CIHI. CIHI is a subsidiary of defendant Canadian Imperial Bank of Commerce (the "Bank"), a Canadian financial services company with a principal place of business in Toronto, Ontario, Canada.

> FN2. Unlike CIBC, Inc., Wood Gundy Corp. was a member of the National Association of Securities Dealers, Inc. ("NASD") and a member organization of the New York Stock Exchange ("NYSE").

As Managing Director of Wood Gundy Corp., Hart was required by the NASD and NYSE Rules to take the Series 7 examination and register with the NASD and NYSE. [FN3] Plaintiff passed his Series 7 exam on March 7, 1996, and registered with the NASD and NYSE by signing a Uniform Application for Securities Industry Registration or Transfer, commonly referred to as a Form U-4. Under a caption warning that "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY" paragraph 5 of the Form U-4 provides:

> FN3. Hart notes that he also took and passed the Series 63 exam and registered for, but never took, the Series 24 exam. (Hart Aff. ¶¶ 17-19).

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10 [here the NASD and NYSE] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

On October 29, 1997, plaintiff's employment with Wood Gundy Corp. was terminated, allegedly for performance reasons.

Plaintiff filed charges with both the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR"), and received a "Notice of Right to Sue" dated May 28, 1998. On June 8, 1998, Hart filed the complaint in this action alleging claims of:

(i) age discrimination in violation of the ADEA; (ii) national origin discrimination under Title VII; and other claims entitled (iii) breach of implied contract; (iv) breach of course of dealing contract to pay bonus; (v) attempt to force *399 plaintiff into arbitration; and (vi) damage to plaintiff's reputation, against his former employers, CIBC, Inc. and Wood Gundy Corp. and their parent corporation, the Bank. [FN4]

> FN4. Also named as defendants are: (i) CIBC Wood Gundy Securities, Inc. ("Wood Gundy, Inc."), a wholly-owned subsidiary of the Bank and Canadian broker-dealer with a principal place of business in Toronto, Ontario, Canada; and (ii) CIBC Oppenheimer Corp. ("OPCO"), a Delaware corporation with a principal place of business in New York, New York. OPCO is the successor in interest of Wood Gundy Corp. (Wood Gundy Corp.'s stock was merged into Oppenheimer & Co., Inc. to form OPCO) and is also a wholly-owned subsidiary of the Bank. Both OPCO and the Bank are members of the NASD and NYSE. Wood Gundy, Inc. is not.

At the time Hart signed his Form U-4 and when he filed the instant complaint, the NASD and NYSE rules provided for compulsory arbitration of employment related disputes, including statutory discrimination claims. Accordingly, on October 15, 1998, defendants moved to dismiss Count V of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim and, simultaneously, for an order pursuant to Section 3 of the FAA, staying this action and compelling arbitration of all causes of action not dismissed by the Court. Since then, the Securities and Exchange Commission ("SEC") has approved changes to NASD and NYSE arbitration rules creating an exception to mandatory arbitration of employment disputes. According to the amendments, arbitration of statutory employment discrimination claims may only be compelled if the parties agreed to arbitration after the dispute had arisen. The NASD rule change went into effect January 1, 1999 and applies to claims filed on or after that date. See SEC Release No. 34-40109, 63 Fed.Reg. 35299, 1998 WL 339422. The NYSE rule change was approved by the SEC on December 29, 1998 and is silent on the issue of retroactivity. See SEC Release No. 34-40858, 64 Fed.Reg. 1051, 1999 WL 3315.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395, *399)

## DISCUSSION

The Second Circuit has enumerated the following factors to be considered when deciding whether to compel arbitration: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) whether Congress intended the plaintiff's statutory claims to be nonarbitrable; and (4) if not all claims are arbitrable, the court must determine whether to stay the balance of the proceedings pending arbitration. See Bird v. Shearson Lehman/ American Express, Inc., 926 F.2d 116, 118 (2d Cir.1991). (citing Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir.1987)).

### I. Plaintiff's Agreement to Arbitrate

[1] It is well established that a signed Form U-4 constitutes an express arbitration agreement enforceable under the FAA. See, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 22-25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); Haviland v. Goldman, Sachs & Co., 947 F.2d 601, 604 (2d Cir.1991). Plaintiff does not deny that he signed a Form U-4; however, he claims that the arbitration agreement is unenforceable because it was signed under duress and was the result of unequal bargaining power. [FN5] Further, he alleges that the waiver of his federal forum rights is neither voluntary or knowing as required by federal law.

> FN5. The FAA recognizes traditional contract defenses against the enforcement of arbitration agreements by providing that they "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

### A. Coercion or Duress

[2][3] To establish duress or coercion plaintiff must show: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." Kamerman v. *400 Steinberg, 891 F.2d 424, 431 (2d Cir.1989); see also Schuetz v. CS First Boston Corp., No. 96 Civ. 5557(DC), 1997 WL 452392, at *2 (S.D.N.Y. Aug.8, 1997). Here, plaintiff has failed to allege any threat that induced him to sign the Form U-4. He claims that he was "required by Defendants to work for ... CIBC Gundy Securities Corp.," that he "agreed" to do so (Compl.¶ 8), and that "his signing

the Form U-4 was a condition of his continued employment" with Wood Gundy Corp. (Pl.Mem.¶ 46). It is clear that plaintiff chose to accept a position with Wood Gundy Corp. which required him to register with the NASD and NYSE by signing a Form U-4. Moreover, Hart claims that he "was frequently approached by executive recruiters during the period 1994 through 1997" and that he "consistently turned down opportunities to interview for other jobs." (Compl.¶ 15). He cannot, therefore, argue that he had no alternative but to accept the position at Wood Gundy Corp. and sign the Form U-4. The arbitration agreement was not coerced or signed under duress. See DeGaetano v. Smith Barney, Inc., No.  95 Civ. 1613(DLC), 1996 WL 44226, at *3 (S.D.N.Y. Feb.5, 1996).

### B. Unequal Bargaining Power

[4] Hart alleges that the arbitration agreement is the result of unequal bargaining power between himself and his employer. This argument has been considered and rejected by the Supreme Court. See Gilmer, 500 U.S. at 33, 111 S.Ct. 1647 ("Mere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context"). Standing alone, unequal bargaining power will not render the Form U-4 unenforceable. See also Desiderio v. NASD, 2 F.Supp.2d 516, 520 (S.D.N.Y.1998).

### C. Knowing and Voluntary

[5][6][7] Plaintiff contends that, even absent duress or coercion, an agreement to arbitrate employment discrimination claims under the ADEA or Title VII will be unenforceable if the consent to arbitrate was not "knowing and voluntary." The ADEA does require a waiver of "a right or claim" under the statute to be "knowing and voluntary," but this provision refers only to substantive rights--not procedural. [FN6] See Seus v. John Nuveen & Co., Inc., 146 F.3d 175, 181 (3d Cir.1998), cert. denied, 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999); Williams v. Cigna Fin. Advisors, Inc., 56 F.3d 656, 660 (5th Cir.1995). The Supreme Court has consistently held that, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi Motors Corp. v.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). The Ninth Circuit is the only Circuit to apply the "knowing and voluntary" test to arbitration agreements, see Prudential Ins. Co. of Am. v. Lai, 42 F.3d 1299 (9th Cir.1994), and we now join with other circuit courts and district courts within the Second Circuit in rejecting this heightened standard. See, e.g., Seus, 146 F.3d at 183 n. 2; Rice v. Brown Bros. Harriman & Co., No. 96 Civ. 6326(MBM), 1997 WL 129396, at *4 (S.D.N.Y. Mar.21, 1997) (citing numerous Southern District cases).

> FN6. 29 U.S.C. § 626(f)(1) provides in pertinent part: "An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary."

Here, as in Gilmer, "there is no indication" that Hart, "an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application." 500 U.S. at 33, 111 S.Ct. 1647. He claims that he was not provided with copies of the relevant NASD Manuals or NYSE Rules and that he "assumed [the Form U-4] was just more paperwork." However, under general contract principles, absent a showing of fraud or other unlawful behavior, *401 "plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract," including the NASD and NYSE arbitration provisions incorporated therein by reference. [FN7] Rice, 1997 WL 129396, at *4. See also Smith v. Lehman Bros., Inc., No. 95 Civ. 10326(JSM), 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996) and cases cited therein.

> FN7. Notwithstanding the irrelevance of Hart's subjective knowledge with respect to the arbitration rules, at Hart's level of employment within the defendant corporations, he was certainly aware of the prevalence of arbitration agreements in the securities industry and, as a savvy businessman, should have taken the time to review the materials referenced in the Form U-4 that he signed.

The format of the Form U-4 only strengthens this presumption: (1) the arbitration provision is encompassed in a section beneath the heading "THE APPLICANT MUST READ THE FOLLOWING CAREFULLY;" (2) the first paragraph in this section expressly states, "I swear or affirm that I have read and understand the items and instructions on this form;" and (3) plaintiff has acknowledged the authenticity of his signature at the end of this section. The fact that Hart may not have been provided with or reviewed the NASD and NYSE manuals does not render the arbitration agreement unenforceable. See Berger v. Cantor Fitzgerald Sec., 967 F.Supp. 91, 95-96 (S.D.N.Y.1997) (compelling arbitration although employee not provided with copy of NASD manual); Cular v. Metro. Life Ins. Co., 961 F.Supp. 550, 556 (S.D.N.Y.1997) (same). The Form U-4 signed by Hart created a valid and enforceable arbitration agreement.

## II. The Scope of the Agreement

The arbitration provision found at paragraph 5 on page 4 of the Form U-4 provides:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

The organizations identified in Item 10 of the Form U-4 are the NASD and NYSE. Thus, plaintiff agreed to arbitrate disputes as required under the NASD Manual-Code of Arbitration Procedure ("NASD Code") and the NYSE Constitution and Rules ("NYSE Rules") as such may be amended from time to time. The relevant rules pertaining to arbitration are Rules 10101 and 10201(a) of the NASD Code and NYSE Rules 347 and 600(a).

### A. The NASD Code

[8] At the time Hart signed his Form U-4 and on the date he commenced this action (June 9, 1998), Rule 10101 of the NASD Code provided for arbitration of "any dispute, claim, or controversy ... arising out of the employment or termination of employment of associated person(s) with any member." Similarly, Rule 10201(a) provided in pertinent part that:

> [a]ny dispute, claim, or controversy ... between or among members and/or associated persons, and/or certain others ... arising out of the employment or

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



termination of employment of such associated person(s) with such member, shall be arbitrated under this Code. [FN8]

FN8. It is undisputed that Wood Gundy Corp. was, and OPCO is, a "member" of the NASD. Plaintiff, as an officer of Wood Gundy Corp. (i.e., Managing Director) was an "associated person" within the meaning of Rule 10101. See NASD By-Laws, Art. I(ee); Cular, 961 F.Supp. at 556 (employees of member are "associated persons"). Finally, the Bank, CIBC, Inc. and Wood Gundy, Inc. (collectively, the "Affiliated Companies") are "certain others" within the meaning of Rule 10201(a). See McMahan Sec. Co. v. Forum Capital Markets L.P., 35 F.3d 82, 87-88 (2d Cir.1994) (corporate defendants "sufficiently immersed in the underlying controversy" or "closely affiliated with numerous parties enmeshed in the underlying dispute" may compel arbitration as "certain others" under NASD Code); see also Essex Corp. v. Independent Fin. Mktg. Group, Inc., 994 F.Supp. 532, 536 (S.D.N.Y.1998); Heller v. MC Fin. Servs. Ltd., No. 97 Civ. 5317(WK), 1998 WL 190288, at *3 (S.D.N.Y. Apr.21, 1998); In re Salomon Inc., No. 91 Civ. 5500(RPP), 1994 WL 533595, at *5-6 (S.D.N.Y. Sept.30, 1994). *402 On June 22, 1998, the SEC approved an amendment to this Rule providing that "claims alleging employment discrimination, including sexual harassment, in violation of a statute are not required to be arbitrated by NASD rules." SEC Release No. 34-40109, 63 Fed.Reg. 35299, 35301, 1998 WL 339422. [FN9] "This means that such claims may be filed in the appropriate court, if the employee chooses to do so and is not under an enforceable predispute obligation to arbitrate the dispute." 63 Fed.Reg. at 35301.

FN9. An employee may, however, agree to arbitrate after a dispute has arisen. See 63 Fed.Reg. at 35301.

Plaintiff argues that he agreed to comply with the NASD Code "as amended from time to time" and therefore is not required to arbitrate his claim. However, the rule change did not become effective until January 1, 1999 and the NASD Regulation expressly states that the rule change applies only "to claims filed on or after the effective date of the rule change." 63 Fed.Reg. at 35301. In approving the amendment, the SEC noted that "this method is the

one most commonly used with regard to changes to the Code and is the most efficient to administer." Id.

The relevant provisions of the SEC Release are clear and unambiguous. Further, they are in accord with numerous decisions in this Circuit holding that "it is the NASD Code in existence at the time an action is commenced that governs." Hall v. MetLife Resources, No. 94 Civ. 0358(JFK), 1995 WL 258061, at *4 (S.D.N.Y. May 3, 1995) (citing Scher v. Equitable Life Assurance Soc., 866 F.Supp. 776 (S.D.N.Y.1994)); see also Moore v. Interacciones Global, Inc., No. 94 Civ. 4789(RWS), 1995 WL 33650, at *5 (S.D.N.Y. Jan.27, 1995) (phrase "as amended from time to time" in Form U-4 means plaintiff "must comply with the NASD Code as it existed at the time [he] commenced the action"). Indeed, plaintiff admits that the effective date of the amendment is January 1, 1999 but argues that compelling arbitration of plaintiff's claims would "fly in the face of public policy." This Court cannot, however, disregard legal precedent and the clear intent of the SEC to apply the amendment only to claims filed in court on or after January 1, 1999. Plaintiff is bound by the NASD Code as it existed on June 9, 1998.

B. The NYSE Constitution and Rules

[9] At the time Hart signed his Form U-4 and on the date he commenced this action (June 9, 1998), NYSE Rule 347 required the arbitration of "any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative." Similarly, NYSE Rule 600(a) required arbitration of disputes:

between a ... non-member and ... [an] associated person arising in connection with the business of such ... associated person in connection with his activities as an associated person. [FN10]

FN10. Here, it is undisputed that Wood Gundy Corp. was, and OPCO is, a "member" of the NYSE and that the Affiliated Companies are "non-members." Plaintiff was both a "registered representative" of the NYSE within the meaning of Rule 347 and, as an officer of Wood Gundy Corp., an "associated person" within the meaning of Rule 600. See Fleck v. E.F. Hutton Group, Inc., 891 F.2d 1047, 1053-54 (2d Cir.1989); Securities and

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395, *402)

Page 41

Exchange Act of 1934 § 3(a)(21), 15 U.S.C. § 78c(a)(21); Pearce v. E.F. Hutton Group, Inc., 828 F.2d 826, 830 (D.C.Cir.1987). See also In re Salomon Inc., 1994 WL 533595, at *5-6 (non-member parent of member can compel arbitration under NYSE Rules). *403 On December 29, 1998, the SEC amended NYSE Rules 347 and 600 "to exclude claims of employment discrimination, including sexual harassment, in violation of a statute from arbitration unless the parties have agreed to arbitrate the claim after it has arisen." See SEC Release No. 34-40858, 64 Fed.Reg. 1051, 1999 WL 3315.

[10] Unlike the NASD, the NYSE rule change is silent on the issue of retroactivity and the SEC Release did not provide an effective date other than the date of approval, here December 29, 1998. The SEC Release provides some guidance, however, by comparing the NASD and NYSE rule changes. In its response to comment letters, the SEC "noted that its proposal is substantially similar to the NASD's recent rule change, since both leave parties' substantive rights and remedies largely unchanged." 64 Fed.Reg. at 1053. The only differences discussed pertain to the NYSE's strict prohibition of pre-dispute arbitration agreements versus the NASD's approach of enforcing private pre-dispute agreements. See id. It would have been logical to discuss a difference in the retroactivity of the rule changes as well. Given the silence of the release on this point, and in light of the SEC's knowledge of the NASD amendments, we find that the NYSE amendments apply to all claims filed in court on or after December 29, 1998. Plaintiff is, therefore, bound by the NYSE Code as it existed on June 9, 1998.

C. Scope of the Arbitration Agreement

[11][12][13] In accordance with the "liberal federal policy favoring arbitration agreements," the FAA requires courts to construe the NASD and NYSE arbitration provisions as broadly as possible and to resolve "any doubts concerning the scope of arbitrable issues ... in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Indeed, broadly worded arbitration provisions create a presumption of arbitrability such that a court must compel arbitration "unless it may be said with positive assurance that the arbitration

clause is not susceptible of an interpretation that covers the asserted dispute." Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir.1998) (quotation and citation omitted).

Applying these principles, all of plaintiff's claims fall within the scope of the NASD and NYSE compulsory arbitration provisions as they existed when this action was commenced. This conclusion is overwhelmingly supported by case law and is seemingly unchallenged by plaintiff. See, e.g., Gilmer, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (ADEA claim within scope of NYSE Rules); Fleck, 891 F.2d at 1053-54 (employment-related defamation and other tort claims within scope of NASD and NYSE arbitration rules); Schuetz, 1997 WL 452392, at *3 (Title VII claims within scope of NASD Code) (collecting cases); Hall, 1995 WL 258061, at *3 (same); Chisolm v. Kidder, Peabody Asset Mgmt., Inc., 810 F.Supp. 479 (S.D.N.Y.1992) (breach of contract, breach of implied contract and age discrimination claims within scope of NASD and NYSE rules).

III. Arbitrability of ADEA Claims

[14] Hart must be compelled to arbitrate his age discrimination claim unless he can show "that Congress intended to preclude a waiver of a judicial forum for ADEA claims" as evidenced by "the text of the ADEA, its legislative history, or an 'inherent conflict' between arbitration and the ADEA's underlying purposes." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647. Plaintiff's burden in this respect is a heavy one given the Supreme Court's dictate that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Id. (quoting Moses H. Cone, 460 U.S. at 24, 103 S.Ct. 927).

As in Gilmer, plaintiff "concedes that nothing in the text of the ADEA or its legislative history explicitly precludes arbitration." 500 U.S. at 26, 111 S.Ct. 1647. *404 Rather, plaintiff argues that arbitration is inconsistent with the ADEA because of the inadequacy of arbitration procedures. Numerous arguments with respect to arbitration procedures were rejected by the Gilmer Court and the ADEA was held not to preclude compulsory arbitration. Thus, unless plaintiff can exceed the proof of such "inherent conflict" offered by the plaintiff in Gilmer, the same result must follow here. [FN11]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395, *404)

Page  42

FN11. Because Hart's arguments concerning the inadequacies of arbitration are equally applicable to Title VII claims, they will be addressed below in connection with both statutory claims.

IV. Arbitrability of Title VII Claims

[15] The Supreme Court has not yet ruled on whether its reasoning in Gilmer should be extended to the arbitration of disputes arising under Title VII. However, the majority of circuit courts have held that Title VII, as amended, does not preclude arbitration. See, e.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith Inc., 170 F.3d 1, 6-11 (1st Cir.1999); Seus, 146 F.3d at 179, 182-83 (3d Cir.1998); Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1062 (11th Cir.1998); Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1130 (7th Cir.1997); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir.1997); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1467-68 (D.C.Cir.1997); Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 882 (4th Cir.1996); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir.1994); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 308, 312 (6th Cir.1991); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir.1991). Only the Ninth Circuit has arrived at the opposite conclusion. See Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.), cert. denied, 525 U.S. 982, 119 S.Ct. 445, 142 L.Ed.2d 399 and 525 U.S. 996, 119 S.Ct. 465, 142 L.Ed.2d 418 (1998) (Nos. 98-237 and 98-409). The Court of Appeals for the Second Circuit has not yet considered the issue, but the weight of authority within the circuit supports the conclusion that mandatory arbitration of Title VII claims is not precluded by the statute. See, e.g., Desiderio, 2 F.Supp.2d at 520; Rand v. J.C. Bradford & Co., No. 98 Civ. 4906(DLC), 1998 WL 872421, at *4 (S.D.N.Y. Dec. 15, 1998) (citing cases); Bishop v. Smith Barney, Inc., No. 97 Civ. 4807(RWS), 1998 WL 50210, at *7 (S.D.N.Y. Feb.6, 1998) (citing cases).

Relying primarily on Duffield and the district court's decision in Rosenberg, plaintiff argues that the 1991 Civil Rights Act ("1991 CRA"), amending Title VII, demonstrates a congressional intent to prohibit enforcement of pre-dispute agreements to arbitrate Title VII claims. [FN12] Section 118 of

the 1991 CRA provides:

FN12. In support of this argument, plaintiff also cites Martens v. Smith Barney, Inc., 181 F.R.D. 243 (S.D.N.Y.1998). The Martens Court, however, did not hold Congress intended to prohibit prospective agreements to arbitrate Title VII claims. Rather "in the inapposite context of determining whether it possessed subject matter jurisdiction to evaluate a settlement," the court held that "plaintiffs would not be collaterally estopped" from making such an argument. Rand, 1998 WL 872421, at *4.

[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.
Civil Rights Act of 1991, Pub.L. No. 102-166, § 118, 105 Stat. 1071, 1081 (1991). In Rosenberg, the district court found that the language and legislative history of this section "unambiguously reject mandatory arbitration agreements." Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, 995 F.Supp. 190, 201 (D.Mass.1998), aff'd on other grounds, 170 F.3d 1 (1st Cir.1999). In particular, the court held that the phrase "where appropriate and to the extent authorized by law" codified the Supreme *405 Court decision in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) which allegedly created an absolute prohibition of prospective waivers of the right to a judicial forum for employment discrimination claims. The Ninth Circuit reached a similar conclusion in Duffield, 144 F.3d 1182.

First, it should be noted that the First Circuit affirmed Rosenberg on different grounds and expressly rejected the district court's finding with respect to the arbitrability of Title VII claims. See Rosenberg, 170 F.3d at 4-11 ("We find no conflict between the language or purposes of Title VII, as amended, and arbitration"). Second, the decision of the Ninth Circuit Court of Appeals in Duffield is not binding on this Court, and we decline to adopt its reasoning, as the courts of appeals for most other circuits have done. It is more likely that the language "where appropriate and to the extent authorized by law" is a reference to the FAA and the current state of the law of arbitrability with regard to federal statutory employment discrimination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

claims, rather than a snapshot of the law as it existed when the 1991 CRA was drafted (i.e., a reference to a particular Supreme Court case). [FN13] See Seus, 146 F.3d at 183 (noting its disbelief that "this straightforward declaration of the full Congress [§ 118] can be interpreted to mean that the FAA is impliedly repealed"); Koveleskie v. SBC Capital Markets, Inc., 167 F.3d 361, 365 (7th Cir.1999). Indeed, the legislative history referenced by plaintiff shows that Congress was aware of the Gilmer decision, and the growing concern over compulsory pre-dispute arbitration agreements, yet chose not to alter the wording of § 118 to preclude arbitration in such instances. We therefore hold that neither the text of Title VII, as amended, nor its legislative history evince a congressional intent to preclude compulsory arbitration of Title VII claims.

> FN13. Even if Congress did intend to reference Gardner-Denver, the decision of this Court would not be different. Gardner-Denver addressed the prospective waiver of judicial forum rights by union representatives in connection with the negotiation of a collective-bargaining agreement. See Alexander v. Gardner-Denver, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The case at hand deals with an individually executed Form U-4, not a collective-bargaining agreement. This distinction was recognized by the Supreme Court in Gilmer, 500 U.S. at 35, 111 S.Ct. 1647, and again in Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, ----, ----, 119 S.Ct. 391, 395, 396, 142 L.Ed.2d 361 (1998). The Wright Court also made clear that Gilmer is still good law.

## V. Challenges to the Adequacy of the Arbitral Forums

[16] Hart asserts that "[t]he Second Circuit has recently acknowledged the inadequacies existent in the arbitral forum in an ADEA case where arbitration was compelled pursuant to a Form U-4 Agreement." (Plaintiff's Mem. at ¶ 80 citing Halligan v. Piper Jaffray, Inc., 148 F.3d 197 (2d Cir.1998), cert. denied, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999)). Plaintiff's reliance on Halligan, however, is misplaced. The court expressly stated that it did "not address Mrs. Halligan's generalized challenge to arbitrations conducted under the aegis of the NASD." Halligan, 148 F.3d at 203. Rather, the arbitral award at issue was vacated upon the Second Circuit's conclusion

that the particular arbitrators involved had "manifestly disregarded the law or the evidence or both." Id. at 204. As defendants correctly point out, the Halligan decision, if anything, confirms that an individual's statutory rights are not waived by submitting claims to arbitration because a district court has the authority to vacate any award issued in manifest error.

In further reliance on the district court decision in Rosenberg, plaintiff also argues that the NYSE arbitration procedures are inadequate due to "institutional bias" or "structural imbalance." In affirming the district court's decision on other grounds, however, the Court of Appeals for the First Circuit stated that, "[i]n reaching this conclusion [regarding "structural *406 bias"], the district court committed two types of errors"--one of law and one of fact. Rosenberg, 170 F.3d at 13-17. The legal error was the refusal to compel arbitration based upon alleged structural infirmities despite finding "no actual bias in the NYSE's arbitration system." Id., at 13. The Court then cited numerous factual errors involving the district court's description of the NYSE's arbitration procedures. For instance, the district court had "mischaracterized both Merrill Lynch's role in the NYSE and NYSE arbitration procedures." Id. at 15. Indeed, rather than constituting a majority of the NYSE board, "representatives of the securities industry actually occupy a minority of seats on the NYSE's board." Id. Further, the circuit court found that "the NYSE is subject to regulation by the SEC" which "possesses 'expansive power to ensure the adequacy of the arbitration procedures' " and that "[r]ather than being controlled by the securities industry, the NYSE plays a significant role in monitoring and disciplining exchange members for noncompliance with its rules." Id. Moreover, the district court was found to have erred in its description of specific arbitration procedures, "including its description of the pool of potential arbitrators, and in equating the NYSE's appointment of arbitrators with appointment of arbitrators by a trade association." Id. The Rosenberg court also noted that, contrary to the plaintiff's assertions, and as affirmed in Gilmer: (1) the "the NYSE arbitration rules ... provide protections against biased panels," Rosenberg, 170 F.3d at 14; (2) "NYSE rules do not limit available relief;" and (3) "NYSE arbitrators possess discretion to award costs and fees when they decide a dispute." Id., at 16. Finally, plaintiff's argument that the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



43 F.Supp.2d 395
(Cite as: 43 F.Supp.2d 395, *406)

Page 44

NYSE policy of not issuing written opinions renders the arbitral forum inadequate was expressly rejected in Gilmer. 500 U.S. at 31-32, 111 S.Ct. 1647. Thus, plaintiff has failed to prove that he cannot effectively vindicate his statutory rights in either the NASD or NYSE arbitral forum. Accordingly, this Court must compel arbitration of the claims set forth in plaintiff's complaint and stay judicial proceedings in this action pending such arbitration.

### VI. Motion to Dismiss Count V

[17][18] Defendants have moved this Court to dismiss Count V of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and to compel the parties to arbitrate all claims that survive the motion to dismiss. The FAA, however, "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). As discussed above, the relevant NASD and NYSE arbitration provisions require Hart to arbitrate all disputes "arising out of [his] employment or termination of employment." Count V of the complaint alleges that "Mr. Michael Capatides and Defendants' senior management conspired to deprive Lewis Hart" of his rights to a judicial forum for his Title VII and ADEA claims by forcing him to transfer to Wood Gundy Corp. The issues raised by this allegation clearly fall within the scope of the arbitration agreement entered into by Hart. The Court, therefore, has no discretion under the FAA and "must direct the parties to arbitration on these issues." The arbitration panel has authority to determine whether or not plaintiff is entitled to relief based upon the allegation contained in Count V. Accordingly, all judicial proceedings are hereby stayed and the Court reserves decision on defendants' motion to dismiss pending arbitration.

### CONCLUSION

For the reasons discussed above, defendants' motion to compel arbitration and for a stay of proceedings pending arbitration is granted. The parties are directed to proceed with arbitration forthwith, and to advise the Court of the status of arbitration *407 by September 17, 1999 unless a decision is rendered by the arbitrators prior to that date. The Court reserves decision on defendants'

motion to dismiss Count V pending arbitration.

SO ORDERED.

43 F.Supp.2d 395, 81 Fair Empl.Prac.Cas. (BNA) 31

END OF DOCUMENT

 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**4**

52 Cal.App.3d 706
125 Cal.Rptr. 147
(Cite as: 52 Cal.App.3d 706)

LEONARD VERNON, Plaintiff and Respondent,
v.
DREXEL BURNHAM & CO.
INCORPORATED, Defendant and Appellant

Civ. No. 45592.

Court of Appeal, Second District, Division 1,
California.

October 23, 1975.

SUMMARY

Two attorneys brought a class action against 25 stockbrokers to recover damages for the brokers' overcharge on margin accounts. The trial court sustained demurrers, with leave to amend as to the original complaint, on the ground that plaintiff attorneys lacked standing to sue as they were customers of only one of the 25 defendant brokers and could sue as representatives of a class composed of the customers of the brokerage house which they patronized, but not of other brokers engaged in the alleged parallel conduct. The attorneys filed an amended complaint adding a party plaintiff, naming as defendants a brokerage firm of which the attorneys were customers, and another broker with which the added plaintiff had a margin account. Subsequently, the brokerage firm doing business with the attorneys went through bankruptcy, leaving the added plaintiff as titular plaintiff and his brokerage firm as the sole remaining defendant. The remaining defendant filed a petition seeking a court order compelling arbitration as to plaintiff pursuant to an arbitration clause contained in a margin account agreement signed by plaintiff. The trial court found that an order compelling plaintiff to arbitrate his controversy solely with defendant would disqualify him as a representative plaintiff in a class action and deprive the alleged class of its representative, and held that in the clash between the policy of law favoring arbitration and the policy that class actions shall not be subverted by depriving the class of its representative, the policy against subversion of class actions should prevail. Accordingly, the trial court denied the petition to arbitrate without prejudice to renewal upon a showing that every member of the class was bound by an arbitration provision, that the class is subject to division into subclasses, *707 some of which were bound by arbitration provisions, and that proceedings to divide the class into subclasses for such purpose shall be undertaken. (Superior Court of Los Angeles County, No. CA-000084, Harry L. Hupp, Judge.)

The Court of Appeal reversed and remanded with directions to order arbitration. The court noted that the trial court's denial of the petition for an order to arbitrate was based on the incorrect premise that if arbitration was ordered solely as between the parties, it would disqualify plaintiff as the representative of the class. It held, however, that if plaintiff did proceed alone to arbitration it would not mechanically render him unfit to represent a class or subclass of customers of defendant similarly situated, and the determination whether or not plaintiff could fairly and adequately protect that class rested in the sound discretion of the trial court. The court further held that in the present case the policy of law favoring arbitration prevailed over the policy of law pertaining to class actions, for the reasons that arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve; that there is perhaps no higher public policy than to uphold and give effect to contracts validly entered into and legally permissive in subject matter, such as the arbitration provision; and that the substantive law of contractual agreement takes precedence over the class action, which is merely a procedural device for consolidating matter properly before the court. The court also held that no basis existed for employment of the doctrine of adhesion contracts to avoid arbitration, and that the trial court properly found that the arbitration clause was enforceable and binding on plaintiff. (Opinion by Hanson, J., with Wood, P. J., and Thompson, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect. Where arbitration is not mandated by statute, but is a matter of contract, it is the role of the court to determine whether a party resisting arbitration has agreed to arbitrate.

 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



52 Cal.App.3d 706
(Cite as: 52 Cal.App.3d 706, *707)

Page 57

(2) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Validity. No basis existed for employment of the *708 doctrine of adhesion contracts to avoid arbitration, and the trial court properly found that an arbitration clause in a margin account agreement between a stock broker and customer was enforceable and binding on the customer, where the agreement was in large bold type and the arbitration provision was contained in a numbered paragraph of the same size of print and easily readable; where there was no showing that arbitration would be contrary to the reasonable expectations of any party or that any loss or unfair imposition would result; and where the agreement was not offered on a "take it or leave it" basis, nor did the subject matter ascend to a public "need" status. Furthermore, the agreement was not invalid for lack of mutual assent to the arbitration provision on the ground plaintiff was unaware of the clause for not having read it.

(3a, 3b) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect. In a class action by a margin account customer against a brokerage firm for damages for overcharge of interest, the trial court's denial of defendant's petition for arbitration pursuant to a valid and enforceable arbitration provision, on the ground that the policy of the law that class actions shall not be subverted by depriving the class of its representative should prevail over the policy of law in favor of arbitration, required reversal. Under the circumstances, the policy of law favoring arbitration should prevail over the policy pertaining to class actions, for the reasons that arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve; that there is no higher public policy than to uphold and give effect to contracts validly entered into and legally permissible in subject matter, and the arbitration provision was an integral part of a valid and enforceable contract; and that the substantive law of contractual agreement takes precedence over the class action, which is merely a procedural device for consolidating matters properly before the court.

[See Cal.Jur.3d, Arbitration and Award, § 1; Am.Jur.2d, Arbitration and Award, § 5.]

(4) Parties § 6--Suing on Behalf of Class--Arbitration. In a class action by a customer against

a brokerage firm for damages for overcharge of interest rates, in which the brokerage firm petitioned for arbitration pursuant to a valid and enforceable provision in the margin account agreement, the fact that plaintiff alone proceeded to arbitration would not mechanically render him unfit to represent a *709 class or subclass of customers of the brokerage firm similarly situated. The determination of whether or not plaintiff could fairly and adequately protect that class rested in the sound discretion of the trial court, although plaintiff might be disqualified to act as a representative plaintiff to subclasses of customers of the brokerage firm where the arbitration clause was not a factor.

(5) Parties § 6--Suing on Behalf of Class--Arbitration. A class action cannot be used to subvert an otherwise enforceable agreement to arbitrate contained in a valid contract merely because other individuals, who might qualify as members of a class, were subject to the same provision.

COUNSEL

Stephens, Jones, La Fever & Smith, R. Wicks Stephens II, Eugene W. Bell, Martin L. Mandel and Lawrence D. Lewis for Defendant and Appellant.

Rich & Ezer and Mitchel J. Ezer for Plaintiff and Respondent.

HANSON, J.

The Case

On November 19, 1973, Attorneys Richard P. Rich and Mitchel J. Ezer "on behalf of themselves and all other persons similarly situated," as plaintiffs and attorneys of record for plaintiff-respondent, filed an action entitled, "Complaint Class Action for Fraud and Deceit; Money Had and Received; Usury" (superior court case No. CA-000084). [FN1] Named as one of the defendants was Drexel Burnham & Co., Incorporated, formerly known as Burnham & Co., Inc., a corporation, appellant herein (hereinafter Drexel Burnham), along with 24 other corporations and 500 Does. The action sought to include as plaintiffs in the class "those persons who have purchased securities from the *710 defendants on margin during the appropriate limitations period immediately preceding the filing

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



of this complaint, at least 100,000 persons." (Italics added.) The complaint alleged that the named plaintiffs Rich and Ezer were damaged in the sum of $266.82, the sum equal to the difference between the "true interest charge" (i.e., interest computed at the points or fractions over prime quoted by defendants to the members of the class) and compounded interest actually charged by defendants and alleged interest overcharges to the class in excess of $1,000,000.

> FN1 We have, on our own motion, pursuant to rule 12(a), California Rules of Court, augmented the record with the superior court file (No. 000084) and reviewed the same in its entirety.

The term "margin account" was described in the complaint as a "customer's account with a stockbroker through which purchases of securities on margin" are made; i.e., the purchase of securities under a financial arrangement with the stockbroker pursuant to which part of the purchase price of the securities is paid by the purchaser, with the balance (the "margin") being collateralized by the securities purchased and financed by the broker to whom the purchaser-borrower pays interest for the amount financed.

The complaint alleged that defendants represented that the interest charges on the class members' balances would be a certain number of points or fractions over "prime," the "prime" or "call rate" being the interest rate at which brokers borrow money from banks in New York City; that the defendants determined interest charges at intervals ranging from 1 to 35 days and added said interest charge to the previously unpaid balance and charged interest on the balance as increased by the interest being charged which was greater than the quoted points or fractions over prime (compounded interest), resulting in actual interest charges greater than the quoted rates.

The trial court sustained demurrers, with leave to amend as to the original complaint, on the ground that the plaintiff attorneys lacked standing to sue as they were customers of only one of the 25 defendant brokers and could sue as representatives of a class composed of the customers of the brokerage house which they patronized, but not of other brokers engaged in alleged parallel conduct.

On April 4, 1974, plaintiff Attorneys Rich and Ezer filed an amended complaint, adding as a party plaintiff, in addition to their names, "Leonard Vernon, on behalf of himself and all other persons similarly situated." The named defendants were Dupont Walston Incorporated, formerly known as Walston & Co., Inc., a corporation, of which plaintiffs Rich and Ezer were customers, and Drexel Burnham, with which *711 Leonard Vernon (hereinafter Vernon) had a margin account. Subsequently Dupont Walston went through bankruptcy leaving plaintiff Vernon, with an individual claim of about $200, as a titular plaintiff and Drexel Burnham as the sole remaining defendant.

On May 1, 1974, Drexel Burnham filed a petition seeking a court order compelling arbitration as to plaintiff Vernon pursuant to an arbitration clause [FN2] contained in a "Margin Account Agreement" signed by Vernon on February 8, 1972.

> FN2 "16. Any controversy between you and the undersigned arising out of or relating to any account, to transactions with or for me or to this contract or the breach thereof, shall be settled by arbitration, in accordance with the rules, then obtaining, of either the Arbitration Committee of the Chamber of Commerce of the State of New York, or the American Arbitration Association, or the Board of Arbitration of the New York Stock Exchange, Inc., as the undersigned may elect. If the undersigned does not make such election by registered mail addressed to you at your main office within five (5) days after receipt of notification from you requesting such election, then the undersigned authorizes you to make such election in behalf of the undersigned. Any arbitration hereunder shall be before at least three arbitrators and the award of the arbitrators, or of a majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction."

On August 3, 1974, the court entered its findings of fact and conclusions of law determining, in pertinent part, that Vernon instituted this class action without first requesting or electing arbitration of the controversy with Drexel Burnham; that Drexel Burnham properly exercised its election in favor of arbitration; that neither Vernon nor Drexel Burnham has alleged or proved that the other

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

52 Cal.App.3d 706
(Cite as: 52 Cal.App.3d 706, *711)

purported members of the class represented by Vernon entered into or were subject to the same or similar agreements; that the arbitration clause is enforceable and binding upon Vernon with respect to his individual controversy with Drexel Burnham; that Drexel Burnham's petition to arbitrate is directed solely to the controversy between Vernon and Drexel Burnham and does not seek to arbitrate the claims of the purported class; that an order compelling Vernon to arbitrate his controversy solely with Drexel Burnham would disqualify him as a representative plaintiff in a class action and deprive the alleged class of its representative; and that "[w]hile the policy of the law is in favor of arbitration, it is also the policy of the law that class actions shall not be subverted by depriving the class of its representative, and in a case such as this the two policies clash. The policy which should prevail is the one against subversion of class actions." *712

The order of August 3, 1974, denying petition to order arbitration was issued without prejudice to renewal upon a showing (1) that every member of the class consisting of all persons who have purchased securities from Drexel Burnham on margin since November 19, 1969 are bound by agreements containing a provision requiring them to arbitrate any dispute arising out of or related to their securities margin account with Drexel Burnham; (2) that the class is subject to division into subclasses, some of which are bound by agreements containing a provision requiring the members of the subclass to arbitrate any dispute arising out of or related to their securities margin account with Drexel Burnham; and (3) that proceedings to divide the class into subclasses for such purpose shall be undertaken in accordance with the Class Action Manual of the court.

Defendant Drexel Burnham appeals from the above order denying its petition for arbitration as to Vernon only. [FN3]

> FN3 Although there is some doubt as to whether the order is appealable, we elect to treat it as appealable.

## Issues

On appeal defendant Drexel Burnham contends that the court below, having found a valid agreement to arbitrate, erred in denying its petition to compel arbitration solely as to Vernon and argues he (Vernon) is disqualified to prosecute a class action because he is not a member of the class he purports to represent and cannot resort to a class action to avoid arbitration.

Plaintiff-respondent Vernon asserts that the arbitration clause is an unenforceable contract of adhesion; but in the event it is held to be enforceable, he contends that he does not lack standing to sue since the class cannot be deprived of its representative.

As to appellant's assertion that respondent is attempting to use the class action device to avoid arbitration, counsel for respondent Vernon during oral argument on appeal stated that: "Mr. Vernon is a titular plaintiff. His individual claim I have estimated out at about $200, and I think even counsel will concede that I have not fought him all the way here and will continue to fight him in order to avoid arbitration in a $200 case. What we are interested in is the class action. ... The interest in this case is the interest of counsel in prosecuting a class action for the possible ultimate recovery of attorney fees out of a fund that's created by a wrong that's been done by the stockbrokers to the public." *713

Vernon urges that to permit Drexel Burnham to arbitrate Vernon's claim alone would result in "a predatory picking off of the representative plaintiff."

## Discussion
### I

The court below found that the arbitration clause was enforceable and was not rendered invalid by reason of the doctrine of adhesion. On appeal plaintiff-respondent Vernon contends that the doctrine of adhesion contracts invalidates the arbitration clause and during oral argument his counsel cited Akin v. Business Title Corp., 264 Cal.App.2d 153 [70 Cal.Rptr. 287], and Gunderson v. Superior Court, 46 Cal.App.3d 138 [120 Cal.Rptr. 35], in support of this contention, both of which are factually distinguishable. Akin involved an exculpatory clause in an escrow agreement intended to insulate the escrow company from its own ordinary negligence. In Gunderson, a medical malpractice action, the reviewing court ordered issuance of a peremptory writ of mandate directing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



52 Cal.App.3d 706
(Cite as: 52 Cal.App.3d 706, *713)

Page 60

the trial court to vacate the order to arbitrate and to enter an order denying defendants' petition predicated on a waiver of the arbitration clause contained in a form signed by plaintiff mother of a minor child when she brought the child to defendant medical clinic for treatment, and did not reach plaintiff's contention that the arbitration agreement was invalid and unenforceable.

(1) Where arbitration is not mandated by statute, but is a matter of contract, it is the role of the court to determine whether a party resisting arbitration has agreed to arbitrate. (Retail Clerks Union v. Thriftimart, Inc. (1963) 59 Cal.2d 421, 425-427 [30 Cal.Rptr. 12, 380 P.2d 652]; Unimart v. Superior Court (1969) 1 Cal.App.3d 1039, 1045 [82 Cal.Rptr. 249].)

(2) We hold that no basis exists in the present case for employment of the doctrine of adhesion contracts to avoid arbitration and that the court below properly found that the arbitration clause is enforceable and binding on Vernon for the following reasons:

First, the document in question, in large bold type, is entitled "Margin Account Agreement between Burnham & Company, Inc. and Leonard Vernon." Although the agreement was prepared by the appellant company, it is in letter form commencing, "To: Burnham & Company, *714 Inc. [¶] Gentlemen: [¶] In consideration of your accepting one or more accounts of the undersigned ... and your agreeing to act as brokers for the undersigned in the purchase or sale of securities, the undersigned agrees as follows:" followed by eighteen (18) numbered paragraphs which are of the same size of print and easily readable, No. 16 containing the arbitration provision (see fn. 2). Respondent Vernon does not contend he did not sign the agreement and his signature appears 13 lines below the arbitration clause on the same page.

Respondent Vernon in his declaration attached to his memorandum in opposition to the petition to order arbitration filed in the court below stated that after he spoke to Drexel Burnham's customer's representative who told him he would send him a "Margin Account Agreement" to sign and return, stated: "I received the Agreement on February 7, 1972; glanced at (but did not read) it; and signed and returned it to Mr. Haft at Burnham on the

following day. I did not know that the Agreement contained an arbitration clause, either then or at any time thereafter until my attorneys brought it to my attention a few days ago following their receipt of the Petition to Order Arbitration herein."

Vernon contends that the agreement is not binding because of lack of mutual assent to the arbitration provision since he was unaware of the clause because he did not read it. This contention is not meritorious. He is in effect asking for retrospective unilateral contractual immunity which is contrary to the law of California. To this same contention the court in Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 24 Cal.App.3d 35 [100 Cal.Rptr. 791], said at page 42: "'But failure to read a contract before signing is not in itself a reason to refuse its enforcement. (Oakland Bank of Commerce v. Washington (1970) 6 Cal.App.3d 793, 800 [86 Cal.Rptr. 276].)' ( Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, at p. 671; Federico v. Frick (1970) 3 Cal.App.3d 872, 875 [84 Cal.Rptr. 74].)" (See also Currin v. Currin, 125 Cal.App.2d 644 [271 P.2d 61]; Larrus v. First National Bank, 122 Cal.App.2d 884 [266 P.2d 143].)

Second, here, as in Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal.App.3d 668 [97 Cal.Rptr. 811] (where the reviewing court reversed an order denying arbitration), there is no showing "that arbitration would be contrary to the reasonable expectations of any party or that any loss or unfair imposition would result." (Page 672.)

Finally, the record on appeal reflects that the letter agreement is not a contract of adhesion because it was not, under the circumstances of this *715 case, offered on a "take it or leave it" basis nor does the subject matter ascend to a public "need" status, which are several fundamental reasons for invoking the doctrine.

II

(3a) The court below, after finding the arbitration clause valid and enforceable, held that the policy of the law that class actions shall not be subverted by depriving the class of its representative clashes with the policy of the law in favor of arbitration and that the former policy should prevail. The court for that reason denied Drexel Burnham's petition to arbitrate without prejudice to renewal upon a showing that

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



52 Cal.App.3d 706                                         Page   61
(Cite as: 52 Cal.App.3d 706, *715)

the members of the class, or a divisible subclass, are bound by the same or similar arbitration provisions.

(4)(See fn. 4.) The trial court's denial of appellant's petition for an order to arbitrate is based on an incorrect premise [FN4] and concludes by favoring one policy of the law over another. With this we disagree.

> FN4 The incorrect premise is that if arbitration was ordered solely as between the parties that would disqualify Vernon as the representative of the class. We hold that if Vernon did proceed alone to arbitration it would not mechanically render him unfit to represent a class or subclass of customers of Drexel Burnham similarly situated. The determination whether or not Vernon can fairly and adequately protect that class rests in the sound discretion of the trial court (see La Sala v. American Sav. & Loan Assn., 5 Cal.3d 864, 871 [97 Cal.Rptr. 849, 489 P.2d 1113]), although, of course, Vernon may be disqualified to act as a representative plaintiff to subclasses of customers of Drexel Burnham, if any, where the arbitration clause is not a factor. (See Petherbridge v. Altadena Fed. Sav. & Loan Assn., 37 Cal.App.3d 193 [112 Cal.Rptr. 144].)

(3b) We hold that, in the instant case, the policy of law favoring arbitration prevails over the policy of law pertaining to class actions for the following reasons:

First, clearly arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve. (Gunderson v. Superior Court, 46 Cal.App.3d 138, 143 [120 Cal.Rptr. 35]; Federico v. Frick, 3 Cal.App.3d 872, 876 [84 Cal.Rptr. 74].) There is a strong public policy in favor of arbitration agreements and the law is designed to encourage persons "who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing." (Utah Const. Co. v. Western Pac. Ry. Co., 174 Cal. 156, 159 [162 P. 631].) Arbitration provides a means of giving effect to the intention of the parties, easing court congestion, and providing a method more expeditious and less expensive for the resolution of disputes. (Player v. Geo. M. Brewster & Son, Inc., 18 Cal.App.3d 526 [96 Cal.Rptr. 149]; McRae v. *716 Superior Court,

221 Cal.App.2d 166 [34 Cal.Rptr. 346, 98 A.L.R.2d 1239].)

Second, there is perhaps no higher public policy than to uphold and give effect to contracts validly entered into and legally permissible in subject matter. The arbitration provision in the instant case is an integral part of a valid and enforceable contract. The sanctity of valid contractual agreements in a free society, such as ours, is of paramount importance and is rooted in both the United States and California Constitutions, which predate and outweigh the body of law on class actions as presently evolving.

Finally, the substantive law of contractual agreement takes precedence over the class action, which is merely a procedural device for consolidating matters properly before the court. "Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends - to sacrifice the goal for the going." (City of San Jose v. Superior Court, 12 Cal.3d 447, 462 [115 Cal.Rptr. 797, 525 P.2d 701].)

(5) A class action cannot be used to subvert an otherwise enforceable agreement to arbitrate contained in a valid contract merely because other individuals, who might qualify as members of a class, were subject to the same provision. (Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 20 Cal.App.3d 668; Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 24 Cal.App.3d 35.) "If the agreement is valid, it is valid as to all members of the class. It would be inappropriate to allow respondent and the other members of the class he claims to represent to evade the terms of the agreement simply by bringing their action together as a 'class' rather than as individuals." (Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 20 Cal.App.3d at p. 672.)

### Disposition

The order denying arbitration without prejudice is reversed. The matter is remanded with directions to vacate the order denying the petition to order arbitration and to enter an order granting the petition. [FN5]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



52 Cal.App.3d 706
(Cite as: 52 Cal.App.3d 706, *716)

FN5 Due to the present posture of the case at bench we do not address ourselves to nor intend to reach the issue as to the maintainability of the class action itself. (See fn. 4, ante.)

Wood, P. J., and Thompson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 14, 1976. Mosk, J., was of the opinion that the petition should be granted. *717

Cal.App.2.Dist.,1975.

Vernon v. Drexel Burnham & Co., Inc.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

5

105 S.Ct. 3346                                                                          Page 64
87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669
(Cite as: 473 U.S. 614, 105 S.Ct. 3346)

Supreme Court of the United States

MITSUBISHI MOTORS CORPORATION,
Petitioner
v.
SOLER CHRYSLER-PLYMOUTH, INC.
SOLER CHRYSLER-PLYMOUTH, INC.,
Petitioner
v.
MITSUBISHI MOTORS CORPORATION.

Nos. 83-1569, 83-1733.

Argued March 18, 1985.
Decided July 2, 1985

Automobile manufacturer brought action against
automobile dealer for nonpayment of stored
vehicles, contractual storage penalties, damage to
manufacturer's warranties and good will, expiration
of distributorship, and other breaches of sales
procedure agreement. Dealer counterclaimed for
violations of the Sherman Act, the Automobile
Dealers' Day in Court Act, Puerto Rico Dealers'
Act and Puerto Rico antitrust and unfair competition
statutes. The United States District Court for the
District of Puerto Rico, Gilberto Gierbolini-Ortiz,
J., ordered arbitration of claims and counterclaims,
and dealer appealed. The First Circuit Court of
Appeals, Kaufman, Circuit Judge, 723 F.2d 155,
reversed in part, affirmed in part and remanded, and
certiorari was granted. The Supreme Court, Justice
Blackmun, held that antitrust dispute was subject to
arbitration under the Arbitration Act.

Affirmed in part and reversed in part and
remanded.

Justice Stevens with whom Justice Brennan joined,
and with whom Justice Marshall joined except as to
Part II, filed a dissenting opinion.

Opinion on remand, 814 F.2d 844.

West Headnotes

[1] Alternative Dispute Resolution    137
25Tk137
(Formerly 33k7  Arbitration)
There is no warrant in the Arbitration Act [9
U.S.C.A. § 1 et seq.] for implying in every contract

within its ken a presumption against arbitration of
statutory claims.

[2] Alternative Dispute Resolution    137
25Tk137
(Formerly 33k7  Arbitration)

[2] Federal Courts    403
170Bk403
First task of a court asked to compel arbitration of a
dispute is to determine whether parties agreed to
arbitrate dispute, and court is to make that
determination by applying federal substantive law of
arbitrability, applicable to any arbitration agreement
within coverage of the Arbitration Act [9 U.S.C.A.
§ 1 et seq.].

[3] Alternative Dispute Resolution    137
25Tk137
(Formerly 33k7  Arbitration)

[3] Alternative Dispute Resolution    138
25Tk138
(Formerly 33k7.1  Arbitration)
As with any other contract, parties' intentions
control regarding arbitrability of a claim, but those
intentions are generously construed as to issues of
arbitrability.

[4] Alternative Dispute Resolution    143
25Tk143
(Formerly 33k7.5  Arbitration)
Nothing prevents a party from excluding statutory
claims from scope of agreement to arbitrate.

[5] Alternative Dispute Resolution    200
25Tk200
(Formerly 33k23.14  Arbitration)
In determining arbitrability of an issue, the Court of
Appeals correctly conducted two-step inquiry by
first determining whether parties' agreement to
arbitrate reached statutory issues and then, upon
finding it did, considering whether legal constraints
external to parties' agreement foreclosed arbitration
of claims.

[6] Alternative Dispute Resolution    513
25Tk513
(Formerly 33k7.5  Arbitration)
Concerns of international comity, respect for
capacities of foreign and transnational tribunals and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, 105 S.Ct. 3346)

sensitivity to need of international commercial system for predictability in resolution of disputes all required enforcement of arbitration clause in automobile distributorship agreement with respect to antitrust claims even if contrary result would be forthcoming in a domestic context. 9 U.S.C.A. § 1 et seq.

**[7] Alternative Dispute Resolution    134(5)**
25Tk134(5)
(Formerly 33k6.2, 33k6 Arbitration)
Mere appearance of antitrust dispute does not alone warrant invalidation of selected forum on undemonstrated assumption that arbitration clause in agreement is tainted. 9 U.S.C.A. § 1 et seq.

**[8] Alternative Dispute Resolution    143**
25Tk143
(Formerly 33k7.5 Arbitration)
Potential complexity of antitrust matters does not suffice to ward off arbitration nor does arbitration panel pose too great a danger of innate hostility to constraints on business conduct that antitrust law imposes. 9 U.S.C.A. § 1 et seq.

**[9] Alternative Dispute Resolution    143**
25Tk143
(Formerly 33k7.5 Arbitration)
Importance of private damages remedy in antitrust dispute does not compel conclusion that resolution may not be sought outside an American court by means of arbitration.

**\*\*3347 \*614 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26

S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner-cross-respondent (hereafter petitioner), a Japanese corporation that manufactures automobiles, is the product of a joint venture between Chrysler International, S.A. (CISA), a Swiss corporation, and another Japanese corporation, aimed at distributing through Chrysler dealers outside the continental United States automobiles manufactured by petitioner. Respondent-cross-petitioner (hereafter respondent),

a Puerto Rico corporation, entered into distribution and sales agreements with CISA. The sales agreement (to which petitioner was also a party) contained a clause providing for arbitration by the Japan Commercial Arbitration Association of all disputes arising out of certain articles of the agreement or for the breach thereof. Thereafter, when attempts to work out disputes arising from a slackening of the sale of new automobiles failed, petitioner withheld shipment of automobiles to respondent, which disclaimed responsibility for them. Petitioner then brought an action in Federal District Court under the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, seeking an order to compel arbitration of the disputes in accordance with the arbitration clause. Respondent filed an answer and counterclaims, asserting, inter alia, causes of action under the Sherman Act and other statutes. The District Court ordered arbitration of most of the issues raised in the complaint and counterclaims, including the federal antitrust issues. Despite the doctrine of \*\*3348 American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821 (CA2), uniformly followed by the Courts of Appeals, that rights conferred by the antitrust laws are inappropriate for enforcement by arbitration, the District Court, relying on Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, held that the international character of the undertaking in question required enforcement of the arbitration clause even as to the antitrust claims. The Court of Appeals reversed insofar as the District Court ordered submission of the antitrust claims to arbitration.

Held:

1. There is no merit to respondent's contention that because it falls within the class for whose benefit the statutes specified in the counterclaimswere \*615 passed, but the arbitration clause at issue does not mention these statutes or statutes in general, the clause cannot be properly read to contemplate arbitration of these statutory claims. There is no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims. Nor is there any reason to depart from the federal policy favoring arbitration where a party bound by an arbitration agreement raises claims founded on statutory rights. Pp. 3353-3355.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *615, 105 S.Ct. 3346, **3348)

2. Respondent's antitrust claims are arbitrable pursuant to the Arbitration Act. Concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes, all require enforcement of the arbitration clause in question, even assuming that a contrary result would be forthcoming in a domestic context. See Scherk v. Alberto-Culver Co., supra. The strong presumption in favor of freely negotiated contractual choice-of-forum provisions is reinforced here by the federal policy in favor of arbitral dispute resolution, a policy that applies with special force in the field of international commerce. The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. So too, the potential complexity of antitrust matters does not suffice to ward off arbitration; nor does an arbitration panel pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes. And the importance of the private damages remedy in enforcing the regime of antitrust laws does not compel the conclusion that such remedy may not be sought outside an American court. Pp. 3355-3361.

723 F.2d 155 (CA1 1983), affirmed in part, reversed in part, and remanded.

Wayne A. Cross argued the cause for petitioner in No. 83-1569 and respondent in No. 83-1733. With him on the briefs were Robert L. Sills, William I. Sussman, Samuel T. Cespedes, and Ana Matilde Nin.

Benjamin Rodriguez-Ramon argued the cause for respondent in No. 83-1569 and petitioner in No. 83-1733. With him on the briefs was Jerome Murray.

*616 Jerrold Joseph Ganzfried argued the cause for the United States as amicus curiae supporting respondent in No. 83-1569. With him on the brief were Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Carolyn F. Corwin, Robert B. Nicholson, and Marion L. Jetton.*

* Briefs of amici curiae urging reversal were filed for the American Arbitration Association by Michael F. Hoellering, Joseph T. McLaughlin,

Wayne D. Collins, Alfred Ferrer, Rosemary S. Page, Thomas Thacher, John R. Stevenson, Robert B. von Mehren, Gerald Aksen, Henry P. de Vries, Andreas F. Lowenfeld, and J. Stewart McClendon; and for the National Automobile Dealers Association by Jerry S. Cohen.

Briefs of amici curiae were filed for the International Chamber of Commerce by James S. Campbell and Andrew N. Vollmer; and for the Commonwealth of Puerto Rico by Hector Rivera Cruz, Secretary of Justice of Puerto Rico, E. Edward Bruce, and Oscar M. Garibaldi.

Justice BLACKMUN delivered the opinion of the Court.

The principal question presented by these cases is the arbitrability, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), [1970] 21 U.S.T. 2517, T.I.A.S: No. 6997, of claims arising under the Sherman Act, 15 U.S.C. § 1 et seq., and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.

I

Petitioner-cross-respondent Mitsubishi Motors Corporation (Mitsubishi) is a Japanese corporation which manufactures automobiles and has its principal place of business in Tokyo, Japan. Mitsubishi is the product of a joint venture between, on the one hand, Chrysler International, S.A. (CISA), a Swiss corporation registered in **3349 Geneva and wholly owned by Chrysler Corporation, and, on the other, Mitsubishi Heavy Industries, Inc., a Japanese corporation. The *617 aim of the joint venture was the distribution through Chrysler dealers outside the continental United States of vehicles manufactured by Mitsubishi and bearing Chrysler and Mitsubishi trademarks. Respondent-cross-petitioner Soler Chrysler-Plymouth, Inc. (Soler), is a Puerto Rico corporation with its principal place of business in Pueblo Viejo, Guaynabo, Puerto Rico.

On October 31, 1979, Soler entered into a Distributor Agreement with CISA which provided for the sale by Soler of Mitsubishi-manufactured

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



vehicles within a designated area, including metropolitan San Juan. App. 18. On the same date, CISA, Soler, and Mitsubishi entered into a Sales Procedure Agreement (Sales Agreement) which, referring to the Distributor Agreement, provided for the direct sale of Mitsubishi products to Soler and governed the terms and conditions of such sales. Id., at 42. Paragraph VI of the Sales Agreement, labeled "Arbitration of Certain Matters," provides:

"All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." Id., at 52-53.

Initially, Soler did a brisk business in Mitsubishi-manufactured vehicles. As a result of its strong performance, its minimum sales volume, specified by Mitsubishi and CISA, and agreed to by Soler, for the 1981 model year was substantially increased. Id., at 179. In early 1981, however, the new-car market slackened. Soler ran into serious difficulties in meeting the expected sales volume, and by the spring of 1981 it felt itself compelled to request that Mitsubishi delay or cancel shipment of several orders. 1 Record 181, 183. About the same time, Soler attempted to arrange for the *618 transshipment of a quantity of its vehicles for sale in the continental United States and Latin America. Mitsubishi and CISA, however, refused permission for any such diversion, citing a variety of reasons, [FN1] and no vehicles were transshipped. Attempts to work out these difficulties failed. Mitsubishi eventually withheld shipment of 966 vehicles, apparently representing orders placed for May, June, and July 1981 production, responsibility for which Soler disclaimed in February 1982. App. 131.

FN1. The reasons advanced included concerns that such diversion would interfere with the Japanese trade policy of voluntarily limiting imports to the United States. App. 143, 177-178; that the Soler-ordered vehicles would be unsuitable for use in certain proposed destinations because of their manufacture, with use in Puerto Rico in mind, without heaters and defoggers, id., at 182; that the vehicles would be unsuitable for use in Latin America because of the unavailability there of the unleaded, high-octane fuel they required, id., at 177, 181-182; that adequate warranty service could not be ensured, id., at 176, 182; and that diversion to the mainland would violate contractual obligations between CISA and Mitsubishi, id., at 144, 183.

The following month, Mitsubishi brought an action against Soler in the United States District Court for the District of Puerto Rico under the Federal Arbitration Act and the Convention. [FN2] Mitsubishi sought an order, pursuant to 9 U.S.C. §§ 4 and 201, [FN3] to **3350 compel arbitration in accord with *619 57 VI of the Sales Agreement. App. 15. [FN4] Shortly after filing the complaint, Mitsubishi filed a request for arbitration before the Japan Commercial Arbitration Association. Id., at 70.

FN2. The complaint alleged that Soler had failed to pay for 966 ordered vehicles; that it had failed to pay contractual "distress unit penalties," intended to reimburse Mitsubishi for storage costs and interest charges incurred because of Soler's failure to take shipment of ordered vehicles; that Soler's failure to fulfill warranty obligations threatened Mitsubishi's reputation and goodwill; that Soler had failed to obtain required financing; and that the Distributor and Sales Agreements had expired by their terms or, alternatively, that Soler had surrendered its rights under the Sales Agreement. Id., at 11-14.

FN3. Section 4 provides in pertinent part: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

this chapter." Article II of the Convention, in turn, provides: "1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

* * *

"3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." 21 U.S.T., at 2519. Title 9 U.S.C. § 203 confers jurisdiction on the district courts of the United States over an action falling under the Convention.

FN4. Mitsubishi also sought an order against threatened litigation. App. 15-16.

Soler denied the allegations and counterclaimed against both Mitsubishi and CISA. It alleged numerous breaches by Mitsubishi of the Sales Agreement, [FN5] raised a pair of defamation claims, [FN6] and asserted causes of action under the Sherman *620 Act, 15 U.S.C. § 1 et seq.; the federal Automobile Dealers' Day in Court Act, 70 Stat. 1125, 15 U.S.C. § 1221 et seq.; the Puerto Rico competition statute, P.R.Laws Ann., Tit. 10, § 257 et seq. (1976); and the Puerto Rico Dealers' Contracts Act, P.R.Laws Ann., Tit. 10, § 278 et seq. (1978 and Supp.1983). In the counterclaim premised on the Sherman Act, Soler alleged that Mitsubishi and CISA had conspired to divide markets in restraint of trade. To effectuate the plan, according to Soler, Mitsubishi had refused to permit Soler to resell to buyers in North, Central, or South America vehicles it had obligated itself to purchase from Mitsubishi; had refused to ship ordered vehicles or the parts, such as heaters and defoggers, that would be necessary to permit Soler to make its vehicles suitable for resale outside Puerto Rico; and had coercively attempted to replace Soler and its other Puerto Rico distributors with a wholly owned subsidiary which would serve as the exclusive Mitsubishi distributor in Puerto Rico. App. 91-96.

FN5. The alleged breaches included wrongful refusal to ship ordered vehicles and necessary parts, failure to make payment for warranty work and authorized rebates, and bad faith in establishing minimum-sales volumes. Id., at 97-101.

FN6. The fourth counterclaim alleged that Mitsubishi had made statements that defamed Soler's good name and business reputation to a company with which Soler was then negotiating the sale of its plant and distributorship. Id., at 96. The sixth counterclaim alleged that Mitsubishi had made a willfully false and malicious statement in an affidavit submitted in support of its application for a temporary restraining order, and that Mitsubishi had wrongfully advised Soler's customers and the public in its market area that they should no longer do business with Soler. Id., at 98-99.

After a hearing, the District Court ordered Mitsubishi and Soler to arbitrate each of the issues raised in the complaint and in all the counterclaims save two and a portion of a third. [FN7] With regard to the **3351 federal antitrust issues, it recognized that the Courts of Appeals, following American Safety Equipment *621 Corp. v. J.P. Maguire & Co., 391 F.2d 821 (CA2 1968), uniformly had held that the rights conferred by the antitrust laws were " 'of a character inappropriate for enforcement by arbitration.' " App. to Pet. for Cert. in No. 83-1569, p. B9, quoting Wilko v. Swan, 201 F.2d 439, 444 (CA2 1953), rev'd, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The District Court held, however, that the international character of the Mitsubishi-Soler undertaking required enforcement of the agreement to arbitrate even as to the antitrust claims. It relied on Scherk v. Alberto-Culver Co., 417 U.S. 506, 515-520, 94 S.Ct. 2449, 2455-2458, 41 L.Ed.2d 270 (1974), in which this Court ordered arbitration, pursuant to a provision embodied in an international agreement, of a claim arising under the Securities Exchange Act of 1934 notwithstanding its assumption, arguendo, that Wilko, supra, which held nonarbitrable claims arising under the Securities Act of 1933, also would bar arbitration of a 1934 Act claim arising in a domestic context.

FN7. The District Court found that the arbitration clause did not cover the fourth and sixth counterclaims, which sought damages for defamation, see n. 6, supra, or the allegations in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346                                                                                    Page 69
(Cite as: 473 U.S. 614, *621, 105 S.Ct. 3346, **3351)

seventh counterclaim concerning discriminatory treatment and the establishment of minimum-sales volumes. App. to Pet. for Cert. in No. 83-1569, pp. B10-B11. Accordingly, it retained jurisdiction over those portions of the litigation. In addition, because no arbitration agreement between Soler and CISA existed, the court retained jurisdiction, insofar as they sought relief from CISA, over the first, second, third, and ninth counterclaims, which raised claims under the Puerto Rico Dealers' Contracts Act, the federal Automobile Dealers' Day in Court Act, the Sherman Act, and the Puerto Rico competition statute, respectively. Id., at B12. These aspects of the District Court's ruling were not appealed and are not before this Court.

The United States Court of Appeals for the First Circuit affirmed in part and reversed in part. 723 F.2d 155 (1983). It first rejected Soler's argument that Puerto Rico law precluded enforcement of an agreement obligating a local dealer to arbitrate controversies outside Puerto Rico. [FN8] It also rejected Soler's 'suggestion that it could not have intended to arbitrate statutory claims not mentioned in the arbitration agreement. Assessing arbitrability "on an allegation-by-allegation basis," id., at 159, the court then read the arbitration *622 clause to encompass virtually all the claims arising under the various statutes, including all those arising under the Sherman Act. [FN9]

> FN8. Soler relied on P.R. Laws Ann., Tit. 10, § 278b-2 (Supp.1983), which purports to render null and void "[a]ny stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract outside of Puerto Rico, or under foreign law or rule of law." See Walborg Corp. v. Superior Court, 104 P.R.R. 258 (1975). The Court of Appeals held this provision pre-empted by 9 U.S.C. § 2, which declares arbitration agreements valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 723 F.2d, at 158. See Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). See also Ledee v. Ceramiche Ragno, 684 F.2d 184 (CA1 1982). Soler does not challenge this holding in its cross-petition here.

> FN9. As the Court of Appeals saw it, "[t]he question ... is not whether the arbitration clause mentions antitrust or any other particular cause of

action, but whether the factual allegations underlying Soler's counterclaims—and Mitsubishi's bona fide defenses to those counterclaims—are within the scope of the arbitration clause, whatever the legal labels attached to those allegations." 723 F.2d, at 159. Because Soler's counterclaim under the Puerto Rico Dealers' Contracts Act focused on Mitsubishi's alleged failure to comply with the provisions of the Sales Agreement governing delivery of automobiles, and those provisions were found in that portion of Article I of the Agreement subject to arbitration, the Court of Appeals placed this first counterclaim within the arbitration clause. Id., at 159-160. The court read the Sherman Act counterclaim to raise issues of wrongful termination of Soler's distributorship, wrongful failure to ship ordered parts and vehicles, and wrongful refusal to permit transshipment of stock to the United States and Latin America. Because the existence of just cause for termination turned on Mitsubishi's allegations that Soler had breached the Sales Agreement by, for example, failing to pay for ordered vehicles, the wrongful termination claim implicated at least three provisions within the arbitration clause: Article I-D(1), which rendered a dealer's orders "firm"; Article I-E, which provided for "distress unit penalties" where the dealer prevented timely shipment; and Article I-F, specifying payment obligations and procedures. The court therefore held the arbitration clause to cover this dispute. Because the nonshipment claim implicated Soler's obligation under Article I-F to proffer acceptable credit, the court found this dispute covered as well. And because the transshipment claim prompted Mitsubishi defenses concerning the suitability of vehicles manufactured to Soler's specifications for use in different locales and Soler's inability to provide warranty service to transshipped products, it implicated Soler's obligation under Article IV, another covered provision, to make use of Mitsubishi's trademarks in a manner that would not dilute Mitsubishi's reputation and goodwill or damage its name and reputation. The court therefore found the arbitration agreement also to include this dispute, noting that such trademark concerns "are relevant to the legality of territorially based restricted distribution arrangements of the sort at issue here." 723 F.2d, at 160-161, citing Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The Court of Appeals read the federal Automobile Dealers' Day in Court Act

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *622, 105 S.Ct. 3346, **3351)

Page 70

claim to raise issues as to Mitsubishi's good faith in establishing minimum-sales volumes and Mitsubishi's alleged attempt to coerce Soler into accepting replacement by a Mitsubishi subsidiary. It agreed with the District Court's conclusion, in which Mitsubishi acquiesced, that the arbitration clause did not reach the first issue; it found the second, arising from Soler's payment problems, to restate claims already found to be covered. 723 F.2d, at 161. Finally, the Court of Appeals found the antitrust claims under Puerto Rico law entirely to reiterate claims elsewhere stated; accordingly, it held them arbitrable to the same extent as their counterparts. Ibid.

*623 **3352 Finally, after endorsing the doctrine of American Safety, precluding arbitration of antitrust claims, the Court of Appeals concluded that neither this Court's decision in Scherk nor the Convention required abandonment of that doctrine in the face of an international transaction. 723 F.2d, at 164-168. Accordingly, it reversed the judgment of the District Court insofar as it had ordered submission of "Soler's antitrust claims" to arbitration. [FN10] Affirming the remainder of the judgment, [FN11] the court directed the District Court to consider in the first instance how the parallel judicial and arbitral proceedings should go forward. [FN12]

FN10. Soler suggests that the court thereby declared antitrust claims arising under Puerto Rico law nonarbitrable as well. We read the Court of Appeals' opinion to have held only the federal antitrust claims nonarbitrable. See id., at 157 ("principal issue on this appeal is whether arbitration of federal antitrust claims may be compelled under the Federal Arbitration Act"); id., at 161 ("major question in this appeal is whether the antitrust issues raised by Soler's third counterclaim [grounded on Sherman Act] are subject to arbitration"). In any event, any contention that the local antitrust claims would be nonarbitrable would be foreclosed by this Court's decision in Southland Corp. v. Keating, 465 U.S., at 110, 104 S.Ct., at 858, where we held that the Federal Arbitration Act "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."

FN11. In this Court, Soler suggests for the first time that Congress intended that claims under the

federal Automobile Dealers' Day in Court Act be nonarbitrable. Brief for Respondent and Cross-Petitioner 21, n. 12. Because Soler did not raise this question in the Court of Appeals or present it in its cross-petition, we do not address it here.

FN12. Following entry of the District Court's judgment, both it and the Court of Appeals denied motions by Soler for a stay pending appeal. The parties accordingly commenced preparation for the arbitration in Japan. Upon remand from the Court of Appeals, however, Soler withdrew the antitrust claims from the arbitration tribunal and sought a stay of arbitration pending the completion of the judicial proceedings on the ground that the antitrust claims permeated the claims that remained before that tribunal. The District Court denied the motion, instead staying its own proceedings pending the arbitration in Japan. The arbitration recommenced, but apparently came to a halt once again in September 1984 upon the filing by Soler of a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.

*624 We granted certiorari primarily to consider whether an American court should enforce an agreement to resolve antitrust claims by arbitration when that agreement arises from an international transaction. 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).

II

At the outset, we address the contention raised in Soler's cross-petition that the arbitration clause at issue may not be read to encompass the statutory counterclaims stated in its answer to the complaint. In making this argument, Soler does not question the Court of Appeals' application of ¶ VI of the Sales Agreement to the disputes involved here as a matter of standard contract interpretation. [FN13] Instead, it argues *625 **3353 that as a matter of law a court may not construe an arbitration agreement to encompass claims arising out of statutes designed to protect a class to which the party resisting arbitration belongs "unless [that party] has expressly agreed" to arbitrate those claims, see Pet. for Cert. in No. 83-1733, pp. 8, i, by which Soler presumably means that the arbitration clause must specifically mention the statute giving rise to the claims that a party to the clause seeks to arbitrate. See 723 F.2d, at 159. Soler reasons that, because it

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.