105 S.Ct. 3346
(Cite as: 473 U.S. 614, *625, 105 S.Ct. 3346, **3353)

falls within the class for whose benefit the federal and local antitrust laws and dealers' Acts were passed, but the arbitration clause at issue does not mention these statutes or statutes in general, the clause cannot be read to contemplate arbitration of these statutory claims.

FN13. We therefore have no reason to review the Court of Appeals' construction of the scope of the arbitration clause in the light of the allegations of Soler's counterclaims. See n. 9, supra; Southland Corp. v. Keating, 465 U.S., at 15, n. 7, 104 S.Ct., at 860, n. 7. Soler does suggest that, because the title of the clause referred only to "certain matters," App. 52, and the clause itself specifically referred only to "Articles I-B through V," ibid., it should be read narrowly to exclude the statutory claims. Soler ignores the inclusion within those "certain matters" of "[a]ll disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to [the specified provisions] or for the breach thereof." Contrary to Soler's suggestion, the exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to operate. Thus, insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability. See 723 F.2d, at 159.

[1] We do not agree, for we find no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims. The Act's centerpiece provision makes a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "liberal federal policy favoring arbitration agreements," Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." Id., at 25, n. 32, 103

S.Ct., at 942, n. 32. [FN14] As this Court recently observed, "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered," *626 a concern which "requires that we rigorously enforce agreements to arbitrate." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

FN14. The Court previously has explained that the Act was designed to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law. See Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 219-221, and n. 6, 105 S.Ct. 1241-1243, and n. 6, 84 L.Ed.2d 158 (1985); Scherk v. Alberto-Culver Co., 417 U.S. 506, 510, and n. 4, 94 S.Ct. 2449, 2452, and n. 4, 41 L.Ed.2d 270 (1974).

[2][3] Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Memorial Hospital, 460 U.S., at 24, 103 S.Ct., at 941. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 400-404, 87 S.Ct. 1801, 1804-1806, 18 L.Ed.2d 1270 (1967); Southland Corp. v. Keating, 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984). And that body of law counsels "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself **3354 or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hospital, 460 U.S., at 24-25, 103 S.Ct., at 941-942. See, e.g., Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-583, 80 S.Ct. 1347, 1352-1353, 4 L.Ed.2d 1409 (1960). Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.

There is no reason to depart from these guidelines

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *626, 105 S.Ct. 3346, **3354)

where a party bound by an arbitration agreement raises claims founded on statutory rights. Some time ago this Court expressed "hope for [the Act's] usefulness both in controversies based on statutes or on standards otherwise created," Wilko v. Swan, 346 U.S. 427, 432, 74 S.Ct. 182, 185, 98 L.Ed.168 (1953) (footnote omitted); see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 135, n. 15, 94 S.Ct. 383, 393, n. 15, 38 L.Ed.2d 348 (1973), and we are well past the time *627 when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution. Just last Term in Southland Corp., supra, where we held that § 2 of the Act declared a national policy applicable equally in state as well as federal courts, we construed an arbitration clause to encompass the disputes at issue without pausing at the source in a state statute of the rights asserted by the parties resisting arbitration. 465 U.S., at 15, and n. 7, 104 S.Ct., at 860, and n. 7. [FN15] Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." 9 U.S.C. § 2; see Southland Corp., 465 U.S., at 16, n. 11, 104 S.Ct., at 861, n. 11; The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). But, absent such compelling considerations, the Act itself provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.

FN15. The claims whose arbitrability was at issue in Southland Corp. arose under the disclosure requirements of the California Franchise Investment Law, Cal.Corp.Code Ann. § 31000 et seq. (West 1977). While the dissent in Southland Corp. disputed the applicability of the Act to proceedings in the state courts, it did not object to the Court's reading of the arbitration clause under examination.

[4] That is not to say that all controversies implicating statutory rights are suitable for arbitration. There is no reason to distort the process of contract interpretation, however, in order to ferret out the inappropriate. Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered

by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. *628 See Wilko v. Swan, 346 U.S., at 434-435, 74 S.Ct., at 186-187; Southland Corp., 465 U.S., at 16, n. 11, 104 S.Ct., at 861, n.11; Dean Witter Reynolds Inc., 470 U.S., at 224-225, 105 S.Ct., at 1244-1245 (concurring opinion). For that reason, Soler's concern for statutorily protected classes provides no reason to color the lens through which the arbitration clause is read. By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. See Wilko v. Swan, supra. Having made the bargain to arbitrate, the party should be held to it unless Congress **3355 itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. Nothing, in the meantime, prevents a party from excluding statutory claims from the scope of an agreement to arbitrate. See Prima Paint Corp., 388 U.S., at 406, 87 S.Ct., at 1807.

[5] In sum, the Court of Appeals correctly conducted a two-step inquiry, first determining whether the parties' agreement to arbitrate reached the statutory issues, and then, upon finding it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims. We endorse its rejection of Soler's proposed rule of arbitration-clause construction.

III

[6] We now turn to consider whether Soler's antitrust claims are nonarbitrable even though it has agreed to arbitrate them. In holding that they are not, the Court of Appeals followed the decision of the Second Circuit in American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821 (1968). Notwithstanding the absence of any explicit support *629 for such an exception in either the Sherman

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *629, 105 S.Ct. 3346, **3355)

Act or the Federal Arbitration Act, the Second Circuit there reasoned that "the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make ... antitrust claims ... inappropriate for arbitration." Id., at 827-828. We find it unnecessary to assess the legitimacy of the American Safety doctrine as applied to agreements to arbitrate arising from domestic transactions. As in Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context.

Even before Scherk, this Court had recognized the utility of forum-selection clauses in international transactions. In The Bremen, supra, an American oil company, seeking to evade a contractual choice of an English forum and, by implication, English law, filed a suit in admiralty in a United States District Court against the German corporation which had contracted to tow its rig to a location in the Adriatic Sea. Notwithstanding the possibility that the English court would enforce provisions in the towage contract exculpating the German party which an American court would refuse to enforce, this Court gave effect to the choice-of-forum clause. It observed:

"The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." 407 U.S., at 9, 92 S.Ct., at 1912.

*630 Recognizing that "agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting," id., at 13-14, 92 S.Ct., at 1914-1916 the decision in The Bremen clearly eschewed a provincial solicitude for the jurisdiction of domestic forums.

Identical considerations governed the Court's decision in Scherk, which categorized "[a]n agreement to arbitrate before a specified tribunal [as], in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." 417 U.S., at 519, 94 S.Ct., at 2457. In Scherk, the American company Alberto-Culver purchased several interrelated business enterprises, organized under the laws of Germany and Liechtenstein, as well as the rights held by those enterprises in certain trademarks, from a German citizen who at the time of trial resided in Switzerland. **3356 Although the contract of sale contained a clause providing for arbitration before the International Chamber of Commerce in Paris of "any controversy or claim [arising] out of this agreement or the breach thereof," Alberto-Culver subsequently brought suit against Scherk in a Federal District Court in Illinois, alleging that Scherk had violated § 10(b) of the Securities Exchange Act of 1934 by fraudulently misrepresenting the status of the trademarks as unencumbered. The District Court denied a motion to stay the proceedings before it and enjoined the parties from going forward before the arbitral tribunal in Paris. The Court of Appeals for the Seventh Circuit affirmed, relying on this Court's holding in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), that agreements to arbitrate disputes arising under the Securities Act of 1933 are nonarbitrable. This Court reversed, enforcing the arbitration agreement even while assuming for purposes of the decision that the controversy would be nonarbitrable under the holding of Wilko had it arisen out of a domestic transaction. Again, the Court emphasized:

*631 "A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction....

"A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.... [It would] damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." 417 U.S., at 516-517, 94 S.Ct., at 2455-2456.

Accordingly, the Court held Alberto-Culver to its

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346
(Cite as: 473 U.S. 614, *631, 105 S.Ct. 3346, **3356)

bargain, sending it to the international arbitral tribunal before which it had agreed to seek its remedies.

The Bremen and Scherk establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions. Here, as in Scherk, that presumption is reinforced by the emphatic federal policy in favor of arbitral dispute resolution. And at least since this Nation's accession in 1970 to the Convention, see [1970] 21 U.S.T. 2517, T.I.A.S. 6997, and the implementation of the Convention in the same year by amendment of the Federal Arbitration Act, [FN16] that federal policy applies with special force in the field of international commerce. Thus, we must weigh the concerns of American Safety against a strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes and an equal commitment to the enforcement of freely negotiated choice-of-forum clauses.

FN16. Act of July 31, 1970, Pub.L. 91-368, 84 Stat. 692, codified at 9 U.S.C. §§ 201-208.

*632 At the outset, we confess to some skepticism of certain aspects of the American Safety doctrine. As distilled by the First Circuit, 723 F.2d, at 162, the doctrine comprises four ingredients. First, private parties play a pivotal role in aiding governmental enforcement of the antitrust laws by means of the private action for treble damages. Second, "the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract." Third, antitrust issues, prone to complication, require sophisticated legal and economic analysis, and thus are "ill-adapted to strengths of the arbitral process, i.e., expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity." Finally, just as "issues of war and peace are too important to be vested in the generals, ... decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community--particularly those **3357 from a foreign community that has had no experience with or exposure to our law and values." See American Safety, 391 F.2d, at 826-827.

[7] Initially, we find the second concern unjustified. The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. A party resisting arbitration of course may attack directly the validity of the agreement to arbitrate. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Moreover, the party may attempt to make a showing that would warrant setting aside the forum-selection clause--that the agreement was "[a]ffected by fraud, undue influence, or overweening bargaining power"; that "enforcement would be unreasonable and unjust"; or that proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." The Bremen, 407 U.S., at *633 12, 15, 18, 92 S.Ct., at 1914, 1916, 1917. But absent such a showing--and none was attempted here--there is no basis for assuming the forum inadequate or its selection unfair.

[8] Next, potential complexity should not suffice to ward off arbitration. We might well have some doubt that even the courts following American Safety subscribe fully to the view that antitrust matters are inherently insusceptible to resolution by arbitration, as these same courts have agreed that an undertaking to arbitrate antitrust claims entered into after the dispute arises is acceptable. See, e.g., Coenen v. R.W. Pressprich & Co., 453 F.2d 1209, 1215 (CA2), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); Cobb v. Lewis, 488 F.2d 41, 48 (CA5 1974). See also, in the present cases, 723 F.2d, at 168, n. 12 (leaving question open). And the vertical restraints which most frequently give birth to antitrust claims covered by an arbitration agreement will not often occasion the monstrous proceedings that have given antitrust litigation an image of intractability. In any event, adaptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts either employed by the parties or appointed by the tribunal. [FN17] Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *633, 105 S.Ct. 3346, **3357)

Page 75

desire to keep the effort and expense required to resolve a dispute within manageable bounds that prompts them mutually to forgo access to judicial remedies.    In sum, the factor of potential complexity *634 alone does not persuade us that an arbitral tribunal could not properly handle an antitrust matter.

FN17. See, e.g., Japan Commercial Arbitration Association Rule 26, reprinted in App. 218-219; L. Craig, W. Park, & J. Paulsson, International Chamber of Commerce Arbitration §§ 25.03, 26.04 (1984);    Art. 27, Arbitration Rules of United Nations Commission on International Trade Law (UNCITRAL) (1976), reprinted in 2 Yearbook Commercial Arbitration 167 (1977).

For similar reasons, we also reject the proposition that an arbitration panel will pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes.    International arbitrators frequently are drawn from the legal as well as the business community; where the dispute has an important legal component, the parties and the arbitral body with whose assistance they have agreed to settle their dispute can be expected to select arbitrators accordingly. [FN18]  We **3358 decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators.

FN18. See Craig, Park, & Paulsson, supra, § 12.03, p. 28;    Sanders, Commentary on UNCITRAL Arbitration Rules § 15.1, in 2 Yearbook Commercial Arbitration, supra, at 203. We are advised by Mitsubishi and amicus International Chamber of Commerce, without contradiction by Soler, that the arbitration panel selected to hear the parties' claims here is composed of three Japanese lawyers, one a former law school dean, another a former judge, and the third a practicing attorney with American legal training who has written on Japanese antitrust law. Brief for Petitioner in No. 83-1569, p. 26;  Brief for International Chamber of Commerce as Amicus Curiae 16, n. 28.   The Court of Appeals was concerned that international arbitrators would lack "experience with or exposure to our law and values."   723 F.2d, at 162.   The obstacles confronted by the arbitration panel in this case, however, should be no greater than those confronted by any judicial or arbitral tribunal required to determine foreign law. See, e.g., Fed. Rule Civ.Proc. 44.1.    Moreover, while our attachment to the antitrust laws may be stronger than most, many other countries, including Japan, have similar bodies of competition law. See, e.g., 1 Law of Transnational Business Transactions, ch. 9 (Banks, Antitrust Aspects of International Business Operations), § 9.03[7] (V. Nanda ed. 1984);  H. Iyori & A. Uesugi, The Antimonopoly Laws of Japan (1983).

We are left, then, with the core of the American Safety doctrine--the fundamental importance to American democratic capitalism of the regime of the antitrust laws.   See, *635 e.g., United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972);  Northern Pacific R. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).   Without doubt, the private cause of action plays a central role in enforcing this regime.   See, e.g., Hawaii v. Standard Oil Co., 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972).    As the Court of Appeals pointed out:

" 'A claim under the antitrust laws is not merely a private matter.   The Sherman Act is designed to promote the national interest in a competitive economy;   thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest.' "  723 F.2d, at 168, quoting American Safety, 391 F.2d, at 826.

The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators.   See, e.g., Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138-139, 88 S.Ct. 1981, 1984-1985, 20 L.Ed.2d 982 (1968).

[9]  The importance of the private damages remedy, however, does not compel the conclusion that it may not be sought outside an American court. Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act, 15 U.S.C. § 15, and pursued by Soler here by way of its third counterclaim, seeks primarily to enable an injured competitor to gain compensation for that injury.

"Section 4 ... is in essence a remedial provision. It provides treble damages to '[a]ny person who


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *635, 105 S.Ct. 3346, **3358)

shall be injured in his business or property by reason of anything forbidden in the antitrust laws....' Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed.... It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a *636 multiple of the injury actually proved, is designed primarily as a remedy." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485-486, 97 S.Ct. 690, 695-696, 50 L.Ed.2d 701 (1977).

After examining the respective legislative histories, the Court in Brunswick recognized that when first enacted in 1890 as § 7 of the Sherman Act, 26 Stat. 210, the treble-damages provision "was conceived of primarily as a remedy for '[t]he people of the United States as individuals,' " 429 U.S., at 486, n. 10, 97 S.Ct., at 696, n. 10, quoting 21 Cong.Rec. 1767-1768 (1890) (remarks of Sen. George); when reenacted in 1914 as § 4 of the Clayton Act, 38 Stat. 731, it was still "conceived primarily to **3359 'open [ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered.' " 429 U.S., at 486, n. 10, 97 S.Ct., at 696, n. 10, quoting 51 Cong.Rec. 9073 (1914) (remarks of Rep. Webb). And, of course, the antitrust cause of action remains at all times under the control of the individual litigant: no citizen is under an obligation to bring an antitrust suit, see Illinois Brick Co. v. Illinois, 431 U.S. 720, 746, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977), and the private antitrust plaintiff needs no executive or judicial approval before settling one. It follows that, at least where the international cast of a transaction would otherwise add an element of uncertainty to dispute resolution, the prospective litigant may provide in advance for a mutually agreeable procedure whereby he would seek his antitrust recovery as well as settle other controversies.

There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism. To be sure, the international arbitral tribunal owes no prior allegiance to the legal norms of particular states; hence, it has no direct obligation to vindicate their statutory dictates. The tribunal, however, is bound to effectuate the intentions of the parties. Where the parties have agreed that the arbitral body is to decide a defined set of claims which includes, as in these cases, those arising from the application of American antitrust law, the tribunal therefore *637 should be bound to decide that dispute in accord with the national law giving rise to the claim. Cf. Wilko v. Swan, 346 U.S., at 433-434, 74 S.Ct., at 185-186. [FN19] And so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.

FN19. In addition to the clause providing for arbitration before the Japan Commercial Arbitration Association, the Sales Agreement includes a choice-of-law clause which reads: "This Agreement is made in, and will be governed by and construed in all respects according to the laws of the Swiss Confederation as if entirely performed therein." App. 56. The United States raises the possibility that the arbitral panel will read this provision not simply to govern interpretation of the contract terms, but wholly to displace American law even where it otherwise would apply. Brief for United States as Amicus Curiae 20. The International Chamber of Commerce opines that it is "[c]onceivabl[e], although we believe it unlikely, [that] the arbitrators could consider Soler's affirmative claim of anticompetitive conduct by CISA and Mitsubishi to' fall within the purview of this choice-of-law provision, with the result that it would be decided under Swiss law rather than the U.S. Sherman Act." Brief for International Chamber of Commerce as Amicus Curiae 25. At oral argument, however, counsel for Mitsubishi conceded that American law applied to the antitrust claims and represented that the claims had been submitted to the arbitration panel in Japan on that basis. Tr. of Oral Arg. 18. The record confirms that before the decision of the Court of Appeals the arbitral panel had taken these claims under submission. See District Court Order of May 25, 1984, pp. 2-3. We therefore have no occasion to speculate on this matter at this stage in the proceedings, when Mitsubishi seeks to enforce the agreement to arbitrate, not to enforce an award. Nor need we consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *637, 105 S.Ct. 3346, **3359)

reinitiate suit in federal court. We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy. See, e.g., Redel's Inc. v. General Electric Co., 498 F.2d 95, 98-99 (CA5 1974); Gaines v. Carrollton Tobacco Board of Trade, Inc., 386 F.2d 757, 759 (CA6 1967); Fox Midwest Theatres v. Means, 221 F.2d 173, 180 (CA8 1955). Cf. Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). See generally 15 S. Williston, Contracts § 1750A (3d ed. 1972).

*638 Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The Convention reserves to each signatory country the right to refuse enforcement of an award where the "recognition or enforcement of the award would be contrary to the public policy of that country." Art. **3360 V(2)(b), 21 U.S.T., at 2520; see Scherk, 417 U.S., at 519, n. 14, 94 S.Ct., at 2457, n. 14. While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them. [FN20]

FN20. See n. 19, supra. We note, for example, that the rules of the Japan Commercial Arbitration Association provide for the taking of a "summary record" of each hearing, Rule 28.1; for the stenographic recording of the proceedings where the tribunal so orders or a party requests one, Rule 28.2; and for a statement of reasons for the award unless the parties agree otherwise, Rule 36.1(4). See App. 219 and 221. Needless to say, we intimate no views on the merits of Soler's antitrust claims.

As international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade. The controversies that international arbitral institutions are called upon to resolve have increased in diversity as well as in complexity. Yet

the potential of these tribunals for efficient disposition of legal disagreements arising from commercial relations has not yet been tested. If they are to take a central place in the international legal order, national courts will need to "shake off the old judicial hostility to arbitration," Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 985 (CA2 1942), and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at *639 least, it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration. See Scherk, supra. [FN21]

FN21. We do not quarrel with the Court of Appeals' conclusion that Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve "subject matter capable of settlement by arbitration," contemplates exceptions to arbitrability grounded in domestic law. See 723 F.2d, at 164-166; G. Gaja, International Commercial Arbitration: New York Convention I. B.2 (1984); A. van den Berg, The New York Convention of 1958: Towards a Uniform Judicial Interpretation 152-154 (1981); Contini, International Commercial Arbitration: The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 8 Am.J.Comp.L. 283, 296 (1959). But see van den Berg, supra, at 154, and n. 98 (collecting contrary authorities); Gaja, supra, at I.D., n. 43 (same). And it appears that before acceding to the Convention the Senate was advised by a State Department memorandum that the Convention provided for such exceptions. See S.Exec.Doc. E, 90th Cong., 2d Sess., 19 (1968). In acceding to the Convention the Senate restricted its applicability to commercial matters, in accord with Art. I(3). See 21 U.S.T., at 2519, 2560. Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope. See Act of July 31, 1970, Pub.L. 91-368, 84 Stat. 692, codified at 9 U.S.C. §§ 201-208. In Scherk, this Court recited Art. II(1), including the language relied upon by the Court of Appeals, but paid heed to the Convention delegates' "frequent[ly voiced] concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *639, 105 S.Ct. 3346, **3360)

such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." 417 U.S., at 520, n. 15, 94 S.Ct., at 2457, n. 15, citing G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24-28 (1958). There, moreover, the Court dealt, arguendo, with an exception to arbitrability grounded in express congressional language; here, in contrast, we face a judicially implied exception. The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention. But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

*640 Accordingly, we "require this representative of the American business community to honor its bargain," Alberto-Culver Co. v. Scherk, 484 F.2d 611, 620 (CA7 1973) (Stevens, J., dissenting), by holding this agreement to arbitrate "enforce[able] ... in accord with the explicit provisions of the **3361 Arbitration Act." Scherk, 417 U.S., at 520, 94 S.Ct., at 2457

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice POWELL took no part in the decision of these cases.

Justice STEVENS, with whom Justice BRENNAN joins, and with whom Justice MARSHALL joins except as to Part II, dissenting.

One element of this rather complex litigation is a claim asserted by an American dealer in Plymouth automobiles that two major automobile companies are parties to an international cartel that has restrained competition in the American market. Pursuant to an agreement that is alleged to have violated § 1 of the Sherman Act, 15 U.S.C. § 1, those companies allegedly prevented the dealer from transshipping some 966 surplus vehicles from Puerto Rico to other dealers in the American market. App. 92.

Petitioner denies the truth of the dealer's allegations and takes the position that the validity of the antitrust claim must be resolved by an arbitration tribunal in Tokyo, Japan. Largely because the auto manufacturer's defense to the antitrust allegation is based on provisions in the dealer's franchise agreement, the Court of Appeals concluded that the arbitration clause in that agreement encompassed the antitrust *641 claim. 723 F.2d 155, 159 (CA1 1983). It held, however, as a matter of law, that arbitration of such a claim may not be compelled under either the Federal Arbitration Act [FN1] or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. [FN2] Id., at 161-168.

FN1. 9 U.S.C. §§ 4, 201.

FN2. [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997.

This Court agrees with the Court of Appeals' interpretation of the scope of the arbitration clause, but disagrees with its conclusion that the clause is unenforceable insofar as it purports to cover an antitrust claim against a Japanese company. This Court's holding rests almost exclusively on the federal policy favoring arbitration of commercial disputes and vague notions of international comity arising from the fact that the automobiles involved here were manufactured in Japan. Because I am convinced that the Court of Appeals' construction of the arbitration clause is erroneous, and because I strongly disagree with this Court's interpretation of the relevant federal statutes, I respectfully dissent. In my opinion, (1) a fair construction of the language in the arbitration clause in the parties' contract does not encompass a claim that auto manufacturers entered into a conspiracy in violation of the antitrust laws; (2) an arbitration clause should not normally be construed to cover a statutory remedy that it does not expressly identify; (3) Congress did not intend § 2 of the Federal Arbitration Act to apply to antitrust claims; and (4) Congress did not intend the Convention on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *641, 105 S.Ct. 3346, **3361)

Recognition and Enforcement of Foreign Arbitral Awards to apply to disputes that are not covered by the Federal Arbitration Act.

I

On October 31, 1979, respondent, Soler Chrysler-Plymouth, Inc. (Soler), entered into a "distributor agreement" to govern the sale of Plymouth passenger cars to be manufactured by petitioner, Mitsubishi Motors Corporation *642 of Tokyo, Japan (Mitsubishi). [FN3] Mitsubishi, however, was not a **3362 party to that agreement. Rather the "purchase rights" were granted to Soler by a wholly owned subsidiary of Chrysler Corporation that is referred to as "Chrysler" in the agreement. [FN4] The distributor agreement does not contain an arbitration clause. Nor does the record contain any other agreement providing for the arbitration of disputes between Soler and Chrysler.

FN3. The distributor agreement provides, in part: "This Agreement is made · by and between CHRYSLER INTERNATIONAL S.A., a corporation organized and existing under the laws of the Swiss Confederation with its principal office in Geneva, Switzerland (hereinafter sometimes called CHRYSLER), and SOLER CHRYSLER-PLYMOUTH INC., ... (hereinafter sometimes called DISTRIBUTOR), and will govern the sale by CHRYSLER to DISTRIBUTOR of PLYMOUTH PASSENGER CARS AND CAR DERIVATIVES MANUFACTURED BY MITSUBISHI MOTORS CORPORATION OF TOKYO, JAPAN and automotive replacement parts and accessories (said motor vehicles, replacement parts and accessories hereinafter sometimes called Products)." App. 18.

FN4. "PURCHASE RIGHTS "Subject to the provisions of this Agreement, CHRYSLER grants to DISTRIBUTOR the non-exclusive right to purchase Products from CHRYSLER, and DISTRIBUTOR agrees to buy Products from CHRYSLER, for resale within the following described territory (hereinafter called Sales Area): METROPOLITAN SAN JUAN, PUERTO RICO...." Ibid. This is the same company that is referred to as "CISA" in the sales purchase agreement and in the Court's opinion.

Paragraph 26 of the distributor agreement authorizes Chrysler to have Soler's orders filled by

any company affiliated with Chrysler, that company thereby becoming the "supplier" of the products covered by the agreement with Chrysler. [FN5] Relying on paragraph 26 of their distributor *643 agreement, [FN6] Soler, Chrysler, and Mitsubishi entered into a separate Sales Procedure Agreement designating Mitsubishi as the supplier of the products covered by the distributor agreement. [FN7] The arbitration clause the Court construes today is found in that agreement. [FN8] As a matter of ordinary contract interpretation, there are at least two reasons why that clause does not apply to Soler's antitrust claim against Chrysler and Mitsubishi.

FN5. Paragraph 26 of the distributor agreement provides:

"DIRECT SALES

"CHRYSLER and DISTRIBUTOR agree that CHRYSLER may, at its option, forward orders received from DISTRIBUTOR pursuant to this Agreement to its parent company, Chrysler Corporation, or to any subsidiary, associated or affiliated company (hereinafter called 'SUPPLIER') which will then sell the Products covered by such order directly to DISTRIBUTOR, CHRYSLER and DISTRIBUTOR hereby acknowledge and agree that, unless otherwise agreed in writing, any such direct sales between SUPPLIER and DISTRIBUTOR will be governed by the terms and conditions contained on the order form and in this Agreement and that any such sales will not constitute the basis forming a distributor relationship between SUPPLIER and DISTRIBUTOR. Further, DISTRIBUTOR acknowledges and agrees that any claim or controversy resulting from such direct sales by SUPPLIER will be handled by CHRYSLER as though such sale had been made by CHRYSLER." Id., at 39-40.

FN6. "WHEREAS, pursuant to Article 26 of the Distributor Agreement, CISA may forward orders received from BUYER to an associated company; "WHEREAS, MMC and CISA have agreed that MMC, which is an associated company of CISA, may sell such MMC Products directly to BUYER pursuant to Article 26 of the Distributor Agreement." Id., at 43.

FN7. Mitsubishi is jointly owned by Chrysler and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *643, 105 S.Ct. 3346, **3362)

by Mitsubishi Heavy Industries, Ltd., a Japanese corporation. Id., at 200-201.

FN8. That clause reads as follows:
"ARBITRATION OF CERTAIN MATTERS

"All disputes, controversies or differences which may arise between MMC and BUYER out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." Id., at 52-53.

First, the clause only applies to two-party disputes between Soler and Mitsubishi. The antitrust violation alleged in Soler's counterclaim is a three-party dispute. Soler has joined both Chrysler and its associated company, Mitsubishi, as counterdefendants. The pleading expressly alleges that *644 both of those companies are "engaged in an unlawful combination and conspiracy to restrain and divide markets in interstate and foreign commerce, in violation of the Sherman Antitrust Act and the Clayton Act." App. 91. It is further alleged that Chrysler authorized and participated in several overt acts directed at Soler. At this stage of the case we must, of course, assume the truth of those allegations. Only by stretching the language of the arbitration clause far beyond its ordinary meaning **3363 could one possibly conclude that it encompasses this three-party dispute.

Second, the clause only applies to disputes "which may arise between MMC and BUYER out of or in relation to Articles I-B through V of this Agreement or for the breach thereof...." Id., at 52. Thus, disputes relating to only 5 out of a total of 15 Articles in the Sales Procedure Agreement are arbitrable. Those five Articles cover: (1) the terms and conditions of direct sales (matters such as the scheduling of orders, deliveries, and payment); (2) technical and engineering changes; (3) compliance by Mitsubishi with customs laws and regulations, and Soler's obligation to inform Mitsubishi of relevant local laws; (4) trademarks and patent rights; and (5) Mitsubishi's right to cease production of any products. It is immediately obviously that Soler's antitrust claim does not arise out of Articles I-B through V and it is not a claim "for the breach thereof." The question is whether it is a dispute "in relation to" those Articles.

Because Mitsubishi relies on those Articles of the contract to explain some of the activities that Soler challenges in its antitrust claim, the Court of Appeals concluded that the relationship between the dispute and those Articles brought the arbitration clause into play. I find that construction of the clause wholly unpersuasive. The words "in relation to" appear between the references to claims that arise under the contract and claims for breach of the contract; I believe all three of the species of arbitrable claims must be predicated on contractual rights defined in Articles I-B through V.

*645 The federal policy favoring arbitration cannot sustain the weight that the Court assigns to it. A clause requiring arbitration of all claims "relating to" a contract surely could not encompass a claim that the arbitration clause was itself part of a contract in restraint of trade. Cf. Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930); see also United States v. Paramount Pictures, Inc., 334 U.S. 131, 176, 68 S.Ct. 915, 938, 92 L.Ed. 1260 (1948). Nor in my judgment should it be read to encompass a claim that relies, not on a failure to perform the contract, but on an independent violation of federal law. The matters asserted by way of defense do not control the character, or the source, of the claim that Soler has asserted. [FN9] Accordingly, simply as a matter of ordinary contract interpretation, I would hold that Soler's antitrust claim is not arbitrable.

FN9. Even if Mitsubishi can prove that it did not violate any provision of the contract, such proof would not necessarily constitute a defense to the antitrust claim. In contrast, in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), Prima Paint's claim of fraud in the inducement was asserted to rescind the contract, not as an independent basis of recovery.

II

Section 2 of the Federal Arbitration Act describes three kinds of arbitrable agreements. [FN10] Two--those including maritime transactions and those covering the submission of an existing dispute to arbitration--are not involved in this case. The language of § 2 relating to the Soler-Mitsubishi arbitration clause reads as follows:

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346                                                              Page  81
(Cite as: 473 U.S. 614, *645, 105 S.Ct. 3346, **3363)

FN10. Section 2 provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

*646 "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law **3364 or in equity for the revocation of any contract."
The plain language of this statute encompasses Soler's claims that arise out of its contract with Mitsubishi, but does not encompass a claim arising under federal law, or indeed one that arises under its distributor agreement with Chrysler.  Nothing in the text of the 1925 Act, nor its legislative history, suggests that Congress intended to authorize the arbitration of any statutory claims. [FN11]

FN11. In his dissent in Prima Paint Corp. v. Flood & Conklin Mfg.· Co., 388 U.S., at 415, 87 S.Ct., at 1811 Justice Black quoted the following commentary written shortly after the statute was passed: "Not all questions arising out of contracts ought to be arbitrated.  It is a remedy peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact--quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like.  It has a place also in the determination of the simpler questions of law--the questions of law which arise out of these daily relations between merchants as to the passage of title, the existence of warranties, or the questions of law which are complementary to the questions of fact which we have just mentioned."  Cohen & Dayton, The New Federal Arbitration Law, 12 Va.L.Rev. 265, 281 (1926).  In the Prima Paint case the Court held that the Act applied to a claim of fraud in the inducement of the contract, but did not intimate that it might also cover federal statutory claims.  See n.

9, supra.

Until today all of our cases enforcing agreements to arbitrate under the Arbitration Act have involved contract claims.  In one, the party claiming a breach of contractual warranties also claimed that the breach amounted to fraud actionable under § 10(b) of the Securities Exchange Act of 1934.  Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).  [FN12] *647 But this is the first time the Court has considered the question whether a standard arbitration clause referring to claims arising out of or relating to a contract should be construed to cover statutory claims that have only an indirect relationship to the contract. [FN13]  In my opinion, neither the Congress that enacted the Arbitration Act in 1925, nor the many parties who have agreed to such standard clauses, could have anticipated the Court's answer to that question.

FN12. "The dispute between these parties over the alleged shortage in defendant's inventory of European trademarks, a matter covered by contract warranties and subject to pre-closing verification, is the kind of commercial dispute for which arbitration is entirely appropriate.  In my opinion, the fact that the 'fraud' language of Rule 10(b)(5) has been included in the complaint is far less significant than the desirability of having the Court of Arbitration of the International Chamber of Commerce in Paris, France, decide the various questions of foreign law which should determine the rights of these parties."  Alberto-Culver Co. v. Scherk, 484 F.2d 611, 619-620 (CA7 1973) (Stevens, J., dissenting), rev'd, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

FN13. It is interesting to note that in Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court referred to the standard clause describing claims "arising out of, or relating to, this Contract or the breach thereof" as a provision "for resolving disputes arising out of the contract or its breach."  Id., at 4-5, 103 S.Ct., at 931-932.

On several occasions we have drawn a distinction between statutory rights and contractual rights and refused to hold that an arbitration barred the assertion of a statutory right.  Thus, in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), we held that the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346                                                                 Page 82
(Cite as: 473 U.S. 614, *647, 105 S.Ct. 3346, **3364)

arbitration of a claim of employment discrimination would not bar an employee's statutory right to damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e--2000e-17, notwithstanding the strong federal policy favoring the arbitration of labor disputes. In that case the Court explained at some length why it would be unreasonable to assume that Congress intended to give arbitrators the final authority to implement the federal statutory policy:

"[W]e have long recognized that 'the choice of forums inevitably affects the scope of the substantive right to be vindicated.' U.S. Bulk Carriers v. Arguelles, 400 *648 U.S. 351, 359-360 [91 S.Ct. 409, **3365 413-414, 27 L.Ed.2d 456] (1971) (Harlan, J., concurring). Respondent's deferral rule is necessarily premised on the assumption that arbitral processes are commensurate with judicial processes and that Congress impliedly intended federal courts to defer to arbitral decisions on Title VII issues. We deem this supposition unlikely.

"Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation.... But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-583, [80 S.Ct. 1347, 1352-1353, 4 L.Ed.2d 1409] (1960). Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts." 415 U.S., at 56-57, 94 S.Ct., at 1023-1024 (footnote omitted).

In addition, the Court noted that the informal procedures which make arbitration so desirable in the context of contractual disputes are inadequate to develop a record for appellate review of statutory questions. [FN14] Such review is essential on *649 matters of statutory interpretation in order to assure consistent application of important public rights.

> FN14. "Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. See Bernhardt v. Polygraphic Co., 350 U.S. 198, 203, [76 S.Ct. 273, 276, 100 L.Ed. 199] (1956); Wilko v. Swan, 346 U.S., at 435-437, [74 S.Ct., at 186-188]. And as this Court has recognized, '[a]rbitrators have no obligation to the court to give their reasons for an award.' United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. [593], at 598 [80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424]. Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." 415 U.S., at 57-58, 94 S.Ct., at 1024-1025 (footnote omitted).

In Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1427, 67 L.Ed.2d 641 (1981), we reached a similar conclusion with respect to the arbitrability of an employee's claim based on the Fair Labor Standards Act, 29 U.S.C. §§ 201-219. We again noted that an arbitrator, unlike a federal judge, has no institutional obligation to enforce federal legislative policy:

"Because the arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights.

"Finally, not only are arbitral procedures less protective of individual statutory rights than are judicial procedures, see Gardner-Denver, supra [415 U.S.], at 57-58 [94 S.Ct., at 1024-1025], but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief. Under the FLSA, courts can award actual and liquidated damages, reasonable attorney's fees,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *649, 105 S.Ct. 3346, **3365)

Page 83

and costs. 29 U.S.C. § 216(b). An arbitrator, by contrast, can award only that **3366 compensation authorized by the wage provision of the collective-bargaining agreement.... It is most unlikely that he will be authorized to award liquidated damages, costs, or attorney's fees." 450 U.S., at 744-745, 101 S.Ct., at 1446-1447 (footnote omitted).
*650 The Court has applied the same logic in holding that federal claims asserted under the Ku Klux Act of 1871, 42 U.S.C. § 1983, and claims arising under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2), may not be finally resolved by an arbitrator. McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

The Court's opinions in Alexander, Barrentine, McDonald, and Wilko all explain why it makes good sense to draw a distinction between statutory claims and contract claims. In view of the Court's repeated recognition of the distinction between federal statutory rights and contractual rights, together with the undisputed historical fact that arbitration has functioned almost entirely in either the area of labor disputes or in "ordinary disputes between merchants as to questions of fact," see n. 11, supra, it is reasonable to assume that most lawyers and executives would not expect the language in the standard arbitration clause to cover federal statutory claims. Thus, in my opinion, both a fair respect for the importance of the interests that Congress has identified as worthy of federal statutory protection, and a fair appraisal of the most likely understanding of the parties who sign agreements containing standard arbitration clauses, support a presumption that such clauses do not apply to federal statutory claims.

## III

The Court has repeatedly held that a decision by Congress to create a special statutory remedy renders a private agreement to arbitrate a federal statutory claim unenforceable. Thus, as I have already noted, the express statutory remedy provided in the Ku Klux Act of 1871, [FN15] the express statutory remedy in the Securities Act of 1933, [FN16] the express statutory remedy in the Fair Labor Standards Act, [FN17] and the express *651 statutory remedy in Title VII of the Civil

Rights Act of 1964, [FN18] each provided the Court with convincing evidence that Congress did not intend the protections afforded by the statute to be administered by a private arbitrator. The reasons that motivated those decisions apply with special force to the federal policy that is protected by the antitrust laws.

FN15. McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

FN16. Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

FN17. Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981).

FN18. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

To make this point it is appropriate to recall some of our past appraisals of the importance of this federal policy and then to identify some of the specific remedies Congress has designed to implement it. It was Chief Justice Hughes who characterized the Sherman Antitrust Act as "a charter of freedom" that may fairly be compared to a constitutional provision. See Appalachian Coals, Inc. v. United States, 288 U.S. 344, 359-360, 53 S.Ct. 471, 473-474, 77 L.Ed. 825 (1933). In United States v. Philadelphia National Bank, 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963), the Court referred to the extraordinary "magnitude" of the value choices made by Congress in enacting the Sherman Act. More recently, the Court described the weighty public interests underlying the basic philosophy of the statute:
"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection **3367 of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete--to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346
(Cite as: 473 U.S. 614, *651, 105 S.Ct. 3346, **3367)

Page 84

might promote greater competition in a more important sector of the economy." United States v. .Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972). *652 The Sherman and Clayton Acts reflect Congress' appraisal of the value of economic freedom; they guarantee the vitality of the entrepreneurial spirit. Questions arising under these Acts are among the most important in public law.

The unique public interest in the enforcement of the antitrust laws is repeatedly reflected in the special remedial scheme enacted by Congress. Since its enactment in 1890, the Sherman Act has provided for public enforcement through criminal as well as civil sanctions. The pre eminent federal interest in effective enforcement once justified a provision for special three-judge district courts to hear antitrust claims on an expedited basis, as well as for direct appeal to this Court bypassing the courts of appeals. [FN19] See, e.g., United States v. National Assn. of Securities Dealers, Inc., 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

FN19. See 32 Stat. 823, 88 Stat. 1708, repealed 98 Stat. 3358 (1984) (Pub.L. No. 98-620, § 402(11)). The Act still provides an avenue for directly appealing to this Court from a final judgment in a Government antitrust suit. 15 U.S.C. § 29(b).

The special interest in encouraging private enforcement of the Sherman Act has been reflected in the statutory scheme ever since 1890. Section 7 of the original Act, [FN20] used the broadest possible language to describe the class of litigants who may invoke its protection. "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328, (1948); see also Associated *653 General Contractors of California, Inc. v. Carpenters, 459 U.S. 519, 529, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983).

FN20. "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in

the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." 26 Stat. 210. The current version of the private remedy is codified at 15 U.S.C. § 15(a).

The provision for mandatory treble damages-- unique in federal law when the statute was enacted-- provides a special incentive to the private enforcement of the statute, as well as an especially powerful deterrent to violators. [FN21] What we have described **3368 as "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955), is buttressed by the statutory mandate that the injured party also recover costs, "including a reasonable attorney's fee." 15 U.S.C. § 15(a). The interest in wide and effective enforcement has thus, for almost a century, been vindicated by enlisting the assistance *654 of "private Attorneys General"; [FN22] we have always attached special importance to their role because "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress." Hawaii v. Standard Oil Co., 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972).

FN21. "We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, [71 S.Ct. 259, 95 L.Ed. 219] (1951), that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. Similarly, in Simpson v. Union Oil Co., 377 U.S. 13, [84 S.Ct. 1051, 12 L.Ed.2d 98] (1964), we held that a dealer whose consignment agreement was canceled for failure to adhere to a fixed resale price could bring suit under the antitrust laws even though by signing the agreement he had to that extent become a participant in the illegal, competition-destroying scheme. Both Simpson and Kiefer-Stewart were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct." Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138-139, 88 S.Ct. 1981, 1984-1985, 20 L.Ed.2d 982 (1968).

FN22. Under the Panama Canal Act, any private shipper--in addition to the United States--may also bring an action seeking to bar access to the canal for any vessel owned by a company "doing business" in violation of the antitrust laws. 37 Stat. 567, 15 U.S.C. § 31.

There are, in addition, several unusual features of the antitrust enforcement scheme that unequivocally require rejection of any thought that Congress would tolerate private arbitration of antitrust claims in lieu of the statutory remedies that it fashioned. As we explained in Blumenstock Brothers Advertising Agency v. Curtis Publishing Co., 252 U.S. 436, 440, 40 S.Ct. 385, 386, 64 L.Ed. 649 (1920), an antitrust treble-damages case "can only be brought in a District Court of the United States." The determination that these cases are "too important to be decided otherwise than by competent tribunals" [FN23] surely cannot allow private arbitrators to assume a jurisdiction that is denied to courts of the sovereign States.

FN23. In University Life Insurance Co. v. Unimarc Ltd., 699 F.2d 846 (CA7 1983), Judge Posner wrote: "The suit brought by Unimarc and Huff ... raises issues of state tort and contract law and federal antitrust law. The tort and contract issues may or may not be within the scope of the arbitration clauses in the coinsurance and second marketing agreements but they are arbitrable in the sense that an agreement to arbitrate them would be enforceable. Federal antitrust issues, however, are nonarbitrable in just that sense. Applied Digital

Technology, Inc. v. Continental Casualty Co., 576 F.2d 116, 117 (7th Cir.1978). They are considered to be at once too difficult to be decided competently by arbitrators--who are not judges, and often not even lawyers--and too important to be decided otherwise than by competent tribunals. See American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821, 826-27 (2d Cir.1968). The root of the doctrine is in the same soil as the principle, announced in Blumenstock Bros. Adv. Agency v. Curtis Pub. Co., 252 U.S. 436, 440-41 [40 S.Ct. 385, 386-387, 64 L.Ed. 649] (1920), that federal antitrust suits may not be brought in state courts." Id., at 850-851.

*655 The extraordinary importance of the private antitrust remedy has been emphasized in other statutes enacted by Congress. Thus, in 1913, Congress passed a special Act guaranteeing public access to depositions in Government civil proceedings to enforce the Sherman Act. 37 Stat. 731, 15 U.S.C. § 30. [FN24] The purpose of that Act plainly was to enable victims of antitrust violations to make evidentiary use of information developed in a public enforcement proceeding. This purpose was further implemented in the following year by the enactment of § 5 of the Clayton Act providing that a final judgment or decree in a Government case may constitute prima facie proof of a violation in a subsequent treble-damages case. 38 Stat. 731, 15 U.S.C. § 16(a). These special remedial provisions attest to the importance that Congress has attached to the private remedy.

FN24. See United States v. Procter & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).

In view of the history of antitrust enforcement in the United States, it is not surprising that all of the federal courts that have considered the question have uniformly **3369 and unhesitatingly concluded that agreements to arbitrate federal antitrust issues are not enforceable. In a landmark opinion for the Court of Appeals for the Second Circuit, Judge Feinberg wrote:

"A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346
(Cite as: 473 U.S. 614, *655, 105 S.Ct. 3346, **3369)

attorney-general who protects the public's interest.... Antitrust violations can affect hundreds of thousands--perhaps millions--of people and inflict staggering economic damage.... We do not believe that Congress intended such claims to be resolved elsewhere than in the courts. We do not suggest that all antitrust litigations attain these swollen proportions; the courts, no less than the public, are thankful *656 that they do not. But in fashioning a rule to govern the arbitrability of antitrust claims, we must consider the rule's potential effect. For the same reason, it is also proper to ask whether contracts of adhesion between alleged monopolists and their customers should determine the forum for trying antitrust violations." American Safety Equipment Corp. v. J.P. Maguire & Co., 391 F.2d 821, 826-827 (1968) (footnote omitted).

This view has been followed in later cases from that Circuit [FN25] and by the First, [FN26] Fifth, [FN27] Seventh, [FN28] Eighth, [FN29] and Ninth Circuits. [FN30] It is clearly a correct statement of the law.

FN25. N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp., 532 F.2d 874, 876 (1976) (per curiam).

FN26. 723 F.2d 155, 162 (1983) (Coffin, J., for the court) (opinion below).

FN27. Cobb v. Lewis, 488 F.2d 41, 47 (1974) (Wisdom, J., for the court).

FN28. University Life Insurance Co. v. Unimarc Ltd., 699 F.2d, at 850-851 (1983) (Posner, J., for the court); Applied Digital Technology, Inc. v. Continental Casualty Co., 576 F.2d 116, 117 (1978) (Pell, J., for the court).

FN29. Helfenbein v. International Industries, Inc., 438 F.2d 1068, 1070 (Lay, J., for the court), cert. denied, 404 U.S. 872, 92 S.Ct. 63, 30 L.Ed.2d 115 (1971).

FN30. Lake Communications, Inc. v. ICC Corp., 738 F.2d 1473, 1477-1480 (1984) (Browning, C.J., for the court); Varo v. Comprehensive Designers, Inc., 504 F.2d 1103, 1104 (1974) (Chambers, J., for the court); Power Replacements, Inc. v. Air Preheater Co., 426 F.2d 980, 983-984 (1970) (Jameson, J., for the court); A. & E. Plastik Pak

Co. v. Monsanto Co., 396 F.2d 710, 715-716 (1968) (Merrill, J., for the court).

This Court would be well advised to endorse the collective wisdom of the distinguished judges of the Courts of Appeals who have unanimously concluded that the statutory remedies fashioned by Congress for the enforcement of the antitrust laws render an agreement to arbitrate antitrust disputes unenforceable. Arbitration awards are only reviewable for manifest disregard of the law, 9 U.S.C. §§ 10, 207, and the rudimentary procedures which make arbitration so desirable in the context of a private dispute often mean that the record is so inadequate that the arbitrator's decision is virtually *657 unreviewable. [FN31] Despotic decisionmaking of this kind is fine for parties who are willing to agree in advance to settle for a best approximation of the correct result in order to resolve quickly and inexpensively any contractual dispute that may arise in an ongoing commercial relationship. Such informality, however, is simply unacceptable when every error may have devastating consequences for important businesses in our national economy and may undermine their ability to compete in world markets. [FN32] Instead **3370 of "muffling a grievance in the cloakroom of arbitration," the public interest in free competitive markets would be better served by having the issues resolved "in the light of impartial public court adjudication." See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 136, 94 S.Ct. 383, 394, 38 L.Ed.2d 348 (1973). [FN33]

FN31. The arbitration procedure in this case does not provide any right to evidentiary discovery or a written decision, and requires that all proceedings be closed to the public. App. 220-221. Moreover, Japanese arbitrators do not have the power of compulsory process to secure witnesses and documents, nor do witnesses who are available testify under oath. Id., at 218-219. Cf. 9 U.S.C. § 7 (arbitrators may summon witnesses to attend proceedings and seek enforcement in a district court).

FN32. The greatest risk, of course, is that the arbitrator will condemn business practices under the antitrust laws that are efficient in a free competitive market. Cf. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 85 L.Ed.2d ---- (1985), rev'g 715



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *657, 105 S.Ct. 3346, **3370)

F.2d 1393 (CA9 1983).   In the absence of a reviewable record, a reviewing district court would not be able to undo the damage wrought.   Even a Government suit or an action by a private party might not be available to set aside the award.

FN33. The Court notes that some courts which have held that agreements to arbitrate antitrust claims generally are unenforceable have nevertheless enforced arbitration agreements to settle an existing antitrust claim.   Ante, at 3357.   These settlement agreements, made after the parties have had every opportunity to evaluate the strength of their position, are obviously less destructive of the private treble-damages remedy that Congress provided.   Thus, it may well be that arbitration as a means of settling existing disputes is permissible.

## *658 IV

The Court assumes for the purposes of its decision that the antitrust issues would not be arbitrable if this were a purely domestic dispute, ante, at 3355, but holds that the international character of the controversy makes it arbitrable.   The holding rests on vague concerns for the international implications of its decision and a misguided application of Scherk v. Alberto-Culver, Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

International Obligations of the United States

Before relying on its own notions of what international comity requires, it is surprising that the Court does not determine the specific commitments that the United States has made to enforce private agreements to arbitrate disputes arising under public law.   As the Court acknowledges, the only treaty relevant here is the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997.   The Convention was adopted in 1958 at a multilateral conference sponsored by the United Nations.   This Nation did not sign the proposed convention at that time;   displaying its characteristic caution before entering into international compacts, the United States did not accede to it until 12 years later.

As the Court acknowledged in Scherk v. Alberto-Culver Co., 417 U.S., at 520, n. 15, 94 S.Ct., at 2457, n. 15, the principal purpose of the Convention "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."   However, the United States, as amicus curiae, advises the Court that the Convention "clearly contemplates" that signatory nations will enforce domestic laws prohibiting the arbitration of certain subject matters.   Brief for United States as Amicus Curiae 28.   This interpretation of the Convention was adopted by the Court of Appeals, 723 F.2d, at 162-166, and the Court *659 declines to reject it, ante, at 3360, n. 21.   The construction is beyond doubt.

Article II(3) of the Convention provides that the court of a Contracting State, "when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration."   This obligation does not arise, however, (i) if the agreement "is null and void, inoperative or incapable of being performed," Art. II(3), or (ii) if the dispute does not concern "a subject matter capable of settlement by arbitration," Art. II(1).   The former qualification principally applies to matters of fraud, mistake, and duress in the inducement, or problems of procedural fairness and feasibility.   723 F.2d, at 164.   The latter clause plainly suggests the possibility **3371 that some subject matters are not capable of arbitration under the domestic laws of the signatory nations, and that agreements to arbitrate such disputes need not be enforced.

This construction is confirmed by the provisions of the Convention which provide for the enforcement of international arbitration awards.   Article III provides that each "Contracting State shall recognize arbitral awards as binding and enforce them."   However, if an arbitration award is "contrary to the public policy of [a] country" called upon to enforce it, or if it concerns a subject matter which is "not capable of settlement by arbitration under the law of that country," the Convention does not require that it be enforced.   Arts. V(2)(a) and (b).   Thus, reading Articles II and V together, the Convention provides that agreements to arbitrate disputes which are nonarbitrable under domestic law need not be honored, nor awards rendered under them enforced. [FN34]

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346
(Cite as: 473 U.S. 614, *659, 105 S.Ct. 3346, **3371)

FN34. Indeed, it has been argued that a state may refuse to enforce an agreement to arbitrate a subject matter which is nonarbitrable in domestic law under Article II(3) as well as under Article II(1). Since awards rendered under such agreements need not be enforced under Article V(2) the agreement is "incapable of being performed." Art. II(3). S.Exec.Doc. E, 90th Cong., 2d Sess., 19 (1968) (hereinafter S.Exec.Doc. E); G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards 27-28 (1958).

*660 This construction is also supported by the legislative history of the Senate's advice and consent to the Convention. In presenting the Convention for the Senate's consideration the President offered the following interpretation of Article II(1):

"The requirement that the agreement apply to a matter capable of settlement by arbitration is necessary in order to take proper account of laws in force in many countries which prohibit the submission of certain questions to arbitration. In some States of the United States, for example, disputes affecting the title to real property are not arbitrable." S.Exec.Doc. E, at 19.

The Senate's consent to the Convention presumably was made in light of this interpretation, and thus it is to be afforded considerable weight. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-185, 102 S.Ct. 2374, 2379-2380, 72 L.Ed.2d 765 (1982).

International Comity

It is clear then that the international obligations of the United States permit us to honor Congress' commitment to the exclusive resolution of antitrust disputes in the federal courts. The Court today refuses to do so, offering only vague concerns for comity among nations. The courts of other nations, on the other hand, have applied the exception provided in the Convention, and refused to enforce agreements to arbitrate specific subject matters of concern to them. [FN35]

FN35. For example, the Cour de Cassation in Belgium has held that disputes arising under a Belgian statute limiting the unilateral termination of exclusive distributorships are not arbitrable under the Convention in that country, Audi-NSU Auto Union A.G. v. S.A. Adelin Petit & Cie. (1979), in 5 Yearbook Commercial Arbitration 257, 259

(1980), and the Corte di Cassazione in Italy has held that labor disputes are not arbitrable under the Convention in that country, Compagnia Generale Construzioni v. Piersanti, [1980] Foro Italiano I 190, in 6 Yearbook Commercial Arbitration 229, 230 (1981).

*661 It may be that the subject-matter exception to the Convention ought to be reserved--as a matter of domestic law--for matters of the greatest public interest which involve concerns that are shared by other nations. The Sherman Act's commitment to free competitive markets is among our most important civil policies. Supra, at 3366-3370. This commitment, shared by other nations which are signatory to the Convention, [FN36] is hardly the sort of parochial **3372 concern that we should decline to enforce in the interest of international comity. Indeed, the branch of Government entrusted with the conduct of political relations with foreign governments has informed us that the "United States' determination that federal antitrust claims are nonarbitrable under the Convention ... is not likely to result in either surprise or recrimination on the part of other signatories to the Convention." Brief for United States as Amicus Curiae 30.

FN36. For example, the Federal Republic of Germany has a vigorous antitrust program, and prohibits the enforcement of predispute agreements to arbitrate such claims under some circumstances. See Act Against Restraints of Competition § 91(1), in 1 Organisation for Economic Co-operation and Development, Guide to Legislation on Restrictive Business Practices, Part D, p. 49 (1980). See also 2 G. Delaume, Transnational Contracts § 13.06, p. 31, and n. 3 (1982).

Lacking any support for the proposition that the enforcement of our domestic laws in this context will result in international recriminations, the Court seeks refuge in an obtuse application of its own precedent, Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), in order to defend the contrary result. The Scherk case was an action for damages brought by an American purchaser of three European businesses in which it was claimed that the seller's fraudulent representations concerning the status of certain European trademarks constituted a violation of § 10(b) of the Securities Exchange *662 Act of 1934, 15 U.S.C. § 78j(b). The Court held that the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



parties' agreement to arbitrate any dispute arising out of the purchase agreement was enforceable under the Federal Arbitration Act. The legal issue was whether the Court's earlier holding in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed.2d 168 (1953)--"that an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933," see 417 U.S., at 510, 94 S.Ct., at 2453--was "controlling authority." Ibid.

The Court carefully identified two important differences between the Wilko case and the Scherk case. First, the statute involved in Wilko contained an express private remedy that had "no statutory counterpart" in the statute involved in Scherk, see 417 U.S., at 513, 94 S.Ct., at 2454. Although the Court noted that this difference provided a "colorable argument" for reaching a different result, the Court did not rely on it. Id., at 513-514, 94 S.Ct., at 2454-2455.

Instead, it based its decision on the second distinction--that the outcome in Wilko was governed entirely by American law whereas in Scherk foreign rules of law would control and, if the arbitration clause were not enforced, a host of international conflict of laws problems would arise. The Court explained:

"Alberto-Culver's contract to purchase the business entities belonging to Scherk was a truly international agreement. Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein. The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the *663 sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

"Such a contract involves considerations and policies significantly different from those found controlling in Wilko. In Wilko, quite apart from the arbitration provision, there was no question

but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement. The parties, the negotiations, and the subject matter of the contract were all situated in this country, and no credible claim could have been entertained that any international conflict-of-laws problems would arise. In this case, by contrast, **3373 in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract." 417 U.S., at 515-516, 94 S.Ct., at 2455-2456 (footnote omitted).

Thus, in its opinion in Scherk, the Court distinguished Wilko because in that case "no credible claim could have been entertained that any international conflict-of-laws problems would arise." 417 U.S., at 516, 94 S.Ct., at 2455. That distinction fits this case precisely, since I consider it perfectly clear that the rules of American antitrust law must govern the claim of an American automobile dealer that he has been injured by an international conspiracy to restrain trade in the American automobile market. [FN37]

FN37. Cf. Compagnia Generale Construzioni v. Piersanti, [1980] Foro Italiano I 190 (Corte Cass. Italy), in 6 Yearbook Commercial Arbitration, at 230; Audi-NSU Auto Union A.G. v. S.A. Adelin Petit & Cie. (Cour Cass. Belgium 1979), in 5 Yearbook Commercial Arbitration, at 259.

The critical importance of the foreign-law issues in Scherk was apparent to me even before the case reached this Court. See n. 12, supra. For that reason, it is especially distressing *664 to find that the Court is unable to perceive why the reasoning in Scherk is wholly inapplicable to Soler's antitrust claims against Chrysler and Mitsubishi. The merits of those claims are controlled entirely by American law. It is true that the automobiles are manufactured in Japan and that Mitsubishi is a Japanese corporation, but the same antitrust questions would be presented if Mitsubishi were owned by two American companies instead of by one American and one Japanese partner. When Mitsubishi enters the American market and plans to engage in business in that market over a period of years, it must recognize its obligation to comply with American law and to be subject to the remedial provisions of American statutes. [FN38]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

105 S.Ct. 3346
(Cite as: 473 U.S. 614, *664, 105 S.Ct. 3346, **3373)

Page 90

FN38. Cf. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (Japanese general trading company's wholly owned subsidiary which is incorporated in the United States is not exempt under bilateral commercial treaty from obligations under Title VII of the Civil Rights Act of 1964).

The federal claim that was asserted in Scherk, unlike Soler's antitrust claim, had not been expressly authorized by Congress. Indeed, until this Court's recent decision in *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), the federal cause of action asserted by Scherk would not have been entertained in a number of Federal Circuits because it did not involve the kind of securities transaction that Congress intended to regulate when it enacted the Securities Exchange Act of 1934. [FN39] The fraud claimed in Scherk was virtually identical to the breach of warranty claim; arbitration of such claims arising out of an agreement between parties of equal bargaining strength does not conflict with any significant federal policy.

FN39. The Court's opinion in *Landreth Timber,* 471 U.S., at 694-695, n. 7, 105 S.Ct., at 2306, n. 7, does not take issue with my assertion, in dissent, that Congress never "intended to cover negotiated transactions involving the sale of control of a business whose securities have never been offered or sold in any public market." *Id.,* at 699, 105 S.Ct., at 2313.

In contrast, Soler's claim not only implicates our fundamental antitrust policies, supra, at 3366-3370, but also should *665 be evaluated in the light of an explicit congressional finding concerning the disparity in bargaining power between automobile manufacturers and their franchised dealers. In 1956, when Congress enacted special legislation to protect dealers from bad-faith franchise terminations, [FN40] it recited its intent "to balance the power now heavily weighted in favor of automobile manufacturers." 70 Stat. 1125. The special federal interest in protecting automobile dealers from overreaching by car manufacturers, as well as the policies underlying the Sherman Act, underscore the folly of the Court's decision today.

FN40. Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221-1225.

**3374 V

The Court's repeated incantation of the high ideals of "international arbitration" creates the impression that this case involves the fate of an institution designed to implement a formula for world peace. [FN41] But just as it is improper to subordinate the public interest in enforcement of antitrust policy to the private interest in resolving commercial disputes, so is it equally unwise to allow a vision of world unity to distort the importance of the selection of the proper forum for resolving this dispute. Like any other mechanism for resolving controversies, international arbitration will only succeed if it is realistically limited to tasks it is capable of performing well--the prompt and inexpensive resolution of essentially contractual disputes between commercial partners. As for matters involving the political passions and the fundamental interests of nations, even the multilateral convention adopted under the auspices of the United Nations recognizes that private international arbitration is incapable of achieving satisfactory results.

FN41. E.g., Charter of the United Nations and Statute of the International Court of Justice, 59 Stat. 1031, T.S. No. 993 (1945); Constitution of the International Labor Organisation, 49 Stat. 2712, T.S. No. 874 (1934); Treaty of Versailles, S.Doc. 49, 66th Cong., 1st Sess., pt. 1, pp. 8-17 (1919) (Covenant of the League of Nations); Kant, Perpetual Peace, A Philosophical Sketch, in Kant's Political Writings 93 (H. Reiss, ed. 1971).

*666 In my opinion, the elected representatives of the American people would not have us dispatch an American citizen to a foreign land in search of an uncertain remedy for the violation of a public right that is protected by the Sherman Act. This is especially so when there has been no genuine bargaining over the terms of the submission, and the arbitration remedy provided has not even the most elementary guarantees of fair process. Consideration of a fully developed record by a jury, instructed in the law by a federal judge, and subject to appellate review, is a surer guide to the competitive character of a commercial practice than the practically unreviewable judgment of a private arbitrator.

Unlike the Congress that enacted the Sherman Act in 1890, the Court today does not seem to appreciate

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



105 S.Ct. 3346
(Cite as: 473 U.S. 614, *666, 105 S.Ct. 3346, **3374)

the value of economic freedom.     I respectfully dissent.

For U.S. Supreme Court Briefs See:

1984 WL 565892 (Appellate Brief), Brief of Petitioner, (December 17, 1984)

1984 WL 565893 (Appellate Brief), Brief of Cross-Petitioner, (October 1, 1984)

1985 WL 669811 (Appellate Brief), Brief of Cross-Respondent and Reply Brief of Petitioner, (February 12, 1985)

1985 WL 669812 (Appellate Brief), Reply Brief of Cross-Petitioner, (February 28, 1985)

1985 WL 669814 (Appellate Brief), Brief for the United States as Amicus Curiae Supporting Respondent In No. 83-1569, (January 24, 1985)

1985 WL 669816 (Appellate Brief), Brief Amicus Curiae of the National Automobile Dealers Association in Support of Soler Chrysler-Plymouth, Inc, (January 24, 1985)

1984 WL 565894 (Appellate Brief), Brief of the Commonwealth of Puerto Rico as Amicus Curiae, (October 1, 1984)

473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444, 53 USLW 5069, 1985-2 Trade Cases P 66,669

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

6

Not Reported in F.Supp.2d
(Cite as: 2006 WL 1579597 (D.Utah))

Page  93

Only the Westlaw citation is currently available.

United States District Court,
D. Utah,
Central Division.

MLDX INVESTMENTS, LLC, MLDX Capital,
Inc., Mark Caruso, Judy Caruso, Phillip
Rasmussen, Linda Rasmussen and Rasmussen
Investments X, LLC, Plaintiffs,
v.
David PARSE, Todd Clendening, and Craig
Brubaker, Defendants.

No. 2:06-CV-00121 PGC.

June 1, 2006.

David R. Deary, Stewart Clancy, W. Ralph
Canada, Jr., Deary, Montgomery, Defeo & Canada,
Dallas, TX, Stephen E.W. Hale, Parr, Waddoups,
Brown, Gee & Loveless, Salt Lake City, UT, for
Plaintiffs.

Daniel Walworth, Laurie Edelstein, Brune &
Richard LLP, San Francisco, CA, James S. Jardine,
Mark W. Pugsley, Matthew R. Lewis, Ray Quinney
& Nebeker, Salt Lake City, UT, Susan E. Brune,
Theresa Trzaskoma, Brune & Richard LLP, New
York, NY, for Defendants.

ORDER DENYING MOTION TO COMPEL
ARBITRATION AND GRANTING MOTION TO
STAY
PROCEEDINGS

PAUL G. CASSELL, District Judge.

*1 Plaintiffs have filed a complaint alleging that
defendants David Parse, Todd Clendening, and
Craig Brubaker (referred to collectively as Parse)
defrauded them into participating in investment
strategies involving foreign exchange digital option
contracts offered by Parse. Pending before the court
is Parse's motion to compel arbitration of the claims
asserted in the plaintiffs' complaint and to stay
proceedings. In his motion, Parse relies on executed
Account Agreements containing broad arbitration
clauses. Parse also seeks to compel arbitration by
way of both the Federal Arbitration Act [FN1] and
the Convention on the Recognition and Enforcement
of Foreign Arbitral Awards. [FN2]

FN1. 9 U.S.C. § 1 et seq.

FN2. 21 U.S.T. 2517, 330 U.N.T.S. 38 (June 10,
1958).

Five days after Parse's motion to compel
arbitration was filed in this court, plaintiffs' counsel
initiated a class action suit on essentially the same
facts in the Southern District of New York. If a
class is certified in that case--Kissel v. Deutsche
Bank AG [FN3]--it would include the plaintiffs in
this action.

FN3. No. 06 Civ.2045 (S.D.N.Y. filed March 15,
2006).

In light of the now-pending class action suit, the
court GRANTS Parse's motion to stay proceedings
[# 10] and DENIES the motion to compel arbitration
without prejudice as premature [# 7]. Plaintiffs are
ordered to submit a report to this court within
fourteen days of any decision by the Southern
District of New York to certify or not certify the
class in Kissel. At that time, plaintiffs are required
to inform the court of their intentions to proceed in
this case. If a class is certified in Kissell, plaintiffs
must determine whether to proceed in this court or
to proceed as members of the class in Kissell. If the
plaintiffs choose to proceed in this court, the court
will at that time GRANT Parse's motion to compel
arbitration here [# 7]. If, however, the plaintiffs
choose to proceed as members of the class in
Kissell, this action will be dismissed without
prejudice.

BACKGROUND

For the purposes of these motions, the court finds
the following relevant facts. David Parse and the
other defendants are all employees, agents, or
representatives of Deutsche Bank AG and/or
Deutsche Bank Securities d/b/a Deutsche Bank
Alex. Brown. Deutsche Bank "does business in
major financial and banking markets in Germany,
Europe and the rest of the world ... and claims to
have a leading position in international foreign
exchange, fixed-income and equities trading."
[FN4] Deutsche Bank Alex Brown is a division of
Deutsche Bank Securities, which is a wholly owned
subsidiary of Deutsche Bank AG.

FN4. Complaint, at ¶¶ 13 -14.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1579597, *1 (D.Utah))

The plaintiffs allege that they were defrauded in participating into a complex tax avoidance strategy involving foreign exchange digital option contracts. In brief, the strategy required the plaintiffs to purchase and write options and then transfer these options to either a partnership or limited liability company. The basis of the transferor's partnership interest would be increased by the cost of the purchased options, but would not be reduced by the transferor's obligation with regard to the options actually written. The contracts generally used a currency pair (such as the Japanese Yen versus the U.S. Dollar, the Euro versus the U.S. Dollar, or the Canadian Dollar versus the U.S. Dollar) as a spot rate to trigger a payoff with respect to the digital options. Plaintiffs essentially allege that Parse structured the contracts fraudulently to ensure exorbitant fees to Parse and Deutsche Bank.

*2 The plaintiffs all signed an Account Agreement with DB Alex. Brown. [FN5] The agreements state that DB Alex. Brown LLC is a "subsidiary of Deutsche Bank AG" and that "each of Deutsche Bank and its affiliates is a separately incorporated legal entity." [FN6] The Account Agreement also applies to "DB Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees." [FN7]

FN5. See Aff. of Laurie Edelstien in Sup. ofDef's Mot. to Compel Arbit., Docket No. 9, at Exhibits 1-3 (Account Agreements).

FN6. Id. Ex. 1 at ¶ 0.

FN7. Id.

Paragraph 19 of the Account Agreement contains an arbitration clause.
I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date or this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.
...
Neither you or I waive any right to seek equitable relief pending arbitration. No person shall bring a

putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the punitive class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute waiver or any rights under this agreement except to the extent state herein. [FN8]

FN8. Id. Ex. 1 at ¶ 19. The Agreement also states in all capital letters directly above the signature line "THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19." [FN9] The plaintiffs do not dispute that they signed these Account Agreements.

FN9. Id. at ¶ 22.

On March 10, 2006, Parse filed a motion to compel arbitration [# 7] and stay proceedings [# 10]. He argued that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards [FN10] requires the arbitration of the plaintiffs' claims. Alternatively, he argued that the court should still enforce the Account Agreement's arbitration provisions in accordance with the Federal Arbitration Act (FAA). Plaintiffs responded that the Convention does not apply to require arbitration and that the Account Agreement's arbitration clause is not valid or enforceable for various reasons.

FN10. 21 U.S.T. 2517, 330 U.N.T.S. 38 (June 10, 1958).

One additional wrinkle to these facts is important. On March 15, 2006, five days after Parse moved to compel arbitration, plaintiffs' counsel filed a class action complaint in the Southern District of New York. The complaint alleges numerous claims which appear to be virtually identical to the claims asserted in the complaint before this court. The plaintiffs here are members of this putative class.

## DISCUSSION

"[T]the first task of a court asked to compel arbitration of a dispute is to determine whether the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1579597, *2 (D.Utah))

parties agreed to arbitrate that dispute. The court is to make this determination by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." [FN11] "Motions to compel arbitration are governed by 9 U.S.C. § 4." [FN12] Generally, the FAA strongly favors arbitration for dispute resolution, but the "presumption of arbitrability falls away" once "the dispute is [over] whether there is a valid and enforceable arbitration agreement in the first place." [FN13]

    FN11. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626 (1985).

    FN12. Spahr v. Secco, 330 F.3d 1266, 1269 (10th Cir.2003).

    FN13. Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir.1998).

*3 Even though the Account Agreement which includes the arbitration clause was between DB Alex. Brown and the plaintiffs, Parse himself seeks to enforce the arbitration clause. In Gibson v. Wal-Mart Stores, Inc., [FN14] the Tenth Circuit held that a non-signatory could enforce an arbitration clause if he was a third-party beneficiary of the agreement. Of course, the intent of the parties to that agreement is important to consider, but the plaintiffs have alleged in their complaint that Parse was an agent or employee of Deutsche Bank AG and DB Alex. Brown. Because the plaintiffs have conceded the agent/employee status of Parse, Parse can enforce the arbitration agreement--if those terms apply, are valid and enforceable. It is to these issues the court now turns.

    FN14. 181 F.2d 1163 (10th Cir.1999).

A. The Pending Class Action Bars Parse's Motion to Compel Arbitration.

Plaintiffs argue that Parse may not seek arbitration because of the existence of the putative class action suit in Kissell v. Deutsche Bank AG, [FN15] currently pending in the Southern District of New York. Plaintiffs claim that the transactions at issue in this case are identical to those in Kissell, and also claim that it is undisputed they are all members of the putative class in that suit.

    FN15. Civil Action No. 06-CV-2405 (S.D.N.Y. Mar. 15, 2006).

The arbitration clause specifically bars the enforcement of "any pre-dispute arbitration agreement against any person ... who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action." [FN16] This language is drawn directly from the NASD Rules, stating that "any claim filed by a member or members of a putative or certified class action is also ineligible for arbitration at the Association if the claim is encompassed by a putative or certified class action in federal or state court." [FN17] The NASD Rules also state that "[n]o member or associated person shall seek to enforce any agreement to arbitrate against a customer ... who ... is a member of a putative or certified class with respect to any claims encompassed by the class action." [FN18]

    FN16. Account Agreement, ¶ 19.

    FN17. NASD Rule 10301(2).

    FN18. NASD Rule 10301(3).

The Kissell class action plaintiffs filed their putative class action on March 15, 2006, five days after Parse filed his motion to compel arbitration. At the time Parse sought arbitration, no pending class action suit existed in either state or federal court. Therefore, at the time Parse filed his arbitration motion, he was in full compliance with the arbitration clause in the Account Agreement and NASD Rules. Parse's seeking arbitration before the plaintiffs' own counsel filed the Kissell class action suit did not void the arbitration clause in the Account Agreement. Since no pending class action suit existed at the time Parse sought arbitration against plaintiffs' claims, Parse could not have violated the arbitration clause or voided the Account Agreement. Therefore, plaintiffs' argument that Parse's motion to compel arbitration voided the Account Agreement is highly unpersuasive.

*4 Now, however, there is a pending class action suit, and arbitration would not be suitable according to the Account Agreement and NASD Rules. Due to the pending class action suit in Kissell, the court may not compel arbitration against the plaintiffs at this time. A stay of this litigation pending the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



outcome of the class certification motion is therefore appropriate. After the class certification decision is made, the plaintiffs will be in a position to decide how they wish to proceed. Therefore, the court stays this litigation until after the Southern District of New York issues its decision on the Kissell class certification [# 10].

**B. Arbitration Would be Appropriate if Plaintiffs Proceed in this Court.**

If plaintiffs decide to proceed before this court, arbitration would be appropriate. Parse first argues that arbitration is appropriate under 9 U.S.C. §§ 201 and 203, which provides that United States courts will enforce the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and confers such jurisdiction to enforce the Convention on this court. [FN19] Parse's arguments are not persuasive, as the Account Agreements are between U.S. citizens and the transactions do not bear a reasonable relationship to one or more foreign states. [FN20]

FN19. Mitsubishi Motors Corp., 473 U.S. at 619 n. 3.

FN20. See, e.g., Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 959 (10th Cir.1992); Ledee v. Ceramiche Ragno, 684 F.2d 184, 186-87 (1st Cir.1982).

Alternatively, Parse argues that the arbitration clause is valid and should be enforced in accordance with the governing principles of the FAA. Because the plaintiffs signed the Account Agreements and Parse is a third-party beneficiary of the Account Agreement's arbitration clause, Parse argues he is entitled to force arbitration. The plaintiffs do not dispute that they signed the Account Agreements. They argue, however, that (1) the defendants may not seek arbitration because of the pending class action suit and have therefore voided the Account Agreements by seeking arbitration, (2) the defendants are judicially estopped from seeking arbitration, and (3) a valid agreement to arbitrate does not exist.

The court has already determined that Parse may not force arbitration during the currently pending class certification action in Kissell. Parse's motion did not violate the Account Agreements or NASD

Rules because no pending class action suit existed at the time he moved to compel arbitration. Plaintiffs argue in the alternative, that Parse previously conceded in other cases that he was prohibited from compelling arbitration under the Account Agreements and NASD rules. Therefore, under "Tenth Circuit or New York law, [plaintiffs argue Parse] should be estopped from taking the position that they have the right to compel arbitration at this time." [FN21] These arguments stem solely from the fact that a pending class certification suit existed at the time Parse previously took this position before other courts. In each case discussed by the plaintiffs in support of their proposition, a currently pending class action suit existed. Therefore, Parse could not in good faith assert any arbitration of other plaintiffs' claims, and had to admit the inability to enforce the arbitration clause. In this case, however, no pending class action suit existed at the time Parse moved to compel arbitration. Additionally, the factual situations of the cases cited by the plaintiffs, in the hopes of judicially estopping Parse from compelling arbitration, are completely different than this case. Merely because Parse admitted in previous cases--where a class action suit was pending--that he could not enforce arbitration, does not mean that he is estopped from seeking arbitration in this case. Accordingly, the plaintiffs' estoppel argument is unpersuasive.

FN21. Pla's Memo. in Opp. of Def's Mot. to Compel Arbit., Docket No. 17, at 10 (Apr. 17, 2006).

**5** Plaintiffs also argue that a valid agreement to arbitrate does not exist. They argue that the arbitration provisions are unconscionable. "While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract.' " [FN22] "[A] written provision for arbitration 'in any ... contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " [FN23] State contract law principles generally govern whether the parties have agreed to arbitrate and whether the agreement is valid. [FN24]

FN22. Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir.2001) (quoting AT & T Techs., Inc. v.



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1579597, *5 (D.Utah))

Commu'ns. Workers of Am., 475 U.S. 643, 648 (1986).

FN23. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 400 (1967) (quoting § 2 of the U.S. Arbitration Act of 1925, 9 U.S.C. § 2).

FN24. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

Plaintiffs do not dispute that they signed the Account Agreements or that they failed to understand these agreements. They argue, however, that the agreement to arbitrate is unenforceable due to unconscionability. [FN25] A showing of unconscionability requires a demonstration that the Account Agreement is "both procedurally and substantively unconscionable when made." [FN26] In other words, plaintiffs must offer "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." [FN27]

FN25. See Tarulli v. Circuit City Stores, Inc., 333 F.Supp.2d 151, 156 (S.D.N.Y.2004).

FN26. Gillman v. Chase Manhattan Bank, 534 N.E.2d 824, 828 (N.Y.Ct.App.1988).

FN27. Id. (quotations omitted).

Regarding the procedural element, the court must consider "matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power." [FN28] New York law specifically states that "the existence of [the arbitration clause] was clearly noted in bold-face print directly above the signature line" and cannot be procedurally deficient on that issue. [FN29] Additionally, the parties to this transaction have not alleged their experience or education clearly demonstrates procedural unconscionability.

FN28. Id. (quotations omitted).

FN29. Id. (quotations omitted).

Plaintiffs only real argument on procedural

unconscionability is that their "lack of meaningful choice" renders the arbitration clause impotent. [FN30] They argue that this lack of meaningful choice is "self-evident" because Parse designed the tax shelter strategy and promoted that strategy to plaintiffs. As a result, Parse, as an employee of DB Alex. Brown, required plaintiffs to open up accounts with their brokerage firm and to sign the Account Agreements in order to take advantage of the tax shelter scheme. Of course, plaintiffs did not have to take advantage of the tax shelter scheme; moreover, they could have gone to other brokers to concoct a similar scheme. Additionally, plaintiffs "had ample time to review the terms and conditions" and to decide not to engage in the tax shelter scheme "if they did not wish to be bound" by the terms of the arbitration clause. [FN31] Finally, it is obvious that the plaintiffs were quite sophisticated investors actively seeking tax shelter opportunities. Given these facts, plaintiffs' argument that they "lacked meaningful choice" is highly unpersuasive.

FN30. See Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449-50 (D.C.Cir.1965); In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F.Supp.2d 1107, 1136-37 (D.Kan.2003); Gillman, 534 N.E.2d. at 828.

FN31. In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F.Supp.2d at 1126, 1136.

*6 Plaintiffs further argue that the arbitration clause is substantively unconscionable because it requires "any controversies" to be arbitrated before the NYSE or NASDR. The arbitration clause requires arbitration of "any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with [DB Alex. Brown], to the construction, performance or breach of any agreement with [DB Alex. Brown], or to transactions with or through [DB Alex. Brown]." [FN32] Plaintiffs provide no case law supporting the proposition that "broad-based, multi-party scheme[s] to fraudulently design, promote and implement a faulty tax shelter" are not appropriate for arbitration before NYSE or NASDR. [FN33] In any event, the claims alleged--including fraud and breach of fiduciary duty--are quintessentially reasonable claims to bring before a NYSE or NASDR arbitration panel. Those panels are familiar with the services brokers provide to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1579597, *6 (D.Utah))

their customers in complex financial transactions of the kind at issue here. And the fact that the NYSE and NASDR arbitrations are held in accordance with certain rules does not demonstrate substantive unconscionability. The arbitration clause clearly states that arbitrations must be brought before one of these two tribunals, and plaintiffs clearly signed these Account Agreements with that understanding. The court finds that the wide scope of the arbitration clause is not unconscionable, and that the claims brought in this suit fall under the rubric of "any controversies" arising under the Account Agreements.

FN32. Account Agreement, ¶ 19.

FN33. Pla's Memo. in Opp., at 13.

Plaintiffs request the court consider "other factors" from the Montana Supreme Court's decision in Kloss v. Edward D. Jones & Co to find unconscionability. [FN34] These factors include: (1) whether the potential arbitrators are disproportionately employed in one of the party's field, whether the arbitrators tend to favor "repeat players," (3) the amount of filing fees in the arbitration, and whether they make small claims prohibitive, (4) whether the arbitration proceedings are "shrouded in secrecy," (5) whether the arbitrators are bound by the law or the facts, and (6) whether there is an opportunity to discover facts necessary to prove a claim. [FN35] These factors do not come close to suggesting unconscionability. Although the NASDR or NYSE arbitration panels undoubtedly use arbitrators from the brokerage field, there has been no showing that such arbitration panels disproportionately favor brokers. Indeed, the success/win rate of 43% in 2005 for plaintiffs may be higher than that in federal courts. And the filing fees of $5,000, while higher than the court's filing fees, do not appear out of line for a general arbitration filing fee, particular given the kind of sophisticated financial transaction at issue here.

FN34. 54 P.3d 1 (Mont.2002).

FN35. Id. at 8-9.

In sum, the court finds that the MLDX plaintiffs have failed to demonstrate the invalidity of the arbitration clause in the Account Agreement.

Therefore, the court finds that arbitration would be appropriate, if the Kissell case were not currently pending in the Southern District of New York.

CONCLUSION

*7 For the foregoing reasons, the court GRANTS the motion to stay proceedings pending arbitration [# 10] and DENIES Parse's motion to compel arbitration without prejudice as premature [# 7]. Plaintiffs are ordered to submit a report to this court within fourteen days of the Southern District of New York's class certification decision in Kissell. At that time, plaintiffs are required to inform the court of their intentions to proceed in this case. If a class is certified in Kissell, plaintiffs must determine whether to proceed in this court or to proceed as members of the class in Kissell. If the plaintiffs choose to proceed in this court, the court will at that time GRANT Parse's motion to compel arbitration here [# 7]. If, however, the plaintiffs choose to proceed as members of the class in Kissell, this action will be dismissed without prejudice.

SO ORDERED.

2006 WL 1579597 (D.Utah)

END OF DOCUMENT

 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



7

Not Reported in F.Supp.
73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P 44,907
(Cite as: 1997 WL 129396 (S.D.N.Y.))

Page 100

United States District Court,
S.D. New York.

Benjamin RICE, Plaintiff,
v.
BROWN BROTHERS HARRIMAN & CO.,
Defendant.

No. 96 Civ. 6326(MBM).

March 21, 1997.

Arlene Boop, Nina Koenigsberg, Alterman & Boop, New York City, for Plaintiff.

Andrea S. Christensen, John D. Geelan, John Roberti, Kaye Scholer Fierman Hays & Handler, New York City, for Defendant.

OPINION AND ORDER

MUKASEY, District Judge.

*1 Benjamin Rice sues Brown Brothers Harriman & Co. ("BBH"), his employer, claiming that BBH discriminated against him in his compensation and other conditions of his employment because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and New York City Human Rights Law, Administrative Code § 8-101 et seq. Plaintiff seeks also a declaratory judgment that his discrimination claims need not be arbitrated under an arbitration clause included in a securities industry registration form which he signed when he was hired. Defendant moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and (6), or for summary judgment pursuant to Fed.R.Civ.P. 56, or in the alternative to compel arbitration and stay further proceedings pending conclusion of the arbitration pursuant to the Federal Arbitration Act ("F.A.A."), 9 U.S.C. §§ 3-4. For the reasons set forth below, defendant's motion to dismiss plaintiff's declaratory judgment claim and its motion to compel arbitration and stay these proceedings are granted.

I.

BBH provides private banking services, including investment, advisory, management and custodial services. (Compl.¶ 7) Plaintiff, 66 years old, has been employed by BBH since 1983 and is now a securities analyst and manager. (Id. ¶ 13) He claims that BBH denied him the same job opportunities and compensation as younger employees. (Id. ¶¶ 23-26)

Around the time he commenced his employment, plaintiff signed a "Uniform Application for Securities Industry Registration or Transfer Form," commonly known as a U-4. (Id. ¶ 15; Geelan Aff., Ex. B) The U-4 provided:

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by laws of the organizations with which I register, as indicated in Question 8.

(Geelan Aff., Ex. B) In answer to Question 8, which asked with which organizations plaintiff planned to register, Rice checked the box labelled NYSE ("New York Stock Exchange"). (Id.) NYSE Rule 347 provides:

Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party....

(Geelan Aff., Ex. C) Plaintiff is a registered representative on the NYSE and defendant is a member organization. (Compl.¶ 14)

Plaintiff asserts age discrimination claims under federal, state and local law. He claims that the U-4 arbitration clause does not cover age discrimination claims. (Id. ¶ 19) Further, plaintiff argues that even if the clause does compel arbitration of age discrimination claims, plaintiff did not knowingly and voluntarily waive his right to a judicial forum for such claims. (Id.¶¶ 20-22, 32-35)

II.

*2 This action is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and by New York contract law. Under 9 U.S.C. § 3:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 129396, *2 (S.D.N.Y.))

Page 101

such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3 (1994). Further, section 4 of the F.A.A. provides that a federal court may compel a party to proceed to arbitration if the party fails, refuses or neglects to honor an agreement to arbitrate. 9 U.S.C. § 4 (1994). To determine whether to stay proceedings and compel arbitration, a court must engage in a four-part inquiry:

First, it must determine whether the parties agreed to arbitrate ...; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable ...; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir.1987). If this inquiry yields a finding that the matter is arbitrable, the court must send the parties to arbitration; there is no room for discretion. Id.

A. Agreement to Arbitrate

Plaintiff does not deny that he signed the U-4 form. The U-4 requires that all matters subject to arbitration under the rules of the NYSE be arbitrated. NYSE Rule 347 requires that any employment dispute between a registered representative and a member organization be arbitrated. Plaintiff is a registered representative on the NYSE, defendant is a member organization, and therefore plaintiff agreed to arbitrate claims arising from his employment.

B. Scope of the Arbitration Clause

Enforcement of an arbitration agreement in relation to a particular claim "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT & T Tech., Inc. v. Communications Workers, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648

(1986). Under the U-4's arbitration clause, and NYSE Rule 347, plaintiff was required to arbitrate any dispute "arising out of ... employment." Rule 347 is broad, and therefore must be read to include all employment disputes. Accordingly, plaintiff's claim that defendant discriminated against him in the condition of employment on account of his age is an employment dispute covered by this language. See, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); Chisholm v. Kidder, Peabody Asset Management, Inc., 810 F.Supp. 479, 481 (S.D.N.Y.1992).

C. Arbitrability of Statutory Claims

*3 It is well settled that age discrimination claims brought under the ADEA and under state and local law are subject to arbitration. Gilmer, 500 U.S. at 27-28; Fletcher v. Kidder, Peabody & Co., 81 N.Y.2d 623, 634, 601 N.Y.S.2d 686, 692, 619 N.E.2d 998, cert. denied, 510 U.S. 933 (1993). In Gilmer, the Supreme Court held in circumstances remarkably similar to these--a securities industry employee, registered with the NYSE, who had signed a U-4 form with the same arbitration clause-- that ADEA claims are subject to arbitration to the same extent as other claims. Gilmer, 500 U.S. at 27-28. The Court reasoned that neither the text of the ADEA nor its legislative history shows a Congressional intent to preclude arbitration of ADEA claims, and that the ADEA's purpose was not inconsistent with arbitration. Id.

Similarly, in Fletcher, the New York Court of Appeals held that state law discrimination claims under New York Executive Law § 296(1)(a) are arbitrable. Fletcher, 81 N.Y.2d at 634, 601 N.Y.S.2d at 692, 619 N.E.2d 998. The Court stated that "the arbitrability of statutory discrimination claims is henceforth to be determined by reference to Congress' intent with regard to alternative dispute resolution of that class of claims." Id. at 688. The Court found in light of Gilmer and the Court of Appeals' own reading of Congressional intent, Congress intended that discrimination claims be arbitrable. Id. at 690-92.

Fletcher's reasoning would apply also to local law-based discrimination claims. The Fletcher Court stated that "[w]here the right is predicated on a State or local statute rather than on a congressional

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 129396, *3 (S.D.N.Y.))

enactment, ... the courts are obliged to draw an analogy to the equivalent Federal law, where possible, and to consider Congress' intentions with regard to the rights created by that law." Id. at 690. Therefore, the arbitrability of a discrimination claim under local law, such as the New York City Human Rights Law, is determined by reference to Congressional intent. As the Fletcher Court noted, Congressional intent favors arbitrating discrimination claims. Accordingly, discrimination claims under New York City Human Rights Law also are arbitrable.

The fourth part of the inquiry--whether nonarbitrable claims should be stayed pending the completion of arbitration on arbitrable claims--is inapplicable here because all of plaintiff's claims are arbitrable.

D. Knowing and Voluntary Agreement to Arbitrate Age Discrimination Claims

Although the mandated four-part inquiry appears to compel arbitration, plaintiff argues that his claim need not be arbitrated because he did not knowingly and voluntarily agree to arbitrate age discrimination claims. He asserts three different theories in support of this conclusion. First, plaintiff claims that he was never told that discrimination claims are arbitrable under the U-4 arbitration clause. "When deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). Under New York law, a party's subjective knowledge of the contents of a contract at the time he signs it is irrelevant. See Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't 1983). Rather, "one 'who signs and accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and assent to them.' " Maye v. Smith Barney Inc., 897 F.Supp. 100, 108 (S.D.N.Y.1995) (quoting Metzaer v. Aetna Ins., Co., 227 N.Y. 411, 125 N.E. 814 (1920)); see also Genesco. Inc., 815 F.2d at 845 ("Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation.").

*4 Here, plaintiff claims that he "was not told and had not [sic ] idea that the rules of the New York Stock Exchange could be read to require arbitration of the present claims I bring for age discrimination." (Rice Aff. ¶ 2) However, under New York law, plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract, including the broad arbitration clause in NYSE Rule 347, which on its face encompasses discrimination claims. See, e.g., Smith v. Lehman Bros., Inc., No. 95 Civ. 10326, 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996) ("As such assertions [that plaintiff was not aware of arbitration clause] alone do not constitute economic duress, coercion, or fraud, Smith is conclusively presumed to have assented to submit his claims to arbitration."); Hall v. Metlife Resources/Div. of Metro. Life Ins. Co., No. 94 Civ. 0358, 1995 WL 258061, at *2-3 (S.D.N.Y. May 3, 1995) (holding arbitration clause binding where plaintiffs claimed in affidavits that they were unaware that U-4's which they signed contained arbitration clauses).

To the extent that plaintiff might seek to rely on Prudential Insurance Company of America v. Lai, 42 F.3d 1299 (9th Cir.1994), cert. denied, 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995), for the proposition that an explicit waiver of the right to a judicial forum or actual knowledge of such a waiver is required to arbitrate a discrimination claim, I follow other courts in this district in rejecting that rule. See DeGaetano v. Smith Barney. Inc., No. 95 Civ. 1613, 1996 WL 44226, at *7 (S.D.N.Y. Feb.5, 1996); Hall, 1995 WL 258061, at *3-4; Pitter v. Prudential Life Ins. Co. of Amer., 906 F.Supp. 130, 139-40 (S.D.N.Y.1995); Maye, 897 F.Supp. at 107; see also Beauchamp v. Great West Life Assurance Co., 918 F.Supp. 1091, 1098 (E.D.Mich.1996). Moreover, unlike the arbitration clause in Lai, NYSE Rule 347 explicitly covers employment disputes. See, e.g., Topf v. Warnaco, Inc., 942 F.Supp. 762, 771 (D.Conn.1996) (distinguishing Lai because arbitration clause "refer[s] specifically to the arbitrability of any controversy arising out of an employment relationship."); Golenia v. Bob Baker Toyota, 915 F.Supp. 201, 205 (S.D.Cal.1996) (same).

Second, plaintiff claims in the complaint that defendant fraudulently induced him to sign the arbitration clause. However, plaintiff has since

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 129396, *4 (S.D.N.Y.))

abandoned this claim. (Christensen Aff., Ex. D) Thus, plaintiff has shown no special circumstances which can overcome the presumption of knowing and voluntary agreement to the full scope of the arbitration clause.

Third, plaintiff argues that the Older Workers Benefit Protection Act of 1990, Pub.L. No. 101-433, title II, 104 Stat. 978, 983-84 (1990) ("OWBPA") (codified at 29 U.S.C. § 626), which amended the ADEA, bars arbitration of this ADEA claim because it imposes high standards for a knowing and voluntary waiver of a judicial forum in ADEA claims, which were not met here. The OWBPA provides that "[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1) (1994). It then provides that a waiver is not considered knowing and voluntary unless certain general requirements are met, including that the waiver is written in an understandable manner, that it refers specifically to the ADEA, that it does not waive rights arising after the waiver is executed, that it is in return for consideration which is in addition to anything of value to which the individual is already entitled, that the waiving party is advised to consult an attorney, and that the waiving party is given seven days to revoke the waiver after its execution. 29 U.S.C. § 626(f)(1)(A)-9 (E), (G). In addition to these general requirements, the statute requires also that an individual be given 21 days to consider the waiver. 29 U.S.C. § 626(f)(1)(F)(i). However, if the "waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees," the individual must be given 45 days to consider the waiver and must be informed of details concerning the group or class being offered the program. 29 U.S.C. § 626(f)(1)(F)(ii), (H). In addition, a "waiver in settlement of a charge filed with the Equal Employment Opportunity Commission, or an action filed in court by the individual or the individual's representative" alleging age discrimination must meet the general requirements listed above and the waiving party must be given a "reasonable period of time" within which to consider the settlement agreement. 29 U.S.C. § 626(f)(1)-(2).

*5 Plaintiff's reliance on the statute is misplaced in part because the arbitration clause in plaintiff's U-4 was executed before the OWBPA was enacted.

The Act provides that the waiver requirements "shall not apply with respect to waivers that occur before the date of enactment of this Act." Old Workers Benefit Protection Act, Pub.L. No. 101-433, § 202, 104 Stat. 978, 984 (1990); see also Ulvin v. Northwestern Nat'l Life Ins. Co., 943 F.2d 862, 866 (8th Cir.1991), cert. denied, 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992). The plain meaning of the word "occur" is that the waiver is signed or executed. Therefore, the most logical interpretation of this statutory provision is that the OWBPA's waiver requirements do not apply to waivers executed before the statute's enactment. Rice signed the U-4 on August 12, 1983 (Geelan Aff., Ex. B), and Congress enacted the OWBPA on October 16, 1990. Any waiver of judicial forum in the U-4 "occurred" well before the enactment of the OWBPA. Accordingly, the OWBPA waiver requirements do not apply to the arbitration clause at issue in this case.

Even if I were to interpret the OWBPA as providing that a waiver of the right to a judicial forum through an arbitration clause does not "occur" until the claim arises and there is occasion for the waiver to be invoked, and that therefore the arbitration clause is covered by the statute, plaintiff's argument would still fail because Congress intended the OWBPA requirements to apply to the waiver only of substantive ADEA claims, and not procedural rights such as the right to a judicial forum. As the Fifth Circuit noted:

Congress, through the OWBPA, has protected terminated employees who waive their substantive rights under ADEA in exchange for a more favorable severance package; however, we find no clear indication that Congress was likewise concerned with protecting employees who agree to arbitrate claims that may arise during the course of their employment.

Williams v. Cigna Fin. Advisors. Inc., 56 F.3d 656, 661 (5th Cir.1995).

There are several indications that Congress intended the OWBPA waiver requirements to apply only to waivers of substantive rights or claims under the ADEA, and not to arbitration agreements. First, the text of the OWBPA shows that, as the Fifth Circuit noted, "Congress' primary concern [in the OWBPA] was with releases and voluntary separation agreements in which employees were forced to waive their rights." Williams, 56 F.3d at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 129396, *5 (S.D.N.Y.))

660.    The statute states that the waiver provisions apply to the waiver of "any right or claim under this chapter." 29 U.S.C. § 626(f)(1).    The reference to rights "under this chapter" would seem to refer to substantive rights conferred by this chapter of the code--i.e., the right to sue for age discrimination--rather than to procedural rights.    In addition, the statute refers specifically to additional safeguards for exit incentive or other termination programs and to settlements of claims filed by individuals or the EEOC, all of which engage substantive rights.

*6    Moreover, the statute does not refer specifically to arbitration or other procedures.    The Supreme Court has endorsed a distinction between waivers of substantive rights and waivers of procedural rights:    "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."    Mitsubishi Motors Corp., v. Soler Chrysler-Plymouth.    Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Therefore, it is significant that the OWBPA does not refer specifically to waivers of procedural rights collateral to ADEA claims such as the right to a judicial forum or a jury trial.    See Douglas E. Abrams.    Arbitrability in Recent Federal Civil Rights Legislation: The Need for Amendment, 26 Conn. L.Rev. 521, 584 n. 187 (1994) (noting that omission of reference to arbitration in statute "stands in stark contrast to legislation which, for nearly two decades, had referred specifically to arbitration when the lawmakers intended to reach the mandate's effect on agreements covering claims under a particular statute.").    Absent such reference, there is no reason to interpret the statute to restrict arbitration clauses.

Second, the legislative history of the OWBPA is consistent with an interpretation of the statute as applying to waivers of ADEA claims but not to waivers of procedural rights such as the right to a judicial forum or a jury trial.    The Senate Report states that the purpose of the waiver provisions is to "ensure[ ] that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA." Sen. Rep. No. 623, 101st Cong., 2d Sess. 5 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1510.    In addition, the Congressional Budget Office in a letter to the Chairman of the Senate Committee on Labor and Human Resources discussing cost estimates, noted that the bill was intended to alleviate the problem of "some employers ... requiring employees, particularly those accepting retirement and other exit incentive offers, to sign waivers of the right to bring cases of age discrimination against the employer." Id. at 1542-43.    Under the heading "Minority Views," the Report notes that the OWBPA sets forth a "series of stringent requirements that must be met by employers seeking waivers or releases of claims under the [ADEA]." Id. at 1563-64.    None of these documents mention arbitration and all seem to confirm that Congress intended the OWBPA waiver provisions to apply to substantive claims.

Third, if the statute were interpreted to cover waivers of the right to a judicial forum or a jury, that would undermine the traditional federal policy favoring arbitration.    Under the OWBPA, an "individual ... [may] not waive rights or claims that may arise after the date the waiver is executed." 29 U.S.C. § 626(f)(1)(C).    Pre-dispute arbitration clauses necessarily waive rights--i.e., the right to a judicial forum--that arise after they are executed. As the Williams court noted,

*7 If we were to hold that an arbitration clause in a U-4 Registration had to comply with the OWBPA's waiver provisions, we would in effect be holding that employers and employees could never enforce a pre-dispute agreement to arbitrate. We decline to remove from the province of arbitration all pre-dispute agreements absent a clear indication that Congress intended such a result.

Williams, 56 F.3d at 661.    The Williams court overstated the impact of applying the OWBPA waiver provisions to arbitration clauses because the waiver rules would apply to ADEA claims only. However, that Court was correct that reading the statute to cover arbitration clauses would effectively eliminate the arbitrability of ADEA claims.    Such a result would be contrary to the distinct federal policy favoring arbitration, see Moses H. Cone Memorial Hosp., v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."), which was reaffirmed specifically in reference to discrimination claims by the Civil Rights Act of 1991, see The Civil Rights Act of 1991, Pub.L. No. 102-166, § 118, 105 Stat. 1081 (1991) ("Where appropriate and to the extent

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo