Not Reported in F.Supp.
(Cite as: 1997 WL 129396, *7 (S.D.N.Y.))

authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of federal law amended by the title.").

Finally, applying of the OWBPA waiver provisions to waivers of a judicial forum would conflict with Supreme Court precedent holding that ADEA claims are arbitrable. See Gilmer, 500 U.S. at 27-28. Gilmer was decided in 1991, after the OWBPA was passed and with full knowledge of its waiver provisions. Gilmer, 500 U.S. at 29 n. 3. The Court wrote that "Congress, however, did not explicitly preclude arbitration or other non-judicial resolution of claims, even in its recent amendments to the ADEA." Id. at 26-27. However, reading the OWBPA to apply to waivers of a judicial forum would undermine the quoted statement from Gilmer by undermining the validity of pre-dispute arbitration clauses for ADEA claims.

Other courts have found also that "the OWBPA ... only bars the waiver of substantive rights and not the waiver of a particular judicial forum in which to adjudicate those rights." Kahalnik v. John Hancock Funds, Inc., No. 95 C 3933, 1996 WL 145842, at *3 (N.D.Ill. March 27, 1996); see also Nieminski v. John Nuveen & Co., No. 96 C 1960, 1997 WL 43241, at * 7 (N.D.Ill. Jan.3, 1997) ("[W]e believe that the Form U-4 does not violate the OWBPA because the OWBPA only bars the waiver of substantive rights and not the waiver of a particular forum in which the adjudicate those rights.").

Having determined that plaintiff agreed to arbitrate his age discrimination claims, I must dismiss plaintiff's declaratory judgment claim, compel arbitration and stay these proceedings pending the completion of that arbitration. 9 U.S.C. §§ 3-4 (1994).

*8 Defendant moves also for costs and attorneys' fees pursuant to Fed.R.Civ.P. 11. Although I have rejected plaintiff's arguments, I find that they pass the straight-face test, and therefore deny defendant's motion for sanctions.

\* \* \*

For the foregoing reasons, defendant's motions to dismiss plaintiff's declaratory judgment claim and to compel arbitration and stay the proceedings are granted.

SO ORDERED.

1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P 44,907

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



8

146 F.3d 175
77 Fair Empl.Prac.Cas. (BNA) 751, 73 Empl. Prac. Dec. P 45,394,
Fed. Sec. L. Rep. P 90,225
(Cite as: 146 F.3d 175)

United States Court of Appeals,
Third Circuit.

Sheila Warnock SEUS, Appellant,
v.
JOHN NUVEEN & CO., INC.

No. 97-1498.

Argued Jan. 20, 1998.
Decided June 8, 1998.

Former employee brought suit against brokerage firm alleging claims of discrimination under Title VII and the Age Discrimination in Employment Act. The United States District Court for the Eastern District of Pennsylvania, Robert S. Gawthrop, J., granted employer's motion to compel arbitration of claims pursuant to the Federal Arbitration Act (FAA), and plaintiff appealed. The Court of Appeals, Stapleton, Circuit Judge, held that: (1) arbitration agreement which employee signed as part of Uniform Application for Securities Industry Registration (Form U-4) was valid and enforceable under the FAA, with respect to claims under Title VII and the ADEA; (2) arbitration agreement covered employment dispute; and (3) district court did not abuse its discretion in denying plaintiff's motion to depose the National Association of Securities Dealers (NASD) in connection with her claim that current NASD arbitration procedures were inadequate to protect her statutory and due process rights.

Affirmed.

West Headnotes

[1] Alternative Dispute Resolution 191
25Tk191
(Formerly 33k23.9 Arbitration)

[1] Alternative Dispute Resolution 195
25Tk195
(Formerly 33k23.9 Arbitration)

[1] Alternative Dispute Resolution 205
25Tk205
(Formerly 33k23.30 Arbitration)
If a party to a binding arbitration agreement is sued

in a federal court on a claim that the plaintiff has agreed to arbitrate, it is entitled under the Federal Arbitration Act (FAA) to a stay of the court proceeding pending arbitration, and to an order compelling arbitration; if all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it. 9 U.S.C.A. §§ 3, 4.

[2] Alternative Dispute Resolution 134(1)
25Tk134(1)
(Formerly 33k6.2 Arbitration)
Predispute agreements to arbitrate claims under the ADEA are enforceable under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[3] Release 2
331k2
Provision of the Older Workers Benefit Protection Act (OWBPA) of 1990 that an individual "may not waive any right or claim" under the ADEA unless the waiver is knowing and voluntary, does not apply to waivers executed before enactment of the statute. Age Discrimination in Employment Act of 1967, §§ 2 et seq., 7(f)(1), 29 U.S.C.A. §§ 621 et seq., 626(f)(1).

[4] Release 15
331k15
With respect to section of the Older Workers Benefit Protection Act (OWBPA) of 1990 providing that individual "may not waive any right or claim" under the ADEA unless the waiver is knowing and voluntary, phrase "any right or claim" refers to substantive rights under the ADEA, not procedural rights such as the right to a judicial forum. Age Discrimination in Employment Act of 1967, §§ 2 et seq., 7(f)(1), 29 U.S.C.A. §§ 621 et seq., 626(f)(1).

[5] Alternative Dispute Resolution 134(1)
25Tk134(1)
(Formerly 33k6.2 Arbitration)
Predispute agreements to arbitrate claims under Title VII are enforceable under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 1 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[6] Civil Rights 1502

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175)

78k1502
(Formerly 78k332)
Section of the Civil Rights Act of 1991 providing that "where appropriate and to the extent authorized by law, the use of alternative dispute resolution, including arbitration, is encouraged to resolve disputes arising under [Title VII and the ADEA]" does not evince Congressional intent to preclude predispute waivers of a judicial forum for Title VII claims. Civil Rights Act of 1991, § 118, 42 U.S.C.A. § 1981 note; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

[7] Alternative Dispute Resolution    135
25Tk135
(Formerly 33k6.2 Arbitration)
Court can decline to enforce a contract covered by the Federal Arbitration Act (FAA) if and only if the party resisting arbitration can point to a generally applicable principle of contract law under which the agreement could be revoked. 9 U.S.C.A. § 2.

[8] Alternative Dispute Resolution    134(1)
25Tk134(1)
(Formerly 33k6.2 Arbitration)
Heightened "knowing and voluntary" standard requiring inquiry in such matters such as specificity of language of agreement, plaintiff's education experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel, was not applicable to determine whether agreement to arbitrate Title VII and ADEA claims was enforceable under the Federal Arbitration Act (FAA). Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 9 U.S.C.A. § 1 et seq.

[9] Alternative Dispute Resolution    134(6)
25Tk134(6)
(Formerly 33k6.2 Arbitration)
Unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion.

[10] Contracts    1
95k1
Under Pennsylvania law, contract of adhesion is invalid only where its terms unreasonably favor the other party.

[11] Contracts    1
95k1
In order for a contract to be invalidated as a contract of adhesion under Pennsylvania law, the plaintiff must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive.

[12] Alternative Dispute Resolution    420
25Tk420
(Formerly 33k92 Arbitration, 160k11(12))
Uniform Application for Securities Industry Registration (Form U-4) which contained agreement to arbitrate employment disputes between employee and brokerage firm , was not a contract of adhesion under Pennsylvania law; agreement was not oppressive, unconscionable or unreasonably favorable to the

National Association of Securities Dealers (NASD) or to brokerage firm, the third party beneficiary of the agreement.

[13] Alternative Dispute Resolution    420
25Tk420
(Formerly 33k92 Arbitration, 160k11(12))
Arbitration provision of Uniform Application for Securities Industry Registration (Form 4) by which employee of brokerage firm agreed to arbitrate all disputes with firm was not invalid on ground that it was analogous to "yellow dog contract" in which employees agreed to waive their right to join union in order to obtain employment; unlike employees who signed yellow dog contracts, brokerage employee did not waive her substantive statutory rights by signing Form U-4.

[14] Alternative Dispute Resolution    419
25Tk419
(Formerly 33k92 Arbitration, 160k11(12))

[14] Securities Regulation    40.15
349Bk40.15
Subsections of § 1 of the 1982 National Association of Securities Dealers (NASD) Code of Arbitration Procedure describe the types of disputes subject to arbitration and not types of insurance related disputes that are excepted; language "(1) between or among members; (2) between or among members

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175)

and public customers or others; and (3) between or among members and registered clearing agencies" modifies the opening clause imposing the arbitration requirement, not the insurance exception clause.

**[15] Alternative Dispute Resolution    419**
**25Tk419**
(Formerly 33k92 Arbitration, 160k11(12))
The 1982 National Association of Securities Dealers (NASD) Code of Arbitration Procedure provided for arbitration of employment disputes between employees and members of NASD in subsection providing for arbitration " between or among members and public customers, or others"; it was at least ambiguous whether term "others" encompassed employees with employment-related disputes, and ambiguity had to be resolved in favor of arbitrability.

**[16] Alternative Dispute Resolution    419**
**25Tk419**
(Formerly 33k92 Arbitration, 160k11(12))
Compliance cause of Uniform Application for Securities Industries Registration (Form U-4) obligated a registrant to comply with amendments to rules of the National Association of Securities Dealers (NASD), including those governing arbitration, and specific amendment of NASD Code of Arbitration Procedure providing for arbitration of employment disputes.

**[17] Federal Civil Procedure    1319.1**
**170Ak1319.1**
District court was within its discretion in declining to permit deposition of the National Association of Securities Dealers (NASD) prior to ordering submission of employment dispute between former employee and brokerage firm to arbitration, notwithstanding employee's assertion that discovery was necessary to explore her belief that NASD arbitration procedures were inadequate to protect her statutory and due process rights. U.S.C.A. Const.Amend. 14.

*177 Stephen C. Richman (Argued), Robert P. Curley, Markowitz & Richman, Philadelphia, PA, for Appellant.

Robert J. Gregory (Argued), Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae-Appellant.

Edward C. Jepson, Jr. (Argued), James E. Bayles, Jr., Vedder, Price, Kaufman & Kammholz, Chicago, IL, and Mitchell Feigenbaum, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, Attorneys for Appellee.

Before:  BECKER, [FN*] and STAPLETON, Circuit Judges, and FEIKENS, [FN**] District Judge.

FN* Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

FN** Honorable John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Sheila Warnock Seus sued John Nuveen & Company, Inc., her former employer, under Title VII and the ADEA. Because Seus, at the commencement of her employment, had signed a Uniform Application for Securities Industry Registration that contained arbitration and compliance clauses, the district court granted the employer's motion to compel arbitration of her claims pursuant to the Federal Arbitration Act. The court also denied Seus's motion for leave to take depositions of the National Association of Securities Dealers ("NASD"). We will affirm.

I. BACKGROUND

In 1982, Sheila Seus joined the Nuveen brokerage firm.  As a member firm of the NASD, Nuveen is required to register with the NASD all employees who deal directly with the public in the purchase and sale of over-the-counter securities. To comply with this requirement, employees complete a Uniform Application for Securities Industry Registration, commonly referred to as a Form U-4. Approximately four months after she was hired, Seus was required to sign a Form U-4. The Form contained the following arbitration clause:
I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ... that is required to be arbitrated under the rules, constitution, or by-laws of the [NASD].

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

146 F.3d 175
(Cite as: 146 F.3d 175, *177)

App. at 5 (Form U-4, ¶ 5).   The Form also
contained a "compliance clause," under which Seus
agreed to:

 abide by, comply with, and adhere to all the
 provisions, conditions and covenants of the ... by-
 laws and rules and regulations of the [NASD] as
 they are and may be adopted, changed or amended
 from time to time ...

App. at 5 (Form U-4, ¶ 2).

At the time Seus executed the Form U-4, the
NASD Code of Arbitration Procedure required
arbitration of:

 any dispute, claim or controversy arising out of or
 in connection with the business of any member of
 the [NASD], with the exception of disputes
 involving the insurance business of any member
 which is also an insurance company: (1) between
 or among members;   (2) between or among
 members and public customers, or others; and (3)
 *178 between or among members [and] registered
 clearing agencies...

NASD Manual--Code of Arbitration Procedure § 1
(reprint ed. May 1982).   Although the NASD Code
in effect in 1982 did not explicitly state that
employment disputes were subject to arbitration, the
Code was amended in 1993 to do so.   The current
Code expressly provides for arbitration of "any
dispute, claim, or controversy ... arising out of the
employment or termination of employment of
associated person(s) with any member."   NASD
Manual--Code of Arbitration Procedure Rule 10101
(formerly § 1)(1997).)

In 1996, Seus filed suit against Nuveen in the
district court, alleging multiple claims of
discrimination under Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et
seq., and the Age Discrimination in Employment
Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq.
Based on Seus's execution of her Form U-4, Nuveen
filed a motion to dismiss and compel arbitration
pursuant to the Federal Arbitration Act ("FAA"), 9
U.S.C. §§ 3-4.   Seus, in turn, filed a motion for
leave to take the deposition of the NASD pursuant
to Fed.R.Civ.P. 30(b)(6) to obtain information
regarding the rules, procedures, and results obtained
in other employment disputes arbitrated under
NASD rules.

The district court granted Nuveen's motion and
dismissed Seus's complaint without prejudice,
directing her to arbitrate her claims.   The court
concluded that the Form U-4 executed by Seus
constituted a valid contractual agreement to arbitrate
enforceable under the FAA, and that the arbitration
agreement covered the claims asserted in this case.

The district court also denied Seus's motion to
depose the NASD. It noted that the Supreme Court
in Gilmer v. Interstate/Johnson Lane Corp., 500
U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991),
recognized the adequacy of the New York Stock
Exchange's arbitration procedures, which the district
court found to be "functionally equivalent" to those
of the NASD. D. Ct. Op. at 15.   The district court
also concluded that the NASD Code of Arbitration
Procedure, which details discovery procedures and
subpoena powers, etc., provides information
sufficient to evaluate the fairness of the arbitration
process.

In accordance with our usual practice in
arbitration cases, we will address, in turn, whether
there is a binding agreement to arbitrate between the
parties and, if so, whether this dispute is within the
scope of that agreement.   See PaineWebber Inc. v.
Hartmann, 921 F.2d 507, 511 (3d Cir.1990).   We
will then determine whether the district court abused
its discretion in denying Seus's motion for discovery
from the NASD. See Marroquin-Manriquez v. INS,
699 F.2d 129, 134 (3d Cir.1983).

II. IS THERE A BINDING AGREEMENT TO
ARBITRATE?
A. The FAA

The FAA, 9 U.S.C. § 1 et seq., was enacted in
1925.   Its purpose was to make agreements to
arbitrate enforceable to the same extent as other
contracts.   Section 2 of the Act provides, in relevant
part:

 A written provision in ... a contract evidencing a
 transaction involving commerce to settle by
 arbitration a controversy arising out of such
 contract ... shall be valid, irrevocable, and
 enforceable, save upon such grounds as exist at
 law or in equity for revocation of any contract.
"Commerce," as defined in the Act, includes
"commerce among the several States." 9 U.S.C. §
1. "[C]ontracts of employment of seamen, railroad
employees, or any other class of workers engaged in
foreign or interstate commerce" are excluded from
the scope of the Act, however.  Id. The Form U-4

Westlaw.

146 F.3d 175
(Cite as: 146 F.3d 175, *178)

has been held by the Supreme Court to be a "contract evidencing a transaction in commerce" and not to be "a contract of employment" within the meaning of the FAA. Gilmer, 500 U.S. at 25 n. 2, 111 S.Ct. 1647 n. 2. This court and others have also held that the "contract of employment" exception is limited to the contracts of employees who, like seamen and railroad workers, are engaged directly in the channels of interstate commerce. See Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 226-27 & nn. 20-21 *179 (3d Cir.1997) (stating Third Circuit rule and collecting cases from other jurisdictions).

[1] If a party to a binding arbitration agreement is sued in a federal court on a claim that the plaintiff has agreed to arbitrate, is entitled under the FAA to a stay of the court proceeding pending arbitration, Section 3, and to an order compelling arbitration, Section 4. If all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it. See Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir.1992); Dancu v. Coopers & Lybrand, 778 F.Supp. 832, 835 (E.D.Pa.1991), aff'd, 972 F.2d 1330 (3d Cir.1992).

Thus, the FAA on its face authorizes the enforcement action taken by the district court. It follows that we must affirm unless we conclude that legislation passed subsequent to the FAA reflects a congressional intent that agreements like the Form U-4 contract be excluded from it scope, that this Form U-4 contract is unenforceable under the provisions of the FAA, or that this dispute is not within the scope of the arbitration provision of that contract.

B. The ADEA, OWBPA, Title VII And The Civil Rights Act of 1991: The Implied Repealer Challenge To The Validity Of The Agreement

Seus contends that Congress, in legislation subsequent to the FAA, has carved out an exception to its provisions for predispute agreements to arbitrate claims under the ADEA (i.e., agreements to arbitrate ADEA claims that have not arisen at the time the agreement is reached). The EEOC, which has filed an amicus brief in support of Seus's position, contends that a similar exception has been created by Congress for predispute agreements to arbitrate claims under Title VII as well. We find

no such implied repealer of the FAA's provisions requiring the enforcement of agreements to arbitrate.

1. Gilmer and the ADEA

[2] An argument much like that of Seus and the EEOC was made to the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), a case that involved an ADEA claim and a Form U-4 agreement between an employee of a brokerage firm and the New York Stock Exchange. Plaintiff Gilmer was required to register with several stock exchanges, including the New York Stock Exchange ("NYSE"), as a condition of his employment. To do so, he executed a Form U-4 application containing the same language regarding arbitration as the Form U-4 signed by Seus except that his commitment was to arbitrate in accordance with the rules of the NYSE. The NYSE Rules in place at the time Gilmer signed his Form U-4 explicitly provided for the arbitration of any controversy between a registered representative and a NYSE member " 'arising out of the employment or termination of employment of such registered representative.' " Id. (quoting NYSE Rule 347). Following Gilmer's termination at age 62, he filed an age discrimination charge with the EEOC and thereafter filed suit against his employer. In response to the employer's insistence that his claim be arbitrated, Gilmer argued that enforcement of the Form U-4 agreement to arbitrate would be inconsistent with the ADEA.

The Supreme Court began its analysis by making it clear that exceptions to the FAA's rule requiring enforcement of agreements to arbitrate are not to be recognized lightly. Because of the strong federal policy favoring arbitration, any exception must be founded on clear indicia of congressional intent:

"[H]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." In this regard, we note that the burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims. If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. Throughout such an inquiry, it should be kept in mind that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

146 F.3d 175
(Cite as: 146 F.3d 175, *179)

"questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."

Id., at 26, 111 S.Ct. 1647 (citations omitted).

Gilmer conceded that nothing in the text or legislative history of the ADEA explicitly **180 precluded enforcement of the FAA in his situation. Rather, he argued that "compulsory arbitration of ADEA claims pursuant to arbitration agreements would be inconsistent with the statutory framework and purposes of the ADEA." Id. at 27, 111 S.Ct. 1647. The Supreme Court perceived no such inconsistency.

The Court held that the FAA required enforcement of Gilmer's agreement to arbitrate all claims arising out of his termination of employment, including his ADEA claim. It stressed that "[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial form.." Id. at 26, 111 S.Ct. 1647 (quoting from Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) (alteration in original). Rejecting Gilmer's argument that the arbitral process was less suited than litigation to the effective enforcement of the ADEA, the Court concluded: "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Id. at 28, 111 S.Ct. 1647 (quoting from Mitsubishi Motors, 473 U.S. at 637, 105 S.Ct. 3346) (alterations in original).

The Court in Gilmer also addressed and rejected an argument that agreements to arbitrate ADEA claims should not be enforced because of the disparity in bargaining power between an employee and her employer. In the course of rejecting the argument, the Court stressed that courts should look solely to the provisions of the FAA in determining on a case-by-case basis whether an arbitration agreement is binding:

Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context ... [T]he FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration

agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." Mitsubishi, 473 U.S., at 627, 105 S.Ct. 3346. There is no indication in this case, however, that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application. As with the claimed procedural inadequacies discussed above, this claim of unequal bargaining power is best left for resolution in specific cases.

Id. at 33, 111 S.Ct. 1647.

Finally, the Gilmer Court rejected an argument based on its prior decision in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Alexander held that an adverse decision in an arbitration proceeding conducted pursuant to an arbitration clause in a collective bargaining agreement could not bar the plaintiff employee from enforcing his rights under Title VII in a federal court. In Gilmer, the Court acknowledged that it had expressed the view in Alexander that "arbitration was inferior to the judicial process for resolving statutory claims." Gilmer, 500 U.S. at 34 n. 5, 111 S.Ct. 1647. It hastened to add, however:

That "mistrust of the arbitral process," however, has been undermined by our recent arbitration decisions. McMahon, 482 U.S. at 231-32, 107 S.Ct. 2332. "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-627, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

Id.

Thus, the Court specifically disavowed, in the context of Title VII claims as well as ADEA claims, the idea that the arbitral process was inferior to the judicial process. It also stressed that because the arbitration clause in Alexander was contained in a collective bargaining agreement, Alexander had not individually agreed to it, "the tension *181 between

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

146 F.3d 175
(Cite as: 146 F.3d 175, *181)

collective representation and individual statutory rights" was an "important concern," and the FAA, with its "liberal federal policy favoring arbitration," was not applicable. Id. at 35, 111 S.Ct. 1647.

### 2. OWBPA

[3] Gilmer was decided on May 13, 1991. Seven months earlier, Congress amended the ADEA by passing the Older Workers Benefit Protection Act of 1990 ("OWBPA"). Gilmer apparently did not contend that these amendments were applicable to his case. Seus and the EEOC do contend that they are applicable here. Under the OWBPA, an individual "may not waive any right or claim" under the ADEA unless the waiver is knowing and voluntary. 29 U.S.C. § 626(f)(1). Moreover, a waiver cannot be considered knowing and voluntary if an individual waives "rights or claims that may arise after the date the waiver is executed." Id. at § 626(f)(1)(C). Seus and the EEOC assert that the language "any right or claim" must encompass the right to a jury trial in district court; thus, the OWBPA prohibits the enforcement of any agreement that requires an individual, in advance of an actual dispute, to forgo her statutory right to trial in a district court. They conclude that the OWBPA precludes enforcement of Seus's agreement to arbitrate. We are unpersuaded for two reasons.

First, the legislative history of the OWBPA indicates that it does "not apply with respect to waivers that occur before the date of enactment of this Act [Oct. 16, 1990]." Older Workers Benefit Protection Act, Pub.L. No. 101-433, § 202(a), 104 Stat. 978, 984 (1990) (reprinted in note to 29 U.S.C. § 626 entitled "Effective Date of 1990 Amendment" (1998)). In common parlance, a waiver "occurs" when it becomes effective, i.e., when it is executed. For that reason, we conclude that the OWBPA's waiver requirements do not apply to waivers executed before enactment of the statute. Accord Rice v. Brown Bros. Harriman & Co., No. 96 Civ. 6326(MBM), 1997 WL 129396, *5 (S.D.N.Y. Mar. 21, 1997). Because Seus executed her Form U-4 before the OWBPA was enacted, it cannot affect the arbitrability of her claim.

[4] Second, assuming arguendo that the OWBPA did apply to Seus's case, its legislative history and the background against which it was enacted provide

persuasive evidence that the protection it affords is limited to the waiver of substantive rights under the ADEA. As the Fifth Circuit explained in Williams v. Cigna Financial Advisors, Inc.,

> [i]n enacting the OWBPA, Congress' primary concern was with releases and voluntary separation agreements in which employees were forced to waive their rights.... [T]he OWBPA protects against the waiver of a right or claim, not against the waiver of a judicial forum. The Supreme Court recognized this distinction in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), in which it held that
>
> [b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.... We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.
>
> We recognize that Congress, through the OWBPA, has protected terminated employees who waive their substantive rights under ADEA in exchange for a more favorable severance package; however, we find no clear indication that Congress was likewise concerned with protecting employees who agree to arbitrate claims that may arise during the course of their employment.

56 F.3d 656, 660-61 (5th Cir.1995) (citations omitted).

The Supreme Court reads OWBPA in the same way. While OWBPA was not urged upon it as controlling authority in Gilmer, the Court did comment upon OWBPA during the course of its analysis there in a way that is highly relevant here. It observed:

> *182 Gilmer also argues that compulsory arbitration is improper because it deprives claimants of the judicial forum provided for by the ADEA. Congress, however, did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA. "[I]f Congress intended the substantive protection afforded [by the ADEA] to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history."

Westlaw.

146 F.3d 175
(Cite as: 146 F.3d 175, *182)

500 U.S. at 29, 111 S.Ct. 1647 (quoting Mitsubishi Motors, 473 U.S. at 628, 105 S.Ct. 3346) (emphasis added). When referring to Congress's "recent amendments to the ADEA," the Supreme Court clearly meant the OWBPA. See id. at 28 n. 3, 105 S.Ct. 3346. While dicta, the Court's comments provide persuasive evidence contradicting the EEOC's assertion that "[b]y its plain terms, the OWBPA prohibits the enforcement of any agreement that requires an individual, in advance of an actual dispute, to forgo her statutory right of action in district court." EEOC's Br. at 14. Clearly, the Supreme Court did not interpret the OWBPA's reference to "any right or claim" as encompassing procedural rights such as the right to a judicial forum.

We thus conclude that the ADEA, as amended by the OWBPA, still reflects no Congressional intent to except from the FAA predispute agreements to arbitrate ADEA claims.

### 3. Title VII

[5] Although the holding in Gilmer involved only ADEA claims and not Title VII claims, numerous courts have determined that the holding is equally applicable to Title VII proceedings. See, e.g., Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir.1994); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 700 (11th Cir.1992); Mago v. Shearson Lehman Hutton, Inc., 956 F.2d 932, 935 (9th Cir.1992); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 307 (6th Cir.1991); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir.1991). Moreover, as we have noted, the Supreme Court in Gilmer expressly disavowed its earlier expressed view that an arbitral forum was inferior to a judicial one for deciding Title VII claims. See 500 U.S. at 34 n. 5, 111 S.Ct. 1647.

Because Title VII and the ADEA "are similar in their aims and substantive provisions," Mago, 956 F.2d at 935, we find Title VII entirely compatible with applying the FAA to agreements to arbitrate Title VII claims.

### 4. Section 118 of the Civil Rights Act of 1991

[6] On November 21, 1991, more than six months after Gilmer was decided, Congress passed the Civil

Rights Act of 1991. Section 118 of that Act provides that, "Where appropriate and to the extent authorized by law, the use of alternative dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under [Title VII and the ADEA]." Pub.L. 102-166, § 118 (reprinted in notes to 42 U.S.C. § 1981). On its face, the text of § 118 evinces a clear Congressional intent to encourage arbitration of Title VII and ADEA claims, not to preclude such arbitration. The EEOC argues, nonetheless, that a Congressional intent to preclude predispute waivers of a judicial forum for Title VII claims can be discerned in the legislative history of § 118.

The EEOC points to two comments by the House Committee on Education and Labor as well as two remarks of individual legislators on the floor to support its position. In our judgment, however, no amount of commentary from individual legislators or committees would justify a court in reaching the result the EEOC would have us reach. The text adopted by the full Congress declares that lawful "arbitration ... is encouraged to resolve disputes arising from [Title VII and the ADEA.]" That declaration simply cannot be "interpreted" to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII and ADEA claims that will arise in the future. [FN1] Other *183 courts of appeals that have addressed the issue have recognized as much. See Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 881-82 (4th Cir.), cert. denied, 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996); Matthews v. Rollins Hudig Hall Co., 72 F.3d 50, 53 n. 4 (7th Cir.1995).

FN1. Not surprisingly there is ample legislative history to support a straightforward reading of the text of § 118. The Report of the House Committee on the Judiciary, for example, explains § 118 as follows: This section "encourages" the voluntary use of conciliation, mediation, arbitration, and other methods of resolving disputes under Civil Rights laws governing employment discrimination. We agree that voluntary mediation and arbitration are far preferable to prolonged litigation for resolving employment discrimination claims.... We recognize that mediation and arbitration, knowingly and voluntarily undertaken, are the preferred methods of settlement of employment discrimination disputes. H.R.Rep. No. 40(II), 102nd Cong., 1st Sess. 78

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175, *183)

(1991), reprinted in 1991 U.S.C.C.A.N. 694, 764.

Nor do we believe this straightforward declaration of the full Congress can be interpreted to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII claims which were executed by an employee as a condition of securing employment. Thus, we respectfully disagree with the decision of the Court of Appeals for the Ninth Circuit in Duffield v. Robertson Stephens & Co., 144 F.3d 1182(9th Cir.1998). As we understand the opinion in that case, the court reads the preferatory clause, "where appropriate and to the extent authorized by law," in light of the legislative history, as a codification of a particular view of the decisional law regarding Title VII arbitration as it existed prior to the Supreme Court's decision in Gilmer. To us, it seems most reasonable to read this clause as a reference to the FAA. Moreover, we find nothing in the legislative history suggesting that this hortatory provision was intended to codify, and thus freeze, any particular view of the case law. Finally, even if we were to accept "authorized by law" as intended to codify case law, we would find the text incompatible with the notion that the law codified was case law inconsistent with a Supreme Court case decided six months before the passage of the Act.

C. Other Challenges to the Validity of the Agreement

Seus insists that anyone seeking to enforce an agreement to arbitrate Title VII and ADEA claims must establish that the other party entered the agreement "knowingly" and "voluntarily." She insists that Nuveen has failed to carry this burden. She argues as well that her agreement is unenforceable because it was a contract of adhesion and analogous to a "yellow dog contract."

1. The Knowing and Voluntary Standard

[7] As we have previously noted, contracts covered by the FAA are "valid, irrevocable, and enforceable," save upon such grounds as exist at law or in equity for revocation of any contracts. As we have also noted, Gilmer establishes that a court can decline to enforce such a contract if and only if the party resisting arbitration can point to a generally applicable principle of contract law under which the agreement could be revoked.

[8] By "knowing" and "voluntary," Seus means more than with an understanding that a binding agreement is being entered and without fraud or duress. Determining whether an agreement to arbitrate is "knowing" and "voluntary," in her view, requires an inquiry into such matters as the specificity of the language of the agreement, the plaintiff's education and experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened "knowing and voluntary" standard is a generally applicable principle of contract law. Rather, Seus finds that standard in cases like Cirillo v. Arco Chemical Co., 862 F.2d 448 (3d Cir.1988) where we found a heightened knowing and voluntary standard applicable to agreements releasing substantive claims under the ADEA. [FN2] Applying *184 that standard here would be inconsistent with the FAA and Gilmer. Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the law applicable to contracts generally would have excused the district court from enforcing Seus's agreement.

FN2. Seus relies, as well, on Prudential Ins. Co. of America v. Lai, 42 F.3d 1299 (9th Cir.1994). The court there held that a Form U-4 agreement to arbitrate under the NASD rules was unenforceable. The agreement was not "knowingly" entered insofar as employment disputes were concerned, according to the court, because the arbitration clause of the NASD rules did not specifically refer to employment disputes. We respectfully disagree with the decision of the court in Lai. Finally, Seus, in support of her heightened "knowing and voluntary" standard, relies upon the provisions of the OWBPA and the Civil Rights Act of 1991 that we have already discussed. As we have explained, the referenced provisions of the OWBPA pertain only to the waiver or release of substantive ADEA rights claims, not procedural rights like the right to proceed in a judicial forum. With respect to the referenced legislative history of § 118, see fn. 1, p. 16, supra, we understand "knowingly and voluntarily" to invoke ordinary, well established principles of contract law rather than the heightened standard for which Seus contends.

2. Contract of Adhesion

[9] Seus suggests that the arbitration agreement in



(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175, *184)

the Form U-4 is invalid as a contract of adhesion because of the disparity in bargaining power between her and her employer. This very argument was rejected in Gilmer, however. Unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion.

[10][11][12] Moreover, even if we were to assume arguendo that the Form U-4 is a contract of adhesion, it would not be unenforceable. A contract of adhesion is invalid only where its terms unreasonably favor the other party. See e.g., Witmer v. Exxon Corp., 495 Pa. 540, 434 A.2d 1222, 1228 (1981). In order for a contract to be invalidated as a contract of adhesion, the plaintiff "must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive." Stebok v. American Gen. Life & Accident Ins. Co., 715 F.Supp. 711, 714 (W.D.Pa.), aff'd 888 F.2d 1382 (3d Cir.1989). The district court found, however, that the terms of Seus's Form U-4 were neither oppressive nor unconscionable. Similarly, the district court in Beauchamp v. Great West Life Assurance Co. concluded that the Form U-4 is not oppressive or unconscionable, explaining:

> The Gilmer court has held that plaintiff is not giving up substantive statutory rights through arbitration of her Title VII claim. Thus, her agreement to arbitrate is not substantively unconscionable. Nor is the language of the U-4 form unconscionable in that it misrepresents the existence or scope of the arbitration clause. The U-4 form clearly states that the applicant should read its provisions very carefully and that any claim between plaintiff and her firm would be arbitrated if required by the arbitration code of the organization with which she registered.

918 F.Supp. 1091, 1098 (E.D.Mich.1996) (citation omitted). We agree. The terms of the Form U-4 that Seus signed were not oppressive, unconscionable, or unreasonably favorable to either the NASD or Nuveen, the third party beneficiary of the agreement.

### 3. "Yellow Dog" Contract

[13] Finally, Seus suggests that the arbitration agreement in the Form U-4 should be invalidated because it is analogous to the "yellow dog contracts" of the nineteenth century, in which employees

agreed to waive their right to join a union in order to obtain employment. Seus asserts that the two types of contracts are analogous because in both instances employers require employees to waive their statutory rights in order to obtain employment. She argues that because Congress invalidated yellow dog contracts in the Norris-LaGuardia Act of 1932, 29 U.S.C. § 103, this court should invalidate her contract. Seus's argument fails once again because, unlike the employees who signed yellow dog contracts, Seus did not waive her substantive statutory rights by signing the Form U-4.

In short, we conclude that the Form U-4 agreement to arbitrate was valid and binding under the FAA.

### III. DOES THE AGREEMENT COVER THIS DISPUTE?

### A. The 1982 NASD Code of Arbitration Procedure

[14] Seus argues that the district court improperly dismissed her action against Nuveen *185 because employment disputes were not covered by the NASD Code of Arbitration Procedure in effect at the time she signed her Form U-4. As we have noted, section 1 of that Code provided for arbitration of:

> any dispute ... claim or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company: (1) between or among members; (2) between or among members and public customers, or others; and (3) between or among members [and] registered clearing agencies....

Although the 1982 Code did not explicitly provide for the arbitration of employment disputes, we are persuaded that it encompassed such disputes and that Seus thus agreed to submit her Title VII and ADEA claims to arbitration.

As the district court pointed out, "[t]he majority of courts which have examined the pre-amendment NASD Code also have concluded that it covers employment disputes," while only the Seventh and Ninth Circuits have held otherwise. D. Ct. Op. at 10. The three different lines of reasoning that courts considering the issue have espoused were concisely explained by the Court of Appeals for the Second Circuit thus:

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175, *185)

In Farrand v. Lutheran Brotherhood, 993 F.2d 1253 (7th Cir.1993), the Seventh Circuit held that § 1's three subsections ((1)-(3)) qualified the phrase "arising out of or in connection with the business of any member of the [NASD]," see id. at 1254; that an employee suing a member-employer fell into none of these subsections (most particularly that such an employee was not an "other[ ]" within the meaning of § 1(2)), see id. at 1254-55; and that employment related disputes were therefore not arbitrable, see id. at 1255.

In Kidd v. Equitable Life Assurance Soc'y of the United States, 32 F.3d 516 (11th Cir.1994), the Eleventh Circuit disagreed and held that employment related disputes are arbitrable. The Eleventh Circuit reasoned that § 1's three subsections applied, not back to that section's initial clause, but rather only to the adjoining "insurance exception" clause. See id. at 519. It therefore read § 1 to "require[ ] arbitration for any dispute connected to an NASD member's business, except for disputes involving the insurance business of an NASD member that are (1) between NASD members or (2) between NASD members and public customers or others." Id. The court thus found that an employee's claim against a member-employer is arbitrable under § 1's unqualified (as the court read it) opening clause. See id. at 519 & n. 5.

The Tenth Circuit, in [Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793 (10th Cir.1995) ], added fuel to the fire. It rejected the Eleventh Circuit's reasoning that § 1's subsections applied only to the insurance exception clause; it agreed with the Seventh Circuit that the three subsections modified the initial clause. See Armijo, 72 F.3d at 798-99 n. 6. Contrary to Farrand, however, the court found that "others" in § 1(2) necessarily encompassed "associated persons" as used in § 8, and therefore included an aggrieved employee. See id. at 798-99. The court accordingly held that employment-related disputes are arbitrable, but not for the reason given by the Eleventh Circuit. See id. at 798.

Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60, 64 (2d Cir.1996). In Jameson, the Second Circuit, like the Tenth Circuit, concluded "that § 1's subsections apply to that section's opening clause, and not just to the insurance exception clause," id., and that the term "others" as used in that section includes employees having employment-related disputes with a member firm, id. at 65.

With respect to the application of § 1's subsections, we adopt the Second Circuit's line of reasoning on this issue. As the Jameson court explained:

We cannot fathom any possible reason why the NASD would except insurance business disputes from arbitration, but then only when those disputes involved certain parties. Rather, the NASD probably meant to exempt "any dispute involving the insurance business of an insurance company member from compulsory arbitration, not just those involving specific *186 classes of individuals." To put it in the language of a grammarian, we therefore interpret the insurance exception clause as something "more akin to a parenthetical within the section rather than an independent clause modified by the language following the colon."

Id. at 64-65 (citations omitted). We agree, and likewise hold that § 1's subsections modify that section's opening clause, not the insurance exception clause.

[15] With respect to the meaning of "others," the Armijo and Jameson courts pointed to several considerations which led them to conclude that the term encompasses employees with employment-related disputes. See Jameson, 102 F.3d at 65-66; Armijo, 72 F.3d at 798-800. First, to conclude otherwise would create a conflict between § 1 and § 8 of the pre-Amendment NASD Code. [FN3] As the Jameson court explained:

FN3. Section 8 of the pre-Amendment NASD Code provided: Any dispute, claim or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s), or in connection with the activities of such associated person(s), shall be arbitrated under this Code, at the instance of: (1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member. NASD Manual—Code of Arbitration Procedure § 1 (reprint ed. May 1982).

Unless he qualifies as an "other[ ]" under § 1(2), it is plain that Jameson does not fall into any category within § 1's subsections. And, on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175, *186)

other hand, § 8 clearly contemplates that Jameson, as an "associated person," will arbitrate his disputes with an NASD-member employer. If we were to read "others" to exclude Jameson, § 1 would take what § 8 gives, rendering § 8 utterly superfluous in this respect. Therefore, to avoid construing one provision as negating the other, "we must give Section 1 an interpretation at least as broad as that clearly called for in Section 8." 102 F.3d at 65. Second, interpreting "others" to include employees with employment-related disputes gives meaning to the language of the Form U-4, which clearly indicates that the applicant agrees that at least some disputes between her and her firm would be arbitrable. See id. at 65; Armijo, 72 F.3d at 799. Third, the NASD itself indicated as early as 1987 that the pre-Amendment Code applied to employment-related disputes between employees and member firms. See Jameson, 102 F.3d at 65; Armijo, 72 F.3d at 799.

Based on these considerations, "we cannot say 'with positive assurance' that 'others' does not include an employee with an employment-related dispute against a member firm." Jameson, 102 F.3d at 65. It is at least ambiguous whether that term encompasses employees with employment-related disputes. "However, to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved in favor of arbitrability." Armijo, 72 F.3d at 798. Accordingly, we find that the district court correctly concluded that the pre amendment NASD Code provided for arbitration of employment disputes.

B. The Compliance Clause and the Amended NASD Code

[16] On October 1, 1993, the NASD amended its Code of Arbitration Procedure to provide for the arbitration of "any dispute, claim or controversy ... arising out of the employment or termination of employment of associated person(s) with any member ..." NASD Arbitration Code, Rule 10101 (formerly § 1). Nuveen argues that, regardless of whether we conclude that the pre-amendment NASD Code requires arbitration of Seus's employment dispute, we should affirm the district court's order compelling arbitration based on the compliance clause in her Form U-4 and the fact that the NASD Code explicitly provided for the arbitration of employment disputes when she commenced this

action. Seus, on the other hand, argues that because the Form U-4 compliance clause did not mention the arbitration clause and was contained in a different paragraph, the compliance clause is reasonably read only to *187 require Seus to conform her behavior, as a securities dealer, to subsequent changes in the NASD rules. [FN4]

> FN4. As noted above, the Form U-4 compliance clause bound Seus to "abide by, comply with, and adhere to all the provisions, conditions and covenants of the ... by-laws and rules and regulations as they may be adopted, changed or amended from time to time...." App. at 5 (Form U-4, ¶ 2).

Seus's argument contradicts the holding of the vast majority of courts to consider this issue. Most courts have found that the Form U-4 compliance clause obligates a registrant to comply with the NASD Arbitration Code as it existed at the time she filed suit. See, e.g., Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc., 957 F.Supp. 1460, 1475-77 (N.D.Ill.1997); Schuetz v. CS First Boston Corp., No. 96 Civ. 5557, 1997 WL 452392, *4 (S.D.N.Y. Aug. 8, 1997); Stone v. Pennsylvania Merchant Group, Ltd., 949 F.Supp. 316, 323-24 (E.D.Pa.1996). We agree. Seus clearly bound herself to comply with amendments to the NASD's rules, including those governing arbitration.

IV. SEUS'S MOTION TO DEPOSE THE NASD

[17] Seus claims that current NASD arbitration procedures are inadequate to protect her statutory and due process rights. As evidence of this, she points to the NASD's recent decision to abandon its policy of requiring agreements to arbitrate employment discrimination claims as a condition of employment with a member. [FN5] Seus insists that the district court should have allowed her to conduct further discovery on this issue before reaching its decision to compel arbitration.

> FN5. On December 17, 1997, after the district court decision in this case, the NASD submitted to the SEC the following proposed change to Rule 10201 (Required Submission) (formerly § 8) of the Code of Arbitration Procedure: (b) A claim alleging employment discrimination or sexual harassment in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



146 F.3d 175
(Cite as: 146 F.3d 175, *187)

have agreed to arbitrate it, either before or after the dispute arose. 62 Fed.Reg. 66164, 66164 (Dec. 17, 1997). Seus views this proposed rule change as an explicit admission by NASD that absent employee free choice, neither it, nor the court, should rely on the Form U-4 to compel arbitration of all employment claims. Since the NASD has decided to give its registrants a choice between signing an agreement to arbitrate and reserving the right to file an employment-related claim in federal court, Seus argues, this court should allow Seus the same choice. The NASD's abandonment of its policy of requiring employees to sign agreements to arbitrate as a condition of registration is irrelevant in this case. The rule change is only a proposal. The SEC has not yet approved it, nor is it obligated to do so. The proposed rule change has no legal force at this time. Moreover, even if the SEC approves the rule change, the NASD has requested that it not take effect until one year after such approval. 62 Fed.Reg. at 66167. Presumably, then, the rule change would not become effective until well after the completion of Seus's arbitration. In any event, the proposed amendment does not reflect a determination that the arbitral process is not fair and effective. It reflects only a policy decision that a commitment to arbitrate employment discrimination claims should not be required as a condition of employment. The amendment expressly recognizes that voluntary agreements to arbitrate will continue to be enforceable whether entered before or after the alleged violation occurs.

We review the district court's denial of Seus's motion for an abuse of discretion. We find none.

Congress has decreed that arbitration is a favored means of dispute resolution. While this does not mean that arbitration pursuant to any kind of arbitral process is consistent with federal policy, the detailed provisions of the NASD Code of Arbitration Procedure are sufficient to permit the kind of evaluation conducted in Gilmer and, as the district court observed, the process required by that Code is the functional equivalent of the process found in Gilmer to be consistent with the effective enforcement of the ADEA. [FN6] Moreover, if there be any inadequacies or unfairness in the application of those rules in this specific case, judicial review will be available. *188 9 U.S.C. § 10; Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1486-87 (D.C.Cir.1997). Under these

circumstances, declining to permit a deposition of the NASD prior to ordering submission of the dispute to arbitration was well within the discretion of the district court.

FN6. In addition to information about the process readily available from the Code, Seus sought to inquire into the race, sex, age and professional backgrounds of the arbitrators, procedures for selecting arbitrators, the cost of arbitration, the percentage of arbitration cases involving age and sex employment discrimination claims, the specific results of the arbitration decisions in employment discrimination cases, the location and scheduling of hearings, and the timeliness of decisions.

V. CONCLUSION

The order of the district court dismissing Seus's claims without prejudice and directing arbitration will be affirmed.

Sheila Warnock SEUS, Appellant, v. JOHN NUVEEN & CO., INC, Appellee., 1997 WL 33493547 (Appellate Brief) (C.A.3 August 29, 1997), Brief of Appellant

Sheila Warnock SEUS, v. JOHN NUVEEN & COMPANY, INC., Sheila Warnock Seus, Appellant., 1997 WL 33493518 (Appellate Brief) (C.A.3 September 2, 1997), Brief of the Equal Employment Opportunity Commission as Amicus Curiae in Support of the Appellant

Sheila Warnock SEUS, Plaintiff-Appellant, v. JOHN NUVEEN & CO., INC., Defendant-Appellee., 1997 WL 33493479 (Appellate Brief) (C.A.3 October 2, 1997), Brief of Appellee John Nuveen & Co., Inc.

Sheila Warnock SEUS, Appellant, v. JOHN NUVEEN & CO., INC., Appellee., 1997 WL 33493549 (Appellate Brief) (C.A.3 October 16, 1997), Reply Brief of Appellant

146 F.3d 175, 77 Fair Empl.Prac.Cas. (BNA) 751, 73 Empl. Prac. Dec. P 45,394, Fed. Sec. L. Rep. P 90,225

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



## AFFIDAVIT OF SERVICE BY HAND

STATE OF NEW YORK    )
                        )   ss.:
COUNTY OF NEW YORK  )

Austin K. Wilkinson, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and am employed by Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019.

2. On February 20, 2007, I served true copies of the attached:

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CLAIMANT'S MOTION TO DISMISS on the following:

> Blaine H. Bortnick
> Liddle & Robinson L.L.P.
> 800 Third Avenue
> New York, NY 10022
>
> Daniel T Hughes
> Litchfield Cavo, LLP
> 420 Lexington Avenue, Suite 1750
> New York, NY 10170

3. I made such service by personally delivering true copies of the aforementioned documents to the offices at the above stated address.

Austin K. Wilkinson

Sworn to before me this
20th day of February, 2007

Notary Public

JASON J. ABREU
Notary Public, State of New York
No. 01AB6061957
Qualified in New York County
Commission Expires July 23, 2009

Doc#: NY6: 185617.1

AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NEW YORK  )

Austin K. Wilkinson, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and am employed by Paul,

Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York,

New York 10019.


2. On February 20, 2007, I served a true copy of the attached:

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO

CLAIMANT'S MOTION TO DISMISS on the following:

> Shari Claire Lewis
> Rivkin Radler LLP
> 926 Reckson plaza
> Uniondale, NY  11556-0926


3.  I made such service by placing a true cop of the aforementioned document in a

properly addressed prepaid wrapper and delivering it to a Federal Express office for

Priority Overnight Delivery.

Austin K. Wilkinson

Sworn to before me this

20ᵗʰ day of February, 2007

Notary Public

JASON J. ABREU
Notary Public, State of New York
No. 01AB6061957
Qualified in New York County
Commission Expires July 23, 2009

Doc#: NY6: 185617.1

# Exhibit R

NATIONAL ASSOCIATION OF SECURITIES
DEALERS, INC.
---------------------------------------------------------- x
In the Matter of Arbitration between JEFFREY S.          :
VAUGHN, individually and on behalf of those Class
Members similarly situated,                              :

                           Claimants,        :        NASD-DR Case No. 06-00534

        - against -                                   :

LEEDS, MORELLI & BROWN, P.C., LEEDS,                     :
MORELLI & BROWN, L.L.P., LEEDS & MORELLI,
LEEDS, MORELLI & BROWN, PRUDENTIAL                       :
SECURITIES, INC., PRUDENTIAL FINANCIAL,
INC., LENARD LEEDS, STEVEN A. MORELLI,                   :
JEFFREY K. BROWN, JAMES VAGNINI, FREDERIC
DAVID OSTROVE, ROBERT JOHN VALLI, JR.,                   :
DISCRIMINATION ON WALL STREET, INC.
DISCRIMINATION ON WALL STREET                            :
MANHATTAN, INC., JOHN DOES, 1-10 AND JANE
DOES, 1-10, a fictitious designation for presently       :
unknown licensed attorneys, professionals and/or
unknown persons or entities,                             :

                        Respondents.      :
---------------------------------------------------------- x

### REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRUDENTIAL RESPONDENTS' MOTION FOR JUDGMENT ON THE PLEADINGS

#### Preliminary Statement

Claimant Jeffrey S. Vaughn ("Vaughn") must submit his claims to arbitration. This is what the District Court decided, and this is the law that the parties and this Panel must follow. Unhappy with this result, Vaughn makes a host of arguments to this Panel, none of which provide a valid reason to allow him to avoid his agreement to arbitrate his claims.

PWRW & G LLP

MAR 13 2007

☑ DOCKETED
☐ IMAGED

- 1 -

*First*, Vaughn argues that this Panel should find that the parties intended that Vaughn could pursue his class claims in court. Vaughn's contention is belied by: 1) the "valid and enforceable" nature of the arbitration provision of the Settlement Agreement ("Arbitration Provision"); 2) the District Court's rulings that clearly and unequivocally compelled Vaughn's claims to arbitration; and 3) Plaintiff counsel's admission that Vaughn is required to arbitrate his individual claims. A ruling by this panel permitting Vaughn to pursue his purported class claims in court would be illogical because Vaughn cannot act as a class representative when the District Court rulings and his own counsel's admissions make clear that he must arbitrate his individual claims. Indeed, the entire purported class, having agreed to the identical Arbitration Provision, would find themselves in the same position as Vaughn. The result of such a ruling by the panel would not be the litigation of the class claims in court, but multiple individual claims being compelled to arbitration.

Furthermore, such a ruling by this panel would enable Vaughn to abrogate his clear and unambiguous agreement to arbitrate merely by filing a purported class claim in court. Prudential Respondents have demonstrated that all of the relevant legal authorities counsel against allowing Vaughn to breach his agreement to arbitrate "any" claims he has relating to the Settlement Agreement.

*Second*, Vaughn argues that, because he is not seeking class arbitration, he must therefore be permitted to pursue his class claim in court. The law is precisely the opposite. Courts have repeatedly held that where, as here, an arbitration agreement is silent on the issue of class claims, a putative class representative subject to that agreement must arbitrate his individual claim in lieu of pursuing his purported "class" claim in court. The cases relied on by Vaughn to support his argument involved agreements that expressly excluded class claims from

2

arbitration <u>and</u> prohibited the parties from compelling a class claim to arbitration. No such "exception" exists to the "sweeping" arbitration clause at issue here.

*Third*, Vaughn suggests that, because the NASD Rules do not permit class arbitrations, he has carte blanche to breach the arbitration agreement simply by asserting a class claim. Not so. Prudential Respondents submit that the first option presented by the District Court to this Panel – to rule that the parties intended to disallow class actions and that Vaughn must arbitrate his claim – is the only one which is consistent with the "sweeping" scope of the arbitration clause, fundamental principles of contract interpretation, and the law and public policy favoring arbitration.

*Finally*, Vaughn contends that he never intended to waive his right to bring a class action. This argument ignores that Vaughn agreed to arbitrate "any" claims he had against PSI and to accept the NASD's limitation on arbitration of class claims. Moreover, the law is well-settled that arbitration agreements appropriately involve the waiver of the ability to proceed with a class claim. In any event, parol evidence concerning Vaughn's "intent" is inadmissible to contradict or vary the terms of the Arbitration Provision.

The essential question before this Panel is whether Vaughn can avoid his "valid and enforceable" agreement to arbitrate. As Prudential Respondents have demonstrated, the correct answer to this question clearly and certainly follows from the language of the Arbitration Provision and the District Court's August 12, 2005 ruling. This panel should enter an award for Prudential Respondents: 1) finding that Vaughn agreed to submit all his claims to arbitration, whether styled as individual or class claims, 2) finding, therefore, that Vaughn has no right to pursue either individual or class claims in court; and 3) denying Vaughn's motion to dismiss his

3

own demand for arbitration, and granting Prudential Respondents' Motion for Judgment on the Pleadings.

## Discussion

### I.

### THE LAW DOES NOT PERMIT VAUGHN TO AVOID A "VALID AND ENFORCEABLE" ARBITRATION AGREEMENT

Prudential Respondents have presented this Panel with numerous reasons — sounding in law and public policy – why it should not permit Vaughn to breach his agreement to arbitrate. In response, Vaughn makes several unavailing arguments.

Vaughn argues that the District Court left open the possibility that the Panel could find that, although individual claims must be arbitrated, the parties intended that class claims could be litigated in court. As Prudential Respondents have demonstrated, for the Panel to select this "option" would be contrary to all of the legal authorities that support upholding the parties' agreement to arbitrate and not permitting Vaughn to breach it.

Foremost among these legal authorities is that the District Court, after reviewing Vaughn's putative class complaint, compelled Vaughn to arbitrate his claims. The District Court, in interpreting the parties' arbitration agreement, held that it was "valid and enforceable" and that Vaughn had "clearly agreed to arbitrate his claims." (*See* Velazquez Aff., Ex. F at 3:19-21.) Indeed, in response to Vaughn's first attempt to re-litigate the Court's decision before the New York Stock Exchange, the Court issued a second order affirming its decision compelling Vaughn to arbitrate. (*See* Velazquez Aff., Ex. D.) These rulings are the law of this case, set the parameters of the Panel's jurisdiction, and Vaughn is bound by them.

4

Here, the District Court has already found that the parties' agreement to arbitrate "*any* claim or controversy arising out of or related to" the Settlement Agreement constitutes "sweeping language concerning the scope of the questions committed to arbitration." (*See* Velazquez Aff., Ex. C at p. 7 (emphasis added, internal citation omitted).) Indeed, the Court pointed out that Vaughn's argument that this clause excludes "class claims" simply because NASD rules prohibit arbitration of class claims "contradicts the clear statement that the arbitration clause applies to 'any' claim or controversy related to the Agreement." (*Id.* at 8.) The Court further noted that, "[e]ven assuming that Vaughn is right, and the applicable arbitration rules do, indeed, forbid class arbitrations under all circumstances, it would be plausible to interpret the arbitration clause to require all claims to be arbitrated and to disallow class actions with no further qualifications or caveats." The statement in the parties' arbitration agreement that Vaughn must arbitrate "any" claim is unequivocal and means that Vaughn cannot pursue his claims (as part of a class or otherwise) in Court and that he must arbitrate his claims individually. (*Id.*)

While the District Court deferred to the Panel to decide whether the scope of the parties' arbitration clause and NASD rules: (i) require Vaughn to arbitrate his claim and forego his class claim, (ii) permit arbitration of class claims, or (iii) allow Vaughn to avoid the arbitration agreement by bringing a class claim -- its ruling did <u>not</u> leave open the question of whether Vaughn could litigate his individual claims in court. Given that his own claims are subject to arbitration and that, as his counsel admitted to the District Court, he *personally* has no claim for damages (PSI paid him the full monetary amount he was seeking for his underlying employment claims (*see* Velazquez Aff., Ex. F, at 7:9-17)), Vaughn fails to explain to this Panel how he could properly serve as a representative plaintiff in the class action he proposes to pursue

in court.  As a matter of law, he could not.  In any event, all of the member os the would-be putative class are other former PSI employees who are subject to the same arbitration clause that the District Court has already found to be "valid and enforceable."

Next, Vaughn argues that, since he is not seeking class arbitration, he must therefore be permitted to pursue his class claim in court.  As Prudential Respondents have demonstrated, where, as here, an arbitration agreement does not provide for a collective or representative procedure, courts faced with a putative class claim have ruled that the self-proclaimed class representative must arbitrate his/her individual claims and have stayed the putative class action.  (See Prudential Respondents' Moving Brief ("Br.") at 14-16.)  These courts do not, as Vaughn is asking this Panel to do, permit the class representative to use his or her putative class claim as a means to breach the arbitration agreement.  To this case law, Vaughn has no credible response.

Moreover, the *Miron*, *King* and *Blythe* cases Vaughn cites in his opposition brief – like the *MLDX Investments* case cited in his moving brief – are inapposite.  In all of these cases, the arbitration agreement at issue contained an express provision that the parties agreed not to bring class arbitration or to compel a party who was a class member to arbitrate unless certain conditions were met, thereby making clear that the parties to those agreements intended class claims to be litigated in court.  (See Prudential Respondents Opposition Br. at 6 & n. 2.)  Here, the Settlement Agreement contains no such exception to arbitrability.  In addition, these cases all involved arbitration agreements with customers and were therefore subject to NASD Rule 10301(d)(3)'s prohibition against motions to compel arbitration of class actions initiated by a "customer, other member or person associated with a member."  This Rule does not apply here.  Indeed, the District Court has already *granted* Prudential Respondents' motion to compel.

In fact, there is absolutely no NASD rule that gives Vaughn leave to breach the arbitration agreement. Rule 10301(d)(1)'s prohibition against arbitration of class actions does not stand for the proposition that the mere assertion of a class claim can override the parties' "valid and enforceable" agreement to arbitrate "any" claims between them.[1]  If it did, it would conflict with the unanimous law and public policy in support of arbitration and construing all doubts as to an arbitration agreement's scope in favor of arbitration.  Prudential Respondents submit that the first option presented by the District Court to this Panel – to rule that the parties intended to disallow class actions and that Vaughn must arbitrate his claim – is the only one which is consistent with the "sweeping" scope of the arbitration clause, fundamental principles of contract interpretation, and the law and public policy favoring arbitration.  Indeed, Rule 10301(d)(4) expressly provides that "[n]o member . . . shall be deemed to have waived any of its rights under . . . any agreement to arbitrate to which it is party except to the extent stated in this paragraph."  Thus, the NASD rules do not provide any authority to override the parties' agreement to arbitrate.  Furthermore, as Prudential Respondents have explained, Rule 10301(d)(3) does not provide a private right of action and its limitation on a member's ability to compel arbitration in certain circumstances is inapplicable here.  (*See* NASD Rule 10301(d)(3); *see also* Prudential Respondents' Opposition Br., at 27-30.)[2]

---

[1]  Prudential Respondents submit that to accept Vaughn's interpretation of the agreement would not only be inconsistent with the plain language of the agreement, fundamental principles of contract interpretation, relevant case law and public policy, it would lead to the absurd result of having the scope of the parties' arbitration clause depend on whether, at any given point in time, the NASD Rules allowed or disallowed class (or any other category of) claims.

[2]  Apparently conceding these points of law, Vaughn has dropped his unfounded request for sanctions against PSI based on Rule 10301 as he breathes not a word in support of this untenable "claim" in his briefs.

7

In a belated effort to buttress his flimsy legal position, Vaughn asks this Panel to rely on his own "say so" that – notwithstanding the "sweeping" scope of the arbitration agreement, the Settlement Agreement's numerous provisions indicating Vaughn's informed consent to its terms, Vaughn's signature on the Settlement Agreement and his receipt of $200,000 from PSI pursuant to that Agreement – he did not "intend" to waive his ability to litigate class claims in court and that class claims should therefore be viewed as an "exception" to the arbitration agreement. But, Vaughn's self-serving statements regarding his state of mind in October 1998 – which he seeks to proffer now, for the first time, over eight years after he entered into the arbitration agreement, and which he never presented to the District Court in response to the motions to compel – provide no grounds for this Panel to enable Vaughn to breach his agreement to arbitrate. Where – as here – there is an integrated agreement with clear and unambiguous terms, the parol evidence rule bars the introduction of extrinsic evidence to vary or contradict one of the agreement's terms. Moreover, Vaughn's arguments regarding the "knowing and voluntary" nature of his "waiver" of the ability to proceed with a class claim have no application here as the law is well-settled that arbitration agreements necessarily and appropriately involve the "waiver" of procedural rights, including the ability to proceed with a class claim. (*See* Prudential Respondents Opposition Br. at 7-9.)

*     *     *

In sum, Vaughn has offered this Panel absolutely no reason to rule – contrary to the District Court's Orders, the FAA, the relevant case law and public policy – that he should be permitted to breach the parties' "valid and enforceable" arbitration agreement by using a class claim. Prudential Respondents urge this Panel not to indulge Vaughn's baseless attempts to

frustrate the enforcement of the arbitration agreement and, instead, to promptly enter an award in favor of Prudential Respondents.

## Conclusion

For all the reasons set forth above and in Prudential Respondents' opening and opposition briefs, Prudential Respondents respectfully request that this Panel enter an award in their favor:  1) finding that Vaughn agreed to submit all his claims to arbitration, whether styled as individual or class claims,  2) finding, therefore, that Vaughn has no right to pursue either individual or class claims in court; and 3) denying Vaughn's motion to dismiss his own demand for arbitration, and granting Prudential Respondents' Motion for Judgment on the Pleadings.

Dated: March 6, 2007

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
Gerard E. Harper
Theodore V. Wells, Jr.
Liza M. Velazquez

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

LOWENSTEIN SANDLER, P.C.
1330 Avenue of the Americas
New York, New York 10019

Of Counsel:
Gregory B. Reilly
Julie L. Werner

Attorneys for Respondents Prudential Securities, Inc. and
Prudential Financial, Inc

10

NATIONAL ASSOCIATION OF SECURITIES
DEALERS, INC.

------------------------------------------------------------------X

In the Matter of Arbitration between JEFFREY S.      :
VAUGHN, individually and on behalf of those Class
Members similarly situated,                          :

                    Claimants,              :

       - against -                             :

LEEDS, MORELLI & BROWN, P.C., LEEDS,                 :
MORELLI & BROWN, L.L.P., LEEDS & MORELLI,
LEEDS, MORELLI & BROWN, PRUDENTIAL                   :
SECURITIES, INC., PRUDENTIAL FINANCIAL,
INC., LENARD LEEDS, STEVEN A. MORELLI,               :
JEFFREY K. BROWN, JAMES VAGNINI, FREDERIC
DAVID OSTROVE, ROBERT JOHN VALLI, JR.,               :
DISCRIMINATION ON WALL STREET, INC.
DISCRIMINATION ON WALL STREET                        :
MANHATTAN, INC., JOHN DOES, 1-10 AND JANE
DOES, 1-10, a fictitious designation for presently   :
unknown licensed attorneys, professionals and/or
unknown persons or entities,                         :

                   Respondents.            :

------------------------------------------------------------------X

NASD-DR Case No. 06-00534

**AFFIDAVIT OF LIZA M.
VELAZQUEZ IN FURTHER
SUPPORT OF PRUDENTIAL
RESPONDENTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

Liza M. Velazquez, being duly sworn, deposes and says:

    1.    I am a member of the law firm of Paul, Weiss, Rifkind, Wharton &

Garrison, LLP, attorneys for Respondents Prudential Securities, Inc. ("PSI") and Prudential

Financial, Inc. (collectively, "Prudential Respondents") in the above captioned matter.  I submit

this affidavit in further support of Prudential Respondents' Motion for Judgment on the

Pleadings.

    2.    Claimant Jeffrey Vaughn is a former PSI employee who, along with other

former PSI employees, retained the law firm of Leeds, Morelli & Brown (the "Leeds Firm") in or

PWRW & C

MAR 13

☑ DOC
☐ IMA

around 1998 to assert employment discrimination claims against PSI. In an effort to resolve these claims expeditiously and fairly, PSI, the Leeds Firm and those employees (including Vaughn) agreed to enter into an alternate dispute resolution process.

      3.     Pursuant to that process, on or about October 27, 1998, expressly upon advice of his counsel of choice, and in consideration of (among other things) a payment from PSI of $200,000, Vaughn executed an agreement settling and completely releasing his claims against PSI (the "Settlement Agreement"). Attached as Exhibit A to this affidavit is a true and correct copy of the Settlement Agreement, bearing the signatures of Jeffrey Vaughn and Eric Schwimmer (on behalf of Prudential Securities Incorporated), dated October 27, 1998. The copy attached to my previous affidavit, sworn to on January 30, 2007, bears only Vaughn's signature. The text of the two copies of the Settlement Agreement are identical.

_____
Liza M. Velazquez

Sworn to before me this
6th day of March, 2007

_____
Notary Public

NORMA SOTO
Notary Public, State of New York
No. 41-4893337
Qualified in New York County
Commission Expires June 22, 2007

- 2 -

**Exhibit A**

# SETTLEMENT AGREEMENT AND GENERAL RELEASE

Made and entered into this ____ day of October 1998, by and between Jeffrey Vaughn and Prudential Securities Incorporated ("PSI").

WHEREAS, Vaughn has alleged certain claims arising out of Vaughn's employment with PSI and separation therefrom; and

WHEREAS, PSI denies all such claims; and

WHEREAS, PSI and Vaughn have agreed to amicably resolve any and all such claims;

NOW, THEREFORE, in full and complete settlement of such claims and in consideration of the mutual promises and covenants set forth herein, Vaughn and PSI agree as follows:

1.  **Separation From Employment.** Vaughn's last day of employment at PSI shall be October 23, 1998.

2.  **Payment by PSI.** Upon the expiration of seven (7) days following Vaughn's execution of this Settlement Agreement and General Release (the "Agreement"), PSI shall pay to Vaughn, in a single lump-sum payment, the total agreed-upon amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), as payment in full for all alleged personal injury or other non-wage claims, including , but not limited to, any claims for emotional distress and general, special and consequential damages. The parties acknowledge and agree that PSI shall file a form 1099-misc reflecting the above payment.

3.  **Medical Benefits.** PSI agrees to continue Vaughn's health plan coverage through October 31, 1998. Thereafter, Vaughn will be eligible to continue the plan coverage pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). If Vaughn elects to continue health plan coverage pursuant to COBRA, PSI will pay Vaughn's COBRA premiums through and including April 30, 1999, or until Vaughn obtains other employment or is eligible for other group health plan coverage, whichever comes first. Thereafter, Vaughn will be responsible for the payment of any COBRA premiums through the remainder of Vaughn's eligibility.

4.  **Release by Vaughn.** In consideration for PSI's commitment to the various arrangements described in the preceding paragraphs, and in lieu of any other benefits, as a full and final settlement, Vaughn hereby releases and discharges PSI, its parent, divisions, subsidiaries and affiliates and their current and former directors, officers, shareholders, agents and employees, and each of their predecessors, successors, and assigns (hereinafter "the Company"), from any and all claims and causes of action (except for the benefits specifically set forth in this Agreement) arising out of or related to Vaughn's employment or separation from employment, including, but not limited to, any claims for salary, bonuses, severance pay, vacation pay or any benefits under the Employee Retirement Income Security Act (except for vested benefits which are not affected by this Agreement), sexual harassment, or discrimination based on race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, citizenship status, pregnancy, medical condition or disability (as defined by the Americans with Disabilities Act, or any other state or local law), age, or any other unlawful discrimination (under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990, Title VII of the Civil Rights Act, as amended, or any other federal, state, or local laws), breach of implied or express contract, breach of promise, misrepresentation, negligence, fraud, estoppel, defamation, infliction of emotional distress, retaliation, whistleblower rights, violation of public policy or wrongful or constructive discharge, and for attorneys' fees, that Vaughn, his heirs, executors, administrators, successors, and assigns now have, ever had or may hereafter have, whether known or unknown, suspected

Vaughn Settlement Agreement
October 1998
Page 2

or unsuspected, up to and including the date of this Agreement. Vaughn further agrees, promises and covenants that, to the maximum extent permitted by law, neither he, nor any person, organization, or other entity acting on his behalf has or will file, charge, claim, sue, or cause or permit to be filed, charged or claimed, any action for damages or other relief (including injunctive, declaratory, monetary relief or other) against the Company involving any matter occurring in the past up to the date of this Agreement, or involving or based upon any claims, demands, causes of action, obligations, damages or liabilities which are the subject of this Agreement (other than an action to enforce the terms herein).

5.    No Admission of Liability.   Neither this Agreement, nor anything contained herein shall be construed as an admission by the Company that it has in any respect violated any Federal, State, or local law or any right or obligation that it may owe or may have owed to Vaughn.  No final findings or final judgments have been made and Vaughn does not purport and will not claim to be a prevailing party, to any degree or extent, nor will this Agreement or its terms be admissible in any proceeding other than in a proceeding for breach of the terms contained herein.

6.    Cooperation by Vaughn.   Vaughn agrees to cooperate with and make himself readily available to PSI or its General Counsel, as PSI may reasonably request, to assist it in any matter, including giving truthful testimony in any litigation or potential litigation, over which Vaughn may have knowledge, information or expertise.

7.    Confidential and Proprietary Information of PSI.   Vaughn understands and agrees that all books, records, documents and information, whether written or not, pertaining to PSI's business activities, are the confidential and proprietary property of PSI (hereinafter referred to as "trade secrets and confidential and proprietary information"). Vaughn warrants, covenants, and agrees that he will not disclose any of PSI's trade secrets and confidential and proprietary information to any person or entity not employed, owned by, or otherwise affiliated with PSI.  Vaughn further agrees that he shall not be entitled to copies, in any form, of such trade secrets and confidential and proprietary information and that he shall immediately return to PSI any copies of such information currently in his possession.

8.    Reemployment or Reinstatement.   Vaughn agrees not to apply for employment or reemployment with PSI, and that PSI has no obligation, contractual or otherwise, to rehire, reemploy or recall him in the future.

9.    Nondisparagement.   Vaughn represents that he has not and agrees that he will not in any way disparage PSI, its current and former officers, directors and employees, or the Company, or make or solicit any comments, statements, or the like to the media or to others that may be considered to be derogatory or detrimental to the good name or business reputation of any of the aforementioned parties or entities.

10.    Testimony Required by Law or Regulatory Authority.   Vaughn further agrees that he will not at any time discuss any matter concerning PSI with anyone adverse or potentially adverse to PSI on any matter including employment claims or customer claims, without the prior written consent of Counsel for PSI.  Nothing contained herein, however, shall preclude Vaughn from discussing any matter concerning PSI with any governmental regulatory or self-regulatory agency.  Further, if required by a governmental regulatory agency or self-regulatory agency to provide testimony or information regarding the PSI, Vaughn will cooperate with said regulatory agency.  If compelled to testify by a validly served subpoena in any legal proceeding or by regulatory authority, Vaughn will testify truthfully as to all matters concerning his employment at PSI.

11.    Confidentiality of Agreement.   Vaughn agrees not to disclose or cause to be disclosed, either directly or indirectly, to any person or organization, except to his legal and

Vaughn Settlement Agreement
October 1998
Page 3

financial advisor(s), or as required by law, or governmental regulatory or self-regulatory authority, any information regarding the amount of, terms of, or facts or circumstances underlying this Agreement.

12.    Indemnification.  Vaughn expressly warrants and represents to PSI that he will indemnify PSI against, and hold PSI harmless from, the tax consequences, if any, of PSI's not withholding taxes from, or reporting to the Internal Revenue Service as income, the aforementioned payment, including, but in no way limited to, any and all taxes, interest, and/or penalties incurred in connection therewith.

13.    Entire Agreement and Severability.  The parties hereto agree that this Agreement may not be modified, altered or changed except by a written agreement signed by the parties hereto.  The parties acknowledge that this constitutes the entire agreement between them superseding all prior written and oral agreements.  If any provision of this Agreement is held to be invalid, the remaining provisions shall remain in full force and effect.

14.    Arbitration.  Any claim or controversy arising out of or related to this Agreement or the interpretation thereof will be settled by arbitration under the then prevailing constitution and rules of the New York Stock Exchange, Inc., or the National Association of Securities Dealers, Inc.  Judgment based upon the decision of the arbitrators may be entered in any court having jurisdiction thereof.  The governing law of this Agreement shall be the substantive and procedural law of the State of New York.

15.    Breach of Agreement.  Should Vaughn violate any provision of this Agreement, the Company may apply for appropriate relief.  In any proceeding to enforce the terms of this Agreement, the Agreement may be introduced under seal in order to maintain its confidentiality.  Vaughn understands and agrees that the damage to the Company due to any such breach will be extremely difficult to determine.  Because of this difficulty, Vaughn agrees that in the event of a finding of such breach, he will forfeit to PSI all amounts received pursuant to this Agreement, and he shall indemnify PSI for any and all costs incurred in connection with any such recovery, including reasonable attorneys' fees. Notwithstanding any such relief, all of the other terms of this Agreement, including, without limitation, Vaughn's release of claims, shall remain in full force and effect.  The remedies provided for in this provision shall not be construed to be exclusive and do not bar any other claims for relief.

16.    Voluntary Execution.  Vaughn acknowledges that he has carefully read this Agreement and understands all of its terms including the full and final release of claims set forth above. Vaughn further acknowledges that he has voluntarily entered into this Agreement; that he has not relied upon any representation or statement, written or oral, not set forth in this Agreement; that the only consideration for signing this Agreement is as set forth herein; that the consideration received for executing this Agreement is greater than that to which he may otherwise be entitled; and that this document gives him the opportunity and encourages him to have this Agreement reviewed by his attorney and tax advisor. Vaughn also acknowledges that he has been afforded at least twenty-one days to consider the release provision contained herein and that he has seven days after signing this Agreement to revoke it in writing.  Accordingly, no payments required under this Agreement shall be made until the expiration of seven days following Vaughn's execution of the Agreement.

Vaughn Settlement Agreement
October 1998
Page 4

*IN WITNESS WHEREOF,* the parties hereto evidence their agreement by their
signatures.

PRUDENTIAL SECURITIES INCORPORATED

Date:                    BY: _Eric Schivin_ _____

Date:        10/27/98  _Jeffrey Vaughn_ _____
                       JEFFREY VAUGHN

NATIONAL ASSOCIATION OF SECURITIES
DEALERS, INC.
-------------------------------------------------------------- x
In the Matter of Arbitration between JEFFREY S.          :
VAUGHN, individually and on behalf of those Class
Members similarly situated,                              :

                      Claimants,          :
                                                     NASD-DR Case No. 06-00534

        - against -                               :

LEEDS, MORELLI & BROWN, P.C., LEEDS,              :
MORELLI & BROWN, L.L.P., LEEDS & MORELLI,
LEEDS, MORELLI & BROWN, PRUDENTIAL               :
SECURITIES, INC., PRUDENTIAL FINANCIAL,
INC., LENARD LEEDS, STEVEN A. MORELLI,           :
JEFFREY K. BROWN, JAMES VAGNINI, FREDERIC             **[PROPOSED]**
DAVID OSTROVE, ROBERT JOHN VALLI, JR.,           : **ARBITRATION AWARD**
DISCRIMINATION ON WALL STREET, INC.
DISCRIMINATION ON WALL STREET                    :
MANHATTAN, INC., JOHN DOES, 1-10 AND JANE
DOES, 1-10, a fictitious designation for presently     :
unknown licensed attorneys, professionals and/or
unknown persons or entities,                     :

                 Respondents.          :

-------------------------------------------------------------- X

       We, the undersigned arbitrators, having reviewed the parties' written

submissions, and having duly considered the parties' positions so presented in a hearing

held March 20, 2007, hereby find as follows:

       1.     Claimant Vaughn agreed to submit all his claims to arbitration,

whether styled as individual or class claims; and

       2.     Claimant Vaughn, therefore, has no right to pursue either

individual and class claims in court.

       Accordingly, Claimant Vaughn's motion to dismiss his own demand for

arbitration is hereby denied, and Prudential Respondents' Motion for Judgment on the

2

Pleadings is hereby granted.  This award shall be a final determination of all matters

submitted to this Panel.

Dated: March __, 2007
New York, New York


_____
Lewis S. Kurlantzick
Public Arbitrator, Presiding Chair


_____
Doris Lindbergh, Esq.,
Non-Public Arbitrator


_____
Nathan M. Lubow,
Public Arbitrator

PAUL W ____

## AFFIDAVIT OF SERVICE BY HAND

STATE OF NEW YORK    )
                           : ss.:

COUNTY OF NEW YORK  )

Jennifer Fuentes, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and am employed by Paul,

Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York,

New York 10019.

2. On March 6, 2007, I personally served true copies of the foregoing REPLY

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

PRUDENTIAL RESPONDENTS' MOTION FOR JUDGMENT ON THE PLEADINGS,

AFFIDAVIT OF LIZA VELAZQUEZ IN FURTHER SUPPORT OF PRUDENTIAL

RESPONDENTS MOTION FOR JUDGMENT ON THE PLEADINGS and

[PROPOSED] ARBITRATION AWARD on the following:

Blaine H. Bortnick
Liddle & Robinson, LLP
800 Third Avene
New York, NY 10022

Daniel T. Hughes
Litchfield Cavo, LLP
420 Lexington Avenue, Suite 1750
New York, NY 10170

3. I made such service by personally delivering true copies of the aforementioned

documents to the offices at the above stated address.

Jennifer Fuentes

Sworn to before me this
6ᵗʰ day of March, 2007

Notary Public

REBECCA McCARTHY
Notary Public, State of New York
No. 01MC6109653
Qualified in New York County
Commission Expires May 17, 2008

### AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

STATE OF NEW YORK     )
                        )   ss.:
COUNTY OF NEW YORK   )

Austin K. Wilkinson, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and am employed by Paul,

Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York,

New York 10019.

2. On March, 6, 2007, I served true copies of the attached:

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

PRUDENTIAL RESPONDENTS' MOTION FOR JUDGMENT ON THE PLEADINGS,

AFFIDAVIT OF LIZA VELAZQUEZ IN FURTHER SUPPORT OF PRUDENTIAL

RESPONDENTS MOTION FOR JUDGMENT ON THE PLEADINGS and

(PROPOSED) ARBITRATION AWARD on the following:

> Shari Clarie Lewis
> Rivkin Radler LLP
> 926 Reckson Plaza
> Uniondale, NY 11556-0926

3. I made such service by placing true copies of the aforementioned documents in

properly addressed prepaid wrappers and delivering them to a Federal Express office for

Priority Overnight Delivery.

*Austin K. Wilkinson*

Austin K. Wilkinson

Sworn to before me this

6th day of March, 2007

Notary Public

REBECCA McCARTHY
Notary Public, State of New York
No. 01MC6109653
Qualified in New York County
Commission Expires May 17, 2008

Doc#: NY6: 185617.1