# Exhibit S

## Curry, Archna

**From:** Lewis.Kurlantzick
**Sent:** Tuesday, March 27, 2007 11:33 AM
**To:** Curry, Archna
**Subject:** #06-00534, jeffrey vaughn v. leeds, morelli & brown; rulings on parties' motions

Ms. Curry,

The panel's rulings are as follows:

Claimant's motion to dismiss is denied.

Respondents' motion for judgment on the pleadings is denied.

Lewis Kurlantzick
Chairman
for the panel

Please address all future mail to:

# Exhibit T

ARBITRATION PROCEEDINGS

AMERICAN ARBITRATION ASSOCIATION

-------------------------------------------x

In the Matter of the

Arbitration between

JEFFREY S. VAUGHN,

Claimant,

-and-

LEEDS, MORELLI & BROWN, P.C.,

LEEDS, MORELLI & BROWN, LLP,

PRUDENTIAL SECURITIES INC.,

et al.,

Respondents.

-------------------------------------------x

One Liberty Plaza

New York, New York

Monday, April 23, 2007

B E F O R E:

LEWIS KURLANTZICK, Chairman

NATHAN LUBOW, ARBITRATOR

DORIS LINDBERGH, ARBITRATOR

Reported by:

William Byrne

APPEARANCES:

For the Claimant:

LIDDLE & ROBINSON, ESQS.
800 Third Avenue
New York, New York 10022
BY: BLAINE H. BORTNICK, ESQ.
REBECCA A. SAENGER, ESQ.

For the Respondent:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, ESQS.
1285 Avenue of the Americas
New York, New York 10018
BY: GERARD E. HARPER, ESQ.
LIZA M. VELAZQUEZ, ESQ.
SAMUEL M. SHELDON, ESQ.

For the Respondent:

Leeds Morelli & Brown
RIVKIN RADLER, ESQ.
EAB Plaza Uniondale
New York 11556
BY: SHARI CLAIRE LEWIS, ESQ.

[Page 2]

ALSO PRESENT:

KENNETH THYNE, ESQ.
JULIA HENICK RIGBY, ESQ.

[Page 3]

PROCEEDINGS

THE CHAIRMAN: This is the hearing of April 23, 2007 NASD case 0600534 Jeffrey S. Vaughn versus Leeds Morelli & Brown et al. We are going to start with the introduction of the arbitration panel. I am the chairman, Lewis Kurlantzick.

ARBITRATOR LUBOW: Nathan Lubow, the arbitrator.

ARBITRATOR LINDBERGH: Doris Lindbergh, the arbitrator.

THE CHAIRMAN: I have no additional disclosures to make at this point.

ARBITRATOR LINDBERGH: I have no disclosures.

ARBITRATOR LUBOW: I have no disclosures to make.

THE CHAIRMAN: We will go around the room and if everybody would indicate your name and your relationship to the parties, please.

MR. VAUGHN: Jeffrey Vaughn,

[Page 4]

the claimant in this arbitration.

MR. BORTNICK: Blaine Bortnick, I am with the law firm of Liddle & Robbinson. With me today is my colleague Robin Saenger. I represent the claimant in this action.

Present in the room today, is Mr. Kenneth Thyne, who is also counsel for Mr. Vaughn. Also Mr. Vaughn's wife is sitting there in the back, she is not a participant.

MS. LEWIS: My name is Shari Lewis, and I am from the law firm of Rivkin Radler. I represent the respondent Leeds Morelli & Brown in this action.

MR. HARPER: My name is Gerard Harper. I am from the law firm of from Paul Weiss Rifkind Wharton & Garrison. I represent Prudential Securities, the respondent. And with me are my colleagues Liza Velazquez and Samuel

[Page 5]

Sheldon as well as a representative of my client Julia Rigby who is the assistant general counsel, and I have a paralegal here as well.

THE CHAIRMAN: Do you have any objection to Ms. Vaughn being present during the proceeding?

MR. HARPER: I don't.

THE CHAIRMAN: We need to at this point to obtain conformation from the parties or the representatives of the their acceptance of the panel's composition.

MR. BORTNICK: Yes, we accept for the claimant.

MS. LEWIS: Yes, we accept.

MR. HARPER: Prudential Securities accepts for the respondent.

THE CHAIRMAN: We have submitted our properly executed oaths of arbitrators to the NASD dispute resolution staff. This

controversy has been submitted to the panel for hearing in accordance with the Code of Arbitration Procedure.

The panel is authorized to determine each of the matters set forth in the parties' statements and filed with the NASD dispute resolution unless the law directs otherwise. All the awards rendered pursuant to the code will be final and will not be subject to an appeal.

We would appreciate it if no interruptions are made during an individual's testimony. Parties are entitled to make objections, cross examine and redirect witnesses, and the arbitrators may ask questions as they deem appropriate.

The submission of the matter to arbitration will not preclude any right of the NASD that it otherwise would be authorized to adopt,

administer or enforce. If any matter comes to the attention of the panel during this panel's participation in this proceeding that this panel has reason to believe may constitute a violation of the association rules or the federal securities laws, the panel may initiate a referral of the matter to the association for disciplinary investigation.

If we make any such referral it will only be initiated after this dispute has been either settled or otherwise disposed of or after a final award has been rendered.

We have been selected to serve as neutral arbitrators to decide the matter, we are not NASD dispute resolution employees. Pursuant to Canon 1 of the ABA, AAA Code of Ethics we as neutral arbitrators have the duty of conducting this proceeding with fairness and

integrity. That duty extends to all parties and to this process, therefore, on behalf of the panel I respectfully request that all parties and their counsel or representatives refrain from engaging in any conversations or contact with the panel members except within this room and in the presence of all parties' counsel or representatives.

We thank you for your anticipated cooperation in that respect.

I need to now administer the oath to those who are or are likely to be witnesses. I don't know who they are. I assume Mr. Vaughn, and I don't know whether that includes Mr. Morelli but if it does please raise your right hand.

(The chairman swore in the proposed witnesses: Mr. Vaughn and Mr. Morelli.)

THE CHAIRMAN: The arbitrators have read the pleadings that have been submitted by the parties. These papers along with executed submission agreements will be marked and received into evidence as Arbitrator's Exhibit 1. We intend to take a break midmorning, midafternoon and for lunch. However, if any of the participants have need to take a break at any other time or for any other reason please let us know, and we will be happy to cooperate with you.

Each party may make an opening statement. It should be limited to what the parties intend to prove and should not be a presentation of the evidence or of the merits of the case with respect to documentary evidence. That evidence will be marked for identification shown to the opposing parties for review and possible objection to its

[Page 10]

admissibility.

The panel will rule on any objections asserted and determine whether the document will be received in evidence. The parties and attorneys are responsible for providing copies of all proposed exhibits to the other parties and to the panel. Parties are encouraged to avoid repetitive arguments and parties and counsel please direct all objections to the panel and not to each other.

We are now ready for the parties' opening statements beginning with the claimant.

MR. BORTNICK: Good morning. We are here for what I hope is going to be a very short hearing because we are here to decide just one issue as directed by the federal court. I know that the panel has seen briefing upon briefing upon briefing, and lots of trees have

[Page 11]

been killed in support of that effort, but it all boils down to one thing what was the intention of the parties to the settlement agreement, when Mr. Vaughn signed a September agreement back in October of 1998 where he settled his matter with Prudential Securities. That's all.

The agreement contains an arbitration clause, and the arbitration clause says any dispute arising out of the agreement shall be arbitrated pursuant to the rules of the New York Stock Exchange or the NASD. Both forms have the exact same rule. For purposes of the NASD we are talking about the rule that prohibits class actions from being arbitrated and, in fact, furthermore as pointed out in the statement of claim that industry parties such as Prudential are in fact prohibited from enforcing agreements to compel arbitration at the NASD of class

[Page 12]

action claims. That's why we have, for example, class actions that are dealing with securities, fraud and so forth.

Typically, as I'm sure this panel well knows if somebody has a typical customer case they have to arbitrate it, but class actions are heard in court. There are the arbitration agreements when a customer signs up with a company like Prudential or Merrill Lynch or anywhere else.

The same thing here. We have an arbitration clause it doesn't include class actions, nevertheless, the federal court has sent to arbitration the question of the meaning of the arbitration clause.

Now the court suggested there are three possible interpretations. One of which I think everybody probably agrees in the room, at least from the parties' side it

[Page 13]

doesn't apply, which would be that you could have a class arbitration.

I'm certain that Mr. Friedman would never allow a class arbitration to go forward with the NASD. The NASD is simply not equipped to handle a class action. So the question is whether Mr. Vaughn intended to waive his rights to bring a class action when he signed the settlement agreement.

You will hear Mr. Vaughn testify today, the answer is clearly no. And that will basically be all the evidence you are going to hear. Mr. Vaughn's testimony is going to be short, and I'm interested to see what the defense will be, but we will find out. And that's it.

In conclusion of the hearing, which I don't even think should go beyond the morning, I think it will be clear that Mr. Vaughn did not intend to waive class action, his

[Page 14]

rights to bring a class action, and as such his class action against Prudential and by extension Leeds Morelli & Brown should go back to court.

Leeds Morelli & Brown is here only because even though they are not a party to the agreement the federal court ruled they get the benefit of whatever the arbitration clause is and how it is interpreted as a codefendant with Prudential.

They are here even though they are not a party to the settlement agreement, but because they actually are a codefendant in the class action and, therefore, get the benefits, to the extent there are any benefits of an arbitration clause that Prudential Securites gets.

Thank you.

THE CHAIRMAN: Proceed.

MR. HARPER: Thank you, Mr.

[Page 15]

Chairman. Good morning, and thank you for agreeing to serve.

I feel something like deja vu all over again because we have made this argument and heard Mr. Bortnick make this argument over and over again.

Let me give you a timeline here, just briefly. Mr. Vaughn entered into a retainer agreement with what was then Leeds Morelli in January of 1998 and he agreed in that retainer agreement to pay a legal fee and Leeds Morelli agreed to attempt to negotiate a settlement.

Mr. Vaughn went through a process that we will hear about, and he asked for $200,000 from Prudential Securities and an extension of his Cobra rights. And he got $200,000 and an extension of his Cobra rights. And so he got every nickel he asked for in the

[Page 16]

mediation.

Almost six years to the day of when he executed that settlement there arrives a class action with Mr. Vaughn's name on the north side of a caption and a bunch of names on the south side of the caption including my client. So we made pursuant to the rules that permit us to make it under the NASD rules, specifically permit us in that circumstance to go into court and compel that he arbitrate pursuant to an arbitration clause that was in the settlement agreement.

And in response to that motion to compel my friend, Mr. Bortnick, made exactly the arguments that he is making today. He made exactly the argument that the NASD rules forbid me to do what I did; he made exactly that -- he argued that the rules of the NASD expressly and unambiguously state that a claim

[Page 17]

submitted as a class action is not eligible for arbitration.

Simply put because they are not eligibile for arbitration this court is the appropriate forum. It is beyond doubt that the NASD prohibits the submission of claims and so, therefore, under those rules this court cannot compel an arbitration.

That is what Mr. Vaughn argued in front of Judge Coate and Judge Coate responded that the arbitration clause in the agreement contains sweeping languag concerning the scope of the questions commited to arbitration, as it commits to arbitration any claim or controversy arising out of or related to the this agreement, meaning the settlement agreement or even the interpretation thereof.

And Vaughn claims that the arbitration clause is inconsistent

[Page 18]

with the rules of the NASD, but this interpretation contradicts the clear statement that the arbitration clause applies to any claim. Even assuming that Mr. Vaughn was right and the applicable arbitration rulings do apply and indeed forbid class arbitration, that it would be plausible to interpret the arbitration clause required that all the claims be arbitrated and to disallow class action with no further qualifications or caveats.

The next thing that happened was that Mr. Vaughn filed a claim identical to the claim he has filed here with the New York State Stock Exchange. And the New York State Stock Exchange has a rule that it will not exercise jurisdiction. It is a plain black and white rule certainly known to my friend Mr. Bortnick who spends more time in these halls than I do and in the New

[Page 19]

York State Stock Exchange than I do, that you can't, it doesn't have jurisdiction over parties other than members. And Mr. Vaughn had named Leeds Morelli and a bunch of lawyers from that firm and a bunch of John Does and so forth.

So the New York Stock Exchange said we have no jurisdiction over this claim. And so back to court goes Mr. Vaughn and Mr. Bordnick. And once more they make exactly the same arguments that they are making now to this panel, and that they had previously made to Judge Coate.

So we went to Judge Coate and said -- they went to the one flora that won't hear claims against nonmembers but the NASD does, so go to the NASD. And in that Judge Coate again sent Mr. Vaughn off to arbitration in December of '05. And then in May of '06, five months later or so, Mr. Vaughn files once

[Page 20]

again an identical piece of paper saying the rules of the NASD forbid class actions, therefore, the promise I made to arbitrate my claim is invalid as to my class action complaint, which is exactly the argument that he had made to Judge Coate the first time and the second time.

And so we went into Judge Coate. We said, Judge Coate, he is asking you ladies and gentlemen to be the Second Circuit and to overrule your ruling. And one of the interesting things that Judge Coate said was that she had before her three documents. She had before her the original letter to the NA -- rather to the New York State Stock Exchange setting forth the statment of claim and the description following the ruling that she had made.

Second she had before her the

[Page 21]

claim, the statement of claim in this case, which again describes in detail or purports to, the issue before this panel and the ruling and intention of Judge Coate.

Finally, she had before her a letter that was from Ms. Saenger on behalf of Mr. Vaughn, that says that because we've gotten the lists with your names on them among others, and that the letter says the skills and knowledge options listed in the terms regarding the arbitration selection process do not match the issue before the NASD in this case.

Mr. Vaughn's statement of claim presents a very narrow issue of whether he waived his right to a class action by signing the settlement agreement with Prudential Securities. Therefore, we request an arbitration possessing knowledge of the law of arbitration. And to that comment on September when we

went into court, and asked Judge Coate what is going on here, she said a couple of interesting things.

She said, first, claimant clearly agreed to arbitration of his claims and I ruled that the arbitration agreement was valid and enforceable, and that legally was not in dispute. In other words, under Judge Coate's ruling there is no -- as a matter of law Mr. Vaughn must arbitrate his individual claim.

She then said in connection with the order to show cause you have been given a set of documents that include some of the plaintiff's submissions to the stock exchange and to the NASD including a February and October 28th letter to the stock exchange, and a February 2nd letter, a statement of claim to the NASD, and the August 15, 2006 letter to the NASD, the one I just read from involving the arbitration.

And I think, said Judge Coate, the presentation of the legal issue in those letters is inaccurate and misleading.

So we are just -- where does that leave us? I think what it leaves us with is that -- and I'll make it now in an opening statement rather than later on interrupt the testimony -- I object, if I could do it now, to any testimony from Mr. Vaughn.

First, on the grounds there is no parole evidence permissible here because the contract is clear and unambiguous.

Second, because the whole thrust of his testimony, as Mr. Bortnick describes it, is that he wants to go back to court to litigate his claim. And that has already been adjudged something he cannot do by Judge Coate.

Third, it is an integrated

agreement as to which parole evidence as to one portion or another portion is prohibited.

Fourth, because the standard or the argument that is being -- the evidence that is being offered for, is that Mr. Vaughn did not give a knowing and voluntary waiver of his, quote, right to a class action.

Well, the lawyers in the room are familiar with the concept of knowing and voluntary waiver and what it applies to is substantive rights. If I'm going to waive my right to a privilege against self-incrimination, my waiver of that right must be known and voluntary. But there are scores of cases, and we cite them that say that a waiver of a right to class action is simply a waiver of a procedural means by which a substantive right is adjudicated, and that the class action itself is

not a substantive right.

And so, therefore, the standard of knowing involuntary waiver has nothing to do with the enforceability of an arbitration agreement.

The argument that the claimant is making here is that he doesn't have to arbitrate his claim, and he is seeking a declaratory judgment from you to that effect. He does not even plead what his claim is. In other words, there is no grievance he brings before you other than that he doesn't want to arbitrate, which is exactly what Judge Coate said he must do.

And if you read Judge Coate's September 5th transcript of '06, she warns Mr. Bortnick, she warned Mr. Bortnick that if he failed to file a claim that lacked the underlying grievance here, the grievance alleged in the class action, that

[Page 26]

Mr. Vaughn would forever waive and be barred from asserting that claim and --

MR. BORTNICK: I'm going to object. That is not flat-out untrue what she said. I have never, I don't think I can remember objecting to an opening statement but that is flat-out untrue, and I know what occurred because she was talking about an ethical issue and she wanted to make sure Mr. Vaughn understood that if he lost in this forum on this issue and he didn't submit an individual claim then it was gone. But it was never about the fact that if he won in this, it was always understood he would have his claim in court and I strongly object to that.

MR. HARPER: I've never interrupted an opening statement in my life, and I thought your instruction --

[Page 27]

THE CHAIRMAN: Perhaps you were not so offended.

MR. HARPER: I don't offend easily, when you have been at this a while.

THE CHAIRMAN: Why don't you move on.

MR. HARPER: I'm reading from the judge's statement, page 5 now.

Now should Mr. Vaughn decide that he doesn't what to submit an individual claim to the arbitration proceeding I expect, and I'm not going to get a ruling on this now but that he can't get a second bite at the apple, and I see plaintiff's counsel nod in agreement, that a forfeiture or waiver rules or res judicata would apply, and that's it.

He had an opportunity to arbitrate the claim. Again, we are playing within our hypothetical, he didn't arbitrate it and end of the story. Mr. Bortnick can read into

[Page 28]

that whatever he wants. I read it, I think it is pretty clear and so I'll end as I began.

This is now the fourth or fifth time I have been in front of decision makers saying that Mr. Vaughn promised to arbitrate, and he is here. And Judge Coate said that that's why he must arbitrate, it is legal and enforceable and he must arbitrate his individual claim.

And what Mr. Bortnick and Mr. Vaughn are here to solicit from the panel is a ruling that he need not do so. And with the utmost respect to this panel, the panel has no right to do that.

THE CHAIRMAN: Thank you, Mr. Harper.

MS. LEWIS: Thank you. I would like to thank you all for your time today. I would like to start first directing your attention to what I hope will be an easily

[Page 29]

disposed of matter, and that's the bad faith inclusion of claims against the individual respondent in this proceeding.

Separate and apart from the arbitration ruling in the decision by Judge Coate filed on March 20, 2006, which is annexed to our submission as Exhibit G by Judge Coate determined that the individual respondents named in this procedure were dismissed from the case not because of the arbitration clause but because of the lack of jurisdiction. And in response to a cross-motion to extend their time to serve these defendants in that matter, the court indicated that the plaintiff had shown a complete disregard and disinterest in getting them in as parties in this action.

So whether or not or whatever this panel concludes as to the arbitrability of this matter, these

[Page 30]

respondents cannot be sent back to federal court. With due deference to this panel there is simply no authority for you to overrule the jurisdictional determination of a federal court that there is no jurisdiction over these individuals.

That defense was included in the answer served by the individual respondent. It was fully brieved in the moving papers. It was ignored in the opposition by the claimant and required our reply, when not given multiple opportunities no possible basis has or can be advanced for including these individual defendants and they have been dismissed from the federal action in an application for declaratory judgment saying that they can go back to court against them.

And I would submit to you that not only should they be dismissed

[Page 31]

but those individuals should be given all costs that they incurred in defending what was brought from nothing more than intimidation. That's the first part. And again because there has been no opposition to that application, I presume that that looking at this decision, looking at the submissions by the parties, that can be fairly easily determined.

The remainder of the application that applies to this declaratory judgment for permission to go back, which would apply against the law firm or potentially and one of the respondents, I certainly join in the able argument that was put forward by Mr. Harper in terms of what has already been determined by Judge Coate. There is a requirement under the law that if we are going to eviscerate an arbitration provision, it has to be

[Page 32]

said with positive assurance that the parties did not intend to the matter to be submitted for arbitration.

The only thing that we can say with positive assurance in this case is based upon the facts that there is a settlement clause in the settlement agreement that applies to this dispute that requires any claim or controversy regarding the agreement or its interpretation to be determined by arbitration under the rules of either the NASD or the New York State Stock Exchange.

Now, any claim or dispute -- excuse me, any claim or controversy is self-evident as to its meaning on its face. And any effort to introduce testimony contrary to the clear meaning of any claim or controversy must be arbitrated is impermissible under the standard contract interpretation laws and

[Page 33]

against established policy which requires positive assurance that something is not included, but we have even more positive assurance here based upon Judge Coate's decision that said no matter what else, the first decision, her statement on the record later on, no matter what else Mr. Vaught's individual claims must be arbitrated.

She said there were three other possibilities, as Mr. Bortnick said which all agree that one of them is not likely, that the NSAD will take a class arbitration.

The other two options that she recognized as plausible did not include Mr. Vaughn going back on his individual claim.

And the next thing that we have positive assurance about and we have it because in their submission Mr. Vaughn stated that his

[Page 34]

individual claim was identical to and part of the class action claim, that there is nothing that's fictionally out there as a class action that he can go back for, back to court on and still arbitrate as an individual claim because they are one and the same.

So clearly what we have, and I think part of the issue here, is that Mr. Vaughn is asking, framing the wrong question, it is not whether, as Mr. Harper suggested there is intentional waiver of the class action but whether or not the parties intended Mr. Vaughn to arbitrate his claims. And that has already been determined, and any parole evidence by Mr. Vaughn or my client Mr. Morelli, would be inappropriate.

The phrase is apparent and clear on its face, and to allow any party or their attorney to attack

[Page 35]

the meaning or even address the meaning of a clear phrase in the contract would make all contracts unenforceable. Because everybody could come in and say, oh, I changed my mind and what I really intended was this or that. It is just here the language is so clear based upon the agreement, which I suggest is the piece of evidence in this case. It would be inappropriate. That's all I have to say right now.

THE CHAIRMAN: Thank you, Ms. Lewis.

We are ready for the presentation of evidence starting with the claimant.

MR. BORTNICK: Thank you, I call Mr. Vaughn.

MR. HARPER: I take it for the record, Mr. Chair, that you have overruled my objection.

THE CHAIRMAN: No, I want to to hear what he has to say before

[Page 36]

and I also want to hear from the other side. It is not no one has responded to your argument.

MR. HARPER: Fine, I beg your pardon.

MR. BORTNICK: At this time I think it it is probably easier if I just introduce the first three exhibits before we get going with Mr. Vaughn.

THE CHAIRMAN: Fine.

MR. BORTNICK: Exhibit Number 1 is going to be the opinion and order of Judge Coate dated August 12, 2005.

Exhibit Number 2 is going to be the transcript of the hearing in front of Judge Coate dated September 5, 2006.

And Exhibit 3 is going to be the settlement agreement between Mr. Vaughn and Prudential dated October 1998.

MR. HARPER: We have one

[Page 37]

signed by both parties.

MR. BORTNICK: That's fine, we would be happy to do that.

MR. HARPER: Why don't we use that one.

MR. BORTNICK: Okay.

JEFFREY S. VAUGHN, having been first duly sworn by a the Chairman was examined andtestified as follows:

(Exhibit Number 1, opinion and order of Judge Coate dated August 12, 2005 marked for identification, as of this date.)

(Exhibit Number 2, transcript of the hearing in front of Judge Coate dated September 5, 2006 marked for identification, as of this date.)

(Exhibit Number 3, settlement agreement between Mr. Vaughn and Prudential Securities, dated October 1998 marked for identification, as of this date.)

[Page 38]

J. Vaughn

EXAMINATION BY MR. BORTNICK:

**Q.** Mr. Vaughn, on Exhibit Number 2, the transcript, I would like you to turn to page 14.

A. Yes.

**Q.** Line 19 of the transcript that begins with "I did not," can you read that through the next two sentences?

A. I did not rule --

MR. HARPER: I object. You can read this as well as the witness is the witness reading what Judge Coate said to the panel.

THE CHAIRMAN: Proceed.

MR. BORTNICK: We just heard here two attorneys telling this panel what the judge said. I thought it would be a much better idea, it is a much better idea, it is very short let's put it in front of the panel and read it out loud, so everybody can hear it what the judge said why we are here.

[Page 39]

J. Vaughn

THE CHAIRMAN: I will permit it, overruled.

**Q.** Start with "I did not."

A. "I did not rule that everything had to be subject to arbitration. I contemplated, therefore, that the arbitrator in deciding the parties intentions might decide that their agreement to arbitrate does not foreclose the plaintiffs from coming to court and litigating a class action."

**Q.** If you turn over to page 15 --

A. Yes.

**Q.** -- and just read the next sentence beginning at line 3 with "but" just the one sentence.

A. "But I think it would be wrong for the defendants to characterize it the way you are today, to suggest that the arbitrators' hands are bound in some way such that they couldn't rule in interpreting the party's intent that the plaintiff has the right to come to court and proceed on a class action."

[Page 40]

J. Vaughn

**Q.** Thank you. Mr. Vaughn, now, you had actually filed a class action in court?

A. Yes.

**Q.** If you turn to Arbitrator's Exhibit 1, is this the amended complaint that you filed in front of Judge Coate?

A. Yes.

**Q.** And the date of this amended complaint is what?

Is there an affidavit of service attached to it?

A. Yes.

**Q.** When was it served?

MS. LEWIS: Objection. There has been a legal determination as to the service on various parties. In fact the legal determination that five of the parties were not served. I do not believe that this witness has any personal knowledge of service of any legal document.

MR. BORTNICK: The only purpose here is to just, so that it

[Page 41]

J. Vaughn

is all clear that at the time Judge Coate made these statements on the record, she had in front of her the complaint that Mr. Vaughn had filed a class action complaint and then she thereafter made the statement many times. That's all.

THE CHAIRMAN: We will note that.

Q. Mr. Vaughn, I'm not sure you stated your full name for the record, would you please state your full name.

A. Jeffrey Sherwood Vaughn.

Q. Just very briefly, what's your educational background?

A. Finance at Pace in 1985.

Q. You received what degree?

A. BA in finance.

Q. And there came a time where you became employed by Prudential Securities?

A. That's correct.

Q. When was that?

A. In February of '85.

[Page 42]

J. Vaughn

Q. And what was the firm known as at the time?

A. Pru Bache, I believe.

Q. Prudential Bache?

A. Yes.

Q. Were you licensed in the securities industry at any time such as a Series 7 or any other security license?

A. No.

Q. Have you ever received a security license?

A. No.

Q. What was your first job with Prudential Securities?

A. Operations clerk.

Q. And what did those job responsibilities entail?

A. Pretty much to take care of all back office issues that were pertaining to trades that were done the prior day or any day before the settlement of trades.

Q. Can you give me an example?

A. Pretty much whatever breaks

[Page 43]

J. Vaughn

that were done on the floor of the exchange. Breaks meaning discrepancies between transactions that went on the prior day. Or like I said up to some point, up until the settlement I was the, one of the key people in making sure the company had no exposure.

Q. This was a back office function?

A. Yes, this was a back office function.

Q. And how long did you remain in this job?

A. For maybe four years I would say.

Q. And then what was your next job?

A. The next job was trade support specialist, which I actually worked on the block trading desk working with the traders and the back office in P&S, and pretty much a liaison between the traders and the floor of the exchange and our Prudential block office.

[Page 44]

J. Vaughn

Q. The block trading desk is a large number of shares being traded at one time?

A. Yes.

Q. For example, 20,000 shares of IBM that would be a block trade?

A. Yes.

Q. A big one?

A. No, a small one.

Q. And this again was a back office function?

A. Yes, it was.

Q. And how long did you remain employed with Prudential?

A. For a total of about 13 years.

Q. When did you leave?

A. In '98 I want to I believe it was November of '98.

Q. Was it before or after you signed Exhibit 3 the settlement agreement?

A. After.

Q. And you stayed with Prudential through all of its name changes?

A. Yes, I did.

[Page 45]

J. Vaughn

Q. But it was always as a broker dealer?

A. Yes.

Q. The respondent party here today?

A. Meaning.

Q. Prudential Financial?

A. Now it is Prudential Financial, when I left it was Prudential Securities.

Q. Now, did there come a time where you retained the law firm of Leeds Morelli & Brown to represent you?

A. Yes, I did.

Q. You heard the opening statement from Mr. Harper which said it was January of 1998; does that sound about right?

A. That's when I signed the retainer, that's correct.

Q. When did you first start talking with Leeds Morelli & Brown?

A. Probably back in November the prior year.

[Page 46]

J. Vaughn

Q. And just very briefly what was the subject matter that you asked Leeds Morelli & Brown Leeds to represent you in?

A. Briefly it was a hostile work environment, a discrimination issue.

Q. Were you the only person represented by Leeds Morelli & Brown who were employees of Prudential with respect to this matter?

A. No.

Q. How many were there?

A. Initially it probably started out to be about maybe 50 people and as it went on it ended up to be about 400 or a little more maybe.

Q. Over the same issue?

A. Yes.

Q. Was it your intention at that time to file a lawsuit?

A. Yes.

Q. Where were you intending to file a lawsuit at that time?

MS. LEWIS: At what point in time?

[Page 47]

J. Vaughn

THE CHAIRMAN: When he retained Leeds Morelli & Brown to prosecute the discrimination case.

A. Meaning where?

Q. In court.

A. In court.

Q. Had you had exposure to the New York Stock Exchange, the NASD or any securities industry arbitration up until that point?

A. No.

Q. Other than the proceeding we are in today and events that led up to this particular proceeding, have you ever had any exposure to New York State Stock Exchange or NASD arbitration?

A. Yes.

Q. What was your exposure?

A. Well, number one, there was a mediation hearing about my particular case within the rest of the people who had come forward from Prudential. And then after that there was a -- I had to testify against Tony Carranate who came in and

[Page 48]

J. Vaughn

wanted to or I guess he was going after Prudential for whatever reasons and I had to testify against him.

Q. In arbitration? He was part of the management?

A. He was part of the management. Yes.

Q. He was suing Prudential?

A. Yes.

Q. And you were brought in as a witness for Prudential?

A. Yes.

Q. Have you ever had any other exposure to the arbitration process?

A. No.

Q. Now, did there come a time when your case settled?

A. Yes.

Q. And is Exhibit 3 your settlement agreement?

A. Yes, it is.

Q. Do you recall when you saw your settlement agreement for the first time?

[Page 49]

J. Vaughn

A. Yes, I do.

Q. When was that?

A. It was at a fundraiser for Carl McCall at Tavern on the Green probably in November of '98.

Q. Was it the day you signed your agreement?

A. Yes, it was.

Q. So I just want to be clear, you saw it for the first time that was the day you signed it?

A. The first time I saw my agreement was in the bathroom of Tavern on the Green that's where I signed it.

Q. You saw it for the first time and signed it in the bathroom at Tavern on the Green?

A. Yes.

Q. Who showed it to you?

A. Jeffrey Brown.

Q. He was one of the partners of Leeds Morelli & Brown?

A. Yes.

Q. What were the circumstances of

[Page 50]

J. Vaughn

your seeing it in the bathroom?

A. We were invited there by Leeds Morelli & Brown to it was a fundraiser for Carl McCall he was running for New York State Comptroller, and we were invited and not only myself but a few other people were introduced to their settlement agreements there for the first time. So I just --

Q. Mr. Vaughn, were you sitting at table and he said here is your agreement? What were the circumstances.

A. No, again, like I said I saw it for the first time in the men's room.

Q. Where did you sign it?

A. In the men's room.

Q. How long did you review it in the men's room?

A. Briefly, maybe about three or four minutes or five minutes tops.

Q. Was Mr. Brown there with you?

A. Yes.

Q. Did he say anything to you?

A. Pretty much, he just went over

[Page 51]

J. Vaughn

it to some point and just made it clear to me that this is somewhat of a gag order for the most part. Just, you can't say anything, and you can't come back to Prudential and go public which I guess at the time we were trying, we wanted to make this public. And they said that if you sign this you can't go public. That was the gist of the conversation.

Q. Any other or anything else that you discussed?

A. No..

Q. Just that point?

A. Yes.

Q. If you would take a look at paragraph 14 of your of Exhibit 3 the settlement agreement --

A. Yes.

Q. -- where it where it says arbitration.

A. Yes.

Q. Did you discuss that clause at all with Mr. Brown?

A. No.

[Page 52]

J. Vaughn

Q. Did you have any understanding of what the arbitration procedures were under the prevailing constitution of rules of the New York State Stock Exchange Inc. or the National Association of Securities Dealers Inc.?

A. No, not in totality.

Q. Did you know whether they had any rules concerning class actions?

A. No, I didn't.

Q. Did you have the intent to waive a class action when you read it?

A. No.

Q. Did you discuss that clause with Mr. Brown?

A. No, not at all.

Q. At the time you signed this agreement, did you believe that you were waiving your rights to bring a class action based upon this agreement?

A. No, and I didn't give it any thought either.

MR. BORTNICK: I have nothing further.

[Page 53]

J. Vaughn

THE CHAIRMAN: Thank you, you may proceed.

MR. BORTNICK: Thank you, Mr. Chairman.

EXAMINATION BY MR. HARPER:

Q. Good morning, Mr. Vaughn.
A. Good morning.
Q. My name is Gerard Harper, I represent Prudential.
A. Yes.
Q. I take it you have testified before at least once?
A. Yes.
Q. And that was in the arbitration against Mr. Carranate?
A. Yes.
Q. And any other time?
A. No, other than the mediation that we went through with Prudential.
Q. When you say you testified at a mediation were you sworn in?
A. If I remember correctly, yes.
Q. And who was the mediator?

[Page 54]

J. Vaughn

A. I can't tell you that, I don't remember.
Q. Where was it held?
A. It was held in, I want to believe it was the NASDAQ building over here by across the street from I don't know the exact address but it's across the street from New York Plaza.
Q. And who was present?
A. I mean who was present, it would have been Leeds, Morelli myself and the panel.
Q. Was Mr. Leeds and Mr. Morelli there?
A. If I remember correctly, yes, they all were there.
Q. When you say all, you mean Leeds?
A. Morelli and Brown was there.
Q. And you were there?
A. Yes.
Q. Was your wife there?
A. No, my wife wasn't there.
Q. And the mediator was there?

[Page 55]

J. Vaughn

A. Yes.
Q. How many mediators?
A. I don't remember.
Q. You don't remember the names?
A. No.
Q. Let me show you what your lawyer marked as Panel Exhibit 1 just a moment ago, and if I could direct your attention to paragraph 14.
A. Yes.
Q. Panel Exhibit 1 --

THE CHAIRMAN: Isn't that the amended complaint?

MR. HARPER: Yes.

MR. BORTNICK: It is part of Arbitrator Exhibit 1, it is not Panel Exhibit 1.

MR. HARPER: I'm sorry.

Q. Could you turn to paragraph 14 of part of Arbitrator Exhibit 1 --
A. Yes.
Q. -- and read that paragraph 14, page 4?
A. Yes.

[Page 56]

J. Vaughn

Q. Can you read that out loud?
A. "Upon information and belief, Leeds Morelli & Brown and the lawyer defendant's without plaintiff's knowledge agreed to cap various claims under their agreement with PSI and refused to press plaintiff's claims until they received payment from PSI which payments were concealed from plaintiff and plaintiff's class."
Q. What is your information and belief to that?
A. I have no idea.
Q. Now, you left Prudential in 1998?
A. That's correct.
Q. And why don't you take a look at your settlement agreement which is Exhibit 3?
A. Yes.
Q. And that is your signature on page 4?
A. Yes.
Q. Who wrote the date in there,

[Page 57]

J. Vaughn

is that your handwriting?

A. I don't know.

Q. Do you recognize that?

A. No.

Q. Do you remember whether that was the date of the McCall fundraiser?

A. Possibly because I believe I left in the early part of November, so that it could possibly be the date.

Q. Well, let's turn to page 1 of Exhibit 3.

A. Yes.

Q. Could you read paragraph 1, the first page?

A. Yes. "Separation from employment, Vaughn's last date of employment at PSI shall be October 23, 1998."

Q. Does that refresh your recollection that you signed this agreement after your last day of employment at PSI?

A. No.

Q. Is that statement false?

[Page 58]

J. Vaughn

A. I don't recall. I don't recall.

Q. But you have no reason to doubt, as you sit here today, that you executed the document on or about October 27, 1998 and that your laste date of employment was four days before?

A. No, I don't necessarily agree with that.

Q. If you don't agree with that, then tell me what is in your mind that makes you doubt the authenticity and accuracy of the document?

A. Because when I left Prudential before I had anything in writing stating what my last day was, I got a call from Leeds Morelli & Brown at the job 4 o'clock in the afternoon -- and I remember this clearly -- they said if you choose to, you do not have to go back to Prudential anymore we have X, Y and Z for you, that's it. You let us know what you want to do.

And that's what I remember. It could have been that day, but clearly I

[Page 59]

J. Vaughn

was still an employee of Prudential as far as I remember as of October 23.

Q. So you could have been orally notified that your claim had been resolved and understood that your last day was to be October 23, 1998 and then signed the paperwork four days later?

A. I can't say, I don't remember.

Q. You have no reason to doubt as you sit here today that the statements in the document itself are accurate?

A. No, I don't have a reason to doubt it.

Q. Thank you.

Now, you mentioned that you retained Leeds & Morelli and your best estimate was January of 1998; do you recall that?

A. Yes.

Q. Did you sign an agreement with Leeds & Morelli?

A. Leeds & Morelli and myself we talked in the latter part of the year before I signed that retainer. So did I

[Page 60]

J. Vaughn

sign a retainer when I first was introduced to them, no, this took about a month or so before I did.

MR. BORTNICK: Would you read back the question, please.

(A portion of the record was read.)

Q. Yes?

A. Yes.

Q. Let me show you a document that will be marked as whatever you want to mark it as?

MR. BORTNICK: Respondents' Exhibit 1.

MR. HARPER: That's fine.

(Respondents' Exhibit 1, agreement marked for identification, as of this date.)

Q. You weren't fired by Prudential, correct?

A. No.

Q. I'm incorrect?

A. No, I wasn't fired by Prudential.

[Page 61]

J. Vaughn

Q. You left voluntarily?
A. Yes.
Q. And now, when you initially retained Leeds Morelli, it was for the purpose of negotiating a settlement with PSI; isn't that right?
A. No, that is not right.
Q. When you signed the retainer agreement with Leeds Morelli, you did so to retain them to negotiate settlement with PSI, correct?
A. No.
Q. Look at the first paragraph of paragraph 1.
A. Yes.
Q. And let me rephrase the question for you.
A. Yes.
Q. You say you met with Leeds Morelli sometime in November --
A. Yes.
Q. -- of what I guess was '97.
A. Yes.
Q. Did you call them or did they

[Page 62]

J. Vaughn

call you?
A. I didn't call them. I was referred to them by another colleague who had already retained them.
Q. Who?
A. Connie Hernandez.
Q. And what did Ms. Hernandez say to you and what did you say to her?
A. Connie expressed to me that she knew I was looking for a lawyer as well because of the issues that were going on at Prudential, and I wanted to do something about it.
So Connie told me she already had a lawyer that she had signed a retainer for, she said they were good and that maybe it would be better that I join them rather than have an individual, another lawyer, and not have the esteem it would be if you had more than one person being retained by a particular firm.
Q. And that happened in around November of?
A. November, December of '97.

[Page 63]

J. Vaughn

Q. And then you subsequently executed a retainer agreement with Leeds Morelli, correct?
A. That's correct.
Q. And in that retainer agreement the first thing that Leeds Morelli promised to do was to negotiate a settlement with PSI on your behalf, correct?
A. I don't know that.
Q. Read paragraph 1 of the retainer agreement.
A. "The retainer will only include the contacting of employee to seek a negotiated settlement."
Q. Stop for a minute. Is there any word in that sentence you don't understand?
A. No.
Q. And so the retainer agreement in the first instance was only to contact PSI to seek a negotiated settlement, correct?
A. According to the retainer,

[Page 64]

J. Vaughn

yes.
Q. And then if you would read the second sentence, please.
A. "If legal action is required then the parties will discuss a different financial situation."
Q. So the first task that you gave Leeds Morelli was to go seek a settlement of your claims?
A. In correct.
Q. Well --
A. Whatever this says here is one thing, I'm telling you that is incorrect.
Q. So this contract means nothing too?
A. I didn't say it doesn't mean anything. You are asking me, and I'm being totally honest with you, no, that is not the case.
Q. You didn't understand it when you read it?
A. You got to -- okay.
Q. Did you understand?
A. Yes, I understood.

[Page 65]

J. Vaughn

Q. Did you read it?

A. Yes.

Q. Did you read it in the men's room or somewhere else?

A. I don't remember where I read it.

Q. Did you read it in their office?

A. I don't remember.

Q. Have you ever been to their office?

A. Yes.

Q. How many times?

A. I don't recall.

Q. And you read this before you signed it?

A. Yes.

Q. And you understood it?

A. I understood the agreement that I had with Leeds & Morelli, again.

Q. Now, let's go back to paragraph 6 --

A. Yes.

Q. -- read that out loud.

[Page 66]

J. Vaughn

A. "There are no other agreements between the parties other than those contained here in this agreement represents the entire understanding of the parties."

Q. Is there any word or phrase in that sentence or paragraph that you do not understand?

A. I understand it clearly.

Q. You understand it clearly?

A. Yes.

Q. So whatever agreement you had with Leeds & Morelli as of January 5, 1998 was in these two pages, right?

A. According to this, yes.

Q. According to this?

A. Yes.

Q. And so there was no other contract between you?

A. Again, do you want to talk about what is on paper or do you want to talk about what we agreed upon?

Q. You see I can only talk about what is on paper. Let's read the next

[Page 67]

J. Vaughn

sentence.

A. "All parties have read this, understood each and every term herein, and the signature below constitutes an acknowledgement of such an understanding."

Q. Now do you understand all the words there?

A. Clearly.

Q. Was that true when you signed it, when you promised and acknowledged that all, that you read it understood it; was it true at the time?

A. No.

Q. It was false?

A. Yes.

Q. So you lied when you signed your name to this contract?

A. I didn't lie no more than the person who signed above my name.

Q. Was paragraph 7 true or false when you signed it?

A. I believe I just answered that question.

Q. Tell it to me again.

[Page 68]

J. Vaughn

A. No. When you asked him to repeat the question, could you repeat the answer --

THE CHAIRMAN: Mr. Vaughn, answer the question, please.

A. The answer is yes again.

Q. It is false?

A. Yes.

Q. And number 6 is false too?

A. That is correct.

Q. And number 1 is false too?

A. That's correct.

Q. Is there anything in Respondents' Exhibit 1 that is true?

A. Yes, I retained them.

Q. That's it?

A. That's it.

Q. And you read an understood the agreement, but it was a false agreement you knew it to be false at the time you signed it?

A. Again, I understood the agreement. I understood what's in the agreement. Again, Leeds & Morelli as well

[Page 69]