J. Vaughn

1  as myself and everybody else who was
2  involved in this were under different
3  perceptions or different interpretations
4  of what was going to happen with this
5  particular situation.
6      Now, what's on paper is one
7  thing. That is the only thing right now
8  we can sit here and say we know to be true
9  that's what was put on paper. However,
10  there were other things that went on that
11  were discussed and totally a lot of this
12  stuff is maybe past the limitations of
13  even going into any further, but the fact
14  of the matter is I'm telling you as well
15  as everybody else in here that this may be
16  a statement in truth, but it's not a true
17  statement.
18      Q.   All I wanted from you was did
19  you sign the document that you knew was
20  false at the time?
21      A.   I answered that.
22      Q.   And you did that's what you
23  did, right?
24      A.   Yes.

[Page 70]

J. Vaughn

1  more, but we don't have that in our
2  paperwork here today but, yes, it was
3  more.
4      Q.   It was more?
5      A.   Yes.
6      Q.   Let me take a look then. Let
7  me mark as Respondents' Exhibit 2, a
8  five-page document.
9      (Respondents' Exhibit 2 a
10  five-page document marked for
11  identification, as of this date.)
12      Q.   Can you identify Respondents'
13  Exhibit 2 for me, Mr. Vaughn?
14      A.   Yes.
15      Q.   What is it?
16      A.   This is a document stating
17  what we were looking for in damages and
18  basically my complaint to Prudential.
19      Q.   And do you see on page 3 where
20  it says back pay damage estimated
21  $200,000?
22      A.   Yes.
23      Q.   Were they your estimated
24  damages at the time?

[Page 72]

J. Vaughn

1      Q.   Now, and you don't remember
2  where you were when you signed this
3  document?
4      A.   No.
5      Q.   Do you know who was present?
6      A.   No.
7      Q.   Now, no one from PSI was
8  present when you signed this document?
9      A.   Absolutely not.
10      Q.   And PSI had absolutely nothing
11  to do with your selection of counsel?
12      A.   No, they didn't have anything
13  to do with it.
14      Q.   That was somebody you chose on
15  your own?
16      A.   Yes.
17      Q.   Based on recommendation from
18  Ms. Hernandez?
19      A.   That's correct.
20      Q.   You gave to Leeds & Morelli a
21  calculation of your injuries and damages
22  which you computered to equal $200,000,
23  correct?
24      A.   Actually it was computed to be

[Page 71]

J. Vaughn

1      A.   These were estimated based on
2  conversations that I had specifically
3  with -- in the counsel at the time, but
4  your answer is yes.
5      Q.   Did anybody ever tell you that
6  your lawyer stood up in front of Judge
7  Coate and said you had no damages on your
8  underlying claims as opposed to your
9  theory of the class action?
10      A.   No.
11      Q.   Nobody told you that?
12      A.   No.
13      Q.   So the first time you read the
14  transcript of February 5, 2006 when Mr.
15  Bortnick asked you to read it out loud, is
16  the first time you saw that today?
17      A.   Yes.
18      Q.   So he hadn't shown you that
19  before?
20      A.   I have seen it.
21      Q.   Turn to -- you have seen it?
22      A.   Yes.
23      Q.   Have you read it?
24      A.   Yes, I read it. You asked me

[Page 73]

[19]  (Pages 70 to 73)

J. Vaughn

1 is this the first time I have seen it, I
2 said, no, I have seen it.
3     Q.   When did you see it?
4     A.   Whenever they mailed me a copy
5 of everything that we have gone through
6 thus far.
7     Q.   Okay. So turn to page 7 --
8     A.   Yes.
9     Q.   -- and if you will refer to
10 line 11?
11     A.   Yes.
12     Q.   Could you read the sentence to
13 the rest of paragraph beginning with "Mr.
14 Vaughn"?
15     A.   "Mr. Vaughn, when he settled
16 his original case with Prudential with
17 Leeds & Morelli representing him, a piece
18 of paper that said: I think these are my
19 damages is a certain amount, and
20 Prudential agreed to pay that certain
21 amount to Mr. Vaughn less, of course, the
22 contingency portion that went to Leeds
23 Morelli & Brown."
24     Q.   And if you go to page 9, line

[Page 74]

J. Vaughn

1 mediation. I do recall showing up at
2 mediation and based on what I had to say
3 they were going to assess what amount
4 would be what they would consider a
5 settlement.
6     Q.   And that amount just happened
7 to coincide with your estimate of what
8 your actual damages were?
9     A.   Yes.
10     Q.   And you got the $200,000,
11 right?
12     A.   Yes.
13     Q.   And you got the Cobra payments
14 on your behalf for six months, right?
15     A.   I don't recall.
16     Q.   You don't remember --
17     A.   I don't recall.
18     Q.   -- whether you got that
19 benefit out of the contract?
20     A.   I don't recall.
21     Q.   But you got those things
22 without having to go to court, right?
23     A.   Yes.
24     Q.   So you got what you asked for

[Page 76]

J. Vaughn

1 3, after the words "Mr. Bortnick." Could
2 you read the first paragraph there?
3     A.   "The court" --
4     Q.   No, after the words "Mr.
5 Bortnick."
6     A.   "Mr. Vaughn did not have any
7 intention to bring a one-on-one
8 arbitration because he has a damages issue
9 here and he understands that."
10     Q.   Do you know what Mr. Bortnick
11 was talking about?
12     A.   I have to read the rest of
13 this to understand that but, no, to answer
14 the question, just reading that one
15 sentence, no.
16     Q.   The fact is you submited a
17 claim in mediation for $200,000; that's
18 the claim you submitted in mediation,
19 right?
20     A.   No.
21     Q.   You submitted a larger claim
22 in mediation?
23     A.   We went to mediation I don't
24 recall ever submitting any numbers to

[Page 75]

J. Vaughn

1 without having to go to court and without
2 having a hearing like this, nobody was
3 cross examining you, were they?
4     A.   No.
5     Q.   And there were no judges
6 there?
7     A.   No.
8     Q.   No juries there?
9     A.   Not that I recall.
10     Q.   And you got 100 percent of
11 what you asked for?
12     A.   Yes.
13     Q.   And you were asserting an
14 individual claim, a claim unique to you,
15 correct?
16     A.   Correct.
17     Q.   Not on behalf of a class, if
18 you will, right?
19     A.   That's correct.
20     Q.   What is a class action?
21     A.   A class action is a group of
22 people coming together for one specific
23 issue for a common cause that would be a
24 class action in my view.

[Page 77]

[20]  (Pages 74 to 77)

J. Vaughn

Q.    Did you know what a class action was back in 1998?

A.    Again, that's probably I would have thought the same thing.

Q.    Now, are you being paid to be a plaintiff in this action?

A.    No, I'm not.

Q.    When is the first time the thought occurred to you to file a class action against my client and others?

A.    When I realized that from what I believed is that the actual agreement that I signed was when I found out they had a relationship with Prudential for whatever reasons, and that wasn't made known to me under confidentiality I would think of your client, then I thought at that point, hey, Prudential paying you and you are taking money from me. I think that there's something wrong with this, and that's when I decided to pursue it.

Q.    I asked you one question and I said "when" not what, "when"?

A.    I don't remember.

[Page 78]

J. Vaughn

A.    Yes.

Q.    That is when the thought first occurred to you?

A.    Yes.

Q.    And yet you filed a class action in October of 2004?

A.    Okay. Well, I could be off but it had to be after 2004 or about around 2004.

Q.    So it wasn't after 2004 it was in 2004?

A.    Okay.

Q.    How long before you filed a class action?

A.    I don't remember. I don't remember.

Q.    Now, whose idea was it to file a class action?

A.    Whose idea?

MR. BORTNICK:    I will object to the extent that if Mr. Vaughn had an attorney at the time that he should not reveal the substance of the attorney-client communications.

[Page 80]

J. Vaughn

Q.    Was it --

MR. BORTNICK:    I will object in terms of the tone here from Mr. Harper. If he can ask the same question without the tone.

THE CHAIRMAN:    It is cross.

Q.    All I asked you is when?

A.    I don't remember.

Q.    You don't remember?

A.    No.

Q.    Was it in 1999?

A.    I don't remember.

Q.    So it could have been 1999?

A.    No, I don't remember. I don't recall.

Q.    You don't recall?

A.    No.

Q.    Do you recall how long it was before you commenced the class action?

A.    It would have had to have been after 2004.

Q.    After 2004?

A.    Yes.

Q.    So 2005?

[Page 79]

J. Vaughn

THE CHAIRMAN:    Fine.

MR. BORTNICK:    I wasn't Mr. Vaughn's counsel at the time. But if he had other counsel.

Q.    Whose idea was it?

A.    Again, when this was brought to my attention?

Q.    By whom?

A.    By Connie Hernandez.

Q.    Connie Hernandez brought it to your attention?

A.    Yes. Then I decided to go forward with it. When that time was I don't recall. It had to be somewhere around 2004, and my reason for saying that is because prior to that I spent from 2000 to 2003 working in Atlanta for Citigroup. So when I got back up here is when this all surfaced.

A.    Who do you work for now?

A.    I work for Bloomberg.

Q.    What did Mr. Hernandez say to you and you say to her?

A.    I don't remember the exact

[Page 81]

[21]  (Pages 78 to 81)

J. Vaughn

1    conversation.
2    **Q.**    Did she mention a lawyer's
3    name?
4    **A.**    She mentioned Angela Roper,
5    yes.
6    **Q.**    And did you call Angela Roper
7    or did she call you?
8    **A.**    I called her.
9    **Q.**    And had Ms. Hernandez retained
10   Ms. Roper?
11   **A.**    I don't know.
12   **Q.**    And you have no recollection
13   whatsoever what Ms. Hernandez said to you
14   in prompting you to make a call to Ms.
15   Roper?
16   **A.**    No?
17   **Q.**    Who is Ms. Roper?
18   **A.**    My other attorney.
19   **Q.**    Mr. Thyne's partner?
20   **A.**    Yes.
21   **Q.**    Now, let's go to the
22   settlement agreement?
23   **A.**    Yes.
24   **Q.**    Between the time Mr. Hernandez

[Page 82]

J. Vaughn

1    friends you mentioned it to?
2    **A.**    No.
3    **Q.**    How about Ms. Hernandez?
4    **A.**    Ms. Hernandez is a very good
5    friend.
6    **Q.**    You mentioned to her you were
7    unhappy that you got 100 percent of what
8    you asked for in the PSI settlement?
9    **A.**    Again, some of the things that
10   we are talking about here are not stated
11   in this because these were things that,
12   number one, were either too old to talk
13   about or they are not on paper.
14         The things that I was unhappy
15   with, if I must go into detail about them,
16   was Leeds & Morelli told me that, hey, you
17   would be getting when you --
18         MR. HARPER:   I have to
19   interrupt the witness, this is
20   cross-examination.
21         MR. BORTNICK:   The question
22   was, what were different --
23         THE CHAIRMAN:   Hold on, one
24   at a time.

[Page 84]

J. Vaughn

1    spoke to you in about 2004 and the --
2    between the time you signed your
3    settlement agreement in October 1998 and
4    when you spoke to Mr. Hernandez at some
5    point, had you ever expressed unhappiness
6    about your settlement agreement with
7    Prudential?
8    **A.**    Yeah.
9    **Q.**    To whom?
10   **A.**    I mean it was just to family
11   and friends for the most part, nobody
12   legally.
13   **Q.**    Did you ever complain to Leeds
14   & Morelli?
15   **A.**    No.
16   **Q.**    Did you ever complain to PSI?
17   **A.**    No.
18   **Q.**    So other than family or
19   friends -- what members of your family?
20   **A.**    I don't remember it was just
21   family, just friends.
22   **Q.**    Your wife?
23   **A.**    It wasn't my wife at the time.
24   **Q.**    Do you remember any of the

[Page 83]

J. Vaughn

1    MR. HARPER:   If you read it
2    back the question is what did you
3    say to Ms. Hernandez.
4         THE CHAIRMAN:   Read it back.
5         (A portion of the record was
6    read.)
7         THE CHAIRMAN:   Let me say one
8    thing. Mr. Vaughn, do not make any
9    assumptions that something is too
10   old for us to hear. If counsel has
11   some objection based on time to what
12   you are going to say they will make
13   it, but don't make that assumption
14   yourself. Don't screen yourself
15   from saying something you think is
16   irrelevant. Okay.
17         THE WITNESS:   Fine.
18   **Q.**    Yes or no?
19   **A.**    It is not yes or no. I did
20   not mention to her that I was content that
21   I got 100 or upset I got 100 percent. It
22   was not 100 percent. 100 percent would
23   have been the job working for DOW, which
24   was Discrimination on Wall Street,

[Page 85]

[22]  (Pages 82 to 85)

J. Vaughn

is a company that Leeds & Morelli as well as the people at Prudential had put together for this purpose.

MS. LEWIS:  Objection.

A.    On top of that, which I have documentation for and I don't have it with us, but they also said that, hey, Jeff, you are going to get out of this deal you will get $200,000 you will have a job working with DOW and you will get long-term disability.  And I was going to their counselors for the purpose of this disability which never took place -- which never took place as well as they took 1 percent of what -- or something along those lines of the what I settled for for purposes of DOW.

So in other words I was buying into the company so I would have a job and work for and none of that existed.  Again, this is not on paper, this is something that we agreed upon and these are things that can be shown.

MS. LEWIS:  Can I note my

[Page 86]

J. Vaughn

objection for the record.  We have been told time and again by every counsel here that we were not going into the merits of these claims, all of which Leeds & Morelli denies.  And this testimony regarding DOW or promises by Leeds & Morelli is not only -- there's documents that exist that aren't here.  I mean this has no relevancy.  Even if it could be proved to what is being discussed here regarding the intentions of Mr. Vaughn regarding when he signed the agreement that said he will arbitrate the claim.

MR. BORTNICK:  I want to largely agree what we said, but what can be proved, certainly not today, but I certainly agree with what this hearing was about, it was elicited on cross-examination.  So I didn't think it was my place to object, but I do agree this is about what, as she said, I think almost a direct

[Page 87]

J. Vaughn

quote what Mr. Vaughn's intentions were at the signing of the settlement agreement, that's the sole issue I agree with her and whether this DOW was right or wrong or whatever is not part of this hearing.

MS. LEWIS:  Respectfully, part of the problem here was this door was opened on direct when Mr. Bortnick went well beyond, this is the agreement did you sign it, did you mean to sign it.  So he asked about his qualifications and experience and Mr. Harper understandably is trying to follow up on it, but at some point when we start getting to the full measure of the claims we have to object.

MR. HARPER:  I actually would only say that Mr. Vaughn can talk all he wants, but I think it all should be stricken.  I think he is not answering the exact question

[Page 88]

J. Vaughn

that I ask and on cross-examination I would ask for instruction that he listen to the question I ask and answer only that question because if you look at the questions I'm asking as opposed to the answers I'm getting, they all go to whatever issue Mr. Bortnick and Ms. Lewis think are an issue here.

THE CHAIRMAN:  Ms. Lewis' objection is overruled.  Mr. Vaughn is to answer the question.  However, there's no reason why Mr. Vaughn has to accept your characterization of something that happened, if he disagrees with it, if there is an assumption built into your question and he does not accept that assumption, he can make that known.

MR. HARPER:  Fair point.

Q.    By the way, you just talked about all these promises that were made to you that aren't on paper, none of them were made by Prudential, correct?

[Page 89]

[23]  (Pages 86 to 89)

1          J. Vaughn
2     A.     Correct.
3     Q.     Let's go to the settlement
4 agreement.
5     A.     Yes.
6     Q.     And start with paragraph 16
7 because I want to to go over it with you
8 carefully.
9     A.     Yes.
10     Q.     Let's take it one sentence at
11 a time, Mr. Vaughn --
12     A.     Yes.
13     Q.     -- paragraph 16.
14     A.     Yes.
15     Q.     "Voluntary execution," let's
16 read the first sentence out loud.
17     A.     "Vaughn acknowledges that he
18 has carefully read this agreement and
19 understands all of its terms including the
20 full and final release of claims set forth
21 above.
22     Q.     Is there anything in that
23 sentence that you do not understand?
24     A.     No.
25     Q.     Is there anything in that

[Page 90]

1          J. Vaughn
2 sentence that you did not understand at
3 the time?
4     A.     No.
5     Q.     Is there anything in that
6 sentence that was false at the time you
7 signed the agreement?
8     A.     No.
9     Q.     Let's do the second sentence,
10 and this is a little longer one, so maybe
11 we will break it down by semicolons. But
12 let's read the first part of the sentence
13 up to the first semicolon.
14     A.     "Vaughn further acknowledge
15 that he has voluntarily entered into this
16 agreement."
17     Q.     Is there anything about that
18 phrase you do not understand?
19     A.     No.
20     Q.     And you understood it clearly
21 at the time you signed the agreement,
22 correct?
23     A.     Yes.
24     Q.     And that statement is true
25 when you went into the agreement; is that

[Page 91]

1          J. Vaughn
2 correct?
3     A.     Yes.
4     Q.     The next phrase.
5     A.     "That he has not relied upon
6 any representation or statement written or
7 oral not set forth in this agreement."
8     Q.     Is there anything about that
9 sentence that you do not understand?
10     A.     Pretty much the whole thing.
11     Q.     You don't understand any of
12 it?
13     A.     No..
14     Q.     And what word don't you
15 understand?
16     A.     Anything that I just read in
17 that sentence there I do not understand.
18     Q.     Do you understand what the
19 word "relied" means?
20     A.     Yes.
21     Q.     What does it mean?
22     A.     Depended upon.
23     Q.     Do you understand what the
24 word "representation of statement" means?
25     A.     Yes.

[Page 92]

1          J. Vaughn
2     Q.     What does it mean?
3     A.     Representation of someone who
4 is being represented.
5     Q.     A fact or statement?
6     A.     Yes.
7     Q.     "Written or oral," do you
8 understand those words?
9     A.     Yes.
10     Q.     And "not set forth in this
11 agreement"?
12     A.     That I don't understand.
13     Q.     So let's break it down that
14 you have not depended upon any statement
15 of the fact whether in writing or oral
16 that isn't in the agreement?
17     A.     No.
18     Q.     No, what does it mean?
19     A.     Well, because you said it says
20 here: Any representation or statement
21 written or oral, what is meant by oral?
22     Q.     You tell me. Do you
23 understand what the word "oral" means?
24     A.     I know what the word "oral"
25 means as it pertains to this statement.

[Page 93]

[24]  (Pages 90 to 93)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

J. Vaughn

```
 1                 J. Vaughn
 2      Q.    What does the word "oral"
 3  mean?
 4      A.    I'm asking you.
 5      Q.    One of the good things and bad
 6  things about being a lawyer is that I get
 7  to ask the questions.  So what does the
 8  word "oral" mean to you in everyday life?
 9      A.    Verbal.
10      Q.    In other words not written
11  down but talked?
12      A.    Yes.
13      Q.    So we understand what the word
14  "oral" means?
15      A.    Exactly.
16      Q.    So now tell me what in this
17  sentence fragment you do not understand?
18      A.    I don't understand again where
19  it says:  That he has not -- that he has
20  not relied upon any representation or
21  statement written or oral not set forth in
22  this agreement.
23            There were things that were
24  said orally that are not in this
25  agreement.
```
[Page 94]

```
 1                 J. Vaughn
 2      Q.    On which you relied?
 3      A.    Yes.
 4      Q.    But you just told me that the
 5  first sentence was true and that you
 6  understood it to be true at the time,
 7  which is that you understood all of its
 8  terms?
 9      A.    I'm not going to say I
10  understood all of its terms.
11      Q.    You are changing the testimony
12  you gave me five minutes ago?
13      A.    I'm not changing my testimony,
14  I'm telling you I did not understand all
15  of the terms included in this.  I'm not a
16  lawyer.
17      Q.    But you said a few -- I
18  understand you are not a lawyer, but you
19  signed a contract.
20      A.    I understand.
21      Q.    And you are trying against
22  Prudential to get around the contract, and
23  I'm trying to focus on the promises you
24  made to my client when you signed the
25  contract.  And you told me not five
```
[Page 95]

```
 1                 J. Vaughn
 2  minutes ago that it was accurate and true,
 3  that you had carefully read and understood
 4  all the terms of the contract and now you
 5  are telling me two fragments later that
 6  you didn't understand what that fragment
 7  meant.
 8      A.    I'm telling you two fragments
 9  later that I did not understand all of the
10  terms.  I understood what the contract
11  represented, I did not all of the terms in
12  the contract is what I'm saying.
13      Q.    Read the next sentence
14  fragment.
15      A.    "That the only consideration
16  for signing this agreement is as set forth
17  herein."
18      Q.    Do you know what that means?
19      A.    No.
20      Q.    Do you know what
21  "consideration" is in a contract?
22      A.    Yes, I know what consideration
23  is.
24      Q.    What is it?
25      A.    (No response.)
```
[Page 96]

```
 1                 J. Vaughn
 2      Q.    Let me help you.  Is it fair
 3  to say that your understanding of the word
 4  "consideration" is the promises that
 5  Vaughn makes to PSI and the promises that
 6  PSI makes to Vaughn in a contract that is
 7  consideration and exchange of
 8  consideration?
 9      A.    I can see that, but that's not
10  what I would interpret it as.
11      Q.    You tell me what you interpret
12  it as.
13      A.    I don't understand this the
14  way it is being represented here.
15      Q.    I thought you just told me you
16  knew what consideration is?
17      A.    Again, you are going to ask me
18  about a word or are you going to ask me
19  about a message fragment.
20      Q.    Consideration in the context
21  of this agreement; do you know what it
22  means?
23      A.    No.
24      Q.    So that's another sentence
25  that you acknowledge that you don't
```
[Page 97]

[25]  (Pages 94 to 97)

J. Vaughn

1  understand the terms?
2
3     A.    Right.
4     Q.    Even though you told me you
5  did understand all the terms?
6     A.    Again, I understand what or
7  understood what the contract represented.
8  I did not understand all of the terms in
9  the contract.
10     Q.    What did this contract, this
11  contract, the written contract, what did
12  it represent?
13     A.    What it represented to me was
14  that Prudential -- I have agreed to settle
15  with Prudential on X amount of dollars,
16  and that was it, that's what that means to
17  me.
18     Q.    Did you give anything to
19  Prudential for that $200,000?
20     A.    What do you mean did I give
21  anything to them.
22     Q.    Did you make any promises to
23  Prudential?
24     A.    That the only thing that I
25  promised was that it wouldn't be something

[Page 98]

J. Vaughn

1  made to PSI in this agreement?  You gave
2  PSI a release from all claims and causes
3  of action; do you see that?
4
5     A.    Yes.
6     Q.    And yet having released all
7  those claims you are bringing a new one?
8     A.    Yes.
9     Q.    And if you go down and it
10  says:  "That the release covers any claims
11  that you ever had or may hereafter have,
12  whether known or unknown" -- this is the
13  last line -- "suspected or unsuspected up
14  to and including the date of this
15  agreement."  Do you see that?
16     A.    Yes.
17     Q.    Is there anything in there you
18  don't understand?
19     A.    I pretty much understand that.
20     Q.    And then on the top of page 2
21  it says:  Vaughn further agrees, promises
22  and covenance, that to the maximum extent
23  permitted by law that neither he" that means
24  you "for any person organization or other
25  entity acting on his behalf, has or will

[Page 100]

J. Vaughn

1  that would go to the news.
2
3     Q.    That's it?
4     A.    That was it.
5     Q.    All right.  Well, let's go
6  back to the first page of the contract --
7     A.    Yes.
8     Q.    -- of the settlement
9  agreement.
10     A.    Yes.
11     Q.    And in paragraph 4 it reads:
12         "Vaughn hereby releases and
13  discharges PSI, its parents, divisions,
14  subsidiaries and affiliations and their
15  current and former directors, officers,
16  shareholders, agents and employees and
17  each of their predecessors, successors and
18  assigns, hereinafter the company, from any
19  and all claims and causes of action except
20  for the benefits specifically set forth in
21  this agreement arising out of or relating
22  to Vaughn's employment or separation from
23  employment."  Do you see that?
24     A.    Yes.
25     Q.    Isn't that a promise that you

[Page 99]

J. Vaughn

1  file, charge, claim, sue or cause to be or
2  permit to be filed, charge or claim any
3  actions for damages or other relief -- "
4  do you see that?
5     A.    Yes.
6     Q.    -- "against the company" --
7     A.    Yes.
8     Q.    -- "involving any matter
9  occurring in the past up to the date of
10  this agreement."  Do you see that?
11     A.    Yes.
12     Q.    Is there anything there you
13  don't understand?
14     A.    I understand it.
15     Q.    You understand that was
16  something else you gave to PSI, you
17  promised not to sue PSI, right?
18     A.    Yes.
19     Q.    And you did sue PSI again?
20     MR. BORTNICK:  I will
21  object.  The basis of the lawsuit
22  which is on a well-recognized
23  exception to a release is not an
24  issue here.  The claim in that being

[Page 101]

[26]  (Pages 98 to 101)

J. Vaughn

there is a collusion between his
attorneys and Prudential, that would
void a release if --

THE CHAIRMAN:  If proven true.

MR. BORTNICK:  That is not
here for today, but he is asking him
about these issues and trying to
make it seem as if he can't even sue
them in the first place which is not
true.

MR. HARPER:  I don't
understand the objection, so I will
continue with my examination.

THE CHAIRMAN:  Fine.

Q.      Then down on paragraph 9 it
says: "Non disparagement.  Vaughn
represents that he has not and agrees that
he will not in any way disparage PSI."  Do
you see that?

A.      Yes.

Q.      Do you understand it?

A.      Yes.

Q.      But in fact you have
disaparaged PSI, correct?

[Page 102]

J. Vaughn

A.      I don't know, have I?

Q.      Well, you sued them, right?

A.      No.

Q.      You haven't sued us?

A.      No.

Q.      What are we doing here?

A.      Again, we are here to see if
this is -- if I can -- if I had any
knowledge that I could not bring a class
action suit against Prudential and the
answer to that is no.

However, have I sued
Prudential right now, this is we are here
to see if that's possible.  Do you
understand what I'm saying?

Q.      I do.  I hope you understand
that I believe you made lots of promises
to PSI that you've broken in this
agreement including the one that says that
you will not disclose directly or
indirectly except to legal advisors if
circumstances underlying this agreement
which you publicly filed a lawsuit,
correct?

[Page 103]

J. Vaughn

A.      Yes.

Q.      So you breached that too,
right?

A.      Yes.

Q.      And then you also said or
promised that any claim or controversy
arising out of or related to this
agreement or interpretation thereof will
be settled by arbitration.  That is in
paragraph --

MR. BORTNICK:  I want to
object.

A.      I think you need to say it,
how it says --

Q.      Under the then prevailing
constitution rules of the New York State
Stock Exchange Inc. or the National
Association of Securities Dealers Inc. Do
you see that.

A.      Yes.

Q.      You made that promise too?

A.      Correct.

Q.      Now, you still have my
$200,000?

[Page 104]

J. Vaughn

A.      Are you trying to be funny?

Q.      No.

A.      What does that have to do with
why we are here?

Q.      What it has to do with, I gave
you $200,000 or that is to say PSI did.

THE CHAIRMAN:  Ask a question
only.

Q.      PSI gave you the $200,000, is
that correct?

A.      Correct.

Q.      You still have it?

A.      That's not here or there.

Q.      Yes or no?

THE CHAIRMAN:  Answer the
question.

MR. BORTNICK:  I have an
objection.  We are not talking about
this is not about a recission
proceeding.  He is asking about
recission and about whether this
agreement should be rescinded.  We
paid you $200,000, you give it back
to us.

[Page 105]

[27]  (Pages 102 to 105)

J. Vaughn

1
2    Recission has nothing to to
3    what we are here for today.  Of
4    course, Mr. Vaughn cashed the check
5    or part of the check he got.  That
6    is not the issue.
7         THE CHAIRMAN:  Do you want to
8    respond to the objection?
9         MR. HARPER:  I'm asking him a
10   question and it goes to the heart.
11        THE CHAIRMAN:  He objected to
12   it and he's given his reasons for
13   objecting.  I want to know whether
14   you wanted to respond.
15        MR. HARPER:  I'm not talking
16   about recission or anything else.
17   I'm here because this gentleman is
18   saying he didn't understand what he
19   was doing when he signed the
20   agreement.  And you have heard the
21   testimony, and I'm going to leave it
22   for the most part as it is that he
23   understands one minute and doesn't
24   understand it the next.
25        THE CHAIRMAN:  So you are

[Page 106]

J. Vaughn

1    any and all costs incurred in connection
2    with any such recovery including
3    reasonable attorneys' fees.
4         Do you understand the meaning
5    of that phrase?
6         A.    Yes.
7         Q.    In paragraph 14 of the
8    settlement agreement where it says: "Any
9    claim or controversy arising out or
10   related to the agreement the interpretion
11   thereof," it doesn't say except class
12   actions, right?
13        A.    No, it doesn't.
14        Q.    You knew what a class action
15   was in October of 1998, correct?
16        A.    Yeah.
17        MR. HARPER:  I pass the
18   witness.
19        THE CHAIRMAN:  Off the
20   record.
21        (Discussion off the record.)
22        THE CHAIRMAN:  You may
23   proceed.
24        MS. LEWIS:  Thank you.

[Page 108]

J. Vaughn

1
2    saying this question is appropriate
3    because --
4         MR. HARPER:  This question is
5    appropriate because if he is going
6    to walk away from the promises he
7    made to me, I want the $200,000
8    back.  I'm wondering why if this
9    agreement is so meaningless to him
10   he hasn't given me the money back.
11        MR. BORTNICK:  That's a
12   statement.  I want my money back is
13   not the question.
14        MR. HARPER:  The question is:
15   Q.    Have you kept the money?
16   A.    Yes.
17        THE CHAIRMAN:  Objection is
18   overruled.
19   A.    Yes.
20   Q.    And finally let me go to
21   paragraph 15, and read: "Vaughn agrees in
22   the event of finding of a breach of the
23   agreement, he will forfeit to PSI all
24   amounts received pursuant to this
25   agreement, and he shall indemnify PSI for

[Page 107]

J. Vaughn

1
2    EXAMINATION BY
3    MS. LEWIS:
4         Q.    Mr. Vaughn, when you settled
5    your claim you were aware you were not
6    settling it in any court proceeding; isn't
7    that correct?
8         A.    That's correct.
9         Q.    And you were aware that by
10   settling it, you were agreeing to give up
11   the right to go to court regarding a
12   claim; isn't that correct?
13        A.    Yes.
14        Q.    And in fact when you went
15   through the mediation process before the
16   mediators where you argued in favor of
17   your claim, you knew that was in lieu of
18   going to court; didn't you?
19        A.    Yes.
20        Q.    There was never a point in
21   time when you went to the mediators and
22   you said, well, if I don't like what you
23   say then I can still file in federal
24   court; did you?
25        A.    No, I didn't say that.

[Page 109]

[28]  (Pages 106 to 109)

J. Vaughn

1
2    **Q.**    And you knew that by going to
3    the mediators to present your claim you
4    weren't going to have a jury trial either;
5    is that correct?
6    **A.**    Yes.
7    **Q.**    And I would like to direct
8    your attention back to the settlement
9    agreement.
10    **A.**    Yes.
11    **Q.**    Did anyone other than you and
12    a representative of the Prudential sign
13    the agreement?
14    **A.**    No.
15    **Q.**    There were other people making
16    claims against Prudential; is that
17    correct?
18    **A.**    Yes.
19    **Q.**    This only settled your claim?
20    **A.**    Yes, that's correct.
21    **Q.**    Did you have to get permission
22    from any of the other claimants to settle
23    your claim?
24    **A.**    No.
25    **Q.**    Did they have a vote because

[Page 110]

J. Vaughn

1
2    is that Mr. Vaughn independently
3    went into a private agreement
4    between Mr. Vaughn and Prudential
5    and nobody else participated in it.
6    And this is further evidence of the
7    fact that the class action is an
8    after-the-fact creation that has
9    nothing to do with the private
10    settlement agreement.
11    **MR. BORTNICK:**    If I had gone
12    out and bought a share of World Com
13    that was my private decision perhaps
14    with my broker to buy a share of
15    World Com. It is totally irrelevant
16    as to whether I'm going to be either
17    a class member or a class
18    representative of a lawsuit against
19    World Com or a class action against
20    World Com which had been ongoing.
21    I mean there is no relevance.
22    It is like saying the sky is blue so
23    you can't file a class action or you
24    can file a class action. It is a
25    disconnected idea.

[Page 112]

J. Vaughn

1
2    it was going to affect their claim one way
3    or another as to whether or not you settle
4    your claim?
5    **MR. BORTNICK:**    I will
6    object. I don't see any relevancy
7    even to what has been on direct or
8    cross or what has been brought up.
9    **MS. LEWIS:**    This would be my
10    cross. So I don't have to follow on
11    his cross, but the claim is that Mr.
12    Vaughn has the right to proceed in a
13    class action and that he can
14    eviscerate his individual process
15    because he wants to go in a group
16    and I think the group participation
17    in his settlement and whether or not
18    this is a one-on-one settlement or
19    something that somebody else
20    participated in because all of these
21    claims about 50 other people in the
22    works is very relevant.
23    **THE CHAIRMAN:**    And the
24    relevance is?
25    **MS. LEWIS:**    And the relevance

[Page 111]

J. Vaughn

1
2    **THE CHAIRMAN:**    The objection
3    is overruled.
4    **MS. LEWIS:**    Read back
5    question.
6    (A portion of the record was
7    read.)
8    **A.**    No.
9    **Q.**    Now in paragraph 14 it says,
10    does it not: "Any claim or controversy
11    arising out of or related to this
12    agreement"? I want to stop there.
13    **A.**    Yes.
14    **Q.**    Do you understand the words
15    "any claim or controversy"?
16    **A.**    Yes.
17    **Q.**    "Will be or the interpretation
18    thereof will be settled by an
19    arbitration."
20    Do you understand what that
21    means will be settled by arbitration?
22    **A.**    Yes.
23    **Q.**    And then it goes on to say:
24    "Under the prevailing
25    constitution rules of New York State Stock

[Page 113]

[29]    (Pages 110 to 113)

J. Vaughn

1
2 Exchange or National Association of
3 Security Dealers Inc." you understood
4 those would be the rules you would be
5 proceeding on for an arbitration; is that
6 correct?
7      A.    Yes.
8      Q.    Did you ask about what those
9 rules were going to be?
10     A.    No.
11     Q.    Did you ask whether or not you
12 would be be entitled to bring a class
13 action?
14     A.    No.
15     Q.    Did it matter to you one way
16 or the other in deciding to accept
17 $200,000 whether or not you would still be
18 entitled to bring a class action?
19     A.    No.
20     Q.    Did you understand that there
21 was any exception to the phrase, "any
22 claim or controversy" that would be
23 brought under the arbitration?
24     A.    No.
25     Q.    Did you ask if there was any

[Page 114]

J. Vaughn

1
2 exception that you could still bring
3 something in court?
4      A.    No.
5      Q.    When did you first decide that
6 you wished to bring a class action?
7      A.    When I realized Prudential had
8 a secret agreement with Leeds & Morelli --
9 when I say secret because I knew nothing
10 about it, and that they were being paid by
11 Leeds & Morelli as well as by myself.  So
12 I looked at that as a reason.
13     Q.    When you say -- I asked you
14 for when.  So why are you telling me what
15 was the basis that you think you have a
16 claim.  When did you determine that?
17         MR. BORTNICK:  I object to
18     the question because the question
19     was when, and his answer was when I
20     realized.
21         THE CHAIRMAN:  That's fine.
22     Q.    What was the date?
23     A.    I don't recall.
24     Q.    Was it before or after you
25 received full payment?

[Page 115]

J. Vaughn

1
2      A.    It would have to be after
3      Q.    Was it before or after they
4 paid you your Cobra?
5      A.    Again, Cobra is something
6 nobody paid me any Cobra or anything like
7 that.  If it was in there it's in there.
8 No one paid me Cobra or anything.
9      Q.    Nobody paid your Cobra?
10     A.    No.
11     Q.    Did you ever seek legal
12 counsel asking someone to enforce the
13 obligation in the settlement agreement
14 regarding a payment of Cobra?
15     A.    No.
16     Q.    Is that something that you
17 didn't pay attention to one way or the
18 other?
19     A.    No.
20     Q.    In paragraph 16 --
21     A.    Yes.
22     Q.    -- towards the end of the
23 paragraph it says: "Vaughn also
24 acknowledges that he has been afforded at
25 least 21 days to consider the release

[Page 116]

J. Vaughn

1
2 provision contained herein."  Was that
3 true?
4      A.    I don't know, I guess, yeah.
5      Q.    You had 21 days to consider
6 whether to release this claim in exchange
7 for payment of $200,000?
8      A.    Yes.
9      Q.    And you did that?
10     A.    Yes.
11     Q.    And after that 21 days you
12 decided to go forward and release the
13 claim against Prudential?
14     A.    This has been way beyond 21
15 days, we are talking about years now.
16     Q.    It says in the contract --
17     A.    I understand that.
18     Q.    -- that you had 21 days to
19 consider the release before you accepted
20 it, and you took that time and decided you
21 wanted to release this claim?
22     A.    Yes.
23     Q.    And in connection with that
24 you had the terms of the settlement
25 agreement?

[Page 117]

[30]   (Pages 114 to 117)

J. Vaughn

```
1              J. Vaughn
2      A.    Yes.
3      Q.    And then it also says that you
4  have seven days after signing this
5  agreement to revoke it in writing.
6      A.    Yes.
7      Q.    Did you understand that at the
8  time?
9      A.    Yes.
10     Q.    And during that seven-day time
11 period, you had the settlement agreement
12 in your possession; isn't that correct?
13     A.    Possibly.
14     Q.    Did you ask anybody for it?
15     A.    No.
16     Q.    Did you review its terms in
17 those seven days?
18     A.    Yes.
19     Q.    And after reviewing and during
20 that seven-day period you did not revoke
21 this agreement?
22     A.    No.
23     Q.    Was there any questions that
24 you directed to anybody about the
25 agreement?
```

[Page 118]

J. Vaughn

```
1              J. Vaughn
2  elapsed between the time you signed
3  whatever you signed in the bathroom the
4  agreement and the release?
5      A.    It had to be maybe a couple of
6  weeks, maybe two weeks or something like
7  that.
8      Q.    During that two-week period
9  did you have any conversations with Mr.
10 Morelli?
11     A.    When I went into his office
12 and signed the release for the check, yes.
13     Q.    Other than that, did you have
14 any other conversations with Mr. Morelli
15 at any time regarding a settlement
16 agreement?
17     A.    No.
18     Q.    Did you discuss the terms of
19 the settlement agreement when you took the
20 check?
21     A.    No.
22     Q.    Did you ask him about the
23 arbitration provision?
24     A.    No.
25     Q.    Did you ask him about the
```

[Page 120]

J. Vaughn

```
1              J. Vaughn
2      A.    Yeah.
3      Q.    Who did you speak with?
4      A.    Steve Morelli.
5      Q.    When did you speak with Mr.
6  Morelli regarding the settlement
7  agreement?
8      A.    The day I came into his office
9  and signed a release for the check.
10     Q.    So you met with Mr. Morelli
11 and you signed the agreement in his
12 office?
13     A.    Not the agreement I signed the
14 release for the check.  I had to sign a
15 release for it.  So I signed that in his
16 office, the agreement was signed in the
17 bathroom at Tavern on the Green.
18     Q.    How much time elapsed between
19 the time you were in the bathroom and the
20 time you signed the release?
21     A.    When you say the release, you
22 are talking about the agreement or are you
23 talking about the check?
24     Q.    You just said you signed the
25 release.  I'm asking you how much time
```

[Page 119]

J. Vaughn

```
1              J. Vaughn
2  class actions?
3      A.    No.
4      Q.    Did you ask him whether or not
5  I will be able to go to federal court
6  after this and sue Prudential again?
7      A.    No, because I figured that he
8  is my attorney, he would tell me that.
9      Q.    That you would be entitled --
10     A.    What my rights are at that
11 point.
12     Q.    Did Mr. Morelli tell you you
13 cannot go to federal court?
14     A.    No.
15     Q.    He never told you that?
16     A.    Never.
17     Q.    You read the agreement and it
18 said that you were releasing all claims?
19     A.    Yes.
20     Q.    Did you ask him:  What is this
21 I'm releasing all my claims?
22     A.    No, I had no reason to ask him
23 that
24     Q.    Because you understood that?
25     A.    Yes.
```

[Page 121]

[31]  (Pages 118 to 121)

J. Vaughn

1
2    **Q.**  You understood that you had to
3  arbitrate any claim or controversy under
4  the agreement?
5    **A.**  Yes.
6    **Q.**  When you went to see Mr.
7  Morelli for the release of the check, did
8  you hand him a written revocation saying I
9  don't want to go forward with this
10  agreement?
11    **A.**  No.
12    **Q.**  Did you tell Mr. Morelli at
13  that time I never agreed to arbitrate any
14  claim or controversy after this?
15    A,  No.
16    MS. LEWIS:  I have nothing
17  further.
18    THE CHAIRMAN:  Thank you.
19    MR. BORTNICK:  I have some
20  questions.
21  EXAMINATION BY
22  MR. BORTNICK:
23    **Q.**  Mr, Vaughn, when you say that
24  you signed a release in order to get the
25  check, was that a release in the form of

[Page 122]

J. Vaughn

1
2  release, it was a statement saying these
3  are the deductions from the $200,000 and
4  here is the Leeds & Morelli Brown check
5  for the net?
6    **A.**  Correct.
7    MR. BORTNICK:  Nothing
8  further.
9    THE CHAIRMAN:  Any recross.
10    MR. HARPER:  No.
11    MS. LEWIS:  Nothing further.
12    ARBITRATOR LINDBERGH:  I have
13  a question.. It is related to your
14  statement.
15    Mr. Vaughn, I'm looking for
16  the date to be specific so that you
17  can know it. It is Respondent's 2,
18  Mr. Vaughn's statement. I wondered
19  if you typed that yourself?
20    THE WITNESS:  No, I didn't.
21    ARBITRATOR LINDBERGH:  Do you
22  recall who did type it?
23    THE WITNESS:  I submitted a
24  statement which I have a copy of but
25  this I think was done at Leeds &

[Page 124]

J. Vaughn

1
2  an agreement like I promise not to sue, or
3  was it I give you the check and you are
4  released, I'm acknowledging I'm getting a
5  check?
6    **A.**  That was a statement with the
7  deductions on it for DOW and for their
8  fees and the amount of the check that was
9  going to be given to me, that's what I
10  signed that release for.
11    **Q.**  That was a check from Leeds &
12  Morelli?
13    **A.**  Yes.
14    **Q.**  It was the $200,000 settlement
15  minus certain deductions?
16    **A.**  Yes.
17    **Q.**  And if I understood what you
18  said, the release was just a document
19  saying these are the deductions?
20    **A.**  Yes.
21    MS. LEWIS:  This is redirect.
22  Why are you leading the witness like
23  this?
24    THE CHAIRMAN:  Overruled.
25    **Q.**  The release when you call it a

[Page 123]

J. Vaughn

1
2  Morelli.
3    ARBITRATOR LINDBERGH:  Nothing
4  further.
5    THE CHAIRMAN:  Mr. Vaughn,
6  several times in the course of your
7  testimony, for example, when you
8  were talking about the Leeds Morelli
9  retainer agreement --
10    THE WITNESS:  Yes.
11    THE CHAIRMAN:  -- you
12  indicated that that wasn't really
13  the full picture of what was
14  transpiring between the two of you.
15  Sometimes you called it a false
16  statement or whatever.
17    Could you elaborate on that as
18  to what the full picture was as you
19  saw it in this situation?
20    THE WITNESS:  Certainly.
21  Again, when we signed this retainer
22  or myself when I signed this
23  retainer for Leeds & Morelli, we
24  were or we had a bit of a group at
25  that point. The group had or was

[Page 125]

[32] (Pages 122 to 125)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

J. Vaughn

1
2 very much looking to take this
3 public, this was not an issue of
4 settling, this was strictly we
5 wanted to go public with it and we
6 wanted it to be -- and go to court.
7        After talking with Leeds &
8 Morelli, you know, they told to us
9 do otherwise and we followed suit
10 with that. However, as far as the
11 agreement is concerned they, again,
12 when I signed not the retainer --
13 are we talking about specifically
14 the retainer.
15        THE CHAIRMAN:   That is one
16 place.
17        THE WITNESS:  The retainer --
18 again, the retainer was signed
19 somewhere after, and if I remember
20 correctly, somewhere around the time
21 that we had already been or where we
22 had already dealt with Prudential
23 and knowing what they wanted to do
24 with the cases.  And we ended up
25 signing the retainer afterwards.  I

[Page  126]

J. Vaughn

1
2 put into this, but yes these are the
3 things you will get as part of your
4 settlement.
5        So that's why when you asked
6 questions about that I was a little
7 reluctant because I know of a
8 different story.
9        THE CHAIRMAN:  One other
10 question.  A little clarification
11 about the relationship between the
12 21 days that the agreement says that
13 you had to consider the release and
14 the signature in the bathroom; how
15 did those two -- what was the time?
16        THE WITNESS:  For the
17 signature --
18        THE CHAIRMAN:  You said you
19 signed it in the bathroom.
20        THE WITNESS:  It was about two
21 weeks afterwards, Steve called me to
22 come down to his office in Carle
23 Place, Long Island to pick up my
24 check and that was two weeks after I
25 signed this in the bathroom at

[Page  128]

J. Vaughn

1
2 know we did not all of us sign it up
3 front, the retainers.
4        As far as the settlement
5 agreement is concerned, again, and I
6 specifically said it over Prudential
7 phones which were recorded at the
8 time: Look, you guys are telling me
9 that I'm going to be working for
10 DOW, I'm going to get $200,000 that
11 is not taxable and I'm going to get
12 long-term disability.
13        The three people who were on
14 the phone was Jeff Brown, Steve
15 Morelli and Lenny Leeds, and all of
16 them agreed that's what was going to
17 happen.
18        Now when I saw this in the
19 bathroom at Tavern on the Green, I
20 specifically asked Jeff, who was the
21 one who presented it to me:  Jeff,
22 what about the long-term disability
23 what about the job for DOW.  That
24 could not be put into this -- in his
25 words, that could not actually be

[Page  127]

J. Vaughn

1
2 Tavern on the Green.
3        ARBITRATOR LUBOW:   Thank you.
4        Had you not been afforded at
5 least 21 days prior to signing it?
6 In other words, you weren't given
7 this 21 days before you signed it?
8        THE WITNESS:  No, not at all.
9 I signed it the same day it was
10 presented to me.
11        THE CHAIRMAN:   And had you
12 been presented with the substance of
13 this?
14        THE WITNESS:  Other than what
15 I've just spoke about what the terms
16 were of my settlement nothing per se
17 in writing.
18        THE CHAIRMAN:   And how long
19 before had that been presented to
20 you?
21        THE WITNESS:  It would have to
22 have been like I say maybe a week or
23 so before.  It was whenever that
24 fundraiser for Carl McCall went on,
25 that's when they informed me

[Page  129]

[33]  (Pages  126 to 129)

J. Vaughn

1  basically and the day I left
2  Prudential for the day that was the
3  day they told me if you don't want
4  to come back you don't have to come
5  back, this is what you are getting.
6  Later on I met them at Tavern on the
7  Green, where I first saw this
8  agreement and signed it there at
9  Tavern on the Green. And even then
10 they went on to say, hey, this is
11 what you are getting. This is,
12 there are certain things that aren't
13 in here, that is for whatever
14 obvious reasons but you will get
15 those things. And, again,
16 documentation, I have to prove that
17 they did try to go after those
18 things.
19     THE CHAIRMAN:   And you knew
20 you had seven days to back out of
21 this?
22     THE WITNESS:  Yes.
23     THE CHAIRMAN:  You didn't
24 consult -- did you consult another

[Page 130]

J. Vaughn

1  lawyer to review this?
2     THE WITNESS:  No.
3     THE CHAIRMAN:  Thank you very
4  much.
5     MR. BORTNICK:  Nothing
6  further.
7     MR. HARPER:  Nothing further
8  order.
9     MR. BORTNICK:  I think Mr.
10 Harper is about to say there is not
11 an issue as as to whether the
12 release was valid because he wasn't
13 afforded 21 days.  We are not making
14 the claim he was short changed in
15 the time.  It means they have to
16 hold the agreement open for 21 days
17 and he can sign it within half a
18 second of receiving it, that's
19 actually a DEA waiver.
20    MR. HARPER:  And it has
21 nothing to do with the time of the
22 execution, as Mr. Bortnick says he
23 can sign it immediately or he can
24 decide to take the full 21 days, and

[Page 131]

J. Vaughn

1  but, he does have seven days to
2  revoke it in writing and the
3  agreement, I think, specifically
4  provides that we don't cut the check
5  until the seven days passes.
6     THE CHAIRMAN:  Fine.
7     MR. HARPER:  I don't think
8  there is a controversy between the
9  parties that those time periods were
10 within the claimants' rights to
11 uphold or disregard.
12    THE CHAIRMAN:  Fine.
13    MR. HARPER:  I have nothing
14 further.
15    MR. BORTNICK:  Mr. Vaughn is
16 our only witness we have nothing
17 more to press, we rest.
18    THE CHAIRMAN:  Do you have
19 any witnesses?
20    MR. HARPER:  Prudential
21 rests?
22    THE CHAIRMAN:  Do you have
23 any witnesses, Ms. Lewis?
24    MS. LEWIS:  We rest.

[Page 132]

J. Vaughn

1     MR. HARPER:  Can I make a
2  suggestion while we have burdened
3  you with a great deal, I would like
4  to read the transcript and submit a
5  very, very short piece of paper.
6     I don't think we need, I would
7  just be repeating whatever I said in
8  terms of the closing, and if I have
9  a transcript I might think it might
10 inspire me but I'm not talking
11 anything voluminous. Ten pages
12 tops.
13    MR. BORTNICK:  I think, Mr.
14 Harper, I appreciate what he is
15 trying to say.  I think we have the
16 right for closing statements I
17 believe under the rules.
18    THE CHAIRMAN:  Sure.
19    MR. BORTNICK:  I would like
20 to use my right.
21    THE CHAIRMAN:  You say you
22 want to file a posthearing brief?
23    MR. HARPER:  Yes.
24    MR. BORTNICK:  So we can

[Page 133]

[34]  (Pages 130 to 133)

J. Vaughn

1 argue after the closing about that?
2 THE CHAIRMAN: Yes. One
3 doesn't exclude the other.
4 MR. BORTNICK: I think I may
5 have misunderstood him. I intend to
6 burden you a little.
7 MR. HARPER: I know the rules
8 say it, but I was hoping to forebear
9 from the closing statement.
10 MR. BORTNICK: You need not
11 to.
12 THE CHAIRMAN: Proceed.
13 MR. BORTNICK: Rule 10301-D,
14 subsection 3 of the NASD rules. No
15 member or associated person -- we
16 are talking about Prudential here --
17 shall seek to enforce any agreement
18 to arbitrate against a customer,
19 other member or person associated
20 with the member who has initiated in
21 court a punitive class action --
22 that would be Mr. Vaughn -- or is a
23 member of a punitive or certified
24 class, with respect to any claims

[Page 134]

J. Vaughn

1 encompassed by the class action
2 unless and until -- and there's a
3 four separate things set out. For
4 example, unless and until the court
5 decides not to certify the class or
6 one of the class members opt out,
7 for example. But the point of the
8 rule is clear, Prudential under rule
9 10301-D3 is not even allowed to be
10 doing what it is doing here, and
11 that's why a statement of claim we
12 have specifically sought the relief
13 of a disciplinary referral against
14 Prudential because it is a direct
15 violation of this rule what they are
16 doing here, that's number one.
17 Number 2, this panel has had
18 way too much paper on why we are
19 here, and that's why I wanted today
20 read into the record what Judge
21 Coate said. She wanted to know --
22 she wanted the arbitrators to
23 decide, not her, because we had
24 initially argued she should decide

[Page 135]

J. Vaughn

1 and she said, no, it is for the
2 arbitrators to decide what was the
3 intention of the parties when the
4 agreement was signed. Specifically,
5 what was the intention with respect
6 to class actions.
7 She came up with three things
8 that she thought might be possible.
9 And one of them no one is arguing.
10 No one is arguing that it was the
11 intent of the parties to have class
12 arbitration, so we are left with
13 two, two possibilities. Okay.
14 So we want to know what the
15 intent of the agreement is. That's
16 easy, we swear, we put under oath
17 and ask the people that signed the
18 agreement, the people that entered
19 into the agreement, Mr. Vaughn and,
20 well, I thought Prudential.
21 Obviously, Leeds & Morelli
22 can't do it. The only thing they
23 possibly could have done, and I
24 thought they might be doing because

[Page 136]

J. Vaughn

1 Mr. Brown was on the witness list
2 because maybe he was going to show
3 up and said I advised Mr. Vaughn
4 that so forth and so on, but he
5 didn't say that, he wasn't here to
6 say that.
7 The only testimony you had is
8 Mr. Vaughn's testimony, and he
9 clearly said I didn't intend to
10 waive a class action. I did not
11 intend to make some kind of waiver
12 with conflict with the other part of
13 rule 10301 which has no class
14 actions at the NASD.
15 I was frankly shocked that
16 Prudential, at least at first I was
17 shocked that Prudential did not put
18 any witnesses on their witness list
19 and did not have anybody appear to
20 say what Prudential's intent was,
21 because then you would have a "he
22 said, she said." Mr. Vaughn says
23 one thing and Prudential would say
24 the other, and the panel would have

[Page 137]

[35]   (Pages 134 to 137)

J. Vaughn

1  to figure it out.
2  We can only speculate, but
3  perhaps the best reason, the one
4  that makes the most sense is that
5  nobody from Prudential showed up is
6  because no one from Prudential was
7  going to come here and say something
8  that wasn't true. But it really
9  doesn't matter the only testimony
10  you have is Mr. Vaughn, that is the
11  only thing that can be relied on as
12  far as what were the intentions of
13  the parties not what is the basis of
14  Mr. Vaughn's class action case, not
15  whether he was happy with his
16  attorneys, not whether he thinks he
17  has to pay $200,000 back to
18  Prudential to continue in court.
19  That is all just more than
20  window dressing. It is the circus
21  around why we are here. And you
22  only heard testimony from one
23  witness about intent and that's why
24  this case was sent here, and so

[Page 138]

J. Vaughn

1  MR. HARPER:  Yes.
2  MR. HARPER:  Mr. Bortnick,
3  consistently overlooks Rule 10216-F
4  of the NASD rules which says, if a
5  member or a current or former
6  associated person of a member files
7  in court of the claim against a
8  member or current or former
9  associated person of a member that
10  includes matters that are subject to
11  mandatory arbitration, identified by
12  the rules of the association or by
13  private agreement, the defendant
14  party may move to compel arbitration
15  of the claims that are subject to
16  mandatory arbitration.
17  Pursuant to that right and
18  that rule we made a motion to compel
19  that the United States federal
20  district court granted in the face
21  of precisely the argument Mr.
22  Bortnick is making to you this
23  morning.
24  So the idea that we were in

[Page 140]

J. Vaughn

1  really there is nothing left to do.
2  I don't see how there could be any
3  finding that there was an intent to
4  waive class action claims because
5  you heard no competent evidence that
6  would support that.
7  So we are left here in the
8  situation where the panel really, at
9  least in my view, has no choice but
10  to make a finding that the class
11  action can go forward and, frankly,
12  that Prudential should be, at least
13  that the panel doesn't have the
14  ability for a regulatory
15  disciplinary -- not to actually
16  impose the discipline, but it has
17  the panel to make the referral to
18  the appropriate district because it
19  is a clear violation of the rule in
20  trying to enforce a no class action
21  clause that they are not allowed to.
22  MR. BORTNICK:  Thank you.
23  THE CHAIRMAN:  Anything
24  further?

[Page 139]

J. Vaughn

1  violation of this rule, and I note
2  that the rule on which Mr. Bortnick
3  relies 10301, does not refer to a
4  formerly associated person. They
5  could have put that in the rule,
6  they didn't, but they did put it in
7  the rule on your right to move to
8  compel.
9  Now, I'm at something of a
10  disability here because the lawyers
11  in the room know that in connection
12  with a communication between Mr.
13  Vaughn and his personally chosen
14  lawyer the lawyer Prudential had
15  absolutely nothing to do with
16  selecting for him. Prudential had
17  no right at all to communicate with
18  Mr. Vaughn directly that's an
19  ethical road in the Code of
20  Professional Responsibilities in New
21  York and in every model Rule of
22  Professional Conduct in the 50
23  jurisdictions.
24  So Prudential is uniquely

[Page 141]

[36]  (Pages 138 to 141)

J. Vaughn

1
2  disabled from having any knowledge
3  of what was said between Mr. Vaughn
4  and his lawyers that was subject to
5  a privilege at the time. And one
6  that would have sent us to ethics
7  jail had we attempted to try and
8  communicate with Mr. Vaughn about
9  the meaning of the agreement that
10  was for his handpicked lawyer to do,
11  and it is deeply unfair for Mr.
12  Vaughn to come in here and say he
13  has a right to sue me because his
14  handpicked lawyer he claims he
15  didn't understand the agreement that
16  between PSI and his lawyer because
17  his lawyer didn't explain it to him.
18  Now, Mr. Bortnick says Prudential
19  has no witness on intent and the
20  reason we have no witness on intent
21  is because Prudential expressed its
22  intent in plain, clear, unambiguous
23  language in the agreement and for
24  Mr. Bortnick to suggest that the
25  only evidence before you is Mr.

[Page 142]

J. Vaughn

1  the judge says in her transcript.
2
3  So I think it is pretty clear
4  when you sign on to a arbitration
5  clause with an individual claim,
6  remember all he had was a individual
7  claim, not a class claim. He had an
8  individual claim that he was
9  discriminated against. And he said
10  he wanted to be paid $200,000, and
11  he was by PSI in a mediation
12  process.
13  The system worked. The law
14  favors these kind of alternative
15  dispute resolution mechanisms. And
16  in Mr. Vaughn's case, it worked very
17  handsomely for him. And it would be
18  I think an unmistakeable inference
19  arising from the clear and
20  unambiguous language of the contract
21  that when a person settles an
22  individual claim and agrees to
23  arbitrate any dispute over the
24  settlement agreement. For example,
25  if he doesn't get his Cobra, which I

[Page 144]

J. Vaughn

1  Vaughn's ever changing ever shifting
2  testimony about what he understood
3  and didn't understand what was true
4  and what wasn't true is the only
5  evidence before you is quite untrue.
6
7  Of course, you have before you
8  the agreements that he signed that
9  very clear and unambiguous language
10  in them. Equally clear and
11  unambiguous is the transcript of
12  Judge Coate in response again to
13  exactly the arguments exactly the
14  arguments that Mr. Bortnick is
15  making to you, quote, the plaintiff
16  clearly agreed to the arbitration of
17  his claims.
18  And I ruled that the
19  arbitration agreement was valid and
20  enforceable and that legally was not
21  in dispute, and that what this panel
22  was to decide was what kind of
23  arbitration proceedings we would
24  have, what kind of arbitration
25  proceedings we would have, is what

[Page 143]

J. Vaughn

1  happen to believe not to be true,
2  but I don't have the document here
3  to demonstrate it as a statutory
4  segue, so it would be quite bizarre
5  for Cobra not to have worked in
6  those circumstances. It is
7  egregiously unfair for Prudential to
8  have to be confronted again by
9  someone it settled with and be paid
10  in a clear and unambiguous contract,
11  what is now almost nine years ago or
12  eight years ago, at some point it is
13  time to stop. Thank you.
14  THE CHAIRMAN: You are next.
15  MS. LEWIS: Let me start with
16  this, which is where we ended when
17  we were opening. Which is the
18  propriety of having Mr. Vaughn
19  testify at all.
20  And I think that Mr. Vaughn's
21  testimony was the quintessential
22  example of the wisdom of the law
23  that says when you have an agreement
24  the intent of the parties is the

[Page 145]

[37]  (Pages 142 to 145)

J. Vaughn

1  objective intent, based upon the
2  words in that agreement, and not the
3  ability of the individuals to go
4  back and try to remember what they
5  did or did not intend eight years
6  ago or nine years ago, whatever it
7  is.
8      Mr. Vaughn demonstrated that
9  he understood certain parts and
10 other parts maybe did not understand
11 other parts, he didn't read some.
12 Maybe he didn't read others very
13 conveniently. And let us be honest,
14 Mr. Vaughn, and his counsel will
15 have to go back to federal court in
16 order to seek his money, they have
17 not sought any money here. They
18 have conveniently turned the
19 standard on its head, the court did
20 not refer to this court or to the
21 panel I mean the question of whether
22 or not there was a knowing waiver of
23 class actions. What was referred
24 was a question of the interpretation

[Page 146]

J. Vaughn

1  arbitrated, can be brought back to
2  court, notwithstanding that
3  unambiguous clause because he has
4  chosen to designate himself as the
5  head of a class, when based upon an
6  individually negotiated settlement
7  puts this in a particularly unique
8  position.
9      Now in preparing for this
10 hearing I actually went onto the
11 NASD website, and the NASD website
12 has a section that talks about we
13 are not just looking to help the
14 industry and the customers and the
15 securities, we can offer dispute
16 resolution to the commercial world
17 and delve into individual questions
18 and individual issues.
19     This is not a customer claim,
20 this is not even an employment
21 claim. This is a commercial
22 contract, a settlement agreement.
23 And in that settlement agreement,
24 the parties unambiguously agreed

[Page 148]

J. Vaughn

1  of the arbitration clause. And the
2  testimony to the extent that it was
3  consistent at all, was consistent
4  with Mr. Vaughn knew and understood
5  that any claim or controversy
6  arising in connection with the
7  agreement or its interpretation was
8  to be arbitrated.
9      And whether or not or what the
10 rules were, he didn't inquire, he
11 didn't care, he wanted his $200,000
12 and he received his $200,000. He
13 had opportunities to ask questions,
14 he had opportunities to revoke, he
15 didn't, as he testified, he just
16 didn't care. That subsequently in
17 order to evade and, frankly,
18 fundamentally attack the quality of
19 the alternative dispute resolution
20 process, Mr. Vaughn, and his counsel
21 can put his name in front of a
22 punitive class action and claim that
23 his individual claims that the court
24 has already determined must be

[Page 147]

J. Vaughn

1  they were going to submit any claim
2  or dispute and Mr. Vaughn has
3  testified that he understood that
4  that should be the end of the
5  question that that should be this
6  body in respect for arbitration and
7  the alternative dispute process
8  should have the discretion to say,
9  he understood the clause, he
10 understood everything, and it says
11 on its face any claim or
12 controversy. And we will go no
13 further than that because the rest
14 was just the rules that were going
15 to be applied in that proceeding.
16     In other words, as Mr. Harper
17 aptly quoted what the court said:
18 What the arbitration is going to
19 look like, not whether or not an
20 arbitration was going to be
21 conducted or not.
22     I would ask again that Mr.
23 Vaughn's testimony be stricken
24 because it should not be relevant to

[Page 149]

J. Vaughn

1
2  this conversation. And point out in
3  response to Mr. Bortnick's comments
4  that is the reason why we didn't
5  compound the error by putting any
6  witness on at this time.
7      The last thing is I would be
8  remiss if I didn't go back and
9  remind about the individual
10  respondents, you heard no word of
11  testimony or heard no word in
12  argument they do not belong here and
13  in due difference to the panel there
14  has been no referral to
15  jurisdictional issues nor could
16  there be. Thank you.
17      MR. BORTNICK:    I have a very
18  brief rebuttal.
19      THE CHAIRMAN:  Yes.
20      MR. BORTNICK:  Over and over
21  I hear from Prudential as well as
22  the Leeds & Morelli firm the
23  individual that this is clear and
24  unambiguous, the arbitration clause
25  is clear and unambiguous. If it was

[Page 150]

J. Vaughn

1
2  language and it is clear on its
3  face, but instead to say:  We knew
4  what we were doing when we stuck
5  this in the agreement. We drafted
6  the agreement and we put this clause
7  in because we wanted to make sure
8  there would never be a class action.
9  That is easy to do, but they didn't.
10      I think we probably can guess
11  why. The same thing for the Leeds &
12  Morelli defense. You could have put
13  on Mr. Brown when he said:  I told
14  Mr. Vaughn that, but they didn't
15  and, of course, we know why it's
16  because that conversation with Mr.
17  Vaughn and Mr. Brown never took
18  place; so, in fact, these parties
19  are uniquely qualified to defend.
20  Thank you.
21      THE CHAIRMAN:  Thank you.
22  First of all, we are complete here.
23  If that was a request that his
24  testimony be stricken, it is denied.
25  And I have a couple of questions for

[Page 152]

J. Vaughn

1
2  so clear and unambiguous, we never
3  would have been here.  The judge
4  would have said:  Off to arbitration
5  you go. Instead she said, the
6  arbitrators have to figure out what
7  it means, and I can think of, she
8  says at the top of page 4 of the
9  transcript at least three different
10  things and maybe there are more.  It
11  was clearly ambiguous to her at
12  least.
13      And that's why she said, and I
14  quoted earlier, you need to figure
15  out the arbitrator -- she said the
16  arbitrator, but we are talking about
17  a panel here -- what are the party's
18  intentions, that is the word she
19  uses "intentions." We read that
20  earlier.
21      And so Prudential is not
22  uniquely disabled, it is uniquely
23  qualified to put on a defense here.
24  Bring up the Prudential witness who
25  is not going to say I can read the

[Page 151]

J. Vaughn

1
2  the lawyers which I hope will help
3  us.
4      First of all, Mr. Bortnick, I
5  apologize for mangling your name
6  before. Why isn't it appropriate to
7  read the reference in the provision.
8  The reference to the NASD rules as
9  shorthand for no class actions.
10      MR. BORTNICK:  You mean in
11  this context or generally speaking?
12      THE CHAIRMAN:  I don't think
13  it makes a difference.
14      MR. BORTNICK:  I'm sorry, I
15  just don't understand the question.
16  You mean in this particular case or
17  this context or other.
18      THE CHAIRMAN:  I'm not sure
19  there is any difference.
20      MR. BORTNICK:  There is in
21  the sense there are class actions as
22  the panel is aware that go on every
23  day against the securities industry.
24  I mean there must be hundreds in
25  court right now, you know, that's an

[Page 153]

[39]  (Pages 150 to 153)

J. Vaughn

1
2  everyday occurrence, all the 10B5
3  cases, the tort reform, and so
4  forth.  Of course there are class
5  actions that exist.  And the rule is
6  there because the NASD for the stock
7  exchange are equipped as forums to
8  handle the administration of a class
9  action.  They've decided there are
10  certain kinds of cases they are not
11  going to hear, class actions are one
12  of them.
13        It doesn't mean that I as a
14  buyer, and I never bought World Com
15  at least not to my knowledge I
16  bought a mutual fund, but as a
17  purchaser of World Com doesn't mean
18  I've waived my rights to a class
19  action against you know there were
20  lawsuits against --
21        THE CHAIRMAN:  I don't think
22  you understand me.  There is a
23  provision here it says: Here is
24  what is going to happen if there is
25  a dispute, we are going to go to

[Page 154]

J. Vaughn

1
2  bringing a class action against
3  Merrill Lynch for wrong research or
4  CSFP is a better example because
5  those were the claims that were made
6  by other firms not me.  So everybody
7  has the same agreement when you have
8  a customer agreement in a customer
9  case, I agree to -- if I have a
10  dispute with my broker, Merrill
11  Lynch, I agree to arbitrate pursuant
12  to the rules of the NASD but not for
13  class actions, that's why the class
14  actions exist.
15        Moreover, it is a question of
16  what is the intent of the actual
17  people, what is the intent to them
18  at the time they are signing it, the
19  two parties to get down to the
20  micro.  And that's why I said
21  Prudential should have had someone
22  saying what they thought it meant.
23        THE CHAIRMAN:  Suppose the
24  NASD has more onerous pleading
25  rules -- just hypothetical -- than a

[Page 156]

J. Vaughn

1
2  arbitration under the rules of the
3  NASD.  And I'm wondering why it is
4  not appropriate to read that phrase
5  as "just as it means whatever the
6  time periods are for pleading in the
7  NASD as no class actions" it is a
8  different way of saying it, in other
9  words.
10        MR. BORTNICK:  I understand.
11  First of all, because this is also
12  the rule that firms aren't allowed
13  to oppose a class action claim that
14  I read to the panel.  But the
15  fundamental issue here is by
16  agreeing to arbitrate, pursuant to
17  the rules of the NASD -- which is
18  pretty near exactly what the
19  agreement says -- the rules are
20  clear, just like anyone else that is
21  arbitrating, I agree to arbitrate
22  pursuant to the rules of NASD if I
23  buy a share of World Com from my
24  broker at Merrill Lynch.  It doesn't
25  mean I have been prohibited from

[Page 155]

J. Vaughn

1
2  judicial process, has a shorter
3  statute of limitations than the
4  judicial process; how is that
5  different from the case where the
6  claimant says -- the claimant says I
7  didn't mean to submit to those
8  rules, those rules are tougher than
9  the rules in the judicial process, I
10  didn't mean to submit to those.
11        MR. BORTNICK:  Again,
12  perhaps, I'm not understanding the
13  question.  He is agreeing to submit
14  to rules that prohibit class actions
15  from being heard in this forum, but
16  permit them to go on in the courts.
17  That's why I use the example of all
18  security industry class action
19  cases.  To my knowledge nobody's
20  ever argued to any NASD or New York
21  stock exchange panel when MillBerg
22  Weiss or Burnstein Lidowitz the mega
23  class action firms bring a class
24  action case against the securities
25  industry like Prudential or similar

[Page 157]

[40]  (Pages 154 to 157)